**UNITED STATE DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| DUSTIN BURNIKEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:15-cv-00050 |
| | ) | |
| MICHAEL FONG, GREG WESSELS and | ) | **APPENDIX** |
| CITY OF DES MOINES, IOWA | ) | |
| | ) | |
| Defendants. | ) | |

**TABLE OF CONTENTS**

Description                                                                      Page

Excerpts of Plaintiff Dustin Burnikel's Deposition                                 1

Excerpts of Defendant Off. Michael Fong's Deposition                              19

Excerpts of Defendant Sgt. Greg Wessels's Deposition                             29

Excerpts of Sgt. Garth House's Deposition                                         39

Excerpts of Lt. Larry Davey's Deposition                                         44

Excerpts of Sgt. Ronald Kouski's Deposition                                       51

Excerpts of Cpt. Paul Stout's Deposition                                          54

Photo Taken by the Des Moines Police Department of Plaintiff's Face                67

Photo Taken by the Des Moines Police Department of Plaintiff's Back                68

Excerpts of Plaintiff's Medical/Dental Records                                     69

Excerpts of Lt. Joseph Leo's Deposition                                           77

Arrest Incident Report                                                            85

Use of Force Investigation                                                       104

| Description | Page |
| --- | --- |
| Excerpts of Plaintiff's Chiropractic Records | 117 |
| 2008 Oral Reprimand of Wessels (Taking Handcuffed Suspect to Ground) | 136 |
| 2008 1-Day Suspension of Wessels (Punching Handcuffed Suspect) | 139 |
| 2013 4-Day Suspension of Wessels (Hitting Handcuffed Suspect) | 144 |
| 2005 2-Day Suspension of Wessels (Accessing Pornography) | 156 |
| 2008/2009 3-Day Suspension of Wessels (Insubordination) | 169 |
| 2013 2-Day Suspension of Wessels (Improperly Shooting at a Moving Vehicle) | 175 |
| 2002 2-Day Suspension of Wessels (Insubordination) | 184 |
| 2013 Written Reprimand of Wessels (Failure to Investigate an Alleged Assault) | 213 |
| 2005 Written Reprimand of Wessels (Directing Profanity Toward a Citizen) | 222 |
| 2008 5-Day Suspension of Fong (Punching Handcuffed Subject) | 228 |
| Annual Reviews for Wessels | 230 |
| 2007 Annual Review for Fong | 265 |
| Complaint | 268 |
| Answer | 292 |

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - -X
DUSTIN BURNIKEL,                :
                               :
        Plaintiff,             :
                               :
vs.                            :
                               :
MICHAEL FONG, Individually     :
and in His Official Capacity   :
as a Law Enforcement Officer   :
with the Des Moines, Police    :
Department; GREG WESSELS,       : Case No. 4:15-cv-00036
Individually and in His        :
Official Capacity as a Law     :
Enforcement Officer with the   :
Des Moines Police Department;  :
and CITY OF DES MOINES, IOWA,  :
                               :
        Defendants.            :
- - - - - - - - - - - - - -X


DEPOSITION OF DUSTIN BURNIKEL,

taken by counsel for the Defendants before Theresa

Kenkel, Certified Shorthand Reporter of the State of

Iowa, at 701 13th Street, West Des Moines, Iowa,

commencing at 9 a.m., Monday, January 4, 2016.


THERESA KENKEL - CERTIFIED SHORTHAND REPORTER

PETERSEN COURT REPORTERS
515-243-6596
PL.APP.000001

**2**

APPEARANCES:

For the Plaintiff:    JUSTIN K SWAIM ESQ
    Swaim Law Firm PLLC
    701 13th Street
    Suite 2
    West Des Moines Iowa 50265

For the Defendants:    JOHN O HARALDSON ESQ
    Assistant City Attorney
    400 Robert D Ray Drive
    Des Moines Iowa 50309-1891

**3**

I N D E X

WITNESS        EXAMINATION

Dustin Burnikel    4 - Haraldson

E X H I B I T S

DEPOSITION EXHIBITS    MARKED

1 - Excerpts from Northeast Iowa Mental    69
    Health Center records

2 - Letter from the Amateur Athletic    88
    Union 2/14/14

3 - Letter from the Regional Health    106
    Services 11/23/15

4 - Records from the Regional Health    108
    Services of Howard County

**4**

1    P R O C E E D I N G S

2    DUSTIN BURNIKEL

3  called as a witness by counsel for the Defendant

4  being first duly sworn by the Certified Shorthand

5  Reporter was examined and testified as follows:

6    EXAMINATION

7  BY MR HARALDSON:

8    Q. Mr Burnikel where do you presently reside

9  your street address?

10    A. 4692 Timber Avenue.

11    Q. And that's in what town?

12    A. Lime Springs, Iowa.

13    Q. How long have you lived at that address?

14    A. About three years.

15    Q. How big a town is Lime Springs?

16    A. Very small; 1500 people, maybe.

17    Q. What's the nearest town to Lime Springs?

18    A. Cresco.

19    Q. How big is Cresco?

20    A. 3,500.

21    Q. Okay So it's a metropolis next to a

22  metropolis?

23    A. Yeah.

24    Q. Near of course this megalopolis

25    A. Yeah.

**5**

1    Q. And that's up in northeast Iowa?

2    A. Yes.

3    Q. What county is that?

4    A. Howard.

5    Q. How old a man are you?

6    A. I'm 34.

7    Q. And where are you from originally? Where

8  were you born?

9    A. Same place; Cresco, Iowa, in the hospital,

10  but--

11    Q. Okay Have you lived in Cresco your whole

12  life--

13    A. Yes.

14    Q. --or Lime--that area? Is that fair to say?

15    A. Yeah.

16    Q. Have you ever lived outside of it for any

17  period of time?

18    A. No.

19    Q. Never served in the military? No?

20    A. Nope.

21    Q. Never went to college?

22    A. Nope.

23    Q. And what do you presently do for work as of

24  today?

25    A. I own a tree service, Dusty's Total Tree

6

1 Service, and I work part-time at a plumbing and
2 heating company.
3    Q.   What's the name of the plumbing and heating
4 company?
5    A.   Piaker Plumbing & Heating.
6    Q.   Can you spell that?
7    A.   P-i-a-k-e-r Plumbing & Heating.
8    Q.   How many hours a week do you do that job?
9    A.   Thirty.
10   Q.   And how many hours a week do you do your
11 tree service?
12   A.   None right now.
13   Q.   Okay.
14   A.   I'm just working part-time at the plumbing
15 place.
16   Q.   Is it off season for tree removal?
17   A.   Yeah.
18   Q.   What's the season for that job?
19   A.   Usually it runs pretty close to December,
20 then I usually--then I would log, but I don't do that
21 anymore.
22   Q.   Have you ever been deposed before, what
23 we're doing here today?
24   A.   No.
25   Q.   Okay.  I know you've given testimony before

7

1 because I believe you testified at your misdemeanor
2 trial; is that right?
3    A.   Yes.
4    Q.   But other than today and that instance, have
5 you ever had to give testimony under oath before?
6    A.   No.
7    Q.   All right.  One thing that I think we're
8 both doing, and it's my fault, is we're sort of
9 talking over each other, and I think that's because
10 you think you know what I'm going to ask, and I think
11 I know what you're going to say.  It's not a
12 difficult question to ask where you live, and so on.
13 But one thing, for the court reporter's convenience,
14 wait until I'm finished asking the question, and then
15 I'll wait until you've finished the answer before I
16 talk again.
17        I think, just judging, both you and I
18 probably talk quicker, so the court reporter
19 hopefully will not hit one of us.  At least let's
20 avoid talking over one another.
21        If at some point today when I'm asking you a
22 question, if you don't understand the question,
23 probably because I phrased it improperly, just let me
24 know and I'll try to rephrase it.  Otherwise I'm
25 going to assume you understand it, okay?

8

1    A.   Okay.
2    Q.   Have you reviewed any documents or anything
3 to get ready for your testimony today?
4    A.   I looked through them.
5    Q.   Do you remember in general what you looked
6 through?
7    A.   The--my testimony for the Court, and my
8 interrogatory answers.
9    Q.   Okay.  All right.  Anything else that you
10 can think of?
11   A.   No.
12   Q.   Okay.  And have you ever--obviously you're
13 the plaintiff in this lawsuit.  Have you been the
14 plaintiff in a lawsuit before?  Do you know what that
15 means?  The person bringing the case?
16   A.   No, I haven't.
17   Q.   I know that at least on one occasion you've
18 been the defendant before.  That was the misdemeanor
19 trial in the spring of 2013, and I know that your
20 lawyer sent me some documents, publicly available, so
21 I knew about it a little bit, your criminal history,
22 the times you've been arrested.  But none of
23 those--other than the misdemeanor trial in May, none
24 of those ever went to trial?
25   A.   No.

9

1    Q.   Okay.  Can you give me a background of your
2 educational history?
3    A.   I graduated from Crestwood High School in
4 2000.  I took continuing education classes in
5 horticulture.  I got my horticulture certificate from
6 the City of Minneapolis to work for the City of
7 Minneapolis.  And that's basically--that's it.
8    Q.   Did you say Crestwood?
9    A.   Crestwood High School, yeah.
10   Q.   That's in Cresco?
11   A.   Cresco, Iowa, yeah.
12   Q.   Okay.  All right.  Now, you said you got a
13 certificate from the City of Minneapolis.  Was that
14 an Extension course, or was that something you went
15 up there and did?
16   A.   It's an Extension course.  It's required to
17 work for the City of Minneapolis, you do have to be
18 certified.  It's just a safety--basically a safety
19 class.
20   Q.   Is that something you had to go to
21 Minneapolis to take, or were you able to take that
22 online?
23   A.   I had to go to Minneapolis to take it.
24   Q.   How long did that course work take?
25   A.   Six hours.

PL.APP.000003

10

1   Q.   So it was like a weekend trip, so to speak?
2   A short trip to Minneapolis?
3      A.   Yeah.
4      Q.   When did you graduate high school?
5      A.   2000.
6      Q.   And then you said you--would the City of
7   Minneapolis--that certificate would be the extent of
8   your post--I know you summarized something for me,
9   I'm just trying to recall.  Is that the only
10  certificate you have, other than your high school
11  diploma?
12     A.   Yes.
13     Q.   When did you get that?  Just best estimate
14  is fine.
15     A.   2007-ish.
16     Q.   All right.  Was that certificate viable for
17  a certain period of time?
18     A.   One year.
19     Q.   Did you apply to work in Minneapolis in that
20  time frame?
21     A.   I actually was working for Wilson Custom
22  Tree, but to be on his crew, I had to be certified.
23     Q.   Oh, okay.  And we have something in the
24  record about Wilson Custom Tree.  Is that someone you
25  subcontract with on occasion?

11

1      A.   Yes, now.  Back when I had my certificate, I
2   actually worked for Wilson Custom Tree.
3      Q.   Where are they located?
4      A.   Cresco, Iowa.
5      Q.   That's their home office?
6      A.   Yes.
7      Q.   The owner of that is a Justin?
8      A.   Jeff.
9      Q.   And do you have any brothers or sisters?
10     A.   Three sisters.
11     Q.   Where do you rank in the family?  Oldest?
12  Youngest?  Somewhere in the middle?
13     A.   Second to last.
14     Q.   Do all of your sisters live in the area?
15     A.   Yes.
16     Q.   And how about your parents?  Are your
17  parents still alive?
18     A.   Yes.
19     Q.   And where do they reside?
20     A.   5881 Timber Avenue, a mile from my house.
21     Q.   And I know you have two children?
22     A.   Yes.
23     Q.   So I imagine your parents are involved in
24  them?
25     A.   Yes.

12

1      Q.   And what are the ages of your two kids?
2      A.   13 is Treyton Burnikel, and 6 is Blake
3   Burnikel.
4      Q.   The middle name is Brickle?
5      A.   Last name is Burnikel.
6      Q.   Burnikel.  Oh.  Okay.  You're used to saying
7   it.  You probably just pronounce it differently than
8   I do, speed it up a little bit.
9           What's the other--Treyton and who?
10     A.   Treyton and Blake.
11     Q.   Both boys?
12     A.   Yes.
13     Q.   How old is Blake?
14     A.   Six.
15     Q.   And are your parents retired?  Still work?
16     A.   They still work.
17     Q.   What do they do?
18     A.   My mother is the owner of Total Look School
19  of Cosmetology and Massage Therapy.  It's a college.
20     Q.   Okay.
21     A.   And my dad works as a county supervisor for
22  Howard County, and works at SMI, Seedorff Masonry.
23  It's a pallet factory.
24     Q.   SMI?
25     A.   Yes.

13

1      Q.   Do you know what SMI stands for?
2      A.   Seedorff Masonry, Incorporated.
3      Q.   That's a pretty big employer in Cresco?
4      A.   Yeah.  Yes.
5      Q.   And, let's see, you presently live with your
6   two kids?
7      A.   Yes.
8      Q.   And do you live with anyone else?
9      A.   No.
10     Q.   Now, I'm just going to cover this a little
11  bit.  I know you testified--I've got all your sworn
12  testimony, about your recollection of what happened,
13  from May 2013, and I'll just say I'm not going to ask
14  you about that.  I'm not going to stick that in front
15  of you and ask you to read it, I'm just going to ask
16  you a few questions about what happened that day,
17  specifically, I believe, February 16th, 2013; is that
18  right?
19     A.   Yes.
20     Q.   Now, that was the early--this incident that
21  you're involved in the litigation against the City
22  for, that happened in the early morning hours of the
23  16th; is that right?
24     A.   Yes.
25     Q.   Okay.  Can you tell me what--as I understand

14

1  it, you're down here in part for the wrestling
2  tournament?
3      A.  Yes.
4      Q.  And you also had a business matter you were
5  attending to earlier that week?
6      A.  I--sorry.  I was working down here logging
7  with the Wilson Custom Tree Monday and Tuesday, and
8  then the state wrestling tournament on Wednesday, and
9  my family met me down here and we stayed at the
10 Embassy.
11     Q.  And do you recall what day the 15th was?
12     A.  Thursday.
13     Q.  I don't mean to trick you.  We can always
14 check.
15         Can you tell me what happened--can you
16 describe the day for me, as you recall it on the
17 15th?  You were at the Embassy, right, Embassy
18 Suites?
19     A.  Yeah, we stayed at the Embassy, and there's
20 different sessions for different classes, 1A, 2A, 3A.
21 I know kids from all of them so I try to get there to
22 watch most of them wrestle, and basically the whole
23 day is wrestling.
24     Q.  So you woke up at the Embassy Suites
25 sometime in the morning of the 15th?

15

1      A.  Yes.
2      Q.  Who was in your suite with you, or in your
3  hotel room with you?
4      A.  My father, Don; my son, Trey; and my sister,
5  Heather; her husband, Marty.
6      Q.  And at this time Trey would have been 10 or
7  11?
8      A.  Ten.
9      Q.  And so what do you recall?  What's--I'm
10 sure--I don't know if you remember waking up, but
11 obviously you did that day.  What's the first event
12 you remember about that day?
13     A.  Eating breakfast.
14     Q.  I assume with your dad and son and maybe
15 some other people?
16     A.  There's quite a crowd down there.  The
17 Cresco fans, there's a lot of them.
18     Q.  Were they all at Embassy Suites?
19     A.  Yes.
20     Q.  Is that where you had breakfast?
21     A.  Yes.
22     Q.  What happened after you had breakfast?  What
23 happens?
24     A.  Took a shuttle to Wells Fargo.
25     Q.  What time of day would that have been, if

16

1  you remember?
2      A.  On Thursday?
3      Q.  Uh-huh.
4      A.  9 a.m.  That's when wrestling started, so,
5  yeah, 9.
6      Q.  And did you stay the whole day at the
7  wrestling meet?
8      A.  No.  We left around lunchtime, came back to
9  the Embassy, and different people from Cresco have
10 lunches different days, so we go in their room.
11     Q.  All right.  So you had lunch in your room or
12 at a restaurant?
13     A.  In our room.
14     Q.  And do you recall who you would have had
15 lunch with on that day?
16     A.  No.
17     Q.  Was your son likely one of them?
18     A.  Yes.
19     Q.  Your dad likely one of them?
20     A.  Yes.
21     Q.  Your sister and brother-in-law?
22     A.  No.  They weren't with us.
23     Q.  All right.  There may have been other people
24 with you besides your son and dad, you just don't
25 recall who it might have been?

17

1      A.  Yes.  We generally met in a super-suite,
2  which had a bunch of tables in it, and everybody
3  would bring their food there, and we just kind of
4  popped in and out and would eat when we came back.
5      Q.  Do you recall what--would you have had
6  anything alcoholic to drink at lunch?
7      A.  No.
8      Q.  Do you recall what you had?  I don't recall
9  what I had yesterday, so I don't mean to put the
10 pressure on you.
11     A.  Maid-rites.  They were burnt, that's why I
12 remember, and chips and dips.
13     Q.  About how long were you gone at the hotel
14 room before you went back?
15     A.  Approximately an hour.
16     Q.  So sometime early afternoon you're back at
17 Wells Fargo?
18     A.  Yes.
19     Q.  And how long were you at that wrestling
20 session?
21     A.  Each individual session--you actually have
22 to leave and--we just go downstairs.  You have to get
23 your new ticket for the next session.  So two-and-a-
24 half hours, depending on wrestle-backs and
25 consolation rounds, who we had still going from our

18

1 area. It's different every time you go in.

2 Q. Sure. As I understand the high school

3 meets, they do not sell alcohol in the arena; is that

4 correct?

5 A. That is correct. You can't drink, have any

6 alcohol on your breath/presence at all when you go

7 into Wells Fargo.

8 Q. Sure. Did you ever leave the arena proper

9 and get yourself a snack or anything to drink that

10 day, that you recall?

11 A. Not outside of Wells Fargo, besides lunch.

12 Q. And when was the last session at Wells

13 Fargo?

14 A. That one was at 9 p.m., if I'm correct.

15 Q. So you were there off and on for about 12

16 hours with a break for lunch. I assume you went--did

17 you go to dinner somewhere?

18 A. We had dinner that night at the hotel when

19 we all got back. It was late.

20 Q. Oh, okay. So after the 9 o'clock session?

21 A. After the 9 o'clock session, and we snacked

22 throughout the day.

23 Q. Sure.

24 A. A ten-year-old tends to eat more than--

25 Q. And they don't handle it well if they're

19

1 hungry.

2 A. No.

3 Q. So you finally--I take it you take a shuttle

4 back to the Embassy Suites?

5 A. Sometimes, depending on how busy they are.

6 If there's a cab available, we'll grab a cab.

7 Q. Do you remember how you got back to the

8 Embassy Suites that night?

9 A. We walked that night, I think. Like I said,

10 there's 20 different sessions, so we were in and out.

11 If it's nice out, we'd walk it. It's not that far,

12 just across the river.

13 Q. What time do you think you got back to the

14 arena--I mean the hotel?

15 A. 11, 11:30.

16 Q. Okay.

17 A. It was just a late session because there are

18 consolation rounds and wrestle-backs, and we had

19 quite a few kids in there, so we stayed for the whole

20 thing.

21 Q. So it normally gets over at 9 o'clock, but

22 for some reason this evening it went long?

23 A. No. That's when it started. It was a late

24 session.

25 Q. All right. So it went past 9 p.m.?

20

1 A. Yes.

2 Q. So you get back to the hotel. What's the

3 first thing you recall doing when you get back?

4 A. All the kids were hungry so we ordered

5 pizzas.

6 Q. How many kids are we talking about?

7 A. Ten.

8 Q. You mentioned Trey?

9 A. Yeah, and all of our youth wrestlers. Our

10 youth wrestlers and their parents, and we just

11 decided it was easier just to get pizza because it

12 was late.

13 Q. And youth wrestlers, these are kids that

14 aren't taking part in the meet?

15 A. No, but they go to watch.

16 Q. But they go to watch, like pee wees go to

17 watch a major league game, or something like that?

18 A. Yes.

19 Q. Approximately how many kids would that have

20 been?

21 A. In our room there would have been five,

22 including my nephew. But, like I said, there's kids

23 in and out, and we all just kind of take care of each

24 other, so...

25 Q. Okay. Was there a group of suites right

21

1 next to each other?

2 A. Yeah. We had the whole block.

3 Q. All the Cresco people?

4 A. Yes.

5 Q. And how long were you at the hotel that

6 night, when you got back?

7 A. I would say an hour, an hour and a half.

8 Like I said, there's a lot going on, and I didn't

9 have much time. We were just basically trying to get

10 everything figured out before we go to bed.

11 Q. And you ordered pizzas; is that right?

12 A. Yes.

13 Q. And I believe Dominos; is that right?

14 A. Dominos, yes.

15 Q. And at some point that night you left the

16 hotel; is that right?

17 A. Yes.

18 Q. How did that come to be?

19 A. My cousin actually was downstairs at the

20 lounge, and the lounge was either closing, or--he

21 called me. I went down there and had a beer with him

22 after I got the kids to bed, and stuff.

23 Q. Who is your cousin?

24 A. Derek Burnikel.

25 Q. Okay. Was he with anybody?

22

1    A.   Yeah.  He was with Justin Sovereign.

2    Q.   And who is Justin Sovereign?

3    A.   He graduated the year below me.  Just a
4    wrestling fan.

5    Q.   So he graduated a year after you?

6    A.   Before me.

7    Q.   So he's a year older?

8    A.   I'm sorry.  A year after.  I'm wrong.
9    Excuse me.

10   Q.   I'm just trying to get the age range.  How
11   is Derek related to you, chronologically?  I don't
12   mean blood-wise, but is he younger?  Older?  Same
13   age?

14   A.   He's older.  He would be, like, a third
15   cousin.  His dad and my dad started--I just call him
16   my cousin.  I don't know.

17   Q.   He's not first cousins, he's third, but are
18   you good friends?

19   A.   Yes, very good friends.

20   Q.   And so the three of you.  Anyone else down
21   in the bar at that time?

22   A.   Not that we knew.

23   Q.   Okay.

24   A.   I mean, kind of, maybe, by faces, but we
25   didn't really--we sat by ourselves and--

23

1    Q.   But you had some--you could leave because
2    you had somebody to watch your son?

3    A.   Yes.  Dad was already sleeping with my son
4    Trey.

5    Q.   Sure.  So you said you had a beer at the
6    bar, at the hotel bar?

7    A.   Yes.

8    Q.   And how long had Justin and Derek--did they
9    leave the meet that evening with you, or did they
10   leave sometime earlier, or do you know when they
11   would have arrived at the hotel?

12   A.   Generally they probably left the same time
13   we did.  When we left, there was just a whole bunch
14   of us and we got back to the hotel, and by the time
15   you get your kids taken care of and all that--I
16   didn't really pay attention to when they were there.
17   They weren't staying with us, so...

18   Q.   Was there anybody else that you knew at
19   the--with those two?  Yourself, and was there anyone
20   else you knew from Cresco there at the bar drinking
21   with you?

22   A.   No.

23   Q.   Okay.  So at some point you decided to leave
24   the hotel?

25   A.   Yes.

24

1    Q.   Whose idea was that?

2    A.   Justin's.

3    Q.   Okay.  Do you know--what do you recall?
4    What did Justin suggest?

5    A.   He suggested we go to the el Bait Shop.  He
6    went to college at Iowa State, so he kind of was
7    familiar with downtown.  I never have been downtown
8    before, so--and he said we'd go there for last call.

9    Q.   Had there been sort of an understanding
10   between the three of you that you might go out, out
11   of the hotel, and have a beer sometime?

12   A.   No, not until I got down to them guys down
13   in the lounge.

14   Q.   So you're down in the lounge and Justin
15   suggests, "Hey, let's go to the Bait Shop"?

16   A.   Yes.

17   Q.   All right.  What happened next?

18   A.   We called a cab, and it never showed up, and
19   it just so happened that guy I got the pizza from,
20   that delivered it, we asked him for a ride, and he
21   gave us a ride to the Bait Shop.

22   Q.   Same guy that delivered your pizza?

23   A.   Yeah.

24   Q.   Not just the same company, same guy?

25   A.   Same guy, yeah.

25

1    Q.   So he gives you a lift?

2    A.   Yes.

3    Q.   And you get to the Bait Shop?

4    A.   Yes.

5    Q.   What happened next?

6    A.   We went into the Bait Shop and ordered--I
7    ordered a beer, and they were--I'm not familiar
8    with--Captain and Coke, or something like that.  I
9    don't know for sure.

10   Q.   They, both Derek and Justin, had the
11   same--were drinking the same stuff?

12   A.   No, I don't think so.

13   Q.   Okay.  Which one ordered the, I guess,
14   Captain Morgan and Coke?

15   A.   It would have been Derek.

16   Q.   Do you know what Justin was drinking?

17   A.   I don't.

18   Q.   But you were drinking beer?

19   A.   Yeah, I was drinking beer.

20   Q.   Any particular beer?

21   A.   Busch Light.

22   Q.   I know that the Bait Shop is famous--well,
23   all of the downtown bars claim how many beers they
24   got, and we're in the middle of the IPA craze.  I
25   can't remember whether that was in 2013 or not, but

26

1 do you pretty much just drink the same beer every
2 time you go out?
3     A. Yes.
4     Q. Your beer of choice is Bud Lite?
5     A. Busch Light.
6     Q. Busch Light, sorry.
7         And what time would you have gotten to the
8 Bait Shop?
9     A. It would have had to have been 1 o'clock.
10     Q. Okay.
11     A. It was late. It was early in the morning.
12 It was weird going down there basically for last call
13 because it was that late. And actually the cab never
14 showed up, so then we were--it was 1 o'clock, I'm
15 sure, right around there, or close.
16     Q. And the bars close about 2 in Des Moines--at
17 2, actually.
18     A. I think they kicked us out at 1:30. Anyway,
19 it was not very long.
20     Q. How many beers do you think you had at the
21 Bait Shop?
22     A. Two.
23     Q. So you had a beer at the hotel, and then a
24 couple at the Bait Shop?
25     A. Yes.

27

1     Q. So you had maybe three beers?
2     A. Yes.
3     Q. After you get--after--I take it you weren't
4 told to leave because you were being rowdy or
5 anything, you were just told to leave because it was
6 closing?
7     A. Yes.
8     Q. So you left when the rest of the people at
9 the bar left; is that right?
10     A. Yes. There wasn't very many people in the
11 bar at that time, for some reason, at the Bait Shop.
12     Q. And this was a Thursday night; right?
13     A. Yes.
14     Q. I guess it's now early Friday morning. But
15 it's Thursday/Friday; correct?
16     A. Yes.
17     Q. What's the next thing that happened?
18     A. We were--they called last call, so we had to
19 go, and it was extremely cold out that night. So--I
20 didn't know it, but we have to walk to a cab station,
21 which I didn't--I wasn't familiar with that at all.
22     Q. How did you find that out?
23     A. Justin knew we had to go to a cab stand.
24 So--
25     Q. Okay. I'm sorry, go ahead.

28

1     A. It was a ways, it seemed like, so we
2 stopped--I think on the way we warmed up in a
3 hallway. I don't know if it was another bar or
4 restaurant. The doors were locked, but we could
5 stand outside in, like, the cool room area.
6     Q. At this time there was just the three of you
7 that left the Bait Shop; is that right?
8     A. Yes.
9     Q. Were there more with your group?
10     A. No. But there was more in that little
11 square--
12     Q. In the place you were waiting?
13     A. Yes.
14     Q. I think it came up that that place might be
15 Joker's; is that right? Okay.
16         But there was some alcove, or something
17 you're sort of standing in while you're walking
18 toward the cab stand just to stay warm?
19     A. Yeah, about halfway we pulled in--stopped in
20 there. There were people already in there, so we
21 stopped in there to warm up.
22     Q. The three of you stopped in there. About
23 how many other people were in there?
24     A. It was full.
25     Q. Okay. So as many people that could fit in

29

1 that doorway as possible?
2     A. Yes.
3     Q. Was that just like someplace that was
4 outside, but it was just sort of protected from the
5 elements, or was it literally an indoor thing, so it
6 was a closed door?
7     A. It was a closed door.
8     Q. At some point were you told to leave there,
9 or did you just volunteer to go, or what happened?
10     A. They told us we had to go.
11     Q. "They" being somebody from Joker's?
12     A. Yes.
13     Q. So I would guess the group of you--you need
14 a second?
15     A. I need to shut this off.
16     Q. At least put it on silent.
17         So did the group of you all have to go--all
18 of you sort of had to move on toward the cab stand at
19 the same time; is that right?
20     A. Yes. Yes.
21     Q. How many people would that have been?
22     A. I couldn't be certain. 20, probably, 10. I
23 don't know for sure.
24     Q. And you moved from Joker's towards where the
25 cab stand is; is that right?

PL.APP.000008

30

1    A.    Yes.
2    Q.    And if I remember the cab--Joker's is sort
3  of across the street from the cab stand; isn't that
4  right?
5    A.    Yes, I think so.  I'm not for certain.  I
6  really don't--I'm not familiar with the downtown
7  area.
8    Q.    You certainly weren't at that time, right?
9    A.    Yeah.  I didn't even know where we were at.
10   Q.    You were just following Justin's lead; is
11  that right?
12   A.    Yes.
13   Q.    What happens next?
14   A.    As we were walking up to the cab stand, we
15  were in the back of the people that were in the
16  holding area, or whatever, to stay warm.  And as we
17  came up to the back of the line, it seemed like right
18  as soon as we got there, I just happened to look up
19  and see a guy throwing a girl on the ground.
20   Q.    Okay.  I just want to focus a little bit on
21  the order.  It was--and I know you don't know the
22  exact number, probable because you didn't think at
23  that time you had to know the exact number; right?
24   A.    Right.
25   Q.    The three of you were somewhere in the back

31

1  of that group that were headed from Joker's toward
2  the cab stand; is that right?
3    A.    Yes.
4    Q.    Were you--where were you in the order of the
5  three of you, you, Derek, and Justin?
6    A.    We were all standing next to each other.
7    Q.    And at the time that you get to the point
8  where you said that you saw a guy that looked like he
9  was throwing a woman down--is that fair?
10   A.    Yes.
11   Q.    --where were you relative to Derek and
12  Justin?
13   A.    We were pretty close together.  We walked
14  over there together, so...
15   Q.    Were you in front of them?  Behind them?
16  Abreast of them?
17   A.    I'm not certain.
18   Q.    Okay.  So--all right.  Now, go ahead and
19  start up.  You see--tell me again.  You come up to
20  the cab stand.  You're sort of at the end of the
21  line; is that right?
22   A.    Yes.
23   Q.    And what do you see?
24   A.    I seen out of the line came a guy with a
25  girl, and he threw her to the ground and had her by

32

1  the back of the hair with his knee on her back, and I
2  didn't--at the time I didn't know who it was or what
3  was going on.  I just--
4    Q.    They both came out of the line?
5    A.    Yeah.  He had her through the line and to
6  the ground, and the line is here (indicating), or
7  vice versa, and she came to the ground.
8    Q.    Just so I got the picture, you're standing
9  in a line--I mean, it's called a line for a reason.  I
10  know it's not perfectly formed, it's not military.  I
11  assume it's February so you're all bundled up in
12  winter gear; fair?
13   A.    Yes.
14   Q.    Nonetheless, it's a line of people, and two
15  people come out of that line, a man and a woman.  It
16  looks like the man is throwing the woman to the
17  ground; is that right?
18   A.    Yes, he's throwing her to the ground.  Like,
19  it was like--the line was, like, a big group of
20  people, so it wasn't--there's not people--there's
21  people all over.
22   Q.    Sure.
23   A.    There was just a lot of people.
24   Q.    When you see those two come out of the line,
25  how far away are you, by your reckoning?

33

1    A.    I can't be exact.  15 feet, 20 feet.
2    Q.    Okay.  And did you literally--did you
3  literally see him throw her to the ground, or did it
4  just appear that that was a possibility from your
5  perspective?
6    A.    He threw her to the ground.
7    Q.    Okay.  How did--where was he attached--where
8  did he grab her to throw her to the ground?
9    A.    He was behind her, and she went to the
10  ground, he followed behind her.
11   Q.    Did you see him literally throw her to the
12  ground?
13   A.    I seen her going down.  I didn't see--it
14  wasn't like he picked her up and threw her on the
15  ground.  He was behind her, she fell, and he fell on
16  top of her, put his knee in her back, grabbed her by
17  the hair.
18   Q.    Do you know--do you recall whether you saw
19  him push her or grab her or toss her to the ground,
20  or she went to the ground and he went right down
21  after her?
22   A.    I can't say I seen him pick her up and throw
23  her on the ground, I just seen her--he was behind
24  her, and when she went down, he went down behind her.
25   Q.    Okay.  She may have fell, she may have been

38

1 were closing, and that's why people were lined up at
2 the cab stand?
3    A.   Yes.
4    Q.   You wouldn't be surprised if someone was a
5 little loud or intoxicated?
6    A.   Absolutely not.
7    Q.   So you see these two individuals come out of
8 the line and go to the ground.  Is that accurate?
9    A.   Yes.
10   Q.   Whether they're thrown or tripped, or
11 whatever, they went to the ground?
12   A.   Yes.
13   Q.   What happened next?
14   A.   I asked--I don't recollect 100 percent what
15 I said.  I'm pretty sure I said "What are you doing
16 to her?  Why are you hurting her?"
17   Q.   Were you still 15 feet away or so?
18   A.   Yeah.  I'm still standing in the same spot.
19 It happened on my left, so I was just standing there
20 and it's straight in front of me.
21   Q.   Was it pretty loud at this point?
22   A.   I couldn't be sure.
23   Q.   Do you recall if there was anyone else in
24 the line that was reacting to this at all?
25   A.   No.

39

1    Q.   Did you step out of the line to say this?
2    A.   No.  It was just right here.  I mean, it
3 wasn't a line, so we were just standing there
4 talking, and it was just right there.
5    Q.   When you say "right there," how far away was
6 it happening?
7    A.   15, 20 feet.
8    Q.   And after you say this, what happened next?
9    A.   The guy who was on top of her turned around
10 and shot mace at my--shot mace at me in the face, and
11 at that point blinded me.  I couldn't see nothing.
12   Q.   About how long after you uttered whatever
13 you said did you get mace in your face?
14   A.   As soon as--I don't think I got it all the
15 way out of my mouth and I was maced, and then I was
16 maced again while I was--I don't know.
17   Q.   So at one point this guy is on the ground 15
18 feet away from you.  I believe you testified you said
19 something like "What are you doing to her," or "What
20 the hell are you doing to her?"  Does that sound
21 accurate?
22   A.   Yes.  I might have cussed, I don't know for
23 sure, but--it was upsetting to see what was going on.
24   Q.   Sure.  And almost as soon as you got done
25 saying "her," you got mace in your face?

40

1    A.   Yes.
2    Q.   So somehow that guy got from 15 feet away
3 from you, to you just like that?
4    A.   No.  He turned and maced me.  He was on top
5 of her.  He couldn't have gotten anywhere closer to
6 me.  He turned and I felt mace.
7    Q.   He must have been close to 15 feet?
8    A.   I got maced from this side, and I got maced
9 from this side, and it was from here to here in mace,
10 so I don't know.
11   Q.   So after the--what did the individual that--
12 could you tell the genders of the two people that
13 fell?
14   A.   The only difference was I seen a lot of hair
15 and heard her.  I mean, you can hear the difference
16 in a male and female's voice.
17   Q.   So you knew one of them was a female?
18   A.   Yes.
19   Q.   And you knew one of them was a male?
20   A.   Yes.
21   Q.   All right.  And what was--do you recall what
22 the female was wearing?
23   A.   No.
24   Q.   Do you know what the male was wearing?
25   A.   Black, dark clothes.

41

1    Q.   Okay.  Now it turns out the male was the
2 police officer; is that right?
3    A.   Yes.
4    Q.   In fact, Michael Fong, does that jibe with
5 your recollection?
6    A.   One of the officers was Fong, one was
7 Wessels.  I'm still trying to figure out who was who.
8    Q.   And the woman was a Breanna Hunemiller.  Is
9 that right?  Am I saying the last name--
10   A.   I don't know how to pronounce it either.
11   Q.   Okay.  Now, I believe your testimony was
12 prior to this night you didn't know who
13 Ms. Hunemiller was?
14   A.   No, I had no idea.
15   Q.   You said the male was dressed in black.  Did
16 you discern any sort of insignia on them at all, on
17 the male?
18   A.   Excuse me?
19   Q.   Did you notice any insignia on the male?
20   A.   What's an insignia?
21   Q.   A badge or identification of some kind to
22 indicate he was from an organization?
23   A.   No, I did not.
24   Q.   What were you assuming was occurring?
25   A.   A guy was beating a girl up.

11 of 43 sheets                 PETERSEN COURT REPORTERS
                                515-243-6596                          Page 38 to 41 of 115
PL.APP.000010

**42**

1     Q.  Okay.  And you just made the statement from
2 the line?  You never approached, or anything?
3     A.  I never moved.  No, I didn't go towards
4 them, I didn't--I just asked him what he was doing to
5 her.
6     Q.  Okay.  But--and no one else said anything in
7 the line?
8     A.  I don't know.
9     Q.  That you know of?
10     A.  That I know of, no.
11     Q.  You don't--did Derek say anything at that
12 time?
13     A.  I can't be certain.
14     Q.  Did Justin say anything at that time?
15     A.  I don't--I can't be certain of that, either.
16     Q.  But somehow from 15 feet away that male was
17 able to discern it was you that said something and
18 maced you?  Is that what you believe?
19     A.  Yes.
20     Q.  What happened next?
21     A.  I couldn't see nothing, and I instantly had
22 people grabbing me, punching me.
23     Q.  You were standing up initially?
24     A.  Yeah, I was standing with my hands over my
25 eyes because they were burning so bad.

**43**

1     Q.  Do you recall whether you said anything at
2 all?
3     A.  At that point I was just kind of freaking
4 out because I couldn't see, and I didn't have any
5 idea that there was a cop and a girl and mace.  I
6 kind of freaked out a little bit.  I didn't know what
7 was going on.
8     Q.  Had you ever been maced before?
9     A.  No.
10     Q.  And I'm just guessing your reaction is to go
11 to your eyes right away; is that right?
12     A.  Yes.
13     Q.  And did you--were you just standing straight
14 up there with your eyes--or were you balled up a
15 little bit?  Do you recall what you did?
16     A.  I can't recall what I did.  I know I had my
17 hands over my eyes because it hurt so bad.  I imagine
18 I was bent over a little bit.  It didn't feel very
19 good.
20     Q.  Did you--what was the--okay.  You get the
21 mace in your eyes, you put your hands to your eyes,
22 which is a natural reaction.  What's the next thing
23 that happened?
24     A.  I got punched in the stomach, which took me
25 down to my knees, and left side and right side I was

**44**

1 just getting punched and kicked--I don't know if it
2 was punched or kicked.  I couldn't see anything.  All
3 I heard was "stop resisting."  And I'd say, "I'm not
4 doing anything."
5     Q.  So someone was saying something to you?
6     A.  After I was on the ground, "Stop resisting."
7 But I wasn't resisting.  I was trying to see.
8     Q.  Were they masculine voices saying "stop
9 resisting"?
10     A.  Yes.
11     Q.  Was it just one male voice or two male
12 voices?
13     A.  Two.
14     Q.  And did you say anything to them when you
15 heard that?
16     A.  "I didn't do anything.  I'm not resisting."
17 They said, "Give me your hands."
18     Q.  I don't mean to be--you did say something?
19 When they told you to stop resisting, you said
20 something back?
21     A.  Yes.
22     Q.  What did you say back?
23     A.  "I'm not doing anything."
24     Q.  Okay.  And you're on your knees at this
25 point?

**45**

1     A.  Yes.
2     Q.  Okay.  And where are your hands at this
3 point?
4     A.  I was actually balled up with my hands like
5 this, my elbows were out, and I was on the ground, I
6 was kind of balled up.
7     Q.  Hunched over?
8     A.  They were hitting me, I was trying to
9 protect myself.
10     Q.  At any point was someone trying to grab your
11 arms or anything?
12     A.  Yes, they were trying to grab my arms.
13     Q.  When did that start?
14     A.  As soon as I was down on my knees.  They
15 would get one arm, hit me on that side of the face.
16 I'd get my arm back and put it back over my face,
17 say, "Stop hitting me."  They get one arm and they'd
18 hit me.  I didn't know what to do.
19     At this point I didn't know they were cops.
20 Everything happened so fast, my reaction was to
21 protect myself.  I just balled up and put my hands on
22 my face and--
23     Q.  Were you watching anything at this point or
24 could you do that?
25     A.  I couldn't see nothing until I got awhile--

PL.APP.000011    

---

**46**

1 a long time after that when I talked to a different

2 guy.

3     Q. A different police officer?

4     A. A sergeant--not a sergeant. A captain or

5 something. An interviewing guy.

6     Q. You're on your knees, they're saying "stop

7 resisting," you're saying "I'm not resisting."

8 They're trying to grab your arms. You say you're

9 being punched, so you're arms are going back up,

10 right, because you get punched?

11     A. Yes. As soon as they take one arm, they

12 punch me. I take my arm back and put it over my

13 face.

14     Q. Where are they punching you?

15     A. Right side of my face, ribs, ear, back of my

16 head.

17     Q. You say right side of the face. Could you

18 indicate where?

19     A. This whole side of my face was mangled

20 (indicating).

21     Q. So between the--I'm sorry. Between your

22 right eyebrow and down to your chin?

23     A. Yeah. It cut through my lip, my teeth did.

24 The whole side of my face. This one was swollen

25 shut, this one was--I got hit on both sides of my

---

**47**

1 face. It happened so fast. I can't tell you exactly

2 who hit me when and how and where. It was a lot of

3 hitting.

4     Q. Do you know which side of your face did you

5 get hit on more, do you recall?

6     A. My right side.

7     Q. How many blows do you recall to your face?

8     A. To be honest--

9     Q. Let's say your head, how many blows do you

10 remember to your head?

11     A. Five, six.

12     Q. And of that five or six, how many were to

13 the right side?

14     A. Actually the one on the right side was two,

15 and they were hard, so I'm hurt.

16     Q. Where did those blows land, those two hard

17 blows?

18     A. Right in my cheek, eye, and my lip was

19 through my--my teeth were through my lip, so...

20     Q. So where did--I think you started to answer.

21 Where--maybe I didn't quite understand. Where did

22 the blows land, the two blows you recall, the ones

23 you said were really hard?

24     A. Inside--in the face.

25     Q. Where on the face?

---

**48**

1     A. Right side--yeah, right side I'm pretty

2 sure. They were both sides.

3     Q. Can you indicate to the extent you

4 recall--you can point, I'll say where you're

5 pointing--where on the right side of your face did

6 they land?

7     A. General area, side of my face, top--from the

8 top of my eye to the bottom of my cheek.

9     Q. There were two in particular that were very

10 hard on the right side?

11     A. Yes.

12     Q. And one was to the cheek and one was to the

13 forehead?

14     A. Back of the head. They seriously hit from

15 here--back of my head, and my back, ribs

16 (indicating), and this all happened in a matter of 30

17 seconds. They basically--whenever there was an open

18 shot, they were taking it.

19     Q. I realize that, but you talked about

20 particular injuries or damages you have. So it's

21 important, to the extent you can, that you try to

22 tell me where you remember any particular blows

23 landed.

24     So you said there were five or six that went

25 to your head?

---

**49**

1     A. That was with fists, it seemed like to me,

2 yeah.

3     Q. You don't know but it felt like fists?

4     A. Yeah. Yeah.

5     Q. And two of those were particularly hard to

6 your right side?

7     A. Yes.

8     Q. And that's what I'm asking about. The two

9 that you recall that were particularly hard to your

10 right side, where did those two blows land?

11     A. From the bottom of--top of my eye to the

12 bottom of my cheek. I don't know exactly where they

13 landed, but right here, the side of my face.

14     Q. Okay.

15     A. Ear, nose. When he--you feel the first one,

16 the second one hurt, but just in general--I was kind

17 of panicked and I didn't know what was going on. All

18 I know is what was going on wasn't right, so I had to

19 figure out some way to--

20     Q. All right. Five or six blows to your head.

21 Where else did you feel an impact?

22     A. I got kicked in the left lower back--I don't

23 know if it was stomped on or kicked or hit with a

24 club, I don't know what it was, but, honestly, it

25 hurt.

---

PL.APP.000012

**50**

1    Q.   You said right lower back?
2    A.   Yeah--left lower back, right on my hip.
3    Q.   Okay.
4    A.   And then one to the testicles, which that
5  did me out, I couldn't--
6    Q.   So at least one--just one blow to the
7  testicles?
8    A.   I think I got hit earlier in the groin, and
9  then when I got down further to the cement, I got
10  kicked underside.
11    Q.   So five or six to the head, one to your
12  lower back around the hip?
13    A.   That was a foot, though.  It stomped on me,
14  I think.  I don't know for sure.  I couldn't see, I'm
15  just going by what I could feel.
16    Q.   Right.  I'm just trying to figure out,
17  whatever the source, whether it was an arm, a baton,
18  a foot, whatever, just wherever you had a physical
19  blow.  Five or six to the head, left lower back
20  around the hip?
21    A.   Ribs.
22    Q.   Okay.  We'll get to that.  One to the
23  testicle?
24    A.   One or two.
25    Q.   One that definitely landed?

**51**

1    A.   One foot that did, yes.
2    Q.   And then you said one to your ribs?
3    A.   Yes.  Not even one to my ribs.  Several.
4  They were hitting me in the ribs.
5    Q.   All right.  So how many would you estimate?
6  Same spot in the ribs?
7    A.   No.  There was one on one side, one on the
8  other.  This is the one that was most sore the next
9  day (indicating).
10    Q.   You're indicating your right ribcage?
11    A.   Yes.
12    Q.   Just below your chest?
13    A.   Yes.
14    Q.   All right.  Any others?
15    A.   Two in the head, ribs, back; no.
16    Q.   So it was a series of blows.  What happens
17  next that you can recall?  What was the last blow
18  that you remember?
19    A.   In the face--no, the last blow where I was
20  completely--I couldn't--I got stunned is when I got
21  kicked from the backside in the testicles.
22    Q.   Okay.
23    A.   That one was just--after that, I don't know
24  if I hurt or what, I just kind of--
25    Q.   So there may or may not have been other

**52**

1  blows, but that was the last one you remember?
2    A.   The last one that was the one that--I mean,
3  it was just terrible when I got kicked in the back of
4  the nuts.
5    Q.   In the scrotum?
6    A.   Yes.
7    Q.   Okay.  What happened?  What's the first
8  thing you recall after that last blow?
9    A.   I was pretty messed up.  Them putting
10  handcuffs on me.
11    Q.   Okay.  So you were handcuffed with your
12  hands behind your back; is that right?
13    A.   Yes.
14    Q.   And from the point in time in which you said
15  "Hey, what are you doing," or "What the hell are you
16  doing to her," to the point you're in handcuffs, how
17  much time would you estimate went by?
18    A.   It wasn't much.  I mean, estimated time, a
19  minute, two minutes.  I don't know.  It didn't take
20  very long.
21    Q.   It's one of those things that happened
22  really fast, but it seemed slow at the time?
23    A.   Yeah.  Seemed like it was never going to
24  stop.
25    Q.   So you're in the handcuffs.  What happened

**53**

1  next?
2    A.   They tried to get me up, and I was face
3  first in the concrete.  They lifted me up with my
4  shoulders--with my hands that were in cuffs right up
5  over the top of my head and I face planted right into
6  the cement.
7    Q.   Do you recall anything being said at that
8  time, anything from the crowd, anything from the
9  officers, anything that you were saying?
10    A.   "You shouldn't have resisted.  You shouldn't
11  have resisted."  I said, "I did not resist."
12    Q.   So that was a conversation you were having?
13    A.   It wasn't yelling at me, it was just "You
14  shouldn't resist."  I said "I didn't resist.  You
15  guys were punching me.  I was protecting myself."
16    Q.   What happened next?
17    A.   Then the other--the officer that grabbed me
18  by the hands was the different one because I could
19  tell by the difference in their voice, and he got me
20  up by my shoulders, picked me up and walked me to--at
21  this point I really couldn't see.  I could see
22  blurriness then.  I sat on the bench in the back of a
23  cargo van.
24    Q.   When you say "the other officer," this
25  officer is different than the officer you first

58

1  wrong with what happened, so then she called 911.
2     Q.  Okay.  At that point where do you have--at
3  the time you're sitting--I'm going to call it a paddy
4  wagon--what are your--where do you hurt?  Do you
5  remember?
6     A.  Yeah.
7     Q.  Okay.
8     A.  My hands were behind my back, I couldn't sit
9  down very well, I had to sit on my right side.  And
10 my face, like I said, that was cut open, and then
11 with mace in it, I just hurt.
12         I mean, when you get hit in the testicles,
13 it obviously takes over everything you hurt on.
14 Between my back and my testicles, it hurt.
15    Q.  But the primary cause of the pain, or the
16 ones that you were fixated on because they were the
17 most painful were the back and the testicles?
18    A.  Yes.
19    Q.  Okay.  Do you recall any other pain at that
20 time?
21    A.  My face was burning.  I mean--
22    Q.  From the mace?
23    A.  Yeah--no, from--yeah.  I had cuts on it, and
24 the mace got in my cuts from getting punched.  Just
25 everything hurt.  I was upset.  I didn't want to be

59

1  where I was at, and it was--I don't know.  I don't
2  even want to think about it.
3     Q.  And I believe this happened around 2:30 at
4  night?
5     A.  Somewhere around there, yes.
6     Q.  So you get transported eventually in the
7  paddy wagon somewhere.  Do you recall where you went?
8     A.  We went to the--there was a police station.
9     Q.  Okay.
10    A.  I don't know where, when it was, at the time
11 I didn't, you know.
12    Q.  Right.  And what happened when you got
13 there?
14    A.  I was talking to a girl that was--I was in a
15 little square room and I walked in, and then I was
16 getting checked in, I suppose.
17    Q.  I should ask, did you have any--were you
18 transported with Breanna to the jail?  Were you both
19 in the car together?
20    A.  Yes, I think so.
21    Q.  Was anyone else in there?  Anyone else
22 arrested that night that you recall?
23    A.  No.
24    Q.  Okay.  Did you and Ms. Hunemiller have any
25 conversation once the paddy wagon started moving?

60

1     A.  She was crying, I was probably crying.  I
2  don't know.
3     Q.  Was there ever any conversation whether Ms.
4  Hunemiller was with somebody, or she had a friend
5  that was involved in this in some way, that you
6  recall?
7     A.  No.
8     Q.  Did you have any other interactions with the
9  police officers when you were being transported out
10 there, other than what we've talked about?
11    A.  No.
12    Q.  So you get to the jail.  What happened--what
13 do you recall happening next?
14    A.  A girl handed me a clipboard and asked me to
15 fill out this paperwork, and I told her I couldn't
16 see.  She said we could do it later.
17    Q.  Okay.
18    A.  Then I got put into a locked cell
19 with--there's people in there--
20    Q.  Sure.
21    A.  --that I don't want to be in there with.
22    Q.  Right.  And I take it at some point that
23 night, somebody came and got you out.  Is that fair?
24    A.  Nope.  Not until the next morning.  I had to
25 see a magistrate.

61

1     Q.  So you saw a magistrate.  So you found out
2  you had been charged with something; is that right?
3     A.  Yes.
4     Q.  And I believe those charges were public
5  intoxication and interference?
6     A.  There's more than that, I think.
7     Q.  All right.  What did you get out--when were
8  you released?
9     A.  After I seen the magistrate.
10    Q.  So sometime early in the morning?
11    A.  I think it was around 9, something like
12 that.
13    Q.  All right.  So when did you get back to--I
14 take it the first thing is you went back to the
15 hotel?
16    A.  No.  My dad was furious.  We got in the car
17 and we went home.
18    Q.  I'm guessing you weren't too happy, either?
19    A.  No, I was not happy at all.
20    Q.  Was your dad--was your dad, to your--was
21 your impression that your dad was angry about the
22 whole situation?  Angry at you in particular?  What
23 do you remember?
24    A.  Well, my dad blamed it on me first, until he
25 found out what happened.  I explained it to him.  I

66

1    Q.   Have you had issues where you were worried
2  that you were addicted to pain medication prior to
3  2014?
4    A.   That I was addicted to them?
5    Q.   Yeah.
6    A.   No.
7    Q.   Okay.  Did you have--do you recall having
8  any--an instance where you thought that you had--that
9  you were too reliant on taking pain killers?
10   A.   Yes.  This last time I was relying on taking
11 them.
12   Q.   In 2014?
13   A.   2015.
14   Q.   2015?
15   A.   No, 2014--it was July.  Not last July, the
16 July before.
17   Q.   I think we have a record of July 28th of '14
18 or so.
19   A.   Yeah.  That's when I, me and my fiancee at
20 the time, came to the conclusion that it was time for
21 me to figure something else out.
22   Q.   One of the things you're alleging in this
23 case is that you had some damage to your teeth; is
24 that right?
25   A.   Yeah.

67

1    Q.   I think in particular you said eight teeth
2  and one knocked out?
3    A.   This one knocked out, all these were
4  chipped, they're cracked in the middle (indicating).
5    Q.   We've gotten some records from your dentist
6  about an estimate in November of 2015.  When was the
7  last time you had seen her for any dental work prior
8  to 20--when you got the estimate for this stuff in
9  2015?  It looks like you had some work done at that
10 point.  When was the last time you'd been to the
11 dentist prior to that?
12   A.   It was for a root canal, and it was fairly
13 shortly after this incident happened.
14   Q.   Okay.
15   A.   And then she referred me.  We went through
16 and she looked at everything, she was going to come
17 up with an estimate.  I ended up having to go to
18 Decorah to get my root canal because they priorly did
19 the root canal, it didn't work, so they had to redo
20 it.
21        So I told her what happened and that I
22 needed to get some sort of--figure out how, you
23 know--what it's going to cost to fix my teeth, and I
24 don't know if it was a verbal, but what she told me,
25 she didn't do that type of work yet, she was getting

68

1  into it.  I don't really specifically remember what
2  we talked about, but it was a catastrophic amount of
3  money, so I didn't really pursue it at the time.  I
4  didn't have the money and--
5    Q.   Because the document--have you always
6  seen--I'm sorry.  What's the name of your dentist?
7    A.   Mrs. Reis, Dr. Reis.
8    Q.   How long have you seen Dr. Reis?
9    A.   I seen Dr. Reis and I seen one in Decorah,
10 depending on when I need to get in.
11   Q.   Who was the dentist in Decorah?
12   A.   I think it was Shaw--no, not Shaw.  I'm
13 sorry.  I'd have to look.
14   Q.   Can you get the name of that dentist?
15   A.   Yes, I can get the name of that dentist.
16   Q.   I don't think we've gotten records from that
17 dentist.  That's the dentist you saw for the root
18 canal in 2014?
19   A.   Yes.
20   Q.   Had you ever seen that dentist before?
21   A.   Prior to that, yes.  Dr. Reis just started
22 in Cresco.  So before that, the dentist that we had
23 there was very busy and we couldn't get into him.
24   Q.   What was the name of that dentist before
25 Dr. Reis that you saw in Cresco?

69

1    A.   I never did.  I couldn't get into him, so I
2  had to go to Decorah.
3              (Exhibit 1 was marked
4              for identification.)
5  BY MR. HARALDSON:
6    Q.   I'm handing you what I've marked as Exhibit
7  1, and this is not the entirety of what we received
8  from Northeast Mental Health Center, but it does have
9  some Bates stamp numbers on it.  The whole thing was
10 Bates stamped.  These are just some excerpts I want
11 to ask you some questions about.
12        We talked a little bit about the issues
13 about hydrocodone.  If you could turn, oh, about
14 two-thirds of the way back there.  So starting
15 with--look for a page marked Northeast Behavioral
16 Health 102.  Do you see those Bates stamps at the
17 bottom?  Do you know what a Bates stamp is?  It's
18 just a page numbering system.  Are you there?
19   A.   Yup.  Yes.
20   Q.   This is the--a clinical assessment that
21 apparently was performed in March of 2012, and you
22 see the section that says "Presenting Problem/Current
23 Situation"?
24   A.   Yes.
25   Q.   The last sentence of that document--of that

82

1 that's marked "Dimension 4"--do you see that?
2    A.  Yes.
3    Q.  --it says "Dustin states that he did have
4 an addiction to hydrocodone after having a back
5 problem "
6         Is the reference there to the problem you're
7 having in July of 2014  is that when you--
8    A.  Yeah, the back problem I was having after
9 that incident, yeah.  2014, that's the summer, yeah.
10   Q.  That incident is the incident with the
11 police officers?
12   A.  Yes.
13   Q.  But this information came into--apparently
14 you were there for some sort of an initial intake in
15 June of 2015  is that correct?
16   A.  You're mixing me up on dates now.  I'm
17 trying to think about too many things.
18   Q.  Go to the page prior  It's Bates stamped
19 24
20   A.  Okay.  What are we doing here?
21   Q.  Well  what we just talked about when you
22 were recollecting an addiction to hydrocodone after a
23 back problem  that was part of an intake interview or
24 some sort of an assessment that took place in June of
25 2015  is that right?

83

1    A.  This says 2014.
2    Q.  If you can look at--about a third of the way
3 down--
4       MR SWAIM:  I think what's confusing is
5 intake at the top is 2014
6       MR HARALDSON:  It looks like they were just
7 continuing your case file
8       MR SWAIM:  And then there's an interpretive
9 summary and showing an actual date of June 10  2015
10      THE WITNESS:  I have so many dates in my
11 head right now that I'm trying to straighten them all
12 out and you're getting me confused
13 MR HARALDSON:
14   Q.  Okay  Let me just ask this way:  Do you
15 remember going to Northeast Iowa Mental Health Center
16 in June of 2015?
17   A.  Yes, I did.
18   Q.  And was the primary purpose of that dealing
19 with a relationship issue?
20   A.  It was a problem with the pain killers, and
21 I went in there with my fiancee to try to get it
22 resolved.  This is a different therapist, I think,
23 correct?
24   Q.  Yeah  It looks like Diane Decker
25   A.  Yeah, this is different.

84

1    Q.  Okay  And what was--and just to re-ask
2 that  do you know why you were seeing Diane Decker in
3 June of 2015?
4    A.  Yes.  It was for counseling for me and my
5 fiancee after--it's all involved in this.  After this
6 incident, it just seemed like there was just a
7 continuous problem with us living a certain way.  I
8 bought a farm, did all this stuff, and then I get to
9 where the money intake, the money I was making, being
10 able to do things, whatever, just halted.  It created
11 problems between I and my fiancee.  It got real bad.
12 We're not together anymore.
13   Q.  I'm sorry to hear about that  When did the
14 relationship end?
15   A.  It's not really relevant, is it?  I'd rather
16 not talk about that, if that's okay.
17   Q.  When did--when you referred to "this
18 incident " you said things deteriorated between the
19 two of you after "this incident "  Is that the
20 incident in Des Moines in February of 2013?
21   A.  Yes.
22   Q.  Can you tell me why you think that was a key
23 thing that led to the end of the relationship  or
24 problems in the relationship?
25   A.  Well, it was just me and my business.  I

85

1 continuously grow the business--grew the business and
2 updated my equipment and got to where I needed to be,
3 to where I can stop buying things--you have to
4 upgrade all the time.  And I upgraded right before,
5 bought a farm, put myself into quite a bit of debt,
6 and all of a sudden got four months where I didn't
7 have any income.  It's pretty tough to pay $3,500 in
8 payments if you're not making any money.  That just
9 led to--it just got worse and worse and worse, and it
10 didn't get better, let's put it that way.
11   Q.  On page 24  again  It's the fourth page of
12 Exhibit 1  So the page where the June 10th  2015
13 thing is listed--are you there?
14   A.  The bottom number is what?  24?
15   Q.  24
16   A.  Yup.  I'm on it right now.
17   Q.  Under "Presenting Problem/Current
18 Situation " it says that "Dustin seeks services with
19 Northeast Iowa Behavioral Health as a result of
20 anxiety around his relationship and also work-related
21 stress "
22        Do you see that?
23   A.  Uh-huh.
24   Q.  You have to answer out loud  Sorry
25   A.  Yes.

PETERSEN COURT REPORTERS
515-243-6596

PL.APP.000016

86

1    Q.   I see references to a relationship and work
2  stress.  I don't see any reference to the situation
3  where you were arrested in February of 2013; is that
4  correct?  In that paragraph, it's not referenced?
5    A.   Yes.  I'm reading it.  Yes, it says, "Dustin
6  states that this most recent situation that has
7  caused a lot of difficulty"--I had to take a new job
8  because I couldn't do my job anymore, which was the
9  difference between 15 bucks an hour and what I was
10  making.
11    Q.   Which job couldn't you do anymore?
12    A.   I can't cut trees.  I mean, I can cut them.
13  There's a lot--there's a lot more than just cutting a
14  tree down.  It's a lot of physical work and a lot of
15  mental work.  It's like a geometry puzzle to put
16  together.  To find people to do it is impossible,
17  good employees is impossible, and stress is high.
18  And the lifestyle that I bought myself into before
19  this happened, which I could have because I--at the
20  time it wasn't a problem, I couldn't keep up to it.
21  I was constantly, you know, stressed out.
22    Q.   One of the things you say in your complaint
23  is you lost your AAU license.
24    A.   Yeah.  Actually it's not a license.  It's a
25  coaching certificate.

87

1    Q.   Okay.  You say it's because of this incident
2  in February of 2013?
3    A.   The incident with the Des Moines cops, and
4  you have to get a background check, and it come back
5  as--they wouldn't give me my coaching certificate
6  because--it wasn't through court yet.  I mean, we
7  just had--we had not done anything, we were just kind
8  of waiting to get into our trial and that stuff.
9        So, yeah, they denied me for that reason,
10  that incident that happened.  It goes on the record.
11  I was charged, but evidently a background check it
12  shows up.  I have the paperwork where it showed up.
13        I called and talked to the administrator of
14  the whole AAU company.  I know him personally.
15    Q.   Who's that?  You'd know if I said--
16    A.   I'm sorry.  My head is trying to think about
17  a lot of things at once.  Yeah, I will get you his
18  name.
19    Q.   Did you get your certificate back
20  eventually?
21    A.   No, I cannot do it through the Iowa AAU
22  Association, I have to go through the president of
23  AAU.  And like I said, we know each other on a
24  personal level, so--yes, I can't go on to the state
25  and the district tournaments and coach, which is the

88

1  whole reason that I coach.  I've got 32 little
2  kids--actually 64 now, and I can't take them to the
3  most important tournaments of the whole year.
4    Q.   How do you know it relates to the February
5  2013 incident?
6    A.   Because I know the guy that's in charge of
7  it, and why it came back that I couldn't get it.
8    Q.   He told you that's why?
9    A.   Yes.
10    Q.   And you're trying to think of his name?
11    A.   I know his name, I just--I'll get it for you
12  right now, actually.
13    Q.   Maybe I have something--is his name Henry
14  Forrest?
15    A.   Nope.
16    Q.   While you're doing that, I'll have--
17        MR. HARALDSON:  If you could mark that.
18            (Exhibit 2 was marked
19            for identification.)
20    A.   Wes Creason.
21  BY MR. HARALDSON:
22    Q.   Can you spell the last name?
23    A.   I have it in my phone as phonetically.
24    Q.   Well, phonetically what do you have in your
25  phone?

89

1    A.   Wes Creason, C-r-e-s-o-n (sic).
2    Q.   What's his title?
3    A.   He's the president of the AAU wrestling
4  group.  It's not an association.  It's basically a
5  club that you have to have a membership through to
6  get your coaching certificate to get your kid to the
7  next level in the state tournament.
8    Q.   Okay.  Is that located in Florida?
9    A.   No.  It's in Des Moines, his office is.
10    Q.   So he's, like, the president of the chapter?
11    A.   Yeah, the chapter in Iowa.
12    Q.   I'm going to show you what's been marked
13  Exhibit 2.  It's a two-page document dated February
14  14th, 2014, from the Amateur Athletic Union.  Do you
15  recognize this document?
16    A.   Yes.
17    Q.   And when you were referring to you lost your
18  certificate, is this the letter you're referring to
19  that informed you of that?
20    A.   This is the union association.  They don't
21  actually--can't even really tell you the reason
22  because it's a different company that does this.
23  It's not AAU.  It's a subcontractor, a hired company
24  that takes care of the background checks and gives
25  them back to the AAU union--well, the union and the

23 of 43 sheets                    PETERSEN COURT REPORTERS
                                    515-243-6596                    Page 86 to 89 of 115
                                                    PL.APP.000017

**94**

1 happened to you in February of 2013 initially?

2     A. Initially, yes. After I explained it to

3 her, no.

4     Q. Was there something about your history

5 together that caused you concerns about you being

6 charged with what you were charged with?

7     A. No.

8     Q. Had you been having any relationship

9 problems prior to February 2013?

10     A. Serious problems? No. Discussions,

11 arguments? Yes.

12     Q. I know there's a petition that was filed in

13 November of last year regarding custody of your

14 children--your child. Did your relationship end

15 before then?

16     A. Yes.

17     Q. And when, approximately, did your

18 relationship end? I know these are tough questions,

19 but you've just related it--

20     A. Yes. It was a month prior.

21     Q. To your recollection was there a last straw

22 that caused the end of the relationship? Was there a

23 final event?

24     A. I can't remember stuff like that.

25     Q. You were together for approximately a year

**95**

1 and a half--or two-and-a-half years after what

2 happened in Des Moines; is that right?

3     A. Yes.

4     Q. Am I right that in your opinion the

5 relationship began to sever most particularly because

6 of what happened in Des Moines in February of 2013?

7     A. It had a lot to do with it, yes.

8     Q. Well, is that a yes or a no?

9     A. Yes.

10     Q. So what was the--what was the--to your

11 recollection, what was the thing that occurred that

12 finally caused the two of you to end your

13 relationship?

14     A. I don't know.

15     Q. Do you recall who made the decision to end

16 the relationship?

17     A. We both did.

18     Q. And were there--was there--were there a

19 series of reasons why the relationship ended that you

20 communicated with each other?

21     A. Yes.

22     Q. Okay. What were those?

23     A. Well, financial burden, and everybody with a

24 financial burden leads to everything else. It was

25 just--

**96**

1     Q. Had the two of you ever had financial

2 difficulties prior to February of 2013?

3     A. No.

4     Q. And I know it's difficult to talk about

5 this, but what in particular, or particular items

6 were there about what happened in February of 2013

7 that caused your relationship to end?

8     A. Well, it stuck me in a six-month hole that I

9 dug myself out of, and it just--the further I

10 dug--it's hard, once you're that far behind, to catch

11 up, to get to where I was at, to where we actually

12 have a life and not me trying to make things work.

13 It's a lot harder than you think.

14     Q. Do you think that the police officers in

15 February 2013 singled you out, or was it all a

16 misunderstanding that went horribly wrong?

17     A. I'm pretty sure it's a misunderstanding that

18 went horribly wrong.

19     Q. What makes you--what makes you think that?

20     A. Because I didn't do anything besides stick

21 up for a girl that got her face smashed into the

22 concrete. I'd do it for any girl that had that

23 problem.

24     Q. Well, you--you just saw her fall and the

25 male fall at the same time. You didn't know who

**97**

1 caused who to fall; is that right?

2     A. No, I didn't.

3     Q. You made an assumption. Would that be fair

4 to say?

5     A. With his hand in her hair and knee in her

6 back with her face on the concrete, yes, I did.

7     Q. That was after she fell on the ground?

8     A. She fell, and it--I mean, it was fast. He

9 was right on top of her, head into the cement. I

10 didn't say anything until--I mean, it was just like

11 watching it happening, "Oh my God. What are you

12 doing?"

13     Q. Did you take any time to discern that maybe

14 there was a police officer involved?

15     A. No. I seen a male on top of a female.

16     Q. Would that have made a difference to you if

17 you would have recognized it was a police officer

18 involved with Ms. Hunemiller?

19     A. Yes, but what he did to her is very wrong.

20     Q. How do you know what he did was wrong if you

21 saw them fall?

22     A. I seen her face, heard him smashing

23 her face on the concrete--

24     Q. You saw her literally--

25     A. --by her hair onto the concrete. I watched

PL.APP.000018

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - - - X
DUSTIN BURNIKEL,                :
                               :
        Plaintiff,             :
                               :
vs.                            : Case No. 4:15-cv-00036
                               :
MICHAEL FONG, individually     :
and in his official capacity   :
as a law enforcement officer   :
with the Des Moines Police     :
Department; GREG WESSELS,       :
individually and in his        :
official capacity with the     :
Des Moines Police Department; :
and CITY OF DES MOINES, IOWA, :
                               :
        Defendants.            :
- - - - - - - - - - - - - - - X


DEPOSITION OF MICHAEL FONG,

taken by Counsel for the Plaintiff before

Edie Spriggs Daniels, Certified Shorthand Reporter

of the State of Iowa, at 400 Robert D. Ray Drive,

Des Moines, Iowa, commencing at 8:30 a.m., Tuesday,

January 5, 2016.


EDIE SPRIGGS DANIELS - CERTIFIED SHORTHAND REPORTER

PL.APP.000019

**2**

1  APPEARANCES:

2  For the Plaintiff:        STEPHEN M. RYALS, ESQ.
                            The Ryals Law Firm, P.C.
3                           Post Office Box 11065
                            Ferguson, Missouri 63135
4
                            JUSTIN K. SWAIM, ESQ.
5                           Swaim Law Firm, P.L.L.C.
                            701 13th Street
6                           Suite 2
                            West Des Moines, Iowa 50265
7
    For the Defendants:     JOHN O. HARALDSON, ESQ.
8                           City of Des Moines Legal Dept.
                            400 Robert D. Ray Drive
9                           Des Moines, Iowa 50309

10  Also Present:           Dustin Burnikel

11

12

13

14

15
16
17
18
19
20
21
22
23
24
25

**3**

1           I N D E X

2  WITNESS                           DIRECT

3  Michael Fong                        4

4

5

6

7

8

9

10

11         E X H I B I T S

12  DEPOSITION EXHIBITS               MARKED

13  1 - Diagram drawn by the witness    90

14

15

16

17

18

19

20

21

22

23

24

25

**4**

1           P R O C E E D I N G S

2                MICHAEL FONG,

3  called as a witness by Counsel for the Plaintiff,

4  being first duly sworn by the Certified Shorthand

5  Reporter, was examined and testified as follows:

6                DIRECT EXAMINATION

7  BY MR. RYALS:

8      Q.   State your name.

9      A.   Mike Fong.

10     Q.   Fong, is it?

11     A.   Yes.

12     Q.   F-o-n-g?

13     A.   Yes.

14     Q.   You're a police officer?

15     A.   Yes.

16     Q.   For how long?

17     A.   Over 10 years.

18     Q.   With which departments?

19     A.   Des Moines Police Department.

20     Q.   That's the only place you've ever worked--

21     A.   Yes.

22     Q.   --as a police officer?

23     A.   Yes.

24     Q.   Are you undercover now?

25     A.   Right this minute?

**5**

1      Q.   No, no.  I mean--

2      A.   I work in the vice and narcotics control

3  section as an investigator, yes.

4      Q.   How long have you been doing that?

5      A.   A little over two years.

6      Q.   Do you have the title "detective"?

7      A.   We use the title "investigator" in our

8  police department.  We work in the detective bureau.

9      Q.   What other assignments have you had?

10     A.   I've worked on 3rd-watch patrol, I've worked

11  on 1st-watch patrol, I've worked on the special

12  enforcement team, and I've been on the

13  Metro S.T.A.R. Team.

14     Q.   What's the Special Enforcement Team?

15     A.   It was a group, a small group, of

16  hand-selected officers that were assigned to patrol

17  the high crime areas of Des Moines, focus on

18  gang-related issues, drug issues, and weapons issues.

19     Q.   How long did you do that work?

20     A.   It was seasonal from the spring to the end

21  of fall for three years.

22     Q.   Was that in uniform or plainclothes?

23     A.   We used both uniform and plainclothes.

24     Q.   Okay.  What training did you have to do that

25  work?

PL.APP.000020

**10**

1    A.    Yes.

2    Q.    Within the infantry rubric  did you have any
3    specialized training or function?

4    A.    I began as a second lieutenant as a platoon
5    commander.  I was then a first lieutenant, a weapons
6    platoon commander, served as an executive officer,
7    and then I left as a company commander.

8         Outside of Marine Corps OCS basic officers
9    school and the infantry officers course, I attended
10   one course for fire support, a fire support team
11   leader course.

12   Q.    Any commendations  medals  other at-a-boys
13   in the service?

14   A.    Yeah.  I received--I don't know if it's
15   three or four Navy Marine Corps achievement medals,
16   Selected Marine Corps Reserve Medal, National Defense
17   Ribbon.

18        There was a couple of other ones, but
19   nothing noteworthy, I would say.

20   Q.    Did you deploy?

21   A.    No.

22   Q.    Same question for your time as a police
23   officer

24   A.    I have received letters of commendation.
25   Our department doesn't issue out a lot of medals or

**11**

1    ribbons like some of the other departments do.
2    Usually it's something pretty significant if somebody
3    receives an award outside of a letter of commendation
4    in our department.

5    Q.    Any discipline actions against you as a
6    police officer?

7    A.    Yes.

8    Q.    How many?

9    A.    I was suspended in 2008 for an incident that
10   occurred in 2007 where I punched an individual that
11   was handcuffed, and I was suspended for excessive use
12   of force.

13   Q.    Any others?

14   A.    I have received--  We have a point system
15   for accidents.  Accidents are given one to
16   three points.  I have had, I think, three one-point
17   accidents.

18   Q.    How long was your suspension?

19   A.    Five days.

20   Q.    With or without pay?

21   A.    Without pay.  Our suspensions are all
22   without pay.

23   Q.    Did you have any other consequence for that
24   2007 incident?  Demotion  reduction in pay  or
25   something like that?

**12**

1    A.    No.

2    Q.    Where were you serving at that time?  What
3    unit?

4    A.    I was on 3rd-watch patrol and assigned to
5    the south-side squad.

6    Q.    And the south-side squad  3rd-watch patrol
7    is drive around in a police car  answer regular
8    calls  that sort of thing?

9    A.    Yes, sir.

10   Q.    Straight patrol activity in uniform?

11   A.    Yes, sir.

12   Q.    Any other discipline?

13   A.    I had some letters of reprimand.

14   Q.    Can you tell me what those were about?

15   A.    I know one was for being rude.

16   Q.    All right  Any others you can remember?

17   A.    I would have to go back and look in my
18   personnel file.

19   Q.    Do you know how many you've received
20   letters of reprimand?

21   A.    Maybe one or two.

22   Q.    So one was for rudeness  You don't recall
23   what the other one was?

24   A.    I don't remember.

25   Q.    Do you know what your assignment was when

**13**

1    you got the rudeness reprimand?

2    A.    Yes.  I was assigned to 3rd watch on the
3    east-side squad at that time.

4    Q.    East-side squad?

5    A.    Yes, sir.

6    Q.    When you make reference to the watches  1st
7    2nd  and 3rd watch  is the first watch a day shift?

8    A.    2nd watch would be what would be considered
9    day shift, 3rd watch would be afternoons, and 1st watch
10   would be overnight hours.

11   Q.    So what are the typical hours of 2nd watch?

12   A.    Well, they've changed, and I'm not out there
13   anymore.

14   Q.    Roughly  You don't have to--I'm not going
15   to hold you to the precise hours and minutes

16   A.    I think they work like 6:30 to 3:30, maybe.
17   3rd watch is like 1 to 11.  1st watch is like 9 to 7,
18   maybe.

19   Q.    So they kind of overlap?

20   A.    Yes.

21   Q.    You told me about the discipline that you've
22   received  Are you aware of any citizen complaints
23   other than those that might have resulted in
24   discipline?

25   A.    Yes.

**22**

1    **Q.**   Expandable baton?

2    **A.**   Yes.

3    **Q.**   TASER?

4    **A.**   Yes.

5    **Q.**   Did I miss anything?  Two sets of handcuffs?

6    **A.**   Yes.

7    **Q.**   Flashlight?

8    **A.**   Yes.

9    **Q.**   You had all of that equipment on your duty

10 belt?

11   **A.**   Yes.

12   **Q.**   Did you wear a vest?

13   **A.**   Yes.

14   **Q.**   Did you hit Dustin Burnikel?

15   **A.**   Yes.

16   **Q.**   How many times did you hit him?

17   **A.**   Twice with knee strikes and once with a

18 punch to the face.

19   **Q.**   When was the--you said the suspension was

20 2008?

21   **A.**   Yes.

22   **Q.**   After you struck the man in handcuffs and

23 got suspended  did you receive any corrective action

24 such as training?  Were you on probation?  Were you

25 more closely supervised  anything like that?

**23**

1    **A.**   I would say I was talked to by several

2 members of my chain of command, and I think I was

3 more closely supervised.

4    **Q.**   Can you explain to me why you struck a man

5 in handcuffs?

6    **A.**   Yes.

7    **Q.**   And do so  please

8    **A.**   Okay.  I can't remember the fellow's name

9 now.  It doesn't matter.

10   I had been tripped to meet with his

11 girlfriend or ex-girlfriend, I don't know, two to

12 three times that night about him making harassing

13 phone calls to her.  They had a no-contact order

14 where he had been the defendant and she was the

15 protected party.

16   At that point I had went by the house that

17 she had said that he resided at a few times during

18 the night in an attempt to arrest him.

19   The first couple of times I went by after

20 speaking with her, he wasn't home.  I saw his vehicle

21 in the driveway the last time.

22   I called for two other patrol officers to

23 come assist me.  Out of concern that he may try to

24 run out of the house, I stood at one door while they

25 went to another door.

**24**

1    We found that the individual lived with his

2 mom.

3   When the officers encountered the suspect we

4 were looking for, I could hear a lot of yelling

5 inside the house, and I thought the guy was going to

6 get shot because I could hear the cops yelling, "Drop

7 it.  Drop it.  Drop the knife."  He ended up being

8 TASERed.

9   While I was outside hearing the yelling, I

10 went inside to assist these officers, not knowing

11 what the situation was.

12   I believe they had already handcuffed him at

13 the time when I got into the house, so I assisted

14 them in escorting him out of the house.

15   He was angry and belligerent, and he

16 shoulder-checked me into the wall as we were leaving

17 the apartment, so--or the house, rather, so when we

18 got outside, I punched him in the face.

19   **Q.**   What part of his face did you hit?

20   **A.**   His nose.

21   **Q.**   Did it cause a visible injury?  Did he bleed?

22   **A.**   Yes.

23   **Q.**   Is it fair to say you were angry?

24   **A.**   Yes.

25   **Q.**   At the scene--  Strike that

**25**

1    Did the other officers who were present

2 observe that?

3    **A.**   One of them did.

4    **Q.**   After it happened  did he say anything to

5 you?

6    **A.**   Yeah.  He told me to knock it off.

7    **Q.**   Was that a fellow officer or a supervisor?

8    **A.**   A fellow officer.

9    **Q.**   Knock what off?  You had already hit him

10 right?  I mean was there more to it?

11   **A.**   I was yelling at him, and I think he was

12 afraid I might hit him again.

13   **Q.**   As a result of that event  did you have to

14 see the department--either the department psychologist

15 or other healthcare provider?

16   **A.**   No.

17   **Q.**   Did you have to see someone outside the

18 department  a healthcare provider?

19   **A.**   No.

20   **Q.**   What was the range of punishment you could

21 have suffered for that event?

22   **A.**   I could have gotten anything from a written

23 reprimand to being fired.

24   **Q.**   Do you have any explanation for why you

25 weren't fired?

**26**

1    A.   The chief at that time basically told me
2  that they had discussed it.  She discussed it with
3  her senior command staff, and that one of them wanted
4  to fire me and the rest wanted to keep me, and she
5  thought I was worth keeping around and that they had
6  invested a lot of money in training me.
7         I think she was just trying to make me feel
8  good, but I personally don't necessarily believe all
9  of that.  I think that they decided that that level
10  of punishment was appropriate for what had occurred.
11    Q.   You understand that that is a violation of
12  the Constitution, to punch somebody when they're in
13  handcuffs?
14    A.   Yes, sir.
15    Q.   I take it it's a violation of Iowa law as
16  well.
17         MR. HARALDSON:  I object.  It calls for a
18  legal conclusion.
19         You can answer, if you know.
20         MR. RYALS:  Go ahead.
21    A.   Yeah, I mean it would probably be considered
22  an assault.
23  BY MR. RYALS:
24    Q.   Is it accurate to say you knew at the time
25  you punched this gentleman, who was in handcuffs,

**27**

1  that you were aware that what you were doing was a
2  violation of the Constitution?
3    A.   I didn't think about any of that when I did
4  it.  I knew I shouldn't do it.
5    Q.   Why did you punch Dustin Burnikel?
6    A.   In the situation that we were in, I felt
7  that was the--in the situation that we were in, I
8  felt that that was the only way I could bring him
9  into custody without using a more invasive, I guess,
10  use of force.  He was a good-sized guy, probably
11  about the same size as me, drunk, belligerent, not
12  listening to instructions.
13         We had already used pepper spray, which if
14  physical force has to be used or a use of force has
15  to be used, that is the department's preferred first
16  course of action, and given the circumstances that we
17  were in, being wedged up against a vehicle, with this
18  tree nearby and with Sergeant Wessels on one part of
19  his body and me on the other end and him trying to
20  get back up, I wasn't going to let him get back to
21  his feet, and at that point I was going to either
22  have to use physical force, strikes, pressure points,
23  a TASER, or a baton.
24         I didn't feel that a baton was appropriate,
25  and I probably could have used a TASER; however, I

**28**

1  would say that in that instance, the department
2  would probably view the TASER as being a more
3  invasive or more--it would probably be viewed as
4  being a more severe use of force than physically
5  striking somebody.
6    Q.   Do you have a use-of-force continuum in your
7  department?
8    A.   So we've gone away from the continuum, and
9  we now have a circle.
10    Q.   Yeah.
11    A.   I don't know what it's called, but we have a
12  circle, and there are force options around the
13  circle, and essentially going back to--I was
14  initially trained on the continuum model, but that's
15  gone away.  It goes from verbal to pepper spray,
16  physical, TASER, baton, firearm, from lowest to most
17  severe.
18    Q.   Actually, the first level is presence; right?
19    A.   Okay.  Verbal, I would consider that
20  presence.
21    Q.   And the circle, how long has that been part
22  of your policy?
23    A.   I don't know.
24    Q.   Were you ever specifically trained on the
25  use of force--for lack of a better way to describe

**29**

1  it, the use-of-force circle?
2    A.   Yes.
3    Q.   You had like in-service training?
4    A.   Yes, sir.
5    Q.   And is it accurate to say that that use-of-
6  force circle basically puts you in the middle, the
7  officer in the middle, and you get to choose any of
8  the force options; correct?
9    A.   Yes.
10    Q.   Which means that unlike the continuum, it
11  doesn't instruct you to work your way up from least
12  aggressive to most aggressive?
13    A.   Correct.
14    Q.   And was that the instruction you received,
15  that you no longer have to go up the use-of-force
16  continuum ladder?
17    A.   Yes.
18    Q.   Where did you strike Mr. Burnikel with your
19  fist?
20    A.   In the nose.
21    Q.   Similar to how you struck the man who was in
22  handcuffs when you got suspended?
23    A.   Similar, yes.
24    Q.   Straight on in the nose?
25    A.   Well, no.  Similar in that I used my fist

PL.APP.000023

**30**

1  and I hit him in the nose, different in that in this
2  instance, Mr. Burnikel was down on the ground and I
3  was on a knee next to him, and instead of striking
4  him with the front of my fist, I hit him with the top
5  of my fist in sort of a swinging motion.
6    Q.  What was the position of his body when you
7  struck him in the face?
8    A.  So his head was facing to the south, his
9  feet were facing to the north.  We were on a
10  north-south street, okay?  He's down on the ground.
11  His knees are in contact with the ground, and he's
12  trying to push himself up, so similar to being sort
13  of on all fours.
14    Q.  How did he get there?
15    A.  Officer Wessels and I--  Where would you
16  like me to start, I guess?  Could you be more
17  specific as to the question?
18    Q.  Okay.  Sure, sure.
19      What immediately preceded him going to the
20  ground?  I don't mean chapter and verse.  I mean what
21  action caused him to go to the ground.
22    A.  Sergeant Wessels and I had pushed him up
23  against this taxicab.  At that time I'm on the right
24  side of Dustin, and I knee struck him.  I would be on
25  his left side, yes, but I'm to Sergeant Wessels'

**31**

1  right.  So I knee strike him like somewhere between
2  the thigh and ribcage area, probably to the left of
3  his belly button, somewhere in that area there,
4  twice.  He goes down to the ground.
5      At some point I end up on the opposite side,
6  so Sergeant Wessels is towards his--so then--  Let me
7  back up.
8      So then Dustin ends up with his head facing
9  south, his feet facing north.  I end up on his south
10  end.  Sergeant Wessels ended up on his north end.
11  Does that make sense?
12    Q.  So it was the knee strikes that caused him
13  to go down?
14    A.  I don't know what caused him to go down.  I
15  know I struck him with knee strikes.
16    Q.  Did you ever see Sergeant Wessels strike
17  him?
18    A.  I saw Sergeant Wessels push him up to the
19  taxicab.
20    Q.  Which is different than delivering a blow?
21    A.  Yes.
22    Q.  Who pepper-sprayed him?
23    A.  I did.
24    Q.  Why did you do that?
25    A.  Well, when Dustin approached me, I was on a

**32**

1  knee, and my back was towards him, and as he's
2  yelling, I turned to focus my attention from what
3  I'm--the girl I was about to arrest to him.
4      As a police officer, when we're in an
5  adversarial situation, I just immediately size people
6  up.
7      I was looking at him, and I could see he's
8  angry.  I can see he's about my size.  It's not
9  somebody I want to--I could tell it was not probably
10  going to go well because I'm yelling at him to back
11  up, he's not listening to me, and so I can tell that
12  he's probably going to go to jail.
13      I'm not here to fight a fair fight.  I'm not
14  Clint Eastwood.  I'm here to do my job, go home
15  safely, keep other people from getting hurt, so with
16  that in mind, I'm not going to go toe to toe with a
17  guy.  I'm going to use my tools that I'm given.
18      I gave him two, three warnings to "back up
19  or you're going to jail."
20      He decided he didn't want to listen.  He
21  wanted to go to jail, so I used pepper spray and
22  sprayed him in the face.
23    Q.  Where was Sergeant Wessels during this?
24    A.  So Sergeant Wessels had escorted another man
25  to the rear of the paddy wagon, where he was going to

**33**

1  be arrested and put in the paddy wagon.
2    Q.  Where was the paddy wagon?
3    A.  So there was a parking garage right at
4  Third and Court on the northeast corner, and the
5  paddy wagon is parked right there.
6    Q.  How far from where you were?
7    A.  Probably within 10 feet.
8    Q.  So when you were--I know you can't get into
9  Sergeant Wessels' mind, but when you were telling
10  Mr. Burnikel to get back, were you saying it loud
11  enough so you think Sergeant Wessels would have heard
12  it?
13    A.  I would think so.  I would caveat that with
14  the way the situation was, Wessels is to the east of
15  where I'm at under the parking garage roof.  I'm
16  right at the edge of the parking garage where the
17  parking garage begins, and Dustin is sort of to my
18  north and west, so I'm yelling the other direction,
19  and the parking garage, I would say that the sound,
20  things sound different under there, and the direction
21  I'm yelling, I'm not confident that he would have
22  heard, just based on how things echo inside there,
23  and whatnot.
24    Q.  I understand.
25      When Mr. Burnikel approached you, did you

**34**

1  have a handful of a woman's hair?
2    A.   No.
3    Q.   Did you ever pull a woman's hair?
4    A.   No.
5    Q.   You said he approached you from behind?
6    A.   Yes.
7    Q.   Do you wear a cover when you're in uniform?
8    A.   No.
9    Q.   This is wintertime   I take it you had a
10  coat on or a jacket?
11   A.   Yes.
12   Q.   Are there any markings on the back of the
13  coat or jacket?
14   A.   No.
15   Q.   Is it a dark blue?
16   A.   Yes.
17   Q.   Dark blue coat?
18   A.   Yes.
19   Q.   And then are there markings on the front of
20  the coat?
21   A.   On the front of our coat is our badge, and
22  then on the sleeves is our police logo.
23   Q.   Okay   The badge  you're talking about the
24  metal badge  you clip that to the front of your coat?
25   A.   Yes, sir.

**35**

1    Q.   Did you ever identify yourself as a police
2  officer?
3    A.   No, not outside of wearing my uniform.
4    Q.   You can understand how someone approaching
5  you from behind might not immediately recognize
6  you're a police officer  right?
7    A.   Well, I would think that at the proximity
8  that Dustin was to me, he would realize that I'm a
9  police officer.
10   Q.   Why?
11   A.   Because there's a police vehicle within
12  10 feet of me.  There's another officer close by.
13  I'm wearing a police uniform with blue stripes.  I'm
14  wearing an equipment belt.  I've worked the cab
15  stand--well, I don't work there anymore, but I worked
16  the cab stand for a period of time, and I never had
17  anybody not understand that we were police officers.
18   Q.   At the time he approached you  you were down
19  on the ground  correct  on your knee?
20   A.   I was on one knee.
21   Q.   All right   And you were dealing with a
22  female subject?
23   A.   Yes.
24   Q.   Where were your hands when Mr  Burnikel
25  approached you?

**36**

1    A.   In front of me.  I don't know if I still had
2  ahold of her hood or not.  She had a coat, like a
3  collared hood.  She was like crying and screaming.
4  She was going to go to jail had Dustin not approached.
5    Q.   Was your knee on the ground or on her body?
6    A.   On the ground.
7    Q.   Your hands were in front of you   You don't
8  know if you were holding the hood   Is it fair to say
9  you were touching her?
10   A.   I honestly don't remember.
11   Q.   Well  you've got a subject on the ground
12  crying and screaming   You decided she's going to
13  jail   Is there any circumstances under which you
14  would let go of her?
15   A.   Yes.  I was interrupted by a third party.
16   Q.   I'm talking about before he approached you
17   A.   I mean it all happened like right at the
18  same time.
19         I don't know where my hands were.  I know I
20  wasn't using any force to keep her on the ground.
21  She was hammered drunk.  She was screaming, she was
22  yelling, but she's not like going to be assaultive.
23  I think she was grabbing Sergeant Wessels because she
24  didn't want to see the guy that Wessels was going to
25  take to jail arrested.

**37**

1    Q.   And that's what kicked it off  the guy
2  Wessels was arresting apparently had committed some
3  offense  correct?
4    A.   Yes.
5    Q.   What was that offense?
6    A.   He was drunk and being disruptive,
7  belligerent.
8    Q.   Is being drunk on a public sidewalk in
9  Des Moines a violation of law?
10   A.   Yes.
11   Q.   Public intoxication  or something?
12   A.   Yes.
13   Q.   What was he being disruptive about?
14   A.   So at the cab stand, at bar close, the cabs
15  line up on the curb and they take people in line and
16  drive them to wherever they want to go, so
17  essentially the cab stand pays the police officers
18  just to make sure people don't act like drunken
19  idiots, which people sometimes do, and generally our
20  presence there will prevent things like that from
21  occurring.
22         This is past bar close.  Bar closes at 2
23  here.  There was, you know, a fairly small crowd
24  because it was kind of cold.  People, when it's cold
25  out, they tend to disperse more quickly than when

**42**

1 first time you told Mr. Burnikel to get back and the
2 second time?
3     A.   **Not very long.  Seconds.**
4     Q.   Two statements close in time, quickly
5 delivered.
6     A.   **Yes.**
7     Q.   Fair to say?
8     A.   **Yes, sir.**
9     Q.   And then after the second statement, how
10 much time elapsed before you pepper-sprayed him?
11     A.   **Probably, I don't know, less than**
12 **10 seconds.**
13     Q.   And so at some point after you pepper-
14 sprayed him, Sergeant Wessels put his hands on him;
15 correct?
16     A.   **Yes.**
17     Q.   So you didn't--did you see Sergeant Wessels
18 come to the scene, or you just knew he was there?
19     A.   **I didn't see him approach. I didn't see**
20 **Sergeant Wessels approach. I had my back to the**
21 **wagon at that time, and I'm yelling at Dustin, and**
22 **the female gets between Dustin and I, and I would**
23 **have probably sprayed him sooner, but I was trying**
24 **not to spray her. She got in between us, and I kind**
25 **of reached over her to spray him.**

**43**

1     Q.   How soon after you sprayed him did you see
2 Sergeant Wessels?
3     A.   **Almost immediately.**
4     MR. RYALS: I forgot my manners. If you
5 need a break at any time--
6     THE WITNESS: I want to go get a class of
7 water.
8     MR. RYALS: Can we take five to
9 seven minutes?
10     (Short recess.)
11 BY MR. RYALS:
12     Q.   When we took our break--and like I said, if
13 you need a break at any time, you can stop me, okay?
14     You said that the female got between you and
15 Mr. Burnikel?
16     A.   **Yes, sir.**
17     Q.   When you pepper-sprayed Mr. Burnikel, were
18 you on one knee or standing?
19     A.   **Standing.**
20     Q.   Facing him?
21     A.   **Yes.**
22     Q.   How far away was he?
23     A.   **Probably no further than me to you.**
24     Q.   So after you said "get back" the second time
25 or the last time, you stood up; correct?

**44**

1     A.   **Yes.**
2     Q.   You turned your attention away from the
3 woman on the ground; correct?
4     A.   **Yes.**
5     Q.   Faced Mr. Burnikel?
6     A.   **Yes.**
7     Q.   Drew your pepper spray?
8     A.   **Yes.**
9     Q.   And somehow the woman got between you and
10 him?
11     A.   **Yes.**
12     Q.   What was she doing when she got between you
13 and him?
14     A.   **I think she was trying to prevent him from**
15 **being arrested or shield him from whatever she**
16 **thought I was going to do to him.**
17     Q.   Regardless of what her intention might have
18 been, what were her actions?
19     A.   **She was facing towards me. She had her back**
20 **towards him, almost--probably touching him. She had**
21 **her arms like back like a mom trying to keep her kids**
22 **back from the street, or something.**
23     Q.   Okay. And you decided, then, to reach past
24 her to pepper-spray Mr. Burnikel?
25     A.   **Yes.**

**45**

1     Q.   And you said you didn't want to pepper-spray
2 her.
3     A.   **Correct.**
4     Q.   Now, she's committed another offense in your
5 presence; correct?
6     A.   **Correct.**
7     Q.   Interfering, or something like that, when
8 she got between you and him?
9     A.   **Sure.**
10     Q.   She had already committed an offense that
11 was going to result in her going to jail; correct?
12     A.   **Yes.**
13     Q.   And all Mr. Burnikel did was say things to
14 you. He never touched you; correct?
15     A.   **He never touched me until we got into the**
16 **physical altercation.**
17     Q.   Until after you pepper-sprayed him?
18     A.   **Correct.**
19     Q.   When he came up to you, before the first
20 time you told him to get back, what words did he say?
21     A.   **I can't remember. He was loud. I felt like**
22 **he was trying to intimidate me, but I can't remember**
23 **specific words.**
24     Q.   After the first time you told him to get
25 back, do you recall specifically what he said?

PL.APP.000026

**46**

1    A.   No.

2    Q.   Why didn't you want to pepper-spray the

3 woman?

4    A.   She's a woman.  She's small.  I didn't need

5 to use any force to arrest her.  She's hammer-drunk.

6 I mean you could about push her and she would

7 probably fall over.

8         Additionally, aside from that, which were my

9 primary considerations, if I pepper-sprayed her, now

10 I've got to do a whole other report on her.  It's not

11 worth it.

12    Q.   The other report you're referring to is the

13 use-of-force report?

14    A.   Yes.

15    Q.   That's in addition to your incident report?

16    A.   Yes.

17    Q.   Was this use of force ever evaluated

18 internally, the use of force against Mr. Burnikel?

19    A.   Yes.

20    Q.   Did you get any feedback about that

21 evaluation--or from that evaluation?

22    A.   Yes.

23    Q.   What feedback did you get?

24    A.   It was endorsed by the patrol bureau

25 commander and each of the supervisors who reviewed it

**47**

1 in between me and the patrol bureau commander.

2         I know going into this that it's not

3 preferred that we strike people in the face.  It is

4 to be used very sparingly, and in this instance I

5 think it was referred to as being unorthodox, or

6 something similar to that.

7         We do--I mean we do box.  We do train.  We

8 do train with striking people with fists, but the

9 department doesn't like you to do it for obvious

10 reasons.

11    Q.   What are the obvious reasons?

12    A.   Well, the potential for getting sued.

13         In this instance given the force options

14 available to me, given the circumstances with us

15 being in close quarters with this vehicle, with

16 Sergeant Wessels being right there, with just the way

17 this situation played out, I thought it was my best

18 course of action, and I still feel that it was my

19 best course of action.

20    Q.   That conclusion was not endorsed at the

21 upper levels of your department; is that correct?

22    A.   It was endorsed, but with like a caveat of

23 saying unorthodox or, you know, not to be--basically,

24 they want to make it known to you that they don't

25 like you doing it, but in this instance, they're okay

**48**

1 with it.

2    Q.   Did any policy in your department ever

3 change after this regarding use of blows to the face?

4    A.   No.

5    Q.   At the time you struck Mr. Burnikel either

6 with your knee or with your fist, had you ever told

7 him he was under arrest?

8    A.   No.

9    Q.   Did you or Sergeant Wessels make statements

10 "stop resisting"?

11    A.   Yes.

12    Q.   And that's something you're trained to do,

13 right, when you're in a confrontation with someone,

14 "stop resisting"?

15    A.   If they're resisting, yes.

16    Q.   Did Sergeant Wessels ever tell Mr. Burnikel

17 that he was under arrest?

18    A.   I don't remember.

19    Q.   We talked about the man you struck while he

20 was handcuffed and how that is in all likelihood an

21 assault under Iowa law.  You would agree?

22    A.   Yes.

23    Q.   Would you also agree that if a citizen is

24 being assaulted by a police officer, that citizen has

25 the right to defend himself or herself?

**49**

1         MR. HARALDSON:  Objection.  That asks for a

2 legal conclusion.

3         You may answer, if you know.

4         THE WITNESS:  Can you say the question one

5 more time?

6         MR. RYALS:  Yes, sure.

7 BY MR. RYALS:

8    Q.   If a citizen is being--or a subject--it

9 doesn't have to be a citizen--is being assaulted by a

10 police officer in Iowa, does that individual, the

11 subject, have the right to defend himself or herself?

12         MR. HARALDSON:  Hold on just a second.

13         Same objection.  Go ahead.

14    A.   I think that wholly depends upon the context

15 of the situation.

16 BY MR. RYALS:

17    Q.   Which is to say, yes, there are

18 circumstances, if a police officer is assaulting

19 someone, where that person is entitled to defend

20 themselves?

21    A.   Yes, depending on the circumstances.

22    Q.   So I mean let's take a hypothetical.  The

23 guy you struck while he was handcuffed, right, after

24 you struck him the first time, if it appeared to him

25 you were going to hit him again, do you think under

**50**

1 those circumstances he would have been justified in
2 trying to defend himself?
3     A.  Yes.
4     Q.  And that defense could take the full gamut
5 of possibilities, short of a firearm.  He could have
6 tried to kick at you or head-butt you?
7     A.  He did eventually head-butt me; so, yeah, I
8 mean I guess in that circumstance, he felt that he
9 should do that and it was okay.
10     Q.  Did he get charged with assault for that?
11     A.  He did.
12     Q.  What happened to that charge?
13     A.  It got dismissed.
14     Q.  Did he get charged with assault for
15 shoulder-checking you?
16     A.  I don't remember that one.  I don't think
17 so.
18     I would caveat that scenario that that
19 head-butt didn't come immediately after the punch.
20 It came a couple of minutes after, so in that
21 scenario, it's probably not okay.  Had it happened
22 like contemporaneous with the punch, it would be
23 probably more understandable.
24     Q.  More justifiable?
25     A.  Yes.

**51**

1     Q.  When you pepper-sprayed Mr. Burnikel, you
2 said that Sergeant Wessels put his hands on him
3 immediately after that.  Do I understand that
4 correctly?
5     A.  Yes.
6     Q.  Did you see what Sergeant Wessels--Wessel or
7 Wessels?
8     A.  With a plural "s".
9     Q.  Did you see what Sergeant Wessels did
10 physically?  What part of Mr. Burnikel's body did he
11 touch with what part of his body?
12     A.  I think we both initially tried to grab his
13 arms, and once we could see that was going to be a
14 struggle, we shoved him back into the cab.  I would
15 just say upper body.  I could see him grabbing the
16 upper body of Dustin.
17     Q.  What did Mr. Burnikel do when you pepper-
18 sprayed him?
19     A.  Nothing, really.  I mean it didn't change
20 his demeanor at all.
21     Q.  Did he put his hands to his face?
22     A.  I don't remember.
23     Q.  What's the intended result of a pepper-spray
24 deployment?
25     A.  Well, if you get it right in their eyes, it

**52**

1 burns the eyes so that people keep their eyes closed,
2 blink their eyes.
3     To people that haven't been exposed to eye
4 irritants, for some people it kind of like takes
5 their breath away for a minute.  It doesn't do that
6 to everyone.  It's mainly to irritate their eyes so
7 they can't see.
8     Q.  Did you shoot it into his eyes?
9     A.  Well, I shot it at his face.  I think it got
10 into his eyes.  It didn't take effect as quickly as I
11 had wanted it to.
12     Q.  Did you or Sergeant Wessels ever tell
13 Mr. Burnikel to put his hands behind his back?
14     A.  I don't specifically remember that.
15     Q.  Ultimately did you handcuff him behind his
16 back?
17     A.  Yes.
18     Q.  That was after you hit him in the face?
19     A.  Yes.
20     Q.  How soon after?
21     A.  Within a few seconds, five to 10 seconds.
22     Q.  After you hit him in the face, what reaction
23 did he have to that?
24     A.  He gave up.
25     Q.  What do you mean by "he gave up"?

**53**

1     A.  He gave up resisting arrest.
2     Q.  Physically what happened?
3     A.  He lowered himself back down to the pavement
4 and at that time gave us his hands.
5     Q.  Had you ever asked him to give you his hands
6 before that?
7     A.  I think we said, "Give us your hands."
8     Q.  Did you or Sergeant Wessels ever put any
9 part of your body onto his back?
10     A.  I'm sure we did.
11     Q.  Would that be your knee, you think?
12     A.  Yes.
13     Q.  Do you think both of you did?
14     A.  I'm sure I did.  I don't know about
15 Sergeant Wessels.
16     Q.  Did Mr. Burnikel ever give you any
17 indication that he was in pain?
18     A.  Afterwards he said his back hurt and his
19 knee hurt, and I mean he had a bloody nose.
20     Q.  During the event, did you hear any
21 verbalization that he was in pain, either him telling
22 you he was in pain or a groan or a moan?
23     A.  I don't remember.
24     Q.  From the time you first pepper-sprayed
25 Mr. Burnikel until you had his hands cuffed behind

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - - - X
DUSTIN BURNIKEL,                    :
                                    :
        Plaintiff,                  :
                                    :
vs.                                 : Case No. 4:15-cv-00036
                                    :
MICHAEL FONG, individually   :
and in his official capacity  :
as a law enforcement officer  :
with the Des Moines Police    :
Department; GREGG WESSELS,    :
individually and in his       :
official capacity with the    :
Des Moines Police Department; :
and CITY OF DES MOINES, IOWA, :
                                    :
        Defendants.            :
- - - - - - - - - - - - - - - X


DEPOSITION OF GREGG WESSELS,

taken by Counsel for the Plaintiff before

Edie Spriggs Daniels, Certified Shorthand Reporter

of the State of Iowa, at 400 Robert D. Ray Drive,

Des Moines, Iowa, commencing at 1:30 p.m., Tuesday,

January 5, 2016.




EDIE SPRIGGS DANIELS - CERTIFIED SHORTHAND REPORTER

PL.APP.000029

**2**

1  APPEARANCES:

2  For the Plaintiff:          STEPHEN M RYALS ESQ
3                              The Ryals Law Firm P C
                               Post Office Box 11065
                               Ferguson Missouri 63135
4
5                              JUSTIN K SWAIM ESQ
                               Swaim Law Firm P L L C
6                              701 13th Street
                               Suite 2
7                              West Des Moines Iowa 50265

8  For the Defendants:         JOHN O HARALDSON ESQ
                               City of Des Moines Legal Dept
9                              400 Robert D Ray Drive
                               Des Moines Iowa 50309

10 Also Present:               Dustin Burnikel

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1                    I N D E X
2
3  WITNESS              DIRECT CROSS REDIRECT RECROSS
4  Gregg Wessels          4
5
6
7
8                  E X H I B I T S
9
10 DEPOSITION EXHIBITS                      MARKED
11 2 - CIR authored by Officer Fong           50

12 3 - Supplemental report authored by        51
       Sergeant Wessels
13
14 4 - Supplemental report authored by        54
       Lieutenant Davey

15 5 - Photograph of Dustin Burnikel          58

16 6 - Photograph of Dustin Burnikel          58

17
18
19
20
21
22
23
24
25

**4**

1                P R O C E E D I N G S
2                    GREGG WESSELS
3  called as a witness by Counsel for the Plaintiff
4  being first duly sworn by the Certified Shorthand
5  Reporter was examined and testified as follows:
6                  DIRECT EXAMINATION
7      Q.  State your name
8      A.  Gregg Wessels.
9      Q.  Sergeant Wessels correct?
10     A.  Yes, yes.
11     Q.  Did you strike Dustin Burnikel in the
12 testicles?
13     A.  In the groin area, yes.
14     Q.  What's the difference between striking in
15 the groin area and the testicles?
16     A.  The groin area is a region including the
17 scrotum, the penis, the testicles, so it's not an
18 aimed shot at just testicles.  It's the groin area.
19     Q.  So the aimed shot was at the penis scrotum
20 and testicles?
21     A.  The groin area, yes.
22     Q.  Who taught you to do that?
23     A.  Nobody.
24     Q.  Who taught you that that was an approved use
25 of force?

**5**

1      A.  We are approved to use the force necessary
2  to effect the arrest.
3      Q.  How many times have you struck a handcuffed
4  subject?
5      A.  I don't recall.
6      Q.  If I told you it was two or three would
7  that sound right to you?
8      A.  If you've looked through my records and
9  that's what you counted up, I would have to agree
10 with you.
11     Q.  Did anybody teach you that it was
12 appropriate to strike a handcuffed subject?
13     A.  Yes.
14     Q.  Who told you that?
15     A.  I don't remember all my use-of-force
16 instructors.
17     Q.  In what context were you taught that it
18 would be acceptable for you to strike a handcuffed
19 subject?
20     A.  When a handcuffed subject is spitting on
21 you, kicking you, biting you, you are allowed to
22 defend yourself.
23     Q.  On any of the occasions when you struck
24 a handcuffed subject were any of those things
25 occurring?

**14**

1  I observed Officer Fong giving Mr. Burnikel orders to
2  stay back.
3     Q.  Where was Officer Fong when he was giving
4  those orders?
5     A.  He was down on his knees attempting to
6  arrest a female by the name of Huemiller, if that's
7  how you say it.
8     Q.  Could you see her?
9     A.  Yes.  She was on the ground.
10    Q.  You had a line of sight to her; correct?
11    A.  Yes.
12    Q.  Did you hear Mr. Burnikel say anything?
13    A.  I do not recall anything that he said.
14    Q.  Did you hear him say anything?
15    A.  I do not recall.
16    Q.  What did you hear Officer Fong say?
17    A.  I just heard him telling Burnikel to get
18  back.
19    Q.  How many times did he say that?
20    A.  I do not recall.
21    Q.  Did he say any other words other than "get
22  back"?
23    A.  I do not recall.
24    Q.  When Officer Fong first told Mr. Burnikel to
25  get back, how far was Mr. Burnikel from him?

**15**

1     A.  A guesstimate would be approximately three
2  to four feet, maybe.
3     Q.  As between you and Mr. Burnikel right now,
4  was he closer or farther away?
5     A.  Approximately this distance.
6     Q.  When Officer Fong addressed Mr. Burnikel
7  and said "get back," was Officer Fong's back to
8  Mr. Burnikel?
9     A.  His primary orientation would be he would be
10 primarily facing north as he's on the right side of
11 the female, and he would be looking to his left,
12 which would have his attention going to the west.
13    Q.  So Mr. Burnikel was to the west of him?
14    A.  Yeah.  He was west of him, yes.
15    Q.  Did you ever see Mr. Burnikel move from that
16 position where you first observed him?
17    A.  I do not recall.
18    Q.  Would you agree with me, that would be a
19 significant fact if Mr. Burnikel had moved toward
20 Officer Fong?
21    A.  Yes, it could be.
22    Q.  Because the threat level would increase.
23 Would you agree?
24    A.  Yes.
25    Q.  After you first heard Mr.--strike that--

**16**

1  Officer Fong say "get back," what was the next thing
2  you heard or observed?
3     A.  I do not recall any other statements.  I
4  know Officer Fong then stood up and went towards
5  Mr. Burnikel.
6     Q.  Now he's facing him full on; correct?
7     A.  Yes.
8     Q.  Heading west?
9     A.  Yes.
10    Q.  You have in front of you, it looks like,
11 several pieces of paper; correct?
12    A.  That is correct.
13    Q.  What are those items?
14    A.  This piece of paper here would be our arrest
15 CIR, case incident report, authored by Officer Fong.
16 The second piece is a supplemental report authored by
17 me.
18       MR. RYALS:  Can we mark these?
19 BY MR. RYALS:
20    Q.  Are these your copies?
21    A.  Those are my copies, yes.
22       MR. RYALS:  John, I don't want to take the
23 officer's copies.
24       MR. HARALDSON:  We can replace them at a
25 break, please.

**17**

1        MR. RYALS:  Do you want to go 2 and 3 or
2  start over at 1 and 2?
3        MR. HARALDSON:  Whatever your preference is.
4        MR. RYALS:  Let's go 2 and 3.
5        MR. HARALDSON:  Let's wait and mark them
6  until after we get copies.
7  BY MR. RYALS:
8     Q.  Other than these two documents you have in
9  front of you, have you written anything else about
10 this incident?
11    A.  I would have written a use-of-force report.
12    Q.  Because of your use of force or because of
13 the force you observed someone else use?
14    A.  We're required to do both.
15    Q.  So you would have reported on Officer Fong's
16 use of force if you saw it; correct?
17    A.  Yes.
18    Q.  And then on your own?
19    A.  Yes.
20    Q.  Would he have been required to report on
21 yours as well?
22    A.  That is correct.
23    Q.  One of your disciplinary matters, did it
24 have a component to it of your failure to report the
25 use of force?

**18**

1    A.   Yes.

2    Q.   And that was one where you had struck a

3 handcuffed subject; correct?

4    A.   That is correct.

5    Q.   Was the discipline that you received in any

6 way related to the failure to report?

7    A.   That was part of the discipline.

8    Q.   And also for the striking; correct?

9    A.   That is correct.

10    Q.   Did you see Officer Fong use any force

11 against Mr. Burnikel?

12    A.   I observed him deliver two knee strikes to

13 the midsection, and once we were on the ground, he

14 delivered one punch to Burnikel's face.

15    Q.   Where was Mr. Burnikel--you said on the

16 ground, but what was his body position when

17 Officer Fong struck him in the face?

18    A.   He would be primarily on his chest and

19 stomach.

20    Q.   Primarily, not completely?

21    A.   Well, it was during a struggle, so I can't

22 say that he was just laying completely flat.  There

23 was movement going on, so he could have been slightly

24 turned one way or the other.

25    Q.   I see.

**19**

1    A.   Primarily, he would be face down.

2    Q.   Basically proned out?

3    A.   Primarily, yes.

4    Q.   I'm not going to hold you to whether he was

5 on his side or not, but what I'm trying to get at is

6 he was flat, essentially.

7    A.   For the most part.

8    Q.   Where were his hands when he was struck?

9    A.   His hands were still--again, I can't be

10 exact with the positioning of his hands, but they

11 would either be towards his sides or underneath him

12 during the struggle.  The struggle was to get his

13 hands out from underneath him to get them behind his

14 back.

15    Q.   When you were struggling with Mr. Burnikel

16 on the ground, were you applying any weight to his

17 back?

18    A.   It's possible, but I don't recall where our

19 knees were all positioned at that time.

20    Q.   Do you recall ever putting your knees on his

21 back, or either knee?

22    A.   I cannot say for sure on that.

23    Q.   Did anybody strike his knee area?

24    A.   Not that I ever observed.

25    Q.   And I take it by that answer, you didn't?

**20**

1    A.   I did not.

2    Q.   How about his thigh area?

3    A.   Again, I did not observe that strike.

4    Q.   How about a blow to the hip?

5    A.   That possibly could have been from one of

6 what I considered a midsection strike.  Like I say, I

7 observed two midsection strikes.

8    Q.   I see.

9    A.   Where they landed for sure, I can't be

10 exactly point on.

11    Q.   When did you strike him in the groin area in

12 relation to the other blows?

13    A.   The knee strikes came first, immediately

14 followed by the groin strike, at which time he was

15 still standing.

16    Q.   Groin strikes; correct?

17    A.   Correct.

18    Q.   You hit him twice?

19    A.   That is correct.

20    Q.   And after you hit him twice in the groin,

21 what happened?

22    A.   That seemed enough to get his knees to

23 buckle, and we were able to force him to the ground.

24    Q.   When he was forced to the ground, was he

25 able to arrest his fall with his hands?

**21**

1    A.   That, I do not recall.

2    Q.   Are you aware that Mr. Burnikel had rather

3 extensive damage to his teeth?

4    A.   That was not reported the night of the

5 incident.

6    Q.   Are you aware now that he had rather

7 extensive damage to his teeth?

8         MR. HARALDSON:  I object.  Speculation.

9         THE WITNESS:  Do I still answer?

10         MR. RYALS:  Yes.

11    A.   I've heard that that's been, what do you

12 call it, accused of.

13    Q.   Alleged?

14    A.   Alleged.

15    Q.   Anything you did or anything you saw happen,

16 would it explain damage to his teeth?

17    A.   No.

18    Q.   If someone is handcuffed behind their back

19 and they're proned, is it proper or improper to lift

20 them up by grabbing the handcuffs?

21    A.   As you're picking someone up, you grab arms

22 and handcuffs both.  If somebody is struggling, you

23 can pick them up by the handcuffs.

24    Q.   Has anybody ever taught you that lifting

25 someone up by the handcuffs alone, with no other

## 26

1  away from that.

2       The suspect had beaten his girlfriend almost

3  to death with a hammer.

4       We observed the suspect.  We got him

5  stopped.  He attempted to take off.  To prevent that

6  person from leading us on a high-speed pursuit, which

7  he was known for doing, I shot the rear tire of the

8  car, which ended that within two blocks.

9       Q.  Why did you get disciplined for that?

10      A.  I'm not sure.

11      Q.  Okay  What other discipline have you

12  received?

13      A.  A written reprimand for failing to write a

14  report for someone who claimed they had been assaulted.

15      Q.  Any other?

16      A.  None that I recall.

17      Q.  What was the discipline meted out for the

18  shooting the tire incident?

19      A.  Two days.

20      Q.  Suspension?

21      A.  Suspension.

22      Q.  How about for the failure to write a report?

23      A.  Written reprimand.

24      Q.  I'm sorry  You said that

25          How long does a Des Moines police officer

## 27

1  have to be on the job before they are qualified for a

2  retirement pension?

3       A.  Twenty-two years for your full vesting, and

4  30 years if you want to reach the maximum escalators.

5       Q.  If you retire before 22 years  you don't get

6  the full pension  is that correct?

7       A.  You would not receive--the full vesting is

8  72 percent.  After 30 years, it's 82 percent.  If you

9  retire prior to the 22 years, then it's based on the

10  percentage of the time served.

11      Q.  Would it be accurate to say that someone who

12  is involuntarily terminated after 22 years would not

13  receive their pension?

14          MR HARALDSON:  Objection  Irrelevant

15          You can go ahead and answer

16      A.  I'm not sure what the procedure is for

17  somebody who is fired that has 22 years.  I'm not

18  sure if they receive pension or they just receive the

19  money that they've put into the pension system

20  themselves and do not receive the City's match.  I'm

21  not sure how that works.

22      Q.  Where were you when Officer Fong sprayed

23  Mr Burnikel with pepper spray?

24      A.  I was heading towards his direction.  I had

25  let loose of the person I had, and I was heading

## 28

1  towards Officer Fong.

2       Q.  When you first observed-- You said you

3  looked over your shoulder and observed Mr  Burnikel

4  and Officer Fong  Did you witness any offense that

5  Mr Burnikel committed?

6       A.  No, I did not.

7       Q.  When you began moving toward them

8  Officer Fong and Mr  Burnikel  had you witnessed any

9  offense?

10      A.  No, I had not.

11      Q.  Were you responding not because you

12  witnessed an offense  but because you were going to

13  support Officer Fong?

14      A.  That is correct.

15      Q.  At the time Mr  Burnikel was pepper-sprayed

16  did you witness any offense?

17      A.  No, I did not.

18      Q.  Did you ever witness any offense committed

19  by Mr  Burnikel?

20      A.  The resisting of us trying to take him into

21  custody.

22      Q.  Did you ever witness any assault?

23      A.  No.

24      Q.  If Mr  Burnikel had pushed you or

25  Officer Fong  would that constitute an assault?

## 29

1       A.  Yes, it would.

2       Q.  How soon after Mr  Burnikel was pepper-

3  sprayed did you touch him?

4       A.  I would say almost immediately.

5       Q.  Was there anybody else in the area close

6  by in the vicinity  say within arm's reach  when

7  Mr Burnikel was pepper-sprayed?

8       A.  I can't say for sure arm's reach.  There

9  were several people in the area, though, due to the

10  reason of the area of the line that's involved with

11  the cab stand.

12      Q.  This woman  Ms Huemiller  or whatever her

13  name is  was she within arm's reach?

14      A.  Once we engaged with Mr. Burnikel, I took my

15  attention away from her.  I don't know how close she

16  was.

17      Q.  Prior to the pepper-spraying  where was she?

18  I mean the instant before

19      A.  She would have been on the ground.

20      Q.  So there was nobody between Officer Fong and

21  Mr Burnikel  correct?

22      A.  Not that I can remember.

23      Q.  How close was Officer Fong when he pepper-

24  sprayed her?

25      A.  Her or him?

30

1    Q.   I beg your pardon  Mr  Burnikel
2    A.   I would say two to three feet, at the most.
3    Q.   He had closed the gap between himself and
4  Mr  Burnikel from when Officer Fong was on the ground
5  until he pepper-sprayed  correct?
6    A.   That is correct.
7    Q.   As did you?
8    A.   Yes.
9    Q.   I take it you put your hands on him  you
10 used your hands somehow to control him?
11   A.   My initial hands-on with Mr. Burnikel was
12 grabbing ahold of his left arm.
13   Q.   Did you grab it with both hands?
14   A.   I would assume so.
15   Q.   Because that's what you've been trained to
16 do  correct?
17   A.   That is correct.
18   Q.   Did you attempt any sort of trained
19 maneuver  an arm bar  a wrist lock  anything like
20 that?
21   A.   Just attempted to pull his arm behind his
22 back.
23   Q.   Was he facing you at that time?
24   A.   I would have been off to his side, so he
25 would have been facing to the east.  I would be on

31

1  his left side, so my primary direction of facing
2  would be to the south.
3    Q.   So you weren't like you and I are sitting
4  here facing one another   You were like bladed  if
5  you will
6    A.   Correct.
7    Q.   And did you ever tell Mr Burnikel he was
8  under arrest?
9    A.   I do not recall if I said those statements.
10   Q.   Did you give him any commands?
11   A.   Yes.  I would have been telling him to put
12 his hands behind his back.
13   Q.   By your response  the way you phrased it  "I
14 would have been telling him " that suggests to me
15 that you're reporting what you think you did or what
16 you ordinarily would do  so let me ask it again:  Did
17 you give him any commands?
18   A.   I cannot say for sure what commands I gave
19 him.
20   Q.   Did you ever hear Officer Fong tell
21 Mr Burnikel he was under arrest?
22   A.   I don't recall him making those statements.
23   Q.   Do you recall Officer Fong saying anything?
24   A.   Not at this time.
25   Q.   Not at this time today or not at this point

32

1  of the event?
2    A.   At this time today, no, due to the fact that
3  this was three years ago, I do not recall what he
4  said.
5    Q.   How quickly after you put your hands on
6  Mr Burnikel did Officer Fong strike him with his
7  knee?
8    A.   It's hard to estimate time during a fight,
9  but everything moves quickly, so it would be a very
10 short time span between hands-on and the initial knee
11 strikes.
12   Q.   By a very short time  is it fair to say this
13 didn't take 30 seconds of you standing there struggling
14 standing up  correct?
15   A.   That is correct.
16   Q.   Do you have an estimate as to how long--how
17 much time elapsed before Mr  Burnikel went to the
18 ground?
19   A.   I won't make estimates as far as the time
20 frame due to the fact that fights are very fast and
21 very short, and to say it was 10 seconds, we could
22 sit here and stare at a clock for 10 seconds and it
23 would seem like an eternity.
24   Q.   Right
25   A.   But during a fight, it is split seconds, so

33

1  I cannot make an estimate on time.
2    Q.   All right   From the time that you first
3  decided to get involved in what was going on between
4  Officer Fong and Mr  Burnikel  is it accurate to say
5  from that first decision until Mr  Burnikel was in
6  cuffs  it was a brief period of time?
7    A.   Very brief, yes.
8    Q.   It happened very quickly?
9    A.   That is correct.
10   Q.   Was it--I know you can't speak for
11 Officer Fong  but was it your intention--once you
12 decided to put your hands on Mr  Burnikel  was it
13 your intention to bring whatever struggle was going
14 on to a conclusion as quickly as you could?
15   A.   That is correct.
16   Q.   And the end of the struggle would be defined
17 by him being in handcuffs  correct?
18   A.   If he has quit resisting once handcuffed,
19 that would be the end.
20   Q.   Did he?
21   A.   As I recall, yes.
22   Q.   What resistance or what acts of resistance
23 did you observe from Mr  Burnikel?
24   A.   Primarily just refusing to put his hands
25 behind his back, and once on the ground, had his

PETERSEN COURT REPORTERS
500 SW 7th Street, Suite 305, Des Moines, IA 50309 (515)243-6596

PL.APP.000034

**50**

1    Q.   And is the natural reaction when you're
2  pepper-sprayed to want to put your hands to your
3  face?
4    A.   If it has the intended effect, that is a
5  pretty natural reaction.
6    Q.   I take it you've seen that out on the
7  street.
8    A.   Yes, I've seen that happen and not happen.
9    Q.   You've already testified that you did not
10  witness Mr. Burnikel commit any offense prior to him
11  being pepper-sprayed.  Would that include you did not
12  see him in any assaultive behavior?
13    A.   That is correct.
14    Q.   And even after he was pepper-sprayed, he was
15  not assaultive?
16    A.   No.
17    Q.   That's not correct?
18    A.   Oh, that is correct.  Excuse me.
19    Q.   Does pepper spray have a color?
20    A.   It depends on the type that your department
21  issues.  Ours has a reddish iodine color.
22         (Deposition Exhibit 2 was
23              marked for identification.)
24  BY MR. RYALS:
25    Q.   So Exhibit 2, is this the CIR you made

**51**

1  reference to earlier in your depo?
2    A.   Yes.  That was authored by Officer Fong.
3         (Deposition Exhibit 3 was
4              marked for identification.)
5  BY MR. RYALS:
6    Q.   And Exhibit 3, is that your supplement?
7    A.   That is correct.
8    Q.   What all did you do to prepare to give your
9  testimony here today?
10    A.   I reviewed the reports that are in front of
11  us here.  I did go back through the record of the
12  trial, and also obviously met with the City attorneys
13  on this situation.
14    Q.   You testified on two separate days at the
15  criminal trial; is that correct?  I may be wrong
16  about the two days.  You took the stand twice.
17    A.   I believe I took the stand twice.  I don't
18  recall if it was two separate days or if I went back.
19    Q.   Do you know why you were called to the stand
20  a second time?
21    A.   I'm assuming either the prosecution or the
22  defense had more questions.
23    Q.   You were not told why you were being called
24  back?
25    A.   No.  That is not abnormal, to testify and be

**52**

1  told to be by your phone in case they need you again.
2    Q.   The person you were escorting to the wagon,
3  what offense had he committed?
4    A.   He was being charged with interference and
5  public intox.
6    Q.   Interference in what respect, sir?
7    A.   With us to performing our duties.
8    Q.   And the woman, what offenses did she commit?
9    A.   She was initially charged with interference.
10  That's from her grabbing my arm when I was trying to
11  walk away with the other individual, also intox, and
12  she had some sort of warrant.  I don't recall what
13  the warrant was, though.
14    Q.   The act that you characterized as
15  interference, was that assaultive?
16    A.   You could classify it as assault if she
17  grabbed my arm, so it's perspective.
18    Q.   So let me see if I have this right.  You
19  have these two subjects, the man you were escorting
20  to the wagon who had committed two violations in your
21  presence; correct?
22    A.   That is correct.
23    Q.   You had the woman who had committed two
24  violations and maybe even a third, if you call her
25  grabbing you assault, in your presence; correct?

**53**

1    A.   That is correct.
2    Q.   And you had Mr. Burnikel who committed no
3  offense in your presence that you saw; correct?
4    A.   That's correct.
5    Q.   And you and Officer Fong determined to turn
6  your attention from two people who had committed
7  multiple offenses to Mr. Burnikel.  Is that accurate?
8    A.   I turned my attention to Mr. Burnikel
9  because I could see Officer Fong was having a
10  situation with him.
11    Q.   And the situation was purely verbal?
12    A.   That I saw, yes.
13    Q.   When you struck Mr. Burnikel twice in the
14  groin area, did you ball your fist?
15    A.   Yes.
16    Q.   Which fist?
17    A.   Left.
18    Q.   Are you right-hand dominant?
19    A.   No.
20    Q.   Are you left-hand dominant?
21    A.   Yes.
22    Q.   Did the two blows that you delivered occur
23  in rapid succession?
24    A.   Yes.
25    Q.   The man that you were arresting who you took

**54**

1  over by the wagon disappeared; is that correct?
2  A.  That is correct.
3  Q.  You never identified him?
4  A.  No, I did not.
5  Q.  And he is presently, as far as you know, at
6  large?
7  A.  That is correct.
8  Q.  So when you prepared Exhibit 3, does that go
9  with Exhibit 2 together?
10  A.  Yes, they would go together, along with the
11  charges, to the county attorneys.
12  Q.  Did you suffer any injury?
13  A.  No, I did not.
14  Q.  Did you suffer any property damage?
15  A.  No, I did not.
16                    (Deposition Exhibit 4 was
17                    marked for identification.)
18  BY MR. RYALS:
19  Q.  This is Deposition Exhibit 4.
20      Do you recognize that document?
21  A.  It would be a City of Des Moines document
22  authored by Lieutenant Larry Davey.
23  Q.  And it's called a supplemental report?
24  A.  Yes, it is.
25  Q.  Can you tell what it is a supplement to?

**55**

1  A.  To the incident that we're discussing here.
2  Q.  So to Exhibit 2; is that correct?
3  A.  It is not part of this.  This is a separate
4  supplemental done by a supervisor.
5      Any time force is used, a supervisor comes
6  to the scene to interview the officers and the person
7  that the force was used on.
8  Q.  So it doesn't go with Exhibits 2 and 3?
9  A.  No.  It would not go to the county attorneys
10  for charges.  This is for--this is more of an
11  internal supplemental for the fact that a supervisor
12  has to come to the scene any time we use force, and a
13  supervisor has to either--if it's your immediate
14  supervisor, he would endorse the use of force, but in
15  this case this was not my immediate supervisor, but
16  the watch commander that was on duty, and since I'm a
17  sergeant, another sergeant can't come to the scene,
18  so if a lieutenant is available, then a lieutenant
19  comes to the scene, which happened on this night.
20  Q.  When you said that you send Exhibits 2 and 3
21  to the county attorney with the charges, what does
22  the charging document look like?  Is it a supplement?
23  A.  No.  It's a piece of paper about this size,
24  two or three copies bound together that when you
25  write, it writes clear through if you did it by hand.

**56**

1      At the point of this one, I believe--I guess
2  I can't say.  This charge was possibly handwritten or
3  it possibly could have been done in the computer
4  system, which then it's automatically sent to the
5  county attorneys for the next morning, and I don't
6  recall which we did with this.
7  Q.  In Exhibit 4 there's a space at the very top
8  where it says "Charges:"
9  A.  Yes.
10  Q.  And what does it say under that?
11  A.  It says, "Interference with official act
12  causing injury, public intox, and resisting arrest".
13  Q.  And are those charges pertaining to
14  Mr. Burnikel?
15  A.  I would believe so, yes.
16  Q.  Interference with official act causing
17  injury?
18  A.  Yes.
19  Q.  Now, did Lieutenant Davey get that
20  information from one or both of you officers?
21  A.  Probably it came from one of us.
22  Q.  What are the elements of this interference
23  with official act causing injury?
24  A.  The element would be a person interfering
25  with the official duties of a police officer and

**57**

1  during that interference an officer was injured.
2  Q.  Was Officer Fong injured?
3  A.  Other than splash-back from the Mace, not
4  that I recall.
5  Q.  And you weren't either; right?
6  A.  No, I was not.
7  Q.  So is that an accurate charge given that
8  neither you nor Officer Fong were injured?
9      MR. HARALDSON:  I'm going to object.
10  Speculation.
11  A.  That's not the charge that was filed against
12  Mr. Burnikel.  I'm not sure where the causing injury
13  part came from, whether it was a misunderstanding,
14  but he was not charged with interference causing
15  injury.  I'm not sure where that came from.  You
16  would have to talk with Lieutenant Davey.
17  Q.  Well, I'm relying on your testimony that
18  Lieutenant Davey got this information from you and
19  Officer Fong, or one of you; correct?
20  A.  Correct.
21  Q.  And when police officers write reports, they
22  value accuracy and completeness; correct?
23  A.  That is correct.
24  Q.  Have you ever known Lieutenant Davey to be
25  sloppy in his work?

## 58

1     A.   Due to the fact that he ranks above me, I

2  can't speculate on his sloppiness with his reports.

3  I've never reviewed his reports.

4     Q.   I mean wouldn't it surprise you if a

5  lieutenant wrote "official act causing injury" and

6  didn't have facts to support that if he wrote it in

7  his official report?

8     A.   Possibly there could have been a mixup

9  in communication between the officers and the

10  lieutenant.

11     Q.   You're quite clear neither you nor

12  Officer Fong told the lieutenant that either of you

13  were injured; correct?

14     A.   I know I told him I was not injured.  I

15  can't speak for Officer Fong.

16              (Deposition Exhibits 5 and 6

17              were marked for identification.)

18  BY MR. RYALS:

19     Q.   Do Exhibits 5 and 6 appear to be familiar to

20  you, or do you recognize them?

21     A.   Yes.

22     Q.   And what are they?

23     A.   They would have been photos taken of

24  Mr. Burnikel by our ident section after use of force

25  occurred.

## 59

1     Q.   Exhibit 6 appears to be in front of the

2  wagon, would you agree, and 5 as well?

3     A.   Both of them would be at the rear of the

4  wagon where the doors are.

5     Q.   Do those photographs fairly and accurately

6  depict what Mr. Burnikel looked like at the time the

7  photos were taken?

8     A.   Yes.

9     Q.   Is this before or after you had attempted to

10  wash the pepper spray from his eyes?

11     A.   That, I do not recall.  I don't know which

12  came first.

13     Q.   When you look at Exhibits 5 and 6, do you

14  see any indication that Mr. Burnikel has been pepper-

15  sprayed?

16     A.   The orange tint to what would be his left

17  eye down the side of his face would be consistent

18  with the color of dye that's in our pepper spray, and

19  his left eye being closed possibly could be because

20  that's the primary eye that took the main hit from

21  the pepper spray.

22     Q.   So the eye being closed could be a sign that

23  he had been pepper-sprayed?

24     A.   That's correct.

25     Q.   In 2009 were you directed to attend an anger

## 60

1  management class?

2     A.   No.

3     Q.   Was it a different year?

4     A.   I've never attended an anger management

5  class.

6     Q.   Have you ever received any counseling, not

7  on a personal level, but as a part of your job, from

8  any healthcare provider?

9         MR. HARALDSON:  Objection.  Relevance.

10         You can answer.

11     A.   Yes.

12  BY MR. RYALS:

13     Q.   And that wasn't anger management?

14     A.   I did not go to an anger management class.

15     Q.   How many times have you received attention

16  from a healthcare provider as part of your job?

17     A.   I could not even--I don't think I can even

18  speculate on times.  Obviously from various different

19  injuries that have occurred during my duties.  I

20  really don't have a number for you.

21     Q.   So is there a protocol for when you go to a

22  healthcare provider?

23         My question is unclear, and I apologize.  I

24  mean mental healthcare provider, not physical

25  injuries.

## 61

1     A.   Repeat your question, please.

2     Q.   My question is have you seen--as part of

3  your job or in relation to your job as a police

4  officer for Des Moines, have you ever received

5  mental-health counseling or attention from a

6  healthcare provider?

7     A.   Yes.

8     Q.   On how many occasions?

9     A.   Once.

10     Q.   Was that in 2009?

11     A.   I would have to look at my records, but it

12  was not called anger management the time I went to

13  the counselor.

14     Q.   What was it called?

15     A.   I really don't know what they even called

16  it.

17     Q.   Do you know the purpose for you seeing this

18  counselor?

19     A.   An evaluation.

20     Q.   For?

21     A.   I was sent there after misuse of a City

22  computer.

23     Q.   That was the cause of it, misuse of a City

24  computer?

25     A.   Part of it was I had to go see a counselor

PL.APP.000037

62

1  for one session.
2      **Q.** Well, what was the misuse?
3          MR. HARALDSON: Objection. Relevance.
4      Go ahead and answer.
5      **A.** **Inappropriate use of the computer, doing**
6  **non-job-related things on the computer.**
7      **Q.** Exactly what were those non-job-related
8  things?
9      **A.** **I'm not going to answer that.**
10     **Q.** Sergeant, your lawyer will tell you if I
11 mischaracterize what the Federal Rules of Civil
12 Procedure allow; all right?
13         If you don't answer this question, I'll go
14 to the Judge and I'll ask the Judge to compel you to
15 answer it, and we'll have to reconvene or else you'll
16 have to write something under oath, but the rules
17 permit me to ferret out information that could have a
18 bearing on this case.
19         The case includes the City of Des Moines
20 as a defendant, and because it includes the City of
21 Des Moines, I'm entitled to explore the way they
22 operate their complaint and discipline system. Okay?
23         MR. HARALDSON: Within relevance or within
24 topics that may lead to relevant evidence.
25         MR. RYALS: That's the dilemma. I can't

63

1  tell if it might lead to relevant evidence if I don't
2  have the information.
3  BY MR. RYALS:
4      **Q.** So, for example, if you sent out an e-mail
5  or passed along a racist cartoon, in my view that
6  would be relevant; okay? So I'm imploring you to
7  answer the question. Maybe the Judge won't order you
8  to, but I can't determine whether it's relevant or
9  not unless I know the answer.
10         MR. HARALDSON: Why don't you give me
11 60 seconds before we get in a fight; okay? Maybe I
12 can avoid this just by talking so I want to know what
13 he wants to do.
14         Come with me for a second. I just need
15 60 seconds.
16         (Short recess.)
17         MR. HARALDSON: Go ahead. Why don't
18 you--before they got to the statements about the
19 answer, could you repeat the last question that was
20 on the record for Gregg?
21         (Question read by the reporter.)
22     **A.** **Again, I'll say this is none of your**
23 **business. It has nothing to do with this case, but I**
24 **looked at adult material. I admitted to my mistake,**
25 **and I was disciplined, which included one counseling**

64

1  session.
2  BY MR. RYALS:
3      **Q.** Okay. How many times have you been
4  disciplined for using your firearm?
5      **A.** **Once.**
6      **Q.** Have you received any commendations, awards,
7  or medals?
8      **A.** **Yes. I do have commendations in my file. I**
9  **wouldn't be able to list them. You would have to**
10 **look at the file for that.**
11     **Q.** Do you recall the substance of any of them?
12     **A.** **One was for catching a rapist in progress.**
13 **I really can't think of the other ones. There's some**
14 **different commendations for being part of the**
15 **military and being deployed, letters of, you know,**
16 **appreciation.**
17         **Other than that, really, off the top of my**
18 **head, I really can't think of them. I'm not too big**
19 **into medals and awards.**
20     **Q.** On January--was it the 6th--February 6th--
21 February 16th, sorry, February 16th of 2013 when you
22 were working at the cab stand, were you dressed like
23 you're dressed now?
24     **A.** **Exactly like this, except I would have been**
25 **wearing a coat, stocking hat, and a pair of gloves.**

65

1      **Q.** The items you carry on your duty belt: Side
2  arm?
3      **A.** **Yes.**
4      **Q.** Pepper spray?
5      **A.** **Yes.**
6      **Q.** TASER?
7      **A.** **No.**
8      **Q.** Some sort of baton?
9      **A.** **No.**
10     **Q.** Handcuffs?
11     **A.** **Yes.**
12     **Q.** Radio?
13     **A.** **Yes.**
14     **Q.** Anything else I've missed?
15     **A.** **Spare ammo.**
16     **Q.** Are you qualified to use a TASER?
17     **A.** **Yes, I am.**
18     **Q.** You choose not to carry it?
19     **A.** **There is only so many TASERs issued, and**
20 **they're primarily issued to the officers, not the**
21 **supervisors.**
22     **Q.** How about a baton? Is there a reason you
23 don't carry a baton?
24     **A.** **We are currently issued an asp baton, which**
25 **is pretty much a worthless piece of equipment, very**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
(CENTRAL DIVISION)

- - - - - - - - - - - - - - - X
DUSTIN BURNIKEL,            :
                         :
       Plaintiff,     :
                         :
vs.                  : Case No. 4:15-cv-00050
                         :
MICHAEL FONG, individually  :
and in his official capacity :
as a law enforcement officer :
with the Des Moines Police  :
Department; GREGG WESSELS,   :
individually and in his     :
official capacity with the   :
Des Moines Police Department; :
and CITY OF DES MOINES, IOWA, :
                         :
       Defendants.    :
- - - - - - - - - - - - - - - X


DEPOSITION OF GARTH HOUSE,

taken by Counsel for the Plaintiff before

Edie Spriggs Daniels, Certified Shorthand Reporter

of the State of Iowa, at 25 East 1st Street,

Des Moines, Iowa, commencing at 10:15 a.m., Monday,

May 9, 2016.


EDIE SPRIGGS DANIELS - CERTIFIED SHORTHAND REPORTER

PL.APP.000039

**2**

1 APPEARANCES:

2 For the Plaintiff:      JAMES R. WYRSCH, ESQ.
                          JAVAD M. KHAZAELI, P.C.
3                         911 Washington Avenue
                          Suite 211
4                         St. Louis, Missouri 63101

5                         JUSTIN K. SWAIM, ESQ.
                          Swaim Law Firm, P.L.L.C.
6                         701 13th Street
                          Suite 2
7                         West Des Moines, Iowa 50265

8 For the Defendants:     JOHN O. HARALDSON, ESQ.
                          City of Des Moines Legal Dept.
9                         400 Robert D. Ray Drive
                          Des Moines, Iowa 50309

10

11

12

13

14

15
16
17
18
19
20
21
22
23
24
25

**3**

1                    I N D E X

2 WITNESS                        EXAMINATION

3 Garth House                    4 (Wyrsch)
4                                37 (Khazaeli)
                                 56 (Haraldson)
5

6

7

8

9

10              E X H I B I T S

11 DEPOSITION EXHIBITS           FIRST REFERENCED

12 1 - Police reports            20

13 3 - Interviews re: Vasquez    47

14 5 - Police reports            59

15

16

17

18

19

20

21

22

23

24

25

**4**

1              P R O C E E D I N G S

2                    GARTH HOUSE,

3 called as a witness by Counsel for the Plaintiff,

4 being first duly sworn by the Certified Shorthand

5 Reporter, was examined and testified as follows:

6                 DIRECT EXAMINATION

7 BY MR. WYRSCH:

8     Q.   Sergeant House?

9     A.   Yes, sir.

10    Q.   Will you identify yourself for the record?

11    A.   I'm Sergeant Garth House, G-a-r-t-h,

12 H-o-u-s-e.

13    Q.   And how long have you been with the

14 Des Moines Police Department?

15    A.   Since June 29th, 1998.

16    Q.   And how long have you been a sergeant?

17    A.   Five years, maybe, four years.

18    Q.   We're here about--  I'm sorry.

19         Have you been deposed before?

20    A.   Yes.

21    Q.   So as I say, I mean earlier we got caught in

22 talking over each other.  I'll try to not talk over

23 you, and I'm more saying that for myself.

24    A.   Okay.

25    Q.   So we're here about an incident involving

**5**

1 Dustin Burnikel, Sergeant Wessels, and Officer Fong.

2         Are you familiar with this?

3     A.   A little bit, yeah.

4     Q.   Okay.  Were you a sergeant--  This happened

5 in February of 2013.  Were you a sergeant at the

6 time?

7     A.   Yes.

8     Q.   The reason you are here is because that guy

9 listed you as a witness--

10    A.   I appreciate that greatly.

11    Q.   --on the list of witnesses, so we're just

12 trying to find out what you know.

13    A.   Okay.

14    Q.   So tell us what you were doing that evening.

15    A.   That evening, I was home in bed.

16    Q.   Okay.  Resting comfortably?

17    A.   I'm sure.  I imagine the reason why I'm here

18 is probably because I'm Officer Fong's supervisor at

19 the time.

20    Q.   Okay.  And I was going to ask you a

21 question, because I think there was some indication

22 that you were a supervisor of both Fong and Wessels,

23 but he was a sergeant.

24    A.   Correct.  No, he was not--I guess in some

25 sense as I scheduled that off-duty job that they were

**6**

1  working at, so I wouldn't really call myself a
2  supervisor of that job, I guess, but more of a
3  coordinator.
4      Q.  Okay.  So tell me about that.  What is your
5  role or what was your role at the time of scheduling
6  off-duty jobs?
7      A.  Well, that particular job was through
8  Trans Iowa, which is the cabstand company for both
9  Yellow and Capitol Cab.
10     Q.  And what was that word, the second one?
11     A.  Capitol.
12     Q.  Capitol?
13     A.  Capitol Cab.
14     Q.  Des Moines being the capital of Iowa.
15     A.  Very good.
16     Q.  All right.
17     A.  So basically what that consisted of is a
18  designated area down at 3rd and Court, which is in
19  the center of our bar district, and basically just
20  keeping things in order, keeping the peace there at
21  the cabstand line on Friday and Saturday nights.
22     Q.  And so how did you obtain the position of
23  being the coordinator of that?
24     A.  I was already scheduling off-duty officers
25  for Operation Downtown, which hires officers to

**7**

1  patrol during the summer.
2          The cab company contacted me because they
3  wanted to know how they could go about hiring
4  officers, and I just started scheduling for them.
5      Q.  And so this is not one of your duties as a
6  police officer; this is something you take on?
7      A.  A side job, I guess you would call it.
8      Q.  Do you get paid to be a coordinator?
9      A.  Some jobs I do; some jobs I don't.
10     Q.  Do you remember if you got paid on the
11  taxicab stands?
12     A.  Yes.
13     Q.  Was that an hourly or was it a fixed fee per
14  night, or how do you get paid by them?
15     A.  How I do personally get paid or the officers
16  that work it?
17     Q.  You.
18     A.  I charged one hour per week per month.
19     Q.  So in the role of coordinating these
20  officers for off duty, how do you go about finding
21  officers to man the post?
22     A.  I've had officers approach me over the years
23  and say they're interested in working off duty, so
24  then about a month ahead of time, I go and say--so
25  like, say, it's May now, so I put out a request for

**8**

1  any officers interested in working the month of June
2  at the cabstand, so then they would respond in an
3  e-mail, and then I just kind of divvy it out as far
4  as I could.
5      Q.  To your knowledge--I know you're not the
6  captain, but why did they want the-duty police
7  officers down there?
8      A.  Well, otherwise it kind of turns into a
9  free-for-all, a bunch of intoxicated people showing
10  extremely poor judgment down there, and they're not
11  really particularly civil, so they will all try to
12  force their way to the front of the line and, you
13  know, try to hassle the taxi drivers, trying to get
14  them to lower their rate, or you get people who are
15  just too intoxicated, throwing up in the cab or
16  dragging people out of the cabs, and it's just--
17  without any kind of authority down there, it just
18  kind of gets pretty murky.
19     Q.  So what are the roles--  Are there two
20  officers that are assigned to the cabstand?
21     A.  Correct.
22     Q.  Off-duty officers?
23     A.  Correct.
24     Q.  And what is their role?  Is this a program
25  that still goes on?

**9**

1      A.  No, actually, it doesn't now.  With Uber and
2  then the other--they have a lot of other cab
3  companies to function within the City, and they
4  weren't paying their share, so the cab company has
5  pretty well done away with it.
6          We take over part of their role.  The
7  officers are working for Operation Downtown now, just
8  kind of managing it a little bit.
9      Q.  So on-duty officers?
10     A.  No, it's still off duty.  It's just run
11  through a different organization.
12     Q.  What organization?
13     A.  Operation Downtown.
14     Q.  Operation Downtown?
15     A.  Correct.
16     Q.  Is that like a civic organization?
17     A.  It's a nonprofit organization that
18  basically--not to overcomplicate things, but there's
19  a thing called SSMID, which is a self-sustaining
20  municipal something or other.
21          Anyway, so it's kind of an organization of
22  businesses that do a self-imposed tax.  They do the
23  Safe and Clean program.  All the trash cans are out,
24  and they power wash buildings, sidewalks, flowers,
25  that kind of thing.

**18**

1  one point before he went to narcotics--so then they
2  fill in too.
3      Q.   And in connection with this use of force, I
4  think you said you endorsed it, so what does that
5  mean?
6      A.   So what happened is because I wasn't present
7  to do the interview on-- Burnikel?
8      Q.   Burnikel.
9      A.   Burnikel.  So what happened was so he
10 conducted use of force, and then he contacted the
11 first supervisor that was working then, which was
12 Larry Davey.
13     THE WITNESS:  Is that right, or Kouski?
14     MR. HARALDSON:  Just your best information.
15     THE WITNESS:  Okay.
16     A.   Anyway, whatever supervisor was working
17 First Watch that night, so they came out and talked
18 to him, so then when I came back to work, Fong came
19 to me and said, "Hey, I had to use force the other
20 night.  Here it is."
21     So then I went and got the supervisor's
22 endorsement--or the supervisor's interview, rather,
23 read that, went and talked to Mike about it.  He told
24 me the story, so I kind of jibed it up with all the
25 pictures, and then I had to decide whether or not

**19**

1  that force was appropriate for the circumstances
2  that had happened after reviewing his stuff,
3  Sergeant Wessels' stuff, and using my best judgment.
4      Q.   Just to be clear, you're reviewing the CIR
5  reports--
6      A.   Correct.
7      Q.   --done by Sergeant Wessels, Officer Fong.
8  Did you look at--it was Lieutenant Davey that did the
9  other one.
10     A.   Yes.
11     Q.   Did you look at that?
12     A.   Yes.
13     Q.   Did you look at photos?
14     A.   Yes.
15     Q.   And you talked to Officer Fong himself?
16     A.   Correct.
17     Q.   Any other things that you reviewed to look
18 at that?
19     A.   Not that I can recall right now.
20     Q.   And then do you make a recommendation for up
21 the chain?
22     A.   Yes.
23     Q.   And in this instance you recommended that
24 you thought it was a justified use of force?
25     A.   Correct.

**20**

1      Q.   Were you involved at all in the review of
2  Officer Fong when he punched a suspect who was in
3  handcuffs and subdued and was disciplined for that?
4      MR. HARALDSON:  Objection.  Relevance.
5      Go ahead.
6      A.   No, I wasn't.
7  BY MR. WYRSCH:
8      Q.   You weren't his supervisor at that time?
9      A.   Correct.
10     Q.   Are you aware that that happened?
11     A.   I've heard some story, but I don't know
12 anything about it other than that.  Essentially what
13 you just said.
14     MR. WYRSCH:  So give him Exhibit 1, if you
15 could.
16 BY MR. WYRSCH:
17     Q.   Do you recognize Exhibit 1?
18     A.   It appears to be a CIR report generated by
19 Officers Fong and Wessels.
20     Q.   Would this be the report that you reviewed
21 as you reviewed the use of force?
22     A.   Yes, it appears to be.
23     Q.   Let's go back.
24     You never would have talked to the victim of
25 these reports, Mr. Burnikel?

**21**

1      A.   The suspect, you mean?  No, I wouldn't have.
2      Q.   You're just reading the reports?
3      A.   Correct.
4      Q.   And talking to the officers?
5      A.   Correct.
6      Q.   Did you talk to Sergeant Wessels about it?
7      A.   Yes.
8      Q.   So turning to the fourth page, this is a
9  supplemental report.
10     Well, I guess before I ask this question, as
11 Officer Fong's supervisor, are you also reviewing
12 this--are you reviewing this just to find out whether
13 Officer Fong's use of force is justified or whether
14 both Sergeant Wessels' and Officer Fong's use of
15 force is justified?
16     A.   Just Officer Fong.
17     Q.   So anything that Sergeant Wessels may have
18 done is not your concern?
19     A.   Correct.  It would be addressed by his
20 supervisor, whoever the watch commander was at that
21 time.
22     Q.   So you don't make any recommendation as to
23 Sergeant Wessels?
24     A.   Correct.
25     Q.   That said, about halfway down the line--

**54**

1    A.   I did not.

2    Q.   In reality, based on the police report,
3  there were multiple punches to the head.  There were
4  punches to the head, punches to the ribs, two punches
5  to the testicles.

6        Is it your testimony that punches to the
7  head, punches to the ribs, and punches to the
8  testicles is significantly less damaging than one
9  head butt to the head?

10   A.   There are two knee strikes to his
11 midsection, two punches to the groin, and Fong
12 punched him once in the face, so it wasn't repeated
13 punches to the head.

14   Q.   Is it your testimony that those five things
15 are less than the head butt?

16        MR. HARALDSON:  Objection.  Speculation and
17 relevance.

18   A.   I guess I'm not a medical expert, so I guess
19 it wouldn't be my place to say.

20 BY MR. KHAZAELI:

21   Q.   Is it possible?

22   A.   Well, if you're talking about head trauma, I
23 don't know where two knee strikes to the midsection
24 is going to have anything to do with head trauma as
25 opposed to one punch to the face.

**55**

1    Q.   Is it possible that the slurred words that
2  Mr. Burnikel had were the cause of head trauma?  Is
3  that possible?

4        MR. HARALDSON:  Objection.  Speculation.

5        Go ahead and answer.

6    A.   From head trauma, it is possible.

7  BY MR. KHAZAELI:

8    Q.   One other question.  I want to go back.

9        You supervised Officer Fong; correct?

10   A.   Correct.

11   Q.   And when you evaluate somebody's use of
12 force, do you take their history of use of force and
13 their background into account?

14   A.   Yes.

15   Q.   Earlier you were asked about an incident in
16 which Officer Fong received a sustained finding of
17 use of force where he punched a handcuffed suspect;
18 correct?

19   A.   That's correct.

20   Q.   What do you know about that incident?

21   A.   That was years before he worked for me, so I
22 guess I take--I guess different sergeants would have
23 different perspectives on how to do things.  Everyone
24 has got their own little personal quirks, so I guess
25 I take my history of my experience working with him

**56**

1  and my other investigations into many uses of force
2  that I may have had with him and kind of take that
3  into context, I guess.

4    Q.   So you don't know about previous use-of-
5  force complaints before you supervised him; correct?

6    A.   Correct.

7    Q.   So you can't take those into account when
8  you're making your analysis?

9    A.   I wouldn't, no.

10   Q.   But is it possible that that would be
11 relevant?

12   A.   It could be.

13        MR. KHAZAELI:  That's all I've got.

14        MR. HARALDSON:  Are you guys done?

15        MR. WYRSCH:  We're done.

16        MR. HARALDSON:  Just one quick question.

17             EXAMINATION

18 BY MR. HARALDSON:

19   Q.   The situation with Officer Fong, as you
20 understood it, on February 16, 2013, was that the
21 blow to the head that he delivered to Mr. Burnikel
22 was while he was resisting being handcuffed; is that
23 right?

24   A.   That's correct.

25   Q.   Is that a different situation than a blow to

**57**

1  the head while someone is handcuffed?

2    A.   That is correct.

3    Q.   Is it a different situation than when
4  someone is both handcuffed and under the control of
5  the police officers?

6    A.   That's correct.

7    Q.   Did you see the blow to the head that
8  Officer Vasquez received?

9    A.   No, I did not.

10   Q.   So you knew a report of him being kicked in
11 the head, or was it punched in the head?  Do you
12 recall?

13   A.   Earlier when he got his nose broke or when
14 he got head butted?

15   Q.   When he was head butted.

16   A.   When he was head butted, I had my back to
17 him when I was talking to Officer Ryan Newman.  I
18 heard the commotion, and I turned around, and that's
19 when I saw them hold him up, and Wellman and Wilson
20 wrestling the guy down.

21   Q.   So you didn't see the blow?

22   A.   No.  I saw the aftermath.

23        MR. HARALDSON:  That's all I have.  Thank
24 you.

25        MR. KHAZAELI:  One follow-up.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
(CENTRAL DIVISION)


- - - - - - - - - - - - - - - X
DUSTIN BURNIKEL,                  :
                                 :
        Plaintiff,                :
                                 :
vs.                               : Case No. 4:15-cv-00050
                                 :
MICHAEL FONG, individually       :
and in his official capacity     :
as a law enforcement officer     :
with the Des Moines Police       :
Department; GREGG WESSELS,        :
individually and in his          :
official capacity with the       :
Des Moines Police Department;    :
and CITY OF DES MOINES, IOWA,    :
                                 :
        Defendants.               :
- - - - - - - - - - - - - - - X


DEPOSITION OF LARRY DAVEY,

taken by Counsel for the Plaintiff before

Edie Spriggs Daniels, Certified Shorthand Reporter

of the State of Iowa, at 25 East 1st Street,

Des Moines, Iowa, commencing at 8:55 a.m., Monday,

May 9, 2016.


EDIE SPRIGGS DANIELS - CERTIFIED SHORTHAND REPORTER

PL.APP.000044

**2**

```
1  APPEARANCES:

2  For the Plaintiff:     JAMES R  WYRSCH  ESQ
                          JAVAD M  KHAZAELI  P C
3                         911 Washington Avenue
                          Suite 211
4                         St  Louis  Missouri 63101

5                         JUSTIN K  SWAIM  ESQ
                          Swaim Law Firm  P L L C
6                         701 13th Street
                          Suite 2
7                         West Des Moines  Iowa 50265

8  For the Defendants:    JOHN O  HARALDSON  ESQ
                          City of Des Moines Legal Dept
9                         400 Robert D  Ray Drive
                          Des Moines  Iowa 50309

10

11

12

13

14

15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1           I N D E X

2  WITNESS                    EXAMINATION

3  Larry Davey                  4 (Wyrsch)
                               51 (Haraldson)
4                              54 (Wyrsch)

5

6

7        E X H I B I T S

8  DEPOSITION EXHIBITS        FIRST REFERENCED

9  1 - Police reports              5

10 2 - ASP Baton Basic Course Outline    36

11

12

13

14

15

16

17

18

19

20

21

22
23
24
25
```

**4**

```
1              P R O C E E D I N G S

2                   LARRY DAVEY

3  called as a witness by the Plaintiff  being first

4  duly sworn by the Certified Shorthand Reporter  was

5  examined and testified as follows:

6                 DIRECT EXAMINATION

7  BY MR  WYRSCH:

8     Q.   Good morning

9          Can you state your name for the record?

10    A.   Larry Davey.

11    Q.   That's D-a-v-e-y?

12    A.   That's correct.

13    Q.   And where are you employed?  What's your

14 rank?

15    A.   Lieutenant.

16    Q.   Lieutenant Davey  where are you currently

17 employed?

18    A.   Currently out of community outreach

19 neighborhood-based service delivery.

20    Q.   For the Des Moines Police Department?

21    A.   Yes.

22    Q.   And how long have you been with the police

23 department?

24    A.   Twenty-seven years.

25    Q.   And how long have you been a lieutenant?
```

**5**

```
1     A.   Oh, gosh.  I want to say three, three years.

2     Q.   And prior to that?

3     A.   Three-and-a-half.  I was a sergeant.

4     Q.   How long were you a sergeant?

5     A.   About eight, I believe.

6     Q.   You've been listed in this case as a

7  potential witness for the Defendants in this matter

8  and the subject told to us is the testimony about

9  your actions investigating the use of force in the

10 events of the evening  and this is in relation to a

11 Dustin Burnikel

12          Are you familiar with Mr  Burnikel?

13    A.   After reading my report, yes.

14              (Deposition Exhibit 1 was

15               marked for identification )

16 BY MR  WYRSCH:

17    Q.   And you have in front of you what is marked

18 as Exhibit No  1  You just referenced a report

19          If you would turn  I think it's about

20 five pages in  there is a supplemental report  page 1

21 of 1

22          Is that what you're referring to as your

23 report?

24    A.   Yes.

25    Q.   Is that the only report that you prepared in
```

**6**

1  connection with the Burnikel matter?
2  A.  Yes.
3  Q.  And it has your name at the bottom in
4  box 14?
5  A.  Yes.
6  Q.  So describe to me how you became involved in
7  the incident, the investigation of the incident.
8  A.  I was watch commander on the midnight shift,
9  and since there was a sergeant involved in this
10  report, this use of force, I responded as a
11  lieutenant, one rank above the officers involved, to
12  interview, you know, Mr. Burnikel and kind of find
13  his side of the story and kind of do a little
14  preliminary investigation, because I knew an arrest
15  incident report would be coming, so I would need to
16  follow up on that and make my recommendation and
17  endorsement.
18  Q.  Okay.  And so you refer that you're a
19  lieutenant and a sergeant is involved.
20     Am I correct that normally sergeants
21  investigate these matters?
22  A.  If it was an officer, which is normally the
23  case, yes, their supervisor, which would be a
24  sergeant, would respond and interview the subject or
25  the person involved.

**7**

1     In this case since there was a sergeant
2  involved, I went as the next rank above to do an
3  investigation.
4  Q.  And when you arrived at the scene--  I guess
5  is there any written policy that guides how you're
6  supposed to conduct your investigation of a report
7  like this, a use-of-force report?
8  A.  A written policy?
9  Q.  Yes.
10  A.  I'm supposed to go talk to both sides and
11  come up with my--make my report based upon the
12  information I received and what I observed at the
13  time I was there.
14  Q.  Okay.
15  A.  I don't know about a policy.  I guess you
16  would have to talk to the Academy about a specific
17  policy that you're looking for.
18  Q.  You're not aware of any written policy that
19  governs the investigation of use of force?
20  A.  I'm sure there's a standard operating
21  procedure.  That would be the reason why I went to
22  interview Mr. Burnikel.
23  Q.  But does that govern just the level of
24  officer who is supposed to be there, or will it
25  actually tell you what you're supposed to do when you

**8**

1  get to the scene?
2  A.  I'm doing what my protocol, what my policy
3  would tell me to do, would be to respond.
4     Since there was a use of force made and
5  there was a sergeant involved, I am the next
6  highest--I'm the higher ranking officer, so that's
7  why I responded.
8  I happened to be the watch commander that
9  night, so when I heard that go out, I was the only
10  lieutenant working the streets that night because I
11  was the assistant watch commander, so since I was the
12  highest ranking officer on that shift, I responded.
13  Q.  I appreciate that, but I guess what I'm
14  asking is no matter if it's you, a lieutenant, or a
15  sergeant following that protocol about who is
16  supposed to go out there to do the investigation, is
17  there anything that actually governs what you're
18  supposed to actually do in the investigation, who
19  you're supposed to talk to, what you're supposed to
20  do.
21  A.  Well, obviously--I don't know what that
22  paperwork is, but obviously there's our SOPs that
23  would indicate that a supervisor needs to respond to
24  the scene and interview and observe and come up with
25  his assessment or her assessment on their findings.

**9**

1  Q.  Okay.  So you think there is a specific SOP?
2  A.  Yeah, there would be probably a standard
3  operating procedure.
4  Q.  Okay.  To your knowledge, do you know,
5  sitting here, what that standard operating procedure
6  is?
7  A.  I don't have that with me so I couldn't tell
8  you what the code is.
9  Q.  And is it specific to use-of-force
10  investigations or is it just investigations
11  generally?
12  A.  Use-of-force investigations.
13  Q.  When you arrived at the scene, where was
14  Mr. Burnikel?
15  A.  He was over by the paddy wagon, which was
16  positioned in the southeast--correction--southwest
17  corner of the parking ramp on the main level.
18  Q.  Was he in handcuffs?
19  A.  Yes.
20  Q.  And was he in the paddy wagon or was he by
21  it?
22  A.  No, he was by the paddy wagon.
23  Q.  What was he doing at the time or what was
24  being done at the time?
25  A.  When I arrived, they were flushing out his

18

1 Q. Turning back to your report, which is again
2 Exhibit 1-- Do you have that in front of you?
3 A. Yes.
4 Q. On the very top of the narrative on the
5 supplemental narrative marked No. 6 that says
6 "charges"--
7 A. Yes.
8 Q. --there's a few things listed there, a few
9 charges listed there.
10 Can you read those?
11 A. Interference with official act causing
12 injury, public intox, and resisting arrest.
13 Q. Okay. Did you write those?
14 A. Those were the charges that were given to me
15 by the officers when I got ready to make my report.
16 Q. Okay. So the officers--and that would be
17 Fong and Sergeant Wessels?
18 A. Yes.
19 Q. --they reported to you that they believe the
20 charges to be interference with official act causing
21 injury?
22 A. Yes.
23 Q. Public intoxication?
24 A. Yes.
25 Q. Resisting arrest?

19

1 A. Yes.
2 Q. So they told you that one or both of the
3 officers were injured?
4 A. Yes. Without reading their report, I don't
5 recall if the report indicates that they had injuries
6 or not. It wasn't my responsibility to decide what I
7 was going to charge for the officers. I was not
8 there when the incident happened. My information is
9 documented based on what the officers told me they
10 were filing.
11 Q. So you have no role in that charging
12 decision? It's purely what the officers tell you?
13 A. Yes.
14 Q. And you write down what the officers tell
15 you?
16 A. Yes.
17 Q. When you're investigating this use-of-force
18 complaint and you're talking to the officers, do you
19 take notes?
20 A. Yes. That's how I came up with this
21 information here.
22 Keep in mind as soon as I completed my
23 investigation there, I came right back to the station
24 and completed my report.
25 Q. So what do you take notes on?

20

1 A. Just a little piece of paper that--I don't
2 have it now, but a little book, a little book that I
3 write some notes down.
4 Q. Do you preserve those notes?
5 A. No.
6 Q. What do you do with the notes after you fill
7 out the report?
8 A. When the book is full, I throw it away and
9 get a new one. Everything I had in the book is here.
10 Q. And the same with talking with Mr. Burnikel,
11 notes of your conversations would be on those notes?
12 A. Yes; scratchpad, yes.
13 Q. And so after you talked to the officers and
14 Mr. Burnikel-- How long did you spend on the scene,
15 do you remember?
16 A. You know, sir, I can't tell you. I was
17 probably there for 20 minutes. I don't know.
18 Q. And then you returned back to headquarters?
19 A. Yes.
20 Q. And when did you write the report?
21 A. Then. When I returned back.
22 Q. When you returned?
23 A. Yes. If it's at all possible, I try to make
24 my reports as quickly as I can while things are still
25 fresh.

21

1 Q. The first three paragraphs of your report
2 kind of describe it, I guess I would say, in a
3 third-person narrative, saying, you know, "Off-duty
4 Officers Fong and Wessels were working."
5 Where are you getting that information? Is
6 that coming straight from Fong and Wessels?
7 A. Yes.
8 Q. You're not writing that in the form of a
9 statement by them?
10 A. No. This is just information that I
11 gathered during my investigation.
12 Q. Okay. I mean later when you talk to
13 Mr. Burnikel, you are reporting what he said in the
14 form of a statement.
15 "Mr. Burnikel says. He proceeded to tell
16 me," et cetera. You don't do the same for the
17 officers?
18 A. Well, they're going to make their own
19 report.
20 Q. But your role in investigating the use of
21 force is to be neutral; right?
22 A. I am neutral.
23 Q. So they're going to make their own report?
24 A. Sure.
25 Q. But you're there to take a statement at the

**22**

1  time and get an independent view of that?
2     A.   Yes.
3     Q.   So why don't you write out a statement of
4  theirs instead of just referring to their report?
5     A.   I guess I figure they're making their police
6  reports.  They're going to justify what they did.
7  I'm getting my information from them as to what they
8  said they did.  It's going to be their responsibility
9  to justify their actions and articulate what it was
10  they did, not mine.
11        I knew that we would not be seeing
12  Mr. Burnikel again, and my concern is whether he
13  needs additional medical attention, and that's why
14  I'm there, is to make sure that I interview him to
15  find out if there is any additional medical attention
16  that needs to be made and also to find out what--
17  during my conversation with him, what my impression
18  is as far as his level of intoxication or what his
19  story was.  So I'm putting down information based on
20  what he told me, just like I was with what the
21  officers told me.
22     Q.   You say your primary goal is to see if he
23  needs medical attention?
24     A.   Yes.
25     Q.   What does his hometown and reason for being

**23**

1  in Des Moines have to do with needing medical
2  attention?
3        MR. HARALDSON:  Objection.  He didn't say it
4  was exclusively medical attention.
5        Subject to that, you can answer.
6        THE WITNESS:  What's that, now?
7        MR. HARALDSON:  Go ahead and answer.
8     A.   I'm talking about if he was hurt, if during
9  this physical altercation, if he needed--you know,
10  if he had a sore arm or leg, or whatever, and he
11  wanted to seek additional medical attention
12  because of the physical altercation with the
13  officers.
14     Q.   All right.  But your interview starts with
15  where he's from and why he's in Des Moines.
16     A.   Okay.  That doesn't necessarily mean that
17  that's the order that I--I'm trying to lay out the
18  whole thing from the beginning to the end on where
19  he's from, why he's here, and what our conversation
20  was like, and then also if he needed additional
21  attention.
22     Q.   So your interview--I mean you are also
23  trying to find out his version of events about the
24  use of force?
25     A.   Yes, absolutely.

**24**

1     Q.   And indeed you're making a judgment about
2  you're saying he took no responsibility for any
3  wrongdoing on his part, and you're--
4     A.   Well, sure.  I'm an investigator as well, as
5  you said.  When I'm there, I'm trying to conduct my
6  own investigation and document what I observed during
7  our conversation.
8     Q.   But you're not documenting the statements of
9  the police officers in the same way.
10     A.   Well, I'm not filing charges.  I'm not--I'm
11  there--they're going to have their reports.  They're
12  going to document, articulate what they found and
13  what the elements of the crime were.
14        I guess I'm not really understanding the
15  importance of me trying to put quotation marks on
16  everything, and as I say, if that's the case, I would
17  record all of my conversations and give that to you.
18     Q.   And you talked about--you said you're
19  conducting an investigation.
20     A.   Yes.
21     Q.   But you're conducting an investigation
22  without talking to any witnesses?
23        MR. HARALDSON:  Objection.  Misstates
24  testimony.  Go ahead.  Argumentative.
25     A.   I didn't have any witnesses, anybody else

**25**

1  that came up to me to ask me, so, no, I did not.
2        My investigation was the use of force, not
3  the charges.  I had nothing to do with what happened
4  that led up to the use of force.  I am there because
5  there was an officer and a sergeant involved in a use
6  of force.  That is the reason why I'm there.  I'm not
7  investigating the crimes, determining who was right,
8  who was wrong, what the charges are going to be.
9  That's not my job.
10     Q.   When you say you're not there to investigate
11  what led up to the use of force, isn't that part of
12  the context of understanding the use of force?
13     A.   What I'm saying is it's not my--  The three
14  charges that you mentioned here, I'm not the officer
15  that filed those charges, okay?  The officers that
16  filed those charges are the ones that will justify
17  and articulate why those charges were filed.
18        I can tell you my observations during the
19  time of my interview, which I did here, indicating
20  that he did have an odor of alcohol and, based on my
21  27 years, that he was intoxicated.
22     Q.   But it's the responsibility of witnesses to
23  come to you, not you to reach out to find other
24  witnesses?
25     A.   If I had other witnesses that I had heard

34

1 to say it's never happened.

2    Q.  Do you recall ever investigating Officer Fong

3 in any other incident?

4    A.  I don't believe so.

5    Q.  In your 27 years of experience as a police

6 officer, do you think it's appropriate to punch

7 someone in the testicles?

8    A.  No, absolutely not, but I say that given the

9 fact that there was--I mean if that's all that's

10 exposed and he's still not in compliance, you need to

11 do what you have to do in order to minimize that

12 threat and gain control of the situation.

13    If the groin is the only thing that's

14 exposed and he's still not complying or going down,

15 the quicker you get him down, the better.

16    Q.  Have you ever punched anyone in the

17 testicles?

18    A.  I can't say that I have, but I can't say

19 that I wouldn't.

20    Q.  In your 27 years of experience as a police

21 officer, do you think it's appropriate to punch a

22 suspect who is in handcuffs and detained?

23    A.  Handcuffs and detained?

24    Q.  Yes.

25    A.  No.  If they're handcuffed and detained, no.

35

1    Q.  Have you ever punched anyone who is

2 handcuffed and detained?

3    A.  No.

4    Q.  Have you ever trained anyone in punching a

5 suspect in the testicles?

6    A.  No.

7    Q.  In fact, the training advises you should not

8 do that?

9    A.  Should not.  That would be a last resort.

10    Q.  So you just testified that it's a method of

11 last resort, that it's against the rules?

12    A.  I'm not going to say--

13    Q.  It's not recommended by the rules?

14    A.  I'm not going to go so far as to say that.

15 I'm going to say that we do what's necessary to

16 effect the arrest, and we shouldn't use any more

17 force than is necessary to effect the arrest.

18    To say it's--you know, with law-enforcement

19 work and situations like that, I mean if the only

20 thing I had was a chair and I was fearing for my life

21 or I needed to get you into compliance, you do what

22 you have to do to minimize a threat and secure the

23 scene, so I'm not going to say that that's something

24 that we wouldn't do.  We do not recommend that.  That

25 is a red-zone area, you know, obviously, just like

36

1 striking the head or those areas, and we teach that,

2 to avoid those areas.

3    MR. WYRSCH:  I'm going to mark what I have

4 as Exhibit 2.

5            (Deposition Exhibit 2 was

6            marked for identification.)

7 BY MR. WYRSCH:

8    Q.  Do you recognize this document?

9    A.  Yes.

10    Q.  This is a training document for the use of a

11 baton?

12    A.  Uh-huh.

13    Q.  "ASP Baton Basic Course Outline"?

14    A.  Yes.

15    Q.  Turn to page 3.

16    A.  (Witness complies.)

17    Q.  It talks about "Target Areas"?

18    A.  Uh-huh.

19    Q.  And it talks about the target areas should

20 be center mass of body parts; arms, legs, and upper

21 torso?

22    A.  Yes.

23    Q.  And it says, "Attempt to avoid striking the

24 head, neck, spine, sternum, or groin"?

25    A.  Yes.

37

1    Q.  So that's in the training materials too?

2    A.  That's exactly what I said.  There's red

3 zones that we try to avoid, and we teach to avoid

4 those if at all possible, but that's not to say

5 that--that's not to say that it's absolutely not

6 under no circumstances, because each situation is

7 going to dictate what the officer has to do to gain

8 control.

9    Q.  Right.  But having that kind of contact to

10 someone's testicles is rare?

11    A.  Oh, absolutely, yes.

12    Q.  And if you were told on the scene that that

13 contact occurred, that would be an important factor?

14    A.  Absolutely, yes.

15    Q.  And you would expect that to be in your

16 report?

17    A.  Absolutely.

18    Q.  And so the omission of that in your report--

19 You said you might have heard it?

20    A.  Again, I can say it was loud that night.

21 They may have told me that, but I didn't hear it.  I

22 mean it's a good possibility.  Had I heard that, I

23 would have put it right in here just like punching

24 him in the face.  I documented the information that I

25 heard.

50

BY MR. WYRSCH:

Q.  Would you agree with me that an officer should exercise patience and discretion in performance of the duties?

A.  Sure.

Q.  And would you agree with me that an officer must use the least amount of force necessary to make an arrest or maintain custody?

A.  Yes, sir.

Q.  And would you agree with me that if there's more than one way or alternative or option for gaining control of a person, the one that is safest or most safe should be used or tried first?

A.  If there is more than one way?

Q.  Yes.

A.  Yes.

Q.  Based on your 27 years with the Des Moines Police Department, would it surprise you that a single officer who was disciplined for not reporting a use-of-force incident, who was found to have watched porn on a work computer during work hours, and had been found to punch a compliant, handcuffed suspect is still working at Des Moines Police Department?

MR. HARALDSON:  Objection.  Irrelevant.

---

51

A.  I would certainly have questions as to why he was still working here.

MR. WYRSCH:  Okay.  No more questions.

MR. KHAZAELI:  Thank you.

MR. HARALDSON:  Just a minute.  I have some.

MR. KHAZAELI:  Still thank you.

THE WITNESS:  Well, you're welcome.

EXAMINATION

BY MR. HARALDSON:

Q.  Lieutenant, if you can look at Exhibit 2 for a moment.

A.  (Witness complies.)

Q.  Would you agree Exhibit 2 is the outline of the ASP baton basic course for the City?  Is that correct?

A.  Yes.

Q.  Was a baton used in this matter in regard to the arrest of Mr. Burnikel?

A.  No.  OC spray and physical confrontation was the only thing I was aware of.

Q.  And in your years of experience with the City, have you had occasion to train with a baton?

A.  Yes.

Q.  Is a baton a more--in your opinion, is a baton a more dangerous instrument--  Well, scratch

---

52

that.

Can you describe an ASP baton?

A.  I can describe it here.  It's a piece of basically a rod that extends about 30 inches, based on the size, and it's a striking instrument.

Q.  And it's essentially a small club, is it not?

A.  Yes.

Q.  In your experience, is the ASP baton a more dangerous instrument than a person's hands or fists?

A.  Absolutely.

Q.  Now, you testified earlier generally you don't work the cabstand on the evenings, late evenings or early mornings?

A.  No.

Q.  Do you have a specific recollection on February 16th, 2013, when this incident occurred between 2:30 and 2:40 in the morning, whenever you were done there, do you have a specific recollection of how many people were down there?

A.  Hundreds.  I would have no idea; but, again, all the bars let out, and they don't just go home. They congregate and hang around all of the 3rd and Court area, so there was obviously a long line. Every weekend the lines were a half-a-block long

---

53

waiting for a cab, you know.

Q.  And this would have been during the state wrestling tournament; is that right?

A.  Yes.

Q.  And if you look at your page on the incident report, Exhibit 1--I think it's five pages in--I think your testimony was you take notes and you come right back to your office here at the police station, a few blocks away, and you put that report together right away?

A.  I did in this case.  When you're busy, that isn't always.  That's why I take notes, but it so happened that I was able to come back to the station and complete this one.

Q.  And although we know his name is Burnikel, Mr. Burnikel, you see that your reference to him up there is Dustin Burnikez?

A.  I noticed that, yes.

Q.  Do you know, do you have any recollection of why you spelled his name Burnikez as opposed to Burnikel?

A.  I don't.  Once again, it's loud down there with all the people underneath that parking ramp area, so I don't know whether I didn't hear him correctly or whether it was his speech that caused me

---

PETERSEN COURT REPORTERS
500 SW 7th Street, Suite 305, Des Moines, IA 50309 (515)243-6596

PL.APP.000050

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
(CENTRAL DIVISION)


- - - - - - - - - - - - - - - X
DUSTIN BURNIKEL,                    :
                                    :
        Plaintiff,                  :
                                    :
vs.                                 : Case No. 4:15-cv-00050
                                    :
MICHAEL FONG, individually    :
and in his official capacity  :
as a law enforcement officer  :
with the Des Moines Police    :
Department; GREGG WESSELS,     :
individually and in his       :
official capacity with the    :
Des Moines Police Department;  :
and CITY OF DES MOINES, IOWA,  :
                                    :
        Defendants.                 :
- - - - - - - - - - - - - - - X


DEPOSITION OF RONALD KOUSKI,

taken by Counsel for the Plaintiff before

Edie Spriggs Daniels, Certified Shorthand Reporter

of the State of Iowa, at 25 East 1st Street,

Des Moines, Iowa, commencing at 2:20 p.m., Monday,

May 9, 2016.




EDIE SPRIGGS DANIELS - CERTIFIED SHORTHAND REPORTER

PL.APP.000051

**2**

1  APPEARANCES:

2  For the Plaintiff:    JAMES R. WYRSCH, ESQ.
                         JAVAD M. KHAZAELI, P.C.
3                        911 Washington Avenue
                         Suite 211
4                        St. Louis, Missouri 63101

5                        JUSTIN K. SWAIM, ESQ.
                         Swaim Law Firm, P.L.L.C.
6                        701 13th Street
                         Suite 2
7                        West Des Moines, Iowa 50265

8  For the Defendants:   JOHN O. HARALDSON, ESQ.
                         City of Des Moines Legal Dept.
9                        400 Robert D. Ray Drive
                         Des Moines, Iowa 50309

10

11

12

13

14

15
16
17
18
19
20
21
22
23
24
25

**3**

1                    I N D E X

2  WITNESS                      EXAMINATION

3  Ron Kouski                   4 (Wyrsch)
                                17 (Haraldson)
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
25

**4**

1              P R O C E E D I N G S

2              RONALD KOUSKI,

3  called as a witness by Counsel for the Plaintiff,

4  being first duly sworn by the Certified Shorthand

5  Reporter, was examined and testified as follows:

6                    EXAMINATION

7  BY MR. WYRSCH:

8      Q.  Will you state your name for the record?

9      A.  Yes.  It's Ronald Kouski, K-o-u-s-k-i.

10     Q.  Kouski?

11     A.  Yes.

12     Q.  What is your current rank?

13     A.  I'm currently a sergeant with the Des Moines

14  Police Department.

15     Q.  How long have you been with the Des Moines

16  Police Department?

17     A.  Approximately 13 years.

18     Q.  And how long have you been a sergeant?

19     A.  Approximately three-and-a-half.

20     Q.  Are you currently in the K-9-unit?

21     A.  Yes, sir.

22     Q.  Do you have a dog yourself?

23     A.  I have a dog myself.

24     Q.  Shepherd?

25     A.  Yes, sir.

**5**

1      Q.  I have a Shepherd.

2          So you are here on a case for our client,

3  Dustin Burnikel, and you were named as a witness by

4  the Defendants in this case.

5          Do you recall this incident?

6      A.  I remember parts of it, yes.

7      Q.  What did you do to prepare for this

8  deposition?

9      A.  The only part I was there for was a brief

10  like literally minutes, so I just was--I met with the

11  City attorney.

12     Q.  Don't tell me anything you guys said.

13     A.  Yes, just to refresh my memory with the

14  incident, and that was it.

15     Q.  Did you review any reports?

16     A.  No.

17     Q.  So generally what do you remember from the

18  incident?

19     A.  I remember I was working patrol that night.

20  I heard that there was an incident that happened at

21  the cabstand downtown where a person, an individual,

22  had been pepper sprayed, and they were requesting for

23  a supervisor.

24     Q.  Okay.  So you were a sergeant at the time?

25     A.  Yes.

PL.APP.000052

14

1 BY MR. WYRSCH:

2    **Q.**  Do you think it's appropriate for an officer

3 to strike a handcuffed suspect, who is compliant, in

4 the face, punch him in the face?

5    **A.  Who is being compliant?**

6    **Q.**  Yes.

7    **A.  No.**

8    **Q.**  Do you think it's appropriate for an officer

9 who engages in the use of force to not report that

10 use of force?

11    **A.  No.**

12    **Q.**  In fact, that's against Department rules?

13    **A.  It's against policy, yes.**

14    **Q.**  Policy?

15    **A.  Yes.**

16    **Q.**  The allegations in this case--since you

17 didn't review the reports, I'll just tell you that

18 one of the allegations is that--the allegations in

19 this case involve admissions by the police of

20 punching a suspect in the testicles.

21    **A.  Okay.**

22    **Q.**  Would you agree with me that that is not a

23 preferred way to use force on a suspect?

24    **A.  That is not a preferred area, no.  I agree.**

25    **Q.**  I think some others have described it as a

15

1 red zone.

2    **A.  Yes.**

3    **Q.**  And so you're trained that that's an area

4 that should be avoided, if necessary--if possible?

5    **A.  If possible, avoid it.**

6    **Q.**  Have you ever punched anyone in the

7 testicles?

8    **A.  No, I do not believe so.**

9    **Q.**  Have you ever punched anyone in the face?

10    **A.  Yes.**

11    **Q.**  With a closed fist?

12    **A.  Yes, I have.**

13    **Q.**  How often?

14    **A.  Twice.**

15    **Q.**  And how long have you been an officer?

16    **A.  I've been an officer for 16 years.**

17    **Q.**  So twice in 16 years?

18    **A.  Yes.**

19    **Q.**  Have you ever been disciplined?

20    **A.  No.**

21    **Q.**  Would you agree that an officer shall

22 exercise patience and discretion in the performance

23 of their duties?

24    **A.  Whenever possible, yes.**

25    **Q.**  And an officer must use the least amount of

16

1 force necessary to make an arrest or maintain

2 custody?

3    **A.  Yes.**

4    **Q.**  Would you agree that if there is more than

5 one way, alternative, or option for gaining control

6 of a person, the one that is safest should be used or

7 tried first?

8    **A.  If possible, yes.**

9    **Q.**  Based on your experience with the Des Moines

10 Police Department, would it surprise you that an

11 officer who was disciplined for not reporting a use-

12 of-force incident, found to have watched porn on a

13 computer, and had been found to have punched a

14 compliant, handcuffed suspect is still working at the

15 Des Moines Police Department?

16        MR. HARALDSON:  Objection, relevance.

17        Go ahead and answer, if you can.

18    **A.  I don't know of that happening, so I guess I**

19 **don't know.**

20 BY MR. WYRSCH:

21    **Q.**  Do you think an officer who had been found

22 in violation of all three of those things should

23 still be an active member of the force?

24    **A.  I would have to know the circumstances**

25 **involved in them.**

17

1        MR. WYRSCH:  Okay.  No further questions.

2            EXAMINATION

3 BY MR. HARALDSON:

4    **Q.**  You guys have a union, right?

5    **A.  Yes, sir.**

6        MR. HARALDSON:  No more questions.

7        MR. KHAZAELI:  I think we're done.  Thank

8 you.

9        THE WITNESS:  Thank you.

10        (Proceedings concluded at 2:35 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PL.APP.000053

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
(CENTRAL DIVISION)


- - - - - - - - - - - - - - - - X
DUSTIN BURNIKEL,                   :
                                   :
        Plaintiff,                 :
                                   :
vs.                                : Case No. 4:15-cv-00050
                                   :
MICHAEL FONG, individually         :
and in his official capacity       :
as a law enforcement officer       :
with the Des Moines Police         :
Department; GREGG WESSELS,         :
individually and in his           :
official capacity with the        :
Des Moines Police Department;      :
and CITY OF DES MOINES, IOWA,      :
                                   :
        Defendants.                :
- - - - - - - - - - - - - - - - X


DEPOSITION OF PAUL STOUT,

taken by Counsel for the Plaintiff before

Edie Spriggs Daniels, Certified Shorthand Reporter

of the State of Iowa, at 25 East 1st Street,

Des Moines, Iowa, commencing at 12:05 p.m., Tuesday,

May 10, 2016.


EDIE SPRIGGS DANIELS - CERTIFIED SHORTHAND REPORTER

**2**

1 APPEARANCES:

2 For the Plaintiff:    JAMES R. WYRSCH, ESQ.
                        JAVAD M. KHAZAELI, P.C.
3                       911 Washington Avenue
                        Suite 211
4                       St. Louis, Missouri 63101

5                       JUSTIN K. SWAIM, ESQ.
                        Swaim Law Firm, P.L.L.C.
6                       701 13th Street
                        Suite 2
7                       West Des Moines, Iowa 50265

8 For the Defendants:   JOHN O. HARALDSON, ESQ.
                        City of Des Moines Legal Dept.
9                       400 Robert D. Ray Drive
                        Des Moines, Iowa 50309

10

11

12

13

14

15
16
17
18
19
20
21
22
23
24
25

---

**3**

1                    I N D E X

2 WITNESS                          EXAMINATION

3 Paul Stout                       4 (Khazaeli)
                                   75 (Haraldson)
4                                  79 (Khazaeli)

5

6

7

8

9              E X H I B I T S

10 DEPOSITION EXHIBITS            FIRST REFERENCED

11  1 - Police reports                      10

12  5 - Police reports                       8

13 20 - 4/28/14 four-day suspension re: Wessels    25

14 21 - 12/6/13 written reprimand re:  Wessels     25

15 22 - 2/13/14 two-day suspension re:  Wessels    25

16 23 - 8/20/14 evaluation report re:  Wessels     19

17

18

19

20

21

22

23

24

25

---

**4**

1              P R O C E E D I N G S

2                    PAUL STOUT,

3 called as a witness by Counsel for the Plaintiff,

4 being first duly sworn by the Certified Shorthand

5 Reporter, was examined and testified as follows:

6                    EXAMINATION

7 BY MR. KHAZAELI:

8     Q.   Could you please state your name?

9     A.   **Paul Stout, S-t-o-u-t.**

10    Q.   And what is your current rank?

11    A.   **Captain.**

12    Q.   Now, Captain Stout, how long have you been

13 with the Des Moines Police Department?

14    A.   **Twenty-seven years.**

15    Q.   And before working for the Des Moines Police

16 Department, did you work for any other law-

17 enforcement agencies?

18    A.   **Yes, I did.**

19    Q.   Who did you work for?

20    A.   **Polk County Sheriff's Office.**

21    Q.   How long were you at Polk?

22    A.   **About a year-and-a-half.**

23    Q.   What was your rank there?

24    A.   **Deputy.**

25    Q.   When you moved over to Des Moines, what was

---

**5**

1 your rank?

2     A.   **Patrolman.**

3     Q.   Did you eventually become a sergeant?

4     A.   **Yes.**

5     Q.   Approximately when?

6     A.   **'99, I would say.**

7     Q.   And then you became a lieutenant; correct?

8     A.   **Correct.**

9     Q.   When, approximately, did you become a

10 lieutenant?

11    A.   **Maybe 2005.  I'm not for sure.**

12    Q.   And when you did become a captain?

13    A.   **2013.**

14    Q.   I get credit for remembering the order,

15 don't I?

16         Is major next?

17    A.   **Correct, major is next.**

18    Q.   Then you guys go to deputy chief?

19    A.   **No.  We have one assistant chief and two**

20 **majors.**

21    Q.   Okay.  Sorry.  What year did you say you

22 became a lieutenant?  2013?

23    A.   **Captain?  2013.**

24    Q.   2009 for lieutenant, 2013 for captain.

25 Okay.

6

1       You're familiar with why you're here today;
2   correct?
3       A.   **Correct.**
4       Q.   The City has--
5       A.   **I'm sorry. The lieutenant was either '07 or**
6   **'08. I was in Iraq when I got promoted.**
7       Q.   You've got experience in the military?
8       A.   **Correct.**
9       Q.   What branch?
10      A.   **Army.**
11      Q.   Are you currently an active reservist?
12      A.   **I am.**
13      Q.   What's your rank in the military?
14      A.   **Sergeant Major.**
15      Q.   Have you done an active tour--you've done
16   active tours while you were a Des Moines officer;
17   correct?
18      A.   **Yes.**
19      Q.   When were those active tours?
20      A.   **'07-08.**
21      Q.   That was the Iraq war too?
22      A.   **Correct.**
23      Q.   You were deployed overseas?
24      A.   **Correct.**
25      Q.   So if I see any gaps, it's because you

7

1   weren't here?
2       A.   **Correct.**
3       Q.   So the City has put you forward as being a
4   fact witness in this matter pertaining to our client,
5   and they've put you in as a person who I can ask
6   questions about Des Moines policies, and because I
7   don't want to spring anything on you, here are the
8   things that the City has said that you have
9   information about.
10      A.   **Okay.**
11      Q.   The first one is the steps the City or the
12   Department takes after a sustained finding of
13   inappropriate use of force.
14          The next one is the steps the City or
15   Department takes to assess a potential hire for
16   suitability to serve as an officer.
17          The next one for you is the City or
18   Department guidelines and training provided to
19   officers regarding when it is appropriate to charge a
20   citizen with resisting arrest or interference and
21   information regarding the prevalence of officers
22   citing citizens for this or similar charges.
23          With that, we do know for misdemeanors, you
24   guys don't track that, so this might be a general
25   question about the prevalence.

8

1       Guidelines and training that are provided to
2   officers regarding when it's appropriate to charge a
3   citizen with public intoxication, and Department
4   policies regarding citizen complaints alleging
5   misconduct by police officers, and information about
6   complaints and investigations against other police
7   officers.
8       A.   **Okay.**
9       Q.   Let's go to this first incident because I
10   think it's the easiest one to get out of the way.
11      A.   **Okay.**
12      Q.   Are you familiar with the incident that
13   occurred in February 2013 pertaining to our client,
14   Dustin Burnikel?
15      A.   **After reviewing this, yes.**
16      Q.   Okay. So what documents did you review to
17   prepare for today?
18      A.   **The AIR report here.**
19          MR. KHAZAELI: And that is Exhibit 5, for
20   the record.
21   BY MR. KHAZAELI:
22      Q.   Before reviewing this, did you remember this
23   incident?
24      A.   **No.**
25      Q.   So we won't have a lot to talk about, but

9

1   let's go--I think it's on page 5, I want to say.
2       A.   **Where my endorsement is at?**
3       Q.   Yes. That's Captain P. Stout?
4       A.   **Correct.**
5       Q.   And that was endorsed two days after the
6   incident on February 18th.
7       A.   **Correct.**
8       Q.   And can you read to me what your endorsement
9   is?
10      A.   **"After reviewing the reports and speaking**
11   **with Sergeant Wessels, I concur with the force he**
12   **used. The force used was necessary to take control**
13   **of Burnikel"**--I don't know how to pronounce his
14   correct name.
15      Q.   I think it's Burnikel.
16      A.   --**"and within Departmental guidelines and**
17   **procedures. The on-scene assessment was conducted by**
18   **Lieutenant Larry Davey."**
19      Q.   Let's talk about Lieutenant Davey's
20   evaluation.
21          He was the person who appeared on the scene;
22   correct?
23      A.   **Correct.**
24      Q.   And it's important to you what he evaluates;
25   correct?

**14**

1  nonpreferred places to strike people

2     A.   Correct.

3     Q.   Would you consider the testicles a red zone?

4     A.   For batons and ASPs, I believe it is.

5     Q.   What about for closed fists?  Is punching a

6  person in the testicles a preferred use of force?

7     A.   I would say no.

8     Q.   If you're investigating a use of force  is

9  that something that you would want to know occurred?

10     A.   If they got punched in the testicles?

11     Q.   Yes  Would that be relevant to you as

12  you're reviewing the AIR?

13     A.   I would think the person who got punched in

14  the testicles would say, "Yes, I got punched in the

15  testicles."

16     Q.   And if an officer punched somebody in the

17  testicles  you would expect them to tell you that

18  they punched a person in the testicles  correct?

19     A.   I mean, yeah, you would hope they would, but

20  if there was other things going on right now, I mean.

21     Q.   And you noticed that this punch to a

22  nonpreferred region is not listed in Lieutenant Davey's

23  report?

24     A.   I didn't see it, correct.

25     Q.   Okay  And this report was something that

**15**

1  you took into account when you signed off on the use

2  of force  correct?

3     A.   Correct.

4     Q.   So it's fair to say that all the information

5  that is relevant wasn't there on paper  correct?

6     A.   Okay.  I'm confused now.

7     Q.   You didn't actually go down to the scene

8  that night  right?

9     A.   No.  I think you said I endorsed it two days

10  later, or something.

11     Q.   Yes  I think this event occurred on

12  February 16th  and then on Exhibit 5  your

13  endorsement occurs on February 18th  two days after

14  the event

15     A.   Okay.

16     Q.   So you didn't go down to the scene  You

17  didn't interview any witnesses or the suspect

18  correct?

19     A.   Correct.

20     Q.   All right  So you spoke to Officer Wessels

21  correct?

22     A.   Correct.

23     Q.   Do you recall him ever telling you that he

24  punched this person in the testicles twice?

25     A.   I don't recall it, but I believe it's his

**16**

1  use of force, his AIR.

2     Q.   We're going to move on to some of these

3  policies

4        Can you tell me  what's the procedure if a

5  complaint is made against an officer for the

6  investigation  internally?

7     A.   So a complaint comes into the Office of

8  Professional Standards.  The folks up here will

9  conduct interviews, gather all the information, and

10  then it's pushed down through the chain of command.

11  It goes back down to the supervisors where the

12  officer works.

13     Q.   On some of these cases that we've looked at

14  there were sustained findings

15     A.   Okay.

16     Q.   So if it accelerates to the point of getting

17  a sustained finding  can you just walk me through

18  that step by step?

19     A.   If a supervisor finds it sustained, they

20  will put their recommendation on it, and it will come

21  back up through the chain, and then the Chief will

22  sign off on it, and then whatever discipline comes

23  out of it is handled by the supervisor.

24     Q.   Let's say you're somebody like Officer Fong

25  You said it goes up the chain  Explain to me who you

**17**

1  would imagine seeing--

2     A.   So it would start at Officer Fong's

3  sergeant.  Then the watch commander, either the

4  lieutenant or the captain, would see it, and then the

5  bureau commander, the assistant chief or major,

6  whoever is down there at this time.

7     Q.   And then who?

8     A.   And then it will go to the Chief.

9     Q.   And then the Chief will make a decision

10  based on those recommendations  correct?

11     A.   Based on the recommendations from his staff,

12  yes.

13     Q.   And sometimes in the middle there is kind of

14  a hearing with like three officers  correct?  You

15  have the right to that?

16     A.   After the investigation.

17     Q.   After the Chief makes the recommendation?

18     A.   Yeah.  The Chief's guidance committee.

19     Q.   So that's after the Chief publishes what the

20  Chief thinks should be done?

21     A.   Correct.

22     Q.   What does the Chief's guidance committee do?

23     A.   It's a chance for the officer to come in.

24  It's made up of, I want to say, like the president of

25  the board and two other officers.  They review it,

18

1 and then they give their recommendations to the
2 Chief.
3     Q. Can they overrule the Chief, or do they just
4 give new information?
5     A. Just a recommendation.
6     Q. So it's ultimately the Chief's decision?
7     A. Yes.
8     Q. So they could say, "We concur with the
9 Chief," which I would imagine the Chief would say,
10 "Great," but if they disagree with the Chief--
11     A. They can go in and point out what they
12 disagree with.
13     Q. And the Chief looks at the totality of the
14 new evidence?
15     A. Correct.
16     MR. HARALDSON: You might, just for the
17 court reporter's sake, wait until he finishes the
18 question.
19     MR. KHAZAELI: Sometimes I jump in over you,
20 too, and he yells at me about it, and he's right when
21 he yells at me about it.
22 BY MR. KHAZAELI:
23     Q. As a captain-- Well, let's talk about
24 performance evaluation reports.
25     A. Okay.

19

1     Q. You're familiar with those; correct?
2     A. Yes.
3     Q. And you've done them in the past; correct?
4     A. Yes.
5     Q. You've received them?
6     A. Yes.
7     Q. And you've given them; correct?
8     A. Yes.
9     MR. KHAZAELI: Can we give him--I think it's
10 Exhibit 23. I think it's a 2014 report that is
11 Officer Wessels'.
12     Q. So let's walk through this. There's a 1, 2,
13 3, and 4 in the left columns; correct?
14     A. Correct.
15     Q. What are those?
16     A. Not satisfactory, needs improvement, meets
17 standards, and above standards.
18     Q. In order of 1, 2, 3, and 4; right?
19     A. Correct.
20     Q. So you've got different factors, and each of
21 them is rated on a 1, 2, 3, or 4; correct?
22     A. Correct.
23     Q. On the top there's 24 standards, correct,
24 the top section?
25     A. Yes.

20

1     Q. And that's what you would get based on an
2 officer; correct?
3     A. Correct.
4     Q. And then below, there's an additional
5 nine more standards that you only get if you're a
6 supervisor; correct?
7     A. I believe--I would have to refer to--there's
8 a key that goes with it.
9     Q. I think it says "For Employees Who Supervise
10 Others" right there above line 30.
11     A. Correct.
12     Q. So in this case the captain was Scott Rounds
13 who signed this, correct, not you?
14     A. Correct.
15     Q. But typically, if you had a sergeant, a
16 lieutenant would be their rating officer and then a
17 captain would be the reviewing officer; correct?
18     A. Correct.
19     Q. Okay. I want you to flip to the second
20 page.
21     A. (Witness complies.)
22     This is from the year of this incident that
23 we're here talking about, 2013.
24     Can you look at No. 16, "Accepts
25 Responsibility"?

21

1     A. (Witness complies.)
2     Q. I'm just going to tell you that there are
3 three different in the year--in 2013 in a three-month
4 period, Officer Wessels had three sustained findings
5 of violations of protocol.
6     MR. HARALDSON: Just to clarify the record,
7 I don't believe this review actually covers the time
8 period of where the February 2013 is.
9     MR. KHAZAELI: If it doesn't, then I don't
10 have one. I don't have a 2013.
11     MR. HARALDSON: There may not be one. We
12 produced what we had.
13     MR. KHAZAELI: I think 2003, 2012, and then
14 if this doesn't cover 2013.
15     MR. HARALDSON: It certainly covers the
16 three incidents listed.
17     MR. KHAZAELI: It definitely covers some of
18 2013.
19 BY MR. KHAZAELI:
20     Q. Just so you can see, there are three
21 different ones starting from the bottom.
22     He received a written reprimand because
23 while he was off duty, a person came to him and
24 reported an assault, and he didn't fill out the
25 paperwork, making it so that that could not be

**22**

1   investigated by your office
2       Later that month he received a two-day
3   suspension for firing his gun at a fleeing vehicle
4   trying to shoot out the tires  and it was found that
5   that put other officers at harm
6       Then two months later he received a four-day
7   suspension for striking a handcuffed officer--a
8   handcuffed suspect who was in the back of the car
9   All right
10      Can you tell me what section this is under?
11  **A.**  **Accepts responsibility, 16.**
12  **Q.**  Let's look back to the first page
13  **A.**  **(Witness complies.)**
14  **Q.**  What did he receive in accepts responsibility?
15  **A.**  **Exceeds standards.**
16  **Q.**  So in the one section where they refer to
17  the three violations he has  they use that as support
18  for him getting an exceeds standards  correct?
19  **A.**  **That's what it appears, yes.**
20  **Q.**  Do you see any place on the first page  any
21  place that he's received anything below a meets
22  standards?
23  **A.**  **No.**
24  **Q.**  I don't want to go through all of
25  the exhibits that I have  I did that with

**23**

1   Lieutenant Leo  I'm just going to go through and
2   just give you a little brief history here
3   **A.**  **Okay.**
4   **Q.**  In 2012--sorry--2002 Officer Wessels
5   received a two-day suspension for insubordination and
6   for trying to get into a basketball game by using his
7   ID without paying
8       In 2005 he received a written reprimand for
9   using profanity against a citizen
10      Later in 2005 he received a two-day
11  suspension for accessing pornography on City
12  computers for the periods of April and May of 2005
13      In 2008 he received a one-day suspension for
14  punching a handcuffed suspect
15      In 2008 he received an oral reprimand for
16  taking a handcuffed suspect to the ground and
17  injuring the suspect because they couldn't defend
18  themselves
19      In roughly 2008-2009 he received a three-day
20  suspension for insubordination to his supervisor and
21  was sent to anger management
22      Then you've got the four-day suspension
23  here  the two-day suspension here  and the written
24  reprimand  All right?
25  **A.**  **Okay.**

**24**

1   **Q.**  That's  I believe to be  a decent amount of
2   sustained violations  especially from 2005 to 2013
3       MR  HARALDSON:  The standing objection to
4   the relevance of those from my part
5   BY MR  KHAZAELI:
6   **Q.**  We've reviewed all of the reviews that have
7   been given us
8       Would it surprise you--and there are 24
9   categories up there--that from 1996 to present  of
10  those 24 categories  which means he's been reviewed
11  400-plus times  that he's only received one time
12  with this history of times  of a below meets?  Is
13  that surprising to you?
14  **A.**  **Yes.**
15  **Q.**  And just so you know  the one time that he
16  received it  he received it for being insubordinate
17  to a supervisor
18      Does it surprise you that he has three
19  separate sustained findings in this 2014 report and
20  he receives either meets or exceeds expectations?
21  **A.**  **I mean I haven't seen any of the--I don't**
22  **know anything about the cases that were sustained,**
23  **and stuff.**
24  **Q.**  If you want  we can look at them  Let's
25  go--I think we're at--these are the ones directly

**25**

1   before this  I think it's 20  21  and 22  and we'll
2   go through them one at a time
3       MR  KHAZAELI:  Can I get 20  21  and 22?
4       I'll hand them to you in a second  I want
5   to give them to you in the right order
6   **A.**  **So are you asking me what I think with**
7   **this--how the evaluation was done or how I would do**
8   **it?  I don't know exactly what you're asking.**
9   BY MR  KHAZAELI:
10  **Q.**  We'll go through them one at a time
11  **A.**  **Okay.**
12  **Q.**  We're going to go to 21  22  then 20
13      Okay  Exhibit 21 is a written reprimand
14  and mind you  we don't get all of the information
15  but I will point you to the--flip to page 5  It says
16  in bold "City of Des Moines"  It's a memo from the
17  Chief of Police to Sergeant Wessels  I'm going to
18  read you the third paragraph:
19      "Your commanding officers stated that you
20  made a poor decision by failing to initiate a police
21  report after being informed of an assault  Your
22  commanders noted that by failing to make a police
23  report and conduct a preliminary investigation  the
24  identity of possible suspects will never be
25  determined  You also admitted that you refused to

30

1 addressed and investigated, and he received
2 punishment for them.
3     Q.  Right.  But during that three-month period,
4 would the fact that he was suspended or reprimanded
5 three times, would that be of concern to you as a
6 supervisor?
7     A.  Yes.
8     Q.  Yes.  Now, looking at this evaluation, does
9 it surprise you that in this period that it covers,
10 there's no negative ratings at all?
11     A.  I would say yes, but I mean you could still
12 mark him as meeting the standards if he corrected his
13 behavior.  I mean that's the whole--
14     Q.  Does it seem strange to you that's the only
15 times that appear on that report as a basis for
16 giving him an exceeds?
17     A.  I do.
18     Q.  That's strange; right?
19     A.  Yes.
20     Q.  And as I said, I listed all of those things,
21 and based on our review from 1996 of the 400-plus
22 categories that he's received, he's only received
23 one not meets expectation, and that was for
24 insubordination.
25     A.  Okay.

31

1     Q.  Does that seem strange to you?
2     A.  Yes.
3     Q.  How do you feel about an officer who has a
4 suspension for--two suspensions now for punching
5 handcuffed suspects, a suspension for taking a
6 handcuffed suspect to the ground, a suspension for
7 firing a gun, a suspension that resulted in anger
8 management, a suspension related to looking at porn,
9 and several other reprimands and suspensions, does
10 that cause you any concern about that officer's
11 tenure here?
12         MR. HARALDSON:  Objection to the phrasing of
13 the question without time frame.
14 BY MR. KHAZAELI:
15     Q.  All of those occurred since 2005 except for
16 a two-day suspension for insubordination at a
17 basketball game, which I didn't list.
18         So since 2005, a written reprimand for
19 profanity, a two-day suspension for porn, a one-day
20 suspension for punching a handcuffed suspect,
21 subsequently another four-day suspension for the same
22 thing, oral reprimand for taking a handcuffed suspect
23 to the ground, a three-day suspension for
24 insubordination that required anger management, a
25 two-day suspension for firing a gun, and a written

32

1 reprimand for not taking a report for an assault.
2 That's from 2005 to 2013.
3         Does that raise any red flags to you?
4         MR. HARALDSON:  You may answer the question,
5 but my standing objection is the same to some of
6 those matters.
7         Go ahead.
8     A.  Yes, I think it's something that we would
9 need to look into.
10 BY MR. KHAZAELI:
11     Q.  Do you know if there's been any
12 investigations of Officer Wessels for a continued
13 pattern of infractions?
14     A.  No.
15     Q.  Now that you've heard all of this, do you
16 think that's something that you guys might want to
17 look into?
18     A.  I don't know if it's been done or not.
19     Q.  As a captain, now that you know about this,
20 you have concerns; correct?
21     A.  Yes, if this was brought to my attention,
22 but I wasn't in the decision-making process here.
23     Q.  Right.  I'm trying to get to two or three
24 things that we've tried to play out.
25         I understand that the performance evals are

33

1 only for a finite period.  If you did something bad
2 three years ago, it shouldn't appear on your
3 performance eval for this year; is that correct?
4     A.  Correct.
5     Q.  Is that correct?
6     A.  Correct.
7     Q.  I also understand that every incident needs
8 to be looked at as its own sole incident.  That's
9 correct?
10     A.  Correct.
11     Q.  But I also know, from what I've read and
12 seen, that you also need to look at the totality of
13 an officer's career to see whether there's a
14 cumulative effect or if this person is involved in a
15 pattern of incidences.
16         Would you agree with that?
17     A.  Yes.
18     Q.  And in fact you guys have terminated
19 officers because of patterns of--  You have
20 terminated officers because of violations of
21 policies; correct?
22     A.  A violation of policies?  Yes.
23     Q.  One of them being Officer Boone; correct?
24     A.  Yes.
25     Q.  And did you know that Officer Boone, before

## 34

1  his final incident, had two sustained use-of-force
2  violations?
3          MR. HARALDSON:  Objection.  Relevance.
4      Go ahead.
5      A.  I do not know about the two.
6  BY MR. KHAZAELI:
7      Q.  He did.  He received two of them within a
8  very short period and received a one-day suspension.
9      A.  Okay.
10     Q.  Okay.  What's the purpose of these
11 evaluations?
12     A.  It's a yearly evaluation just to let the
13 employee know how they're doing.
14     Q.  So if an employee received all meets and
15 exceeds, how would the employee feel like they're
16 doing?
17         MR. HARALDSON:  Objection.  Speculation.
18 BY MR. KHAZAELI:
19     Q.  When you've received these, if you received
20 all meets and exceeds, do you believe that you've
21 been performing up to standards?
22     A.  Yes.
23     Q.  That's the purpose of these; correct?
24     A.  Correct.
25     Q.  If you weren't performing up to standards,

## 35

1  what would you expect to see on the report?
2      A.  Well, I hope to see something before the
3  evaluation.
4      Q.  What would you see before the evaluation?
5      A.  Well, hopefully there is some kind of
6  counseling, you know.
7          Evaluation is not the time to document you
8  screwed something up six months ago.  It needs to be
9  addressed then.
10     Q.  You shouldn't wait that long; right?
11     A.  Right.  It can still be addressed on the
12 evaluation, but it shouldn't be the first time the
13 employee sees it.
14     Q.  That makes total sense to me.
15         Okay.  Do you know--you've been put forward
16 as somebody who can tell me about the hiring process
17 for the Department.
18     A.  Okay.
19     Q.  What factors does the Department take into
20 account to assess a potential hire as suitable to
21 serve as an officer?
22     A.  Well, do you want me to start from step one?
23     Q.  Yeah.
24     A.  We start with the application process.
25 After that, they start the polygraph examinations.

## 36

1  After the polygraph examination--
2      Q.  What does the polygraph examination cover?
3      A.  A variety of questions.  I don't have the
4  list of questions.
5      Q.  But is it about previous criminality?
6      A.  Everything.
7      Q.  Personality?
8      A.  Correct.
9      Q.  The potential for violence?
10     A.  Yes.
11     Q.  After the poly, what's next?
12     A.  After the polygraph, we probably go to the
13 Civil Service interviews.
14     Q.  Okay.  What's the Civil Service interviews?
15     A.  That's where the Civil Service will narrow
16 the applicant numbers down.
17     Q.  And who is the Civil Service?  Is this a
18 board of civilians?
19     A.  Yes; and I believe they're appointed by the
20 Mayor.
21     Q.  About how many, do you know, roughly?
22     A.  I don't know offhand.
23     Q.  And do they actually do interviews with the
24 people or do they use a test?
25     A.  Interviews.

## 37

1      Q.  Okay.
2      A.  So after the interviews, they'll narrow it
3  down to, I believe, 40.  I believe that's when we do
4  the MMPI, the Minnesota--
5          MR. HARALDSON:  I never remember either.
6          MR. SWAIM:  The personality inventory.
7      A.  --Multiphasic Personality Inventory.
8      Q.  I'll look it up.
9          You guys do a personality inventory at that
10 point?
11     A.  Correct.
12     Q.  You get down to 40 and do the personality
13 inventory.
14         Does that possibly weed out some people or
15 does that rank people?
16     A.  No.  Then that's scored by our Department
17 psychologist.
18     Q.  Okay.
19     A.  If there's issues in that, he'll provide the
20 names of folks that he would like to talk to.
21     Q.  Okay.
22     A.  Then he'll talk to them, and he'll either
23 tell us yes or no.
24     Q.  So you can't get disqualified just based on
25 the score alone?

38

1    A.   Correct.
2    Q.   It could flag you as somebody we want a
3  little bit more information?
4    A.   Correct.
5    Q.   Okay.  And then after the psychologist signs
6  off, what happens next?
7    A.   I believe it's the staff interviews.
8    Q.   What are staff interviews?
9    A.   It would be a board made up of captains or
10  the majors, depending on--it's been done a number of
11  ways down here.
12    Q.   Did you guys ever do a test?
13    A.   The written test is right out of the--
14    Q.   The written test is the first thing?
15    A.   Correct.  I'm sorry.  The Cooper test, the
16  physical agility test, is the first thing.
17    Q.   Physical agility?
18    A.   The written.
19    Q.   Fat guys like me get knocked out, and then
20  you guys do the written test?
21    A.   Correct.
22    Q.   And then you go down that process that we
23  already talked about?
24    A.   Correct.
25    Q.   So you do the interview with the board of

39

1  current officers.  Then what happens?
2    A.   Then a list is made, and then they're hired
3  off that list.
4    Q.   And then they're given the choice to accept
5  or reject?
6    A.   Correct.
7    Q.   If you have five openings and you offer it
8  to the first five people and one of them says no, do
9  you go down to the next person?
10    A.   Correct.
11    Q.   Okay.  Going now to sustained findings of
12  inappropriate force, you kind of walked me through
13  what the process is to get to either a sustained or
14  exonerated or unfounded finding.
15        Let's say that there is a sustained finding.
16    A.   Okay.
17    Q.   What's the next step?  What policies does
18  the Department have as to what to do next?
19    A.   Well, you refer to the rules and regulations
20  to see what policy violation you have.
21        The sergeant will make his recommendation.
22        It goes to the Watch Commander, either the
23  captain or the lieutenant.  They'll make the
24  recommendation, and then send it up either to the
25  major or assistant chief.

40

1    Q.   After all of that, at the end, after going
2  to the board, the Chief signs off that this is a
3  sustained violation of the use-of-force policy.
4        What do you guys do next?
5    A.   It comes back down, and whatever is decided
6  the punishment is going to be is given to the
7  officer.
8    Q.   Is there a policy in place that requires
9  every officer who has a sustained use-of-force
10  violation to go through retraining?
11    A.   A standard policy, no.
12    Q.   So you could get a use-of-force violation
13  and not have to go through retraining; correct?
14    A.   Correct.
15    Q.   In fact, you could get multiple ones and
16  there's no policy that mandates that you have to go
17  through retraining; correct?
18    A.   Correct.
19    Q.   The Department trains officers on what the
20  elements of specific crimes are; correct?
21    A.   Correct.
22    Q.   And that's done at the Academy; correct?
23    A.   Yes.
24    Q.   Now, can you tell me, are they given
25  specific training on the elements of resisting

41

1  arrest?
2    A.   I would say yes, I mean.
3    Q.   And they're given--I'm assuming it's for all
4  of the crimes; correct?
5    A.   Correct.
6    Q.   Specifically, just so I can check it off my
7  box, they're trained on what the elements are for
8  resisting arrest; correct?
9    A.   Yes.
10    Q.   How about on interference with a police
11  officer?
12    A.   Yes.
13    Q.   How about on public intoxication?
14    A.   Yes.
15    Q.   Can you tell me what the elements--as you
16  were trained, what you believe to be the elements of
17  resisting arrest?
18    A.   Well, basically somebody is resisting you
19  while you're trying to make the arrest, pulling away
20  from you.
21    Q.   Do they need to know that you're a police
22  officer?
23    A.   Yes.
24    Q.   We're going to come back to that one, but
25  what about for interference with an officer with

**46**

1    A.   I don't believe so.  I've never seen one,
2  no.
3    Q.   So if there is a report or if that's
4  tracked  it's not shared with supervisors like you?
5    A.   Correct.  I don't know what level it is
6  shared, I mean.
7    Q.   Throughout your career from sergeant to
8  lieutenant to captain  you've had multiple people
9  that you've supervised  correct?
10   A.   Correct.
11   Q.   When a new person is given to you as a
12  direct report  is any information shared with you
13  about their history of complaints?
14   A.   No.
15   Q.   So you would have no idea  correct?
16   A.   Unless I had firsthand knowledge of it.
17   Q.   So that would make it very difficult for you
18  to evaluate if this person had a pattern  wouldn't
19  it?
20   A.   Yes.
21   Q.   How about Officer Boone?  Are you familiar
22  with Officer Boone?
23   A.   I know who he was, I mean, yeah.
24   Q.   Do you know where he is now?
25   A.   No.

**47**

1    Q.   Do you know that he's in prison?
2    A.   I didn't know if he went to prison yet or
3  not.
4    Q.   You know he's been sentenced to prison  at
5  least?
6    A.   Right.
7    Q.   Do you know what the circumstances are of
8  the allegation that resulted in him going to prison?
9    A.   Excessive force.
10   Q.   Do you know any other details about that?
11   A.   Just hearsay.
12   Q.   What have you heard?
13   A.   I mean like from kicking a guy in the head
14  down on a traffic stop.  That's the only thing I
15  know.
16   Q.   So when one of your officers was charged
17  federally with this  there was no training that was
18  given by the Department that says "Hey guys  this
19  happened   Let's make sure this doesn't happen again"?
20   A.   I don't recall if it was covered in
21  in-service that year or not.
22   Q.   When was the last time you received
23  in-service training on use of force?
24   A.   I'm trying to think if we do it yearly.  I
25  would have to look at the records.

**48**

1    Q.   According to my records  the last one that's
2  been shared with me is 2009
3       Does that sound right to you  or do you
4  think you've received use-of-force training--
5    A.   I can't recall.
6    Q.   So you can't recall the last time
7       Do you know if there's a policy that every X
8  number of years the officers need to be recertified
9  on use of force?
10   A.   No.
11   Q.   You don't know?
12   A.   Not that I know of, yes.
13   Q.   And how many captains are there?
14   A.   Eight.
15   Q.   How many people are there above you?  How
16  many--so above you  I guess--
17   A.   Two majors, the assistant chief, and Chief.
18   Q.   So there are only four people in the
19  Department who are above you  correct?
20   A.   Correct.
21   Q.   So you're in the top 12 supervisors in this
22  Department  correct?
23   A.   Right.
24   Q.   The four above you  and you and the other
25  seven?

**49**

1    A.   Okay.
2    Q.   How many officers are there?
3    A.   Three-hundred-forty-some sworn, I think.
4    Q.   Three-hundred-plus officers?
5    A.   Correct.
6    Q.   So you're in a pretty elite  high position
7       Would you expect to know if there are
8  mandated trainings for your officers to go through?
9    A.   Like firearms training, and stuff?
10   Q.   If there were--
11   A.   Right.
12   Q.   I worked in law enforcement and as a
13  prosecutor years ago   I know that there are specific
14  recertifications you have to do on a gun  correct?
15   A.   Right.
16   Q.   How often do you have to recertify?
17   A.   Once a year.
18   Q.   Are there similar recertifications  that you
19  know of  for use of force?
20   A.   No.
21   Q.   Are there similar recertifications on
22  elements of crimes?
23   A.   Yes.
24   Q.   How often do you have to be recertified on
25  elements of crimes?

PL.APP.000063

**54**

1 than the first-line supervisors, should the same
2 people be on that review of the AIRs, if they're two
3 separate AIRs?
4    A.   Well, I don't think it's necessary.  Again,
5 I might have looked at this because Sergeant Wessels
6 and Fong were assigned to my watch and were both
7 involved in this.
8    Q.   What I'm trying to get to is we've deposed a
9 lot of people, and I get people who say, "I only have
10 to review Sergeant Wessels' actions.  My job was to
11 review Sergeant Wessels."
12        The next person says, "My job was to review
13 Sergeant Fong."
14        Is there somebody who reviews both of their
15 actions in totality to determine if in totality there
16 was too much use of force?
17    A.   The next stop is the bureau commander where
18 he has got the whole packet there.
19    Q.   So he would review the totality; correct?
20    A.   He's looking at the whole incident together.
21    Q.   And he would review the separate AIRs for
22 each officer; is that right?
23    A.   Correct.
24    Q.   Okay.  Do you know if when you signed the
25 AIR there, do you know whether or not you knew that

**55**

1 Sergeant Wessels used a closed fist to punch
2 Mr. Burnikel in the testicles twice?
3    A.   No, because it just says in here that he
4 struck him in the groin area with his left hand.
5    Q.   What's the groin area to you?
6    A.   It could be the area of the testicles.
7    Q.   But it could be other places; correct?
8    A.   Correct.
9    Q.   So could the inner thigh be the groin area?
10    A.   Yes.
11    Q.   Is punching somebody in the inner thigh
12 different than punching somebody in the testicles?
13    A.   It would probably be less painful, yes.
14    Q.   So do you think groin, was that enough
15 information for you?  Would you have preferred to
16 know that it was actually the testicles?  Would that
17 have been relevant information for you to know?
18        MR. HARALDSON:  That's speculation.  I
19 object to that speculation.  It says "groin area."
20 Are you expecting Sergeant Wessels to feel him up to
21 make sure he got the balls?
22        MR. KHAZAELI:  No.  He admits later that he
23 punched him in the testicles.
24 BY MR. KHAZAELI:
25    Q.   My question is this:  If somebody--

**56**

1        MR. HARALDSON:  He said later he believed it
2 was probably the testicles.  He said the groin area.
3        MR. KHAZAELI:  Right.
4        MR. HARALDSON:  I will concede the testicles
5 are in the groin area.
6        MR. KHAZAELI:  Right.
7 BY MR. KHAZAELI:
8    Q.   My question is, the definition of groin area
9 that he uses there, was that specific enough for you
10 to know that it was the testicles?
11    A.   It doesn't say testicles.
12    Q.   So was it specific enough for you to know
13 testicles?
14    A.   The groin area has the testicles, I mean.
15    Q.   I'm not trying to be combative here.  What
16 I'm saying is if I say groin area, that could mean
17 the inner thigh; correct?
18    A.   Okay.
19    Q.   Right.  And the inner thigh is very
20 different than punching somebody in the testicles;
21 correct?
22    A.   Correct.
23    Q.   So what I'm trying to get to is by him just
24 saying "groin area," was there enough specificity
25 when you signed off on this document for you to know

**57**

1 that it was actually a punch to the testicles?
2    A.   I can't tell you he punched him in the
3 testicles.
4    Q.   Okay.  When you're making a use-of-force
5 evaluation, do you think that's important information
6 for you to know?
7        MR. HARALDSON:  Objection.  Irrelevant.
8    A.   I mean I took it for striking him in the
9 groin.
10 BY MR. KHAZAELI:
11    Q.   But would it be important for you to know if
12 he punched him in the testicles?
13    A.   It probably wouldn't have changed my
14 recommendation, no.
15    Q.   Why?
16    A.   The amount of force he used was effective
17 and it worked.
18    Q.   Based on what he wrote down?
19    A.   Correct.
20    Q.   But you weren't on the scene?
21    A.   Correct.
22    Q.   And we know that the supervisor who was on
23 the scene didn't interview witnesses that were
24 available to that person; correct?
25    A.   If that's what you found out, yes.  I have

1 victim?

2     MR. HARALDSON: Irrelevant.

3     A. I can't arrest on that.

4 BY MR. KHAZAELI:

5     Q. But is that relevant to you as you're

6 investigating?

7     A. **It's going to be based on if the victim has**

8 **injuries or not.**

9     Q. You also are basing your determination on

10 the credibility of the witnesses; correct?

11     A. **No. If I'm there and the victim has**

12 **injuries and said the other person did it, you have**

13 **to make an arrest.**

14     Q. Okay. What if it's a threat? Let's say

15 you're going in on a stalking case where there's no

16 physical injuries, okay? And the person says,

17 "Person X threatened me."

18     There's no physical evidence; correct?

19     A. **Okay.**

20     Q. But you investigate that; correct?

21     A. **Correct.**

22     Q. You take in the totality of the evidence;

23 correct?

24     A. **Correct.**

25     Q. You interview the people there; correct?

1     A. **Yes.**

2     Q. Would a factor that you consider be if the

3 suspect had a history of doing this?

4     MR. HARALDSON: If I can interject, is your

5 hypothetical assuming--is your hypothetical that

6 you're supposed to arrest people based on their past?

7     MR. KHAZAELI: No. My hypothetical is that

8 all of that information and their past is a factor

9 that should be used if you're taking into the

10 totality of the events.

11     MR. HARALDSON: By an arresting officer in

12 deciding whether or not a crime has been committed at

13 that time?

14     MR. KHAZAELI: Correct.

15     MR. HARALDSON: I think that's a

16 misstatement of the law.

17     MR. KHAZAELI: I don't.

18     MR. HARALDSON: Well, that's fine. I think

19 that's what juries are for, not arresting officers.

20     MR. KHAZAELI: The question is whether or

21 not he has probable cause. We don't have to get into

22 that.

23 BY MR. KHAZAELI:

24     Q. Do you take into the totality--

25     A. **What he did six months ago? I'm basing my**

1 endorsement on this incident in his report.

2     Q. Let's go to Officer Boone. Okay?

3     A. **Okay.**

4     Q. Officer Boone. Officer Boone had two--I can

5 pull the documents, but just to go over this, he had

6 two incidents that were very similar that he was

7 sustained for within about a one- to two-month

8 period. Okay? If you were reviewing the second incident,

9     If you were reviewing the second incident,

10 would you want to know that he had the exact same

11 thing sustained against him a month earlier? Would

12 that be relevant to you?

13     A. **Are you talking about the complaint now or**

14 **the use of force?**

15     Q. A sustained use-of-force determination.

16     A. **Yes, I would probably want to know what**

17 **happened to him last time.**

18     Q. Right. It's relevant. It may not be

19 totally the determinative factor, but it's relevant.

20     A. **Correct.**

21     Q. And you would decide how important it is;

22 correct?

23     A. **Correct.**

24     Q. But you didn't know about this history when

25 you evaluated this; correct?

1     MR. HARALDSON: I object.

2 BY MR. KHAZAELI:

3     Q. You didn't know about Officer Wessels'

4 history of all of these violations, did you?

5     MR. HARALDSON: I object to the phrasing and

6 the relevance.

7     You can answer.

8 BY MR. KHAZAELI:

9     Q. At the time you filled out the AIR, you

10 didn't know about that; correct?

11     A. **Correct.**

12     Q. So you said the bureau commander reviews the

13 complete packet; correct?

14     A. **Correct.**

15     Q. The bureau commander determines if

16 Officer Fong's use of force was appropriate; correct?

17     A. **Correct.**

18     Q. The bureau commander determines if

19 Officer Wessels' use of force is appropriate;

20 correct?

21     A. **Correct.**

22     Q. Does the bureau commander make a separate

23 determination that the totality of the use of force

24 by the two officers was appropriate?

25     A. **I mean he endorses each use of force.**

66

1   Q.   But does he endorse the use of force in
2   totality?
3   A.   **No.**
4   Q.   Would you agree--  I'm going to give you
5   another hypothetical.  I like to play hypothetical
6   games.
7        I have a noncompliant suspect who needs to
8   be taken down with a knee strike.  Okay?  You have 10
9   officers there.  All right?  Each of them strikes him
10  in the knee one time.
11       We could agree that striking a witness in
12  the knee--a suspect in the knee one time to take them
13  down is likely an appropriate use of force; correct?
14  A.   **Correct.**
15  Q.   We could also agree striking that same
16  person 10 separate times might be too much, correct,
17  might be?
18  A.   **Might be, yes.**
19  Q.   So a single officer's use of force is
20  different than the totality of the use of force;
21  correct?
22  A.   **Correct.**
23  Q.   Do you know who in the Department reviews
24  officers regarding patterns of inappropriate use of
25  force?

67

1   A.   **Like I said, I believe it's tracked on the**
2   **report.**
3   Q.   But who investigates them?
4   A.   **If there's a pattern, I guess if somebody**
5   **sees something, it will probably go down through the**
6   **chain of command again.**
7   Q.   But we've already heard testimony that
8   necessarily you won't see something.  I mean you're
9   the captain.
10  A.   **Right.**
11  Q.   You're one of the 12 highest people here,
12  and when you did this AIR, you had no idea about
13  Officer Wessels' history; correct?
14  A.   **I might be wrong.  The report might have**
15  **came to the watch commanders.  I can't remember.**
16  Q.   But coming in today, I went through the list
17  of all of those things that Officer Wessels did;
18  correct?  You didn't know about all of those;
19  correct?
20  A.   **Firsthand knowledge, no.**
21  Q.   No.  And you're a captain?
22  A.   **Correct.**
23  Q.   You're high up, and you didn't know that one
24  of these officers has this multitude of complaints.
25  A.   **On some of these I wasn't a captain.**

68

1   Q.   I'm sorry.  Now you're a captain.
2   A.   **Correct.**
3   Q.   And you didn't know that one of the officers
4   that at some point was below you had this history.
5        My question is, whose job is it to find out
6   somebody has a history like this and conduct an
7   investigation of their totality of experiences as a
8   police officer?  Not who keeps the stats, not who
9   keeps the records.  Is there somebody within the
10  Des Moines Police Department whose job has as one of
11  its requirements to look for and investigate officers
12  for inappropriate use of force?
13  A.   **I don't have an answer for that.**
14  Q.   Do you know of anybody?
15  A.   **Not offhand, no.**
16  Q.   So you're not aware of anybody?
17  A.   **Correct.**
18  Q.   Did you have anything to do with the
19  termination of Officer Boone?
20  A.   **No.**
21  Q.   Were you involved in that?
22  A.   **No.**
23  Q.   Did you have anything to do with the
24  termination of Officer Grimes?  I know he's been
25  reinstated.

69

1   A.   **No.  I can't remember if I was up here.  I**
2   **can't remember where I was assigned when that**
3   **happened.**
4   Q.   But you didn't have any actual role in that?
5   A.   **Correct.**
6   Q.   Have you had any role in Officer Grimes'
7   most recent complaint where he's alleged to have
8   broken a suspect's ribs?
9   A.   **No.**
10       MR. HARALDSON:  Objection to relevance.
11       Go ahead.
12  A.   **No.**
13  BY MR. KHAZAELI:
14  Q.   Do you know if the Des Moines Police
15  Department has ever fired an officer or found that an
16  officer has exhibited a pattern of inappropriate
17  force, not a single incident, but based on a pattern
18  of inappropriate force?
19  A.   **Not in my knowledge, no.**
20  Q.   Do you know anything about Officer Dautovic,
21  D-a-u-t-o-v-i-c?
22       MR. HARALDSON:  Standing objection to the
23  line of questions.
24       Go ahead and answer.
25  A.   **What would you like to know?**

Page 66 to 69 of 83                PETERSEN COURT REPORTERS
500 SW 7th Street, Suite 305, Des Moines, IA 50309 (515)243-6596                18 of 31 sheets

PL.APP.000066



PLAPP.000067



PL.APP.000068

# Regional
# Health Services

O F   H O W A R D   C O U N T Y

✝ *A partner with Mercy Health Network-North Iowa*

• **COMMUNITY HEALTH SERVICES** • **HOSPITAL SERVICES** • **MEDICAL CLINICS** • **RESIDENTIAL SERVICES**

November 23, 2015

To Whom It May Concern.

RE:  BURNIKEL, DUSTIN G
    MRN:  30640
    DOB: ██████

MEDICAL REPORT

To Whom It May Concern:

This report covers the injuries Dustin Burnikel recieved that were caused by the encounter between Mr. Burnikel and Des Moines police officers that occured on February 16, 2013, for which I treated him.

Dustin Burnikel was first examined on 02/18/2013 for injuries relating to the incident on 02/16/2013. His initial examination demonstrated chipped teeth in addition to bruising and swelling of the anterior lip. He had tenderness of his left lateral rib cage. He had right testicular swelling and tenderness that was moderate in severity. He had a 1 cm bruise over his left lateral knee and he had tenderness over his medial collateral ligament. He was also noted to have bruising over his left lateral buttocks.

Based on the above findings and his history of an altercation, he was diagnosed with a left medial collateral ligament sprain, chipping of his teeth, bruising of his left rib cage, and right testicular contusion. I recommended ice and rest for his swollen areas. I encouraged him to take ibuprofen for his knee. I offered physical therapy if his symptoms were not improved. I refilled his hydrocodone 7.5/325 one to two tablets t.i.d. with three refills. We did not obtain x-rays of his ribs as that would not likely change his treatment course and the plan was further evaluation of the knee if it did not improve. I saw Dustin 3 more times subsequently on 05/31/2013, 08/05/2013, and 09/13/2013. Dustin's pain was more difficult to control. He had more frequent pain medicine requests since the incident on 02/16/2013. If I am asked to assume that Dustin will testify truthfully that the pain experienced in his back and hip after the injury on 02/16/2013 is continuing today and is increased above his baseline, then it is my opinion to a reasonable degree of medical certainty that after this length of time, Dustin's injuries to his back and hip and the pain from them will be permanent.

It is my opinion that although Dustin experienced significant symptoms from his right testicular contusion, bruised left ribcage, and left medial collateral ligament sprain, I would not expect those injuries to cause chronic and longterm symptoms assuming that his symptoms returned to their baseline status subsequently. His chipped teeth will be permanent unless repaired. I am not qualified to offer an opinion as to the cost of that repair. I would also expect his exacerbation of his chronic back pain to be longterm. It would likely require multiple visits per year, intermittent physical and massage therapy, prescription medications, and perhaps intermittent radiographs to be fully and appropriately cared for. I

**COMMUNITY HEALTH SERVICES**
327 8th Avenue West
Cresco, IA 52136
Phone (563) 547-2630
Fax (563) 547-4223

**CRESCO MEDICAL CLINIC**
321 8th Avenue West
Cresco, IA 52136
Phone (563) 547-2022 or
888-547-5474
Fax (563) 547-4340

**HOSPITAL SERVICES**
235 8th Avenue West
Cresco, IA 52136
Phone (563) 547-2101
Fax (563) 547-3448

**HOWARD RESIDENTIAL CARE**
**FACILITY PATTY ELWOOD CENTER**
21668 80th Street
Cresco, IA 52136
Phone (563) 547-2698
Fax (563) 547-4274

**LIME SPRINGS MEDICAL CLINIC**
101 West Main Street
Lime Springs, IA 52155
Phone (563) 566-2243 or
800-658-3463
Fax (563) 566-2674

PL.APP.000069

would estimate the cost of that care to be $1600 per year. That figure assumes that he won't need surgical intervention.

Sincerely,

Joe D. Kammerer, MD

JDK/rar  D: 11/23/2015 13:23:21  T: 11/23/2015 15:07:23  JOB #: 216419  DOC #: 486038

PL.APP.000070

Curriculum Vitae

Jon Kammerer, M.D.
9072 Yankee Ave
Cresco IA, 52136
(563) 547-2810 (home)
jon-kammerer@juno.com

# Education

| | |
|---|---|
| Mercy Family Medicine Residency<br>Mason City, IA | July 2004 - June 2007 |
| University of Iowa College of Medicine<br>Iowa City, IA<br>M.D. | Aug 2000 – May 2004 |
| Wartburg College<br>Waverly, IA<br>B.A. Physics | Sept 1995 – May 1999 |

# Employment

| | |
|---|---|
| Family Medicine Physician<br>Cresco Medical Clinic, Cresco IA<br>Regional Health Services Howard County, Cresco IA | August 2007 - Present |
| Medical Director<br>Hawkeye Care Center, Cresco IA | August 2007 - Present |
| Medical Director<br>Patty Elwood Center | June 2014 - Present |
| Emergency Room Physician with Acute Care, Inc<br>Hancock County Memorial, Britt, IA<br>Mercy Medical Center New Hampton, IA<br>Mitchell County Regional Health Center, Osage, IA<br>Regional Health Services Howard County, Cresco IA | July 2005 - Present |

# Licensure

PL.APP.000071

State of Iowa:  Board of Medical Examiners
#36255

## Honors and Awards

Regents Scholar 1995-1999
Magna Cum Laude 1999
Chief of Staff 2009
Golden Stethoscope Award 2010
Secretary of Medical Staff 2011
Physician Champion Cerner Health Record 2011-Present
Vice Chief of Staff 2012-Present

## Professional Affiliations

American Academy of Family Practice
Iowa Academy of Family Practice

## Personal

Married with four sons and a daughter
Enjoy board games, baseball, and cooking

References are available upon request

PL.APP.000072

# Oak Creek Dental

**Dr. Amy Reis**

1155 Canterbury Street
Cresco, IA 52136
Phone: (563) 547-1704
Fax: (563) 547-1111
oakcreek-dental@live.com

## Fax Cover Sheet

Date: 11/25/15

To: Justin Swaim

From: Dr. Reis / Sue

Fax #: 515 777-1127

Total Pages (including cover sheet): 3

Comments:

The information contained in this fax message is intended for the sole use of the designated recipients and may contain confidential information. If you have received this communication in error, please notify us immediately by telephone and destroy this document.          Thank you.
          If you do not receive all pages, please call the sender at the above number.

PL.APP.000073


## Oak Creek
### – DENTAL –

1155 CANTERBURY STREET
CRESCO, IA 52136
PHONE: 563-547-1704
FAX: 563-547-1111

November 25, 2015

To whom it may concern:

Dusty Burnkel was seen for a comprehensive evaluation on November 5, 2015.  A treatment plan is attached that breaks down all his treatment needs.  The total treatment plan cost is $11,778.00.

Sincerely,

Dr. Amy Reis D.D.S



PL.APP.000074

# Proposed Treatment Plan

## Oak Creek Dental

1155 Canterbury Street
Cresco, IA 52136
(563)547-1704

Dusty Burnikel
208 5th Ave East
Cresco, IA 52136

ID: 330

| Phase | Date Plan | Appt | Provider | Service | | Tth | Surf | Fee | Ins. | Pat. |
|-------|-----------|------|----------|---------|--|-----|------|-----|------|------|
| | 11/05/2015 | | ALR | D2962 | LABIAL VENEER (PORCELAIN LA | 6 | | $916.00 | $458.00 | $458.00 |
| | 11/05/2015 | | ALR | D2962 | LABIAL VENEER (PORCELAIN LA | 7 | | $916.00 | $458.00 | $458.00 |
| | 11/05/2015 | | ALR | D2962 | LABIAL VENEER (PORCELAIN LA | 8 | | $916.00 | $84.00 | $832.00 |
| | 11/05/2015 | | ALR | D2962 | LABIAL VENEER (PORCELAIN LA | 9 | | $916.00 | $0.00 | $916.00 |
| | 11/05/2015 | | ALR | D2962 | LABIAL VENEER (PORCELAIN LA | 10 | | $916.00 | $0.00 | $916.00 |
| | 11/05/2015 | | ALR | D2962 | LABIAL VENEER (PORCELAIN LA | 11 | | $916.00 | $0.00 | $916.00 |
| | 11/05/2015 | | ALR | D0470 | DIAGNOSTIC CASTS | | | $46.00 | $0.00 | $46.00 |
| | 11/05/2015 | | ALR | D6010 | SURG PLACE OF IMPLANT BODY | 29 | | $0.00 | $0.00 | $0.00 |
| | 11/05/2015 | | ALR | D6057 | Custom Abutment | 29 | | $814.00 | $0.00 | $814.00 |
| | 11/05/2015 | | ALR | D6058 | ABUTMENT SUPPORTED PORC/ | 29 | | $975.00 | $0.00 | $975.00 |
| | 11/05/2015 | | ALR | ISEAT | Implant Crown Seat | | | $0.00 | $0.00 | $0.00 |
| | 11/05/2015 | | ALR | D2740 | CROWN-PORCELAIN/CERAMIC S | 13 | | $876.00 | $0.00 | $876.00 |
| | 11/05/2015 | | ALR | D2740 | CROWN-PORCELAIN/CERAMIC S | 19 | | $876.00 | $0.00 | $876.00 |
| | 11/05/2015 | | ALR | D2950 | CORE BUILDUP, INCLUDING AN | 13 | | $218.00 | $0.00 | $218.00 |
| | 11/05/2015 | | ALR | D2950 | CORE BUILDUP, INCLUDING AN | 19 | | $218.00 | $0.00 | $218.00 |
| | 11/05/2015 | | ALR | CSEAT | Crown Seat | 13 | | $0.00 | $0.00 | $0.00 |
| | 11/05/2015 | | ALR | CSEAT | Crown Seat | 19 | | $0.00 | $0.00 | $0.00 |
| | 11/05/2015 | | ALR | D2740 | CROWN-PORCELAIN/CERAMIC S | 18 | | $876.00 | $0.00 | $876.00 |
| | 11/05/2015 | | ALR | D2950 | CORE BUILDUP, INCLUDING AN | 18 | | $218.00 | $0.00 | $218.00 |
| | 11/05/2015 | | ALR | CSEAT | Crown Seat | 18 | | $0.00 | $0.00 | $0.00 |
| | 11/05/2015 | | ALR | D2391 | RESIN-BASED COMPOSITE-ONE | 21 | B5 | $139.00 | $0.00 | $139.00 |
| | 11/05/2015 | | ALR | D2392 | RESIN-BASED COMPOSITE-TWO | 30 | MO | $188.00 | $0.00 | $188.00 |
| | 11/05/2015 | | ALR | D2393 | RESIN-BASED COMPOSITE-THR | 31 | DOB5 | $220.00 | $0.00 | $220.00 |
| | 11/05/2015 | | ALR | D2391 | RESIN-BASED COMPOSITE-ONE | 27 | I | $139.00 | $0.00 | $139.00 |
| | 11/05/2015 | | ALR | BLCH | BLEACHING TRAYS | | | $274.00 | $0.00 | $274.00 |
| | 11/05/2015 | | MS | D1110 | PROPHYLAXIS-ADULT | | | $71.00 | $0.00 | $71.00 |
| | 11/05/2015 | | ALR | D7140 | EXTRACT-ERUPTED TOOTH OR | 29 | | $134.00 | $0.00 | $134.00 |

|  | Subtotal: | $11,778.00 | $1,000.00 | $10,778.00 |
|--|-----------|------------|-----------|------------|

Insurance coverage is only an estimation. Guarantor is responsible for all treatment not covered by insurance. Fees are valid for one year from treatment plan date.

| | |
|--|--|
| Total Proposed: | $11,778.00 |
| Total Completed: | $0.00 |
| Total Accepted: | $0.00 |
| Proposed Insurance: | $1,000.00 |

Current Dental Terminology (CDT) © American Dental Association (ADA). All rights reserved.

Patient Initials _____     Page 1 of 2

PL.APP.000075



# Amy Reis, D.D.S

563-547-1704

## (563) 547-1704

## Dr. Reis

**Q. What do you enjoy doing on your day off?**
**A.** Anything and everything outdoors. Kayaking, hiking, cross country skiing, archery, biking, gardening and I could go on and on. I feel most relaxed in nature and am in awe of its beauty. It is an appreciation and respect I hope to pass on to my kids.

**Q. What do most people not know about you?**
**A.** I'm a FOODIE!! Food should not only taste good, but I love when it is thoughtfully presented showcasing colors, textures and bright fresh flavors. Yumo!

**Q. What are you most proud of?**
**A.** Being a mom. What more is there to say? I am reminded with each sweet smile how lucky I am to have them. Often we set out to teach our kids about life and ultimately they are the ones who teach us.



**Education**
DDS, University of Iowa, College of Dentistry (2007)
BA, University of Northern Iowa, Biology/Chemistry (2003)
Riceville High School (1999)

**Affiliations**
American Dental Association
Iowa Dental Association
Dubuque District Dental Society
Seattle Study Club

**Personal**
Married to Josh Reis
2 Children: son Cade and daughter Eversyn
1 dog: Ruby

PL.APP.000076

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
(CENTRAL DIVISION)


- - - - - - - - - - - - - - - X
DUSTIN BURNIKEL,                        :
                                        :
        Plaintiff,                      :
                                        :
vs.                                     : Case No. 4:15-cv-00050
                                        :
MICHAEL FONG, individually    :
and in his official capacity  :
as a law enforcement officer  :
with the Des Moines Police    :
Department; GREGG WESSELS,     :
individually and in his       :
official capacity with the    :
Des Moines Police Department; :
and CITY OF DES MOINES, IOWA, :
                                        :
        Defendants.                     :
- - - - - - - - - - - - - - - X


                DEPOSITION OF JOSEPH LEO,

taken by Counsel for the Plaintiff before

Edie Spriggs Daniels, Certified Shorthand Reporter

of the State of Iowa, at 25 East 1st Street,

Des Moines, Iowa, commencing at 8:05 a.m., Tuesday,

May 10, 2016.




     EDIE SPRIGGS DANIELS - CERTIFIED SHORTHAND REPORTER

PL.APP.000077

**2**

1  APPEARANCES:

2  For the Plaintiff:    JAMES R. WYRSCH, ESQ.
                          JAVAD M. KHAZAELI, P.C.
3                         911 Washington Avenue
                          Suite 211
4                         St. Louis, Missouri 63101

5                         JUSTIN K. SWAIM, ESQ.
                          Swaim Law Firm, P.L.L.C.
6                         701 13th Street
                          Suite 2
7                         West Des Moines, Iowa 50265

8  For the Defendants:   JOHN O. HARALDSON, ESQ.
                          City of Des Moines Legal Dept.
9                         400 Robert D. Ray Drive
                          Des Moines, Iowa 50309

10

11

12

13

14

15
16
17
18
19
20
21
22
23
24
25

**3**

1              I N D E X

2  WITNESS                        EXAMINATION

3  Joseph Leo                     4 (Khazaeli)
                                  173 (Haraldson)
4                                 176 (Wyrsch)

5           E X H I B I T S

6  DEPOSITION EXHIBITS          FIRST REFERENCED

7   1 - Police reports                      11
    2 - ASP Baton Basic Course Outline      19
8   6 - "Officer's Goal in Use of Force"    27
    7 - 2009 In-Service                     32
9   8 - Chapter 14, Off-Duty Police Work    45
    9 - 7/27/09 evaluation report re: Fong  53
10  10 - 1/30/08 evaluation report re: Fong 60
    11 - 3/5/08 administrative review re: Fong 61
11  12 - 5/24/02 committee findings re: Wessels 71
    13 - 6/16/02 written reprimand re: Wessels 74
12  14 - 8/9/05 two-day suspension re: Wessels 75
    15 - 2/27/06 evaluation report re: Wessels 77
13  16 - 4/24/09 administrative review re: Wessels 79
    17 - 6/3/08 acknowledgement of oral reprimand 80
14  18 - 1/22/09 three-day suspension re: Wessels 83
    19 - 2/12/09 four-day suspension re: Wessels 85
15  20 - 4/28/14 four-day suspension re: Wessels 87
    21 - 12/6/13 written reprimand re: Wessels 90
16  22 - 2/13/14 two-day suspension re: Wessels 91
    23 - 8/20/14 evaluation report re: Wessels 93
17  24 - 9/14/12 administrative review re: Boone 115
    25 - Topics re: 30(B)(6)                117
18  26 - Color version of ASP baton force   133
         continuum

19

20

21

22

23

24

25

**4**

1              P R O C E E D I N G S

2              JOSEPH LEO,

3  called as a witness by Counsel for the Plaintiff,

4  being first duly sworn by the Certified Shorthand

5  Reporter, was examined and testified as follows:

6              EXAMINATION

7  BY MR. KHAZAELI:

8      Q.  Can you state your name for the record?

9      A.  It's Joseph Michael Leo.  Last name spelling

10  is L-e-o.

11     Q.  Like law enforcement officer?

12     A.  Yes.

13     Q.  What's your current rank?

14     A.  Lieutenant.

15     Q.  And, Lieutenant Leo, how long have you

16  worked for the Des Moines Police Department?

17     A.  Approximately 23 years.

18     Q.  And before working for the Des Moines Police

19  Department, did you work for any other law-

20  enforcement agencies?

21     A.  No, I did not.

22     Q.  What is your current role as a lieutenant?

23     A.  Right now I'm in charge of the Academy's

24  personnel section.

25     Q.  And what does the Academy's personnel

**5**

1  section do?

2      A.  It deals with any and all personnel issues,

3  medical issues, hiring processes, things of those

4  nature.

5      Q.  When you say "deals with," what do you mean?

6  Do you guys draft policies?  Do you enforce policies?

7  Do you investigate policies?

8      A.  No.  I just deal with all the medical stuff

9  that comes in.  I process the bills, and those kinds

10  of things.

11     Q.  So if there's a medical claim--

12     A.  Yes.

13     Q.  --you process that?

14     A.  Right.

15     Q.  What else have you done with the Academy?

16     A.  I'm also one of the primary instructors.

17     Q.  Okay.  So the reason you're here today is

18  that the City has listed you as a fact witness and as

19  a witness that can help us learn what the policies of

20  the City of Des Moines and the Des Moines Police

21  Department are.

22          Are you comfortable with doing that?

23     A.  Yes.

24     Q.  All right.  Let's go to your fact witness.

25  We're here representing our client, Dustin Burnikel.

14

1 at one point Sergeant Wessels-- Well, let's take
2 this back.
3 I'm going to jump back a few steps because I
4 missed something.
5 When you said you went to school for this
6 training about five years ago--
7 A. Uh-huh.
8 Q. --you don't remember who conducted the
9 training; correct?
10 A. No, I don't. I would have to go back and
11 look.
12 Q. Were you sent there on behalf of the
13 Des Moines Police Department?
14 A. Yes, I was.
15 Q. Do you remember, was the training here in
16 Des Moines or were you sent off site?
17 A. I think it was here at our Academy.
18 Q. Were you the only Des Moines Police
19 Department member to attend that training?
20 A. That, I couldn't tell you. I don't
21 remember.
22 Q. But is this the type of training that other
23 sergeants and lieutenants have experienced?
24 A. That, I couldn't tell you. I don't know
25 what other people have attended or not.

15

1 Q. Do you know of anybody else who has ever
2 attended a training like that?
3 Here's what I'm trying to get to: Is this
4 type of training a standard training given to
5 officers who investigate use of force?
6 A. I don't believe so, no. It was a--I don't
7 want to say unique, but it was a one-time school from
8 whoever was teaching it that was here from out of
9 town.
10 Q. Okay. So this is not a part of your--
11 A. This is not something that every supervisor
12 or commander goes through, no.
13 Q. And this isn't something that's built into
14 your Academy?
15 A. No.
16 Q. And this isn't something that the Des Moines
17 Police Department gives the training--this isn't the
18 type of thing that the Des Moines Police Department
19 provides training for?
20 A. No. They did at this time, but it's not
21 something that every commander or sergeant goes
22 through when they get promoted or goes through once a
23 year, no.
24 Q. So there are sergeants and commanders, then,
25 that conduct use-of-force investigations who have

16

1 never received this training; correct?
2 A. I don't know. The specific training that I
3 went through, I remember that I went. I don't
4 remember who from Des Moines went, so for that I
5 can't answer to.
6 MR. WYRSCH: Could we go off the record for
7 a second?
8 (Discussion off the record.)
9 MR. KHAZAELI: We'll go back on.
10 BY MR. KHAZAELI:
11 Q. All right. Do you provide--have you, as
12 a--sorry. Let's go back.
13 Do you provide training here for the
14 Des Moines Police Department?
15 A. Yes, I do.
16 Q. Do you train supervisors on how to
17 investigate use-of-force incidences?
18 A. I do not train that specifically, no.
19 Q. Do you know who trains supervisors here on
20 how to investigate use-of-force incidences?
21 A. That would be conducted during supervisory
22 or sergeant school.
23 Q. During supervisory or sergeant school, what
24 does the Des Moines Police Department tell its
25 sergeants and lieutenants to do during a use-of-force

17

1 investigation?
2 A. You are to review the reports, which would
3 be your case investigation reports, your arrest
4 incident reports, review any witness statements,
5 review any supplemental reports, photographs.
6 Q. What if you're the one who is actually on
7 the scene, because at that point the CIR and the AIR
8 have not been written yet.
9 A. No. So once an officer uses force or
10 there's force used, a supervisor responds to the
11 scene, and the supervisor would talk to the officer
12 that was involved, any witness officers that were
13 there, any third-party witnesses, and then the person
14 to whom the force was used on.
15 Q. So is it your testimony that in sergeant
16 school you're directed to interview any witnesses who
17 are on the scene, if they're available?
18 A. If they're available and you can do that,
19 yes, you should.
20 Q. Are there documents provided to you during
21 your training in sergeant school?
22 A. Yes, there are.
23 MR. KHAZAELI: John, we would want the
24 documents from the sergeant school.
25

50

1  it?
2      A.   No, I don't.
3      Q.   Does Sergeant Wessels still work that?
4      A.   I don't believe he does.  He hasn't been
5  down there since I've been down there.
6      Q.   And do you have any idea why he doesn't work
7  it anymore?
8      A.   No, I don't.
9      Q.   In your experience supervising this group of
10  people  have you ever made a determination that
11  somebody can't work one of these places based on an
12  incident involving them?
13      A.   I've not been involved in anything or a
14  decision.
15      Q.   If you're involved in an incident at one of
16  these places  is it possible that you're told  "You
17  can't work this place anymore"?  Have you ever heard
18  of anything like that?
19      A.   You're talking about by the Department or--
20      Q.   By anybody
21      A.   --by the bar owners, or who?
22      Q.   By anybody
23          Do you just get to pick whenever you want to
24  work  or is it possible that if you're involved in an
25  incident  that your ability to work one of these

51

1  places gets restricted in some way?
2      A.   I guess I couldn't answer that.
3          Sergeant House, Garth House, is in charge of
4  doing all the scheduling, so I couldn't answer if he
5  has not allowed someone to come back and work or not.
6      Q.   How does the Des Moines Police Department
7  track the officers' off-duty hours?
8      A.   They have a sheet that they have to turn in.
9  I think it's a weekly sheet that tracks that.
10      Q.   And then how are these people paid?  Are
11  they paid through the police department and then into
12  their paychecks  or are they paid directly from the
13  third-party private entities?
14      A.   My assignment as the ODT supervisor is
15  through the City of Des Moines, so it's through the
16  City.
17      Q.   What about when you're working Price Chopper?
18      A.   That's paid by Price Chopper.
19      Q.   So do they pay you directly?
20      A.   Yes.
21      Q.   Okay
22      A.   Some of the officers that work ODT that are
23  down there at the same time I am, the City is paying
24  me.  Operation Downtown is paying them.
25      Q.   But if you're paid by Price Chopper  let's

52

1  say  you report those hours to the City so they keep
2  track of it  correct?
3      A.   Yes.
4      Q.   And it's not proper ever to get paid like
5  off the books or in cash  or anything like that
6  correct?
7      A.   No, there's cash jobs out there.
8      Q.   Is the cabstand a cash job?
9      A.   No.
10      Q.   How is the cabstand paid?
11      A.   Again, I guess I don't know because
12  I've never worked it.  I've never worked
13  Operation Downtown as Operation Downtown.  I've
14  always worked it as a City job, so I believe it's
15  Operation Downtown that pays that.
16      Q.   And if it was Operation Downtown  it would
17  be through the police department and then reimbursed?
18      A.   No.  Operation Downtown would pay the
19  officers.
20      Q.   Okay
21      A.   But I believe that they would get a check.
22      Q.   And do you know if Operation Downtown  is
23  that a City organization?  Who owns Operation Downtown?
24      A.   I don't really know anything more about it
25  other than it's Operation Downtown.

53

1      Q.   What's the process for tracking those hours?
2  Like do you write them down daily?  Do you send them
3  in weekly?
4          Sorry   Well  answer that question first
5      A.   What year did they start tracking that?  I
6  guess I'm not really sure.
7      Q.   But in 2013-ish  do you think they were
8  tracking it?
9      A.   Oh, yeah, most definitely they should have
10  been in '13.
11      Q.   I'm going to give you this document  which
12  we'll mark Exhibit 9 now
13              (Deposition Exhibit 9 was
14              marked for identification )
15  BY MR  KHAZAELI:
16      Q.   Do you recognize this?
17      A.   Yes, I do.
18      Q.   What is this?
19      A.   It is a performance evaluation report.
20          MR  HARALDSON:  Do you have a copy for me?
21  I'm sorry  Go ahead
22  BY MR  KHAZAELI:
23      Q.   It's a performance evaluation report
24  What's a performance evaluation report?
25      A.   It's a performance evaluation report where

**54**

1  your supervisor is evaluating your performance.

2  Q.  And this is done on basically--generally on

3  an annual basis  correct?

4  A.  Yes, a yearly evaluation.

5  Q.  Have you ever received one of these?

6  A.  Yes, I have.

7  Q.  On a yearly basis  correct?

8  A.  Correct.

9  Q.  Have you ever filled out one of these as a

10  supervisor?

11  A.  Yes, I have.

12  Q.  And how many of these do you think you've

13  filled out as a supervisor?

14  A.  Probably, say, in my time as being a

15  sergeant and a lieutenant, probably, take a ballpark

16  figure, I don't know, probably 50 to 75.

17  Q.  So you're familiar with these?

18  A.  Yes.

19  Q.  I know when I was a government manager  it

20  was my least favorite thing to do  It's awful

21  A.  Yes.

22  Q.  So let's look at the key  There's a key of

23  1  2  3  and 4  correct?

24  A.  Correct.

25  Q.  And can you read to me what those numbers

**55**

1  mean on the bottom of the sheet?

2  A.  1 is not satisfactory.  2 is some

3  improvement needed.  3 is meets standards.  4 is

4  exceed standards.

5  Q.  And there is no fifth?

6  A.  5 is does not apply.  Well, 5 would be clear

7  over to the right.

8  Q.  Okay  And in Section A  the factor list

9  there are 24 specific criteria that you look at

10  correct?

11  A.  Correct.

12  Q.  Starting from observance of work hours  and

13  it makes sense  the first five  you know  you can't

14  exceed expectations on

15  A.  Right.

16  Q.  You can't work hours you weren't assigned

17  A.  Right.

18  Q.  That explains why the fourth column is

19  blocked out for the first five

20  A.  Correct.

21  Q.  But this goes through everything from

22  observe work hours  attendance  grooming and dress

23  compliance with rules  safety practices  public

24  contacts  suspect contacts  employee contacts

25  knowledge of work  work judgments  planning and

**56**

1  organizing  job skill level  quality of work  volume

2  of acceptable work  meeting deadlines  accepts

3  responsibility  accepts direction  accepts change

4  effectiveness under stress  appearance of work

5  station  operation and care of equipment  work

6  coordination  initiative  and report writing/

7  spelling

8  Those are the 24 criteria that you look at

9  correct?

10  A.  Correct.

11  Q.  And when you evaluate somebody  you

12  individually look at each of these criteria  correct?

13  A.  Yes.

14  Q.  What do you take into account when

15  evaluating somebody for each of these?  Is it just

16  one or two incidences?  Is it the whole year?  What

17  do you look at?

18  A.  Again, I'm going to give you my perspective

19  on looking at this.  It looks like then Sergeant Hardy

20  completed this, so I'm speaking for me, not for him.

21  Q.  I'm not talking about this specific one

22  I'm just talking generally performance evaluation

23  reports when you're doing it

24  A.  The period would include just that

25  evaluation period of time, so if there was any

**57**

1  deficiencies, or anything like that, noted in there,

2  those would be noted on the third page.

3  Q.  And sometimes there's not a third page  I've

4  noticed

5  A.  Well, yeah, sometimes--like the second page

6  is the instruction.  Some people include those, some

7  people don't.  The one I'm looking at in Exhibit 9,

8  it's got the second page, which is the instructions.

9  When I say the third page, it actually would be

10  considered the second page of the actual evaluation

11  report.

12  Q.  And when did you receive training on how to

13  fill out one of these forms?

14  A.  When I went to sergeant school.

15  Q.  And was there any written procedures given

16  to you as to how to do this?

17  A.  I don't recall there being any written

18  procedures.  It was classroom instruction.  It would

19  have included a PowerPoint and then a practical

20  exercise.

21  Q.  Okay  So there would have been a PowerPoint

22  and a practical exercise  correct?

23  A.  I'm going from my memory, and it seems to me

24  that I recall Major Singleton, I believe, taught

25  this.  He is retired now.  He taught this portion of

**58**

1  the sergeants class.

2      Q.   This isn't the type of thing that a normal

3  officer learns in the Academy; correct?

4      A.   No.  This is just for supervisors.

5      Q.   I remember when I was a supervisor in the

6  Government, it was awful, and we received a lot of

7  training on it, and nobody liked to do it.  It was

8  nobody's favorite.

9           You were trained on how to evaluate, let's

10  say, No. 8, employee contacts.  You're trained on

11  what to look for to determine if an officer is

12  meeting, exceeding, or not meeting expectations on

13  each one of these 24 topics; correct?

14      A.   Yes.

15      Q.   So the document in front of you, I believe,

16  is Officer Fong's report for 2008, I think; correct?

17      A.   It says 2009 on here.

18      Q.   But that's the date it's filled out;

19  correct?

20      A.   Yes.

21      Q.   And often you do it for the time period

22  before?

23      A.   One period back, yes, so from July to July.

24      Q.   And then what type of ratings does

25  Officer Fong receive?

**59**

1      A.   In here it appears that they're all 3, which

2  is standard.

3      Q.   So meets standards across the board?

4      A.   Yes.

5      Q.   I'm going to give you the next document,

6  which is--sorry.  Let's flip to that--you said that

7  there's a third page; correct?

8      A.   Yes.

9      Q.   And that lists the--  Let me pull it up on

10  my computer.

11      A.   Like if you mark anything in exceeds

12  standards in column 4, you have to explain that.

13      Q.   Or if you mark anything in column 2;

14  correct?

15      A.   Yes, or if you mark anything below

16  standards, that also has to be outlined or detailed.

17      Q.   So in this case--and for meets standards,

18  you can also put additional observations; correct?

19      A.   Yes.  It's required, and the instructions

20  tell you that.  Under Section D, you're given an

21  assignment, which Officer Fong was in patrol, so his

22  sergeant was required to explain 6, 9, 13, 14, and

23  23.

24      Q.   And in 6 he says, "Michael is very courteous

25  with the citizens he serves.  He is well liked by his

**60**

1  peers..."  Correct?

2      A.   Yes.

3      Q.   And 10 it says, "SPO"--  What does SPO mean?

4      A.   Senior police officer.

5      Q.   "Senior Police Officer Fong has just

6  completed a lengthy military tour and has returned to

7  Third Watch Patrol.  He has attended refresher

8  training at the academy and he has transitioned

9  flawlessly.  Michael is making excellent decisions

10  during his shift and can be counted on to accomplish

11  tasks without hesitation."  Correct?

12      A.   Correct.

13      Q.   What does it say for No. 3 for quality of

14  work?

15      A.   "Fong is handling 'calls for service'

16  effectively and professionally.  He makes quality

17  arrests and always looks to hinder criminal elements

18  in his district."

19      Q.   I'm going to hand you Exhibit No.--

20           MR. KHAZAELI:  What is this?  Ten now?

21           MR. HARALDSON:  Yes.

22                (Deposition Exhibit 10 was

23                 marked for identification.)

24  BY MR. KHAZAELI:

25      Q.   Do you recognize this document?

**61**

1      A.   Yes, I do.

2      Q.   And just to cut to the chase, this was

3  filled out in January 2008, and it's a performance

4  evaluation for Officer Fong; correct?

5      A.   Correct.

6      Q.   So this would have covered the 2007 period;

7  correct?

8      A.   Yes.

9      Q.   And once again, what kind of ratings does he

10  get?

11      A.   3, standards; meet standards.

12      Q.   And let's go to the third page.

13      A.   (Witness complies.)

14      Q.   Let's look at No. 13.

15      A.   Okay.

16      Q.   What does it say about his quality of work?

17      A.   It says "Fong's quality of work is up to

18  standard."

19           MR. KHAZAELI:  Okay.  Let's go to Exhibit

20  No. 11.

21                (Deposition Exhibit 11 was

22                 marked for identification.)

23  BY MR. KHAZAELI:

24      Q.   I'm going to apologize about this one

25  because I don't have a lot of background here.

162

1  commander on Third Watch patrol, when officers would
2  have five arrest incidents, meaning that they had
3  used five use--once they completed five use of
4  forces, I would get an alert to say that Officers X,
5  Y, and Z have had five use of forces, so I would open
6  that up and look in there, and it showed what the use
7  of force was, whether it was punches, strikes, knee
8  strikes, OC, whatever the case was, and then what the
9  finding of those was, whether it was deemed to be
10 appropriate or inappropriate.
11       Then once I got those five and I would be
12 alerted of those, I would review those, determine if
13 there was any apparent pattern.
14       If there was, then it would be up to me, as
15 a supervisor, to do something with that.  I could
16 request an administrative review of a particular
17 incident or a combination of those incidents.
18       That system, like I said, it was when I was
19 watch commander on patrol.
20       When I was up in detectives, I never--very
21 rarely did I deal with arrest incidents, so I didn't
22 have that to worry about with my officers, so I'm not
23 sure how long that has been in play or how long that
24 system has been in operation.
25    Q.  So I've noticed, as I've gone through these

163

1  officers, that their supervisors are constantly
2  changing, you know, whether their supervisor gets
3  promoted, they get moved to a different unit, but is
4  it fair to say that your direct supervisor isn't
5  stagnant for a long period of time?
6     A.  That's been relatively true in the past.
7  That's always at the Chief's discretion.
8     Q.  Are there any policies in place that tell
9  you as a new supervisor, that you should go and
10 review your new direct reports' history as an
11 officer?
12    A.  There is no policy that dictates that, no.
13    Q.  So you could be assigned an officer that has
14 multiple sustained findings against them and not know
15 that; correct?
16       MR. HARALDSON:  Objection.  Speculation.
17       Go ahead.
18    A.  You potentially could, yes.
19 BY MR. KHAZAELI:
20    Q.  When you were assigned Officer Wessels in
21 your chain of command, did you see this long history
22 of violations that I've laid out?
23       MR. HARALDSON:  Objection.  Argumentative in
24 phrasing.
25

164

1  BY MR. KHAZAELI:
2     Q.  These other seven-plus incidents that we've
3  gone through today, did you know about those before
4  today?
5     A.  Specifically in relationship to me being
6  Sergeant Wessels' supervisor for the time that I was
7  down on Third Watch with him, I was aware of some of
8  these.  The ones that I was aware of, I noted in the
9  evaluation period.
10       The ones prior to that, I might have been
11 aware of a few of them, but they were irrelevant as
12 far as the performance evaluation goes.
13    Q.  But this is where you're confused, okay?
14       MR. HARALDSON:  He's confused.
15       MR. KHAZAELI:  Right.  That's what--
16    A.  If I can say this, you're picking on--you're
17 picking--
18 BY MR. KHAZAELI:
19    Q.  In a 10-year period of nine-plus incidences,
20 and I'm just trying to figure out if there's a
21 procedure in place.
22    A.  What are those nine that you're picking out?
23    Q.  Okay.  Let's go through those.  Give me a
24 second.
25       A two-day suspension for insubordination, a

165

1  written reprimand for profanity, a two-day suspension
2  for looking at porn, a one-day suspension for
3  punching a handcuffed suspect, an oral reprimand for
4  taking a handcuffed suspect to the ground, a
5  three-day suspension, with anger management, for
6  insubordination, hitting a handcuffed suspect, firing
7  a gun inappropriately, and not filing a report in an
8  assault case.
9        Here's what I'm trying to get to:  You
10 listed the four-day suspension for hitting the
11 handcuffed suspect, the firing of a gun, and the not
12 filing a report in an assault case.
13       What I'm trying to figure out is when he was
14 assigned to you, was there a procedure in place that
15 would have allowed you to know that he had previously
16 received four separate suspensions and three
17 reprimands?
18       MR. HARALDSON:  Asked and answered.
19 BY MR. KHAZAELI:
20    Q.  Was there a procedure in place for you to
21 have known about that?
22       MR. HARALDSON:  Same objection.
23    A.  When I get transferred to take over
24 somewhere, I don't get a form that comes in and says
25 here's a list of all your officers and here's

166

1  everything in their history, no.
2  BY MR. KHAZAELI:
3      Q.  There is no procedure for you to know that?
4      A.  No.
5      Q.  So if you have a person who you're
6  supervising that has a history of, let's say, looking
7  at porn on a computer, wouldn't that be something you
8  would want to know to make sure they're not doing it
9  again?
10          MR. HARALDSON:  Objection.  Irrelevant.
11     A.  Since you picked that out, I guess I didn't
12  know about that until today.
13 BY MR. KHAZAELI:
14     Q.  Right.  When you were managing him and he's
15  using a computer, isn't that something you would want
16  to know as his manager to make sure he's not doing it
17  anymore?
18          MR. HARALDSON:  Objection.  Argumentative.
19     A.  I guess as a supervisor, yes, I would want
20  to know that somebody is doing that.  I would--
21     Q.  I'm not saying he's still doing it.
22          MR. HARALDSON:  Please let him finish his
23  answer.
24     A.  I didn't know about that, so I don't know.
25  If somebody is doing anything inappropriate, as their

167

1  supervisor, yes, I would want to know about that so I
2  could monitor that, so I could watch that, but I'm
3  also going to take into account what some of these--
4  what the circumstances were in all of these
5  situations.  Just because you're pointing them all
6  out, I mean when you cobble them altogether and you
7  say it looks like it's a lot and it's a lot, okay,
8  yes, you could say that, and you could agree with
9  that; but I've worked on the tactical unit with
10 Gregg Wessels.  I've worked with him, I think, in the
11 traffic unit, and I've worked with him and around him
12 on patrol.
13         All nine of these incidences that you pick
14 out, in my opinion--and this is just strictly my
15 opinion--is not an accurate depiction of what
16 Officer Wessels is as a police officer.
17     Q.  Do you know the context of those things?  Do
18 you know the facts behind them?
19     A.  Some of them I didn't until today.  Some of
20 them I didn't even know about today.
21     Q.  So if you didn't know about them and you
22 don't know the facts about them, how can you tell me
23 that it's not an accurate depiction?
24         MR. HARALDSON:  Objection.  Argumentative.
25 He just answered why--

168

1      A.  How many hundreds or--
2          MR. HARALDSON:  --why he thinks they're not
3  representative.
4          Let me finish my objection.
5          THE WITNESS:  Oh.  Sorry.
6          MR. HARALDSON:  Go ahead.  I'm done.
7      A.  How many thousands of people--understand,
8  I'm not saying anything in here, all this is no
9  excuse at all for anything, and I'm not making
10 excuses for him by any means, but when you take into
11 account all the hundreds of people that he comes into
12 contact with on a daily basis and all the other
13 things that he's done, these, in my opinion, are not
14 a direct reflection on his day-to-day activities and
15 a reflection of him as a person or him as a police
16 officer.
17 BY MR. KHAZAELI:
18     Q.  So earlier you testified that you've
19 previously given people below meets standards on
20 three to five occasions; correct?
21     A.  Maybe somewhere in there, yes.
22     Q.  Do you remember what they did that
23 deserved--
24     A.  One was an officer that continuously wrote
25 horrible reports, would leave out--

169

1      Q.  So a horrible--
2          MR. HARALDSON:  Please let him finish the
3  answer.
4      A.  --would leave out pertinent information
5  for the investigators, and that was consistent on a
6  day-to-day basis.  That's how I graded that on.
7  These are not on a day-to-day basis.  That's the
8  difference, from my perspective.
9      Q.  Okay.  What were the other incidences?  So
10 that's one of them.  Do you remember any other ones?
11     A.  Just the way he routinely handled calls of
12 service, did not perform up to a professional level
13 of standard, in my opinion, a professional level of
14 service to people that would call the police and want
15 the police to help them out with whatever problem
16 they had, and that was on a day-to-day basis, a
17 continuous basis, not like what's displayed here in
18 Wessels' file.
19     Q.  Would you agree with me that there's a
20 qualitative difference between not filling out a
21 report and committing an act of violence?
22     A.  Yes, but it is still not a reflection of his
23 day-to-day service.  That's my opinion.  Agree with
24 me or disagree with me, I don't care.  That's my
25 opinion.  This is not a reflection of his day-to-day

DOMESTIC ABUSE ☒          HATE/BIAS ☒          LEOKA ☒

| | | | | |
|---|---|---|---|---|
| **17. DISTRICT** 4 | **18. BEAT** 42 | **19. REP. AREA** | **1. NAME (LAST, FIRST, MIDDLE)** Burnikel, Dustin George | **2. CASE NUMBER** 2013-4734 |

**3. ADDRESS** 4692 Timber Ave   **CITY** Lime Springs, IA   **4. RES. PHONE**

| **20. OCCUPATION** Unk | **21. HOURS OF EMPLOY.** Unk | **22. SOBRIETY** Drunk | **5. PLACE OF EMPLOYMENT OR SCHOOL** Unk | **6. BUS. PHONE** | **4a. CELL PHONE** |

**23. DESCRIBE LOCATION OF OFFENSE OR TYPE OF PREMISE** Sidewalk

**7. R/S/A –** WM31   **D.O.B.** 4/24/81   **ETHNIC** H ☐ NH ☒   **8. LOCATION OF OFFENSE (ADDRESS)** 200 Blk 3rd

**24. VEHICLE USED BY SUSPECTS**   LICENSE NO.   STATE   YEAR

**9. REPORTING PERSON** Observed   R/S/A   **10. RES. PHONE**

COLOR   YEAR   MAKE   BODY   MODEL

**11. REPORTING PERSON'S ADDRESS** DMPD   CITY   **12. BUS. PHONE**

IDENTIFYING CHARACTERISTICS OF VEHICLE

**13. DATE AND TIME OCCURRED** 16 Feb 13  0220   **14. DATE AND TIME REPORTED** 16 Feb 13  0220

CODE:   V-VICTIM (OTHER THAN IN BLOCK #1) AND SHOW SEX
RACE, AGE;   W-WITNESS;   P-PARENT OR GUARDIAN.

**15. CRIME** Interference   **16. CLASSIFICATION**

| **25. NAME** N/A | CODE | RESIDENCE ADDRESS | CITY | RES. PHONE | BUS. PHONE |
| **26.** | | | | | |
| **27.** | | | | | |

**28. NOTIFICATIONS:**
INVESTIGATORS ☐ YES  ☒ NO    IDENTIFICATION UNIT ☐ YES  ☒ NO    PHOTOGRAPHS ☐ YES ☒ NO    CAR VIDEO ☐ YES ☐ NO   UNIT #2823

**PROPERTY & INJURIES**

| **29. TOOL OR WEAPON USED** N/A | **30. METHOD USED** | **31. POINT OF ENTRY** | **32. VICTIM'S VEHICLE**   LICENSE NO.   STATE/YEAR |
| **33. TYPE PROPERTY TAKEN** ITEM 63 | **34. TOTAL VALUE** ITEM 63 | **35. LOCATION OF VICTIM'S PROPERTY** | **36. DEGREE OF INJURY AND VICTIM'S CONDITION** |
| **37. TYPE OF INJURY AND LOCATION ON BODY** | | **38. HOSPITAL** | **39. TRANSPORTED BY** |

**WORTHLESS DOCUMENTS**

| **40. COLOR OF DOC.** N/A | **41. TYPE OF DOC.** | **42. DATE OF DOC.** | **43. DOCUMENT NO.** | **44. FIRM NAME OF DOCUMENT** |
| **45. NAME AND NO OF BANK** | | **46. MADE PAYABLE TO** | | **47. SIGNATURE ON FACE** |
| **48. REASON NOT HONORED** | | **49. TYPE OF PROPERTY OR SERVICES OBTAINED** | | **50. AMOUNT OF DOCUMENT** |

**DOMESTIC ABUSE**

**51. DO YOU HAVE A CURRENT NO CONTACT ORDER?**   YES ☐   NO ☐

**52. HAS THE SUSPECT BEEN CHARGED WITH DOMESTIC ABUSE ASSAULT ON THE VICTIM OR OTHERS IN THE PAST?**   YES ☐   NO ☐

**53. NOTICE OF ABUSED PERSON RIGHTS GIVEN?**   YES ☐   NO ☐

I REQUEST A NO CONTACT ORDER:

SIGNATURE OF VICTIM

**15**   Burnikel: Intox, Resisting Arrest.   Huemiller: Interference, Intox,   WANTED 0W2R005556 -

Sgt Wessels and I were working off-duty in police uniform at the cabstand, 3rd and Court. At about 0220hrs an intoxicated and unruly group of 4 or 5 approached the cabstand area and cut to the front of the line. We instructed them to move to the back of the line. The group disregarded our instructions and began mouthing off and using profanities. Sgt Wessels told sus3 he was under arrest and began to handcuff him.

Sus2, Huemiller, grabbed Sgt Wessels from behind. I pulled Huemiller away from Sgt Wessels by the collar of her coat and Huemiller tripped over the curb of the parking ramp and fell to the ground. I told Huemiller she was under arrest. Before I could handcuff Huemiller, Burnikel approached me clenching his fists at his sides and puffing his chest up. I told him to back away or he would be arrested. Burnikel ignored my order, and he moved closer squaring up to fight. Huemiller had gotten back to her feet and moved to a position between me and Burnikel. I felt a fight was imminent and I sprayed Burnikel with OC. At this time Sgt Wessels had released Sus3 to assist me. Sgt Wessels pushed Burnikel up against a minivan cab. Burnikel was actively resisting and I delivered two knee strikes to his abdomen. The OC spray had also hit me in the eyes and I was having trouble seeing. We forced Burnikel to the ground but he was attempting to get back to his feet.

| **54. REPORTING OFFICER** Fong, M | **NO.** 5040 | **55. STATUS (CHECK ONE)** ☐ SUSPENDED ☐ OPEN ☐ EX. CLD. ☐ CLOSED | **57. REPRODUCED BY** | **NO.** | **60. UNIT REFERRED TO:** ☒ CID  ☐ SO |
| **2ND OFFICER** Wessels, G | **NO.** 4768 | **56. SUPERVISOR APPROVING** | **NO.** | **58. REVIEWED** | ☐ VNCS  ☐ CHIEF |
| | | | | **59. UCR DISPOSITION** | ☐ RA  ☐ PIO |
| 70-100-3 (revised April 2006) | | | | | ☐ CO. ATT.  ☒ OTHER |

PL.APP.000085

## SUSPECT/PROPERTY INFORMATION
DES MOINES, IOWA POLICE DEPARTMENT

61. CASE NUMBER
2013-4734

62.

### NOTE SUSPECT PECULIARITIES
HAIR : STYLE/LENGTH;  FACIAL FEATURES:  SCARS, MARKS, TATTOOS;  BUILD : MUSCULAR, THIN, FAT, TALL, SHORT, ETC.

| SUS 1 | NAME/ALIAS Burniler, Dustin George | R/S/A WM31 | D.O.B. 4-24-81 | HT. 6-1 | WT. 190 | HAIR BRO | EYES BLU |
|---|---|---|---|---|---|---|---|
| | ADDRESS 4592 Timber Ave, Lime Springs, IA | PHONE NO. | | ARRESTED? | YES ☒ | NO ☐ | |
| | | | | WARRANT NEEDED? YES ☐ | NO ☒ | | |
| | 847ZZ7472 | ETHNIC H ☐ NH ☒ | | CHARGES FILED? | YES ☒ | NO ☐ | |

| SUS 2 | NAME/ALIAS *Husemeller* Huamiller, Breanna | R/S/A WF25 | D.O.B. 7-14-86 | HT. 5-9 | WT. 160 | HAIR BRO | EYES BRO |
|---|---|---|---|---|---|---|---|
| | ADDRESS 716 3rd St, Waverly, IA | PHONE NO. | | ARRESTED? | YES ☐ | NO ☒ | |
| | | | | WARRANT NEEDED? YES ☐ | NO ☒ | | |
| | 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 | ETHNIC H ☐ NH ☒ | | CHARGES FILED? | YES ☒ | NO ☐ | |

| SUS 3 | NAME/ALIAS Unk | R/S/A WM25 | D.O.B. | HT. 5-6 | WT. 150 | HAIR | EYES |
|---|---|---|---|---|---|---|---|
| | ADDRESS | PHONE NO. | | ARRESTED? | YES ☐ | NO ☒ | |
| | | | | WARRANT NEEDED? YES ☐ | NO ☒ | | |
| | | ETHNIC H ☐ NH ☐ | | CHARGES FILED? | YES ☐ | NO ☒ | |

| SUS 4 | NAME/ALIAS | R/S/A | D.O.B. | HT. | WT. | HAIR | EYES |
|---|---|---|---|---|---|---|---|
| | ADDRESS | PHONE NO. | | ARRESTED? | YES ☐ | NO ☐ | |
| | | | | WARRANT NEEDED? YES ☐ | NO ☐ | | |
| | | ETHNIC H ☐ NH ☐ | | CHARGES FILED? | YES ☐ | NO ☐ | |

63.

### PROPERTY DESCRIPTION

| QTY | ARTICLE | BRAND | MODEL | SERIAL NO. | MISC. DESCRIPTION: COLOR, SIZE, INSCRIPTIONS, CALIBER, ETC. | VALUE |
|---|---|---|---|---|---|---|
| | N/A | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

64.

### CASE SCREENING

YES NO
☐ ☐ 1. DOES THE NATURE OF THE OFFENSE POSE A SERIOUS THREAT OF HARM OR INJURY TO AN INDIVIDUAL OR TO THE COMMUNITY? (ITEM 15)
☐ ☒ 2. WAS THE VICTIM SERIOUSLY INJURED? (ITEM 36)
☐ ☒ 3. WAS THERE A WITNESS TO THE OFFENSE? (ITEM 25)
☒ ☐ 4. CAN A SUSPECT EITHER BE NAMED, LOCATED, IDENTIFIED, OR AN IDENTIFIABLE DESCRIPTION BE PROVIDED? (ITEM 62)
☐ ☒ 5. CAN A SUSPECT VEHICLE EITHER BE IDENTIFIED, OR AN IDENTIFIABLE DESCRIPTION BE PROVIDED? (ITEM 24 OR 32)
☐ ☒ 6. IS THERE A REASONABLE EXPECTATION THAT PHYSICAL EVIDENCE CAN BE OBTAINED? (ITEM 28)
☐ ☒ 7. WAS IDENTIFIABLE PROPERTY TAKEN? (ITEM 63)
☐ ☒ 8. WAS THERE A SUBSTANTIAL LOSS OF PROPERTY? (ITEM 63)
☐ ☒ 9. WERE CERTAIN EVENTS OR ACTIONS IN THE OFFENSE DISTINCTIVE OR UNUSUAL AND/OR RELATED TO OTHER OFFENSES? (ITEMS 29, 30, AND 31)
☐ ☐ 10. IS THERE REASON TO BELIEVE THAT THE CRIME IS SUCH THAT PUBLIC INTEREST AND SUPPORT OR FURTHER INVESTIGATION MAY PRODUCE MORE INVESTIGATIVE LEADS, AND MAY RESULT IN SOLVING THE CRIME?
☐ ☒ 11. WAS THE OFFENSE, OTHER THAN DOMESTIC ABUSE, A SIMPLE MISDEMEANOR THAT OCCURRED IN THE OFFICER'S PRESENCE? (ITEM 15)

IF ALL OF THESE ITEMS ARE ANSWERED NO, THE REPORTING OFFICER WILL SUSPEND THE CASE
THE VICTIM WILL BE INFORMED BY THE REPORTING OFFICER THAT THE CASE IS BEING SUSPENDED
AND NO FURTHER ACTION WILL BE TAKEN UNLESS FURTHER LEADS ARE PRODUCED.

| REPORTING OFFICER Fong, M | IDENT. NO. 5040 | DATE 16 Feb 13 | SUSPENDED YES ☐ NO ☒ |
|---|---|---|---|

70-100-3 (revised April 2006)

PL.APP.000086

| | |
|---|---|
| 1. Complainant, Driver #1, Victim, or Arrestee | 2. Arrest No. 3. Case No. |
| **Burnikel, Dustin George** | N/A    **2013-4734** |

| | | |
|---|---|---|
| ☒ Form used as Continuation Sheet for Current Report | 4. Date this Report | 5. Date Original Occurrence |
| | **16 February 2013** | **16 February 2013** |
| ☐ Form used to Report Follow-up Investigation or Supplemental Information | 6. Correct offense or Incident Classification   Changed ☐ Yes |
| | **Interference** |

| | | |
|---|---|---|
| 7. Kind of Report Continued | ☐ Witness Statement | 8. Multiple Clear Up?  ☒ No |
| ☐ Follow-up or Supplemental or Prosecution | ☐ Offense | ☐ Yes  (list other case numbers in narrative) |
| ☐ Traffic Accident | ☒ Arrest | |
| 9. Page No. | 10. Traffic Citation No. | 11. Value of Property Recovered and Type |
| **3 of 3** | | $N/A |

| | |
|---|---|
| **INSTRUCTIONS FOR FOLLOW-UP OR SUPPLEMENTAL USAGE** | Under narrative, record your activity and all developments in the case subsequent to last report. Describe and record value of any property recovered, names and arrest numbers of any persons arrested. Explain any offense classification change. Clearly show disposition of recovered property and inventory number. Recommend to supervisor case status and to reviewer UCR disposition. Indicate "Item Number Continued" at left, if any. |

Item No.

Sgt Wessels and I were trying to pull Burnikel's arms away from the front of his body, without success. I was on one knee next to Burnikel and delivered one strike to his nose with a closed fist. We were able to force Burnikel's hands behind his back and handcuff him. At this point we could smell an odor of alcoholic drinks on Burnikel. He also had some slurred speech at times. Burnikel refused a PBT.

Huemiller had left the scene, but returned a short time later. We arrested her without incident. Huemiller had poor balance, smelled of alcoholic drinks, failed to follow simple instructions, and refused a PBT.

During this time Sus3 left the area. We were unable to locate him.

We called for Ident, and a supervisor for an AIR. Lt Davey responded to the scene and interviewed Burnikel. Burnikel had sustained a bloody nose, likely due to my strike to his face.

The wagon transported both to jail.

| | | | |
|---|---|---|---|
| | 13. Date/Time Typed   No. | Reproduced   No. | |
| 14. Reporting Officer   No. | 15. Status (check one) ☐ Suspended ☐ Open | 17. Unit Referred To: | 18.  UCR Disposition |
| **Fong, M**   **5040** | ☐ Ex. Closed ☐ Closed | | |
| Second Officer   No. | Supervisor Approving   No. | 19. Reviewer | No. |
| **Wessels, G**   **4768** | | | |

PL.APP.000087

| 1. COMPLAINANT, DRIVER #1, VICTIM, OR ARRESTEE BURNIKEL, DUSTIN | | 2. ARREST NO. | 3. CASE NO. 2013 004734 |
|---|---|---|---|

| FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT | 4. DATE THIS REPORT 16-FEB-13 | 5. DATE ORIGINAL OCCURRENCE 16-FEB-13 |
|---|---|---|

| FORM USED TO REPORT FOLLOW-UP INVESTIGATION OR SUPPLEMENTAL INFORMATION | OFFICER CASE INVESTIGATION PHOTOS YES  NO TAKEN BY INDENT | 6. CORRECT OFFENSE OR INCIDENT CLASSIFICATION INTERFERENCE | CHANGED? YES |
|---|---|---|---|

| 7. KIND OF REPORT CONTINUED FOLLOW-UP OR SUPPLEMENTAL OR PROSECUTION TRAFFIC ACCIDENT | WITNESS STATEMENT OFFENSE ARREST | 8. MULTIPLE CLEAR UP? NO YES  (LIST OTHER CASE NUMBERS IN NARRATIVE) |
|---|---|---|

| 9. PAGE NO. 1 OF 1 | 10. TRAFFIC CITATION NO. NA | 11. VALUE OF PROPERTY RECOVERED AND TYPE NA |
|---|---|---|

| INSTRUCTIONS FOR FOLLOW-UP OR SUPPLEMENTAL USAGE | UNDER NARRATIVE, RECORD YOUR ACTIVITY AND ALL DEVELOPMENTS IN THE CASE SUBSEQUENT TO LAST REPORT. DESCRIBE AND RECORD VALUE OF ANY PROPERTY RECOVERED AND THE NAMES AND ARREST NUMBERS OF ANY PERSON(S) ARRESTED. EXPLAIN ANY OFFENSE CLASSIFICATION CHANGE. CLEARLY SHOW DISPOSITION OF RECOVERED PROPERTY AND INVENTORY NUMBER. RECOMMEND TO SUPERVISOR CASE STATUS AND TO REVIEWER UCR DISPOSITION. INDICATE "ITEM NUMBER CONTINUED" AT LEFT, IF ANY. |
|---|---|

| ITEM NO. | |
|---|---|

ON THIS DATE MYSELF AND OFF FONG WERE WORKING OFF DUTY AT THE CABSTAND. AT APPROX 0215 HRS A GROUP OF 4-5 INDIVIDUALS CAME TO THE CABSTAND AND ATTEMPTED TO GET INTO A CAB. I TOLD THEM THAT THEY HAD TO STAND IN LINE. IMMEDIATELY THE GROUP BEGAN TO ARGUE WITH US. HUEMILLER AND A WM20'S WERE THE TWO MAIN INSTIGATORS AND REFUSED TO STAND IN LINE. THE MALE THAT WAS WITH HUEMLLER REFUSED TO STOP ARGUING AFTER BEING TOLD SEVERAL TO BACK AWAY AND STAND IN LINE. THIS CONTINUED FOR SEVERAL MINUTES. FINALLY I GRABBED THE MALE AND TOLD HIM HE WAS UNDER ARREST FOR INTOX. AS I GRABBED THE MALE, HUEMILLER GRABBED ME AND TRIED TO STOP ME FROM ARRESTING THE MALE. I TOOK THE MALE OVER TO THE WAGON AND WAS ATTEMPTING TO HANDCUFF HIM. I LOOKED OVER MY SHOULDER AND SAW HUEMILLER ON THE GROUND (SHE TRIPPED OVER THE CEMENT CURB) AND OFF FONG ORDERING BURNIKEL TO BACK AWAY. BURNICKEL REFUSED TO BACK AWAY AND EVEN DOUBLE HIS FISTS AND WAS IN A FIGHTING STANCE. OFF FONG THEN WENT TOWARDS BURNICKEL TO TAKE HIM INTO CUSTODY FOR INTERFERENCE. AS OFF FONG WAS ATTEMPTING TO ARREST BURNICKEL, HUEMILLER STEPPED IN BETWEEN OFF FONG AND BURNICKEL. AS THIS WAS GOING ON I HAD NOT YET CUFFED MY SUSPECT AND LET HIM GO TO ASSIST OFF FONG. AS I APPROACHED OFF FONG DEPLOYED HIS MACE SPRAYING BURNICKEL WITH 1 SHORT BURST OF MACE TO HIS FACE. I GRABBED BURNICKEL'S LEFT ARM AND FONG GRABBED HIS RIGHT. BURNICKEL TRIED TO PULL AWAY AND WE PUSHED HIM UP AGAINST A TAXI VAN THAT WAS IN LINE. BURNICKEL CONTINUED TO TRY TO PULL AWAY AND FONG DELIVERED TWO KNEE STRIKES TO BURNICKEL'S MID-SECTION. AT THE SAME TIME I STRUCK BURNICKEL TWICE IN THE GROIN AREA WITH MY LEFT HAND. THESE STRIKES CAUSED BURNICKEL TO BEND OVER AND GO DOWN TO THE GROUND. ONCE ON THE GROUND BURNICKEL CONTINUED TO RESIST BY REFUSING TO PUT HIS HANDS BEHIND HIS BACK AND ATTEMPTED TO STAND UP. FONG DID THEN PUNCH BURNICKEL ONCE IN THE FACE. THIS PUNCH DID CAUSE BURNICKEL TO QUIT RESISTING. I WAS FINALLY ABLE TO PULL BURNICKEL'S LEFT ARM BEHIND HIS BACK, AND FONG WAS ABLE TO GET A CUFF ON BURNICKEL'S RIGHT WRIST. WE WERE THEN ABLE TO GET THE CUFF ON HIS LEFT WRIST. THIS ENDED THE PHYSICAL CONFRONTATION WITH BURNICKEL.

LT DAVEY CAME TO THE SCENE TO CONDUCT THE AIR INTERVIEW. SGT KOUSKI ALSO CAME TO THE SCENE AND GAVE US A BOTTLE OF WATER THAT I USED TO RINSE BURNICKEL'S EYES. IDENT ALSO MADE TO SCENE AND TOOK PHOTOS OF BURNICKEL AND BOTH OFFICERS INVOLVED.

DURING ALL OF THIS THE WM THAT WAS INITIALLY BEING ARRESTED FLED THE SCENE WITH HUEMILLER. HUEMILLER THEN CAME BACK AND WAS ARRESTED TO INTOX, AND INTERFERENCE. THE WM WAS NEVER LOCATED.

| | | OFFICE USE ONLY | |
|---|---|---|---|
| | 13. DATE/TIME TYPED  NO. | REPRODUCED  NO. | |

| 14. REPORTING OFFICER WESSELS G.  NO. 4768 | 15. STATUS (CHECK ONE) EXCEPTIONALLY CLEARED  OPEN  CLOSED SUSPENDED | 17. UNIT REFERRED TO: | 18. UCR DISPOSITION |
|---|---|---|---|
| SECOND OFFICER  NO. | SUPERVISOR APPROVING  NO. | 19. REVIEWER | NO. |

PL.APP.000088

| | 1.Complainant, Driver #1, Victim, or Arrestee **Burnikez, Dustin** | 2. Arrest No. N/A | 3. Case No. **2013-4734** |
|---|---|---|---|
| ☐ Form used as Continuation Sheet for Current Report | 4. Date this Report **16 February 2013** | | 5. Date Original Occurrence **16 February 2013** |
| ☒ Form used to Report Follow-up Investigation or Supplemental Information | 6. Correct offense or Incident Classification **See Narrative** | | Changed ☐ Yes |

| 7. Kind of Report Continued ☒ Follow-up or Supplemental or Prosecution ☐ Traffic Accident | ☐ Witness Statement ☐ Offense ☐ Arrest | 8. Multiple Clear Up? | ☒ No ☐ Yes (list other case numbers in narrative) |
|---|---|---|---|
| 9. Page No. **1 of 1** | 10. Traffic Citation No. | 11. Value of Property Recovered and Type **$N/A** | |

| INSTRUCTIONS FOR FOLLOW-UP OR SUPPLEMENTAL USAGE | Under narrative, record your activity and all developments in the case subsequent to last report. Describe and record value of any property recovered, names and arrest numbers of any persons arrested. Explain any offense classification change. Clearly show disposition of recovered property and inventory number. Recommend to supervisor case status and to reviewer UCR disposition. Indicate "Item Number Continued" at left, if any. |
|---|---|

| Item No. | |
|---|---|
| | 6.) Charges: Interference with Official Act Causing Injury, Public Intox, Resisting Arrest |

Off duty officers Fong and Sgt Wessels were working the cab stand as the bars were closing. The incident started when a small group tried butting ahead of the line. Officers confronted them and due to their intoxicated state, they failed to comply to officers orders to move back in line and wait their turn.

Sgt Wessels report will give additional information in more detail on what transpired prior to arrest.

Both Officers Fong and Sgt Wessels had to use force to gain control of the situation. They immediately notified dispatch of the A.I.R and requested Ident for photos as well as a supervisor. Since there was a sergeant involved, I responded to conduct the interview of the arrestee, Mr. Burnikez.

When I arrived, Ident had just finished photo's and both officers were standing at the rear of the paddy wagon in the parking ramp with Mr. Burnikez. Mr Burnikez had been sprayed with mace and officers were flushing his eyes with a bottle of water. Mr. Burniker's demeanor was good by this time. He was however, very intoxicated and had a strong oder of alcohol on his breath.

It appeared his left eye took most of the OC spray. His right eye had no redness. Mr. Burnikez had a minor bloody nose. The bleeding had stopped and the blood was dried.

I introduced myself and asked his name and where he lives. Mr. Burnikez said he lives in Cresco Iowa and is here for the wrestling tournament. He proceeded to tell me he saw the officers grab a female and push her to the ground for no reason. He states he didn't know the female but after seeing this, he stepped in to help her. His story changed somewhat following additional questioning. Another time he said he was standing back doing nothing but watching when they grabbed him and started punching him in the face. He said the officers punched him three time in the face, then sprayed him with mace. I asked if he had any other injuries and he said "no", only his eyes from the spray and his face where they hit him. I asked if he wanted to go to the hospital and he said "no".

He took no responsibility for any wrong doing on his part. Following our conversation, the wagon arrived and transported him to jail.

| | | | 13.Date/Time Typed No. | Reproduced No. |
|---|---|---|---|---|
| 14. Reporting Officer **Lt. L. Davey** | No. **4786** | 15.Status (check one) ☐ Suspended ☐ Open ☐ Ex. Closed ☒ Closed | 17. Unit Referred To: | 18. UCR Disposition |
| Second Officer | No. | Supervisor Approving No. | 19. Reviewer | No. |

PL.APP.000089

| 1.Complainant, Driver #1, Victim, or Arrestee BURNICKEL, DUSTIN | 2. Arrest No. N/A | 3. Case No. 13-4734 |
|---|---|---|

| ☐ Form used as Continuation Sheet for Current Report | 4. Date this Report 2-16-13 | 5. Date Original Occurrence 2-16-13 |
|---|---|---|

| ☐ Form used to Report Followup Investigation or Supplemental Information | 6. Correct offense or Incident Classification   Changed ☐ Yes ARREST INCIDENT |
|---|---|

| 7. Kind of Report Continued   ☐ Witness Statement ☐Followup or Supplemental or Prosecution   ☐ Offense ☐Traffic Accident   ☐ Arrest | 8. Multiple Clear Up?   ☐ No   ☐ Yes  (list other case numbers in narrative) |
|---|---|

| 9. Page No. 1 of 1 | 10. Traffic Citation No. N/A | 11. Value of Property Recovered and Type $N/A |
|---|---|---|

| INSTRUCTIONS FOR FOLLOWUP OR SUPPLEMENTAL USAGE | Under narrative, record your activity and all developments in the case subsequent to last report.  Describe and record value of any property recovered, names and arrest numbers of any persons arrested. Explain any offense classification change. Clearly show disposition of recovered property and inventory number. Recommend to supervisor case status and to reviewer UCR disposition. Indicate "Item Number Continued" at left, if any. |
|---|---|

Item No.

ON SATURDAY, FEBRUARY 16, 2013 AT 0230HR IDENT WAS DISPATCHED TO 3RD AND COURT ON REPORT OF AN ARREST INCIDENT UNDER CASE 13-4734.

I ARRIVED AT 0231HR AND MET WITH SERGEANT G: WESSELS AND OFFICER FONG AT THE CAB STAND.

THE OFFICERS ADVISED THEY WERE INVOLVED IN THE ARREST INCIDENT.  THEY ADVISED THEY HAD NO INJURIES OR DAMAGE TO THEIR UNIFORMS FROM THE ARREST.

I TOOK A FRONT FACIAL AND OVERALL PHOTOGRAPH OF EACH OF THE OFFICERS, WHO WERE IN FULL UNIFORM, FOR IDENTIFICATION PURPOSES.

I MET WITH THE SUSPECT, DUSTIN BURNICKEL, (WM DOB 4-24-81).  SERGEANT WESSELS ADVISED MR. BURNICKEL WAS MACED DURING THE ARREST.

MR. BURNICKEL ADVISED HIS LOWER BACK AND LEFT KNEE WERE ALSO SORE FROM THE ARREST.  HE ORIGINALLY ADVISED HE HAD BACK PROBLEMS, AND THAT HIS BACK WAS SORE FROM DOING TREE WORK EARLIER IN THE DAY, THEN A SHORT TIME LATER REPORTED THE SORENESS WAS FROM THE ARREST.

I TOOK A FRONT FACIAL AND OVERALL PHOTOGRAPH OF MR. BURNICKEL FOR IDENTIFICATION PURPOSES. IMAGES WERE TAKEN SHOWING HIS INJURIES INCLUDING;

REDNESS AND WATERING TO EYES
BLEEDING TO NOSE
LOWER BACK (NO VISIBLE INJURY AT THIS TIME)
LEFT KNEE (NO VISIBLE INJURY AT THIS TIME)

MR. BURNICKEL ADVISED HE HAD NO FURTHER INURES FROM THE ARREST AT THIS TIME.

I DEPARTED AT 0238HR.  NO FURTHER ACTION WAS TAKEN AT THIS TIME.

| | 13.Date/Time Typed No. | Reproduced   No. |
|---|---|---|
| 14. Reporting Officer   No. M. WILCUTT   8622 | 15.Status (check one) ☐ Suspended ☐Open ☐ Ex. Closed ☐ Closed | 17. Unit Referred To: OPS | 18.UCR Disposition |
| Second Officer   No. | Supervisor Approving   No. *(signature)* 183 | 19. Reviewer DA. | No. 4935 |

PL.APP.000090

IN THE IOWA DISTRICT COURT IN AND FOR POLK COUNTY
*PRELIMINARY COMPLAINT*

STATE OF IOWA,
    Plaintiff,

vs.

_Deeanna Huertvce_
    Defendant.
Address: _916 3rd_
City: _Waverly_ State: _IA_ Zip: _____

Court Case No. _____
Date of Arrest _16 Feb 13_
Soc. Sec. No. _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_
D.L. # _____
Date of Birth _7/14/86_
Sex: _F_ Hgt: _5-9_ Eyes: _Bro_
Race: _W_ Wgt: _120_ Hair: _Bro_
Agency/Ticket No. _13-4734_

Defendant is accused of the crime(s) of: _Interference_ , in violation of Iowa
Code Section(s) _719.1_ , in that defendant on the _16_ day of _Feb_ _2013_
in the City of _Des M_ , Polk County, Iowa, _Did flee physically resisting_
_to the officers from intake to apps_

Defendant is implicated in crime by: [ ] operating motor vehicle in Polk County [ ] admissions/statements [ ] possession
[ ] possessed drugs/paraphernalia [ ] possessed alcoholic beverages/containers [ ] near scene of crime [ ] fingerprints
[✗] caught in act [ ] identified by witnesses [ ] possession/use of weapons [ ] caused personal injury
[ ] caused property damage [ ] crime observed by officers [ ] other physical evidence _____

[ ] VICTIM REQUESTS A NO CONTACT ORDER

_Wessels, 6468_
[✗] Officer      [ ] Complaining Witness      [ ] Assistant Polk County Attorney

Subscribed and sworn to before me by _Gale Wessels_ on this _16_ day of _Feb_ _2013_

[ ] Notary Public in and for the State of Iowa      [ ] Judge, Fifth Judicial District

NAMES & ADDRESSES OF WITNESSES: [Please designate victim(s)]

_Tab M 5090 arpo_

THE COURT FINDS PROBABLE CAUSE exists to detain the defendant for the charge(s) set forth above and he/she is
to be admitted to bail in the amount of $ _____ under the following conditions: [ ] cash only [ ] cash or surety
[ ]10% cash to the court [ ] own recognizance [ ]other conditions imposed with bail: _____

JUDGE, FIFTH JUDICIAL DISTRICT          Date

### ORDER

Defendant pleads guilty to the crime(s) of _____ and is sentenced as follows:
[ ] Defendant shall serve _____ days in the Polk County Jail. Defendant is credited with _____ days served.
[ ] Defendant shall pay assessed court costs.
[ ] Defendant shall pay a fine in the amount of $ _____ plus surcharges and court costs.
[ ] The fine, surcharge, and/or court costs shall be taken out of the defendant's property.
[ ] Defendant shall abide by the attached No Contact Order.
[ ] Defendant shall pay restitution to _____ in the amount of _____ through the Clerk of
Court and the Clerk of Court shall mail payments to: _____
[ ] The pecuniary damage amount is not available at this time. The county attorney shall file a pecuniary damage
statement within 30 days of this date and a copy of the statement shall be mailed by the Clerk of Court to the defendant
who shall have 30 days from the date of the filing of the damage statement to contest the damages claimed, otherwise the
amount of restitution shall be as stated in the pecuniary damage statement.
[ ] Defendant shall pay restitution, fines, surcharges and court costs by _____ to the Clerk of Court,
Polk County Courthouse, Room 103, 500 Mulberry Street, Des Moines, Iowa 50309. **Failure to pay on time will result
in an automatic referral to the Iowa Department of Revenue for collection and the imposition of a 10% penalty.**

JUDGE, FIFTH JUDICIAL DISTRICT          Date

PL.APP.000091

# IN THE IOWA DISTRICT COURT IN AND FOR POLK COUNTY
## PRELIMINARY COMPLAINT

STATE OF IOWA,
    Plaintiff,

vs.

_Breanna Huemmer_
  Defendant.

Address: _1116 3rd_
City: _Waverly_     State: _IA_   Zip: _____

Court Case No. _____
Date of Arrest _16 Feb 13_
Soc. Sec. No. _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_
D.L. # _____
Date of Birth _7/4/86_
Sex: _F_   Hgt: _54_   Eyes: _Bro_
Race: _W_   Wgt: _110_   Hair: _Bro_
Agency/Ticket No. _13-9139_

Defendant is accused of the crime(s) of _Public Intoxication_ in violation of Iowa Code Section(s) _123.46_, in that defendant on the _16_ day of _Feb_ _2013_, in the City of _DSM_, Polk County, Iowa, _of had a strong smell of alcohol. Slurred words. Was unsteady standing. Refuse PBT._

Defendant is implicated in crime by: [ ] operating motor vehicle in Polk County    [ ] admissions/statements    [ ] possession
[ ] possessed drugs/paraphernalia    [ ] possessed alcoholic beverages/containers    [ ] near scene of crime    [ ] fingerprints
[X] caught in act    [ ] identified by witnesses    [ ] possession/use of weapons    [ ] caused personal injury
[ ] caused property damage    [ ] crime observed by officers    [ ] other physical evidence _____

[ ] VICTIM REQUESTS A NO CONTACT ORDER

_Wessels 5468_
[X] Officer       [ ] Complaining Witness       [ ] Assistant Polk County Attorney

Subscribed and sworn to before me by _Greg Wessels_ on this _16_ day of _Feb_ _2013_

[ ] Notary Public in and for the State of Iowa       [ ] Judge, Fifth Judicial District

**NAMES & ADDRESSES OF WITNESSES:** [Please designate victim(s)]

_Fire M 5810 DMPD_

**THE COURT FINDS PROBABLE CAUSE** exists to detain the defendant for the charge(s) set forth above and he/she is to be admitted to bail in the amount of $ _____ under the following conditions: [ ] cash only [ ] cash or surety
[ ]10% cash to the court [ ] own recognizance [ ]other conditions imposed with bail: _____

JUDGE, FIFTH JUDICIAL DISTRICT           Date

## ORDER

Defendant pleads guilty to the crime(s) of _____ and is sentenced as follows:
[ ] Defendant shall serve _____ days in the Polk County Jail. Defendant is credited with _____ days served.
[ ] Defendant shall pay assessed court costs.
[ ] Defendant shall pay a fine in the amount of $ _____ plus surcharges and court costs.
[ ] The fine, surcharge, and/or court costs shall be taken out of the defendant's property.
[ ] Defendant shall abide by the attached No Contact Order.
[ ] Defendant shall pay restitution to _____ in the amount of _____ through the Clerk of Court and the Clerk of Court shall mail payments to: _____
[ ] The pecuniary damage amount is not available at this time. The county attorney shall file a pecuniary damage statement within 30 days of this date and a copy of the statement shall be mailed by the Clerk of Court to the defendant who shall have 30 days from the date of the filing of the damage statement to contest the damages claimed, otherwise the amount of restitution will be as stated in the pecuniary damage statement.
[ ] Defendant shall pay restitution, fines, surcharges and court costs by _____ to the Clerk of Court, Polk County Courthouse, Room 103, 500 Mulberry Street, Des Moines, Iowa 50309. **Failure to pay on time will result in an automatic referral to the Iowa Department of Revenue for collection and the imposition of a 10% penalty.**

JUDGE, FIFTH JUDICIAL DISTRICT           Date

White: Court Files    Yellow: County Attorney Simple Misdemeanor Docket    Pink: Defendant    Gold: Defense Attorney    Revised: 02/04

PL.APP.000092

ARREST

## IN THE IOWA DISTRICT COURT IN AND FOR POLK COUNTY
### PRELIMINARY COMPLAINT

STATE OF IOWA,
    Plaintiff,

vs.

DUSTIN GEORGE BURNIKEL
    Defendant.
Address: 4692 TIMBER AVE
City: LIME SPRINGS State: IA Zip: _____

Court Case No. _____
Date of Arrest 16 FEB 13
Soc. Sec. No. 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
D.L. # 847727472
Date of Birth 4-24-81
Sex: M Hgt: 6-1 Eyes: BLU
Race: W Wgt: 190 Hair: BRO
Agency/Ticket No. DM 13-4734

Defendant is accused of the crime(s) of INTERFERENCE / INTOX in violation of Iowa
Code Section(s) 719.1 / 123.46 in that defendant on the 16 day of FEB 13,
in the City of DM , Polk County, Iowa, DID PHYSICALLY INTERFERE
W/ UNIFORMED POLICE ARRESTING ANOTHER PERSON AFTER
BEING WARNED. SMELLED OF ALCOHOL, FAILED TO FOLLOW
SIMPLE INSTRUCTIONS. SLURRED SPEECH, REFUSED PBT.

Defendant is implicated in crime by: [ ] operating motor vehicle in Polk County [X] admissions/statements [ ] possession
[ ] possessed drugs/paraphernalia   [ ] possessed alcoholic beverages/containers [X] near scene of crime   [ ] fingerprints
[X] caught in act   [ ] identified by witnesses   [ ] possession/use of weapons   [ ] caused personal injury
[ ] caused property damage   [X] crime observed by officers   [ ] other physical evidence _____
                                                           1

[ ] VICTIM REQUESTS A NO CONTACT ORDER

M. FONG
[X] Officer    [ ] Complaining Witness    [ ] Assistant Polk County Attorney

Subscribed and sworn to before me by _____ on this 16 day of FEB 13

[ ] Notary Public in and for the State of Iowa    [ ] Judge, Fifth Judicial District

NAMES & ADDRESSES OF WITNESSES: [Please designate victim(s)]

G. WESSELS   #4768   DMPD

**THE COURT FINDS PROBABLE CAUSE** exists to detain the defendant for the charge(s) set forth above and he/she is
to be admitted to bail in the amount of $ _____ under the following conditions: [ ] cash only [ ] cash or surety
[ ] 10% cash to the court [ ] own recognizance [ ] other conditions imposed with bail: _____

JUDGE, FIFTH JUDICIAL DISTRICT        Date

### ORDER
Defendant pleads guilty to the crime(s) of _____ and is sentenced as follows:
[ ] Defendant shall serve _____ days in the Polk County Jail. Defendant is credited with _____ days served.
[ ] Defendant shall pay assessed court costs.
[ ] Defendant shall pay a fine in the amount of $ _____ plus surcharges and court costs.
[ ] The fine, surcharge, and/or court costs shall be taken out of the defendant's property.
[ . ] Defendant shall abide by the attached No Contact Order.
[ ] Defendant shall pay restitution to _____ in the amount of _____ through the Clerk of
Court and the Clerk of Court shall mail payments to: _____
[ ] The pecuniary damage amount is not available at this time. The county attorney shall file a pecuniary damage
statement within 30 days of this date and a copy of the statement shall be mailed by the Clerk of Court to the defendant
who shall have 30 days from the date of the filing of the damage statement to contest the damages claimed, otherwise the
amount of restitution shall be as stated in the pecuniary damage statement.
[ ] Defendant shall pay restitution, fines, surcharges and court costs by _____ to the Clerk of Court,
Polk County Courthouse, Room 103, 500 Mulberry Street, Des Moines, Iowa 50309. **Failure to pay on time will result
in an automatic referral to the Iowa Department of Revenue for collection and the imposition of a 10% penalty.**

JUDGE, FIFTH JUDICIAL DISTRICT        Date

PL:APP.000093

White: Court Files   Yellow: County Attorney Simple Misdemeanor Docket   Pink: Defendant   Gold: Defense Attorney   Revised: 02 / 04

ARREST

# IN THE IOWA DISTRICT COURT FOR POLK COUNTY
## COMPLAINT AND PROBABLE CAUSE STATEMENT

CITY OF DES MOINES

VS.

DUSTIN GEORGE BURNIKEL IA0770300
(DEFENDANT)

4692 TIMBER AVE
(ADDRESS)

LIME SPRINGS, IA
(CITY & STATE)

COURT CASE NO. _____

DMPD. CASE NO. 13-4734
IA DLA-84722 7472

SOC. SEC. NO. 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

DATE OF BIRTH 4-24-81

DESCRIPTION W M 6-1 190

| RACE | SEX | HGT | WGT |
|---|---|---|---|
| W | M | 6-1 | 190 |
| BLU | BRO | — | |
| EYES | HAIR | MARKS | |

THE DEFENDANT IS ACCUSED OF THE CRIME(S) OF: RESISTING ARREST

AT: 200 BLK 3RD
(ADDRESS OR LOCATION)

IN VIOLATION OF SECTION(S): 70-67

OF THE MUNICIPAL CODE OF THE CITY OF DES MOINES, 20 12. COMMITTED ON OR ABOUT
THE 16 DAY OF FEB , 20 13 IN THE CITY OF DES MOINES, POLK COUNTY, IOWA.
SIGNED AND SWORN TO ON THIS 16 DAY OF FEB , 20 13.

M. FONG

FILING COMPLAINANT                         (NOTARY PUBLIC, ASSOCIATE JUDGE OR MAGISTRATE)

## BASIS OF PROBABLE CAUSE

THE DEFENDANT WAS:
(X) CAUGHT IN THE ACT
( ) IDENTIFIED BY PRINTS
( ) NAMED BY WITNESSES
( ) HAD PROPERTY ASSOCIATED WITH CRIME
(X) ARRESTED FOLLOWING INVESTIGATION
( ) WEAPON INVOLVED CRIME

(X) IDENTIFIED IN PERSON
( ) CONFESSED TO CRIME
( ) ACCUSED BY CO-DEFENDANT

( ) VICTIM INJURED

( ) IDENTIFIED BY PHOTO
(X) ARRESTED AT SCENE
( ) OTHER (SPECIFY BELOW)

( ) PROPERTY / MONEY TAKEN

VALUE OF PROPERTY TAKEN $_____        DAMAGE EST. VALUE $_____

OTHER FACTS IMPORTANT TO PROBABLE CAUSE AND BAIL: DID REFUSE TO COMPLY W/
UNIFORMED POLICE + SUBMIT TO PEACEFUL ARREST,
RESULTING IN POLICE HAVING TO USE PHYSICAL
FORCE. TO EFFECT ARREST

SIGNATURE OF ARRESTING OFFICER    NO. 5646        2,16,13
                                                   (DATE OF ARREST)

DATED: ___/___/___

## WITNESS INFORMATION

| NAME | ADDRESS | HM PHONE | WK PHONE |
|---|---|---|---|
| G. WESSELS | 4768 DMPD | | |

BOND AMOUNT $_____    CASH ONLY ( )        CASH OR SURETY ( )
OTHER CONDITIONS IMPOSED WITH BAIL:_____

(JUDGE, ASSOCIATE JUDGE OR MAGISTRATE)

DMPD (88-362)    WHITE • COURT FILE    YELLOW • CITY ATTORNEY    PINK • DEFENDANT OR DEFENDANT ATTORNEY

PI.APP.000094

13-4734

<u>Polk County Jail Booking Information</u>
<u>by Arresting or Transporting Officer</u>

Check all that apply

Suicidal ☐ Yes
Assaultive          ☐ Yes
Juvenile ☐ Yes
Keep Separate    ☐ Yes

**(Please Print Legibly)**

_____: OMPD          Officer & ID# W23623 428          Your Case # 13-4734

Arrest Date: 16 Feb 13          Time: 0020          Location: 200 Ct Rd

_____: Hunemiller          Hunemiller          Sex: F          Race: W

_____: Brianna          Date of Birth: 2/14/86          SOC: 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

_____: _____          Height: 5'9"          Weight: _____          Hair: Bro          Eyes: Bro

Home Address: XXX 116 Ave, WAVERLY IA _____
Number                              City                    State          Zip

Vehicle Make: N/A          Model: _____          Year: _____          Color: _____          Plate _____          State: _____

Was the vehicle impounded? ☐ Yes    ☐ No          If yes, by what law enforcement agency? _____

**\*\*\* List each charge individually \*\*\***          Use additional sheets if more than six charges or warrants.

| Charge Description | Charge Class | Statute/Ordinance | Warrant? | Warrant # |
|---|---|---|---|---|
| Public Intox |  | 123.46 | ☐ Yes  ☐ No | |
| FTA Driving under the influence |  |  | ☒ Yes  ☐ No | OWCR005556 |
|  |  |  | ☐ Yes  ☐ No | |
|  |  |  | ☐ Yes  ☐ No | |
|  |  |  | ☐ Yes  ☐ No | |
|  |  |  | ☐ Yes  ☐ No | |

Is the person injured? ☐ Yes  ☒ No          Prior to arrest? ☐ Yes  ☒ No          During arrest? ☐ Yes  ☒ No

If injured, was the prisoner treated before being brought to jail? ☐ Yes    ☐ No  If so, where? _____

Is the prisoner chemically impaired? ☒ Yes    ☐ No          If so, by what? ALCOHOL _____

Has the prisoner given indications of having mental health problems? ☐ Yes  ☒ No  If so, what? _____

Has the prisoner displayed or communicated self-harm or suicidal behavior or intentions? ☐ Yes  ☒ No  (If Yes, explain below)

Has the prisoner been resistive? ☐ Yes  ☒ No          Has the prisoner been assaultive towards officers? ☐ Yes  ☒ No

Did the prisoner use a weapon? ☐ Yes  ☒ No          If yes, what was it? _____

Keep this prisoner separate from: _____          Reason: _____

Additional information or comments: _____

Officer(s) completing this form (please print) _____          Signature _____

PL.APP.000095
01/2007

PDM1 S092 S091.

* WANTED PERSON LOCATED 20130216 BY IA0770300 DES MOINES PD, DES MOINES *
ORI/IA0090002-BREMER CO SO WAVERLY
OCA/09285
SIN/2004277
NAM/HUNEMILLER,BREANNA LAROSE
 RECORD SENT TO NCIC

 ;201302160532/201302160532
PDM1 313
MESSAGE FROM IOWA
050200

1L01IOWA,MRI12QF053
IA0770300
LOCATE NAM/HUNEMILLER,BREANNA LAROSE OCA/09285

 ;201302160532/201302160532
PDM1 314
MESSAGE FROM IOWA
050202

PL.APP.000096

YR.PDM1.
****HIT CONFIRMATION RESPONSE****

THE RECORD BELOW: IS CONFIRMED

OCA/09285.SIN/2004277.

**WANTED PERSON**

NAM/HUNEMILLER,BREANNA.DOB/19860714.SEX/F.

NAME OF CONFIRMER: LEYA. CONFIRMING AGENCY: BREMER COUNTY SHERIFF.
PHONE:(319)352-5400. FAX:(319)352-2708.
REMARKS: WARRANT IS VALID AS ENTERED & WE WILL EXTRADITE WHEN SHE IS DONE ON
YOUR
CHARGES   PLEASE PLACE A HOLD ON
HER

;201302160531/201302160531
PDM1 312
MESSAGE FROM S091
050182

PL.APP.000097

Shieldware NCIC - **IOWA HIT CONFIRMATION REQUEST FOR WANTED PERSON (YQ)**

REFERENCE INFORMATION

Reference Information (REF)                    Originating Agency ID (ORI) **IA0770300**

DESTINATION INFORMATION

Destination Code (DST) **S091**

REQUEST INFORMATION

Request Number (RNO) **1**                    Request Priority (PRI) **U**

Agency Case Number (OCA) **09285**            State Id Number (SIN) **2004277**

PERSON INFORMATION

Name (NAM) **HUNEMILLER,BREANNA**             Date of Birth (DOB) **19860714**

Sex (SEX) **F**

REQUESTOR INFORMATION

Requestor Name (RNA) **HOWELL**               Requestor Agency (RAG) **DES MOINES PD**

Requestor Phone# (PHO) **5152834890**   Extension # (EXT)        Requestor FAX# (FAX) **5152834293**

Remarks (REM) **OFFICER ARRESTED HER ON OUR CHARGES AND SHE HAS BEEN TAKEN TO PCJ. ARE YOUR CHARGES VALID AND DO YOU WANT HER WHEN WE ARE DONE?**

PL.APP.000098

PDM1.

```
*  WANTED PERSON RECORD  *
ORI/IA0090002-BREMER CO SO WAVERLY  STN/S092  COA/S091
NAM/HUNEMILLER,BREANNA LAROSE  DOB/19860714  RAC/W  SEX/F
HAI/BRO  EYE/GRN  SKN/FAR  HGT/509  WGT/130
SOC/444948962
OLN/687XX59B9  OLS/IA  OLY/2013
SMT/SC R ANKL....TAT ABDOM
AKA/HUNEMILLER,BREA
ADR/716 3RD ST SE  CIT/WAVERLY,IA
DCI/831257  FBI/321174WC5  POB/OK  CTZ/US
CPH/3193525400  FAX/3193522708  VLN/SCHWERIN,SHARON  VLD/20120318
OCA/09285  SIN/2004277  CTL/CSS
DOV/20091130  DOW/20091202  WNO/OWCR005556
DDI/20091202  1418  DDM/20120318  0506
INC/SERIOUS/AGG MISDEMEANOR  PCK/NATIONWIDE
EXL/NO EXTRADITION OUTSIDE IOWA
OFF/5015-FAILURE TO APPEAR
OOC/5404-DRIVING UNDER INFLUENCE-LIQUOR
MIS/FTA FOR SHOW CAUSE HEARING O/C OWI 1ST BOND $1650 CASH ONLY PICK UP
    IOWA ONLY SC R ANKL-5 INCHES TAT ABDOM-DERANGER
******************** END OF RECORD ********************
```

```
;201302160525/201302160525
PDM1 305
MESSAGE FROM IOWA
049759
```

PL.APP.000099

13-4734

**Polk County Jail Booking Information**
**by Arresting or Transporting Officer**

Check all that apply

Suicidal ☐ Yes
Assaultive ☐ Yes
Juvenile ☐ Yes
Keep Separate ☐ Yes

**(Please Print Legibly)**

_____: DMPD    Officer & ID#: FONG 5040 / WESSEL 4768    Your Case #: 13-4734

Arrest Date: 16 FEB 13    Time: 0220    Location: 200 BLK 3RD

_____: BURNIKEL    Sex: M    Race: W

_____: DUSTIN    Date of Birth: 4-24-81    SOC: 847227472

_____: GEORGE    Height: 6-1    Weight: 190    Hair: BRO    Eyes: BLU

Home Address: 4692 TIMBER AVE    LIME SPRINGS    IA    52165
Number    City    State    Zip

Vehicle Make: _____    Model: _____    Year: _____    Color: _____    Plate _____    State: _____

Was the vehicle impounded? ☐ Yes ☒ No    If yes, by what law enforcement agency? _____

**\*\*\* List each charge individually \*\*\***    Use additional sheets if more than six charges or warrants.

| Charge Description | Charge Class | Statute/Ordinance | Warrant? | Warrant # |
|---|---|---|---|---|
| INTERFERENCE | SIM | 719.1 | ☐ Yes ☒ No | |
| INTOX | SIM | 123.46 | ☐ Yes ☒ No | |
| RESISTING ARREST | SIM | | ☐ Yes ☒ No | |
| | | | ☐ Yes ☐ No | |
| | | | ☐ Yes ☐ No | |
| | | | ☐ Yes ☐ No | |

Is the person injured? ☐ Yes ☒ No    Prior to arrest? ☐ Yes ☒ No    During arrest? ☐ Yes ☒ No

If injured, was the prisoner treated before being brought to jail? ☐ Yes ☒ No  If so, where? _____

Is the prisoner chemically impaired? ☒ Yes  ☐ No    If so, by what? ALCOHOL

Has the prisoner given indications of having mental health problems? ☐ Yes  ☒ No  If so, what? _____

Has the prisoner displayed or communicated self-harm or suicidal behavior or intentions? ☐ Yes  ☒ No  (If Yes, explain below)

Has the prisoner been resistive? ☒ Yes  ☐ No    Has the prisoner been assaultive towards officers? ☐ Yes  ☒ No

Did the prisoner use a weapon? ☐ Yes  ☒ No    If yes, what was it? _____

Keep this prisoner separate from: _____    Reason: _____

Additional information or comments: _____

Officer(s) completing this form (please print) FONG, M    Signature _____

PLAPP 000100
01/2007

CASE NUMBER 13-41734

# WANTED PERSON INQUIRY COMPLETED

# NO MATCHES FOUND

Verify Stamp Area

NO RECORD

LENCIR OPERATOR 8107

PL.APP.000101

# APPLICATION FOR PUBLIC RECORDS
## City of Des Moines Police Department

CITY OF DES MOINES
Police Deparment

12:24PM         Feb 20/13
00-0002 001      MitchF
#19136            CLERK

Pol.Case Rpt          $5.00

*TTL                   $5.00
CASH                   $5.00

----- Thank You -----

### PLEASE PRINT

CASE NUMBER **13-4734**

**Feb 16, 2013**
Date & time occurred

**Downtown**
Location

**Interference with**
Offense or description of incident

**Official Acts, Resisting Arrest** (Write On back if necessary)

Involved Person(s) Name(s) **Dustin Burnikel**

| | | | |
|---|---|---|---|
| ☐ Vehicle Accident Report: ($5.00) | | ☐ OWI Report: ($5.00) |
| ☒ Case Report: ($5.00) | | ☐ Officer's OWI Certification: ($5.00) |
| ☐ Trip Log: ($5.00) | | ☐ PBT Calibration Log: ($5.00) |
| ☐ Sex Offender Map: ($10.00) | | ☐ Dispatch Audio Recording: ($15.00) |
| ☐ Photo CD: ($15.00) | | ☐ Video Recording: ($15.00) Subpoena Required |

☐ Arrest Record: ($5.00)        ☐ Visa Letter: ($5.00)

Name: _____ Alias or Maiden: _____

Address: _____

Date of Birth: _____ Social Security _____
         Month    Day    Year

**Ted Prine      213 4th St ste 125      244-0380**
Applicant's Name    Address (for mailing purpose)    Phone Number
                    **DSM 50309**

Application is hereby made for the requested records maintained by the Des Moines Police Department in accordance to City Ordinance 2-130. Records requested may be confidential under the City Ordinance or Code of Iowa and not available for release. Requests will be handled immediately if possible. * Requests not immediately available will be processed as soon as possible and in most cases within 5 working days.

* ☐ pick up in person  ☐ mail (include zip code)                    12/13/11

PL.APP.000102

HAS NOT PAID

**APPLICATION FOR PUBLIC RECORDS**
**City of Des Moines Police Department**

<u>PLEASE PRINT</u>

CASE NUMBER  2013- 4734

2-16-13  /  0220

Date & time occurred

DSM

Location

Offense or description of incident

CA1
51 CITY OF DES MOINES
Police Department

Mar 14/13
Nichol
CLERK

12:16PM
We 00-0002 001
Pay #19667                    $15.00

AudioRecord            $15.00

*TTL                        $15.00
Check

Cash
(Paying      — Thank You —
as no ch

4

(Write On back if necessary)

Involved Person(s) Name(s)   Breanna Hunemiller

| | | |
|---|---|---|
| ☐ Vehicle Accident Report: ($5.00) | ☐ OWI Report: ($5.00) |
| ☐ Case Report: ($5.00) | ☐ Officer's OWI Certification: ($5.00) |
| ☐ Trip Log: ($5.00) | ☐ PBT Calibration Log: ($5.00) |
| ☐ Photo CD: ($15.00) ✲ | ☑ Dispatch Audio Recording: ($15.00) ✲ |
| | ☐ Video Recording: ($15.00) ✲ |

✲ SUBPOENA REQUIRED FOR ANY OPEN CRIMINAL CASE

☐ Arrest Record: ($5.00)                    ☐ VISA Letter: ($5.00)

Name:_____ Alias or Maiden:_____

Address:_____

Date of Birth: _____Social Security_____
                Month   Day   Year

Wendy Jomin (Gratias Investigations)   244-9817

Applicant's Name          Address (for mailing purpose)       Phone Number

Spoke w/ Wendy 3-14-13

Application is hereby made for the requested records maintained by the Des Moines Police Department in accordance to City Ordinance 2-130. Records requested may be confidential under the City Ordinance or Code of Iowa and not available for release. Requests will be handled immediately if possible. *Requests not immediately available will be processed as soon as possible and in most cases within 5 working days.

* ☐ pick up in person  ☐ mail (include zip code)                    0/23/13

PL.APP.000103

# CONFIDENTIAL

## ARREST INCIDENT REPORT
DES MOINES, IOWA POLICE DEPARMENT

| | |
|---|---|
| OFFICER'S MEDICAL ATTENION: | 1. ARRESTEE'S NAME (LAST,FIRST,MIDDLE) **Burnikel, Dustin George** |
| FACILITY: **N/A** | |
| TRANSPORTED BY: **N/A** | 2. ARRESTEE'S ADDRESS **4692 Timber Ave, Lime Springs, IA** |

| | | |
|---|---|---|
| 3. R/S/A **WM31** | 4. DATE OF BIRTH **4-24-81** | 5. CASE NUMBER **13-4734** |

| | | |
|---|---|---|
| 12. ARRESTEE'S MEDICAL ATTENTION: | 6. ADDRESS OF INCIDENT **200 Blk 3rd** | 7. ARREST NUMBER |
| FACILITY: **Refused** | | |
| TRANSPORTED BY: **N/A** | 8. DATE/TIME OF INCIDENT **16 Feb 13  0220** | 9. ASSIGNMENT **3rd Watch**  10. CRIME **Interference** |

13. CHEMICAL DETERRENT USED?: YES ☒ NO ☐

PRESCRIBED TREATMENT ADMINISTERED BY:

**14. TYPE OF DEFENSIVE RESPONSE USED:**

FIREARM ☐   ASP BATON ☐

PEPPER SPRAY ☒   ESD ☐

PR-24 BATON ☐   PHYSICAL ☒

OTHER ☐

**15. PHOTOGRAPHS TAKEN?**

YES ☒   NO ☐
BY WHOM.

☒ IDENT TECH

☐ OFFICER _____

☐ CAR VIDEO   UNIT # _____

**16. LIST ALL ARRESTEE'S INJURIES (IF ANY) PRIOR TO ARREST:**

☐ HEAD   ☐ ARMS   ☐ FEET

☐ NECK   ☐ HANDS   ☐

☐ LEGS   (SEE NARRATIVE)

17. TYPE AND LOCATION OF OFFICER'S INJURIES
**None**

18. TYPE AND LOCATION OF ARRESTEE'S INJURIES
**OC Spray to eyes, Bloody Nose, Complained of pain to Right Knee, and lower back**

| 19. WITNESSES (INCUDING OFFICERS) | ADDRESS | RESIDENCE PHONE | BUSINESS PHONE |
|---|---|---|---|
| **Wessels. G** | **DMPD** | | |
| | | | |

20. Arrestee under the influence of Alcohol/Controlled Substance?

Yes ☒   No ☐

If Yes explain .
Burnikel had been drinking at bars in the court avenue area.  Declined a PBT.  Smelled of alcohol.

21. Narrative

**15. Intox, Resisting Arrest**

Sus2, Huemiller, grabbed Sgt Wessels from behind.  I pulled Huemiller away from Sgt Wessels by the collar of her coat and Huemiller tripped over the curb of the parking ramp and fell to the ground.  I told Huemiller she was under arrest.  Before I could handcuff Huemiller, Burnikel approached me clenching his fists at his sides and puffing his chest up.  I told him to back away or he would be arrested.  Burnikel ignored my order, and he moved closer squaring up to fight.  Burnikel was about the same size as me, and was wearing a Waterloo wrestling sweatshirt.  Huemiller had gotten back to her feet and moved to a position between me and Burnikel.  A fight was imminent and I sprayed Burnikel with one short burst of OC.  At this time Sgt Wessels had released Sus3 to assist me.  Sgt Wessels pushed Burnikel up against a minivan cab.  Burnikel was actively resisting by trying to push us back away from him.  I delivered two knee strikes to his abdomen.  The OC spray had also hit me in the eyes and I was having trouble seeing.  We forced Burnikel to the ground but he was attempting to get back to his feet.  Sgt Wessels and I were trying to pull Burnikel's arms away from the front of his body, without success.  Sgt Wessels and I were both in close proximity, and we did not have much room to maneuver because of our proximity to the taxicab, the curb, and a tree.

| 22. REPORTING OFFICER **Fong, M** | 26 FEB 13 | IDENT NO. **5040** |
|---|---|---|

92-0374(Revised 12-2010)

92-374

PENGAD 800-631-6989

DEPOSITION
EXHIBIT
5
5/9/16

PL APP 000104

Our force options were limited and we needed to secure Burnikel quickly before any other members of his group interfered. I was on one knee next to Burnikel and delivered one strike to his nose with a closed fist. We were able to force Burnikel's hands behind his back and handcuff him.

At this point we could smell an odor of alcoholic drinks on Burnikel. He also had some slurred speech at times. Burnikel refused a PBT.

Sgt Wessels rinsed Burnikel's eyes with a bottle of water. Lt Davey came to the scene to interview Burnikel. Burnikel said his back had been bothering him before the altercation and that it now hurt. Burnikel also said his knee hurt. I observed no visible injury to either body part. Burnikel did have a bloody nose which was likely due to me striking him once in the nose.

---

**23. IMMEDIATE SUPERVISOR'S ENDORSEMENT**

Officer Fong and Sgt. Wessels were confronting a hostile female when an aggressive male intervened. Not only was he intoxicated and belligerent, but he apparently fancied himself a wrestler and by his stance and mannerisms indicated that he was preparing to assault the officers. After he refused to follow lawful orders, Ofc. Fong sprayed the suspect with OC, which had little effect. He attempted to assault the officers by shoving them. Knowing that he was accompanied by other persons, and concerned with others jumping in, they needed to secure the suspect as quickly as possible. He administered two knee strikes to the suspect's abdomen, and took him to the ground. Ofc. Fong was also suffering from the effects of the OC spray. The suspect was struggling to get to his feet, and due to the confined quarters, aggravated suspect, and possible cohorts, as well as his now diminished abilities due to the OC, he punched the suspect in the nose with a closed fist. This immediately had the desired effect, and the suspect was able to be taken into custody.

While closed punched fists to the head are to be avoided, this exception worked well, quickly deescalating the fight and allowing him to be secured without further resistance. The force used was appropriate and necessary to affect the arrest.

| 24. SUPERVISOR | | | IDENT NO. |
|---|---|---|---|
| House | _signature_ 25 FEB '13 | | 4919 |

**25. UNIT / WATCH / SECTION COMMANDER'S ENDORSEMENT**

After reviewing all of the documentation related to this incident I concur with Sgt. House's endorsement. It appears that the force used was minimal and necessary to bring a very intoxicated subject into custody. I don't condon striking someone in the head with a closed fist unless it is necessary to control a volatile situation. When Officer Fong took this course of action Mr. Burnikel relaxed just enough to allow officers to regain control before others in his group could come to his aid. In reviewing the photo's they appear to be consistent with the Officers version of the events.

| 26. UNIT / WATCH / SECTION COMMANDER | _signature_ 25 FEB 13 |
|---|---|
| Lt. Tony Knox | 4789 |

**27. BUREAU COMMANDER'S ENDORSEMENT**

I agree that the actions taken by Officer Fong were reasonable given the circumstances. Following the deployment of mace, Mr. Burnikel was not deterred and an active struggle ensued. Although the method was unconventional, it was effective in ending the fight, which was paramount as the mace was impacting Officer Fong's ability to continue. This has been discussed with Officer Fong.

_signature_ 2/28/2013

PL.APP.000105

28. BUREAU COMMANDER

PL.APP.000106

# ARREST INCIDENT REPORT
DES MOINES, IOWA POLICE DEPARTMENT

THIS REPORT IS BEING COMPLETED INVOLUNTARILY IN ACCORDANCE WITH DEPARTMENTAL GENERAL ORDER 04-01

**1. ARRESTEE'S NAME (LAST, FIRST, MIDDLE)**
BURNIKEL, DUSTIN GEORGE

**11. OFFICER'S MEDICAL ATTENTION:**
FACILITY: NA

TRANSPORTED BY: NA

**2. ARRESTEE'S ADDRESS**
4692 TIMBER AV          LIME SPRINGS IA

| 3. R/S/A | 4. DATE OF BIRTH | 5. CASE NUMBER |
|---|---|---|
| WM31 | 24-APR-81 | 2013 004734 |

**12. ARRESTEE'S MEDICAL ATTENTION:**
FACILITY: NA

TRANSPORTED BY: NA

**6. ADDRESS OF INCIDENT**
200 BLK 3RD

**7. ARREST NUMBER**

| 8. DATE/TIME OF INCIDENT | 9 ASSIGNMENT | 10. CRIME |
|---|---|---|
| 16-FEB-13 / 0220 HOURS | PATROL | INTERFERENCE |

**13. CHEMICAL DETERRENT USED?:** YES ☒ NO ☐

PRESCRIBED TREATMENT ADMINISTERED BY: WESSELS 4768

**14. TYPE OF DEFENSIVE RESPONSE USED:**

FIREARM ☐          ASP BATON ☐

PEPPER SPRAY ☒     ESD ☐

PR-24 BATON ☐      PHYSICAL ☒

OTHER ☐

**15. PHOTOGRAPHS TAKEN?**
YES ☒   NO ☐
BY WHOM:

☒ IDENT TECH
☐ OFFICER _____
☐ CAR VIDEO   UNIT# _____

**16. LIST ALL ARRESTEE'S INJURIES (IF ANY) PRIOR TO ARREST:**

☒ HEAD   ☐ ARMS   ☐ FEET

☐ NECK   ☐ HANDS  ☐ TRUNK

☐ LEGS   (SEE NARRATIVE)

**17. TYPE AND LOCATION OF OFFICER'S INJURIES**
NONE

**18. TYPE AND LOCATION OF ARRESTEE'S INJURIES**
MACE IN EYES, BLOODY NOSE, COMPLAINT OF KNEE AND BACK PAIN, NO VISIBLE INJURIES IN THIS AREA

| 19. WITNESSES (INCLUDING OFFICER) | ADDRESS | RESIDENCE PHONE | BUSINESS PHONE |
|---|---|---|---|
| FONG, M | DMPD | | 283-4873 |
| | | | |
| | | | |

**20. ARRESTEE UNDER THE INFLUENCE OF ALCOHOL/CONTROLLED SUBSTANCE?**
YES ☒   NO ☐
IF YES EXPLAIN: HAD BEEN DRINKING, ACTED INTOXICATED

**21. NARRATIVE**
ON THE ABOVE DATE MYSELF AND OFF FONG WERE WORKING OFF DUTY AT THE CABSTAND AT 3RD AND COURT. AT APPROX 0220 HRS BURNIKEL AND 3-4 OTHER PEOPLE CAME TO THE CABSTAND AND ATTEMPTED TO GET INTO A CAB. THE GROUP WAS ADVISED THAT THEY NEEDED TO WAIT IN LINE. DUE TO THE INTOXICATION LEVEL OF THE GROUP THEY BEGAN TO ARGUE WITH US, AND WOULD NOT STOP. AFTER SEVERAL MINUTES OF THIS I GRABBED A WM FROM THE GROUP AND ADVISED HIM HE WAS UNDER ARREST FOR INTOX. I TOOK THIS WM OVER TO THE WAGON AND STARTED TO HANDCUFF HIM. WHILE DOING THIS, I LOOKED OVER MY SHOULDER I SAW A FEMALE THAT WAS WITH THE GROUP, (LATER ID AS BREANNA HUEMILLER) LAYING ON THE GROUND. APPARENTLY BURNIKEL THOUGHT FONG HAD KNOCKED HER DOWN SO HE STARTED TO ARGUE WITH OFF FONG, AND TOOK AN AGGRESSIVE STANCE WITH HIS FISTS DOUBLE. I HEARD FONG TELLING BURNIKEL TO GET BACK. AFTER TELLING BURNIKEL TO GET BACK SEVERAL TIMES FONG WENT TOWARDS HIM. AT THE SAME TIME HUEMILLER STEPPED IN BETWEEN FONG AND BURNIKEL. FONG WAS TRYING TO GET AHOLD OF BURNIKEL BUT COULD NOT BECAUSE OF HUEMILLER. FONG DID THEN SPRAY BURNIKEL WITH ONE SHORT BURST OF MACE. AT THIS TIME I HAD LET GO OF MY WM TO ASSIST FONG. AS I GOT TO BURNIKEL I GRABBED HIS LEFT ARM AND FONG HAD GRABBED HIS RIGHT. BURNIKEL WAS TRYING TO PULL AWAY FROM US AND FONG DELIVERED TWO KNEE STRIKES TO BURNIKELS MIDSECTION. AT THE SAME TIME I STRUCK BURNIKEL IN THE GROIN AREA WITH MY LEFT HAND. THESE STRIKES CAUSED BURNIKEL TO BEND OVER AND WE PUSHED HIM TO THE GROUND. WHEN WE WENT TO THE GROUND WE WERE UP AGAINST A TAXI VAN THAT WAS WAITING IN LINE, A TREE, AND THE CURB. WE CONTINUE TO STRUGGLE WITH BURNIKEL AS HE REFUSED TO GIVE US HIS ARMS AND HE WAS ATTEMPTING TO STAND UP. AT THIS TIME FONG STRUCK BURNIKEL WITH HIS FIST, CAUSING A BLOODY NOSE. DUE TO THE CONFINED AREA THAT WE WERE

**22. REPORTING OFFICER**
WESSELS.

**IDENT NO.**
4768

92-0374 (REVISED 12-2010)

PL.APP.000107

IN, FONG STRUCK THE ONLY AREA AVAILABLE. THIS STRIKE CAUSED BURNIKEL TO RELAX ENOUGH THAT WE WERE ABLE TO PULL BOTH ARMS BEHIND HIS BACK AND CUFF HIM WITHOUT ANY FURTHER FORCE.

I DID FLUSH OUT BURNIKEL'S EYES WITH WATER THAT WAS PROVIDED BY SGT KOUSKI. LT. DAVEY ALSO MADE THE SCENE TO INTERVIEW BURNIKEL

AFTER BURNIKEL WAS PUT INTO THE WAGON, HUEMILLER RETURNED TO THE SCENE. SHE WAS ARREST FOR INTOX AND INTERFERNCE. HUEMILLER WAS CHARGED WITH INTERFERENCE DUE TO THE FACT THAT SHE HAD GRABBED ME FROM BEHIND WHEN I WAS ATTEMPTING THE GRABBED OUR INTITIAL SUSPECT. WHILE FIGHTING WITH BURNKEL THE THE WM THAT I WAS ATTEMPT TO HANDCUFF DID LEAVE THE SCENE AND WAS NEVER LOCATED.

**23. IMMEDIATE SUPERVISOR'S ENDORSEMENT**

| 24. SUPERVISOR | IDENT NO. |
|---|---|
| | |

**25. UNIT/ WATCH/ SECTION COMMANDER'S ENDORSEMENT**

After reviewing the reports and speaking with Sgt. Wessles, I concur with the force he used. The force used was necessary to take control of Burnikel and within departmental guidelines and procedures. The on- scene assessment was conducted by Lt. Davey.

*P. Stout* 18 FEB 13

| 26. UNIT/WATCH/SECTION COMMANDER | |
|---|---|
| Capt. P. Stout | 4767 |

**27. BUREAU COMMANDER'S ENDORSEMENT**

I agree that the physical force used by Sgt. Wessels was appropriate given the circumstances. Following the deployment of mace, which did not deter Mr. Burnikel, the officers became engaged in an active physical struggle to control him, with limited area to maneuver, the method of force was effective in gaining control and securing Mr. Burnikel in handcuffs. Lt. Davey provided the on-scene assessment.

| 28. BUREAU COMMANDER | |
|---|---|
| Maj. Wh723 2/28/2013 | |

92-0374 (REVISED 12-2010)

PL.APP.000108

# CASE INVESTIGATION REPORT
## DES MOINES, IOWA POLICE DEPARTMENT

**ARREST CIR**

DOMESTIC ABUSE ☐   HATE/BIAS ☐   LEOKA ☐

| 1. NAME (LAST, FIRST, MIDDLE) Burnikel, Dustin George | 2. CASE NUMBER 2013-4734 |
|---|---|

| 17. DISTRICT 4 | 18. BEAT 42 | 19. REP. AREA | 3. ADDRESS 4692 Timber Ave | CITY Lime Springs, IA | 4. RES. PHONE |
|---|---|---|---|---|---|

| 20. OCCUPATION Unk | 21. HOURS OF EMPLOY. Unk | 22. SOBRIETY Drunk | 5. PLACE OF EMPLOYMENT OR SCHOOL Unk | 6. BUS. PHONE | 4a. CELL PHONE |
|---|---|---|---|---|---|

| 23. DESCRIBE LOCATION OF OFFENSE OR TYPE OF PREMISE Sidewalk | 7. R/S/A -- WM31 | D.O.B. -- 4/24/81 | ETHNIC H☐ NH☒ | 8. LOCATION OF OFFENSE (ADDRESS) 200 Blk 3rd |
|---|---|---|---|---|

| 24. VEHICLE USED BY SUSPECTS | LICENSE NO. | STATE | YEAR | 9. REPORTING PERSON Observed | R/S/A | 10. RES. PHONE |
|---|---|---|---|---|---|---|

| COLOR | YEAR | MAKE | BODY | MODEL | 11. REPORTING PERSON'S ADDRESS DMPD | CITY | 12. BUS. PHONE |
|---|---|---|---|---|---|---|---|

| IDENTIFYING CHARACTERISTICS OF VEHICLE | 13. DATE AND TIME OCCURRED 16 Feb 13  0220 | 14. DATE AND TIME REPORTED 16 Feb 13  0220 |
|---|---|---|

| CODE:  V-VICTIM (OTHER THAN IN BLOCK #1) AND SHOW SEX  RACE, AGE;   W-WITNESS;    P-PARENT OR GUARDIAN | 15. CRIME Interference | 16. CLASSIFICATION |
|---|---|---|

| 25. NAME N/A | CODE | RESIDENCE ADDRESS | CITY | RES. PHONE | BUS. PHONE |
|---|---|---|---|---|---|
| 26. | | | | | |
| 27. | | | | | |

28. NOTIFICATIONS.
INVESTIGATORS ☐ YES  ☒ NO   IDENTIFICATION UNIT ☐ YES  ☒ NO   PHOTOGRAPHS ☐ YES ☒ NO   CAR VIDEO ☒ YES ☐ NO   UNIT #2823

**PROPERTY & INJURIES**

| 29. TOOL OR WEAPON USED N/A | 30. METHOD USED | 31. POINT OF ENTRY | 32. VICTIM'S VEHICLE | LICENSE NO. | STATE/YEAR |
|---|---|---|---|---|---|

| 33. TYPE PROPERTY TAKEN ITEM 63 | 34. TOTAL VALUE ITEM 63 | 35. LOCATION OF VICTIM'S PROPERTY | 36. DEGREE OF INJURY AND VICTIM'S CONDITION |
|---|---|---|---|

| 37. TYPE OF INJURY AND LOCATION ON BODY | 38. HOSPITAL | 39. TRANSPORTED BY |
|---|---|---|

**WORTHLESS DOCUMENTS**

| 40. COLOR OF DOC. N/A | 41. TYPE OF DOC. | 42. DATE OF DOC. | 43. DOCUMENT NO. | 44. FIRM NAME OF DOCUMENT |
|---|---|---|---|---|

| 45. NAME AND NO OF BANK | 46. MADE PAYABLE TO | 47. SIGNATURE ON FACE |
|---|---|---|

| 48. REASON NOT HONORED | 49. TYPE OF PROPERTY OR SERVICES OBTAINED | 50. AMOUNT OF DOCUMENT |
|---|---|---|

**DOMESTIC ABUSE**

| 51. DO YOU HAVE A CURRENT NO CONTACT ORDER?  YES ☐  NO ☐ | 52. HAS THE SUSPECT BEEN CHARGED WITH DOMESTIC ABUSE ASSAULT ON THE VICTIM OR OTHERS IN THE PAST?  YES ☐  NO ☐ | 53. NOTICE OF ABUSED PERSON RIGHTS GIVEN?  YES ☐  NO ☐  I REQUEST A NO CONTACT ORDER: ____  SIGNATURE OF VICTIM |
|---|---|---|

| 15 | Burnikel: Intox, Resisting Arrest.  Huemiller: Interference, Intox

Sgt Wessels and I were working off-duty in police uniform at the cabstand, 3rd and Court.  At about 0220hrs an intoxicated and unruly group of 4 or 5 approached the cabstand area and cut to the front of the line.  We instructed them to move to the back of the line.  The group disregarded our instructions and began mouthing off and using profanities.  Sgt Wessels told sus3 he was under arrest and began to handcuff him.

Sus2, Huemiller, grabbed Sgt Wessels from behind.  I pulled Huemiller away from Sgt Wessels by the collar of her coat and Huemiller tripped over the curb of the parking ramp and fell to the ground.  I told Huemiller she was under arrest.  Before I could handcuff Huemiller, Burnikel approached me clenching his fists at his sides and puffing his chest up.  I told him to back away or he would be arrested.  Burnikel ignored my order, and he moved closer squaring up to fight.  Huemiller had gotten back to her feet and moved to a position between me and Burnikel.  I felt a fight was imminent and I sprayed Burnikel with OC.  At this time Sgt Wessels had released Sus3 to assist me.  Sgt Wessels pushed Burnikel up against a minivan cab.  Burnikel was actively resisting and I delivered two knee strikes to his abdomen.  The OC spray had also hit me in the eyes and I was having trouble seeing.  We forced Burnikel to the ground but he was attempting to get back to his feet. |
|---|---|

| 54. REPORTING OFFICER Fong, M | NO. 5040 | 55. STATUS (CHECK ONE) ☐ OPEN  ☐ EX. CLD  ☐ SUSPENDED  ☐ CLOSED | 57. REPRODUCED BY     NO. | 60. UNIT REFERRED TO: ☐ CID  ☐ SO |
|---|---|---|---|---|
| 2ND OFFICER Wessels, G | NO. 4768 | 56. SUPERVISOR APPROVING     NO. | 58. REVIEWER | ☐ VNCS  ☐ CHIEF |
| | | | 59. UCR DISPOSITION | ☐ IA  ☐ PIO |
| | | | | ☐ CO. ATT.  ☐ OTHER |

70-100-3 (revised April 2006)

PL.APP.000109

**SUSPECT/PROPERTY INFORMATION**
DES MOINES, IOWA POLICE DEPARTMENT

61. CASE NUMBER
2013-4734

62.

**NOTE SUSPECT PECULIARITIES**
HAIR : STYLE/LENGTH;  FACIAL FEATURES;  SCARS, MARKS, TATTOOS;  BUILD : MUSCULAR, THIN, FAT, TALL, SHORT, ETC.

| SUS 1 | NAME/ALIAS Burnikel, Dustin George | R/S/A WM31 | D.O.B. 4-24-81 | HT. 6-1 | WT. 190 | HAIR BRO | EYES BLU |
|---|---|---|---|---|---|---|---|
| | ADDRESS 4692 Timber Ave, Lime Springs, IA | PHONE NO. | | ARRESTED? YES ☒ NO ☐ | | | |
| | | | | WARRANT NEEDED? YES ☐ NO ☒ | | | |
| | 847ZZ7472 | | ETHNIC H ☐ NH ☒ | CHARGES FILED? YES ☒ NO ☐ | | | |

| SUS 2 | NAME/ALIAS Huemiller, Breanna | R/S/A WF25 | D.O.B. 7-14-86 | HT. 5-9 | WT. 160 | HAIR BRO | EYES BRO |
|---|---|---|---|---|---|---|---|
| | ADDRESS 716 3rd St, Waverly, IA | PHONE NO. | | ARRESTED? YES ☒ NO ☐ | | | |
| | | | | WARRANT NEEDED? YES ☐ NO ☒ | | | |
| | 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 | | ETHNIC H ☐ NH ☒ | CHARGES FILED? YES ☒ NO ☐ | | | |

| SUS 3 | NAME/ALIAS Unk | R/S/A WM25 | D.O.B. | HT. 5-6 | WT. 150 | HAIR | EYES |
|---|---|---|---|---|---|---|---|
| | ADDRESS | PHONE NO. | | ARRESTED? YES ☐ NO ☒ | | | |
| | | | | WARRANT NEEDED? YES ☐ NO ☒ | | | |
| | | | ETHNIC H ☐ NH ☐ | CHARGES FILED? YES ☐ NO ☒ | | | |

| SUS 4 | NAME/ALIAS | R/S/A | D.O.B. | HT. | WT. | HAIR | EYES |
|---|---|---|---|---|---|---|---|
| | ADDRESS | PHONE NO. | | ARRESTED? YES ☐ NO ☐ | | | |
| | | | | WARRANT NEEDED? YES ☐ NO ☐ | | | |
| | | | ETHNIC H ☐ NH ☐ | CHARGES FILED? YES ☐ NO ☐ | | | |

63.

**PROPERTY DESCRIPTION**

| QTY | ARTICLE | BRAND | MODEL | SERIAL NO. | MISC. DESCRIPTION: COLOR, SIZE, INSCRIPTIONS, CALIBER, ETC. | VALUE |
|---|---|---|---|---|---|---|
| | N/A | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

64.

**CASE SCREENING**

| YES | NO | |
|---|---|---|
| ☐ | ☐ | 1. DOES THE NATURE OF THE OFFENSE POSE A SERIOUS THREAT OF HARM OR INJURY TO AN INDIVIDUAL OR TO THE COMMUNITY? (ITEM 15) |
| ☐ | ☐ | 2. WAS THE VICTIM SERIOUSLY INJURED? (ITEM 36) |
| ☐ | ☐ | 3. WAS THERE A WITNESS TO THE OFFENSE? (ITEM 25) |
| ☐ | ☐ | 4. CAN A SUSPECT EITHER BE NAMED, LOCATED, IDENTIFIED, OR AN IDENTIFIABLE DESCRIPTION BE PROVIDED? (ITEM 62) |
| ☐ | ☐ | 5. CAN A SUSPECT VEHICLE EITHER BE IDENTIFIED, OR AN IDENTIFIABLE DESCRIPTION BE PROVIDED? (ITEM 24 OR 32) |
| ☐ | ☐ | 6. IS THERE A REASONABLE EXPECTATION THAT PHYSICAL EVIDENCE CAN BE OBTAINED? (ITEM 28) |
| ☐ | ☐ | 7. WAS IDENTIFIABLE PROPERTY TAKEN? (ITEM 63) |
| ☐ | ☐ | 8. WAS THERE A SUBSTANTIAL LOSS OF PROPERTY? (ITEM 63) |
| ☐ | ☐ | 9. WERE CERTAIN EVENTS OR ACTIONS IN THE OFFENSE DISTINCTIVE OR UNUSUAL AND/OR RELATED TO OTHER OFFENSES? (ITEMS 29, 30, AND 31) |
| ☐ | ☐ | 10. IS THERE REASON TO BELIEVE THAT THE CRIME IS SUCH THAT PUBLIC INTEREST AND SUPPORT OR FURTHER INVESTIGATION MAY PRODUCE MORE INVESTIGATIVE LEADS, AND MAY RESULT IN SOLVING THE CRIME? |
| ☐ | ☐ | 11. WAS THE OFFENSE, OTHER THAN DOMESTIC ABUSE, A SIMPLE MISDEMEANOR THAT OCCURRED IN THE OFFICER'S PRESENCE? (ITEM 15) |

**IF ALL OF THESE ITEMS ARE ANSWERED NO, THE REPORTING OFFICER WILL SUSPEND THE CASE**
**THE VICTIM WILL BE INFORMED BY THE REPORTING OFFICER THAT THE CASE IS BEING SUSPENDED**
**AND NO FURTHER ACTION WILL BE TAKEN UNLESS FURTHER LEADS ARE PRODUCED.**

| REPORTING OFFICER Fong, M | IDENT NO. 5040 | DATE 16 Feb 13 | **SUSPENDED YES ☐ NO ☒** |
|---|---|---|---|

70-100-3 (revised April 2006)

PL.APP.000110

| | |
|---|---|
| 1. Complainant, Driver #1, Victim, or Arrestee | 2. Arrest No. | 3. Case No. |

**Burnikel, Dustin George**

| 2. Arrest No. | 3. Case No. |
|---|---|
| N/A | **2013-4734** |

☒ Form used as Continuation Sheet for Current Report

| 4. Date this Report | 5. Date Original Occurrence |
|---|---|
| **16 February 2013** | **16 February 2013** |

☐ Form used to Report Follow-up Investigation or Supplemental Information

6. Correct offense or Incident Classification     Changed ☐ Yes

**Interference**

7. Kind of Report Continued    ☐ Witness Statement
   ☐ Follow-up or Supplemental or Prosecution    ☐ Offense
   ☐ Traffic Accident    ☒ Arrest

8. Multiple Clear Up?    ☒ No
   ☐ Yes (list other case numbers in narrative)

| 9. Page No. | 10. Traffic Citation No. | 11. Value of Property Recovered and Type |
|---|---|---|
| **3** of **3** | | **$N/A** |

| INSTRUCTIONS FOR FOLLOW-UP OR SUPPLEMENTAL USAGE | Under narrative, record your activity and all developments in the case subsequent to last report. Describe and record value of any property recovered, names and arrest numbers of any persons arrested. Explain any offense classification change. Clearly show disposition of recovered property and inventory number. Recommend to supervisor case status and to reviewer UCR disposition. Indicate "Item Number Continued" at left, if any. |
|---|---|

**Item No.**

Sgt Wessels and I were trying to pull Burnikel's arms away from the front of his body, without success. I was on one knee next to Burnikel and delivered one strike to his nose with a closed fist. We were able to force Burnikel's hands behind his back and handcuff him. At this point we could smell an odor of alcoholic drinks on Burnikel. He also had some slurred speech at times. Burnikel refused a PBT.

Huemiller had left the scene, but returned a short time later. We arrested her without incident. Huemiller had poor balance, smelled of alcoholic drinks, failed to follow simple instructions, and refused a PBT.

During this time Sus3 left the area. We were unable to locate him.

We called for Ident, and a supervisor for an AIR. Lt Davey responded to the scene and interviewed Burnikel. Burnikel had sustained a bloody nose, likely due to my strike to his face.

The wagon transported both to jail.

| 13. Date/Time Typed No. | Reproduced No. |
|---|---|

| 14. Reporting Officer | No. | 15. Status (check one) ☐ Suspended ☐ Open | 17. Unit Referred To: | 18. UCR Disposition |
|---|---|---|---|---|
| **Fong, M** | **5040** | ☐ Ex. Closed ☐ Closed | | |

| Second Officer | No. | Supervisor Approving | No. | 19. Reviewer | No. |
|---|---|---|---|---|---|
| **Wessels, G** | **4768** | | | | |

PL.APP.000111

# SUPPLEMENTAL REPORT
DES MOINES, IOWA POLICE DEPARTMENT

| | |
|---|---|
| 1. COMPLAINANT, DRIVER #1, VICTIM, OR ARRESTEE<br>**BURNIKEL, DUSTIN** | 2. ARREST NO.    3. CASE NO.<br>**2013 004734** |

☐ FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT

| | | |
|---|---|---|
| ☒ FORM USED TO REPORT FOLLOW-UP INVESTIGATION<br>OR SUPPLEMENTAL INFORMATION | 4. DATE THIS REPORT<br>**16-FEB-13** | 5. DATE ORIGINAL OCCURRENCE<br>**16-FEB-13** |

OFFICER CASE INVESTIGATION PHOTOS YES ☒ NO ☐ TAKEN BY INDENT

6. CORRECT OFFENSE OR INCIDENT CLASSIFICATION **INTERFERENCE**    CHANGED? ☐ YES

7. KIND OF REPORT CONTINUED
☐ FOLLOW-UP OR SUPPLEMENTAL OR PROSECUTION
☐ TRAFFIC ACCIDENT
☐ WITNESS STATEMENT
☒ OFFENSE
☐ ARREST

8. MULTIPLE CLEAR UP?
☒ NO
☐ YES   (LIST OTHER CASE NUMBERS IN NARRATIVE)

9. PAGE NO. **1** OF

10. TRAFFIC CITATION NO. **NA**

11. VALUE OF PROPERTY RECOVERED AND TYPE **NA**

**INSTRUCTIONS FOR FOLLOW-UP OR SUPPLEMENTAL USAGE** — UNDER NARRATIVE, RECORD YOUR ACTIVITY AND ALL DEVELOPMENTS IN THE CASE SUBSEQUENT TO LAST REPORT. DESCRIBE AND RECORD VALUE OF ANY PROPERTY RECOVERED AND THE NAMES AND ARREST NUMBERS OF ANY PERSON(S) ARRESTED. EXPLAIN ANY OFFENSE CLASSIFICATION CHANGE. CLEARLY SHOW DISPOSITION OF RECOVERED PROPERTY AND INVENTORY NUMBER. RECOMMEND TO SUPERVISOR CASE STATUS AND TO REVIEWER UCR DISPOSITION. INDICATE "ITEM NUMBER CONTINUED" AT LEFT, IF ANY.

ITEM NO.

ON THIS DATE MYSELF AND OFF FONG WERE WORKING OFF DUTY AT THE CABSTAND. AT APPROX 0215 HRS A GROUP OF 4-5 INDIVIDUALS CAME TO THE CABSTAND AND ATTEMPTED TO GET INTO A CAB. I TOLD THEM THAT THEY HAD TO STAND IN LINE. IMMEDIATELY THE GROUP BEGAN TO ARGUE WITH US. HUEMILLER AND A WM20'S WERE THE TWO MAIN INSTIGATORS AND REFUSED TO STAND IN LINE. THE MALE THAT WAS WITH HUEMLLER REFUSED TO STOP ARGUING AFTER BEING TOLD SEVERAL TO BACK AWAY AND STAND IN LINE. THIS CONTINUED FOR SEVERAL MINUTES. FINALLY I GRABBED THE MALE AND TOLD HIM HE WAS UNDER ARREST FOR INTOX. AS I GRABBED THE MALE, HUEMILLER GRABBED ME AND TRIED TO STOP ME FROM ARRESTING THE MALE. I TOOK THE MALE OVER TO THE WAGON AND WAS ATTEMPTING TO HANDCUFF HIM. I LOOKED OVER MY SHOULDER AND SAW HUEMILLER ON THE GROUND (SHE TRIPPED OVER THE CEMENT CURB) AND OFF FONG ORDERING BURNIKEL TO BACK AWAY. BURNICKEL REFUSED TO BACK AWAY AND EVEN DOUBLE HIS FISTS AND WAS IN A FIGHTING STANCE. OFF FONG THEN WENT TOWARDS BURNICKEL TO TAKE HIM INTO CUSTODY FOR INTERFERENCE. AS OFF FONG WAS ATTEMPTING TO ARREST BURNICKEL, HUEMILLER STEPPED IN BETWEEN OFF FONG AND BURNICKEL. AS THIS WAS GOING ON I HAD NOT YET CUFFED MY SUSPECT AND LET HIM GO TO ASSIST OFF FONG. AS I APPROACHED OFF FONG DEPLOYED HIS MACE SPRAYING BURNICKEL WITH 1 SHORT BURST OF MACE TO HIS FACE. I GRABBED BURNICKEL'S LEFT ARM AND FONG GRABBED HIS RIGHT. BURNICKEL TRIED TO PULL AWAY AND WE PUSHED HIM UP AGAINST A TAXI VAN THAT WAS IN LINE. BURNICKEL CONTINUED TO TRY TO PULL AWAY AND FONG DELIVERED TWO KNEE STRIKES TO BURNICKEL'S MID-SECTION. AT THE SAME TIME I STRUCK BURNICKEL TWICE IN THE GROIN AREA WITH MY LEFT HAND. THESE STRIKES CAUSED BURNICKEL TO BEND OVER AND GO DOWN TO THE GROUND. ONCE ON THE GROUND BURNICKEL CONTINUED TO RESIST BY REFUSING TO PUT HIS HANDS BEHIND HIS BACK AND ATTEMPTED TO STAND UP. FONG DID THEN PUNCH BURNICKEL ONCE IN THE FACE. THIS PUNCH DID CAUSE BURNICKEL TO QUIT RESISTING. I WAS FINALLY ABLE TO PULL BURNICKEL'S LEFT ARM BEHIND HIS BACK, AND FONG WAS ABLE TO GET A CUFF ON BURNICKEL'S RIGHT WRIST. WE WERE THEN ABLE TO GET THE CUFF ON HIS LEFT WRIST. THIS ENDED THE PHYSICAL CONFRONTATION WITH BURNICKEL.
LT DAVEY CAME TO THE SCENE TO CONDUCT THE AIR INTERVIEW. SGT KOUSKI ALSO CAME TO THE SCENE AND GAVE US A BOTTLE OF WATER THAT I USED TO RINSE BURNICKEL'S EYES. IDENT ALSO MADE TO SCENE AND TOOK PHOTOS OF BURNICKEL AND BOTH OFFICERS INVOLVED.
DURING ALL OF THIS THE WM THAT WAS INITIALLY BEING ARRESTED FLED THE SCENE WITH HUEMILLER. HUEMILLER THEN CAME BACK AND WAS ARRESTED TO INTOX, AND INTERFERENCE. THE WM WAS NEVER LOCATED.

**OFFICE USE ONLY**

| 13. DATE/TIME TYPED | NO. | REPRODUCED | NO. |
|---|---|---|---|
| | | | |

| | | | | |
|---|---|---|---|---|
| 14. REPORTING OFFICER   NO.<br>**WESSELS G.**   **4768** | 15. STATUS (CHECK ONE)   ☐ OPEN   ☒ CLOSED<br>☐ EXCEPTIONALLY CLEARED   ☐ SUSPENDED | 17. UNIT REFERRED TO: | 18. UCR DISPOSITION |
| SECOND OFFICER   NO. | SUPERVISOR APPROVING    NO | 19. REVIEWER | NO. |

PL.APP.000112

| | | |
|---|---|---|
| 1.Complainant, Driver #1, Victim, or Arrestee **Burnikez, Dustin** | 2. Arrest No. N/A | 3. Case No. **2013-4734** |

| ☐ Form used as Continuation Sheet for Current Report | 4. Date this Report **16 February 2013** | 5. Date Original Occurrence **16 February 2013** |
|---|---|---|
| ☒ Form used to Report Follow-up Investigation or Supplemental Information | 6. Correct offense or Incident Classification **See Narrative** | Changed ☐ Yes |

| 7. Kind of Report Continued ☐ Witness Statement | 8. Multiple Clear Up? ☒ No |
|---|---|
| ☒ Follow-up or Supplemental or Prosecution ☐ Offense ☐ Traffic Accident ☐ Arrest | ☐ Yes (list other case numbers in narrative) |

| 9. Page No. **1 of 1** | 10. Traffic Citation No. | 11. Value of Property Recovered and Type **$N/A** |
|---|---|---|

| INSTRUCTIONS FOR FOLLOW-UP OR SUPPLEMENTAL USAGE | Under narrative, record your activity and all developments in the case subsequent to last report. Describe and record value of any property recovered, names and arrest numbers of any persons arrested. Explain any offense classification change. Clearly show disposition of recovered property and inventory number. Recommend to supervisor case status and to reviewer UCR disposition. Indicate "Item Number Continued" at left, if any. |
|---|---|

| Item No. | |
|---|---|

6.) Charges:
Interference with Official Act Causing Injury, Public Intox, Resisting Arrest

Off duty officers Fong and Sgt Wessels were working the cab stand as the bars were closing. The incident started when a small group tried butting ahead of the line. Officers confronted them and due to their intoxicated state, they failed to comply to officers orders to move back in line and wait their turn.

Sgt Wessels report will give additional information in more detail on what transpired prior to arrest.

Both Officers Fong and Sgt Wessels had to use force to gain control of the situation. They immediately notified dispatch of the A.I.R and requested Ident for photos as well as a superviser. Since there was a sergeant involved, I responded to conduct the interview of the arrestee, Mr. Burnikez.

When I arrived, Ident had just finished photo's and both officers were standing at the rear of the paddy wagon in the parking ramp with Mr. Burnikez. Mr Burnikez had been sprayed with mace and officers were flushing his eyes with a bottle of water. Mr. Burniker's demeanor was good by this time. He was however, very intoxicated and had a strong oder of alcohol on his breath.

It appeared his left eye took most of the OC spray. His right eye had no redness. Mr. Burnikez had a minor bloody nose. The bleeding had stopped and the blood was dried.

I introduced myself and asked his name and where he lives. Mr. Burnikez said he lives in Cresco Iowa and is here for the wrestling tournament. He proceeded to tell me he saw the officers grab a female and push her to the ground for no reason. He states he didn't know the female but after seeing this, he stepped in to help her. His story changed somewhat following additional questioning. Another time he said he was standing back doing nothing but watching when they grabbed him and started punching him in the face. He said the officers punched him three time in the face, then sprayed him with mace. I asked if he had any other injuries and he said "no", only his eyes from the spray and his face where they hit him. I asked if he wanted to go to the hospital and he said "no".

He took no responsibility for any wrong doing on his part. Following our conversation, the wagon arrived and transported him to jail.

| | | 13.Date/Time Typed No. | Reproduced No. |
|---|---|---|---|
| 14. Reporting Officer **Lt. L. Davey** | No. **4786** | 15.Status (check one) ☐ Suspended ☐ Open ☐ Ex. Closed ☒ Closed | 17. Unit Referred To: | 18. UCR Disposition |
| Second Officer | No. | Supervisor Approving No. | 19. Reviewer | No. |

PL.APP.000113



AZL
13-4734
2-16-13
M. Willett



↑ SGT WILLETT



↑ OFC. FOWL



PL.APP.000114





OFC. FONG

← DUSTN

BUKMKEL →





PL.APP.000115



BURNIKEL

PL.APP.000116

**Date:** 8/8/14  **Patient:** Dusty Burnikel  **Joslyn Chiropractic Clinic**  **Visit #____** **Dr.** CV  **Page #____**

## DESCRIPTION OF SYMPTOMS

| | Onset | SYMPTOMS | Types 1-14 | Frequency 1-4 | Intensity 1-4 | Radiating 1-8 | L R B | Actions 1-14 | B A R | Complaints (1-4) NC SF | Scale 1-10 | SYMPTOM FOLLOW-UP Frequency 1-4 | Intensity 1-4 | Worse 1-4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Subjective:** 1. | Pam | LBP | | | | | | | | 2 | 1 | C | | |
| 2. | | UBP | | | | | | | | 2 | 1 | C | | |
| **Flare-up** 3. | | nn Pain | | | | | | | | 2 | 1 | C | | |
| 4. | | | | 5 da Better forego | | | | | | | | | | |
| 5. | | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | | |

**Additional info:** Patient choose to forego a cortisone shot and will try a few unit — tried a few unit — helps

### ORTHO / NEURO / NOTES
ROM: ☐ PROM is full in the ☐ Cervical & ☐ Thoracolumbar regions.
☐ PROM is decreased in the C/S with Flex __ Ext __ LLB __ RLB __ LR __ RR __
☐ PROM is decreased in the L/S with Flex __ Ext __ LLB __ RLB __ LR __ RR __
End point tenderness noted in C/S: ___ T/S: ___ L/S: ___
ORTHO: F/C [−][R: (ipsi)(contra)(rad)] [L: (ipsi)(contra)(rad)], Shoulder Depression [−][R][L],
Distraction [+][−], SLR [R____°][L____°], SSLR [R____°][L____°],
Root Tension Sign [−][R][L], Well Leg Raising [R____°][L____°], Kemp's [−][R][L],
Yeoman's [−][R][L], Hibb's [−][R][L], Faber Patrick [−][R][L],
Lindner-Valsalva-Bechterew[+][−] ☐ Neurovascular compression testing
demonstrates Erb's point tenderness [−][R][L], AEST [−][R][L], Adson's [−][R][L],
Hyperabduction [−][R][L], Tinel [−][R][L], Phalen [−][R][L], V.A.T. [+][−]
Other: ___
Neuro: ☐ Romberg is [+][−].
☐ Plantars are flexor [+][Upgoing toes]
☐ Bowel/bladder disfunction [+][−]
SN: ☐ Sensory Examination is normal
Except for hypesthesia / hyperpathia to pin in the: ___ dermatome(s).
DTR's: ☐ Deep tendon reflexes are 2+/2+ and equal bilaterally.
Except: Jaw (C-V) R___ L___, Biceps (C5-6) R___ L___
Radial (C5-6) R___ ; Wrist (C7-8) R___ L___
Achilles (S1-2) R___ ; Triceps (C7-8) R___ L___
Ulnar (C8-T1) R___ ; Petellar (L2-L4) R___ L___
Hamstrings (L4-S2) R___ L___
M/G: ☐ Motor Examination is 5/5 in upper and lower extremities
Except for: Deltoid (C5) R___ L___, Biceps (C6) R___ L___
Wrist Ext (C6) R___ L___, Wrist Flex (C7) R___ L___
Finger Ext (C7) R___ L___, Finger Flex (C8) R___ L___
Finger Abductors (T1) R___ , Ankle Inversion (L4) R___ L___
Extensor Hallucis Longus (EHL-L5) R___ L___
Ankle Eversion (S1-2) R___ L___, Heel Walk (L4-5) R___ L___
Toe Walk (S1-2) R___
☐ There are (no) signs of atrophy and/or fasciculations at ___
☐ Waddell Sign [+][−] (non-organic signs: inordinate sensitivity or weakness; axial loading and/or rotation = excessive LBP; overreaction; SLR vs. SSLR)

| **Objective:** | Exam ___ | Cervical | Thoracic | Lumbar | Extremities / Other |
|---|---|---|---|---|---|
| | Re-Exam ___ | L R B | L R B | L R B | |
| | Reg. Visit ___ | UPPER | | | |
| | | MIDDLE | | | |
| | | LOWER | | | |
| **ROM: N/C Neg** | Prom Arom Normal | | | | |
| | Prom Arom Slightly ↓ Pain (P), Spasm (S) | | | | |
| | Prom Arom Moderately ↓ Pain (P), Spasm (S) | | | | |
| **Palpation** | Tenderness (1-4) | 2 | 2 | 2 | |
| | Hypertonicity (1-2) | 2 | 1 | 2 | |
| | Trigger Points (1-2) | | | 2 | |
| | Edema (1-2) | | | | |
| | Spasms, (1-3) | 1 | 1 | | |
| | Inflammation | 1 | 1 | 1 | |
| | WNL | | | | |
| **Segments** | Subluxations List Segments | C6 | T8 | L2 | |
| | Malpositions List Segments | | | | |
| | Articular Fixations List Segments | | | | |
| | Technique | Div | M | SP | |
| **Assessment/ Treatment** | Today's Modalities/Procedures (TM) | Div | CA | E | |
| **N/C MMI** | | | | | |

**Today's Treatment Goals (TTG) N/C** ☐ 1) ↓ pain ☐ 2) ↓ spasm ☐ 3) ADL ☐ 4) Ret. to Pre-clin. ☐ 5) ↑ funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9) ↓ freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recur. ☐ 12) ↑ Swelling, Infl.
☐ 13) ↑ ROM ☐ 14) Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18) Flexibility ☐ 19) Improve Alignment

**Progress/Improvement (PRO) N/C** ☐ 1) (first visit) Favorable results expected ☐ 2) Progressing as exp. ☐ 3) Slower than exp. ☐ 4) Not @ MMI ☐ 5) At ___% MMI ☐ 6) Temp.Total.Disability (til __/__/__)
☐ 7) Temp. Partial Disability ☐ 8) Excellent prog. ☐ 9) Good prog. ☐ 10) Fair prog. ☐ Other: ___
**Improvement?** ☐ 11) None ☐ 12) Minor ☐ 13) Moderate ☐ 14) Marked ☐ Other: ___

**Diagnosis: N/C** ☐ ☐ Cervical: 839.__ 739.1 723.1 847.0 723.4 784.0 722.0 722.4' 728.85 721.0 729.1 ☐ Thoracic: 839.21 739.2 724.1 724.4 739.8 737.34' 847.1 722.11 722.51 728.85 721.2 729.1
☐ Change ☐ Lumbar: 839.20 739.3 724.2 724.4 847.2 724.9 724.02 738.4 724.3 722.10 722.52 722.83 728.85 729.1 ☐ Sacpelvic: 839.42 847.3 739.4 739.5 846.1 720.2 724.79 847.4 728.85 729.1
☐ Other: ___

**Plan: N/C** MMI Phase (CF): ☐ 1) Relief (acute) ☐ 2) Thera. (subacute) ☐ 3) Rehab ☐ 4) Support (chronic) ☐ 5) Pall. ☐ 6) Maint. FDT: ___ times per wk for ___ wks or ___
Future Treatment Plan (FTP): N/C ☐ 1) ↓ pain ☐ 2) ↓ spasm ☐ 3) ADL ☐ 4) Ret. to Pre-clin. ☐ 5) ↑ funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9) ↓ freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recur. ☐ 12) ↑ Swelling, Infl. ☐ 13) ↑ ROM
Future Treatment Goals (FTG) N/C ☐ 1) ↓ pain ☐ 2) ↓ spasm ☐ 3) ADL ☐ 4) Ret. to Pre-clin. ☐ 5) ↑ funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9) ↓ freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recur. ☐ 12) ↑ Swelling, Infl. ☐ 13) ↑ ROM

PL.APP 000117

**Joslyn Chiropractic Clinic**

Date: 8/13/14  Patient: Dusty Bernikel  Visit #: ___  Dr.: ___  Page #: ___

**DESCRIPTION OF SYMPTOMS**

| | Onset | SYMPTOMS | Types 1-14 | Frequency 1-4 | Intensity 1-4 | Radiating 1-8 | L R B | Actions 1-14 | B-A R | Complaints 1/4 NC SF | Scale 1-10 | **SYMPTOM FOLLOW-UP** Frequency 1-4 | Intensity 1-4 | Worse 1-4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subjective: 1. | Sore | Rib | | | | | | | | No | | | | |
| 2. | | Rib | | | | | | | | NC | | | | |
| 3. | | Neck | | | | | | | | at | | | | |
| 4. | | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | | |

☐ Flare-up

Additional info: ___ Massage Today w/Mother ___

**ORTHO / NEURO / NOTES**

ROM: ☐ PROM is full in the ☐ Cervical & ☐ Thoracolumbar regions.
☐ PROM is decreased in the C/S with Flex __° Ext __° LLB __° RLB __° LR __° RR __°
☐ PROM is decreased in the L/S with Flex __° Ext __° LLB __° RLB __° LR __° RR __°
End point tenderness noted in C/S: ___ T/S: ___ L/S: ___

ORTHO: F/C [–][R: (ipsi)(contra)(rad)] [L: (ipsi)(contra)(rad)], Shoulder Depression [–][R][L], Distraction [+][–], SLR [R___°][L___°], SSLR [R___°][L___°], Root Tension Sign [–][R][L], Well Leg Raising [R___°][L___°], Kemp's [–][R][L], Yeoman's [–][R][L], Hibb's [–][R][L], Faber Patrick [–][R][L], Lindner-Valsalva-Bechterew[+][–] ☐ Neurovascular compression testing demonstrates Erb's point tenderness [–][R][L], AEST [–][R][L], Adson's [–][R][L], Hyperabduction [–][R][L], Tinel [–][R][L], Phalen [–][R][L], V.A.T. [+][–]
Other: ___

Neuro: ☐ Romberg is [+] [–].
☐ Plantars are flexor [+](Upgoing toes)
☐ Bowel/bladder disfunction [+][–]
SN: ☐ Sensory Examination is normal
Except for hypesthesia / hyperpathia to pin in the ___ dermatome(s).
DTR's: ☐ Deep tendon reflexes are 2+/2+ and equal bilaterally.
Except: Jaw (C-V) R___ L___, Biceps (C5-6) R___ L___,
Radial (C5-6) R___ L___, Wrist (C7-8) R___ L___,
Achilles (S1-2) R___ L___, Triceps (C7-8) R___ L___,
Ulnar (C8-T1) R___ L___, Petellar (L2-L4) R___ L___,
Hamstrings (L4-S2) R___ L___,
M/G: ☐ Motor Examination is 5/5 in upper and lower extremities
Except for: Deltoid (C5) R___ L___, Biceps (C6) R___ L___,
Wrist Ext (C6) R___ L___, Wrist Flex (C7) R___ L___,
Finger Ext (C7) R___ L___, Finger Flex (C8) R___ L___,
Finger Abductors (T1) R___ L___, Ankle Inversion (L4) R___ L___,
Extensor Hallucis Longus (EHL-L5) R___ L___,
Ankle Eversion (S1-2) R___ L___, Heel Walk (L4-5) R___ L___,
Toe Walk (S1-2) R___
☐ There are [no] signs of atrophy and/or fasciculations at ___
☐ Waddell Sign [+][–] (non-organic signs; inordinate sensitivity or weakness; axial loading and/or rotation = excessive LBP; overreaction; SLR vs; SSLR)

**Objective:** Exam ___  Re-Exam ___  Reg. Visit ___

| | Cervical L R B M A | Thoracic L R B M A | Lumbar L R B M A | Extremities / Other |
|---|---|---|---|---|
| UPPER | C | T | | 58° |
| MIDDLE | C | T | | |
| LOWER | C | T | | |

ROM: N/C Neg
Prom Arom Normal.
Prom Arom Slightly ↓ Pain (P). Spasm (S)
Prom Arom Moderately ↓ Pain (P). Spasm (S)

Palpation: Tenderness (1-4)
Hypertonicity (1-2)
Trigger Points (1-2)
Edema (1-2)
Spasms (1-3)
Inflammation
WNL

Segments: Subluxations List Segments  C ___ T8 1C
Malpositions List Segments
Articular Fixations List Segments
Technique
Today's Modalities/Procedures (TM)

**Assessment/Treatment** N/C MMI ___

**Today's Treatment Goals (TTG):** N/C ☐ 1)↓ pain ☐ 2)↓ spasm ☐ 3) ADL ☐ 4) Ret.to Pre-clin. ☐ 5)↑ funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9) Relieve Symp Exacer. ☐ 10) Min. Recur. ☐ 11)↓ Swelling, Infl. ☐ 13)↑ ROM ☐ 14)↑ Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18)↑ Flexibility ☐ 19) Improve Alignment ☐ Other:___

**Progress/Improvement (TAD):** N/C ☐ 1) (first visit) Favorable results expected ☐ 2) Progressing as exp. ☐ 3) Slower than exp. ☐ 4) Not@MMI ☐ 5) At___%MMI ☐ 6) Temp.Total.Disability (til __/__/__) ☐ 7) Temp.Partial Disability ☐ 8) Excellent prog. ☐ 9) Good prog. ☐ 10) Fair prog. ☐ Other:___
Improvement? ☐ 11) None ☐ 12) Minor ☐ 3) Moderate ☐ 14) Marked ☐ Other:___

**Diagnosis:** N/C ☐ Cervical: 839.__ 739.1 723.1 847.0 723.4 784.0 722.0 722.4 728.85 721.0 729.1 ☐ Thoracic: 839.21 739.2 724.1 724.4 739.8 737.34 847.1 722.11 722.51 728.85 721.2 729.1
☐ Change ☐ Lumbar: 839.20 739.3 724.2 724.4 847.2 724.4 724.02 738.4 724.3 722.10 722.52 728.83 728.85 729.1 ☐ Sac:Pelvic: 839.42 847.3 739.4 738.5 846.9 848.1 720.2 724.79 847.4 728.85 729.1
☐ Other:___

**Plan:** N/O MMI  Phase (CF): ☐ 1) Relief (acute) ☐ 2) Thera.(subacute) ☐ 3) Rehab ☐ 4) Support (chronic) ☐ 5) Pall. ☐ 6) Maint.  FOT: ___ times per wk for ___ wks for ___
☐ Change ☐ Other:___
**Future Treatment Plan (FTP):** N/C ☐ CM  EMS  US  IFL  HP  CP  MS  TP  TP  MA  Home Ex ☐ Other:___
**Future Treatment Goals (FTG):** N/C ☐ 1)↓ pain ☐ 2)↓ spasm ☐ 3)↑ ADL ☐ 4) Ret.to Pre.clin. ☐ 5)↑ funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9) Relieve Symp Exacer. ☐ 10) Min. Recur. ☐ 11)↓ Swelling, Infl. ☐ ↑ ROM
Same as TTG ☐ ☐ 14)↑ Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18)↑ Flexibility ☐ 19) Improve Alignment ☐ Other:

PL APP 000118



### JOSLYN CHIROPRACTIC CLINIC
### DR. PAUL C. JOSLYN

## X-Ray Report

Patient Name: _Dustin Burnikel_     X-Ray #: _7639_

Facility Where Studies Performed: **Joslyn Chiropractic Clinic**

History:

Age _22_   Sex _M_     Doctor: **Paul C. Joslyn D.C., C.C.S.P, C.C.E.P.**

Type and Date of Study: _AP/lat lumbopelvic  8/12/14_

**Findings:** There is a mild lumbar list to the ~~left~~ Right with a mild lumbar pelvic tilt to the right. Hip Joints are well-maintained. The lumbar spine is hypolordotic. Mild disc thinning is note at L5/S1.

**Diagnostic impressions**

1. Mild lumbar list to the Right
2. Mild Pelvic tilt to the Right
3. Hip Joints are well-maintained
4. Hypolordosis
5. Mild disc thinning L5/S1

_____
Signature

PL.APP.000119

## DESCRIPTION OF SYMPTOMS

| | Onset | SYMPTOMS | Types 1-14 | Frequency 1-4 | Intensity 1-4 | Radiating 1-8 | L R B | Actions 1-14 | B-A-R | Complaints 1-4 NC SF | Scale 1-10 | Frequency 1-4 | Intensity 1-4 | Worse 1-4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Subjective:** 1. | 8/11/14 | Blood | 1,3 | 2 | 2 | | | | | | | | | |
| 2. | | Grip | 3 | 2 | 2 | | | | | | | | | |
| 3. | | Nur | 3 | 2 | | | | | | | | | | |
| 4. | | | | | | | | | | | | | | |
| **Flare-up** 5. | | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | | |

Additional info: ___ Seal off Scaffolding

### SYMPTOM FOLLOW-UP

## ORTHO / NEURO / NOTES

ROM: ☐ PROM is foll in the ☐ Cervical & ☐ Thoracolumbar regions.
☐ PROM is decreased in the C/S with Flex ___° Ext ___° LLB ___° RLB ___° LR ___° RR ___°
☐ PROM is decreased in the L/S with Flex ___° Ext ___° LLB ___° RLB ___° LR ___° RR ___°
End point tenderness noted in C/S: ___ T/S: ___ L/S: ___

ORTHO: F/C [–][R: (ipsi)(contra)(rad)] (L: (ipsi)(contra)(rad)], Shoulder Depression [–][R][L],
Distraction [+][–], SLR [R___°][L___°], SSLR [R___°][L___°],
Root Tension Sign [–][R][L], Well Leg Raising [R___°][L___°], Kemp's [–][R][L],
Yeoman's [–][R][L], Hibb's [–][R][L], Faber Patrick [–][R][L],
Lindner-Valsalva-Bechterew[+][–] ☐ Neurovascular compression testing
demonstrates Erb's point tenderness [–][R][L], AEST [–][R][L], Adson's [–][R][L],
Hyperabduction [–][R][L], Tinel [–][R][L], Phalen [–][R][L], V.A.T. [+][–]
Other: ___

Neuro: ☐ Romberg is [+] [–].
☐ Plantars are flexor [+](Upging toes)
☐ Bowel/bladder disfunction [+][–]

SN: ☐ Sensory Examination is normal
Except for hypesthesia / hyperpathia to pin in the: ___ dermatome(s).

DTR's: ☐ Deep tendon reflexes are 2+/2+ and equal bilaterally.
- Except: Jaw (C-V) R___ L___, Biceps (C5-6) R___ L___
Radial (C5-6) R___ L___, Wrist (C7-8) R___ L___
Achilles (S1-2) R___ L___, Triceps (C7-8) R___ L___
Ulnar (C8-T1) R___ L___, Petellar (L2-L4) R___ L___
Hamstrings (L4-S2) R___ L___

M/G: ☐ Motor Examination is 5/5 in upper and lower extremities
Except for: Deltoid (C5) R___ L___, Biceps (C6) R___ L___
Wrist Ext (C6) R___ L___, Wrist Flex (C7) R___ L___
Finger Ext (C7) R___ L___, Finger Flex (C8) R___ L___
Finger Abductors (T1) R___ L___, Ankle Inversion (L4) R___ L___
Extensor Hallucis Longus (EHL-L5) R___ L___
Ankle Eversion (S1-2) R___ L___, Heel Walk (L4-5) R___ L___
Toe Walk (S1-2) R___ L___
☐ There are [no] signs of atrophy and/or fasciculations at ___
☐ Waddell Sign [+][–] (non-organic signs: inordinate sensitivity or weakness; axial loading and/or rotation = excessive LBP; overreaction; SLR vs. SSLR)

| **Objective:** | Exam | Cervical | | | Thoracic | | | Lumbar | | | Extremities / Other |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | L R B | | | L R B | | | L R B | | | |
| | Re-Exam | | | | | | | | | | |
| | Reg. Visit | UPPER | M | C | | C | | M | A | | |
| | | MIDDLE | C | | | C | | | | | |
| | | LOWER | | | | | | | | | |
| **ROM: N/C Neg** | Prom Arom Normal | | | | | | | | | | |
| | Prom Arom Slightly ↓ Pain (P) Spasm (S) | | | | | | | | | | |
| | Prom Arom Moderately ↓ Pain (P) Spasm (S) | | | | | | | | | | |
| **Palpation** | Tenderness (1-4) | | 2 | | | 2 | | | 2 | | |
| | Hypertonicity (1-2) | | 2 | | | 2 | | | 2 | | |
| | Trigger Points (1-2) | | 2 | | | 2 | | | 2 | | |
| | Edema (1-2) | | | | | | | | | | |
| | Spasms (1-3) | | 1 | | | 1 | | | 1 | | |
| | Inflammation | | 1 | | | 1 | | | 1 | | |
| | WNL | | | | | | | | | | |
| **Segments** | Subluxations List Segments | | | | C5 | T8 | | L5 | | | |
| | Malposition List Segments | | | | | | | | | | |
| | Articular Fixations List Segments | | | | | | | | | | |
| **Assessment/ Treatment** | Technique | | | | Div M SD | | | | | | |
| | Today's Modalities/Procedures (TM) | | | | En CMC | | | | | | |
| **N/C MMI** | | | | | | | | | | | |

Today's Treatment Goals (TTG): N/C ☐ 1) pain ☐ 2) spasm ☐ 3) ADL ☐ 4) Ret.to Pre-clin. ☐ 5) funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9) freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recurr. ☐ 12) Swelling, Infl.
☐ 13) ROM ☐ 14) Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18) Flexibility ☐ 19) Improve Alignment ☐ 20) ___

Progress/Improvement (TAD): N/C ☐ 1) (first visit) favorable results expected ☐ 2) Progressing as exp. ☐ 3) Slower than exp. ☐ 4) Not MMI ☐ 5) At ___ % MMI ☐ 6) Temp.Total Disability (till ___ / ___ / ___ )
☐ 7) Temp.Partial Disability ☐ 8) Excellent prog. ☐ 9) Good prog. ☐ 10) Fair prog. ☐ Other: ___
Improvement? ☐ 11) None ☐ 12) Minor ☐ 13) Moderate ☐ 14) Marked ☐ Other: ___

Diagnosis: N/C ☐ Cervical: 839. 739.1 723.1 847.0 723.4 784.0 722.0 722.4' 728.85 721.0 726.1 ☐ Thoracic: 839.41 739.2 724.1 724.4 739.8 737.34 847.1 722.11 722.51 728.85 721.2 729.1'
☐ Change ☐ Lumbar: 839.20 739.3 724.2 724.6 847.3 724.9 724.02 738.4 724.3 722.10 722.52 722.83 728.85 729.1 ☐ SP/Pelvic: 839.42 847.3 739.4 739.5 846.1 720.2 724.79 847.4 728.85 729.1 ☐ Other: ___

Plan: N/C ☐ MMI Phase (CF): ☐ 1) Relief(acute) ☐ 2) Thera.(subacute) ☐ 3) Rehab ☐ 4) Support(chronic) ☐ 5) Pall. ☐ 6) Maint. FDT: 3 times per wk for 3 wks or Reg Visits 8/28/14

Future Treatment Plan (FTP): N/C ☐ CMM EMS US IFL HP CP MS TP TR Home Ex ___
Future Treatment Goals (FTG): N/C ☐ 1) pain ☐ 2) spasm ☐ 3) ADL ☐ 4) Ret.to Pre-clin. ☐ 5) funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9) freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recurr. ☐ 12) Swelling, Infl. ☐ 13) ROM

PL.APP 000120

**DESCRIPTION OF SYMPTOMS**

| | Onset | SYMPTOMS | Types 1-14 | Frequency 1-4 | Intensity 1-4 | Radiating L R B | Actions 1-14 | B A R | Complaints 1-4 NC SF | Scale 1-10 | SYMPTOM FOLLOW-UP Frequency 1-4 | Intensity 1-4 | Worse 1-4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subjective 1. | 3/16/14 | Neck Pn | (3) | 2 | cm | Heat | | | | | | | |
| 2. | | LBP | 3 | 2 | 2 | | | | | | | | |
| 3. | | UBP | 3 | 2 | | | | | | | | | |
| Flare-up 4. | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | |

Additional Info: _____

**ORTHO / NEURO / NOTES**

ROM: ☐ PROM is full in the ___ ☐ Cervical & ☐ Thoracolumbar regions.
☐ PROM is decreased in the C/S with Flex___ Ext.___ LLB___ RLB___ LR___ RR___
☐ PROM is decreased in the L/S with Flex___ Ext.___ LLB___ RLB___ LR___ RR___
End point tenderness noted in C/S:___ T/S:___ L/S:___

| Objective | Exam ___ | Cervical | Thoracic | Lumbar | Extremities / Other |
|---|---|---|---|---|---|
| | Re-Exam ___ | L A R | L R B | L R B | |
| | Reg. Visit ___ | M A | | B M A | |
| | | UPPER | | | |
| | | MIDDLE | | | |
| | | LOWER | | | |

ORTHO: F/C [-](R)(L): (ipsi)(contra)(rad)) [L: (ipsi)(contra)(rad)], Shoulder Depression [-](R)(L),
Distraction [+]-(L), SLR [R___°][L___°], SSLR [R___°][L___°],
Root Tension Sign [-](R)(L), Well Leg Raising (R___°)[L___°], Kemp's [-](R)(L),
Yeoman's [+](R)(L), Hibb's [-](R)(L), Faber Patrick [-](R)(L),
Lindner-Valsalva-Bechterew[+]-] ☐ Neurovascular compression testing
demonstrates Erb's point tenderness [-](R)(L), AEST [-](R)(L), Adson's [-](R)(L),
Hyperabduction [-](R)(L), Tinel [-](R)(L), Phalen [-](R)(L), V.A.T. [+]-]
Other: ___

| ROM: N/C Neg | | | | |
|---|---|---|---|---|
| Prom Arom Normal. | | | | |
| Prom Arom Slightly ↓ Pain (P). Spasm (S) | | | | |
| Prom Arom Moderately ↓ Pain (P). Spasm (S) | | | / | |
| Palpation | Tenderness (1-4) | 2 | 2 | 2 |
| | Hypertonicity (1-2) | 2 | 2 | 2 |
| | Trigger Points (1-2) | 2 | 2 | 2 |
| | Edema (1-2) | | | |
| | Spasms (1-3) | 1 | 1 | 1 |
| | Inflammation | | | |
| | WNL | NC | 8 | LL |
| Segments | Subluxations List Segments | | | |
| | Malpositions List Segments | | | |
| | Articular Fixations List Segments | | | |
| | Technique | | | |
| Assessment/ Treatment N/C  MMI | Today's Modalities/Procedures (TM) | | | |

Neuro: ☐ Romberg is [+] [−].
☐ Plantars are flexor [+] (Upgoing toes)
☐ Bowel/bladder disfunction [+] [−]
SN: ☐ Sensory Examination is normal
Except for hypesthesia / hyperpathia to pin in the:___ dermatome(s).
DTR's: ☐ Deep tendon reflexes are 2-+/2+ and equal bilaterally.
Except: Jaw (C-V) R___ L___, Biceps (C5-6) R___ L___,
Radial (C5-6) R___ L___, Wrist (C7-8) R___ L___,
Achilles (S1-2) R___ L___, Triceps (C7-8) R___ L___,
Ulnar (C8-T1) R___ L___, Petellar (L2-L4) R___ L___,
Hamstrings (L4-S2) R___ L___
M/G: ☐ Motor Examination is 5/5 in upper and lower extremities
Except for: Deltoid (C5) R___ L___, Biceps (C6) R___ L___,
Wrist Ext (C6) R___ L___, Wrist Flex (C7) R___ L___,
Finger Ext (C7) R___ L___, Finger Flex (C8) R___ L___,
Finger Abductors (T1) R___ L___, Ankle Inversion (L4) R___ L___,
Extensor Hallucis Longus (EHL-L5) R___ L___,
Ankle Eversion (S1-2) R___ L___, Heel Walk (L4-5) R___ L___,
Toe Walk (S1-2) R___ L___
☐ There are [no] signs of atrophy and/or fasciculations at___
☐ Waddell Sign [+][-] (non-organic signs: inordinate sensitivity or weakness; axial loading and/or rotation = excessive LBP; overreaction; SLR vs. SSLR)

Today's Treatment Goals (TTG): N/C ☐ 1) pain ☐ 2) spasm ☐ 3) ADL ☐ 4) Ret.to Pre-clin. ☐ 5) funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9) freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recur. ☐ 12) Swelling. ☐ 13) ROM ☐ 14) Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18) Flexibility ☐ 19) Improve Alignment ☐ Other:___

Progress/Improvement (TAU): N/C ☐ 1) (first visit) Favorable results expected ☐ 2) Progressing as exp. ☐ 3) Slower, than exp. ___ ☐ 4) Not @MMI ☐ 5) At___ %MMI ☐ 6) Temp.Total.Disability (til___/___/___)
☐ 7) Temp.Partial.Disability ☐ 8) Excellent Prog. ☐ 9) Good prog. ☐ 10) Fair prog. ☐ Other:___
Improvement? ☐ 11) None. ☐ 12) Minor ☐ 3) Moderate ☐ 14) Marked. ☐ Other:___

Diagnosis: N/C ☐ Cervical: 839.___ 723.1 723.1 724.4 784.0 722.0 723.4 721.0 721.2 Thoracic: 839.21 739.2 724.1 724.4 739.8 737.34 847.1 722.11 722.51 728.85 721.2 729.1
☐ Change ☐ Lumbar: 839.20 739.3 724.2 724.4 847.2 724.9 724.02 722.10 722.52 722.83 728.85 729.1 S/Pelvic: 839.42 847.3 739.4 739.5 846.1 720.2 724.79 847.4 728.85 729.1
☐ Other:___

Plan: N/C  MMI  Phase (CF): ☐ 1) Relief(acute) ☐ 2) Thera.(subacute) ☐ 3) Rehab ☐ 4) Support(chronic) ☐ 5) Pall. ☐ 6) Maint. FOT:___ times per wk for___ wks or___
Future Treatment Plan (FTP): N/C ☐ CM ☐ EMS ☐ US ☐ IFL ☐ HP ☐ CP ☐ MS ☐ TP ☐ TP ☐ MA ☐ Home Ex ☐ Other:___
Future Treatment Goals (FTG): N/C ☐ 1) pain ☐ 2) spasm ☐ 3) ADL ☐ 4) Ret.to Pre-clin. ☐ 5) funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9) freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recur. ☐ ROM
Same as TTG ☐ 14) Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18) Flexibility ☐ 19) Improve Alignment ☐ Other:___

PL APP 000421

## DESCRIPTION OF SYMPTOMS

| | Onset | SYMPTOMS | Types 1-14 | Frequency 1-4 | Intensity 1-4 | Radiating 1-8 | L R B | Actions 1-14 | B A R | Complaints 1-4 NC SF | Scale 1-10 | Frequency 1-4 | Intensity 1-4 | Worse 1-4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subjective: 1. | 10/2/13 | LBP | 13 | 2 | c | | | | | | | | | |
| 2. | | | | | | | | | | | | | | |
| 3. | | | | | | | | | | | | | | |
| Flare-up 4. | | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | | |

Additional Info: _____

**SYMPTOM FOLLOW-UP**

## ORTHO / NEURO / NOTES

ROM: ☐ PROM is foll in the ☐ Cervical & ☐ Thoracolumbar regions.
☐ PROM is decreased in the C/S with Flex___° Ext.___° LLB___° RLB___° LR___° RR___°
☐ PROM is decreased in the L/S with Flex___° Ext.___° LLB___° RLB___° LR___° RR___°
End point tenderness noted in C/S:_____ T/S:_____ L/S:_____

| Objective: | Exam | | Cervical | Thoracic | Lumbar | Extremities / Other |
|---|---|---|---|---|---|---|
| | Re-Exam | | | | | |
| | Reg. Visit | | L R B / M A | L R B / M A | L R B / M A | |
| | | UPPER | C | T | | |
| | | MIDDLE | C | T | | |
| | | LOWER | C | T | 5 | |

ROM: N/C Neg  Prom Arom Normal
Prom Arom Slightly ↓ Pain (P)  Spasm (S)
Prom Arom Moderately ↓ Pain (P)  Spasm (S)

| Palpation | | | | | |
|---|---|---|---|---|---|
| Tenderness (1-4) | | | | P/S | |
| | | | | 2 | |
| Hypertonicity (1-2) | | | | 2 | |
| Trigger Points (1-2) | | | | 2 | |
| Edema (1-2) | | | | | |
| Spasms (1-3) | | | | 2 | |
| Inflammation | | | | | |
| WNL | | | | | |

Segments  Subluxations  List Segments _____ / 5
Malpositions  List Segments _____
Articular Fixations  List Segments _____
Technique _____ SPLT
Today's Modalities/Procedures (TM) _____ Cx

ORTHO: F/C [–][R: (ipsi)(contra)(rad)] [L: (ipsi)(contra)(rad)], Shoulder Depression [–][R][L],
Distraction [+][–], SLR [R___°][L___°], SSLR [R___°][L___°],
Root Tension Sign [–][R][L], Well Leg Raising [R___°][L___°], Kemp's [–][R][L],
Yeoman's [–][R][L], Hibb's [–][R][L], Faber Patrick [–][R][L],
Lindner-Valsalva-Bechterew[+][–]  ☐ Neurovascular compression testing
demonstrates Erb's point tenderness [–][R][L], AEST [–][R][L], Adson's [–][R][L],
Hyperabduction [–][R][L], Tinel [–][R][L], Phalen [–][R][L], V.A.T. [+][–]
Other: _____

Neuro: ☐ Romberg is [+] [–].
☐ Plantars are flexor [+](Upgoing toes)
☐ Bowel/bladder disfunction [+][–]

SN: ☐ Sensory Examination is normal
Except for hypesthesia / hyperpathia to pin in the:_____ dermatome(s).

DTR's: ☐ Deep tendon reflexes are 2+/2+ and equal bilaterally.
Except: Jaw (C-V) R___L___, Biceps (C5-6) R___L___,
Radial (C5-6) R___L___, Wrist (C7-8), R___L___,
Achilles (S1-2) R___L___, Triceps (C7-8) R___L___,
Ulnar (C8-T1) R___L___, Petellar (L2-L4) R___L___,
Hamstrings (L4-S2) R___L___

M/G: ☐ Motor Examination is 5/5 in upper and lower extremities
Except for: Deltoid (C5) R___L___, Biceps (C6) R___L___,
Wrist Ext (C6) R___L___, Wrist Flex (C7) R___L___,
Finger Ext (C7) R___L___, Finger Flex (C8) R___L___,
Finger Abductors (T1) R___L___, Ankle Inversion (L4) R___L___,
Extensor Hallicus Longus (EHL-L5) R___L___,
Ankle Eversion (S1-2) R___L___, Heel Walk (L4-S) R___L___,
Toe Walk (S1-2) R___L___
☐ There are [no] signs of atrophy and/or fasiculations at_____
☐ Waddell Sign [+][–] (non-organic signs: inordinate sensitivity or weakness; axial
loading and/or rotation = excessive LBP; overreaction; SLR vs. SSLR)

Assessment/ Treatment
N/C  MMI

Today's Treatment Goals (TTG): N/C ☐1)↓pain ☐2)↓spasm ☐ 3)↑ADL ☐ 4) Ret.to Pre-clin ☐5)↑Funct. ☐ 6) Stabilize ☐ 7) Max.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9)↓ freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recurr. ☐12)↓Swelling, Infl.
☐ 13)↑ROM ☐ 14)↑Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18)↑Flexibility ☐ 19) Improve Alignment ☐ Other:_____

Progress/Improvement (TAU): N/C ☐ 1)(first visit) Favorable results expected ☐ 2)Progressing as exp. ☐ 3) Slower than exp. ☐ 4) Not@MMI ☐ 5) At___% MMI ☐ 6) Temp.Total Disability (til___/___/___)
☐ 7) Temp.Partial Disability ☐ 8) Excellent prog. ☐ 9) Good prog. ☐ 10) Fair prog. ☐ Other:_____
Improvement? ☐ 11) None ☐ 12) Minor ☐ 13) Moderate ☐ 14) Marked ☐ Other:_____

Diagnosis: N/C ☐ Cervical: 839.___  739.1  723.1  847.0  723.4  784.0  722.0  722.4  728.85  721.0  729.1  ☐ Thoracic: 839.21  739.2  724.1  724.4  739.8  737.34  847.1  722.11  722.51  728.85  721.2  729.1
☐ Change  ☐ Lumbar: 839.20  739.2  724.2  724.4  847.2  724.9  724.02  738.4  724.3  722.10  722.52  722.83  728.85  729.1  ☐ SI/Pelvic: 839.42  847.3  739.4  739.5  846.1  722.0  724.79  847.4  728.85  729.1
☐ Other:_____

Plan: N/C  MMI  Phase (CF): ☐ 1) Relief(acute) ☐ 2) Thera.(subacute) ☐ 3) Rehab ☐ 4) Support(chronic) ☐ 5) Pall. ☐ 6) Maint.  FDT:____ times per wk for____ wks or_____
Future Treatment Plan (FTP): N/C  CM  EMS  US  IFL  HP  CP  MS  TP  MR  Home Ex._____
Future Treatment Goals (FTG): N/C ☐1)↓pain ☐2)↓spasm ☐3)↑ADL ☐4) Ret.to Pre-clin ☐5)↑funct. ☐ 6) Stabilize ☐7) Max.Med.Imp. ☐8) Max.Chiro.Imp. ☐9)↓freq.exac. ☐10) Relieve Symp Exacer. ☐11) Min. Recurr. ☐12)↓Swelling,Infl. ☐13)↑ROM
☐ 14)↑Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18)↑Flexibility ☐ 19) Improve Alignment ☐ Other:_____

PL.APP.000122

# Joslyn Chiropractic Clinic

Date: 5/1/13   Patient: _Dusty Bunosk(_   Visit #: ___  Dr. _CV_  Page #: ___

PL.APP 000123

## DESCRIPTION OF SYMPTOMS

| | Onset | SYMPTOMS | Types 1-14 | Frequency 1-4 | Intensity 1-4 | Radiating 1-8 | L R B | Actions 1-14 | B A R | SYMPTOM FOLLOW-UP Complaints 1-4 NC SF | Scale 1-10 | Frequency 1-4 | Intensity 1-4 | Worse 1-4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Subjective:** 1. | Sev | LBP | | | | | | | | 3 | 8 | @3 | 3 | Bath/Twist |
| 2. | | | | | | | | | | | | | | |
| ☐ Flare-up 3. | | | | | | | | | | | | | | |
| 4. | | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | | |

Additional info: (handwritten notes) _Twisted wrong yesterday 4/13 and Sudd Sev LBP — Prior to this he was st a Sore and still equit... the Sev up first attack in March..._

_Patient states he been busy, on his feet all... Not been able to get in for treatment... Sev flash up... patient slowly improving... in 50-60% Better with days of exercise but then more..._

ORTHO / NEURO / NOTES

**ROM:** ☐ PROM is full in the ☐ Cervical & ☐ Thoracolumbar regions.
☐ PROM is decreased in the C/S with Flex ___° Ext ___° LLB ___° RLB ___° LR ___° RR ___°
☐ PROM is decreased in the L/S with Flex ___° Ext ___° LLB ___° RLB ___° LR ___° RR ___°
End point tenderness noted in C/S: ___ T/S: ___ L/S: ___

**ORTHO:** F/C [–]/R: (ipsi)(contra)(rad) /L: (ipsi)(contra)(rad), Shoulder Depression [–][R][L],
Distraction [+][–], SLR [R___°][L___°], SSLR [R___°][L___°],
Root Tension Sign [–][R][L], Well Leg Raising [R___°][L___°], Kemp's [–][R][L],
Yeoman's [–][R][L], Hibb's [–][R][L], Faber Patrick [R][L],
Lindner-Valsalva-Bechterew[+][–] ☐ Neurovascular compression testing
demonstrates Erb's point tenderness [–][R][L], AEST [–][R][L], Adson's [–][R][L],
Hyperabduction [–][R][L], Tinel [–][R][L], Phalen [–][R][L], V.A.T. [+][–]
Other:_____

**Neuro:** ☐ Romberg is [+] [–].
☐ Plantars are flexor [+](Upgoing toes)
☐ Bowel/bladder disfunction [+][–]
**SN:** ☐ Sensory Examination is normal
Except for hypesthesia / hyperpathia to pin in the: ___ dermatome(s).

**OTR's:** ☐ Deep tendon reflexes are 2+/2+ and equal bilaterally.
Except: Jaw (C-V) R___ L___, Biceps (C5-6) R___ L___,
Radial (C5-6) R___ L___, Wrist (C7-8) R___ L___,
Achilles (S1-2) R___ L___, Triceps (C7-8) R___ L___,
Ulnar (C8-T1) R___ L___, Petellar (L2-L4) R___ L___,
Hamstrings (L4-S2) R___ L___,

**M/G:** ☐ Motor Examination is 5/5 in upper and lower extremities
Except for: Deltoid (C5) R___ L___, Biceps (C6) R___ L___,
Wrist Ext (C6) R___ L___, Wrist Flex (C7) R___ L___,
Finger Ext (C7) R___ L___, Finger Flex (C8) R___ L___,
Finger Abductors (T1) R___ L___, Ankle Inversion (L4) R___ L___,
Extensor Hallucis Longus (EHL-L5) R___ L___,
Ankle Eversion (S1-2) R___ L___, Heel Walk (L4-5) R___ L___,
Toe Walk (S1-2) R___ L___,
☐ There are [no] signs of atrophy and/or fasciculations at ___
☐ Waddell Sign [+][–] (non-organic signs: inordinate sensitivity or weakness; axial loading and/or rotation = excessive LBP; overreaction; SLR vs: SSLR)

## Objective / Palpation Table

|  | Cervical L R B M A | Thoracic L R B M A | Lumbar L R B M A | Extremities / Other |
|---|---|---|---|---|
| **Objective:** Exam ___ | | | | |
| Re-Exam ___ | | | | |
| Reg. Visit ___ | | | | |
| UPPER | C | T | | |
| MIDDLE | C | T | | |
| LOWER | C | T | (L) | |
| **ROM: N/C Neg** Prom Arom Normal | | | | |
| Prom Arom Slightly ↓ Pain (P). Spasm (S) | | | | |
| Prom Arom Moderately ↓ Pain (P). Spasm (S) | | | /S | |
| **Palpation** Tenderness (1-4) | | | 2 | |
| Hypertonicity (1-2) | | | 2 | |
| Trigger Points (1-2) | | | 2 | |
| Edema (1-2) | | | | |
| Spasms (1-3) | | | 2 | |
| Inflammation | | | 2 | |
| WNL | | | | |
| **Segments** Subluxations List Segments | | | L5 | |
| Malpositions List Segments | | | | |
| Articular Fixations List Segments | | | | |
| **Assessment/ Treatment** Technique | | | Diff T | |
| Today's Modalities/Procedures (TM) | | | Abu / IFC (circled) | |
| N/C  MMI | | | | |

**Today's Treatment Goals (TTG):** N/C ☐ 1)↓ pain ☐ 2)↓ spasm ☐ 3)↑ ADL ☐ 4) Ret.to Pre-clin. ☐ 5)↑ funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9)↓ freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recurr. ☐ 12)↓ Swelling, Infl.
☐ 13)↑ ROM ☐ 14)↑ Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18)↑ Flexibility ☐ 19) Improve Alignment ☐ Other:___

**Progress/Improvement (TXO):** N/C ☐ 1) (first visit) Favorable results expected ☐ 2)Progressing as exp. ☐ 3) Slower than exp. _Plateau_ ☐ 4) Not@MMI ☐ 5) At ___%MMI ☐ 6) Temp.Total.Disability (til __/__/__)
☐ 7) Temp.Partial Disability ☐ 8) Excellent prog. ☐ 9) Good prog. ☐ 10) Fair prog. ☐ Other:___
Improvement? ☐ 11) None ☐ 12) Minor ☐ 13) Moderate ☐ 14) Marked. ☐ Other:___

**Diagnosis: N/C** ☐ Cervical: 839.___ 739.1 723.1 847.0 723.4 784.0 722.0 722.4 728.85 721.0 729.1  ☐ Thoracic: 839.21 739.2 724.1 724.4 739.8 737.34 847.1 722.11 722.51 728.85 721.2 729.1
☐ Change ☐ Lumbar: 839:20 739.3 724.2 724.4 847.2 724.4 724.02 738.4 722.10 722.52 722.83 728.85 729.1  ☐ SI/Pelvic: 839:42 847.3 739.4 738.5 846.1 720.2 724.79 847.4 728.85 729.1
☐ Other:___

**Plan:** N/C  MMI  Phase (Ck): ☐ 1) Relief (acute) ☐ 2) Thera (subacute) ☐ 3) Rehab ☐ 4) Support (chronic) ☐ 5) Pall. ☐ 6) Maint. FDT: ___ times per wk for ___ wks or ___
**Future Treatment Plan (FTP):** N/C  CM CMS US IFI HP CP MS TP TP MA Home Ex ___ ☐ Other:___

**Future Treatment Goals (FTG):** N/C ☐ 1)↓ pain ☐ 2)↓ spasm ☐ 3)↑ ADL ☐ 4) Ret.to Pre-clin. ☐ 5)↑ funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9)↓ freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recurr. ☐ 12)↓ Swelling, Infl.
Same as TTG ☐ ☐ 14)↑ Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18)↑ Flexibility ☐ 19) Improve Alignment ☐ Other:___

# Regional Health Services of Howard County

Cresco, Iowa

A Member of Trinity Health
Livonia, Michigan

Patient Name: BURNIKEL, DUSTIN G
MRN: (HD)-030640
Date of Birth: 04/24/1981
Admit Date: 03/01/2013
Discharge Date: 03/01/2013
Account Number: 499047
Patient Type: Single-Visit Diag
Attending: Kammerer MD, Jon DT

## Ultrasound

| Exam Name: | Accession Number: | Ordering Physician: | Exam Date/Time: |
|---|---|---|---|
| US Scrotum and Contents | US-13-0024376 | Kammerer MD, Jon DT | 03/01/2013 8:41:38 AM CST |
| | FINAL REPORT | | |

### Report

This examination was performed at Regional Health Services of Howard County, Cresco, Iowa.

HISTORY: 31-year-old male with left testicular pain since 2/16/2013, trauma/injury on 2/16/2013.

Evaluation of the scrotal contents was performed by ultrasound. Both testes are normal in size, echotexture and overall appearance. The right measures 4.6 x 3 x 2.5 cm and the left measures 4.3 x 2.9 x 2.4 cm. No intra or extra testicular masses are identified. There is normal blood flow to both testicles without evidence of torsion. Epididymi appear normal. There are prominent vessels along the lateral aspect of the left testicle and within the inguinal canal which slightly dilate with Valsalva maneuver. This is consistent with a small varicocele. Tiny bilaterally hydroceles are present.

IMPRESSION:
1. Normal appearance of the testes.
2. Left varicocele.
3. Tiny bilateral hydroceles.

********** FINAL REPORT **********
Dictated By: Petree MD, Jeana L 03/01/2013 08:49
Assigned Physician: Petree MD, Jeana L
Reviewed and Electronically Signed By: Petree MD, Jeana L 03/01/2013 10:22
Transcribed by: MLS 03/01/2013 08:59
Technologist: ANE

### Reason For Exam:

1    Left testicular pain since 2/16/13, Trauma injury on 2/16/13.

PL.APP.000124



# Joslyn Chiropractic Clinic
## Dr. Paul C. Joslyn
221 West Second St
Cresco, IA 52136
563-547-3782

### AUTHORIZATION FOR RELEASE OF RECORDS

I hereby authorize and request:

RH#SHC / Dr. kammover
(Dr., Hospital, or Clinic)

Cresco IA 5
(Address)

### To Release:

[X] Clinical Notes

[X] Radiology Reports (X-ray, MRI, CT, U.S., etc) — if Performed

[ ] X-Ray films, CT, MRI (Hard copies)

Regarding: Injuries Sustained to head, face, Testicle etc.

Patient: Dusty Burpilled ███ from Altercation with police in Des Moines on Sat 2/15/13

Date of Birth: ███████

S.S. #: ████████

To: Joslyn Chiropractic Clinic
Dr. Paul C Joslyn D.C., C.C.S.P., C.C.E.P.
221 West Second Street
Cresco, IA 52136
Or
Fax: 563-547-4627

_____     3-4-13
Patients' Authorization/Signature      Date

_____
Witness

PL.APP.000125

**Joslyn Chiropractic Clinic**

Date: 3/4/13  Patient: Dustin Burnike   Visit #____  Dr. RC   Page #____

## DESCRIPTION OF SYMPTOMS

| | Onset | SYMPTOMS | Types 1-14 | Frequency 1-4 | Intensity 1-4 | Radiating 1-8 | L R B | Actions 1-14 | B A R | Complaints 1-4 NC SF | Scale 1-10 | Frequency 1-4 | Intensity 1-4 | Worse 1-4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Subjective:** 1. | Some | Low Back | | | | | | | | NC | 7 | 3 | 2 | Daily |
| 2. | | | | | | | | | | | | | | |
| 3. | | | | | | | | | | | | | | |
| **Flare-up** 4. | | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | | |

Additional info: Patient missed last appt. — got busy with business.

### SYMPTOM FOLLOW-UP

## ORTHO / NEURO / NOTES

**ROM:** ☐ PROM is full in the ☐ Cervical & ☐ Thoracolumbar regions.
☐ PROM is decreased in the C/S with Flex ___ Ext. ___ LLB ___ RLB ___ LR ___ RR ___
☐ PROM is decreased in the L/S with Flex ___ Ext. ___ LLB ___ RLB ___ LR ___ RR ___
End point tenderness noted in C/S: ___ T/S: ___ L/S: ___

**ORTHO:** F/C [–][R: (ipsi)(contra)(rad)] [L: (ipsi)(contra)(rad)], Shoulder Depression [–][R][L],
Distraction [+][–], SLR [R___°][L___°], SSLR [R___°][L___°],
Root Tension Sign [–][R][L], Well Leg Raising [R___°][L___°], Kemp's [–][R][L],
Yeoman's [–][R][L], Hibb's [–][R][L], Faber Patrick [–][R][L],
Lindner-Valsalva-Bechterew[+][–]. ☐ Neurovascular compression testing
demonstrates Erb's point tenderness [–][R][L], AEST [–][R][L], Adson's [R][L],
Hyperabduction [–][R][L], Tinel [–][R][L], Phalen [–][R][L], V.A.T. [+][–]
Other:

**Neuro:** ☐ Romberg is [+] [–].
☐ Plantars are flexor [+][Upgoing toes]
☐ Bowel/bladder disfunction [+][–]

**SN:** ☐ Sensory Examination is normal
Except for hypesthesia / hyperpathia to pin in the ___ dermatome(s).

**DTR's:** ☐ Deep tendon reflexes are 2+/2+ and equal bilaterally.
Except: Jaw (C-V) R___ L___, Biceps (C5-6) R___ L___
Radial (C5-6) R___ L___, Wrist (C7-8), R___ L___
Achilles (S1-2) R___ L___, Triceps (C7-8) R___ L___
Ulnar (C8-T1) R___ L___, Patellar (L2-L4) R___ L___
Hamstrings (L4-S2) R___ L___

**M/G:** ☐ Motor Examination is 5/5 in upper and lower extremities
Except for: Deltoid (C5) R___ L___, Biceps (C6) R___ L___
Wrist Ext (C6) R___ L___, Wrist Flex (C7) R___ L___
Finger Ext (C7) R___ L___, Finger Flex (C8) R___ L___
Finger Abductors (T1) R___ L___, Ankle Inversion (L4) R___ L___
Extensor Hallucis Longus (EHL-L5) R___ L___
Ankle Eversion (S1-2) R___ L___, Heel Walk (L4-5) R___ L___
Toe Walk (S1-2) R___ L___
☐ There are [no] signs of atrophy and/or fasciculations at ___
☐ Waddell Sign [+][–] (non-organic signs: inordinate sensitivity or weakness; axial loading and/or rotation = excessive LBP; overreaction; SLR vs. SSLR)

## Objective:

Exam ____  Re-Exam ____  Reg. Visit ____

| | Cervical | | | Thoracic | | | Lumbar | | | Extremities / Other |
|---|---|---|---|---|---|---|---|---|---|---|
| | L | R | B | L | R | B | L | R | B | |
| | M | A | | M | A | | M | A | | |
| UPPER | C | | | | | | | | | |
| MIDDLE | C | | | T | | | | | | |
| LOWER | C | | | T | | | | | | |

**ROM:** N/C Neg  Prom Arom Normal
Prom Arom Slightly ↓ Pain (P)  Spasm (S)
Prom Arom Moderately ↓ Pain (P)  Spasm (S)

**Palpation**
Tenderness (1-4)
Hypertonicity (1-2)
Trigger Points (1-2)
Edema (1-2)
Spasms (1-3)
Inflammation
WNL

**Segments**
Subluxations  List Segments
Malpositions  List Segments
Articular Fixations  List Segments
Technique

**Assessment/ Treatment**
Today's Modalities/Procedures (TM)
N/C  MMI

**Today's Treatment Goals (TTG):** N/C ☐1) pain ☐ 2) ↓ spasm ☐ 3)↑ ADL ☐ 4) Ret.to Pre-clin. ☐ 5)↑ funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp ☐ 9)↑ freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recurr. ☐ 12)↑ Swelling, Infl.
☐ 13)↑ ROM ☐ 14)↑ Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18)↑ Flexibility ☐ 19) Improve Alignment ☐ Other:

**Progress/Improvement (PIO):** N/C ☐ 1) (first visit) Favorable results expected ☐ 2)Progressing as exp. ☐ 3) Slower than exp. ☐ 4) Not@MMI ☐ 5) At ___ %MMI ☐ 6) Temp.Total Disability (SI ___/___/___)
☐ 7) Temp.Partial Disability ☐ 8) Excellent prog. ☐ 9) Good prog. ☐ 10) Fair prog. ☐ Other:
Improvement? ☐ 11) None ☐ 12) Minor ☐ 13) Moderate ☐ 14) Marked ☐ Other:

**Diagnosis:** N/C
☐ Change
Cervical: 839. ___ 739.1  723.1  847.0  723.4  784.0  722.0  722.4  728.85  721.0  729.1  ☐ Thoracic: 839.21  739.2  724.1  724.4  739.8  737.34  847.1  722.11  722.51  728.85  721.2  729.1
Lumbar: 839.20  739.3  724.2  724.4  847.2  724.9  724.02  738.4  724.3  722.10  722.52  722.83  728.85  729.1  ☐ SI/Pelvic: 839.42  847.3  739.4  739.5  846.1  720.2  724.9  847.4  728.85  729.1
☐ Other:

**Plan:** N/C  MMI  Phase (CP): ☐ 1) Relief(acute) ☐ 2) Thera.(subacute) ☐ 3) Rehab ☐ 4) Support(chronic) ☐ 5) Pall. ☐ 6) Maint.  FOT: ___ times per wk for ___ wks or ____
Future Treatment Plan (FTP): N/C ☐ CMT ☐ EMS ☐ US ☐ IFL ☐ HP ☐ CP ☐ MS ☐ TP ☐ TP ☐ MR ☐ Home Ex ____
Future Treatment Goals (FTG): N/C ☐ 1) pain ☐ 2)↓ spasm ☐ 3)↑ ADL ☐ 4) Ret.to Pre-clin. ☐ 5)↑ funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9)↑ freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recurr. ☐ 12)↑ Swelling, Infl. ☐ 13)↑ ROM
Same as TTG ☐ ☐ 14)↑ Strength ☐ 15) Return pre-accident ☐ 16) Retard

PL.APP.000126

## DESCRIPTION OF SYMPTOMS

| | Onset | SYMPTOMS | Types 1-14 | Frequency 1-4 | Intensity 1-4 | Radiating 1-8 | L R B | Actions 1-14 | B A R | Complaints 1-4 NC SF | Scale 1-10 | SYMPTOM FOLLOW-UP Frequency 1-4 | Intensity 1-4 | Worse 1-4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Subjective:** | | 1. | | | | | | | | | | | | |
| | | 2. | | | | | | | | | | | | |
| ☐ Flare-up | | 3. | | | | | | | | | | | | |
| | | 4. | | | | | | | | | | | | |
| | | 5. | | | | | | | | | | | | |
| | | 6. | | | | | | | | | | | | |

**Additional info:** — Appt 9:30 — No show — called
— Reschedule for 2:30 on 2/28/13
— Appt 2:30 = No show

### ORTHO / NEURO / NOTES

**ROM:** ☐ PROM is full in the ☐ Cervical & ☐ Thoracolumbar regions.
☐ PROM is decreased in the C/S with Flex___° Ext___° LLB___° RLB___° LR___° RR___°
☐ PROM is decreased in the L/S with Flex___° Ext___° LLB___° RLB___° LR___° RR___°
End point tenderness noted in C/S:___ T/S:___ L/S:___

**ORTHO:** F/C [—]R: (ipsi)(contra)(rad)] {L: (ipsi)(contra)(rad)}, Shoulder Depression [—]R[L],
Distraction [+][—], SLR [R___°][L___°], SSLR [R___°][L___°],
Root Tension Sign [—]R[L], Well Leg Raising [R___°][L___°], Kemp's [—]R[L],
Yeoman's [—]R[L], Hibb's [—]R[L], Faber Patrick [—]R[L],
Lindner-Valsalva-Bechterew[+][—] ☐ Neurovascular compression testing
demonstrates Erb's point tenderness [—]R[L], AEST [—]R[L], Adson's [—]R[L],
Hyperabduction [—]R[L], Tinel [—]R[L], Phalen [—]R[L], V.A.T. [+][—]
Other:___

**Neuro:** ☐ Romberg is [+] [—].
☐ Plantars are flexor [+][Upgoing toes]
☐ Bowel/bladder disfunction [+][—]___

**SN:** ☐ Sensory Examination is normal
Except for hypesthesia / hyperpathia to pin in the:___ dermatome(s).

### Objective:

| | | Cervical | | | Thoracic | | | Lumbar | | | Extremities / Other |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Exam_____ | | L R B | | | L R B | | | L R B | | | |
| Re-Exam_____ | | M A | | | M A | | | M A | | | |
| Reg. Visit_____ | UPPER | C | | | T | | | L | | | |
| | MIDDLE | C | | | T | | | L | | | |
| | LOWER | C | | | T | | | L | | | |

**ROM: N/C Neg**
Prom Arom Normal___
Prom Arom Slightly ↓ Pain (P) Spasm (S)___
Prom Arom Moderately ↓ Pain (P) Spasm (S)___

**Palpation**
Tenderness (1-4)___
Hypertonicity (1-2)___
Trigger Points (1-2)___
Edema (1-2)___
Spasms (1-3)___
Inflammation___
WNL___

**Segments**
Subluxations  List Segments___
Malpositions  List Segments___
Articular Fixations  List Segments___
Technique___

**Assessment/ Treatment**
Today's Modalities/Procedures (TM)___
N/C MMI

**DTR's:** ☐ Deep tendon reflexes are 2+/2+ and equal bilaterally.
Except: Jaw (C-V) R___ L___, Biceps (C5-6) R___ L___,
Radial (C5-6) R___ L___, Wrist (C7-8), R___ L___,
Achilles (S1-2) R___ L___, Triceps (C7-8) R___ L___,
Ulnar (C8-T1) R___ L___, Petellar (L2-L4) R___ L___,
Hamstrings (L4-S2) R___ L___,

**M/G:** ☐ Motor Examination is 5/5 in upper and lower extremities
Except for: Deltoid (C5) R___ L___, Biceps (C6) R___ L___,
Wrist Ext (C6) R___ L___, Wrist Flex (C7) R___ L___,
Finger Ext (C7) R___ L___, Finger Flex (C8) R___ L___,
Finger Abductors (T1) R___ L___, Ankle Inversion (L4) R___ L___,
Extensor Hallicus Longus (EHL-L5) R___ L___,
Ankle Eversion (S1-2) R___ L___, Heel Walk (L4-5) R___ L___,
Toe Walk (S1-2) R___ L___,
☐ There are [no] signs of atrophy and/or fasciculations at___
☐ Waddell Sign [+][—] (non-organic signs: inordinate sensitivity or weakness; axial loading and/or rotation = excessive LBP; overreaction; SLR vs. SSLR)

**Today's Treatment Goals (TTG): N/C** ☐ 1)↓ pain ☐ 2)↓ spasm ☐ 3)↑ ADL ☐ 4) Ret.to Pre-clin. ☐ 5)↑ funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp ☐ 9)↓ freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recur. ☐ 12)↓ Swelling, Infl.
☐ 13)↑ROM ☐ 14)↑ Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18)↑ Flexibility ☐ 19) Improve Alignment ☐ Other:___

**Progress/Improvement (TAU): N/C** ☐ 1) (first visit) Favorable results expected ☐ 2) Progressing as exp. ☐ 3) Slower than exp. ☐ 4) Not@MMI ☐ 5) At___%MMI ☐ 6) Temp.Total.Disability (til___/___/___)
☐ 7) Temp.Partial Disability ☐ 8) Excellent prog. ☐ 9) Good prog. ☐ 10) Fair prog. ☐ Other:___
Improvement ☐ 11) None ☐ 12) Minor ☐ 13) Moderate ☐ 14) Marked ☐ Other:___

**Diagnosis: N/C** ☐ Cervical: 839.___ 739.1 723.1 847.0 723.4 784.0 722.0 722.4 728.85 721.0 729.1 ☐ Thoracic: 839.21 739.2 724.1 724.4 739.8 737.34 847.1 722.11 722.51 728.85 721.2 729.1
☐ Change ☐ Lumbar: 839.20 739.3 724.2 724.4 847.2 724.9 724.02 738.4 724.3 722.10 722.52 722.83 728.85 729.1 ☐ SI/Pelvic: 839.42 847.3 739.4 739.5 846.1 720.2 724.79 847.4 728.85 729.1
☐ Other:___

**Plan: N/C** MMI  Phase (CF): ☐ 1) Relief(acute) ☐ 2) Thera.(subacute) ☐ 3) Rehab ☐ 4) Support(chronic) ☐ 5) Pall. ☐ 6) Maint.  FDT:___ times per wk for___ wks or___
☐ Change ☐ Other:___
**Future Treatment Plan (FTP): N/C** CM EMS US IFL HP CP MS TP TR MR  Home Ex___
**Future Treatment Goals (FTG): N/C** ☐ 1)↓ pain ☐ 2)↓ spasm ☐ 3)↑ ADL ☐ 4) Ret.to Pre-clin. ☐ 5)↑ funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp ☐ 9)↓ freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recur. ☐ 12)↓ Swelling, Infl. ☐ 13)↑ROM

PL APP 000127





1000 Brady Street
Davenport, Iowa 52803
Phone (563) 884-5805
Fax (563) 884-5328

*Imaging Consultation Services*

Name: **Burnikel, Dustin**       Dr: **Paul C. Joslyn**
Age: ███████                    Date of Exam:   02-26-13
Sex: Male                       Date of Report:  03-14-13

**HISTORY**: Low back pain.

**LUMBOPELVIC SPINE:** AP, lateral.

Bone density is adequate. Intervertebral discs are well maintained. The sacroiliac and iliofemoral joint spaces are generally well maintained.

Minor right thoracolumbar lateral curvature noted. There is no evidence of abdominal mass or calcification.  Bowel gas distribution is normal.

**IMPRESSIONS:**

1.    Minor right thoracolumbar lateral curvature.


*Ian D. McLean, DC*
*Diplomate, American Chiropractic Board of Radiology*

PL.APP.000128

Date: 2/26/13  Patient: Dusty Burnikel  **Joslyn Chiropractic Clinic**  Visit #____  Dr.____  Page #____

## DESCRIPTION OF SYMPTOMS

| | Onset | SYMPTOMS | Types 1-14 | Frequency 1-4 | Intensity 1-4 | Radiating 1-8 | L R B | Actions 1-14 | B A R | Complaints 1-4 NC SF | Scale 1-10 | SYMPTOM FOLLOW-UP Frequency 1-4 | Intensity 1-4 | Worse 1-4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subjective 1. | 2/16/13 | Low Back Pain | 1,3 | 4 | 3 | | | Bend | | | | | | |
| 2. | | | | | | | | | | | | | | |
| 3. | | | | | | | | | | | | | | |
| Flare-up 4. | | | | | | | | | | | | | | |
| 5. | | | | | | | | | | | | | | |
| 6. | | | | | | | | | | | | | | |

Additional info: Aggravation noted w/ patient in front of dishwasher ___ ___ hotel. Glancing sideways. Patient was bending in the bar and felt a ___ in the back. New onset low back

### ORTHO / NEURO / NOTES

ROM: ☐ PROM is full in the ___ ☐ Cervical ☐ Thoracolumbar region
☐ PROM is decreased in the C/S with Flex ___ Ext ___ LLB ___ RLB ___ LR ___ RR
☐ PROM is decreased in the L/S with Flex 30 Ext 0 LLB 15 RLB 10 LR 15 RR 15
End point tenderness noted in C/S: ___ T/S: ___ L/S: S

ORTHO: F/C [–][R: (ipsi)(contra)(rad)] [L: (ipsi)(contra)(rad)], Shoulder Depression [–][R][L],
Distraction [+][–], SLR [R 2 @ L 2 @], SSLR [R ___ °][L ___ °], Root Tension Sign [–][R][L], Well Leg Raising [R ___ °][L ___ °], Kemp's [–][R][L], Yeoman's [–][R][L], Hibb's [–][R][L], Faber Patrick [–][R][L], Lindner-Valsalva-Bechterew [+][–]. ☐ Neurovascular compression testing demonstrates Erb's point tenderness [–][R][L], AEST [–][R][L], Adson's [–][R][L], Hyperabduction [–][R][L], Tinel [–][R][L], Phalen [–][R][L], V.A.T. [+][–]. Other:____

Neuro: ☐ Romberg is [+] [–].
☐ Plantars are flexor [+][Upgoing toes]
☐ Bowel/bladder disfunction [+][–]
SN: ☐ Sensory Examination is normal
Except for hypesthesia / hyperpathia to pin in the: ___ dermatome(s).
DTR's: ☐ Deep tendon reflexes are 2+/2+ and equal bilaterally.
Except: Jaw (C-V) R ___ L ___, Biceps (C5-6) R ___ L ___,
Radial (C5-6) R ___ L ___, Wrist (C7-8) R ___ L ___,
Achilles (S1-2) R ___ L ___, Triceps (C7-8) R ___ L ___,
Ulnar (C8-T1) R ___ L ___, Petellar (L2-L4) R ___ L ___,
Hamstrings (L4-S2) R ___ L ___
M/G: ☐ Motor Examination is 5/5 in upper and lower extremities
Except for: Deltoid (C5) R ___ L ___, Biceps (C6) R ___ L ___,
Wrist Ext (C6) R ___ L ___, Wrist Flex (C7) R ___ L ___,
Finger Ext (C7) R ___ L ___, Finger Flex (C8) R ___ L ___,
Finger Abductors (T1) R ___ L ___, Ankle Inversion (L4) R ___ L ___,
Extensor Hallicus Longus (EHL-L5) R ___ L ___,
Ankle Eversion (S1-2) R ___ L ___, Heel Walk (L4-5) R ___ L ___,
Toe Walk (S1-2) R ___ L ___
☐ There are [no] signs of atrophy and/or fasciculations at ___
☐ Waddell Sign [+][–] (non-organic signs: inordinate sensitivity or weakness; axial loading and/or rotation = excessive LBP; overreaction; SLR vs. SSLR)

### Objective: Exam

| | | Cervical | | | Thoracic | | | Lumbar | | | Extremities / Other |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | L R B | M | A | | | | L R B | M | A | |
| Re-Exam | | | | | | | | | | | |
| Reg. Visit | | | | | | | | | | | |
| ROM: N/C Neg | Prom Arom Normal. | UPPER | C | T | | | | | | | |
| | Prom Arom Slightly ↓ Pain (P) Spasm (S) | MIDDLE | C | T | | | | | | | |
| | Prom Arom Moderately ↓ Pain (P) Spasm (S) | LOWER | C | T | | | 1/P | | | | |
| Palpation | Tenderness (1-4) | | | | | | | 2 | | | |
| | Hypertonicity (1-2) | | | | | | | 2 | | | |
| | Trigger Points (1-2) | | | | | | | | | | |
| | Edema (1-2) | | | | | | | | | | |
| | Spasms (1-3) | | | | | | | 2 | | | |
| | Inflammation | | | | | | | | | | |
| | WNL | | | | | | | | | | |
| Segments | Subluxations List Segments | | | | | | | 15 | | | |
| | Malpositions List Segments | | | | | | | | | | |
| | Articular Fixations List Segments | | | | | | | | | | |
| | Technique | | | | | | | | | | |
| Assessment/Treatment N/C MMI | Today's Modalities/Procedures (TM) | | | | | | | | | | |

Today's Treatment Goals (TTG): N/C ☐ 1) ↓ pain ☐ 2) ↓ spasm ☐ 3) ↑ ADL ☐ 4) Ret. to Pre-clin. ☐ 5) ↑ funct. ☐ 6) Stabilize ☐ 7) Max.Chiro.Imp. ☐ 8) ↓ freq.exac. ☐ 9) Relieve Symp Exacer. ☐ 10) Min. Recurr. ☐ 11) ↓ Swelling, Infl.
☐ 13) ↑ ROM ☐ 14) ↑ Strength ☐ 15) Return pre-accident ☐ 16) Retard degeneration ☐ 17) Correct Musc. Imbal. ☐ 18) ↑ Flexibility ☐ 19) Improve Alignment ☐ Other:____

Progress/Improvement (TAO): N/C ☐ 1) (first visit) Favorable results expected ☐ 2) Progressing as exp. ☐ 3) Slower than exp. ☐ 4) Not @MMI ☐ 5) At ___ %MMI ☐ 6) Temp.Total.Disability (till ___ / ___ / ___ )
☐ 7) Temp. Partial Disability ☐ 8) Excellent prog. ☐ 9) Good prog. ☐ 10) Fair prog. ☐ Other:____
Improvement? ☐ 11) None ☐ 12) Minor ☐ 13) Moderate ☐ 14) Marked ☐ Other:____

Diagnosis: N/C ☐ Cervical: 839. ___ 739.1 723.1 847.0 723.4 784.0 722.0 722.4 728.85 721.0 729.1 ☐ Thoracic: 839.21 739.2 724.1 724.4 739.8 737.34 847.1 722.11 722.51 728.85 721.2 729.1
☐ Change ☐ Lumbar: 839.20 739.3 724.2 724.4 847.2 724.9 724.02 738.4 724.3 722.10 722.52 722.83 728.85 729.1 ☐ SI/Pelvic: 839.42 847.3 739.4 739.5 846.1 720.2 724.79 847.4 728.85 729.1
☐ Other:____

Plan: N/C MMI Phase (CF): ☐ 1) Relief (acute) ☐ 2) Thera (subacute) ☐ 3) Rehab ☐ 4) Support (chronic) ☐ 5) Palt. ☐ 6) Maint. FDT: 2 times per wk for 4 wks or ____
Future Treatment Plan (FTP): N/C ☐ CM ☐ MS ☐ US ☐ IFL ☐ HP ☐ CP ☐ MS ☐ TP ☐ TP ☐ MR Home Ex ___ ☐ Other:____
Future Treatment Goals (FTG): N/C ☐ 1) ↓ pain ☐ 2) ↓ spasm ☐ 3) ↑ ADL ☐ 4) Ret. to Pre-clin. ☐ 5) ↑ funct. ☐ 6) Stabilize ☐ 7) Max.Med.Imp. ☐ 8) Max.Chiro.Imp. ☐ 9) ↓ freq.exac. ☐ 10) Relieve Symp Exacer. ☐ 11) Min. Recurr. ☐ 12) ↓ Swelling, Infl. ☐ 13) ↑ ROM

PL.APP.000129



# JOSLYN CHIROPRACTIC CLINIC
## DR. PAUL C. JOSLYN

### PATIENT ACCIDENT FORM

CHECK ACCIDENT TYPE:  AUTO _____ HOME _____ WORK _____

1. Name: Dustin Bornikel          AGE: 32     SEX: Male
2. Address: 4692 timber Ave LineSprings IA 52155
   (Street)          (City)     (State)     (Zip)
3. Who did you report the accident/injury to? Police, Doc, Ciro
4. Date accident was reported: Sat Feb 16
5. Date and time of accident: 2:00 Am
6. Where were you taken after the accident? Jail
7. Where did you feel pain? Lower back, Left testical, Ribs, face, Left knee
8. What are you symptoms? Pain
9. Name of any other doctor consulted since your accident? Dr Kammer
10. Treatment received (if any): Ciro treatment, Dr Checkup
11. How often did you receive treatment? 2 time per week
12. Since the injury, are your symptoms:
    Improving _____ Getting worse _____ Same X
13. Have you retained an attorney? X    If so, his name and address:
    Ted @ Pring Des Möins IA Tprinclaw @ qwestoffice. Net

### Auto Accident

1. Were you wearing seat belts at the time of the accident? Yes ____ No ____
2. Where was your position in the vehicle? _____
3. Approximate speed of vehicle(s) involved: _____
4. Approximate damage to vehicle(s): _____

### Workman's Compensation

1. Employer Name: _____
2. Employer Address: _____
3. Did you miss any work? _____ Date returned to work: _____
4. Are your work activities restricted as a result of the accident? _____
5. Have you had any other disease or accident that affects your employment? ____
6. Do you favor any part of your body in employment? _____
   What? _____
7. History of absenteeism caused from accidents on the job? _____
8. Were you capable of working on an equal basis with others your age prior to your accident? _____
9. What is your present occupation? _____
10. Length of present occupation? _____

**** For all accident types: Please explain in detail how and where your accident happened on the other side of this form. I was out side waiting for a cab to go back to hotel (embacy suits) and I seen two guys that threw a female on the ground and hurting her I said Guys what are you doing you are hurting that girl. I instantly I was Maced and beaten to the ground

PL.APP.000130

once on the ground I was kicked in the testicals 4 different time, in the ribs in the face several times till I was knocked out. I was handcuffed and left laying on the ground for several minuts intill I was picked up and escorted to a van. I was bleeding from my face elbows and had extreme path threw out my body I did not at anytime fight back or resist the two guys from beating me to the ground. I was taken 14hrs later to polk co jail. I never recieved treatment, I just had pictures taken.

PL.APP.000131

# Confidential Patient Data

IF YOU NEED ANY ASSISTANCE COMPLETING THIS FORM, PLEASE ASK THE RECEPTIONIST

## PATIENT INFORMATION

Today's Date: _____

Name: Dustin Burnikel                     Date of Birth: ██████████

Address: 4692 Timber Ae     City: Lime Springs   State: IA   Zip: 52655

Home Phone: 641-330-3414     Work Phone: same

Social Security #: ████████   Age: 32   ☑ Male   ☐ Female

Marital Status: ☐ Married  ☐ Single  ☐ Divorced  ☐ Separated  ☐ Other engaged

Name of Spouse or Nearest Relative: Lacey Mader     Phone: 641-330-8081

Your Occupation: Tree Sergean     Your Employer: self employed

Referred to this Office by: ☐ Friend/Family Member - Name? _____
☐ Yellow Pages  ☐ Mail  ☐ Clinic Location ☐ Other _____

Payment for Services will be by: ☐ Cash  ☐ Check  ☐ Credit Card  ☐ Health Insurance
☐ Automobile Insurance  ☐ Worker's Compensation

Name of Insurance Co.: _____ Insured's Employer: _____ Insured'

Social Security #: _____ Employer's Phone #: _____

Are you covered by more than one insurance company? ☐ Yes  ☑ No  Name _____

## MEDICAL/FAMILY HISTORY   S = Self   M = Mother   F = Father

(Please indicate which conditions have been experienced by the above by marking appropriate boxes).

| S | M | F | | S | M | F | | S | M | F | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ AIDS | | ☑ | ☐ | ☑ | dislocated joints | ☐ | ☐ | ☐ | neck pain |
| ☐ | ☐ | ☐ anemia | | ☐ | ☐ | ☐ | epilepsy | ☑ | ☑ | ☐ | nervousness |
| ☐ | ☐ | ☐ arthritis | | ☐ | ☐ | ☐ | German measles | ☐ | ☐ | ☐ | numbness |
| ☐ | ☐ | ☐ asthma | | ☐ | ☐ | ☐ | headaches | ☐ | ☐ | ☐ | polio |
| ☑ | ☑ | ☐ back pain | | ☐ | ☐ | ☐ | heart trouble | ☐ | ☐ | ☐ | poor circulation |
| ☐ | ☐ | ☐ bladder trouble | | ☐ | ☐ | ☐ | reproductive disorders | ☐ | ☐ | ☐ | hepatitis |
| ☐ | ☑ | ☐ bone fracture | | ☑ | ☑ | ☑ | high blood pressure | ☐ | ☐ | ☐ | rheumatic fever |
| ☐ | ☑ | ☐ cancer | | ☐ | ☐ | ☐ | HIV/ARC | ☐ | ☐ | ☐ | rheumatism |
| ☐ | ☐ | ☐ chest pain | | ☐ | ☐ | ☐ | kidney disorder | ☐ | ☐ | ☐ | scarlet fever |
| ☐ | ☐ | ☐ concussion | | ☐ | ☐ | ☐ | bowel control loss | ☐ | ☐ | ☐ | serious injury |
| ☐ | ☐ | ☐ convulsions | | ☐ | ☐ | ☐ | menstrual cramps | ☐ | ☐ | ☐ | sinus trouble |
| ☐ | ☐ | ☐ diabetes | | ☐ | ☐ | ☐ | multiple sclerosis | ☐ | ☐ | ☐ | tuberculosis |
| ☐ | ☐ | ☐ indigestion | | ☐ | ☐ | ☐ | muscular dystrophy | ☐ | ☐ | ☐ | venereal disease |

Have you been treated by a physician for any health condition in the last year? ☐ Yes  ☑ No

Describe Condition _____     Date of Last Physical Exam _____

SURGICAL HISTORY:

1. _____     Date: _____
2. _____     Date: _____
3. _____     Date: _____

Have you ever had a metal implant? ☐ Yes  ☑ No     Ever been gunshot? ☐ Yes  ☑ No

ACCIDENT HISTORY :  ☑ Job ☐ Auto ☐ Other 1. Sm. Back Hurt   Date: 9-01-2003
☐ Job ☐ Auto ☐ Other 2. _____     Date: _____
☐ Job ☐ Auto ☐ Other 3. _____     Date: _____

(over please)

PL.APP.000132

## PLEASE DESCRIBE PRESENT MAJOR COMPLAINTS:

Please Rate Your symptoms(1-10, with 1 being least serious)

1. _Lower Back_ — 7
2. _Left testicual_ — 7
3. _Left Knee_ — 4
4. _____
5. _____
6. _____

SYMPTOMS ARE WORSE IN ☒MORNING ☐AFTERNOON ☐NIGHT

WHEN AND HOW OCCURRED? _Was beat Up by 2 cops in Des Mions_

SYMPTOMS DEVELOPED FROM: ☐JOB RELATED INJURY ☐AUTO ACCIDENT ☒OTHER ☐ACCIDENT ☐ILLNESS
☐UNKNOWN CAUSE ☐GRADUAL ONSET DATE OCCURRED: _3-16-13_
SYMPTOMS HAVE PERSISTED FOR # ____HOUR(S) ____DAY(S) ☒WEEK(S) ____MONTH(S) ____YEAR(S)
SYMPTOMS/COMPLAINTS: ☐COME & GO ☒ARE CONSTANT
HAVE YOU EVER HAD THIS BEFORE: ☒NO ☐YES WHEN?_____
IF YOU WERE TO GUESS, WHAT DO YOU THINK IS CAUSING YOUR COMPLAINTS?
_getting kicked in testicous and back_
NAME AND LOCATION OF DOCTORS PREVIOUSLY SEEN FOR PRESENT CONDITION(S):
_Regional Health services_

ARE YOU ALLERGIC TO ANY MEDICATIONS ☒NO ☐YES WHAT KIND?_____
ARE YOU TAKING ANY MEDICATIONS ☐NO ☒YES WHAT KIND? _Hydrocodone_
ARE YOU PREGNANT ☒NO ☐YES DATE OF LAST MENSTRUAL PERIOD_____

**PLEASE CHECK THE FOLLOWING ACTIVITIES THAT AGGRAVATE YOUR CONDITION:**
☒BENDING ☒REACHING ☐STRAINING AT STOOL ☐COUGHING ☒SITTING ☐TURNING HEAD
☒LIFTING ☐SNEEZING ☒WALKING ☒LYING DOWN ☒STANDING

PLEASE CHECK THE FOLLOWING ACTIVITIES THAT **RELIEVE** YOUR CONDITION:
☐BENDING ☒SITTING ☐LIFTING ☐STANDING ☐LYING DOWN ☐TURNING HEAD ☐REACHING ☐WALKING

PLEASE CHECK ANY **ADDITIONAL SYMPTOMS** YOU MAY BE EXPERIENCING:
☐blurred vision ☐buzzing in ears ☐cold feet ☐cold hands ☐cold sweats ☐concentration loss /confusion ☐constipation
☐depression /weeping spells ☐diarrhea ☐dizziness ☐face flushed ☐fainting ☐fatigue ☐fever ☐head seems too heavy
☐headaches ☐insomnia ☐light bothers eyes ☐loss of balance ☐loss of smell ☐loss of taste ☐low resistance to colds ☒muscle
jerking ☐numbness in fingers ☐numbness in toes ☐pins and needles in arms ☐pins and needles in legs ☐ringing in ears
☐shortness of breath ☐stiff neck ☐stomach upset

Patient's Signature: _____  Date: _3-4-13_

PL.APP.000133

**Activities that are affected by my current health problems**

Name: _Dyslan Burnbel_  Date: _3-04-13_

0 = No affect
1 = I am aware of my problem when I do this activity (Mild)
2 = I don't want to do this activity because of my problem (Moderate)
3 = I can't do this activity at all. (Severe)

**Basic**

X 1  Bending

X 1  Climbing Stairs

X 1  Falling Asleep

X 1  Kneeling

X 3  Lifting

_____  Looking Over Shoulder

X 1  Lying Down

X 1  Rising Out of Chair

_____  Sitting

X 1  Standing

X 1  Staying Asleep

1  Walking

**Daily Living**

_____  Caring for Infirm Family Member

_____  Child Care

_____  Computer Use (extended time)

_____  Computer Use (short time)

_____  Concentrating

1 X  Driving

_____  Housework

_____  Lifting Children

_____  Lifting/Carrying Groceries

_____  Pet Care

_____  Reading

X 2  Sexual Activity

X 1  Yard Work

**Occupational Duties**

_____  Computer Work

_____  Desk Work

X 1  Driving (at work)

X 3  Lifting (at work)

_____  Using the Telephone

**Personal Care**

_____  Bathing

X 1  Dressing

_____  Hair Care

_____  Shaving

**Recreational Activities**

_____  Cycling

_____  Drawing

X 3  Exercise

_____  Golf

_____  Needle Work

_____  Piano

X 3  Running

_____  Softball

_____  Swimming

_____  Tennis

PL.APP.000134

# REVISED OSWESTRY LOW BACK PAIN DISABILITY QUESTIONNAIRE

*PLEASE READ*: This questionnaire is designed to enable us to understand how much your low back/leg pain is affecting your ability to manage everyday activities. Please answer <u>each section</u> by circling the ONE CHOICE that <u>best</u> applies to you <u>today</u>. We realize that you may feel that more than one statement may relate to you, but *PLEASE JUST CIRCLE THE ONE CHOICE WHICH MOST CLOSELY DESCRIBES YOUR PROBLEM RIGHT NOW.*

## SECTION 1 – Pain Intensity

A. I have no pain
B. The pain is mild
C. The pain comes and goes and is moderate
D. The pain does not vary much and is moderate
E. The pain comes and goes and is severe
F. The pain does not vary much and is severe

## SECTION 2 – Personal Care

A. I would not have to change my way of washing or dressing to avoid pain.
B. I do not normally change my way of washing or dressing even though it causes some pain.
C. Washing and dressing increases the pain, but I manage not to change my way of doing it.
D. Washing and dressing increases the pain and I find it necessary to change my way of doing it.
E. Because of the pain, I am unable to do some washing and dressing without help.
F. Because of the pain, I am unable to do any washing or dressing without help.

## SECTION 3 – Lifting

A. I can lift heavy weights without extra pain.
B. I can lift heavy weights, but it causes extra pain.
C. Pain prevents me from lifting heavy weights from any height.
D. Pain prevents me from lifting heavy weights off the floor, but I can manage if they are conveniently positioned, (eg. on a table)
E. Pain prevents me from lifting heavy weights off the floor, but I can manage medium weights if they are conveniently positioned.
F. I can only lift very light weights at the most.

## SECTION 4 – Walking

A. I can walk as long as I want without getting pain.
B. Walking gives me pain which does not increase with time.
C. Walking gives me pain which I can relieve by varying my pace.
D. I get pain only when I walk long distances.
E. I get pain when I walk short distances.
F. I avoid walking because it gives me pain straight away.

## SECTION 5 – Sitting

A. I can sit in any chair as long as I like without pain.
B. I can sit in some types of chairs as long as I like without getting pain.
C. I get pain only when I get out of some seats.
D. I get pain after sitting in most seats.
E. I get pain soon on sitting in most seats.
F. Sitting in most seats gives me pain straight away.

## SECTION 6 – Standing

A. I can stand as long as I want without pain
B. Standing eventually causes some pain, but it does not increase with time.
C. Standing eventually gives me pain which I can relieve by shifting my weight.
D. Standing eventually gives me pain which I can not relieve by shifting my weight.
E. I get pain soon on standing.
F. I avoid standing because I get pain straight away.

## SECTION 7 – Sleeping

A. I get no pain in bed.
B. I get some pain in bed but it does not disturb my sleep.
C. I get some pain in bed which sometimes disturbs my sleep.
D. I get pain in bed which often disturbs my sleep.
E. I get pain in bed which always disturbs my sleep.
F. Pain prevents me from sleeping at all.

## SECTION 8 – Social Life

A. My social life is normal and gives me no pain.
B. My social life is normal but increases the pain.
C. Pain has no significant effect on my social life apart from limiting my more energetic interests, (e.g., dancing)
D. Pain has restricted my social life and I do not go out very often.
E. Pain has restricted my social life to my home.
F. I have hardly any social life because of the pain.

## SECTION 9 – Traveling

A. I get no pain while traveling.
B. I get some pain while traveling, but none of my usual forms of travel make it any worse.
C. I get extra pain while traveling, but it does not compel me to seek alternative forms of travel.
D. I get extra pain while traveling which compels me to seek alternative forms of travel.
E. Pain restricts all forms of travel.
F. Pain prevents all forms of travel except that done lying down.

## SECTION 10 – Changing Degree of Pain

A. My pain has gone.
B. My pain is rapidly getting better.
C. My pain varies but is slowly getting better.
D. My pain is getting neither better nor worse.
E. My pain is slowly worsening.
F. My pain is rapidly worsening.

Patient name *Dusty Burnikel*    Patient signature _____    Date *2-16/13*

PL.APP.000135

# CITY OF DES MOINES, IOWA
## Office of
## Homeland Security Bureau

TO:     David Lillard, Major                      DATE:      3 June 2008
Commanding, Inspectional Services Bureau

FROM:   Leonard L. R. Murray, Major           SUBJECT:    Acknowledgement of
Commanding, Homeland Security Bureau                      Oral Reprimand
                                               Administrative Review  08-05-00:
                                               DMPD Case No. 2008-9181

Attached is documentation of the Oral Reprimand issued to Senior Police Officer Gregg Wessels as a result of his actions during the arrest of an intoxicated individual, reference case 2008-9181.

Officer Wessels was also instructed on the proper method for transporting prisoners.


                                      *Leonard L. R. Murray*
                                      Leonard L. R. Murray

PL.APP.000136

# CITY OF DES MOINES, IOWA
## Office of
## Homeland Security Bureau

TO: Leonard Murray, Major
Commanding, Homeland Security Bureau

DATE: 3 June 2008

FROM: David Bowen
Lieutenant
Metro Special Tactics and Response

SUBJECT: Acknowledgement of
Oral Reprimand
Re: Administrative Review
Control No. 08-05-003

On 3 June 2008, Senior Police Officer Gregg Wessels was given an oral reprimand for inappropriate use of force during the arrest of Sean Wall on case 08-9181. The attached communication documents the Oral Reprimand issued to Officer Wessels.

On this same date Officer Wessels was instructed on the proper procedure for transporting prisoners.

David Bowen

PL.APP.000137

# CITY OF DES MOINES, IOWA
## Office of
## Homeland Security Bureau

| | | | |
|---|---|---|---|
| TO: | Gregg Wessels, Senior Police Officer<br>Team 4<br>Metro Star | DATE: | 27 May 2008 |
| FROM: | David Bowen<br>Lieutenant<br>Metro Special Tactics and Response | SUBJECT: | Administrative Review<br>Control No. 08-05-003<br>Oral Reprimand |

As directed by Chief Judy Bradshaw, this communication will serve as documentation of an oral reprimand pertaining to Administrative Review Control No. 08-05-003. This oral reprimand is the result of your inappropriate use of force as it relates to the arrest incident involving Sean Wall on case 2008-9181.

This incident occurred on 17 March 2008, after you were tripped with another officer to 312 Court reference an intoxicated individual later identified as Sean Wall. Due to a strong odor of alcohol and slurred speech, the determination to arrest Mr. Wall was made. Considering the close proximity to the Polk County Jail and the delay of the transport wagon, Mr. Wall was handcuffed and you and the other officer walked him to the Polk County Jail. It was during this time Mr. Wall became combative and was forced to the ground. Mr. Wall sustained injuries to his face as a result of your actions.

Your decision to forcibly place a handcuffed prisoner to the ground under these circumstances and with two officers present is inappropriate. It is the responsibility of the arresting officer to maintain control of a handcuffed prisoner for his safety. In this situation there were two officers present. Mr. Wall, who was intoxicated and in handcuffed, was forced to the ground with no way to protect himself from the impending impact of the ground.

Inappropriate use of force is in violation of Personnel and Administrative Rules Chapter One, "Use of Force", which reads as follows:

Officers shall not use more force than necessary in making an arrest or while maintaining custody of the individual arrested.

Your signature below will acknowledge receipt of this oral reprimand.

Gregg Wessels

David Bowen

PL.APP.000138

# CITY OF DES MOINES
OFFICE OF
**Patrol Services Bureau**

*PERSONNEL FILE*

**To:**   David Lillard
Major, Commanding
Inspectional Services Bureau

**Date:**  24 April 2009

**From:**  Richard L. Singleton
Major, Commanding
Patrol Services Bureau

**Subject:** Administrative Review
09-03-004, CN 09-002389
SPO Gregg Wessels

Senior Police Officer Gregg Wessels will serve his one-day suspension (eight hours) on the 26th of April 2009. He will use compensatory time to fulfill the remainder of his ten-hour shift.

Richard L. Singleton

cc:   Lisa Baagoe
Bureau Timekeeper

T. Anne Miller
Department Timekeeper

PL.APP.000139

# CITY OF DES MOINES
OFFICE OF
## PATROL SERVICES BUREAU


**TO:** Richard Singleton
Major Commanding
Patrol Services Bureau

**DATE:** April 24, 2009

**FROM:** Joanne M. Pollock
Captain Commanding
Watch 2

**SUBJECT:** Admin Review 09-03-004
AIR 2009-0002389
One Day Suspension
SPO Gregg Wessels


Sunday, 26 April has been identified as Officer Wessels suspension date. He has chosen to be carried on "C" time for the remainder of the shift that day.

Forwarded for your information.


Joanne M Pollock
Joanne M. Pollock

PL.APP.000140

# CITY OF DES MOINES, IOWA
### Office of
## PATROL SERVICES BUREAU

| | | | |
|---|---|---|---|
| **TO** | Joanne Pollock, Captain/Raymond Rexroat, Lieutenant<br>Commanding Second Watch, Patrol Section | **DATE** | 22 April 2009 |
| **FROM** | Richard Singleton, Major<br>Commanding, Patrol Services Bureau | **SUBJECT** | Senior Police Officer<br>Gregg Wessels –<br>One Day Suspension<br>Re: Administrative Review<br>09-03-004 – Arrest Incident<br>Report 2009-2389 |

Attached please find a memorandum from Major David Lillard, Commander of the Inspectional Services Bureau, indicating Chief Bradshaw has determined that Senior Police Officer Gregg Wessels receive a one-day suspension for inappropriate use of force reference DMPD Case Number 2009-2389.

Please indicate the date that Officer Wessels will serve the one-day suspension, within the next 30 days, and forward to this office NLT 29 April 2009, allowing sufficient time for departmental paperwork.

Please note that a one-day suspension is for eight (8) hours. Officer Wessels may choose to work two (2) hours or be carried off on any time he designates.

If you need him to report to work, then state this as well. This is at your discretion.

_____
Richard Singleton

mkg

PL.APP.000141

# CITY OF DES MOINES
## OFFICE OF
# INSPECTIONAL SERVICES BUREAU

To: Richard Singleton
Major, Commanding
Patrol Services Bureau

DATE: April 21, 2009

FROM: David Lillard
Major, Commanding
Inspectional Services Bureau

SUBJECT: Administrative Review 09-03-004
Senior Police Officer Gregg Wessels

**RE: Arrest Incident Report 2009-2389**

In accordance with Department Rule 1.2.2, paragraph f., Item 1, Disposition of Personnel Complaints, the classification of this investigation as approved by the Chief of Police is reflected as indicated in the "disposition applicable table."

**A copy of this document should be forwarded to the employee concerned.**

## Disposition Applicable Table

    1. Unfounded

    2. Exonerated

    3. Non-sustained

(X) 4. Sustained      Inappropriate Use of Force

As outlined in the attached memorandum, the Chief of Police has determined that Officer Wessels will serve a one (1) day suspension in regard to Arrest Incident Report 2009-2389.

Please forward the proper written documentation to this office upon completion.

_____
David Lillard

Attachment

cc: SPO Gregg Wessels

PL.APP.000142

| | | | |
|---|---|---|---|
| **TO:** | Richard Singleton<br>Major, Commanding<br>Patrol Services Bureau | **DATE:** | 20 April 2009 |
| **FROM:** | Judy A. Bradshaw<br>Chief of Police | **SUBJECT:** | Administrative Review<br>09-03-004, Senior Police<br>Officer Gregg Wessels |

I have reviewed your findings in regard to the Arrest Incident Report filed by Senior Police Officer Gregg Wessels. The incident involved the arrest of Darnell Lee who was struck by Officer Wessels in the face while he was handcuffed.

I agree with your assessment that Officer Wessels actions were inappropriate, not with department guidelines and he had other options available to defend himself.

Officer Wessels received a reprimand for using excessive force on a prisoner in June of 2008. During a Pre-disciplinary hearing Officer Wessels indicated the reprimand was not for striking the prisoner but rather for taking him to the ground. That is factual however the incident involved striking the handcuffed prisoner with an open hand and then taking him forcefully to the ground causing a bloody nose and abrasion.

This is the second incident within ten months where Officer Wessels has used inappropriate force against a handcuffed prisoner with other officers present.

Officer Wessels is in violation of the Personnel and Administrative Rules Chapter One, Use of Force. Officer Wessels will serve a one day suspension. Please proceed and identify the day the suspension will be served and forward to my office.

*Judy A. Bradshaw*

Judy A. Bradshaw

cc: Senior Police Officer Gregg Wessels
    Patrol Services Bureau

PL.APP.000143

# CITY OF DES MOINES, IOWA

Office of

## OPERATIONS DIVISION

**TO**    Todd Dykstra,
Captain, Executive Officer
Office, Chief of Police

**DATE**    28 April 2014

**FROM**    Dana Wingert
Major, Commanding
Operations Division

**SUBJECT**    Sergeant Gregg Wessels –
Four Day Suspension
Administrative Review
14-01-006

Sergeant Gregg Wessels will serve his four (4) day, 32 hour suspension as follows:

a. 10 hours on Saturday, 17 May 2014

b. 10 hours on Sunday, 18 May 2014

c. 10 hours on Monday, 19 May 2014

d. 2 hours on Tuesday, 20 May 2014. Sergeant Wessels will work the remaining eight (8) hours on this date.

_Dana Wingert_

Dana Wingert

CF    Jennifer Rico, Administrative Assistant
Office, Chief of Police
Debby Mook, Bureau Timekeeper

mkg

PL.APP.000144

# CITY OF DES MOINES
## OFFICE OF
## CHIEF OF POLICE

*PERSONNEL FILE*

**To:** Dana Wingert
Major, Commanding
Operations Division

**DATE:** 11 April 2014

**FROM:** Todd Dykstra
Captain, Executive Officer

**SUBJECT:** Administrative Review 14-01-006
Sergeant Gregg Wessels

**RE:** **Inappropriate Use of Force**
**Policy Violation**

In accordance with Department Rule 1.2.2, paragraph f., Item 1, Disposition of Personnel Complaints, the classification of this investigation as approved by the Chief of Police is reflected as indicated in the "disposition applicable table."

## Disposition Applicable Table

|   |   |   |   |
|---|---|---|---|
|   | 1. | Unfounded |   |
|   | 2. | Exonerated |   |
|   | 3. | Non-sustained |   |
| **X** | 4. | **Sustained** | The act complained of occurred and was inappropriate |

As outlined in the attached memorandum, the Chief of Police concurs with the Division Commander's findings of **sustained**; Sergeant Gregg Wessels is to serve a **four (4) day (32 hour) suspension** for violating the following policies:

*1) Des Moines Police Department Personnel and Administrative Rules, Chapter 1, Personnel Conduct, (a) Standard of Conduct*

*2) Des Moines Police Department Personnel and Administrative Rules, Chapter 1, Personnel Conduct, (b) Use of Force*

Please forward proper documentation to this office when completed. Sgt. Wessels has the right to appeal this action to the Civil Service Commission within 14 days after the disciplinary action has taken place.

_____
Todd Dykstra

Attachment

cc: Sgt. Gregg Wessels

# CITY OF DES MOINES
### OFFICE OF
## CHIEF OF POLICE

PERSONNEL FILE

**TO:**     Gregg Wessels
            Sergeant
            Operations Division

**DATE:**    10 April 2014

**FROM:**   Judy A. Bradshaw
            Chief of Police

**SUBJECT**    Administrative Review
               14-01-006

I have reviewed all the material presented to me in connection to Administrative Review 13-12-001 including the recommendations of your supervisors.

The personnel investigation indicates you struck a combative, handcuffed prisoner, as two subordinate officers looked on.

Your actions, although they did not cause injuries, were inappropriate and violated department policy. Your actions depicted in the video appear to be punitive in nature, as though you lost your temper in front of your officers.

Striking a handcuffed prisoner, then failing to properly document your actions as required was a violation of our rules and department policy. You placed your officers in the uncomfortable position of providing the details of your actions that should have been recorded by you.

Sgt. Wessels you have held the rank of Sergeant for one year and eight months and within this time frame you have received a written reprimand, a two-day suspension, and your Commanding Officer is recommending progressive corrective action for a four-day suspension.

In the Pre-Disciplinary Hearing you acknowledged you were wrong and had no excuse for your actions stating that your emotions got the best of you. You admitted that you made a mistake and you accept the pending disciplinary action.

Your previous experience as a Senior Police Officer shows you are capable of making good decisions, which earned you the right to the rank of Sergeant. However, you are in a critical point in your career as a new Sergeant.

Any future incidents of misconduct of any kind will result in further discipline, up to and including demotion or termination.

I agree with the recommendation of your Commanding Officer and find this review to be sustained.

For the violations of the Personnel and Administrative Rules:
- You will serve a four-day (32 hours) suspension.

You have the right to appeal my decision within 14 days to the Des Moines Civil Service Commission.

Judy A Bradshaw

Judy Bradshaw

PL.APP.000147



# CITY OF DES MOINES

OFFICE OF

## CHIEF OF POLICE

**TO:** Dana Wingert
Major, Commanding
Operations Division

**DATE:** 28 March 2014

**FROM:** Todd Dykstra
Captain, Executive Officer

**SUBJECT:** Pre-disciplinary Procedures
Administrative Review 14-01-006
Sergeant Gregg Wessels

On 8 December 2013, Sergeant Gregg Wessels was involved in the arrest of Joshua Farrell under case number 2013-38390. After review of this arrest incident, the Operations Division Commander determined inappropriate force was used by Sergeant Wessels and has forwarded a recommendation that Sergeant Wessels serve a **four (4) day (48 hour) suspension** for the following policy violations:

2) **Des Moines Police Department Personnel and Administrative Rules, Chapter 1, Personnel Conduct, (a) Standard of Conduct**

> *All employees of the department shall conduct themselves in a manner that will reflect credit on themselves, the department and the City of Des Moines. Employees shall be professional to the public and to one another. They shall be attentive and respectful and shall exercise patience and discretion in the performance of their duties.*

3) **Des Moines Police Department Personnel and Administrative Rules, Chapter 1, Personnel Conduct, (b) Use of Force**

> *Employees shall only use that force which is necessary to make an arrest or maintain custody of an individual arrested. When force is used against an individual, except in incidents of deadly force, an Arrest Incident Report shall be completed by the employee and reviewed by the chain of command. The bureau commander shall forward the report to the Inspectional Services Bureau commander, where it will be maintained for a period of five years.*

Chief Bradshaw is offering Sgt. Wessels the opportunity to participate in pre-disciplinary procedures as excerpted below from Departmental General Order 04-1, Personnel and Administrative Rules.

Subject: Pre-disciplinary Procedures

### Sworn Personnel

A sworn employee subject to a recommendation for disciplinary action involving an unpaid suspension, demotion or termination will be afforded the opportunity to request a Chief's Guidance Committee be convened if the individual so desires. Upon notification of the disciplinary recommendation, the accused shall have forty-eight (48) hours in which to waive or exercise the right to a Chief's Guidance Committee. If the accused chooses a Chief's Guidance Committee, the accused shall have the choice of one member

from anyone within the department to represent them on the committee. The request for the committee and representative shall be made through the chain of command.

The committee shall consist of three members of the department excluding the commanding officer of the accused, a relative of the accused, any witness or investigator in the case, or a member of the Chief's staff.

The Chief of Police shall select the other two members of the committee, one being the chairperson. The accused will have the right to veto one committee member selected by the Chief, other than the chairperson. The accused will be allowed one veto during this process. The Chief will then select a replacement for the vacant committee position. The accused will receive notification of the Chief's initial selections and subsequent replacement. The accused will also be notified of when the committee will convene.

Whether or not a Chief's Guidance Committee is convened, the employee will be afforded the opportunity to participate in a pre-disciplinary hearing conducted by the Chief of Police or her designee. This hearing will occur after completion of the Guidance Committee process, if one is requested. A hearing notice will be sent to the employee and the appropriate union official. The notice will state the date of the improper conduct, a general statement of the conduct alleged and the date and location of the hearing. The employee may have a union representative or another person of the employee's choice at the hearing.

The pre-disciplinary hearing is an opportunity for the employee to be presented with the charges of misconduct and to provide information to be considered by management as disciplinary procedures are contemplated. It is not a forum for the employee or their representative to engage in cross-examination of management or for management to prove its case. The hearing is not recorded.

Notes are normally taken but there is no official transcript made of the hearing. It is not a public meeting.

Following the hearing, the Chief of Police or her designee will consider the information available, including the input of the employee from the pre-disciplinary hearing and arrive at a determination. Following the determination of the Chief of Police or her designee, the employee will be advised of his or her right to appeal the action to the Civil Service Commission within 14 days after the disciplinary action has been taken place.

If a Chief's Guidance Committee is requested, the officer will be notified of the date and time. A **mandatory pre-disciplinary hearing** will be scheduled for Sgt. Wessels and he will be notified of the date and time.

PL.APP.000149

Please have Sgt. Wessels submit, in writing, his intention to exercise or waive his right to a Chief's Guidance Committee. If he chooses to exercise his right to a Chief's Guidance Committee, his selection should be included in his memorandum.

Please notify me of Sgt. Wessels' intentions by 5:00 pm, Thursday, April 3, 2014.

Todd Dykstra

cc: Chief Bradshaw

PL.APP.000150

# CITY OF DES MOINES
OFFICE OF
## CHIEF OF POLICE

TO: Judy Bradshaw
Chief of Police

FROM: Todd Dykstra
Captain, Executive Officer

DATE: 28 March 2014

SUBJECT: Administrative Review 14-01-006
Sergeant Gregg Wessels
Arrest Incident 13-38390

### RE: Inappropriate Use of Force
### Policy Violation – Standard of Conduct

The Office of Professional Standards obtained information concerning this administrative review. This information represents the investigative product which has been reviewed by the officer's supervisors and commanding officers.

Each reviewer was directed to affix a recommendation to include corrective or punitive action if warranted.

Operations Division Commander Major Dana Wingert reviewed the complaint and recommends the following disposition for your consideration:

Unfounded

Exonerated

Non-Sustained

**X    Sustained**          The acts complained of occurred and were inappropriate.

Major Wingert recommends a finding of **sustained** and that Sergeant Gregg Wessels serve a **four (4) day (24 hour) suspension** for violating standard of conduct policy and his inappropriate use of force reference an Arrest Incident DMPD case no. 13-38390.

_____
Todd Dykstra

PL.APP.000151

# CITY OF DES MOINES, IOWA
## Office of
## Operations Division



PERSONNEL FILE

TO:   Judy A. Bradshaw                    DATE:     14 March 2014
        Chief of Police

FROM:  Dana Wingert                  SUBJECT:   Arrest Incident-
        Major, Commanding                         Case No. 13-38390
        Operations Division                         Sgt. Gregg Wessels

The attached case material pertains to a force related issue that took place during the arrest of Mr. Joshua Farrell, as recorded under Case No. 13-38390.

During the review of the Arrest Incident Reports and related video of the event, Acting Captain David Ness discovered that Sergeant Gregg Wessels had struck Mr. Farrell in the jaw with a closed fist.

At the time of the strike, Mr. Farrell was in the back of the transport vehicle, and although somewhat physically and verbally uncooperative, he was secured in handcuffs. Given the circumstances, which is supported by the video evidence, the strike to the face was clearly unnecessary and inappropriate.

During a conversation with Acting Captain Ness, Sergeant Wessels acknowledged that he directed Officers John VanOrsdel and Xiaotian Lu to complete Arrest Incident Reports to document their force, but deliberately did not complete on himself. Officer David Lam was also present during the event, but was not in a position to see the strike and did not hear it discussed.

Officers VanOrsdel and Lu were interviewed by Acting Captain Ness, and both acknowledged that they observed the incident. They added that it was their assumption that Sergeant Wessels would document his actions in an Arrest Incident Report. In hindsight, and given the failure of Sergeant Wessels to complete an Arrest Incident Report, both agree that they should have reported what they felt was an inappropriate act to their watch commander. All three officers were provided reinstruction in this regard.

In reviewing the audio and video from the prisoner transport vehicle, it is obvious that Mr. Farrell is less than cooperative. What is also clear is that the strike to the face is unwarranted, as there was more than enough officers present to gain/maintain control of Mr. Farrell in this particular situation.

In addition to the policy violations, Sergeant Wessels' actions were a poor example of proper conduct to the officers who were present. We cannot condone or tolerate this type of behavior from our officers, much less a supervisor.

Cont.

PL.APP.000152

**Personnel and Administrative Rules, Chapter One (a); Standard of Conduct:**

*Employees of the department shall conduct themselves in a manner that reflects credit on themselves, the department and the City of Des Moines. Employees shall be professional to the public and to one another. They shall be attentive and respectful and shall exercise patience and discretion in the performance of their duties.*

**Personnel and Administrative Rules, Chapter One (a); Use of Force:**

*Employees shall only use that force which is necessary to make an arrest and maintain custody of an individual arrested. When force is used against an individual, except in incidents of deadly force, an Arrest Incident Report shall be completed by the employee and reviewed by the chain of command. The bureau commander shall forward the report to the Inspectional Services Bureau commander, where it will be maintained for a period of five years.*

I recommend that Sergeant Wessels receive a **four (4) day suspension** for the listed violations.

Sergeant Wessels has been involved in two other recent events that have resulted in disciplinary action. In October 2013 a complaint was made for which he received a written reprimand for unsatisfactory service when he failed to make a police report for a citizen involved in an assault. In December 2013 he intentionally shot a tire on a fleeing vehicle, and he subsequently received a two day suspension for the policy violation

In reviewing the recent events, there is a pattern of decision making and behavior that does not conform to the department's standards and expectations. Although these events we not related to his duties as a police sergeant, it certainly impacts his status and the level of confidence we place in him as a front-line supervisor.

I have discussed these concerns with Sergeant Wessels, including the essential responsibility of our supervisors to lead, teach and mentor our officers to ensure that their operational decisions and actions conform to our policies and procedures. Having said this, the standard must be set and clearly visible in performance of our front-line supervisors.

Forwarded for your information.

Dana Winger

PL.APP.000153

# CITY OF DES MOINES, IOWA
## Office of
## OPERATIONS DIVISION

TO:      Dana Wingert                                 DATE:      Jan 22, 2014
Major, Commanding
Operations Division

FROM:     David Ness                                  SUBJECT:     Arrest Incident Report
Acting Captain                                              Sgt. Gregg Wessels
Third Watch, Patrol Section                          13-38390

I received an Arrest Incident Report from SPO John VanOrsdel and SPO Xiaotian Lu regarding their interaction with prisoner Joshua Farrell. I watched the video from inside the prisoner transport van and saw Farrell kick out the rear window and repeatedly try to injure himself by rubbing his feet in the glass and slamming his head into the metal wall. Both officers provided exemplary treatment and care as they tried to prevent him from causing further damage or injury.

Sgt. Wessels arrived and instructed officers to use hobble restraints on Farrell, who was momentarily calm (video timestamp: 56:45). The officers tried to do so, but the prisoner again became irate and physically resisted and shouted at them.

The sergeant entered the wagon and initially tried to roll him over but Farrell resisted. From close quarters, he drew his right arm back and punched the left side of the prisoner's jaw (1:01:35). With Farrell's hands and feet already restrained and three officers/sergeants controlling him, the strike was clearly unnecessary and inappropriate.

On Jan 6, 2014, I met with Sgt. Wessels to discuss the incident. In the four weeks that had passed, he had endorsed the officers' AIR but had not completed one himself. He was surprised to learn the incident had been caught on video. To his credit, he promptly acknowledged the punch was inappropriate and that he deliberately failed to report it.

Concerned about possible collusion, I asked about any conversation that followed the incident, specifically dealing with the punch or AIRs. The sergeant said he directed Lu and VanOrsdel to document their efforts on an AIR. The punch was not mentioned, but he believes the officers assumed he would complete an AIR detailing his actions as well.

I spoke individually with all three officers present during the incident. Officers Lu and VanOrsdel saw the punch and described it as unnecessary. They both thought the act would be described in Sgt. Wessels' AIR. Officer Lam was outside the van and did not see the incident or hear it discussed.

I re-instructed all three officers about the importance of ensuring all force employed by police officers and supervisors is accurately documented. Officers Lu and VanOrsdel agree they should have reported the incident to another supervisor or watch commander since they thought it was inappropriate.

PL.APP.000154

## Policy Violations

By striking a handcuffed prisoner and failing to document his actions, Sergeant Wessels violated fundamental personnel and administrative rules (04-01, Ch. 1a, 1b).

**Standard of Conduct** – *Employees of the department shall conduct themselves in a manner that reflects credit on themselves, the department and the City of Des Moines. They shall...exercise patience and discretion in the performance of their duties.*

**Use of Force** – *Employees shall only use that force which is necessary to make an arrest or maintain custody of the individual arrested. (Re: Iowa Code 704.1, 804.8)*

**Use of Force** – *When force is used against an individual...an Arrest Incident Report shall be completed by the employee and reviewed by the chain of command.*

## Additional Considerations:

I understand how Sgt. Wessels could momentarily lose his composure with a prisoner who was physically and verbally resistive. Twice previously, in 2008 and 2009, he was disciplined for mistreating prisoners; the latter resulted in a one (1) day suspension.

Gregg's deliberate indifference toward critical department policies is more troubling. By failing to report the mistake that was witnessed by his subordinates, he squandered a golden opportunity to demonstrate the sound judgment, leadership, honesty and ethical standards we expect of all police supervisors.

This is the third recommendation for disciplinary action against Sgt. Wessels in the last two months. The first resulted in a written reprimand for unsatisfactory service while working off-duty (13-11-004). The second involved shooting at a fleeing vehicle (13-12-003) in which a two (2) day suspension has been recommended.

Through several discussions, Gregg understands how this series of transgressions have undermined his effectiveness as a supervisor. I have suspended his role as a back-up watch commander and will not hesitate to recommend a lengthy suspension and/or demotion for any future misjudgments of this magnitude.

**I recommend Sgt. Gregg Wessels receive a three (3) day suspension** for violating department rules. In addition to his pending disciplinary action, this suspension will represent a significant and appropriate punishment.

Despite his recent struggles, I remain confident Sgt. Wessels will extend great effort to restore his positive reputation as an effective police supervisor.

PL.APP.000155

# CITY OF DES MOINES, IOWA
### Office of
# PATROL SERVICES BUREAU

| | | | |
|---|---|---|---|
| **TO** | Bill McCarthy<br>Chief of Police | **DATE** | 19 August 2005 |
| **FROM** | Dale P. Patch, Major<br>Commanding, Patrol Services Bureau | **SUBJECT** | Senior Police Officer<br>Gregg Wessels<br>Two Day Suspension |

Senior Police Officer Gregg Wessels has identified the dates of 22-23 August 2005 for his two-day suspension.

Anne Miller has been notified of these dates and has advised it is not a problem, even though it is short notice.

_____
Dale P. Patch

CF   Anne Miller, Administrative Assistant
      Office, Chief of Police
   Scott Baker, Police Officer
      Patrol Support Unit, Community Outreach and Protective Services Bureau
   Bureau Timekeeper

*noted Bill McCarthy 8-22-05*

PL.APP.000156

\mkg

# CITY OF DES MOINES
## OFFICE OF
# TRAFFIC UNIT

TO:    Michael Shay
       Captain, Headquarters
       Uniform Division

DATE:    19 August 2005

FROM:    Gregg R. Wessels
        Traffic Unit

SUBJECT:    Discipline

I am requesting that the dates of 22 and 23 August 2005 be set as the dates for my discipline.

Gregg R. Wessels

1

PL.APP.000157

# CITY OF DES MOINES, IOWA
### Office of
### PATROL SERVICES BUREAU

**TO:** Bill McCarthy
Chief of Police

**DATE:** 12 August 2005

**FROM:** Dale P. Patch
Major, Commander
Patrol Services Bureau

**SUBJECT:** Officer Greg Wessels -
Recommendation of
Discipline

On 12 August 2005, Officer Greg Wessels received your memorandum regarding a recommendation of a two-day suspension for his violation of work rules.

Officers Wessels has prepared a memorandum indicating that he does not wish to participate in a pre-disciplinary hearing or utilize the Chief's Guidance Committee.

Dale P. Patch

PL.APP.000158

# CITY OF DES MOINES, IOWA
## Office of
## TRAFFIC UNIT

**TO**    M. Michael Shay
Captain, Commanding
Community Outreach and Protective Services

**DATE**    12 August 2005

**FROM**    Richard Hickle
Sergeant, First Squad
Traffic Unit

**SUBJECT**    Greg Wessels
Pre-disciplinary Hearing

Attached is a memo from Officer Wessels declining a pre-disciplinary hearing and/or a Chief's Guidance Committee.

Forwarded for you information and action.

*Richard V. Hickle*
Richard V. Hickle

PL.APP.000159

# CITY OF DES MOINES
## OFFICE OF
## TRAFFIC UNIT

**TO:** Dana Wingert
Lieutenant, Commanding

**DATE:** 12 August 2005

**FROM:** Gregg Wessels
Squad 2
Traffic Unit

**SUBJECT:** Disciplinary Hearing

I have been informed of my right to a Pre-disciplinary Hearing, and a Chief's Guidance Committee. I do not wish to participate in either.

Forwarded for your action.

Gregg R. Wessels

1

PL.APP.000160

# CITY OF DES MOINES, IOWA
### Office of
## PATROL SERVICES BUREAU

**TO:** Dana Wingert
Lieutenant, Commanding
Traffic Unit

**DATE:** 11 August 2005

**FROM:** M. Michael Shay
Captain, Commanding
Community Outreach and Protective Services Section

**SUBJECT:** Officer Greg Wessels
Pre-disciplinary Hearing

Please ensure that the attached memorandums are directly, in person, given to Officer Wessels. Please note that he has 48 hours to request a Chief's Guidance committee. Therefore, the date of his receipt of this memorandum should be noted.

Officer Wessels needs to respond, by memorandum, through his chain of command, if he wishes to participate in the administrative proceedings.

Major Dale Patch has requested that he receive the needed memorandums, NLT 15 August 2005. Thus please ensure that I am in receipt of the needed memorandums NLT 15 August 2005, 1200 hours.

M. Michael Shay

PL.APP.000161

# CITY OF DES MOINES, IOWA
### Office of
## PATROL SERVICES BUREAU

TO:     Dana Wingert                 **DATE:**     11 August 2005
          Lieutenant, Commanding
          Traffic Unit

FROM:    M. Michael Shay             **SUBJECT:**    Officer Greg Wessels
            Captain, Commanding                       Pre-disciplinary Hearing
            Community Outreach and Protective Services Section

Please ensure that the attached memorandums are directly, in person, given to Officer Wessels. Please note that he has 48 hours to request a Chief's Guidance committee. Therefore, the date of his receipt of this memorandum should be noted.

Officer Wessels needs to respond, by memorandum, through his chain of command, if he wishes to participate in the administrative proceedings.

Major Dale Patch has requested that he receive the needed memorandums, NLT 15 August 2005. Thus please ensure that I am in receipt of the needed memorandums NLT 15 August 2005, 1200 hours.

M. Michael Shay

PL.APP.000162

# CITY OF DES MOINES
## OFFICE OF
# INSPECTIONAL SERVICES BUREAU

**To**    Dale Patch             **Date**    10 August 2005
Major, Commanding
Patrol Services Bureau

**From**    Craig L. Zubrod      **Subject**    Pre-disciplinary Hearing
Major, Commanding                          Administrative Review
Inspectional Services Bureau           05-06-004

The Chief of Police is in receipt of your recommendation proposing Officer Gregg Wessels serve a two-day suspension for violating departmental rules regarding a standard of conduct violation during the months of April and May 2005. You also recommended Officer Wessels attend a session with the department psychologist. This was completed and the officer was approved for duty status.

Chief McCarthy is offering Officer Wessels the opportunity to participate in a pre-disciplinary hearing. The officer needs to respond through his chain of command as to whether or not he wants to participate. If he does, the date and time of the hearing will be scheduled and coordinated by the Office of Professional Standards. If the hearing is requested, the employee will have the opportunity to have a union representative or another person of the employee's choice present during the hearing.

The pre-disciplinary hearing is an opportunity for the employee to be presented with the charges of misconduct and to provide information to be considered by management as disciplinary procedures are contemplated. It is not a forum for the employee or their representative to engage in cross-examination of management or for management to prove it's case. The hearing is not recorded. Notes are normally taken, but there is no official transcript made of the hearing. It is not a public meeting.

Following the hearing, the Chief of Police or his designee will consider the information available, including the input of the employee from the pre-disciplinary hearing and arrive at a determination. Following the determination of the Chief of Police or his designee, the employee will be advised of his right to appeal the action to the Civil Service Commission within fourteen (14) days after the disciplinary action has taken place.

Officer Wessels is also entitled to request a Chief's Guidance Committee be convened **_prior_** to the pre-disciplinary hearing. Upon receipt of this notification, the officer will have forty-eight (48) hours in which to waive or exercise the right to a Chief's Guidance Committee. If he chooses to have the committee, he

PL.APP.000163

must submit a request through the chain of command and include his selection of one person from anyone within the department to serve on his behalf. The absence of such request shall be considered a waiver of the right to appear before the committee.

The Chief of Police shall select the members of the committee and set the hearing date within seventy- two (72) hours of request. Convening will not be delayed because of any pending civil actions.

The committee shall consist of three members of the department, excluding the commanding officer of the accused, a relative of the accused, any witness or investigator in the case, or a member of the Chief's staff.

The Chief of Police shall select the other two members of the committee, one being the chairperson. The accused will have the right to veto one committee member selected by the Chief, other than the chairperson. The accused will be allowed one veto during this process. The Chief will then select a replacement for the vacant committee position. The accused will receive notification of the Chief's initial selections and subsequent replacement. The accused will also be notified of when the committee will convene.

The third committee member shall be selected by the accused from anyone within the department. The accused will have the right to veto the committee members selected by the Chief, other than the chairperson. The accused will be allowed on veto during this process. The Chief of Police will then select the a replacement for the vacant committee position.

Please advise me no later than 15 August 2005, whether or not Officer Wessels wishes to participate in a pre-disciplinary hearing and requests a Chief's Guidance Committee be convened before that hearing.


Craig L. Zubrod

Cc:     William McCarthy
        Chief of Police

PL.APP.000164

# CITY OF DES MOINES, IOWA
### Office of
## PATROL SERVICES BUREAU

**TO:**   M. Michael Shay
Captain, Commanding
Community Outreach and Protective Services Section

**DATE:**   11 August 2005

**FROM:**   Dale P. Patch
Major, Commanding
Patrol Services Bureau

**SUBJECT:**   Officer Greg Wessels
Pre-disciplinary Hearing

Please ensure that the attached memorandum, pertaining to Officer Greg Wessels' opportunity to participate in a pre-disciplinary hearing and/or a Chief's Guidance Committee, is forwarded to him.

Officer Wessels needs to respond, by memorandum, through his chain of command, if he wishes to participate in the aforementioned proceedings. Upon his receipt of this memorandum, he will have 48 hours in which to waive or exercise his right to a Chief's Guidance Committee.

Given the restricted time frame involved, please ensure that I receive Officer Wessels decision NLT 15 August 2005. Thank you for you assistance.

Dale P. Patch

PL.APP.000165

_Y. Wessels_

# CITY OF DES MOINES, IOWA
### Office of
# PATROL SERVICES BUREAU

**TO**   Bill McCarthy
Chief of Police

**DATE**   19 August 2005

**FROM**   Dale P. Patch, Major
Commanding, Patrol Services Bureau

**SUBJECT**   Senior Police Officer
Gregg Wessels
Two Day Suspension


Senior Police Officer Gregg Wessels has identified the dates of 22-23 August 2005 for his two-day suspension.

Anne Miller has been notified of these dates and has advised it is not a problem, even though it is short notice.

_Dale P. Patch_
Dale P. Patch


CF   Anne Miller, Administrative Assistant
Office, Chief of Police
Scott Baker, Police Officer
Patrol Support Unit, Community Outreach and Protective Services Bureau
Bureau Timekeeper

_noted
Bill McCarthy
8-23-05_

PL.APP.000166

\mkg

# CITY OF DES MOINES
### OFFICE OF
## TRAFFIC UNIT

**TO:** Michael Shay
Captain, Headquarters
Uniform Division

**DATE:** 19 August 2005

**FROM:** Gregg R. Wessels
Traffic Unit

**SUBJECT:** Discipline

I am requesting that the dates of 22 and 23 August 2005 be set as the dates for my discipline.

Gregg R. Wessels

1

PL.APP.000167

# CITY OF DES MOINES, IOWA
### Office of
### PATROL SERVICES BUREAU

**TO:**    Bill McCarthy
Chief of Police

**DATE:**    12 August 2005

**FROM:**    Dale P. Patch
Major, Commander
Patrol Services Bureau

**SUBJECT:**    Officer Greg Wessels -
Recommendation of
Discipline

On 12 August 2005, Officer Greg Wessels received your memorandum regarding a recommendation of a two-day suspension for his violation of work rules.

Officers Wessels has prepared a memorandum indicating that he does not wish to participate in a pre-disciplinary hearing or utilize the Chief's Guidance Committee.

_Dale P. Patch_
Dale P. Patch

*Ann*
*Pls call Mjr Patch*
*& ret the date*
*Bill McCarthy*
*8-15-05*

PL.APP.000168

# CITY OF DES MOINES, IOWA
Office of
# PATROL SERVICES BUREAU

**TO**    David Lillard, Major
Acting Chief of Police

**DATE**    22 January 2009

**FROM**    Richard Singleton, Major
Commanding, Patrol Services Bureau

**SUBJECT**    Senior Police Officer
Gregg Wessels –
Three Day Suspension
Re: Administrative Review
Control No. 08-12-002

Attached please find a memorandum from Lieutenant Raymond Rexroat, Assistant Second Watch Commander, indicating Officer Gregg Wessels will serve his suspension dates as follow.

    a.  01 February 2009 – 10 hours "W"

    b.  02 February 2009 – 10 hours "W"

    c.  03 February 2009 – 4 hours "W"

Officer Wessels has elected to use six (6) hours "C" time on Tuesday, 03 February 2009.

_____
Richard Singleton

CF  Anne Miller, Administrative Assistant
    Office, Chief of Police
    Lisa Baagoe, Bureau Timekeeper

mkg

PL.APP.000169

# CITY OF DES MOINES, IOWA

### Office of

## Patrol Services Bureau

TO:    Richard Singleton         DATE:    22 January 2009
Major, Commanding
Patrol Services Bureau

FROM:    Raymond Rexroat     SUBJECT:    SPO Gregg Wessels
Lieutenant                           Suspension Dates
Second Watch Patrol Section

In response to your memorandum, dated 21 January 2009, SPO Gregg Wessels has identified the following dates to serve 24 hours of unpaid suspension.

01 February 2009 "W"10   02 February 2009 "W"10   03 February 2009 "W"4 "C"6.

These dates are being forwarded as per the instructions contained in your memorandum.

Raymond Rexroat

PL.APP.000170

| | | | |
|---|---|---|---|
| **TO** | David Lillard, Major<br>Acting Chief of Police | **DATE** | 22 January 2009 |
| **FROM** | Richard Singleton, Major<br>Commanding, Patrol Services Bureau | **SUBJECT** | Senior Police Officer<br>Gregg Wessels –<br>Three Day Suspension<br>Re:  Administrative Review<br>Control No. 08-12-002 |

Attached please find a memorandum from Lieutenant Raymond Rexroat, Assistant Second Watch Commander, indicating Officer Gregg Wessels will serve his suspension dates as follow.

    a.  01 February 2009 – 10 hours "W"

    b.  02 February 2009 – 10 hours "W"

    c.  03 February 2009 – 4 hours "W"

Officer Wessels has elected to use six (6) hours "C" time on Tuesday, 03 February 2009.


Richard Singleton

CF   Anne Miller, Administrative Assistant
      Office, Chief of Police
      Lisa Baagoe, Bureau Timekeeper

mkg

PL.APP.000171

# CITY OF DES MOINES, IOWA
## Office of
## Patrol Services Bureau

TO: Richard Singleton
Major, Commanding
Patrol Services Bureau

DATE: 22 January 2009

FROM: Raymond Rexroat
Lieutenant
Second Watch Patrol Section

SUBJECT: SPO Gregg Wessels
Suspension Dates

In response to your memorandum, dated 21 January 2009, SPO Gregg Wessels has identified the following dates to serve 24 hours of unpaid suspension.

01 February 2009 "W"10  02 February 2009 "W"10  03 February 2009 "W"4 "C"6.

These dates are being forwarded as per the instructions contained in your memorandum.

Raymond Rexroat

PL.APP.000172

# CITY OF DES MOINES
## OFFICE OF
# INSPECTIONAL SERVICES BUREAU

To: Richard Singleton
Major, Commanding
Patrol Services Bureau

DATE: January 20, 2009

FROM: David Lillard
Major, Commanding
Inspectional Services Bureau

SUBJECT: Administrative Review 08-12-002
SPO Gregg Wessels

RE: **Policy Violations**

1) *Departmental General Order 04-01, Personnel and Administrative Rules; Chapter 1, Personnel Conduct, a. Standard of Conduct*

2) *Departmental General order 04-01, Personnel and Administrative Rules; Chapter 1, Personnel Conduct, c. Respect Between Ranks*

3) *Departmental General order 04-01, Personnel and Administrative Rules; Chapter 2, General Conduct on Duty, b. Required Duty*

4) *Departmental General Order 04-01, Personnel and Administrative Rules; Chapter 2, General Conduct on Duty, c. Maintenance of Communications On Duty*

In accordance with Department Rule 1.2.2, paragraph f., Item 1, Disposition of Personnel Complaints, the classification of this investigation as approved by the Chief of Police is reflected as indicated in the "disposition applicable table."

**A copy of this document should be forwarded to the employee concerned.**

## Disposition Applicable Table

1. Unfounded

2. Exonerated

3. Non-sustained

(X) 4. Sustained          Policy Violations

As outlined in the attached memorandum, the Chief of Police concurs with the Bureau Commander's recommendation of a three day suspension and the removal of SPO Wessels from the MetroSTAR Team Response pool.

Please forward the proper written documentation to this office upon completion.

_David Lillard_
David Lillard

Attachment

cc: SPO Gregg Wessels

PL.APP.000173

**TO:** Richard Singleton
Major, Commanding
Patrol Services Bureau

**DATE:** 19 January 2009

**FROM:** David Lillard
Major, Commanding
Inspectional Services Bureau

**SUBJECT:** Administrative Review
08-12-002
SPO Gregg Wessels

Chief Bradshaw received your findings and recommendation as it pertains to Administrative Review 08-12-002. Your findings indicated Senior Police Officer Gregg Wessels violated 4 sections of the Department General Order 04-01. You forwarded a recommendation for a three day suspension, transfer from Metro STAR to the Patrol Section and removal from the Metro STAR Team Response Pool.

Officer Wessels was notified of the recommendation and offered an opportunity to participate in a Chief's Guidance Committee. At his request a committee convened on 13 January 2009 to review the findings contained within the Administrative Review.

The Committee presented their findings to Chief Bradshaw for review. The Committee found Officers Wessels was in violation of General Orders 04-01 as stated in your memorandum and concurred with the recommendation for a three day suspension. In addition the Committee recommended Officer Wessels should be required to attend an anger management class. The Committee however made the recommendation to leave Officer Wessels as a member of the Metro STAR Team Response Pool.

After careful consideration of your findings and recommendation and those of the Chief's Guidance Committee Chief Bradshaw concluded the violations of general Order 04-01 occurred as indicated. Chief Bradshaw has concurred with the recommendation for a three day suspension, transfer from the Metro STAR Unit to the Patrol Section and the removal from the Metro STAR Team Response Pool.

Officer Wessels has voluntarily transferred from the Metro STAR Unit to Second Watch Patrol. No further action will be needed in that regard. Please identify the dates the suspension will be served and proceed with the order removing Officer Wessels from his assignment in the Metro STAR Response Pool.

David Lillard
Acting Chief of Police

CC:
Senior Police Officer Gregg Wessels

PL.APP.000174

# CITY OF DES MOINES, IOWA
## Office of
## OPERATIONS DIVISION

**TO:** Dana Wingert
Major, Commanding
Operations Division

**DATE:** 3 February 2014

**FROM:** David Ness
Acting Captain
3rd Watch, Patrol Section

**SUBJECT:** Suspension Dates
Sgt. Greg Wessels
Admin Review 13-12-003

Sergeant Gregg Wessels will serve his two (2) suspension days on 22, 23 Feb 2014. He will use Compensatory time for the remaining four (4) hours on the second day.

Sgt. Wessels displayed a pleasant demeanor and a desire to move beyond this incident.

*D.D. Ness*

PL.APP.000175

# CITY OF DES MOINES, IOWA
### Office of
## OPERATONS DIVISION

**TO**    David Ness, Acting Captain/David Seybert, Lieutenant Commanding Third Watch, Patrol Section, Patrol Services Bureau, Operations Division

**DATE**    31 January 2014

**FROM**    Dana Wingert
Major, Commanding
Operations Division

**SUBJECT**    Sergeant Gregg Wessels –
Two-Day Suspension
Re: Administrative Review
13-12-003

Attached please find a memorandum from Captain Todd Dykstra, Executive Officer, Office of Chief of Police, indicating Chief Bradshaw has reviewed this investigation and has determined that Sergeant Gregg Wessels is to serve a two-day (16 hour) suspension for violating departmental policy regarding discharge of firearms, as outlined in Captain Dykstra's memorandum.

Also attached is Chief Bradshaw's memorandum detailing her findings of this Administrative Review, to include the findings of the Firearms Review Committee.

Please indicate the dates that Sergeant Wessels will serve the two-day (16 hour) suspension, within the next 30 days, and forward to this office, allowing sufficient time for processing of departmental paperwork.

Please note that a two-day suspension is for 16 hours. On Sergeant Wessels' second day, he may choose to work four (4) hours or be carried off on any time he designates.

If you need him to report to work, then state this as well. This is at your discretion.

_____
Dana Wingert

mkg

PL.APP.000176

# CITY OF DES MOINES
## OFFICE OF
### CHIEF OF POLICE



To: Dana Wingert
Major, Commanding
Operations Division

DATE: January 30, 2014

FROM: Todd Dykstra
Captain, Executive Officer

SUBJECT: Administrative Review 13-12-003
Sergeant Gregg Wessels

RE:   Policy Violation

In accordance with Department Rule 1.2.2, paragraph f., Item 1, Disposition of Personnel Complaints, the classification of this investigation as approved by the Chief of Police is reflected as indicated in the "disposition applicable table."

### Disposition Applicable Table

1. Unfounded

2. Exonerated

3. Non-sustained

**X   4.   Sustained**        The act complained of occurred and was inappropriate

As outlined in the attached memorandum, the Chief of Police concurs with the Division Commander's findings of **sustained**; Sergeant Gregg Wessels is to serve a **two (2) day suspension (16 hours)** for violating the following policy:

*1) Des Moines Police Department Personnel and Administrative Rules, Chapter 6, Firearms, n. Discharge of Firearms – Not Permitted*

   *1. For the purpose of warning.*
   *2. At moving vehicles except in self-defense, the defense of another police officer, or a third party.*
   *3. In cases where a warrant is on file, the identity is known to the employee and such escape would not be an immediate danger to innocent persons or the employee.*

Please forward proper documentation to this office when completed. Sergeant Wessels has the right to appeal this action to the Civil Service Commission within 14 days after the disciplinary action has taken place.

_____
Todd Dykstra

Attachment

cc:   Sgt. Gregg Wessels

PL.APP.000177

# CITY OF DES MOINES
## OFFICE OF
# CHIEF OF POLICE

**TO:**    Gregg Wessels  
Sergeant  
Operations Division

**DATE:**    30 January 2014

**FROM**    Judy A. Bradshaw  
Chief of Police

**SUBJECT**    Administrative Review  
13-12-003

I have completed my examination of the information contained in Firearms Review Committee Findings and I have reviewed the findings and recommendations from your commanding officer.

The Firearms Review Committee reviewed the incident involving the firing of your weapon and found that it was not done in accordance with Des Moines Police Department Personnel and Administrative Rules, Chapter 6, Subparagraph n: Discharge of Firearms – Not Permitted.

Likewise, your commanding officer stated that discharging a firearm is one of the most dangerous actions an officer can take and shooting the tires of a fleeing vehicle is not an acceptable practice. He noted the risk of ricochet or the possibility of striking an unintended target presents a danger that is far too great to consider this as a reasonable tactic.

I realize that this individual was considered dangerous and was wanted on an earlier assault. You were trying to prevent him from eluding you and other officers. Although I understand your desire to prevent him from escaping, our rules for discharging a firearm simply does not allow officers to fire at a vehicle in order to secure an apprehension.

I support your commanding officer's recommendation for the violation of Personnel and Administrative Rules and you will receive a two-day (16- hour) suspension.

You have the right to appeal my decision within 14 days to the Des Moines Civil Service Commission.

*Judy A Bradshaw*

Judy A. Bradshaw

PL.APP.000178



**TO:** Dana Wingert
Major, Commanding
Operations Division

**DATE:** 14 January 2014

**FROM:** Todd Dykstra
Captain, Executive Officer

**SUBJECT:** Pre-disciplinary Procedures
Administrative Review 13-12-003
Sergeant Gregg Wessels

The Office of Professional Standards obtained information concerning this administrative review which concerns the discharge of a firearm and the associated shooting review.

The Chief of Police is in receipt of a recommendation from the Division Commander that this Administrative Review be classified as **sustained** and Sergeant Gregg Wessels serve a **two (2) day suspension (16 hours)** for violating the following department policy:

## 1) *Des Moines Police Department Personnel and Administrative Rules, Chapter 6, Firearms, n. Discharge of Firearms – Not Permitted*

1. *For the purpose of warning.*
2. *At moving vehicles except in self-defense, the defense of another police officer, or a third party.*
3. *In cases where a warrant is on file, the identity is known to the employee and such escape would not be an immediate danger to innocent persons or the employee.*

Chief Bradshaw is offering Sergeant Wessels the opportunity to participate in pre-disciplinary procedures as excerpted below from Departmental General Order 04-1, Personnel and Administrative Rules.

Subject: Pre-disciplinary Procedures

### Sworn Personnel

A sworn employee subject to a recommendation for disciplinary action involving an unpaid suspension, demotion or termination will be afforded the opportunity to request a Chief's Guidance Committee be convened if the individual so desires. Upon notification of the disciplinary recommendation, the accused shall have forty-eight (48) hours in which to waive or exercise the right to a Chief's Guidance Committee. If the accused chooses a Chief's Guidance Committee, the accused shall have the choice of one member from anyone within the department to represent them on the committee. The request for the committee and representative shall be made through the chain of command.

The committee shall consist of three members of the department excluding the commanding officer of the accused, a relative of the accused, any witness or investigator in the case, or a member of the Chief's staff.

The Chief of Police shall select the other two members of the committee, one being the chairperson. The accused will have the right to veto one committee member selected by the Chief, other than the chairperson. The accused will be allowed one

PL.APP.000179

veto during this process. The Chief will then select a replacement for the vacant committee position. The accused will receive notification of the Chief's initial selections and subsequent replacement. The accused will also be notified of when the committee will convene.

Whether or not a Chief's Guidance Committee is convened, the employee will be afforded the opportunity to participate in a pre-disciplinary hearing conducted by the Chief of Police or her designee. This hearing will occur after completion of the Guidance Committee process, if one is requested. A hearing notice will be sent to the employee and the appropriate union official. The notice will state the date of the improper conduct, a general statement of the conduct alleged and the date and location of the hearing. The employee may have a union representative or another person of the employee's choice at the hearing.

The pre-disciplinary hearing is an opportunity for the employee to be presented with the charges of misconduct and to provide information to be considered by management as disciplinary procedures are contemplated. It is not a forum for the employee or their representative to engage in cross-examination of management or for management to prove its case. The hearing is not recorded.

Notes are normally taken but there is no official transcript made of the hearing. It is not a public meeting.

Following the hearing, the Chief of Police or her designee will consider the information available, including the input of the employee from the pre-disciplinary hearing and arrive at a determination. Following the determination of the Chief of Police or her designee, the employee will be advised of his or her right to appeal the action to the Civil Service Commission within 14 days after the disciplinary action has been taken place.

If a Chief's Guidance Committee is requested, the officer will be notified of the date and time. A **mandatory pre-disciplinary hearing** will be scheduled for Sgt. Wessels and he will be notified of the date and time.

Please have Sgt. Wessels submit, in writing, his intention to exercise or waive his right to a Chief's Guidance Committee. If he chooses to exercise his right to a Chief's Guidance Committee, his selection should be included in his memorandum.

Please notify me of Sgt. Wessels' intentions by 5:00 pm, Monday, January 20, 2014.

Todd Dykstra

cc: Chief Bradshaw

PL.APP.000180

# CITY OF DES MOINES

OFFICE OF

## CHIEF OF POLICE



**TO:** Judy Bradshaw
Chief of Police

**DATE:** 6 January 2014

**FROM:** Todd Dykstra
Captain, Executive Officer

**SUBJECT:** Administrative Review 13-12-003
Sergeant Gregg Wessels

### RE: Policy Violation

The Office of Professional Standards obtained information concerning this administrative review which concerns the discharge of a firearm. This information represents the investigative product and the associated shooting review.

Operations Division Commander Major Dana Wingert has reviewed this information and recommends the following disposition for your consideration:

Unfounded

Exonerated

Non-Sustained

**X    Sustained**        The acts complained of occurred and were inappropriate.

Major Dana Wingert recommends a finding of **sustained** and a **two (2) day suspension (16 hours)** for Sergeant Gregg Wessels for violating the following department policy:

1) ***Des Moines Police Department Personnel and Administrative Rules, Chapter 6, Firearms, n. Discharge of Firearms – Not Permitted***

   1. *For the purpose of warning.*
   2. *At moving vehicles except in self-defense, the defense of another police officer, or a third party.*
   3. *In cases where a warrant is on file, the identity is known to the employee and such escape would not be an immediate danger to innocent persons or the employee.*

*AM.*
*Please Notify Sgt. Wessels A Re-D.*
*As To His Right To*
*(Grievance)*
*13 JAN 14*

_____
Todd Dykstra

PL.APP.000181

# CITY OF DES MOINES, IOWA
## Office of
## Operations Division

TO:    Judy A. Bradshaw
        Chief of Police

DATE:    30 December 2013

FROM:  Dana Wingert
         Major, Commanding
         Operations Division

SUBJECT:   Discharge of Firearm-
               Case No. 13-34525
               Sergeant Gregg Wessels

The case material pertaining to Case No. 13-34525, in which Sergeant Gregg Wessels discharged his firearm at a tire of a fleeing vehicle, has been reviewed. A Firearms Review Committee was also convened to review the circumstances and determine if the discharge conforms to department policy.

Sergeant Wessels was assisting on a vehicle stop involving Brian Huckfeldt, who was wanted for charges stemming from a violent domestic the day prior. As Sergeant Wessels and Senior Police Officer Darrin Miller approached the minivan, Mr. Huckfeldt quickly accelerated, causing the tires to spin on grass as he attempted to flee in the vehicle.

During his formal statement, Sergeant Wessels stated that it was his intention to shoot the front passenger-side tire, thus incapacitating the vehicle and possibly preventing a prolonged vehicle pursuit. As the vehicle accelerated away, Sergeant Wessels was near the rear passenger-side tire and fired one round into the tire from a distance of less than a foot.

Mr. Huckfeldt was able to flee for a short distance, and after a few blocks, the vehicle lost control and he continued his flight on foot. A short time later, Mr. Huckfeldt was taken into custody by other officers who had responded to assist.

Sergeant Wessels stated that his decision to shoot the tire on the fleeing vehicle was done to prevent a high speed pursuit. However, his actions are not in compliance with department policy as it pertains to the discharge of firearms, nor is this considered an approved method of preventing a chase.

**Personnel and Administrative Rules, Chapter 6; Subparagraph n: "Discharge of Firearms- Not Permitted".**

1. *For the purpose of warning.*
2. *At moving vehicles except in self-defense, the defense of another police officer, or a third party.*
3. *In cases where a warrant is on file, the identity is known to the employee and such escape would not be an immediate danger to innocent persons or the employee.*

Cont.

PL.APP.000182

Discharging a firearm is arguably one of the most dangerous actions an officer can take, and therefore, it cannot be taken lightly. Our training, procedures and policies are such that the restrictions in place are designed to limit the inherent dangers and liability.

Shooting the tires of a fleeing vehicle, regardless of the distance, is not an acceptable practice. It goes without saying that the risk of ricochet or missing and striking an unintended target presents a danger that is far too great to consider this as a reasonable tactic.

I recommend that Sergeant Gregg Wessels receive **a two (2) day suspension** for the listed violation.

Forwarded for your information.

_____
Dana Wingert

PL.APP.000183

# CITY OF DES MOINES
OFFICE OF
# PROFESSIONAL STANDARDS

**TO:** William Moulder
Chief of Police

**DATE:** 24 May 2002

**FROM:** Lieutenant Tom Trimble
Chief's Guidance Committee

**SUBJECT:** Guidance Committee
Findings
SPO Gregg Wessels

As instructed by your office, the Chief's Guidance Committee met at 0800 hours, 24 May 2002 to hear witnesses and consider evidence in the matter of actions taken by SPO Gregg Wessels at Veteran's Memorial Auditorium on 14 March 2002 and 15 March 2002.

As a result of these incidents, violations of department policy and procedure were identified in a memo dated 27 March 2002 by Acting Lieutenant Robert Clock.

Those violations being:

Des Moines Police Department Rules and Regulations, Departmental General Order 86-1, Personnel Rules, Section 1.1.1, Personnel Conduct, paragraph e, page One-1 Obedience to orders of Supervisors and Section 1.1.2, General Conduct on Duty, paragraph c, page One-6, Required Duty.

## Findings
The committee finds that SPO Gregg Wessels violated the Personnel Rules and Regulations as listed above by failing to leave the auditorium when first directed by Captain Zubrod and again when observed at another location in the auditorium and given a direct order to leave at that time.

Spo Gregg Wessels has acknowledged to his commanders and to the Guidance Committee that he exercised poor judgment. From our observations it appears that the process has left a positive impact regarding his acceptance of his responsibilities.

## Recommendations
The Guidance Committee recommends the suspension of SPO Gregg Wessels remain at two (2) days.

_A/Chief Mc. Carthy Guidance Committee confirms the original decision P/S select days for suspension. William N. Moulder 24 May 02_

PL.APP.000184

# CITY OF DES MOINES
OFFICE OF
## PROFESSIONAL STANDARDS

**TO:** Bill McCarthy
Assistant Chief, Commanding
Patrol Services Division

**DATE:** 30 April 2002

**FROM:** Douglas Harvey
Sergeant
Office of Professional Standards

**SUBJECT:** Chief's Guidance
Committee
Officer Greg Wessels

On 24 May 2002, a Chief's Guidance Committee reviewed the actions of Officer Greg Wessels, pertaining to an incident at Veteran's Memorial Auditorium. The committee collectively concurred with the previous action, a two-day suspension.

Chief of Police William Moulder has asked you to identify the days that the suspension will be administered. If you have any questions, please contact the Office of Professional Standards.

Douglas Harvey

PL.APP.000185

The recommendation is based upon the review of memorandums generated in this Adminstrative Review, as well as the interviews with Captain Craig Zubrod, Sergeant Jack Beardsley, and SPO Gregg Wessels.

A suspension for an incident such as this could have been more severe. However, based upon his past performance and truthfulness during this process, we believe that a two (2) day suspension will ensure a change in his behavior as well as prevent an incident like this from reoccurring in the future.

LT Tom Tiemble

SPO Dennis O'Donnell

David K. Viggoes

Lou Fields

Shawn M Burns

PL.APP.000186

| | | | |
|---|---|---|---|
| **TO** | Bill McCarthy<br>Assistant Chief, Commanding<br>Patrol Services Division | **DATE** | 25 April 2002 |
| **FROM** | William H. Moulder<br>Chief of Police | **SUBJECT:** | SPO Gregg Wessels<br>Administrative Sanction |

It is clear from this file that SPO Wessels used his authority as a police officer to enter Veteran's Auditorium during a basketball game without an admission ticket while on duty. Both of those actions are significant violations of department rules and regulations.

When Officer Wessels was confronted by Captain Craig Zubrod, supervisor in charge of the security at this event, he was repeatedly insubordinate in that he did not leave as he was directed to do. This, again, is a serious violation.

The following day, 15 March 2002, Officer Wessels chose to come back and act in a manner that was disrespectful to Captain Zubrod and Sgt. Bruce Elrod, also a superior officer who was present at the Auditorium and participating in security at that location. This is a fourth serious violation of department rules and regulations. It is recognized that the officer was off duty and in possession of an admission ticket at this point.

It is quite obvious that Officer Wessels' actions were not just a mistake. It is somewhat gratifying that in the officer's memorandum of 25 March 2001 he begins to recognize how serious a violation this is and begins taking ownership of that violation. However, in that memorandum the officer takes less than full ownership, pointing out that it was not his intent to use his position to get something for free when that is exactly what he had done.

The officer was interviewed in the sergeant promotional process by all three assistant chiefs and myself on 2 April 2002. At the conclusion of the interview, he took the initiative to raise this matter and accept ownership for his misconduct. He made no excuses, and he acknowledged that his conduct was intolerable. He did hedge with the comment that he had a personality conflict with Captain Zubrod, but also acknowledged that this was not an excuse for his conduct. His initiative to mitigate what had happened at that point augured for us to leave him in the process for consideration as a future sergeant. Had he not been forthcoming and readily accepting his responsibility, I would have moved to have him decertified from the list at the conclusion of a founded investigation. His initiative and candor are commendable, but nonetheless, we are still dealing with a serious breach of conduct.

The point of any disciplinary action is to mark inappropriate conduct and to change behavior. Sgt. Dana Wingert, his immediate supervisor, has recognized the need for behavior change and made the excellent recommendation that Officer Wessels and Captain Zubrod have a meeting that would clear the air between these two officers. Not only is that to address the tension between the two of

PL.APP.000187

them, but to also recognize, in Sgt. Wingert's words, that "both have a long-term stake in the overall success of our organization, and both undoubtedly have the ability to affect the personality of our department in the future."

I note in your communication of 19 April 2002 that Officer Wessels has made a personal apology to Captain Zubrod, which Captain Zubrod deemed sincere.

Officer Wessels benefits from having a very good reputation as a police officer and an informal leader in the organization. This is recognized by all of the personnel in his chain of command.

Taking into consideration the personal apology that has been extended to Captain Zubrod, the ownership of responsibility that Officer Wessels demonstrated on 2 April 2002, the officer's exemplary record as a police officer and an informal leader, and, as noted in Captain Judy Bradshaw's, commander of the Special Operations Section, memorandum of 11 April 2002 stating that Officer Wessels has been removed from the role of sergeant understudy, I will support the recommendation of a two-day suspension.

No action to seek decertification from the sergeant's promotional list will be taken at this point. If Officer Wessels comes under consideration for a vacant sergeant position, a decision to promote or decertify will be made based on his conduct and performance.

William H. Moulder

ak

PL.APP.000188

**TO**    Judy A. Bradshaw, Captain
        Commanding, Special Operations Section

**DATE**    26 April 2002

**FROM**    Bill McCarthy
        Assistant Chief Commanding
        Patrol Services Division

**SUBJECT**    Senior Police Officer
        Gregg Wessels –
        Administrative Sanction

Please provide me the dates SPO Wessels will serve the suspension. Those dates should be at the convenience of the unit's scheduling and, at least, a week in advance to allow for processing.

Bill McCarthy
Bill McCarthy

FILE COPY

mkg

PL.APP.000189

| | | | |
|---|---|---|---|
| **TO** | William H. Moulder<br>Chief of Police | **DATE** | 19 April 2002 |
| **FROM** | Bill McCarthy<br>Assistant Chief, Commanding<br>Patrol Services Division | **SUBJECT** | Senior Police Officer<br>Gregg Wessels |

I agree with the assessment of fact as provided by Acting Lieutenant Clock and Captain Bradshaw and find that there is very little else to add.

I am further impressed that Senior Police Officer Wessels made a personal apology to Captain Zubrod, which the Captain deemed as sincere.

I concur with Captain Bradshaw's recommendation, but personally believe that, given the totality of both events, a two (2) day suspension is appropriate.

*Bill McCarthy*
Bill McCarthy

mkg

PL.APP.000190

# CITY OF DES MOINES
OFFICE OF
# UNIFORM PATROL DIVISION

TO:    Bill McCarthy
Assistant Chief, Commanding
Patrol Division

FROM:    Judy A. Bradshaw
Captain, Commanding
Special Operations Section

DATE:    **11 April 2002**

SUBJECT:    Senior Police Officer
Gregg Wessels

The attached documents pertain to two separate, verbal exchanges that occurred between Captain Zubrod and Officer Greg Wessels.

In the first instance, Captain Zubrod, who was working off-duty at Vets Auditorium, approached Officer Wessels to inquire whether he had purchased a ticket for the event.

Officer Wessels was standing at one of the corners near the basketball court. He was in uniform and on duty at the time. Captain Zubrod observed him and informed Officer Wessels that the administration for Vets Auditorium did not want officers, who had not paid to get in, allowed inside the building at any event. He advised Officer Wessels to leave the building, before the staff saw him, or purchase a ticket.

Approximately an hour later, Captain Zubrod became aware that Officer Wessels was still in the building. He approached him and told him to leave or he would be written up, and Officer Wessels made the remark, "go ahead and write me up". Captain Zubrod ordered him to leave the building and observed him walking towards the door. He learned later, by Officer Wessels, that he had not left, but walked up to the balcony and finished watching the game.

The next day, Captain Zubrod became aware that Officer Wessels was standing in the corner of the basketball court.

On this date, although he was off-duty and in uniform, he had just finished his tour and was intending on working an off-duty job after the basketball game.

Captain Zubrod and Sgt. Elrod approached him and asked to see his admission ticket. Officer Wessels advised them he did not have to show the ticket, and told them he was there off duty.

The conversation escalated with Sgt. Elrod advising Officer Wessels he was "a smart ass" and threatened to arrest him while in uniform. Officer Wessels told Sgt. Elrod that he had "better back off". Eventually, Officer Wessels produced the ticket, and was advised by Captain Zubrod to sit in the assigned seat if he was going to remain at the game. Officer Wessels complied with that order.

PL.APP.000191

Several weeks have passed since this incident occurred.

In the interim, Officer Wessels has met with Assistant Chief McCarthy and admitted that his behavior was inappropriate. Officer Wessels is currently on a Civil Service Sergeant's List. During his recent interview with Chief Moulder and his staff, he brought up the incident, volunteered that he was wrong and offered that he should not have lost his temper.

In Officer Wessel's written response to this inquiry, he states there is "no excuse" for his behavior, and takes full responsibility for the events that transpired on both occasions. On 10 April 2002, Captain Zubrod advised me that Officer Wessels came into his office and offered his apologies for his behavior at Vets Auditorium. Captain Zubrod stated that he felt the apology was sincere and they ended their conversation with a handshake and a desire to put the incident behind them.

On both occasions, Officer Wessels was at Vets Auditorium to watch his home team play in the basketball tournament. I understand that he had family, including his children, wife, and father present at the game. It is unknown if they witnessed the exchange, although he has indicated he is embarrassed in having to explain his actions to his family.

I am dismayed and disappointed at the exchange that occurred between Captain Zubrod, Sgt. Elrod, and Officer Wessels. I cannot understand how their conversation deteriorated to the point of anger and insubordination.

A review of Officer Wessel's personnel file indicates he has not had any other disciplinary or behavioral problems in the past. He has made several efforts to demonstrate he was wrong, and has taken responsibility for his actions.

However, Officer Wessels failed to leave the auditorium as ordered by Captain Zubrod on 14 March 2002. His demeanor towards both supervisors, when approached, was clearly unwarranted and unacceptable.

I support Acting Lieutenant Clock's recommendation for a one-day suspension for Officer Wessel's violation of Departmental Rules and Regulations, "Obedience to orders of Supervisors", and "General Conduct on Duty."

Additionally, Officer Wessels has been removed from the role of Sergeant's Understudy.

Forwarded for your consideration.

Judy A. Bradshaw

PL.APP.000192

# CITY OF DES MOINES, IOWA

### Office of

## PATROL DIVISION

TO:    Judy Bradshaw                DATE:     27 March 02
        Captain, Commanding
        Special Operations

FROM:  R. Clock                SUBJECT:  Senior Police Officer
        Acting Lieutenant                        Gregg Wessels
        Special Response Unit

I have spoken with Senior Police Officer Gregg Wessels and Sergeant Dana Wingert and have reviewed all of the memorandums regarding the incidents that occurred at Veterans Auditorium on the 14 and 15th of March 2002.

I agree with the conclusions made by Sergeant Wingert and concur with the recommendations he has outlined.

For violations of Des Moines Police Department Rules and Regulations, Departmental General Order 86-1, Personnel Rules, Section 1.1.1, Personnel Conduct, paragraph e, page One-1 Obedience to orders of Supervisors and Section 1.1.2, General Conduct on Duty, paragraph c, page One-6, Required Duty. I feel that a one-day suspension for Senior Police Officer Wessels is a reasonable punishment for his exchange with Captain Zubrod, and his failure to abide by his order to leave, and for his lack of judgment to attend a function at the auditorium while on duty.

Punitive action is used to modify or stop unwanted behavior. Gregg Wessels has accepted responsibility for his actions and has admitted that he was wrong, in addition to being forthcoming and honest during this investigative process.

I have researched Gregg Wessels personnel file and cannot find any record of disciplinary action.

Gregg has no history of disciplinary or behavioral problems. This behavior is not a true depiction of Gregg Wessel's personal or professional life. Gregg Wessel knows what he has done is wrong and will not let it happen again. I do not feel it is necessary to club him over the head with a two by four to send him a message. He has received the message. The suspension will send the appropriate message to the balance of the rank and file.

I would feel differently and may well recommend different punitive action if Gregg Wessels was a problem officer. However, this is not the case and I feel the recommendations of one day of suspension and a meeting with Captain Zubrod will send the appropriate message and modify this unwanted behavior.

Robert Clock

PL.APP.000193

# CITY OF DES MOINES, IOWA

### Office of

## Patrol Services Division

TO:     Bob Clock                           DATE:        25 March 2002
          Acting Lieutenant, Commanding
          Special Response Unit

FROM:    Dana Wingert                    SUBJECT:     Senior Police Officer
          Sergeant, Squad One                              Gregg Wessels
          Special Response Unit

This communication summarizes the recent incident involving Captain Craig Zubrod and Senior Police Officer Gregg Wessels, and as requested by Assistant Chief Bill McCarthy, includes a disciplinary recommendation for Gregg's role in this matter.

Captain Zubrod cites several regulatory type violations within his memorandum, all of which I have discussed at length with Gregg. Although these are not to be overlooked, the primary consideration, in my mind, is the conversation between the two, and more importantly, the tone and direction of the dialog.

On 14 March 2002, Captain Zubrod, while working in an off-duty capacity, asked once, and later ordered Gregg to leave Veterans Memorial Auditorium. Intertwined in the encounter were threats to document his conduct, which were met with little response from Gregg. Although he left the immediate area, Gregg did not take the directive seriously and did not leave the building. Upon leaving, Gregg met with me and provided a detailed account of the exchange, consistent with that which is contained in Captain Zubrod's original memo. By his own admission, Gregg was wrong by not leaving the event when initially approached and asked to do so.

Gregg assures me that he did not utilize his "official capacity" to gain access to the event, but rather walked into the building unchallenged to see if his father had made the trip from Palmer to see his hometown team play. His presence there was not pre-planned, whereas staffing would have allowed him to take the necessary time off to attend. Although Gregg was available by radio and/or phone, it was discussed with him that better utilization of his time during the work shift is expected, regardless of past practice of similar nature by other employees.

On 15 March 2002, Gregg again went to Veterans Auditorium to watch his hometown team, Palmer, play in the championship game. Gregg had previously acquired tickets for this game for himself, his wife and two sons, who were also in attendance. Gregg was in uniform at the time, as he had just completed his regular shift, and would be leaving the event prior to the conclusion of the game to work an off-duty job.

Cont.

PL.APP.000194

Prior to Gregg attending this game, we discussed the previous altercation and the animosity that may exist and foster further problems. Gregg again assured me that he had no intentions of causing a conflict, and would attempt to avoid any further contact/conflict with Captain Zubrod.

To avoid provoking another exchange with the officers working the event, Gregg stated that he took a position in the corner rather than attempt to mingle in with a large group of Palmer fans while in full uniform. Gregg mentions that the tone of Captain Zubrod as he approached from behind set the stage for this encounter, which obviously went downhill. As Captain Zubrod checked the validity of Gregg's ticket, Sergeant Bruce Elrod took a less professional approach to the situation. This encounter was described by Gregg as embarrassing, particularly due to the location.

A short time after this encounter, I spoke with Lieutenant David Lillard by phone, and I subsequently called Gregg. Gregg provided the details of exchange, understanding the position of Captain Zubrod to a point, yet unimpressed with Sergeant Elrod's involvement and demeanor.

One characteristic our organization has succeeded in building and maintaining over the years has been a level of respect amongst employees, both on and off duty. This is a critical component of a police department, where outside criticism and invalid perceptions bring added pressure to the daily functions and overall mission of the organization. Through it all, we are able to maintain a viable working relationship and a level of respect and trust in house.

The exchange between Captain Zubrod and Senior Police Officer Wessels fell short of this expectation to say the least, and certainly needs to be addressed to regain our focus. Disciplinary action alone may provide a suitable punishment in regards to the actions of Gregg, but I doubt it will go far in restoring the level of mutual respect necessary to proceed with a viable working relationship between the two. My suggestion, although out of the norm, would be a meeting to "clear the air" between a Police Captain and a highly regarded Senior Police Officer. Both have a long-term stake in the overall success of our organization, and both undoubtedly have the ability to impact the personality of our Department in the future. Rather than let this incident fade away over the long term, we have an opportunity to put it to rest and move forward.

Gregg's actions are truly out of character for someone who is highly regarded by supervisors and peers alike. This incident is particularly damaging in Gregg's case, as he currently sits on a promotional list for Police Sergeant. He is fully aware that this will cause a serious setback in his career enhancement endeavors, an unfortunate product of what he describes as a "bad day".

PL.APP.000195

Gregg and I have dissected and discussed this ordeal at great length, up to and including the things that could have been done differently to diffuse it from the onset. Gregg did not attempt to hide from or alter the facts, nor does he hunker down to fend off the criticism associated with his actions. Gregg admits he was wrong for staying following the order from Captain Zubrod to leave, and certainly could have made more constructive use of his time during his work shift.

As previously mentioned, this entire incident is grossly out of character for Gregg. There has been no previous history of this nature, and in speaking with Gregg, I would not expect a similar occurrence in the future. He is aware of the importance of and adherence to our rank structure, along with it's impact on the workings of our organization. Gregg's open admission to his wrong doing, and the embarrassment of the situation, I believe, will go great lengths in regaining his focus and re-establishing his position as a solid, productive employee. Having said this, the conduct of Gregg needs to be addressed to begin this process.

This incident, as expected, will have a serious impact on Gregg's promotional endeavors. Gregg is acutely aware of this, and although disappointed, takes full responsibility for his actions. This in itself will provide a constant reminder of his actions, as prior to this incident many considered him to be one of the top promotional candidates. Gregg recognizes that it is imperative that a uniformed police supervisor, whether on or off-duty, is regarded as such for the sake of our command structure, and all lawful orders should be followed accordingly. In addition, the work shift is simply that, and Gregg has assured me that this is an isolated incident and better judgment will be exercised in the future.

With this, I recommend that Senior Police Officer Gregg Wessels serve a one-day suspension for his exchange with Captain Zubrod, and failure to abide by his directive when ordered to do so, in addition to appropriate utilization of his on-duty time.

Forwarded for your information.

Dana Wingert

TO:    Dana Wingert
1st Squad
Special Response Unit

DATE:    25 March 2002

FROM:    Gregg R. Wessels
1st Squad Member
Special Response Unit

SUBJECT:    Vets Auditorium

This communication is in response to the events that happened at Vets Auditorium between myself and Captain Zubrod.

In response to the charge of insubordination I can make no excuse for my conduct and have to admit that I was wrong. I realize that the police dept. is a para-military organization and that the following of the rank structure is very important. I spent four years in the Marine Corps and learned there that I have to follow the rank structure no matter what my personal feelings are if the organization is going to run properly.

At no time during the incident did I have the intent of using my position as a police officer to get something for free. I went to Vets to watch my home team play basketball. I did have my radio on and did have my cell phone with me. I realize that I should make better use of my on duty time and in the future this will not happen again. I am not a thief, and had no intentions to stealing anything. I was doing something that has been done by officers for years. I have a very good work ethic and this was just a minor infraction in the use of my time.

There has been some speculation that I went back to Vets on the 15th looking for another confrontation with Capt. Zubrod. The reason I went back to Vets was to watch a basketball game and to see my dad . Even prior to the game I advised Sgt Wingert that I was going to the game. I told him that I was going in uniform because I was getting off work at 1800 hrs and had to be to a off-duty job at 2000 hrs. Sgt. Wingert warned me to avoid Capt. Zubrod because I did not need any further problems. I assured Sgt. Wingert that I did not want any further problems with Capt. Zubrod.

On the 15th I was at the game standing in the corner watching the game. As I was watching the game I heard someone call my name. I turned and saw Capt. Zubrod and Sgt Elrod standing about 20 feet away. I walked over to them and Capt. Zubrod asked if I had a ticket. I told him that I did. He asked if he could

PL.APP.000197

see it and I asked why he was checking my ticket and no one elses. I told him that I was off duty and at the game as a private citizen and that I just wanted to watch the game and be left alone. He again asked for the ticket and I asked why he wanted to see my ticket. This is when Sgt. Elrod stepped in and started yelling at me. Sgt. Elrod threatened to arrest me, called me a asshole, and told me that he would throw me out an he was just the man to do it. I then gave my ticket to Capt. Zubrod. Capt Zubrod told me it was a reserved seat and that I would have to go upstairs.

Capt. Zubrod and Sgt. Elrod have accused me of having my fists clinched as if preparing to fight. They have also accused me of being mentally unstable. These charges are completely ridiculous and demeaning. At no time was I out of control or preparing to fight, nor would I be willing to shoulder the embarrassment this would bring to our department.

As stated earlier I take complete responsibility for my conduct. I take great pride in my reputation and my integrity. My conduct has hurt no one except for myself. I do truly regret the events that took place at Vets. Compounding my mistake is the strain I've placed on my family, and the difficulty my wife and two sons have understanding my actions.

Forwarded for your information and action.



Gregg R. Wessels

PL.APP.000198

# CITY OF DES MOINES, IOWA
**Office of**
## COMMANDER, PATROL SERVICES DIVISION

**TO**      Judy A. Bradshaw, Captain
Commanding Special Operations Section
Robert Clock, Acting Lieutenant
Commanding Special Response Unit,
Special Operations Section

**DATE**    22 March 2002

**FROM**   Bill McCarthy
Assistant Chief, Commanding
Patrol Services Division

**SUBJECT**   Senior Police Officer
Gregg Wessels

For your information and inclusion in the investigative packet pertaining to this matter.

_Bill McCarthy_
Bill McCarthy

mkg

PL.APP.000199

**To:** Douglas B. Nichols                                      **Date:** 21 March 2002
     Assistant Chief, Commanding
     Criminal Investigation Division

**From:** Jack Beardsley                                    **Subject:** Greg Wessels
      Sergeant, Special Assignment Section
      Criminal Investigation Division

The following memorandum is in response to the events that occurred at Veterans
Memorial Auditorium on 14 March 2002 concerning SPO Greg Wessels:

On 14 March 2002, I was working in an off-duty capacity at Vets for the Boys State
Basketball tournament. My morning assignment was to relieve other off-duty officers at
the four corners on the main floor of this facility. Prior to the beginning of a mid-
morning contest, Capt. Zubrod asked me to maintain his assigned northwest corner. SPO
Greg Wessels arrived at this corner shortly after Capt. Zubrods departure. SPO Wessels
was in uniform and I was aware he was not assigned to be working this event. I assumed
that SPO Wessels was not a paying customer and out of courtesy informed him that Capt.
Zubrod would not allow him to be in this facility. SPO Wessels responded that he had
already passed Capt. Zubrod and there didn't seem to be a problem. SPO Wessels and I
spoke for a short time and he informed me that his dad was in the auditorium from their
hometown and he wanted to see him. Within five minutes, Capt. Zubrod returned to this
corner. I then proceeded to the northeast corner leaving SPO Wessels and Capt. Zubrod
at the northwest corner.

Within 5 – 10 minutes SPO Wessels came walking into the northeast corner of the arena
floor and told me that his presence or company was not welcomed down there. I inquired
what took place and he informed me that Capt. Zubrod told him to buy a ticket or leave.
SPO Wessels and I talked for a short time at this corner about how times have changed
and that they no longer allow cops in here like the old days. SPO Wessels asked how
much tickets were to the tournament and I informed him that I believed they were $6.
During this conversation, SPO Wessels asked me if Capt. Zubrod roamed the arena. I
told him that there was a good chance that he would be around. SPO Wessels then
introduced me to his two sons and we spoke for a short time until I proceeded to the
southeast corner of the arena. I then relieved the off-duty officers at the southeast and
then the southwest corners of the arena floor.

I then proceeded back to the northwest corner of the arena to relieve Capt. Zubrod. There
was approximately 3 minutes left in this mid-morning contest. Capt. Zubrod then
informed me that he had to kick SPO Wessels out. Capt. Zubrod then explained how the
administration for the auditorium does not allow a cop to come to an event as a spectator

PL.APP.000200

without paying and that the administration watches everything extremely close with their security camera system. Capt. Zubrod went on to say that it was also a violation of our rules and regulations so he had to kick Wessels out. I then acknowledged that I was aware of what he was saying as Wessels had stopped by the northeast corner. Capt. Zubrod then asked if SPO Wessels is still there and had he been there the entire game. I responded that I thought he had but did not know if he had purchased a ticket or not.

Capt. Zubrod left the northeast corner for a short time and then returned to the northwest corner. Capt. Zubrod then informed me that he gave SPO Wessels a second chance to leave or he would write him up. I understood that SPO Wessels response was something like, "go ahead and write me up". I was told that SPO Wessels refused to leave until Capt. Zubrod clarified that this is an order for him to leave. I later learned that SPO Wessels then went to the balcony sections instead of leaving on that date.

On 15 March 2002, I was assigned to the Box Office and Front Office portion of the auditorium for the evening session. I was not present during any of the events that occurred that evening.

Forwarded for your information.

Sgt. Jack Beardsley

PL.APP.000201

# CITY OF DES MOINES, IOWA
### Office of
## COMMANDER, PATROL SERVICES DIVISION

**TO**    Judy A. Bradshaw, Captain
Commanding, Special Operations Section

**DATE**    21 March 2002

**FROM**    Bill McCarthy
Assistant Chief Commanding
Patrol Services Division

**SUBJECT**    Senior Police Officer
Gregg Wessels

For your information and investigative file.

_Bill McCarthy_
Bill McCarthy

LT-
PLEASE Consider with your Response.
J. Bradshaw
21 March 02

mkg

# CITY OF DES MOINES, IOWA

### Office of

## Third Watch Patrol Section

TO: William McCarthy
Assistant Chief, Commanding
Patrol Services Division

DATE:  18 March 2002

FROM: Craig L. Zubrod
Captain, Commanding
Third Watch Patrol Section

SUBJECT:  Vet's Auditorium
Senior Police Officer
Gregg Wessels

This memorandum is a follow-up to the original memo I sent to you on the 14th of March concerning the actions of Officer Gregg Wessels.

On 15 March 2002, at approximately 1845 hours, a state championship game was being played at Vet's Auditorium. I was working there off-duty and received a call from Sgt. Deb Richardson. She told me Officer Gregg Wessels was standing at the northeast corner of the basketball court in uniform and watching the game. After the events that occurred on the 14th, I decided it would be appropriate to make sure the officer had a ticket to watch the game. I found Sgt. Bruce Elrod and asked him to assist me in talking to Wessels.

We arrived at the corner and observed Officer Wessels standing there watching the game. I called him over to the side, away from the crowd and asked to see his ticket for admission. He said he didn't have to show me his ticket. I said he did and demanded again to see it. He took what appeared to be a ticket from his shirt pocket, waved it briefly in front of my face, commented that he even had it time stamped, then quickly shoved it back into his pocket. I could not see if it was in fact a ticket, so I told him I needed to look at it closer. He said he would not show it to me again, commenting that as a citizen he did not have to show it to me. I told him I could demand to see any citizen's ticket if I felt they did not have one and had entered the building illegally. Sgt. Elrod then shouted at Officer Wessels telling him, "If you want to be treated like a common citizen, then I'll arrest you like a common citizen, smart ass." Wessels told Elrod in response, "You better back off." Officer Wessels had his fists clenched as if he were ready to fight. I asked Wessels what his problem was and demanded to see the ticket again. He then took the ticket back out and gave it to me.

I put my glasses on and walked under a light to better see what the ticket said. It appeared to be a valid ticket for March 15th. It was also for reserved seating, the same as all other tickets for the event. I gave him the ticket back and said it was okay. He turned to walk back to the northeast corner to watch the game.

One of the jobs we perform for Vet's when we work the tournaments is to assist in keeping the corners cleared of individuals standing and blocking the way to the bleachers. This is mandated by the Fire Marshall. We also assist with crowd control. Any officer standing at the corner is working and performs a crucial task. It would not be appropriate for Officer Wessels to continue to stand there just to watch the game. I stopped him from going back to

PL.APP.000203

the corner, telling him his ticket was for reserved seating and he needed to go sit in it. He turned and began heading towards the stairs to the balcony.

I stopped him and said I had another question for him. He turned around and came back to me. I asked him, "The other day when I told you to leave, where did you go?" He pointed at the northeast corner and said, "I went to that corner right there and watched the game." I said, "When I ordered you to leave the building, where did you go?" He said, "I went up to the balcony and finished watching the game." (This confirmed a rumor I had heard that he, in fact, did not leave the building after I had told him to twice, but went up to the balcony and watched the rest of the game.)

I later went to the north drive and saw Unit 2633 parked on the north side of Vets. I checked with the off-duty officers at Vets and no one was driving that vehicle. I don't know if it was being driven by Officer Wessels that night or not. The day before when he came to Vet's, Officer Rahn Bjornson, who was working the north drive, had seen Officer Wessels arrive in a marked car and park on the north drive. Officer Bjornson also said he did not see Officer Wessels leave that day until after the game.

I believe Officer Wessels' mood throughout both of these incidents was one of defiance, agitation and disrespect. He demonstrated total disregard for departmental rules and regulations. He failed to obey supervisors at all times as written in the rules and regulations, failed to show respect between ranks, obey laws and orders, and he used his badge and uniform to gain free admission to a place of amusement. I further suspect he failed to devote his entire time and energies to the duties and responsibilities or his rank, grade and position to which he was assigned when he came in on the 14th during his tour of duty. The fact he admitted to going to the balcony to finish watching the game, after being told twice to leave, demonstrates a blatant and malicious attitude. I am also concerned with his behavior in a public place that could have easily brought discredit to the department and the other officers working at Vet's Auditorium.

I ask this information be forwarded to his commanding officer for further recommendation, or if you feel appropriate, the Office of Professional Standards.

Craig L. Zubrod

PL.APP.000204

# CITY OF DES MOINES, IOWA
### Office of
## COMMANDER, PATROL SERVICES DIVISION

**TO**    Judy A. Bradshaw, Captain
        Commanding, Special Operations Section

**DATE**    20 March 2002

**FROM**    Bill McCarthy
             Assistant Chief Commanding
             Patrol Services Division

**SUBJECT**    Senior Police Officer
                   Gregg Wessels

please add this information to your assessment of this situation.

*Bill McCarthy*
Bill McCarthy

LT. CLOCK –
A/C McCarthy HAS INDICATED THAT THERE
MAY BE Another Communication, In Addition to this one,
From Sgt. BEARDICY on THIS MATTER.

J. BRADSHAW
21 MARCH 02

mkg

PL.APP.000205

| | | | |
|---|---|---|---|
| **TO** | Bill McCarthy<br>Assistant Chief Commanding<br>Patrol Division | **DATE** | 20 March 2002 |
| **FROM** | Jack Morton<br>Assistant Chief, Commanding<br>Administrative Services Division | **SUBJECT** | SPO Greg Wessels |

Please find attached a memo for your information describing a confrontation that occurred on 15 March 2002. The confrontation involved Captain Zubrod, Sergeant Elrod and SPO Greg Wessels.

*Jack Morton*
_____
Jack Morton

clb
attachment

PL.APP.000206

# CITY OF DES MOINES
### OFFICE OF
## ADMINISTRATIVE SERVICES DIVISION

**TO:** H. Jack Morton
Asst. Chief, Commanding
Administrative Services Division

**DATE:** 18 March 2002

**FROM:** Bruce Elrod
Sgt., Public Information Officer
Administrative Services Division

**SUBJECT:** SPO Greg Wessels

This communication is forwarded to detail events that occurred on 15 March 2002 at the Veterans Memorial Auditorium with SPO Greg Wessels.

I had been informed that a problem had occurred with Off. Wessels the day before, 14 March, when he entered the auditorium without a ticket and while on duty to watch a basketball game. Capt. Zubrod advised me that he had an altercation with Wessels and that he had ordered the officer to leave the building. As it was explained to me Off. Wessels was, at that time, not only in violation of Department Rules and Regulations but also violating state law (Theft of Services) by being in the auditorium to watch a show without purchasing a valid ticket.

At approximately 1845 hours on 15 March Capt. Zubrod ask me to accompany him to address a problem because Off. Wessels was back in the building. He was apparently standing in the same corner as he had been the day before again watching the ball game.

We went to the area and I saw Off. Wessels, in uniform, standing in the corner, watching the game. Capt. Zubrod ask him to step back away from the crowd and ask him if he had a ticket to be there. Wessels stated that he did. He also took what may or may not have been a ticket out of his left shirt pocket and flashed it in front of the Captain stating that it was "time stamped and everything." He then put the item directly back into his pocket.

Since neither one of us had an opportunity to see if Wessels indeed had a valid ticket or not the Captain ask him to see it again. Wessels refused to surrender it. Again, the Captain asks him to see the ticket and Wessels stated that he would not show it. He said that he was just there as an ordinary citizen and he didn't have to show the Captain anything.

During this part of the conversation Captain Zubrod remained very calm and kept his voice even and measured. I felt that this, even though very professional, was not having the desired effect in making Wessels comply with direction. I then decided to take the exact opposite tact. I got directly into Officer Wessels face and raised my voice to near yelling and told him " If you want to be treated like a

PL.APP.000209

common citizen I will arrest you like a common citizen. Now give him the ticket, smart ass." Off. Wessels then complied and gave Capt. Zubrod his ticket. Wessels then, without looking at me, stated "you better back off."

Since he was then, and continued to comply with Capt. Zubrods' direction I made no further statements to Officer Wessels and took no actions other than simply being present.

After the Capt. had checked the validity of the ticket he gave it back to Wessels who then started to walk back to the corner he had been standing in. Capt. Zubrod told him he could not watch from there. Since all seating was reserved he would have to sit in the seat he had purchased.

Officer Wessels then turned and started to walk to the stairs when Capt. Zubrod stopped him again for another question. The Captain asked him where he had gone yesterday after he had been told to leave. Wessels responded that he had gone to another corner to watch from there. Captain Zubrod clarified himself by saying he was talking about the second time when he had ordered Wessels to leave the building. Wessels said that he had then gone to the balcony and finished watching the game.

During this confrontation I found Officer Wessels attitude to be beyond insubordinate, it was extremely aggressive and borderline bizarre. He was tightening his jaw and clenching his fists to the point that I felt we would have to fight him at any second.

After the conversation with Wessels was over Capt. Zubrod and myself went to the administration office to discuss the problem and how to handle it. At my suggestion the Capt. called Asst. Chief McCarthy to apprise him of what was going on in case the situation escalated in the near future.

I also ask the Capt.'s permission to contact Lt. Lillard. My thinking in this was that we had an individual in the balcony with several thousand people below him. This individual was acting unstable and he was armed. I wanted to know from Wessels supervisor if anything was going on that we should know about while assessing the problem. I wanted to know if Lt. Lillard had seen this type behavior from Wessels before or if he was having any personal difficulties that would precipitate such unusual actions.

Lt. Lillard told me that he had not see anything unusual before and that he would have Sgt. Wingert call Wessels and maybe that would diffuse the problem.

I then returned to the floor of the auditorium. I could see Officer Wessels in the balcony, setting by himself (he was in a section where no other patrons were seated). A short time later he got up and apparently left the building because I

2

PL.APP.000208

did not see him again. I do not know if Sgt. Wingert convinced him to leave or if he left on his own.

That concluded my contact with Wessels on that date.

This communication is forwarded for information.

Sgt. B. Elrod

PL.APP.000209

# CITY OF DES MOINES, IOWA
### Office of
## COMMANDER, PATROL SERVICES DIVISION

**TO**    Judy A. Bradshaw, Captain
        Commanding, Special Operations Section

**DATE**    14 March 2002

**FROM**    Bill McCarthy
        Assistant Chief Commanding
        Patrol Services Division

**SUBJECT**    Senior Police Officer
                Gregg Wessels

The attached memo from Captain Zubrod is self-explanatory. Please investigate and return to me with your finding and recommendation.

*Bill McCarthy*
Bill McCarthy

LT -
PLEASE INVESTIGATE + RESPOND NLT
26 MARCH 02, with your Recommendations.
J. BRADSHAW
15 MARCH 02

PL.APP.000210

mkg

# CITY OF DES MOINES, IOWA

### Office of

## First Watch Patrol Section

TO:    William McCarthy                     DATE:     14 March 2002
            Assistant Chief, Commanding
            Patrol Services Division

FROM:  Craig L. Zubrod                  SUBJECT:  Vets Auditorium
            Captain, Commanding                       Senior Police Officer
            First Watch Patrol Section                 Gregg Wessels

As you know, I am in charge of all off-duty officers at both Veteran's Auditorium and the Polk County Convention Complex. Occasionally, thankfully not often, administrative staff have come to me to complain about police officers being in the building who are not part of the police staff. These officers are in uniform, are not working for the business at the time, and have not paid admission to come in. In other words, they have used their badge and uniform to enter the event. Staff at both locations are familiar with most of the officers working events, so they generally know an officer isn't working for them. Sometimes they tell the officer themselves to leave or they contact the supervisor working at the time to handle the problem. As I said, thankfully this doesn't occur that often.

On 14 March 2002, at approximately 1030 hours, a basketball game between Pomeroy-Palmer and Boyden-Hull began at Vet's Auditorium. I was working off-duty. I noticed Officer Gregg Wessels come into the building and walk past the entry gate. I shortly thereafter saw him standing at the northwest corner of the basketball court. He was watching the game. He was not wearing a hat, which all other officers working events are required to do, so I knew it would not be long before staff would see him and complain. I had to go to the office to pick up a schedule. Once I got it, I went back to the corner to talk to Wessels. I didn't know if he was off-duty or working, but asked him is he was there on a trip. He said he wasn't, but that he was there to watch his home town play. I told him about the problem of staff seeing officers in the building without paying and not working the event. I told him there is a camera at the west end of the arena and Auditorium staff watch what goes on inside. I told him once they seen him, they would complain and ask if he had bought a ticket. He said he was going to watch his home town play. I told him he better leave so there wouldn't be any problems. He asked me if I wasn't going to let him watch the game. I told him to buy a ticket. He then left. I believed he was either going to buy a ticket or leave the building.

About an hour later, towards the end of the game, Sgt. Beardsley came to relieve me at the corner I was working. He told me Officer Wessels was at the northeast corner of the court watching the game, opposite of the corner I had talked to him. Wessels had mentioned to Beardsley that I had told him to leave. I then went to the northeast corner and talked to Officer Wessels. I told him if he left right then I would not write him up. He said, "Okay, write me up then." I said, "You have to leave now and that's an order." He then left, heading for the north door.

PL.APP.000211

I had Sgt. Deb Richardson check with the box office and all the ushers working the ticket gate at the west entrance to see if an individual in uniform had either bought a ticket at the office or gave them a ticket to enter. None recalled an officer not wearing a hat going by them, but they were all sure no uniformed officer had given them a ticket.

I checked with dispatch and Officer Wessels was shown on the daily time sheets as working from 1000 to 1800 hours, this date. Whether he was on a lunch or coffee break at the time he was at Vet's is not known.

Departmental Rules and Regulations 1.1.1(u) prohibit officers from using their badge, uniform, identification card or official position to solicit special privileges such as free admission to places of amusement. Rules and Regulations also require obedience to orders of supervisors. It seems to me his behavior of simply going to another corner to watch the game after I had told him to leave and his remarks the second time I spoke to him would constitute insubordination. He never indicated to me during any of this incident that he had purchased a ticket.

I ask this information be given to Officer Wessels' commanding officer for a recommendation of further action.

Craig L. Zubrod

PL.APP.000212

| | | | |
|---|---|---|---|
| **TO** | Todd Dykstra<br>Captain, Executive Officer<br>Office of Chief of Police | **DATE** | 06 December 2013 |
| **FROM** | Dana Wingert<br>Major, Commanding<br>Operations Division | **SUBJECT** | Sergeant Gregg Wessels –<br>Written Reprimand<br>Administrative Review<br>13-11-004 |

Attached is the Written Reprimand issued to Sergeant Gregg Wessels for his violation of Department Personnel and Administrative Rules; Chapter 1, Personnel Conduct, Paragraph A - Standard of Conduct and Patrol Services Bureau Standard Operating Procedure, Chapters 4-5 and 4-6.

Dana Wingert

mkg

PL.APP.000213

# CITY OF DES MOINES
### OFFICE OF
# THIRD WATCH PATROL

**TO:**    Dana Wingert           **DATE:**    05 December 2013
Major, Commanding
Operations Division

**FROM:**    Scott Rounds        **SUBJECT:**    Notice of Written
Acting Captain, Commanding               Reprimand; Sergeant
Third Watch Patrol                  Gregg Wessels

Sergeant Gregg Wessels was issued a written reprimand as a result of Administrative Review 13-11-004.

Attached is the written reprimand that was signed by Sergeant Wessels for inclusion to his personnel file.

Scott Rounds

PL.APP.000214

# CITY OF DES MOINES
## OFFICE OF
# THIRD WATCH PATROL

**TO:** Gregg Wessels
Sergeant, Squad Four
Third Watch Patrol

**DATE:** 05 December 2013

**FROM:** Scott Rounds
Acting Captain, Commanding
Third Watch Patrol

**SUBJECT:** Written Reprimand;
Administrative Review
13-11-004

Administrative Review 13-11-004 has been completed. The Chief of Police has determined that you violated the following departmental policies:

Personnel and Administrative Rules, Chapter 1, Personnel Conduct, Paragraph A Standard of Conduct

Patrol Services Bureau Standard Operating Procedure, Chapter 4-5, and 4-6

The Administrative Review will be classified as sustained. As a result of these findings you are to receive a written reprimand.

Scott Rounds

I acknowledge that I have been issued this written reprimand and that it will be placed in my personnel file.

Gregg Wessels

PL.APP.000215

| | | | |
|---|---|---|---|
| **TO** | Scott Rounds, Acting Captain/David Seybert, Lieutenant Commanding Third Watch, Patrol Section, Patrol Services Bureau, Operations Division | **DATE** | 04 December 2013 |
| **FROM** | Dana Wingert Major, Commanding Operations Division | **SUBJECT** | Sergeant Gregg Wessels – Written Reprimand Administrative Review 13-11-004 |

Attached is a communication from Captain Todd Dykstra, Executive Officer, Office of Chief of Police, indicating the findings of Administrative Review 13-11-004.

Chief Bradshaw has determined that Sergeant Gregg Wessels is to receive a Written Reprimand for his failure to provide satisfactory service and violation of department standard of conduct policy reference an incident while working off-duty downtown.

Issue a Written Reprimand to Sergeant Wessels and return that Written Reprimand to my office NLT 16 December 2013.

_____
Dana Wingert

Attachment

PL.APP.000216

mkg

# CITY OF DES MOINES
OFFICE OF
# CHIEF OF POLICE

**TO:**   Gregg Wessels
Sergeant
Operations Division

**DATE:**   02 December 2013

**FROM:**   Judy A. Bradshaw
Chief of Police

**SUBJECT**   Administrative Review
13-11-004

I have completed my examination of the information contained in Administrative Review 13-11-004 and I have reviewed the findings and recommendations from your supervisors.

Your commanders have cited that you violated department policies regarding your conduct while engaged in an off-duty uniformed assignment (ODT).

Your commanding officers stated that you made a poor decision by failing to initiate a police report after being informed of an assault. Your commanders noted that by failing to make a police report and conduct a preliminary investigation, the identity of possible suspect(s) will likely never be determined. You also admitted that you refused to make a police report.

Sgt. Wessels, there is an expectation of management, inclusive of front line supervisors, to set the example for their squads which you failed to do in this instance. You are an experienced officer, capable of demonstrating the right way of handling situations, and allowing other officers to learn from you.

I believe that you can be a quality supervisor who can be relied upon to lead and make appropriate decisions in the future, if you choose to do so. My expectations are that you will continue to grow and evolve into an effective supervisor within our department.

I concur with your commanders that you committed the following policy violations.
- Personnel and Administrative Rules Chapter 1, Personnel Conduct, Paragraph A -- Standard of Conduct
- Patrol Services Bureau Standard Operating Procedure, Chapter 4-5 and 4-6

The violations as cited by your supervisors support that your conduct was unacceptable and you failed to operate in a professional manner.

Administrative Review Control No. 13-11-004 will be classified as Sustained.

For the violations of the Personnel and Administrative Rules, you will receive a Written Reprimand.

Judy a Bradshaw

Judy A. Bradshaw

PL.APP.000217

# CITY OF DES MOINES
## OFFICE OF
## CHIEF OF POLICE

**TO:** Judy A. Bradshaw
Chief of Police

**DATE:** 2 December 2013

**FROM:** Todd Dykstra
Captain, Executive Officer

**SUBJECT:** Administrative Review  13-11-004
Sergeant Gregg Wessels

**RE: Unsatisfactory Service/Policy Violations**

The Office of Professional Standards obtained information concerning this administrative review.  This information represents the investigative product which has been reviewed by the officer's supervisors and commanding officers.

Each reviewer was directed to affix a recommendation to include corrective or punitive action if warranted.

Operations Division Commander Major Dana Wingert reviewed the complaint and recommends the following disposition for your consideration:

Unfounded

Exonerated

Non-sustained

**X     Sustained**        The acts complained of occurred and were inappropriate

Major Wingert recommends a finding of **sustained** and Sergeant Gregg Wessels be given a **written reprimand** for his failure to provide satisfactory service and violating department standard of conduct policy reference an incident while working off-duty downtown.

_____
Todd Dykstra

PL.APP.000218

# CITY OF DES MOINES
### OFFICE OF
## CHIEF OF POLICE



PERSONNEL FILE

TO: Dana Wingert
Major, Commanding
Operations Division

DATE: December 1, 2013

FROM: Todd Dykstra
Captain, Executive Officer

SUBJECT: Administrative Review 13-11-004
Sgt. Gregg Wessels

RE: **Unsatisfactory Service/Policy Violation**

In accordance with Department Rule 1.2.2, paragraph f., Item 1, Disposition of Personnel Complaints, the classification of this investigation as approved by the Chief of Police is reflected as indicated in the "disposition applicable table."

## Disposition Applicable Table

1. Unfounded

2. Exonerated

3. Non-sustained

**X** 4. **Sustained**    The act complained of occurred and was inappropriate

The Chief of Police concurs with the Division Commander's finding of **sustained;** Sergeant Gregg Wessels is to be given a **written reprimand** for his failure to provide satisfactory service and violating department standard of conduct policy reference an incident while working off-duty downtown.

Please forward proper documentation to this office when completed

_____
Todd Dykstra

cc: Sgt. Gregg Wessels

PL.APP.000219

# CITY OF DES MOINES
### OFFICE OF
# CHIEF OF POLICE



**TO:**  Gregg Wessels
Sergeant
Operations Division

**DATE:**  02 December 2013

**FROM:**  Judy A. Bradshaw
Chief of Police

**SUBJECT**  Administrative Review
13-11-004

I have completed my examination of the information contained in Administrative Review 13-11-004 and I have reviewed the findings and recommendations from your supervisors.

Your commanders have cited that you violated department policies regarding your conduct while engaged in an off-duty uniformed assignment (ODT).

Your commanding officers stated that you made a poor decision by failing to initiate a police report after being informed of an assault. Your commanders noted that by failing to make a police report and conduct a preliminary investigation, the identity of possible suspect(s) will likely never be determined. You also admitted that you refused to make a police report.

Sgt. Wessels, there is an expectation of management, inclusive of front line supervisors, to set the example for their squads which you failed to do in this instance. You are an experienced officer, capable of demonstrating the right way of handling situations, and allowing other officers to learn from you.

I believe that you can be a quality supervisor who can be relied upon to lead and make appropriate decisions in the future, if you choose to do so. My expectations are that you will continue to grow and evolve into an effective supervisor within our department.

I concur with your commanders that you committed the following policy violations.
- Personnel and Administrative Rules Chapter 1, Personnel Conduct, Paragraph A – Standard of Conduct
- Patrol Services Bureau Standard Operating Procedure, Chapter 4-5 and 4-6

The violations as cited by your supervisors support that your conduct was unacceptable and you failed to operate in a professional manner.

Administrative Review Control No. 13-11-004 will be classified as Sustained.

For the violations of the Personnel and Administrative Rules, you will receive a Written Reprimand.

Judy A. Bradshaw

PL.APP.000220

# CITY OF DES MOINES, IOWA
## Office of
## Operations Division



TO: Judy A. Bradshaw  
     Chief of Police

DATE: 18 November 2013

FROM: Dana Wingert  
       Major, Commanding  
       Operations Division

SUBJECT: CARE Investigation-  
              Sgt. Gregg Wessels

The attached communication from Lieutenant David Seybert pertains to his investigation into an allegation of unsatisfactory service on behalf of Sergeant Gregg Wessels.

This investigation began as a CARE Inquiry from the Office of Professional Standards. During the course of researching this matter, it was determined that Sergeant Wessels failed to initiate a police report when it was clearly prudent to do so.

By failing to make a police report and conduct a preliminary investigation, the identity of the possible suspect(s) and true circumstances of the incident will likely never be established.

Lieutenant Seybert outlines the details of the investigation within his memorandum. He has also secured a photograph of the injury, which was supplied by the victim, Ms. Alyssa Corbie.

**Patrol Services Bureau Standard Operating Procedure; Chapter 4-5:**  
*"Make every effort to satisfy the needs of citizens requesting service, assistance, or information. When no action is taken because of jurisdictional limitations, an explanation should be given and suggestions offered to assist in resolving the complainant's problem."*

**Patrol Services Bureau Standard Operating Procedure; Chapter 4-6:**  
*"Conduct a thorough investigation of all offenses with area of assignment and scope of activity. Collect evidence and record data that will aid in identification, apprehension and prosecution of offenders and the recovery of property."*

**Personnel Rules and Regulations; Chapter 1**  
*"All employees of the department will conduct themselves in a manner that will reflect credit on themselves, the department and the City of Des Moines."*

Sergeant Wessels failed to provide adequate service to Ms. Corbie, and I agree with the recommendation that he receive a **written reprimand** for the listed violations.

Pending your approval, I will have the reprimand issued by the commanders of Third Watch Patrol and acknowledged by Sergeant Wessels' signature.

Forwarded for your information.

_____  
Dana Wingert

PL.APP.000221

*Y. Wessels*

# CITY OF DES MOINES, IOWA

## Office of

## Inspectional Services Bureau

TO: William McCarthy
Chief of Police

DATE: 16 June 2005

From: Craig L. Zubrod
Major, Commanding
Inspectional Services Bureau

SUBJECT: Officer Greg Wessels
Written Reprimand
Personnel Complaint
Control No. 05-04-004

Attached is the completed written reprimand issued to Officer Greg Wessels for his inappropriate actions regarding Personnel Complaint Control No. 05-04-004. A copy of the reprimand has been included with the complaint.

*Craig L. Zubrod*
Craig L. Zubrod

*To Major Z*
*Completed*
*Bill Mc*
*6-17-05*

# CITY OF DES MOINES, IOWA
## Office of
## PATROL SERVICES BUREAU

**TO:**    Craig Zubrod
Major, Commanding
Inspectional Services Bureau

**DATE:**    15 June 2005

**FROM:**    Dale P. Patch
Major, Commanding
Patrol Services Bureau

**SUBJECT:**    Officer Greg Wessels
Notice of Written
Reprimand –
Personnel Complaint
Control No. 05-04-004

Attached to this memorandum is a written reprimand documenting the inappropriate actions of Officer Greg Wessels.

Please forward this to Chief of Police Bill McCarthy for his review, as he requested. Thank you for your assistance.

Dale P. Patch

PL.APP.000223

# CITY OF DES MOINES, IOWA
## Office of
## Traffic Unit

TO:     Gregg Wessels, Senior Police Officer
Squad One, Traffic Unit

DATE:    15 June 2005

FROM:   Dana Wingert, Lieutenant
Commanding, Traffic Unit

SUBJECT:   Personnel Complaint
Control No. 05-04-004
Written Reprimand

As directed by Chief Bill McCarthy, this communication will serve as documentation of a written reprimand pertaining to Personnel Complaint Control No. 05-04-004. The sustained allegations within this complaint involve the use of profanity during a traffic related encounter, along with failing to properly report the incident per departmental procedures.

This incident involved a heated exchange between you and Mr. Bradley Evans on 12 April 2005, during which a minimal amount of force was used to push Mr. Evans away to create separation during the argument.

The initial complaint from Mr. Evans, which was non-sustained, involved the contention that you grabbed Mr. Evans by the neck and choked him. Witnesses to the encounter stated that his did not occur, and you mentioned during your formal interview that the red marks on his neck were self-inflicted. This in itself gives rise to the likelihood of a complaint, and supports the necessity of properly documenting the encounter through the proper channels.

When we make the conscious decision to engage in police action, we take on the responsibility of ensuring that our actions are properly reported. You failed in this regard, and the decision to drive away following a volatile exchange fell short of the expected standard.

The use of profanity is in violation of Personnel and Administrative Rules Chapter One, "Standard of Conduct", which reads as follows:

"All employees of the department shall conduct themselves in a manner that will reflect credit on themselves, the department and the City of Des Moines. Employees shall be professional to the public and to one another..."

Your signature below will acknowledge receipt of this written reprimand for the use of profanity and for failing to properly report the incident as described in Personnel Complaint Control No. 05-04-004.

_____
Gregg Wessels

_____
Dana Wingert

PL.APP.000224

# CITY OF DES MOINES, IOWA
### Office of
## PATROL SERVICES BUREAU

| | | |
|---|---|---|
| **TO:** | Dana Wingert<br>Lieutenant, Commanding<br>Traffic Unit | **DATE:** 14 June 2005 |
| **FROM:** | Dale P. Patch<br>Major, Commanding<br>Patrol Services Bureau | **SUBJECT:** Personnel Complaint<br>Control No. 05-04-004 |

The portions of this personnel complaint pertaining to the use of profanity and reporting requirements have been sustained. Chief of Police Bill McCarthy has determined that that Officer Greg Wessels will receive a written reprimand for violation of police department policies regarding the use of profanity and reporting procedures.

I am requesting that you, or your designee, prepare the reprimand and ensure that Officer Wessels, as well as the author of the document, sign it.

Please return the signed reprimand to my office, NLT 21 June 2005.

Dale P. Patch

PL.APP.000225

# CITY OF DES MOINES
OFFICE OF
# PROFESSIONAL STANDARDS

**TO:** Dale Patch
Major, Commanding
Patrol Services Bureau

**DATE:** ~~JUNE~~ 17 ~~May~~ 2005

**FROM:** Craig L. Zubrod
Major, Commanding
Office of Professional Standards

**SUBJECT:** Personnel Complaint
05-04-004

**Complaint Concerning:** Officer Greg Wessels

**RE:** Excessive Force and Rudeness

The classification of this investigation as determined by the Chief of Police is provided below.

## Disposition Applicable Table

Unfounded

**X** **Exonerated**    Officer Wessels denied grabbing Mr. Evans by the neck and choking him. None of independent witnesses observed Officer Wessels grab Mr. Evans by the neck.

Non-sustained

**X** **Sustained**    One independent witness heard Officer Wessels use profanity.

## Chief's Findings

Chief McCarthy agreed with Lieutenant Wingert and Captain Shay's recommendations of exonerated that Officer Wessels did not choke Mr. Evans in the manner he alleges.

Chief McCarthy agreed a written reprimand be given to Officer Wessles for the use of profanity and failing to document the events in the proper departmental manner.

Please have the reprimand issued, signed, and returned upon completion to the Office of Professional Standards.

A copy of this document and the attached memo should be provided to the officer concerned.

*Craig L. Zubrod*
Craig L. Zubrod

PL.APP.000226

# CITY OF DES MOINES
## OFFICE OF
## INSPECTIONAL SERVICES BUREAU

**TO:** Bill McCarthy
Chief of Police

**DATE:** 8 June 2005

**FROM:** Craig L. Zubrod
Major, Commanding
Inspectional Services Bureau

**SUBJECT:** Personnel Complaint
05-04-004
Excessive Force
Rudeness

**RE:** Officer Greg Wessels

The investigation has been reviewed by Officer Wessels' supervisor and Commanding Major.

The Commander of the Patrol Services Bureau recommended the following disposition for your consideration.

      Unfounded

**X**    **Exonerated**    Officer Wessels denied grabbing Mr. Evans by the neck and choking him. None of the independent witnesses observed Officer Wessels grab Mr. Evans by the neck.

      Non-sustained

**X**    **Sustained**    One independent witness heard Officer Wessels use profanity.

Captain Shay, Acting Commander of Patrol Services Bureau, recommends a written reprimand for the use of profanity and failing to document the events in the proper departmental manner.

*Craig L. Zubrod*
Craig L. Zubrod

*I agree with the assessment of fact as presented by Lt Wingert and affirmed by Capt Shay. Further I concur in their recommendations. upon completion of a written reprimand return-signed. to me for review.*

*Bill McCarthy*    *6-13-05*

PL.APP.000227

TO    Robert Clock, Captain/Michael Steverson, Lieutenant    **DATE**    05 March 2008
Commanding Third Watch, Patrol Section

FROM    William R. Jones, Captain    **SUBJECT**    Senior Police Officer
Acting Commander, Patrol Services Bureau                Michael Fong
                                                  Administrative Review
                                                  Control No. 07-12-001
                                                  Re: DMPD CN 2007-43756

Attached please find a memorandum from Major David Lillard, Commander of the Inspectional Services Bureau, indicating Chief Bradshaw has determined that Senior Police Officer Fong receive a five-day suspension regarding the above Administrative Review Control Number.

Please indicate the dates that Officer Fong will serve the five-day suspension and return written documentation of same to this office NLT 10 March 2008.

William R. Jones

mkg

PL.APP.000228

To: Rick Singleton
Major, Commanding
Patrol Services Bureau

DATE: March 5, 2008

FROM: David Lillard
Major, Commanding
Inspectional Services Bureau

SUBJECT: Administrative Review
07-12-001
SPO Michael Fong

**Administrative Review Concerning:** Senior Police Officer Michael Fong

**RE:** Excessive Force and Policy Violation - DMPD Case No. 2007-43756

In accordance with Department Rule 1.2.2, paragraph f., Item 1, Disposition of
Personnel Complaints, the classification of this investigation as approved by the
Chief of Police is reflected as indicated in the "disposition applicable table."

## Disposition Applicable Table

1. Unfounded

2. Exonerated

3. Non-sustained

(X) 4. Sustained      Policy Violation – failure to report all
information related to an investigation

Excessive Force – use of force beyond
what is necessary to make an arrest or
maintain custody of an individual arrested

On November 8, 2007, SPO Michael Fong arrested Felix Suarez under case
number 2007-43756. After an administrative review was conducted regarding
this arrest, the Chief of Police has determined SPO Michael Fong will serve a
five (5) day suspension for his actions.

Please forward written documentation of the suspension dates to this office.

David Lillard

cc: SPO Michael Fong

PL.APP.000229

# PERFORMANCE EVALUATION REPORT

USE INK OR TYPEWRITER FOR FINAL MARKINGS

| EMPLOYEE NAME (Last) | (First) | (Init.) | EMPLOYEE NO | DIVISION | SECTION | UNIT |
|---|---|---|---|---|---|---|
| Wessels | Gregg | | 768 | Uniform | Patrol | Third Watch |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| Senior Police Officer | Permanent | Fourth Squad | 31 December, 1996 |

## SECTION A — FACTOR CHECK LIST

Immediate Supervisor Must Check Each Factor in the Appropriate Column

Columns: 1 NOT SATISFACTORY / 2 SOME IMPROVEMENT NEEDED / 3 MEETS STANDARDS / 4 EXCEEDS STANDARDS / 5 DOES NOT APPLY

| Factor | Column |
|---|---|
| 1. Observance of Work Hours | 4 (X) |
| 2. Attendance | 4 (X) |
| 3. Grooming & Dress | 4 (X) |
| 4. Compliance with Rules | 4 (X) |
| 5. Safety Practices | 4 (X) |
| 6. Public Contacts | 3 (X) |
| 7. Suspect Contacts | 3 (X) |
| 8. Employee Contacts | 2 (X) |
| 9. Knowledge of Work | 3 (X) |
| 10. Work Judgments | 3 (X) |
| 11. Planning and Organizing | 4 (X) |
| 12. Job Skill Level | 4 (X) |
| 13. Quality of Work | 4 (X) |
| 14. Volume of Acceptable Work | 4 (X) |
| 15. Meeting Deadlines | 4 (X) |
| 16. Accepts Responsibility | 3 (X) |
| 17. Accepts Direction | 4 (X) |
| 18. Accepts Change | 4 (X) |
| 19. Effectiveness Under Stress | 2, 3 (X) |
| 20. Appearance of Work Station | 4 (X) |
| 21. Operation & Care of Equip. | 4 (X) |
| 22. Work Coordination | 4 (X) |
| 23. Initiative | 3 (X) |
| 24. Report Writing | 4 (X) |
| 25. Spelling | 4 (X) |
| 26. | |
| 27. | |
| 28. | |
| 29. | |

### FOR EMPLOYEES who SUPERVISE OTHERS

| Factor | Column |
|---|---|
| 30. Planning & Organizing | |
| 31. Scheduling & Coordinating | |
| 32. Training & Instructing | |
| 33. Effectiveness | |
| 34. Evaluating Subordinates | |
| 35. Judgments & Decisions | |
| 36. Leadership | |
| 37. Operational Economy | |
| 38. Supervisory Control | |
| 39. (ADDITIONAL FACTORS) | |
| 40. | |
| 41. | |

**CHECK IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E**

## SECTION B
Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4. See attachment.

## SECTION C
Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period. See attachment.

## SECTION D
Describe STANDARD performance. (Optional for most factors checked in Col. 3; MANDATORY for some factors – see instructions.)
See attachment.

## SECTION E
Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)
Nothing for this period.

RATER: I certify this report represents my best judgment. ☐ I DO ☐ I DO NOT recommend this employee be granted permanent status. (For final probationary reports only).

| (RATER'S SIGNATURE) | (TITLE) | (DATE) |
|---|---|---|
| David F. Brown | Sergeant | 11-28-96 |

REVIEWER: (IF NONE, SO INDICATE)

| (REVIEWER'S SIGNATURE) | (TITLE) | (DATE) |
|---|---|---|
| Russell Underwood | Captain | 11-25-96 |

EMPLOYEE: I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement. ☐ I wish to discuss this report with the reviewer.

Comment:

| (EMPLOYEE'S SIGNATURE) | (DATE) |
|---|---|
| Gregg Wessels | 12/5/96 |

70-117-2

– SEE INSTRUCTIONS ON REVERSE SIDE –

PL.APP.000230

**PERFORMANCE EVALUATION**　　　　　**31 DECEMBER, 1996**
**REPORT:** Gregg Wessels

**Section B.** Senior Police Officer Wessels is an outstanding representative of
this department. His appearance is always at its best. He is the Understudy
for my squad. He always conducts himself with the highest degree of
professionalism.

**Section C.** I have nothing in specific that I would recommend for Gregg at
this time. I know that he has put in for various transfers during the past few
months, and for one reason or another those transfers have been granted to
other officers. He should not be discouraged. He has to keep in mind that
he has been on the Tactical Unit, he has worked both Vice and Narcotics
-and he has done an excellent job in all of those areas-. And it is only fair
to let someone else have some varied experience. The time will come when
he is granted a requested transfer. Until that time comes I hope that he will
be patient and continue to perform in the manner in which he does.

**Section D. #6, public contacts.** As I stated in my opening paragraph Gregg
represents this department and the city very well. He demonstrates command
presence and the public has confidence in his ability to perform whatever task
they may expect of him. He is polite. He takes charge of situations that he
has to deal with in a decisive manner. Just by the manner in which he conducts
himself his presence commands respect from the citizens he comes in contact
with.

　　　　**#7, suspect contacts.** As I stated above Gregg deals with people
well, even those who are considered the criminals or suspects. He treats these
people with respect. He is not "badge heavy". At the same time he leaves no
doubt as to who is in charge when it comes to Officer vs. Suspect confrontations.

　　　　**#9, knowledge of work.** Like I said Gregg is my Understudy. I
placed him in that position due to the fact he has the background and the ability
to make the decisions that I might be forced to make. He has  superior wisdom
is respect to the various aspects of this job.

　　　　**#10, work judgments.** This basically ties in to the above paragraph.
However I will say that in my absences I always feel confident that things will
be ran in the way that I would expect them to be. Gregg has a good head on his
shoulders.

PL.APP.000231

**#13, quality of work.** Gregg does an admirable job in all areas. His reports are always of the highest quality. His arrest are sound, and as I said he treats people with respect and dignity when they are placed in the situation of forcible detention due to their indiscretion in regards to the law.

**#14, volume of acceptable work.** I feel that this has been covered in previous paragraphs. Suffice to say that Gregg puts a lot of effort into what he does to insure that his work is done in a professional manner. He realizes that our reports are extremely important regardless of how menial the subject manner may be.

**#16, accepts responsibility.** Gregg takes on a lot of responsibility in my absence. He does an excellent job supervising my squad while I am gone. Like I have already eluded to, I have the utmost confidence in his ability and judgment.

In addition to serving as my Understudy, once again Gregg has taken on the task of being a Field Training Officer again. This in an of itself is a great task. It is not one that we just let anyone do. We have to have confidence in and support for the trainer, before we put them with a trainee.

**#19, effectiveness under stress.** Military back ground or just a common sense cool head? I don't know. However he does it is probably the most admirable attribute that Gregg displays. He is not one to let pressure of any kind get him off track or rattled. He is always in control.

**#23, initiative.** Besides being my Understudy Gregg patrols one of the most active beats in the city. He is always aware of what is going on that needs added attention. He is always mobile looking for something to do. He is not one to sit and wait for something to come to him...he goes out and finds it. By doing this he keeps a positive attitude toward his job. He sets a good example for his peers.

I have had the pleasure of working with Senior Police Officer Wessels in several assignments. I have always considered him an asset to my squads. He is an asset to the department and an employee that the city of Des Moines can be proud of.

Rater _David Brown_ Date _28 Nov 96_

Employee _Gregg Wessel_ Date _12/5/96_

PL.APP.000232

# PERFORMANCE EVALUATION REPORT



USE INK OR TYPEWRITER FOR FINAL MARKINGS

| EMPLOYEE NAME (Last) (First) (Init)<br>**Wessels, Gregg** | EMPLOYEE NO.<br>**768** | DIVISION<br>**Uniform** | SECTION<br>**Patrol** | UNIT<br>**3rd Watch** |
|---|---|---|---|---|
| CLASS TITLE<br>**Senior Police Officer** | EMPLOYEE STATUS<br>**Permanent** | ASSIGNMENT<br>**Fourth Squad** | | DUE DATE:<br>**12 31 97** |

| See Key* | | | | SECTION A | | SECTION B Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4 |
|---|---|---|---|---|---|---|

**FACTOR CHECKLIST**
Immediate Supervisor Must Check Each Factor in the Appropriate Column
**SEE CODE KEY***

SECTION B Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4

SEE ATTACHMENT

| 1 | 2 | 3 | 4 | | 5 |
|---|---|---|---|---|---|
| | | | X | 1. Observance of Work Hours | |
| | | | X | 2. Attendance | |
| | | | X | 3. Grooming & Dress | |
| | | | X | 4. Compliance with Rules | |
| | | | X | 5. Safety Practices | |
| | | X | | 6. Public Contacts | |
| | | X | | 7. Suspect Contacts | |
| | | X | | 8. Employee Contacts | |
| | | X | | 9. Knowledge of Work | |
| | | X | | 10. Work Judgments | |
| | | X | | 11. Planning and Organizing | |
| | | X | | 12. Job Skill Level | |
| | | X | | 13. Quality of Work | |
| | | X | | 14. Volume of Acceptable Work | |
| | | X | | 15. Meeting Deadlines | |
| | | X | | 16. Accepts Responsibility | |
| | | X | | 17. Accepts Direction | |
| | | X | | 18. Accepts Change | |
| | | X | | 19. Effectiveness under Stress | |
| | | X | | 20. Appearance of Work Station | |
| | | X | | 21. Operation & Care of Equip | |
| | | X | | 22. Work Coordination | |
| | | X | | 23. Initiative | |
| | | X | | 24. Report Writing/Spelling | |
| | | | | 25. | |
| | | | | 26. | |
| | | | | 27. | |
| | | | | 28. | |
| | | | | 29. | |

SECTION C Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period.

SEE ATTACHMENT

SECTION D Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see instructions)

SEE ATTACHMENT

SECTION E Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)

SEE ATTACHMENT

**FOR EMPLOYEES WHO SUPERVISE OTHERS**

| | | | | |
|---|---|---|---|---|
| | | | | 30. Planning & Organizing |
| | | | | 31. Scheduling & Coordinating |
| | | | | 32. Training & Instructing |
| | | | | 33. Effectiveness |
| | | | | 34. Evaluating Subordinates |
| | | | | 35. Judgments & Decisions |
| | | | | 36. Leadership |
| | | | | 37. Operational Economy |
| | | | | 38. Supervisory Control |
| | | | | 39. |
| | | | | 40. |
| | | | | 41. |

☐ I DO

RATER: I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)
(RATER'S SIGNATURE) (TITLE) (DATE)
Sergeant 12-19-97

REVIEWER: (IF NONE, SO INDICATE)
(REVIEWER'S SIGNATURE) (TITLE) (DATE)
Captain 17 DEC 97

EMPLOYEE: I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.
☐ I wish to discuss this report with the reviewer.

COMMENT:

**CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E**

EMPLOYEE'S SIGNATURE (DATE)
12-23-97

70-117-2

*CODE KEY: 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply
- SEE INSTRUCTIONS ON REVERSE SIDE -

PL.APP.000233

**GENERAL:**

1. Using a preliminary draft sheet and pencil, complete Section A first, then other appropriate sections. The rater should review the draft report with his own supervisor. Markings and comments should then be typed or inked in on the final form. Either the rater or reviewer (or both), should then review the rating with the employee in a private interview. All signatures shall be in ink. Changes and corrections shall be initialed by the employer.

**2. If space for comments in inadequate, dated and signed attachments may be made (either typewritten or in ink).**

**3. Due Dates** shall be observed, and are particularly important for final probationary reports. Filing dates for these are flexible, and both the first and the final reports may be filed at any time between the receipt and printed due date.

4. All probationers (either entrance level or promotional) shall be evaluated not later than the end of the first three months of probationary service, and every three months thereafter for the first year. Probationers may be separated (or demoted, if permanent, in a lesser class) at any time such action is deemed necessary by the department head, through use of either a scheduled or an unscheduled performance evaluation report.

5. All permanent employees and entrance level probationers in their second year shall be evaluated semi-annually as of the printed due date.

6. Unscheduled reports may be filed at any time for either permanent or probationary employees.

7. The "Guide to Performance Evaluation" should be consulted for suggestions, definitions, interpretations, and further instructions.

8. The main purposes of this form are to inform the employee of his performance, to improve performance when possible, and to sustain superior performance.

**SECTION A:**

Check one column for each factor. Column 5 may be checked when a factor is not considered applicable to a particular job. Additional spaces have been provided to write in any additional factors. Each checkmark in Columns 1 and 2 require specific explanation in Section E. In the absence of specific standards for a factor, use your own opinion as to what constitutes standard performance.

**4. EXCEEDS STANDARD:** Total performance is well above standards for the position. This evaluation should be reflected by marks for critical factors in Section A, and superior or excellent performance should be noted in Section B. Only a few employees would normally qualify for this rating.

**3. EFFECTIVE - MEETS STANDARD:** Consistently competent performance meeting or exceeding standards in all critical factors for the position. If margin is narrow and standards barely met, explain in Section E. Most employees would be rated in this category.

**2. SOME IMPROVEMENT NEEDED:** Total performance occasionally or periodically falls short of normal standards. Specific deficiencies should be noted in Section E. This evaluation indicates the supervisor's belief that the employee can and will make the necessary improvements.

**1. NOT SATISFACTORY:** Performance clearly inadequate in one or more critical factors as explained or documented in Section E. Employee has demonstrated inability or unwillingness to improve or to meet standards. Performance not acceptable for position held.

**SECTION B:**

Must be used to describe outstanding qualities or performance when checkmarks are placed in Column 4. Use this section to record other progress or improvements in performance resulting from employee's efforts to reach previously set goals.

**SECTION C:**

Record agreed-upon or prescribed performance goals for the next evaluation period.

**SECTION D:**

Use for describing standard performance. This section must be completed for certain factors, depending on assignment:

**PATROLMAN:**
  Uniform Division: 6,9,13,14,23
  Crim Invest Div: 9,10,13,23
  Adm. Serv. Div: 6,8,11,2,13,15,19

**CIVILIAN EMPLOYEES:**
  Clerks: 6,12,13,14
  Technical, Trades: 12,13,14
  SUPERVISORS;
    Sergeants: 32,33,34,38
    Lts. and above: 30,31,33,34
    Civilians: 30,31,,32,33,34

**SECTION E:**

Give specific reasons for checkmarks in Columns 1 and 2. Record here any specific reasons why the employee should not be recommended for permanent status, or, if the employee is already permanent, any specific reasons for required improvement.

**SIGNATURES:**

Both the rater and the employee shall sign the report. The employee's signature indicates that the conference has been held and that he has had an opportunity to read the report. If he refuses to sign for any reason, explain that his signature does not necessarily imply or indicate agreement with the report, and that space is provided for him to state any disagreement. Further refusal to sign shall be recorded on the report, after which it shall be forwarded.

**ROUTING:**

Keep the preliminary draft at the division level until the next rating period and then discard. Route the permanent copy through channels to the Personnel Division.

PL.APP.000234

# PERFORMANCE EVALUATION REPORT ATTACHMENT

| EMPLOYEE NAME (Last)          (First)  (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| **Wessels, Gregg** | **768** | **Uniform** | **Patrol** | **3rd Watch** |
| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
| **Senior Police Officer** | **Permanent** | **Fourth Squad** | | **12 31 97** |

**SECTION B:** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

**SECTION C:** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:

**SECTION D:** Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)

Item #6 (Public Contacts) - Employee should conduct himself in a manner commensurate with departmental guidelines when meeting and dealing with the public. (i.e. courteous, civil, respectful, etc.)

Item #9 (Knowledge of Work) - Employee should demonstrate a level of knowledge commensurate with his job experience which allows him to function adequately when performing routine assignments encountered on a daily or periodic basis.

Item #13 (Quality of Work) - Employee should produce an acceptable volume of completed work with minimal errors in a manner commensurate with reasonable standards of penmanship, grammar, and communication.

Item #14 (Volume of Acceptable Work) - Employee should produce a volume of work equal to or nearly equal to the average of work produced by his pier group.

Item #23 (Initiative) - Employee should demonstrate a willingness to perform on his own independently in the absence of other direction.

**SECTION E:** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explain checks in Columns 1 and 2):

Section B. It is a pleasure to have an employee the caliber of Gregg assigned to my squad. As anyone can see by the face sheet of this evaluation I have a high opinion of Gregg and the integrity of his work. Gregg is an excellent representative of this department. By the manner in which he conducts himself he sets an example that all of us should try to copy.

I have marked him in the exceeds standards column in several areas, #6 public contacts, #7 suspect contacts, #8 employee contacts, #9 knowledge of work, #13 quality of work, #16 accepts responsibility, #19 effectiveness under stress and #23 initiative.

Public contacts, like I said Gregg represents this department well. His appearance is consistently sharp. He has that bearing that without saying a word tells people "here is someone who has got it together." He is courteous to everyone, even those who might try to give him a bad time. Even those people he treats with respect, all the way to jail.

Suspect contacts, Gregg has been around, he has worked several areas within the department and has developed an excellent knowledge of the people that we should be aware of. Like I said in the above paragraph, Gregg treats all people with respect, even those we classify as suspects. He by no means is a push over, as long as he is treated with respect there will not be any problems for them.

Employee contacts, I have never given anyone exceeds standards in this column until now. Gregg is looked up to by peers and superiors. I have had superiors express compliments on the manner in which Gregg conducts himself.

PL.APP.000235

# PERFORMANCE EVALUATION REPORT



**USE INK OR TYPEWRITER FOR FINAL MARKINGS**

| EMPLOYEE NAME (Last) (First) (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| **Wessels, Greg** | **768** | **Patrol Services** | **Special Operations** | **Tactical** |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| **Senior Police Officer** | **Permanent** | **Third Squad-Gangs** | **31 Dec 98** |

| See Key* | | | | SECTION A | | SECTION B — Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4 |
|---|---|---|---|---|---|---|

**SECTION A — FACTOR CHECKLIST** — Immediate Supervisor Must Check Each Factor in the Appropriate Column — SEE CODE KEY*

| 1 | 2 | 3 | 4 | Factor | 5 |
|---|---|---|---|---|---|
| | | | | 1. Observance of Work Hours | |
| | | | | 2. Attendance | |
| | | | | 3. Grooming & Dress | |
| | | | | 4. Compliance with Rules | |
| | | | | 5. Safety Practices | |
| | X | | | 6. Public Contacts | |
| | X | | | 7. Suspect Contacts | |
| | X | | | 8. Employee Contacts | |
| | | X | | 9. Knowledge of Work | |
| | | X | | 10. Work Judgments | |
| | X | | | 11. Planning and Organizing | |
| | | X | | 12. Job Skill Level | |
| | | X | | 13. Quality of Work | |
| | X | | | 14. Volume of Acceptable Work | |
| | X | | | 15. Meeting Deadlines | |
| | | X | | 16. Accepts Responsibility | |
| | X | | | 17. Accepts Direction | |
| | X | | | 18. Accepts Change | |
| | | X | | 19. Effectiveness under Stress | |
| | X | | | 20. Appearance of Work Station | |
| | X | | | 21. Operation & Care of Equip | |
| | X | | | 22. Work Coordination | |
| | | X | | 23. Initiative | |
| | | X | | 24. Report Writing/Spelling | |
| | | | | 25. | |
| | | | | 26. | |
| | | | | 27. | |
| | | | | 28. | |
| | | | | 29. | |

**FOR EMPLOYEES WHO SUPERVISE OTHERS**

| | | | | Factor | |
|---|---|---|---|---|---|
| | | | | 30. Planning & Organizing | |
| | | | | 31. Scheduling & Coordinating | |
| | | | | 32. Training & Instructing | |
| | | | | 33. Effectiveness | |
| | | | | 34. Evaluating Subordinates | |
| | | | | 35. Judgments & Decisions | |
| | | | | 36. Leadership | |
| | | | | 37. Operational Economy | |
| | | | | 38. Supervisory Control | |
| | | | | 39. | |
| | | | | 40. | |
| | | | | 41. | |

**CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E**

**SECTION B** — Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4

SEE ATTACHED

**SECTION C** — Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period.

SEE ATTACHED

**SECTION D** — Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see instructions)

SEE ATTACHED

**SECTION E** — Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)

SEE ATTACHED

**RATER:** I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)

(RATER'S SIGNATURE) *[signature]* (TITLE) Sergeant (DATE) 29 Dec 98

**REVIEWER:** (IF NONE, SO INDICATE)

(REVIEWER'S SIGNATURE) *[signature]* (TITLE) Lieutenant (DATE) 29 Dec 98

**EMPLOYEE:** I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.
☐ I wish to discuss this report with the reviewer.

**COMMENT:**

EMPLOYEE'S SIGNATURE: *[signature]* (DATE) 1/4/99

70-117-2

**\*CODE KEY:** 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply

PL.APP.000236

## INSTRUCTIONS
## FOR USE OF THE PERFORMANCE EVALUATION REPORT FORM

**GENERAL:**

1. Using a preliminary draft sheet and pencil, complete Section A first, then other appropriate sections. The rater should review the draft report with his own supervisor. Markings and comments should then be typed or inked on the final form. Either the rater or reviewer (or both), should then review the rating with the employee in a private interview. All signatures shall be in ink. Changes and corrections shall be initialed by the employer.

**2. If space for comments in inadequate, dated and signed attachments may be made (either typewritten or in ink).**

**3. Due Dates** shall be observed, and are particularly important for final probationary reports. Filing dates for these are flexible, and both the first and the final reports may be filed at any time between the receipt and printed due date.

4. **All probationers** (either entrance level or promotional) shall be evaluated not later than the end of the first three months of probationary service, and every three months thereafter for the first year. Probationers may be separated (or demoted, if permanent, in a lesser class) at any time such action is deemed necessary by the department head, through use of either a scheduled or an unscheduled performance evaluation report.

5. All permanent employees and entrance level probationers in their second year shall be evaluated semi-annually as of the printed due date.

6. Unscheduled reports may be filed at any time for either permanent or probationary employees.

7. The "Guide to Performance Evaluation" should be consulted for suggestions, definitions, interpretations, and further instructions.

8. The main purposes of this form are to inform the employee of his performance, to improve performance when possible, and to sustain superior performance.

**SECTION A:**

Check one column for each factor. Column 5 may be checked when a factor is not considered applicable to a particular job. Additional spaces have been provided to write in any additional factors. Each checkmark in Columns 1 and 2 require specific explanation in Section E. In the absence of specific standards for a factor, use your own opinion as to what constitutes standard performance.

**4. EXCEEDS STANDARD:** Total performance is well above standards for the position. This evaluation should be reflected by marks for critical factors in Section A, and superior or excellent performance should be noted in Section B. Only a few employees would normally qualify for this rating.

**3. EFFECTIVE - MEETS STANDARD:** Consistently competent performance meeting or exceeding standards in all critical factors for the position. If margin is narrow and standards barely met, explain in Section E. Most employees would be rated in this category.

**2. SOME IMPROVEMENT NEEDED:** Total performance occasionally or periodically falls short of normal standards. Specific deficiencies should be noted in Section E. This evaluation indicates the supervisor's belief that the employee can and will make the necessary improvements.

**1. NOT SATISFACTORY:** Performance clearly inadequate in one or more critical factors as explained or documented in Section E. Employee has demonstrated inability or unwillingness to improve or to meet standards. Performance not acceptable for position held.

**SECTION B:**

Must be used to describe outstanding qualities or performance when checkmarks are placed in Column 4. Use this section to record other progress or improvements in performance resulting from employee's efforts to reach previously set goals.

**SECTION C:**

Record agreed-upon or prescribed performance goals for the next evaluation period.

**SECTION D:**

Use for describing standard performance. This section must be completed for certain factors, depending on assignment:

**PATROLMAN:**
    **Uniform Division: 6,9,13,14,23**
    **Crim Invest Div: 9,10,13,23**
    **Adm. Serv. Div: 6,8,11,2,13,15,19**

**CIVILIAN EMPLOYEES:**
    **Clerks: 6,12,13,14**
    **Technical, Trades: 12,13,14**
    **SUPERVISORS:**
        **Sergeants: 32,33,34,38**
        **Lts. and above: 30,31,33,34**
        **Civilians: 30,31,,32,33,34**

**SECTION E:**

Give specific reasons for checkmarks in Columns 1 and 2. Record here any specific reasons why the employee should not be recommended for permanent status, or, if the employee is already permanent, any specific reasons for required improvement.

**SIGNATURES:**

Both the rater and the employee shall sign the report. The employee's signature indicates that the conference has been held and that he has had an opportunity to read the report. If he refuses to sign for any reason, explain that his signature does not necessarily imply or indicate agreement with the report, and that space is provided for him to state any disagreement. Further refusal to sign shall be recorded on the report, after which it shall be forwarded.

**ROUTING:**

Keep the preliminary draft at the division level until the next rating period and then discard. Route the permanent copy through channels to the Personnel Division.

PL.APP.000237

# PERFORMANCE EVALUATION REPORT ATTACHMENT

| EMPLOYEE NAME (Last)     (First)   (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| **Wessels, Greg** | **768** | **Patrol Services** | **Special Operations** | **Tactical** |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| **Senior Police Officer** | **Permanent** | **Third Squad-Gangs** | **31 Dec 98** |

**SECTION B:** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

Greg has recently joined the TAC unit and the gang squad. He has previous experience as a TAC officer and is training with the entry team. Gre has worked in several areas of the department and in different territories. He has an excellent working knowledge of the various people that we dea with. He has spent a couple of tours in the narcotics and vice unit and has a good working knowledge of the gang members and their involvement i the drug trafficking and vice related crimes. Greg's experience has allowed him to develop skills at identifying illicit activity and pursuing a case an gathering sufficient facts to prepare for a successful prosecution. Greg has previously served as an understudy and acting sergeant and hi decision-making abilities are strong. He does not get frustrated and make rash decisions but rather is able to sort out the facts and draw soli conclusions. (9,10,12,13,19)

Greg is highly dependable and when given an assignment, can be allowed to work independently, with complete confidence on my part that th work will be finished timely and in a professional manner. He has a high level of initiative and is the kind of officer who leads by example. He wi quickly establish himself as one of the leaders of the tactical unit, and will be looked up to by his fellow officers as one they can turn to fo assistance and guidance. (16, 23)

**SECTION C:** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:

There are no areas where Greg needs improvement. He is a solid performer. Greg will acquire new skills and improve on his existing skills as he learns his new duties. Greg has the traits and qualities to be an excellent supervisor and should strive to prepare himself for promotion in the future.

**SECTION D:** Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)

6. PUBLIC CONTACTS. Greg is a compassionate person and does his best to make the public feel comfortable as he interacts with them i different situations.

14. VOLUME OF ACCEPTABLE WORK. Since Greg has only been with the unit a short time it is difficult to measure his volume compared to others. His past reputation indicates tat he will be a strong performer. The squad works most of the time as a team and Greg fits in well, doing his fair share, and all the work he does is of the highest quality.

**SECTION E:** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explain checks in Columns ' and 2):

None.

| | | |
|---|---|---|
| ☐ I DO | | |
| **RATER:** I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only) | | |
| (RATER'S SIGNATURE) | (TITLE) Sergeant | (DATE) 29 Dec 98 |
| **EMPLOYEE'S SIGNATURE:** | | (DATE) |

PL.APP.000238

# PERFORMANCE EVALUATION REPORT



USE INK OR TYPEWRITER
FOR FINAL MARKINGS

| EMPLOYEE NAME (Last)    (First)  (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| **Wessels, Greg** | **768** | **Patrol Services** | **Special Operations** | **Tactical** |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| **Senior Police Officer** | **Permanent** | **Squad One** | **31 Dec 99** |

| See Key* | | | | SECTION A | | SECTION B  Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4 |
|---|---|---|---|---|---|---|

**SECTION A — FACTOR CHECKLIST** — Immediate Supervisor Must Check Each Factor in the Appropriate Column — SEE CODE KEY*

| 1 | 2 | 3 | 4 | FACTOR | 5 |
|---|---|---|---|---|---|
| | | X | | 1. Observance of Work Hours | |
| | | X | | 2. Attendance | |
| | | X | | 3. Grooming & Dress | |
| | | X | | 4. Compliance with Rules | |
| | | X | | 5. Safety Practices | |
| | | | X | 6. Public Contacts | |
| | | X | | 7. Suspect Contacts | |
| | | X | | 8. Employee Contacts | |
| | | | X | 9. Knowledge of Work | |
| | | X | | 10. Work Judgments | |
| | | X | | 11. Planning and Organizing | |
| | | X | | 12. Job Skill Level | |
| | | | X | 13. Quality of Work | |
| | | | X | 14. Volume of Acceptable Work | |
| | | X | | 15. Meeting Deadlines | |
| | | | X | 16. Accepts Responsibility | |
| | | X | | 17. Accepts Direction | |
| | | X | | 18. Accepts Change | |
| | | X | | 19. Effectiveness under Stress | |
| | | X | | 20. Appearance of Work Station | |
| | | X | | 21. Operation & Care of Equip | |
| | | X | | 22. Work Coordination | |
| | | | X | 23. Initiative | |
| | | X | | 24. Report Writing/Spelling | |
| | | | | 25. | |
| | | | | 26. | |
| | | | | 27. | |
| | | | | 28. | |
| | | | | 29. | |

**FOR EMPLOYEES WHO SUPERVISE OTHERS**

| 30. Planning & Organizing |
| 31. Scheduling & Coordinating |
| 32. Training & Instructing |
| 33. Effectiveness |
| 34. Evaluating Subordinates |
| 35. Judgments & Decisions |
| 36. Leadership |
| 37. Operational Economy |
| 38. Supervisory Control |
| 39. |
| 40. |
| 41. |

**SECTION B** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4

SEE ATTACHED

**SECTION C** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period.

SEE ATTACHED

**SECTION D** Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see instructions)

SEE ATTACHED

**SECTION E** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)

SEE ATTACHED

☐ I DO

**RATER:** I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)

(RATER'S SIGNATURE)          (TITLE)          (DATE)

_[signature]_          Sergeant          7 Dec 98

**REVIEWER:**     (IF NONE, SO INDICATE)

(REVIEWER'S SIGNATURE)     (TITLE)     (DATE)

_[signature]_          Lieutenant          9 Dec 99

**EMPLOYEE:** I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.

☐ I wish to discuss this report with the reviewer.

**COMMENT:**

| CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E | EMPLOYEE'S SIGNATURE  _[signature]_ | (DATE)  09 Dec 99 |
|---|---|---|

70-117-2

*CODE KEY: 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply

PL.APP.000239

**GENERAL:**
1. Using a preliminary draft sheet and pencil, complete Section A first, then other appropriate sections. The rater should review the draft report with his own supervis Markings and comments should then be typed or inked in on the final form. Either the rater or reviewer (or both), should then review the rating with the employee in private interview. All signatures shall be in ink. Changes and corrections shall be initialed by the employer.

**2. If space for comments in inadequate, dated and signed attachments may be made (either typewritten or in ink).**

**3. Due Dates** shall be observed, and are particularly important for final probationary reports. Filing dates for these are flexible, and both the first and the final repor may be filed at any time between the receipt and printed due date.

4. **All probationers** (either entrance level or promotional) shall be evaluated not later than the end of the first three months of probationary service, and every thr months thereafter for the first year. Probationers may be separated (or demoted, if permanent, in a lesser class) at any time such action is deemed necessary by t department head, through use of either a scheduled or an unscheduled performance evaluation report.

5. All permanent employees and entrance level probationers in their second year shall be evaluated semi-annually as of the printed due date.

6. Unscheduled reports may be filed at any time for either permanent or probationary employees.

7. The "Guide to Performance Evaluation" should be consulted for suggestions, definitions, interpretations, and further instructions.

8. The main purposes of this form are to inform the employee of his performance, to improve performance when possible, and to sustain superior performance.

**SECTION A:**
Check one column for each factor. Column 5 may be checked when a factor is not considered applicable to a particular job. Additional spaces have been provided write in any additional factors. Each checkmark in Columns 1 and 2 require specific explanation in Section E. In the absence of specific standards for a factor, use yo own opinion as to what constitutes standard performance.

4. **EXCEEDS STANDARD:** Total performance is well above standards for the position. This evaluation should be reflected by marks for critical factors in Section and superior or excellent performance should be noted in Section B. Only a few employees would normally qualify for this rating.

3. **EFFECTIVE - MEETS STANDARD:** Consistently competent performance meeting or exceeding standards in all critical factors for the position. If margin is narro and standards barely met, explain in Section E. Most employees would be rated in this category.

2. **SOME IMPROVEMENT NEEDED:** Total performance occasionally or periodically falls short of normal standards. Specific deficiencies should be noted in Section This evaluation indicates the supervisor's belief that the employee can and will make the necessary improvements.

1. **NOT SATISFACTORY:** Performance clearly inadequate in one or more critical factors as explained or documented in Section E. Employee has demonstrat inability or unwillingness to improve or to meet standards. Performance not acceptable for position held.

**SECTION B:**
Must be used to describe outstanding qualities or performance when checkmarks are placed in Column 4. Use this section to record other progress or improvements performance resulting from employee's efforts to reach previously set goals.

**SECTION C:**
Record agreed-upon or prescribed performance goals for the next evaluation period.

**SECTION D:**
Use for describing standard performance. This section must be completed for certain factors, depending on assignment:

**PATROLMAN:**
    Uniform Division: 6,9,13,14,23
    Crim Invest Div: 9,10,13,23
    Adm. Serv. Div: 6,8,11,2,13,15,19

**CIVILIAN EMPLOYEES:**
    Clerks: 6,12,13,14
    Technical, Trades: 12,13,14
**SUPERVISORS:**
    Sergeants: 32,33,34,38
    Lts. and above: 30,31,33,34
    Civilians: 30,31,,32,33,34

**SECTION E:**
Give specific reasons for checkmarks in Columns 1 and 2. Record here any specific reasons why the employee should not be recommended for permanent status, if the employee is already permanent, any specific reasons for required improvement.

**SIGNATURES:**
Both the rater and the employee shall sign the report. The employee's signature indicates that the conference has been held and that he has had an opportunity read the report. If he refuses to sign for any reason, explain that his signature does not necessarily imply or indicate agreement with the report, and that space provided for him to state any disagreement. Further refusal to sign shall be recorded on the report, after which it shall be forwarded.

**ROUTING:**
Keep the preliminary draft at the division level until the next rating period and then discard. Route the permanent copy through channels to the Personnel Division.

PL.APP.000240

# PERFORMANCE EVALUATION REPORT ATTACHMENT

| EMPLOYEE NAME (Last)     (First)  (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| **Wessels, Greg** | **768** | **Patrol Services** | **Special Operations** | **Tactical** |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
|---|---|---|---|---|
| **Senior Police Officer** | **Permanent** | **Squad One** | | **31 Dec 99** |

**SECTION B:** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

Officer Wessels is an articulate, knowledgeable, veteran officer. He daily demonstrates leadership qualities and a detailed knowledge of the laws of this state and the procedures and regulations of this department. Greg is the understudy of squad one. For an extended period Greg was the acting sergeant of the squad. He performed his duties admirably. Being the acting supervisor is difficult in any squad. However, when one is the acting supervisor in a squad of exceptionally talented, motivated and veteran officers it can be even more difficult. The apparent ease in which Greg accomplished this, is a testiment to his abilities and to the respect his peers have for him. This respect does not end with the members of his squad, but when the command staff required Greg to remain in a supervisory position for as long as they did, shows the faith and respect his supervisors have for him. Not only was Greg able to accomplish his duties as the squad supervisor but he was able to maintain a volume of work and the quality of work, equal to that of the members of his squad. Greg deals easily with the public he is able to show empathy and concern and still maintain control of whatever situations he encounters. Greg is always eager to accept new challenges and duties; he has volunteered to be a back up grenadier for the entry team. As the understudy I have every confidence in his decision-making abilities and I am comfortable leaving the squad in his hands. (6,9,13,14,16.23)

**SECTION C:** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:

None noted for this period.

**SECTION D: Describe** STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)

**SECTION E:** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explain checks in Columns and 2):

None noted for this period.

(SGT. CLOCK)

□ I DO
RATER: I certify this represents my best judgment. □ I DO NOT recommend this
employee be granted permanent status (for probationary reports only)
(RATER'S SIGNATURE)          (TITLE)          (DATE)
                             Sergeant      9 Dec 99

EMPLOYEE'S SIGNATURE:                        (DATE)
                                             09 Dec 99

PL.APP.000241

# PERFORMANCE EVALUATION REPORT

USE INK OR TYPEWRITER FOR FINAL MARKINGS

| EMPLOYEE NAME (Last) (First) (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| Wessels, Gregg | 768 | Patrol Services | Special Operations | Tactical |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| Senior Police Officer | Permanent | Squad One | 31 Dec 00 |

| See Key* | | | | SECTION A | |
|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | FACTOR CHECKLIST — Immediate Supervisor Must Check Each Factor in the Appropriate Column — SEE CODE KEY* | 5 |
| | | | | 1. Observance of Work Hours | |
| | | | | 2. Attendance | |
| | | | | 3. Grooming & Dress | |
| | | | | 4. Compliance with Rules | |
| | | | | 5. Safety Practices | |
| | | | X | 6. Public Contacts | |
| | | | X | 7. Suspect Contacts | |
| | | | X | 8. Employee Contacts | |
| | | | X | 9. Knowledge of Work | |
| | | X | | 10. Work Judgments | |
| | | X | | 11. Planning and Organizing | |
| | | X | | 12. Job Skill Level | |
| | | | X | 13. Quality of Work | |
| | | | X | 14. Volume of Acceptable Work | |
| | | X | | 15. Meeting Deadlines | |
| | | | X | 16. Accepts Responsibility | |
| | | X | | 17. Accepts Direction | |
| | | X | | 18. Accepts Change | |
| | | X | | 19. Effectiveness under Stress | |
| | | X | | 20. Appearance of Work Station | |
| | | X | | 21. Operation & Care of Equip | |
| | | X | | 22. Work Coordination | |
| | | | X | 23. Initiative | |
| | | X | | 24. Report Writing/Spelling | |
| | | | | 25. | |
| | | | | 26. | |
| | | | | 27. | |
| | | | | 28. | |
| | | | | 29. | |
| FOR EMPLOYEES WHO SUPERVISE OTHERS | | | | | |
| | | | | 30. Planning & Organizing | |
| | | | | 31. Scheduling & Coordinating | |
| | | | | 32. Training & Instructing | |
| | | | | 33. Effectiveness | |
| | | | | 34. Evaluating Subordinates | |
| | | | | 35. Judgments & Decisions | |
| | | | | 36. Leadership | |
| | | | | 37. Operational Economy | |
| | | | | 38. Supervisory Control | |
| | | | | 39. | |
| | | | | 40. | |
| | | | | 41. | |

**SECTION B** — Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4

SEE ATTACHED

**SECTION C** — Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period.

SEE ATTACHED

**SECTION D** — Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see instructions)

SEE ATTACHED

**SECTION E** — Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)

SEE ATTACHED

☐ I DO

RATER: I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)

X RATER'S SIGNATURE) (TITLE) Sergean (DATE) 31 Dec 00

REVIEWER: (IF NONE, SO INDICATE) (REVIEWER'S SIGNATURE) (TITLE) Lieutenan (DATE) 31 Dec 00

EMPLOYEE: I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.
☐ I wish to discuss this report with the reviewer.

COMMENT:

CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E

EMPLOYEE'S SIGNATURE: (DATE) 12/19/00

70-117-2

*CODE KEY: 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply

PL.APP.000242

# PERFORMANCE EVALUATION REPORT ATTACHMENT

| EMPLOYEE NAME (Last)    (First)  (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| Wessels, Gregg | 768 | Patrol Services | Special Operations | Tactical |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
|---|---|---|---|---|
| Senior Police Officer | Permanent | Squad One | | 31 Dec 00 |

**SECTION B:** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

6. Public contacts: Senior Police Officer Wessels is always courteous and polite when he is dealing with the general public. He shows compassion when the situation calls for it and he can be firm and fair when need be.

7. Suspect Contacts: SPO Wessels has acquired a firm grasp of the criminal element throughout the city. He has good working knowledge of the criminal element in the area in which he works.

8. Employee Contacts: SPO Wessels is well liked by his peers and gets along very well with his fellow employees.

9. Knowledge of Work: As a member of the SniperTeam, SPO Wessels has acquired the knowledge needed to be a productive member. He constantly trains to perfect his skills as a member of this team. He has gained great proficiency and maintains a high skill level as member of the Sniper Team.

13. Quality of Work: SPO Wessels' reports are always neat and concise. The work is such that follow-up investigation is not a problem because the facts are in order. SPO Wessels' reports are always complete and thorough.

16. Accepts Responsibility: SPO Wessels is a veteran officer who is well respected by his peer. Because of his knowledge and maturity he serves as the Understudy of Squad One. He has outstanding leadership qualities that are noticed by his peers and management. SPO Wessels is well versed in the laws of the state as well as the policies and procedures of this department. I can count on Gregg to maintain the squad in my absence. He has shown the ability to make sound and prudent decisions when necessary.

23. Initiative: SPO Wessels is a highly motivated officer. He works and carries out assignments without direct supervision. When not assigned a particular task, he patrols an area of the city trying to locate violators and volunteers to assist patrol elements with trips.

**SECTION C:** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:

I would encourage SPO Wessels to continue to utilize the department's resources i.e., schools, and training and take the next Sergeants exam.

**SECTION D:** Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)

24. Report Writing: SPO Wessels produces complete, neat, thorough reports with little or no grammatical errors.

**SECTION E:** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explain checks in Columns 1 and 2):

None noted at this time.

| | |
|---|---|
| ☐ I DO | |
| **RATER:** I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only) | |
| (RATER'S SIGNATURE) (TITLE) (DATE) | Sergean  31 Dec 00 |
| EMPLOYEE'S SIGNATURE | (DATE)  12/19/00 |

PL.APP.000243

# PERFORMANCE EVALUATION REPORT

USE INK OR TYPEWRITER FOR FINAL MARKINGS

| EMPLOYEE NAME (Last) (First) (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| Wessels, Gregg | 768 | Patrol Services | Special Operations | S.R.U. |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
|---|---|---|---|---|
| Senior Police Officer | Permanent | Squad One | | 05 Dec 01 |

| See Key* | | | | SECTION A | | SECTION B — Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4 |
|---|---|---|---|---|---|---|

**FACTOR CHECKLIST** — Immediate Supervisor Must Check Each Factor in the Appropriate Column SEE CODE KEY*

SECTION B — Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4
SEE ATTACHED

| 1 | 2 | 3 | 4 | SECTION A FACTOR | 5 |
|---|---|---|---|---|---|
| | | | | 1. Observance of Work Hours | |
| | | | | 2. Attendance | |
| | | | | 3. Grooming & Dress | |
| | | | | 4. Compliance with Rules | |
| | | | | 5. Safety Practices | |
| | | X | | 6. Public Contacts | |
| | | X | | 7. Suspect Contacts | |
| | | X | | 8. Employee Contacts | |
| | | X | | 9. Knowledge of Work | |
| | X | | | 10. Work Judgments | |
| | X | | | 11. Planning and Organizing | |
| | X | | | 12. Job Skill Level | |
| | | X | | 13. Quality of Work | |
| | | X | | 14. Volume of Acceptable Work | |
| | X | | | 15. Meeting Deadlines | |
| | X | X | | 16. Accepts Responsibility | |
| | | X | | 17. Accepts Direction | |
| | X | | | 18. Accepts Change | |
| | X | | | 19. Effectiveness under Stress | |
| | X | | | 20. Appearance of Work Station | |
| | X | | | 21. Operation & Care of Equip | |
| | X | | | 22. Work Coordination | |
| | | X | | 23. Initiative | |
| | X | | | 24. Report Writing/Spelling | |
| | | | | 25. | |
| | | | | 26. | |
| | | | | 27. | |
| | | | | 28. | |
| | | | | 29. | |

**FOR EMPLOYEES WHO SUPERVISE OTHERS**

| | | | | | |
|---|---|---|---|---|---|
| | | | | 30. Planning & Organizing | |
| | | | | 31. Scheduling & Coordinating | |
| | | | | 32. Training & Instructing | |
| | | | | 33. Effectiveness | |
| | | | | 34. Evaluating Subordinates | |
| | | | | 35. Judgments & Decisions | |
| | | | | 36. Leadership | |
| | | | | 37. Operational Economy | |
| | | | | 38. Supervisory Control | |
| | | | | 39. | |
| | | | | 40. | |
| | | | | 41. | |

CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E

**SECTION C** — Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period.

SEE ATTACHED

**SECTION D** — Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see instructions)

SEE ATTACHED

**SECTION E** — Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)

SEE ATTACHED

☐ I DO

RATER: I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)
(RATER'S SIGNATURE)   (TITLE) Sergeant   (DATE) 05 Dec 01

REVIEWER: (IF NONE, SO INDICATE)
(REVIEWER'S SIGNATURE)   (TITLE) Lieutenant   (DATE) 05 Dec 01

EMPLOYEE: I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.
☐ I wish to discuss this report with the reviewer.

COMMENT:

EMPLOYEE'S SIGNATURE:   (DATE) 12/5/01

70-117-2

*CODE KEY: 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply

PL.APP.000244

**GENERAL:**

1. Using a preliminary draft sheet and pencil, complete Section A first, then other appropriate sections. The rater should review the draft report with his own supervisor. Markings and comments should then be typed or inked in on the final form. Either the rater or reviewer (or both), should then review the rating with the employee in a private interview. All signatures shall be in ink. Changes and corrections shall be initialed by the employer.

2. If space for comments in inadequate, dated and signed attachments may be made (either typewritten or in ink).

3. Due Dates shall be observed, and are particularly important for final probationary reports. Filing dates for these are flexible, and both the first and the final reports may be filed at any time between the receipt and printed due date.

4. All probationers (either entrance level or promotional) shall be evaluated not later than the end of the first three months of probationary service, and every three months thereafter for the first year. Probationers may be separated (or demoted, if permanent, in a lesser class) at any time such action is deemed necessary by the department head, through use of either a scheduled or an unscheduled performance evaluation report.

5. All permanent employees and entrance level probationers in their second year shall be evaluated semi-annually as of the printed due date.

6. Unscheduled reports may be filed at any time for either permanent or probationary employees.

7. The "Guide to Performance Evaluation" should be consulted for suggestions, definitions, interpretations, and further instructions.

8. The main purposes of this form are to inform the employee of his performance, to improve performance when possible, and to sustain superior performance.

**SECTION A:**
Check one column for each factor. Column 5 may be checked when a factor is not considered applicable to a particular job. Additional spaces have been provided to write in any additional factors. Each checkmark in Columns 1 and 2 require specific explanation in Section E. In the absence of specific standards for a factor, use your own opinion as to what constitutes standard performance.

4. EXCEEDS STANDARD: Total performance is well above standards for the position. This evaluation should be reflected by marks for critical factors in Section A, and superior or excellent performance should be noted in Section B. Only a few employees would normally qualify for this rating.

3. EFFECTIVE - MEETS STANDARD: Consistently competent performance meeting or exceeding standards in all critical factors for the position. If margin is narrow and standards barely met, explain in Section E. Most employees would be rated in this category.

2. SOME IMPROVEMENT NEEDED: Total performance occasionally or periodically falls short of normal standards. Specific deficiencies should be noted in Section E. This evaluation indicates the supervisor's belief that the employee can and will make the necessary improvements.

1. NOT SATISFACTORY: Performance clearly inadequate in one or more critical factors as explained or documented in Section E. Employee has demonstrated inability or unwillingness to improve or to meet standards. Performance not acceptable for position held.

**SECTION B:**
Must be used to describe outstanding qualities or performance when checkmarks are placed in Column 4. Use this section to record other progress or improvements in performance resulting from employee's efforts to reach previously set goals.

**SECTION C:**
Record agreed-upon or prescribed performance goals for the next evaluation period.

**SECTION D:**
Use for describing standard performance. This section must be completed for certain factors, depending on assignment:

PATROLMAN:
    Uniform Division: 6,9,13,14,23
    Crim Invest Div: 9,10,13,23
    Adm. Serv. Div: 6,8,11,2,13,15,19

CIVILIAN EMPLOYEES:
    Clerks: 6,12,13,14
    Technical, Trades: 12,13,14
SUPERVISORS:
    Sergeants: 32,33,34,38
    Lts. and above: 30,31,33,34
    Civilians: 30,31,,32,33,34

**SECTION E:**
Give specific reasons for checkmarks in Columns 1 and 2. Record here any specific reasons why the employee should not be recommended for permanent status, or, if the employee is already permanent, any specific reasons for required improvement.

**SIGNATURES:**
Both the rater and the employee shall sign the report. The employee's signature indicates that the conference has been held and that he has had an opportunity to read the report. If he refuses to sign for any reason, explain that his signature does not necessarily imply or indicate agreement with the report, and that space is provided for him to state any disagreement. Further refusal to sign shall be recorded on the report, after which it shall be forwarded.

**ROUTING:**
Keep the preliminary draft at the division level until  the next rating period and then discard. Route the permanent copy through channels to the Personnel Division.

PL.APP.000245

# PERFORMANCE EVALUATION REPORT ATTACHMENT

| EMPLOYEE NAME (Last)      (First)  (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| Wessels, Gregg | 768 | Patrol Services | Special Operations | S.R.U. |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
|---|---|---|---|---|
| Senior Police Officer | Permanent | Squad One | | 05 Dec 01 |

**SECTION B:** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

6.  Public contacts: Senior Police Officer Wessels is always courteous and polite when he is dealing with the general public.

7.  Suspect Contacts: SPO Wessels has acquired a firm grasp of the criminal element throughout the city. He has good working knowledge of the criminal element in the area in which he works.

8.  Employee Contacts: SPO Wessels is well liked by his peers and gets along very well with his fellow employees. SPO Wessels has the respect of his peers in that his peers have appointed him Union Stewart for the Special Response Unit.

9.  Knowledge of Work: As a member of the Sniper-Rifle Team, SPO Wessels has acquiried the knowledge needed to be a productive member. He constantly trains to perfect his skills as a member of this team.

13.  Quality of Work: SPO Wessels' reports are always neat and concise. The work is such that follow-up investigation is not a problem because the facts are in order. SPO Wessels' reports are always complete and thorough.

14.  Volume of Acceptable Work: SPO Wessels produces the volume of work that is consistent with an officer of his tenure.

16.  Accepts Responsibility: SPO Wessels is a veteran officer who is well respected by his peers. Because of his knowledge and maturity, he serves as the Understudy of the squad. He has good leadership qualities that are noticed by his peers. SPO Wessels understands the laws of the state and municipal statutes as well as department policies and procedures. I can count on SPO Wessels to maintain the squad in my absence.

23.  Initiative: SPO Wessels is a highly motivated officer. He works and carries out assignments without direct supervision. When not assigned a particular task, he patrols an area of the city trying to locate violators and volunteers to assist patrol with trips.

**SECTION C:** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:

I would encourage SPO Warren to utilize the department's resources i.e., schools, and training and take the next Sergeants exam.

**SECTION D:** Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)

**SECTION E:** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explain checks in Columns 1 and 2):

None at this time.

☐ I DO

RATER: I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)

(RATER'S SIGNATURE)          (TITLE)          (DATE)
Sergeant 05 Dec 01

EMPLOYEE'S SIGNATURE:          (DATE)
12/5/01

PL.APP.000246

# PERFORMANCE EVALUATION REPORT



USE INK OR TYPEWRITER FOR FINAL MARKINGS

| EMPLOYEE NAME (Last) (First) (Init) | EMPLOYEE NO. | BUREAU | SECTION |
|---|---|---|---|
| **Wessels, Gregg** | **4768** | **Inspectional Services** | **Personnel and Training** |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| **Senior Police Officer** | **Permanent** | **Firearms Coordinator** | **22 February 2005** |

## SECTION A — FACTOR CHECKLIST
Immediate Supervisor Must Check Each Factor in the Appropriate Column SEE CODE KEY*

| 1 | 2 | 3 | 4 | FACTOR |
|---|---|---|---|---|
| | | | X | 1. Observance of Work Hours |
| | | | X | 2. Attendance |
| | | | X | 3. Grooming & Dress |
| | | | X | 4. Compliance with Rules |
| | | | X | 5. Safety Practices |
| | | | X | 6. Public Contacts |
| | | | X | 7. Suspect Contacts |
| | | | X | 8. Employee Contacts |
| | | X | | 9. Knowledge of Work |
| | | | X | 10. Work Judgments |
| | | X | | 11. Planning and Organizing |
| | | X | | 12. Job Skill Level |
| | | | X | 13. Quality of Work |
| | | | X | 14. Volume of Acceptable Work |
| | | | X | 15. Meeting Deadlines |
| | | X | | 16. Accepts Responsibility |
| | | | X | 17. Accepts Direction |
| | | | X | 18. Accepts Change |
| | | | X | 19. Effectiveness under Stress |
| | | X | | 20. Appearance of Work Station |
| | | X | | 21. Operation & Care of Equip |
| | | X | | 22. Work Coordination |
| | | | X | 23. Initiative |
| | | | X | 24. Report Writing/Spelling |
| | | | | 25. |
| | | | | 26. |
| | | | | 27. |
| | | | | 28. |
| | | | | 29. |

### FOR EMPLOYEES WHO SUPERVISE OTHERS

| | FACTOR |
|---|---|
| | 30. Planning & Organizing |
| | 31. Scheduling & Coordinating |
| | 32. Training & Instructing |
| | 33. Effectiveness |
| | 34. Evaluating Subordinates |
| | 35. Judgments & Decisions |
| | 36. Leadership |
| | 37. Operational Economy |
| | 38. Supervisory Control |
| | 39. |
| | 40. |
| | 41. |

**CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E**

70-117-2

**SECTION B** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4

SEE ATTACHED

**SECTION C** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period.

SEE ATTACHED

**SECTION D** Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see instructions)

SEE ATTACHED

**SECTION E** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)

SEE ATTACHED

☐ I DO

**RATER:** I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)

| (RATER'S SIGNATURE) | (TITLE) | (DATE) |
|---|---|---|
| *[signature]* 4731 | Lieutenant | 22 February 2005 |

**REVIEWER:** (IF NONE, SO INDICATE)

| (REVIEWER'S SIGNATURE) | (TITLE) | (DATE) |
|---|---|---|
| *[signature]* | Major | 22 February 2005 |

**EMPLOYEE:** I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.

☐ I wish to discuss this report with the reviewer.

**COMMENT:**

| EMPLOYEE'S SIGNATURE: | (DATE) |
|---|---|
| *[signature]* | 21/FEB05 |

*CODE KEY: 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply

PL.APP.000247

## INSTRUCTIONS
## FOR USE OF THE PERFORMANCE EVALUATION REPORT FORM

**GENERAL:**

1. Using a preliminary draft sheet and pencil, complete Section A first, then other appropriate sections. The rater should review the draft report with his own supervisor. Markings and comments should then be typed or inked in on the final form. Either the rater or reviewer (or both), should then review the rating with the employee in a private interview. All signatures shall be in ink. Changes and corrections shall be initialed by the employer.

**2.** If space for comments in inadequate, dated and signed attachments may be made (either typewritten or in ink).

**3.** Due Dates shall be observed, and are particularly important for final probationary reports. Filing dates for these are flexible, and both the first and the final reports may be filed at any time between the receipt and printed due date.

4. All probationers (either entrance level or promotional) shall be evaluated not later than the end of the first three months of probationary service, and every three months thereafter for the first year. Probationers may be separated (or demoted, if permanent, in a lesser class) at any time such action is deemed necessary by the department head, through use of either a scheduled or an unscheduled performance evaluation report.

5. All permanent employees and entrance level probationers in their second year shall be evaluated semi-annually as of the printed due date.

6. Unscheduled reports may be filed at any time for either permanent or probationary employees.

7. The "Guide to Performance Evaluation" should be consulted for suggestions, definitions, interpretations, and further instructions.

8. The main purposes of this form are to inform the employee of his performance, to improve performance when possible, and to sustain superior performance.

**SECTION A:**

Check one column for each factor. Column 5 may be checked when a factor is not considered applicable to a particular job. Additional spaces have been provided to write in any additional factors. Each checkmark in Columns 1 and 2 require specific explanation in Section E. In the absence of specific standards for a factor, use your own opinion as to what constitutes standard performance.

**4. EXCEEDS STANDARD:** Total performance is well above standards for the position. This evaluation should be reflected by marks for critical factors in Section A, and superior or excellent performance should be noted in Section B. Only a few employees would normally qualify for this rating.

**3. EFFECTIVE - MEETS STANDARD:** Consistently competent performance meeting or exceeding standards in all critical factors for the position. If margin is narrow and standards barely met, explain in Section E. Most employees would be rated in this category.

**2. SOME IMPROVEMENT NEEDED:** Total performance occasionally or periodically falls short of normal standards. Specific deficiencies should be noted in Section E. This evaluation indicates the supervisor's belief that the employee can and will make the necessary improvements.

**1. NOT SATISFACTORY:** Performance clearly inadequate in one or more critical factors as explained or documented in Section E. Employee has demonstrated inability or unwillingness to improve or to meet standards. Performance not acceptable for position held.

**SECTION B:**

Must be used to describe outstanding qualities or performance when checkmarks are placed in Column 4. Use this section to record other progress or improvements in performance resulting from employee's efforts to reach previously set goals.

**SECTION C:**

Record agreed-upon or prescribed performance goals for the next evaluation period.

**SECTION D:**

Use for describing standard performance. This section must be completed for certain factors, depending on assignment:

**PATROLMAN:**
Uniform Division: 6,9,13,14,23
Crim Invest Div: 9,10,13,23
Adm. Serv. Div: 6,8,11,2,13,15,19

**CIVILIAN EMPLOYEES:**
Clerks: 6,12,13,14
Technical, Trades: 12,13,14
SUPERVISORS:
Sergeants: 32,33,34,38
Lts. and above: 30,31,33,34
Civilians: 30,31,,32,33,34

**SECTION E:**

Give specific reasons for checkmarks in Columns 1 and 2. Record here any specific reasons why the employee should not be recommended for permanent status, or, if the employee is already permanent, any specific reasons for required improvement.

**SIGNATURES:**

Both the rater and the employee shall sign the report. The employee's signature indicates that the conference has been held and that he has had an opportunity to read the report. If he refuses to sign for any reason, explain that his signature does not necessarily imply or indicate agreement with the report, and that space is provided for him to state any disagreement. Further refusal to sign shall be recorded on the report, after which it shall be forwarded.

**ROUTING:**

Keep the preliminary draft at the division level until the next rating period and then discard. Route the permanent copy through channels to the Personnel Division.

PL.APP.000248

# PERFORMANCE EVALUATION REPORT ATTACHMENT

| EMPLOYEE NAME (Last)　　(First)　(Init) | EMPLOYEE NO. | BUREAU | SECTION |
|---|---|---|---|
| **Wessels, Gregg** | **4768** | **Inspectional Services** | **Personnel and Training** |
| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
| **Senior Police Officer** | **Permanent** | **Firearms Coordinator** | **22 February 2005** |

**SECTION B:** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

Throughout most of 2004, Gregg was the Firearms Coordinator for the Department. Gregg recently transferred to the Traffic Unit in the Patrol Services Bureau.

While Gregg was the Firearms Coordinator, he was responsible for the overseeing the complete firearms training and qualification program for the Department. These duties consisted of:

Management and upkeep of the Academy's indoor range
Ensuring all sworn officers qualified by-annually with their handguns
Maintenance of all Department owned firearms
Providing adequate firearms training for all new police officers
Maintaining accurate records associated to the firearms program
Ordering of all ammunition for weapons training, qualifications and to be carried on duty
Research and propose changes to Department's policies pertaining to the firearms program

Gregg did an excellent job in all of the above-mentioned areas. In 2004, Gregg headed a committee that researched the feasibility of allowing officers to carry the 40 and 45 caliber pistol along with assessing which manufactures produced pistols that were adequate for the rigors of law enforcement. Subsequently, the Department approved Gregg's recommendations and last July Gregg started the training program for officers to switch to the newly approved pistols.

Throughout last winter and spring, Gregg was part of a committee that put together the 1st joint Metro Spring Qualification Test. The committee was defined a two week period where approximately 900 sworn officers from multiple jurisdictions were tested in their handgun/shotgun proficiency.

In August 2004, Gregg also assumed the responsibilities of Polk County Sheriff's Office Firearm Program. Gregg quickly learned his duties for overseeing the Polk County Range and did an excellent job at coordinating his duties between the two ranges and programs.

The areas of operation the were Gregg's responsibility were kept clean and well maintained.

**SECTION C:** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:

None.

**SECTION D:** Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)

(23) Initiative:

Gregg gave eight hours of work for days pay. He did his job well and made suggestions/recommendations when needed.

**SECTION E:** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explain checks in Columns 1 and 2):

None noted at this time.

| | □ I DO |
|---|---|
| **RATER:** I certify this represents my best judgment. □ I DO NOT recommend this employee be granted permanent status (for probationary reports only) | |
| (RATER'S SIGNATURE)　　　(TITLE)　　　(DATE) | |
| 4731　Lieutenant　22 February 2005 | |
| **EMPLOYEE'S SIGNATURE:**　　　(DATE) | |

PL.APP.000249

# PERFORMANCE EVALUATION REPORT


| EMPLOYEE NAME (Last) (First) (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| **Wessels, Gregg** | **4768** | **Homeland Security** | **Metro** | **Metro Star** |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| **Senior Police Officer** | **Permanent** | **Squad One** | **27 Feb 06** |

| See Key* | | | | SECTION A | | SECTION B Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4 |
|---|---|---|---|---|---|---|

**SECTION A — FACTOR CHECKLIST**
Immediate Supervisor Must Check Each Factor in the Appropriate Column
SEE CODE KEY*

| 1 | 2 | 3 | 4 | | 5 | |
|---|---|---|---|---|---|---|
| | | | | 1. Observance of Work Hours | | **SECTION B** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4 |
| | | | | 2. Attendance | | SEE ATTACHED |
| | | | | 3. Grooming & Dress | | |
| | | | | 4. Compliance with Rules | | |
| | | | | 5. Safety Practices | | |
| | | | X | 6. Public Contacts | | |
| | X | | | 7. Suspect Contacts | | |
| | X | | | 8. Employee Contacts | | |
| | | | X | 9. Knowledge of Work | | |
| | X | | | 10. Work Judgments | | **SECTION C** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period. |
| | X | | | 11. Planning and Organizing | | |
| | X | | | 12. Job Skill Level | | SEE ATTACHED |
| | | | X | 13. Quality of Work | | |
| | | | X | 14. Volume of Acceptable Work | | |
| | X | | | 15. Meeting Deadlines | | |
| | | | X | 16. Accepts Responsibility | | |
| | X | | | 17. Accepts Direction | | |
| | X | | | 18. Accepts Change | | |
| | X | | | 19. Effectiveness under Stress | | **SECTION D** Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see instructions) |
| | X | | | 20. Appearance of Work Station | | |
| | X | | | 21. Operation & Care of Equip | | |
| | X | | | 22. Work Coordination | | SEE ATTACHED |
| | | | X | 23. Initiative | | |
| | X | | | 24. Report Writing/Spelling | | |
| | | | | 25. | | |
| | | | | 26. | | **SECTION E** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.) |
| | | | | 27. | | |
| | | | | 28. | | |
| | | | | 29. | | SEE ATTACHED |

**FOR EMPLOYEES WHO SUPERVISE OTHERS**

| | | | | | |
|---|---|---|---|---|---|
| | | | | 30. Planning & Organizing | |
| | | | | 31. Scheduling & Coordinating | |
| | | | | 32. Training & Instructing | |
| | | | | 33. Effectiveness | |
| | | | | 34. Evaluating Subordinates | |
| | | | | 35. Judgments & Decisions | |
| | | | | 36. Leadership | |
| | | | | 37. Operational Economy | |
| | | | | 38. Supervisory Control | |
| | | | | 39. | |
| | | | | 40. | |
| | | | | 41. | |

**RATER:** I certify this represents my best judgment. ☐ I DO  ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)

(RATER'S SIGNATURE) *RVC* (TITLE) Lieutenant (DATE) 2/13/06

**REVIEWER:** (IF NONE, SO INDICATE)

(REVIEWER'S SIGNATURE) (TITLE) Captain (DATE) 2/13/06

**EMPLOYEE:** I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.
☐ I wish to discuss this report with the reviewer.

**COMMENT:**

**CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E**

EMPLOYEE'S SIGNATURE: *Gregg Wessel* (DATE) 13 Feb 06

70-117-2

*CODE KEY:  1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply

PL.APP.000250

# PERFORMANCE EVALUATION REPORT ATTACHMENT

| EMPLOYEE NAME (Last)      (First)  (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| **Wessels, Gregg** | **4768** | **Homeland Security** | **Metro** | **Metro STAR** |
| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
| **Senior Police Officer** | **Permanent** | **Squad One** | | **27 Feb 06** |

**SECTION B:** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

Items 6) Public Contacts, 9) Knowledge of Work, 13) Quality of Work, 14) Volume of Acceptable Work, 16) Accepts Responsibility and 23) Initiative.

Gregg Wessels has been assigned to Metro Special Tactics and Response for the last month; however he has been a Team Leader and a member of the Response Pool for this reporting period. I feel comfortable in writing this evaluation I have work with and around Gregg many times during his career. He is an extremely experienced officer, a team leader and part time understudy. Gregg is a member of the WMD Entry Team. Gregg is a talented leader both formally and informally, he leads by example. He is a capable instructor one who relates his subject matter with ease. His team has flourished under his tutelage. He is not satisfied with the status quo and constantly challenges his team to improve.

Gregg's reports are concise, accurate and complete. He works well with the public and more importantly in this job works well with other police entities.    Gregg is capable of taking and giving orders, he needs little supervision and can be counted on to complete any task assigned. The result of his labors is always a quality product. He is a hard worker and can be counted on to go the extra mile regardless of the assignment. As a natural leader he accepts responsibility for things that go well and those that do not go well. When confronted with a problem Gregg searches out a cause and a remedy. Gregg Wessels displays the ability to act and make decisions without the help or advice of other people he searches out ways to improve his team and the unit's abilities and capabilities.

On January 23, 2006 Gregg Wessels thru experience and superior observation skills apprehended Richard Wilson just after a robbery at the French Way cleaners in Des Moines. Wilson was a suspect in at least three other robberies in the previous three days.

**SECTION C: Record** specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:
None for this period

**SECTION D:** Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)

None for this period.

**SECTION E:** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explains checks in Columns 1 and 2):

In the last period has not had a chargeable accident. He has received a written reprimand.

| | □ I DO |
|---|---|
| **RATER:** I certify this represents my best judgment. □ I DO NOT recommend this employee be granted permanent status (for probationary reports only) | |
| (RATER'S SIGNATURE)          (TITLE)          (DATE) | |
|                                    Lieutenant | |
| **EMPLOYEE'S SIGNATURE:**                              (DATE) | |

PL.APP.000251

# PERFORMANCE EVALUATION REPORT

USE INK OR TYPEWRITER FOR FINAL MARKINGS

| EMPLOYEE NAME (Last) (First) (Init)<br>**Wessels, Gregg** | EMPLOYEE NO.<br>**4768** | DIVISION<br>**Homeland Security** | SECTION<br>**Metro Star** | UNIT |
|---|---|---|---|---|
| CLASS TITLE<br>**Senior Police Officer** | EMPLOYEE STATUS<br>**Permanent** | ASSIGNMENT<br>**Days** | DUE DATE:<br>**27 Feb 08** | |

| | See Key* | | | SECTION A<br>FACTOR CHECKLIST<br>Immediate Supervisor Must Check Each Factor In the Appropriate Column<br>SEE CODE KEY* | |
|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | | 5 |

| 1 | 2 | 3 | 4 | Factor | 5 |
|---|---|---|---|---|---|
| | | X | | 1. Observance of Work Hours | |
| | | X | | 2. Attendance | |
| | | X | | 3. Grooming & Dress | |
| | | X | | 4. Compliance with Rules | |
| | | X | | 5. Safety Practices | |
| | | | X | 6. Public Contacts | |
| | | X | | 7. Suspect Contacts | |
| | | X | | 8. Employee Contacts | |
| | | | X | 9. Knowledge of Work | |
| | | X | | 10. Work Judgments | |
| | | X | | 11. Planning and Organizing | |
| | | X | | 12. Job Skill Level | |
| | | | X | 13. Quality of Work | |
| | | X | | 14. Volume of Acceptable Work | |
| | | X | | 15. Meeting Deadlines | |
| | | | X | 16. Accepts Responsibility | |
| | | X | | 17. Accepts Direction | |
| | | X | | 18. Accepts Change | |
| | | X | | 19. Effectiveness under Stress | |
| | | X | | 20. Appearance of Work Station | |
| | | X | | 21. Operation & Care of Equip | |
| | | X | | 22. Work Coordination | |
| | | X | | 23. Initiative | |
| | | X | | 24. Report Writing/Spelling | |
| | | | | 25. | |
| | | | | 26. | |
| | | | | 27. | |
| | | | | 28. | |
| | | | | 29. | |

**FOR EMPLOYEES WHO SUPERVISE OTHERS**

| | | | | Factor | |
|---|---|---|---|---|---|
| | | | | 30. Planning & Organizing | |
| | | | | 31. Scheduling & Coordinating | |
| | | | | 32. Training & Instructing | |
| | | | | 33. Effectiveness | |
| | | | | 34. Evaluating Subordinates | |
| | | | | 35. Judgments & Decisions | |
| | | | | 36. Leadership | |
| | | | | 37. Operational Economy | |
| | | | | 38. Supervisory Control | |
| | | | | 39. | |
| | | | | 40. | |
| | | | | 41. | |

**CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E**

70-117-2

**SECTION B** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4

SEE ATTACHED

**SECTION C** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period.

SEE ATTACHED

**SECTION D** Describe STANDARD performance (optional for most factors checked In Col 3; Mandatory for some factors - see instructions)

**SECTION E** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)

SEE ATTACHED

☐ I DO

**RATER:** I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)
(RATER'S SIGNATURE) (TITLE) (DATE)
_Lieutenant_

**REVIEWER:** (IF NONE, SO INDICATE)
(REVIEWER'S SIGNATURE) (TITLE) (DATE)
_Major_ 3-27-08

**EMPLOYEE:** I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.
☐ I wish to discuss this report with the reviewer.

COMMENT:

EMPLOYEE'S SIGNATURE _Gregg Wessels_ (DATE) _31MAR08_

**\*CODE KEY:** 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply

PL.APP.000252

# PERFORMANCE EVALUATION REPORT ATTACHMENT

| EMPLOYEE NAME (Last)    (First)  (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| **Wessels, Greg** | **4768** | **Homeland** | **Metro Star** | |
| | | **Security** | | |
| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
| **Senior Police Officer** | **Permanent** | **Days** | | **27 Feb 08** |

**SECTION B:** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

#6. Officer Wessels is a member of the Metro Special Tactics and Response Team. Part of this assignment is working with the public during critical incidents and dignitary visits. He presents himself in a professional manner during his encounters with the public and other police agencies.

#9. Officer Wessels has a wealth of knowledge when it comes to weapons and tactical equipment. He is an armorer and assists the Police Academy during annual training and qualification shoots.

#13. Officer Wessels work is completed in a professional manner and is neat and concise.

#14 and #16. Officer Wessels has been assigned certain task to be completed on a daily basis. He completes these tasks with little or no supervision.

#23. Officer Wessels makes himself available when task needs to be completed. He is always available to assist his co-workers when needed.

**SECTION C:** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:

None

**SECTION D:** Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)
None

**SECTION E:** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explain checks in Columns 1 and 2):

None at this time

| |
|---|
| ☐ I DO |
| **RATER:** I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only) |
| (RATER'S SIGNATURE)    (TITLE)    (DATE) |
| Lieutenant    27 man 08 |
| **EMPLOYEE'S SIGNATURE:**    (DATE) |

PL.APP.000253

# PERFORMANCE EVALUATION REPORT

Wessels

**INK OR TYPEWRITER FOR FINAL MARKINGS**

| EMPLOYEE NAME (Last) (First) (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| ssels, Greg | 4768 | Uniform | Patrol | 2nd Watch |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| **Senior Police Officer** | **Permanent** | **One Squad One** | **12 Feb. 09** |

| 1 | 2 | 3 | 4 | FACTOR CHECKLIST / SEE CODE KEY* | 5 |
|---|---|---|---|---|---|
| | | | X | 1. Observance of Work Hours | |
| | | X | | 2. Attendance | |
| | | X | | 3. Grooming & Dress | |
| | | X | | 4. Compliance with Rules | |
| | | X | | 5. Safety Practices | |
| | | | X | 6. Public Contacts | |
| | | | X | 7. Suspect Contacts | |
| | X | | | 8. Employee Contacts | |
| | | X | | 9. Knowledge of Work | |
| | | | X | 10. Work Judgments | |
| | | X | | 11. Planning and Organizing | |
| | | | X | 12. Job Skill Level | |
| | | X | | 13. Quality of Work | |
| | | X | | 14. Volume of Acceptable Work | |
| | | X | | 15. Meeting Deadlines | |
| | | X | | 16. Accepts Responsibility | |
| | | X | | 17. Accepts Direction | |
| | | X | | 18. Accepts Change | |
| | | X | | 19. Effectiveness under Stress | |
| | | X | | 20. Appearance of Work Station | |
| | | X | | 21. Operation & Care of Equip | |
| | | X | | 22. Work Coordination | |
| | | X | | 23. Initiative | |
| | | X | | 24. Report Writing/Spelling | |
| | | | | 25. | |
| | | | | 26. | |
| | | | | 27. | |
| | | | | 28. | |
| | | | | 29. | |

**SECTION A** — FACTOR CHECKLIST. Immediate Supervisor Must Check Each Factor in the Appropriate Column SEE CODE KEY*

**SECTION B** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4

SEE ATTACHED

**SECTION C** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period.

SEE ATTACHED

**SECTION D** Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see instructions)

SEE ATTACHED

**SECTION E** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)

SEE ATTACHED

### FOR EMPLOYEES WHO SUPERVISE OTHERS

| | | | | |
|---|---|---|---|---|
| | | | | 30. Planning & Organizing |
| | | | | 31. Scheduling & Coordinating |
| | | | | 32. Training & Instructing |
| | | | | 33. Effectiveness |
| | | | | 34. Evaluating Subordinates |
| | | | | 35. Judgments & Decisions |
| | | | | 36. Leadership |
| | | | | 37. Operational Economy |
| | | | | 38. Supervisory Control |
| | | | | 39. |
| | | | | 40. |
| | | | | 41. |

**CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E**

☐ I DO

RATER: I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)

(RATER'S SIGNATURE) (TITLE) Lieutenant (DATE) 12 Feb. 09 — John Scarpino

REVIEWER: (IF NONE, SO INDICATE)
(REVIEWER'S SIGNATURE) William R. Jones (TITLE) Captain — Major (DATE) 12 Feb. 09

EMPLOYEE: I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.
☐ I wish to discuss this report with the reviewer.

COMMENT:

EMPLOYEE'S SIGNATURE: Gregg Wessels (DATE) 20 Feb 09

70-117-2

*CODE KEY: 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply

PL.APP.000254

# PERFORMANCE EVALUATION REPORT ATTACHMENT

| EMPLOYEE NAME (Last) (First) (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| Wessels, Greg | 4768 | Uniform | Patrol | 2nd Watch |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| Senior Police Officer | Permanent | Squad One | 12 Feb. 09 |

**SECTION B:** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

**Item 6 - Public Contacts:** Officer Wessels was a member of the Metro Special Tactics and Response Team. Part of Greg's duties required him to work in and around the public during many dignitary visits. During these assignments Greg responded in a professional manner and presented a positive image.

**Item 9 – Knowledge of Work, Item 10 – Work Judgments, Item 12 – Job Skill Level:** Greg had been assigned to the Metro Special Tactics for the past couple of years. During that time Greg was a member of the WMD team, as well as a member of the Tactical Entry Team. Both of these areas require an extremely experienced officer and one that can use sound judgment.

**SECTION C:** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:
**None**

**SECTION D:** Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)
**Item 13 – Quality of Work:** Because of Greg's experience, he has the comprehension and the understanding to know what needs to be done and when it's to be done. Greg normally is able to make appropriate decisions without relying on direct supervision.

**#22 Work Coordination:** As a member of Metro STAR, Greg has learned to coordinate various tasks among the members of his squad.

**SECTION E:** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explain checks in Columns 1 and 2):

**Item 8 – Employee Contacts:** Greg recently was disciplined for his inappropriate conduct towards fellow team members and his supervisor. That conduct consisted of walking out on a team training class, missing several On-Call assignments, and being insubordinate to a supervisor.

| ☐ I DO | | |
|---|---|---|
| **RATER:** I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only) | | |
| (RATER'S SIGNATURE) | (TITLE) | (DATE) |
| | Lieutenant | 12 Feb. 09    John Scarpino |
| EMPLOYEE'S SIGNATURE: | | (DATE) |
| Gregg Wessels | | |

PL.APP.000255

# PERFORMANCE EVALUATION REPORT



| EMPLOYEE NAME (Last) (First) (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| **Wessels, Gregg** | **4768** | **Patrol** | **Patrol** | |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| **Senior Police Officer** | **Permanent** | **Traffic Unit** | **27 Feb 2010** |

| See Key* | | | | SECTION A | SECTION B Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4 |
|---|---|---|---|---|---|
| | | | | FACTOR CHECKLIST Immediate Supervisor Must Check Each Factor in the Appropriate Column SEE CODE KEY* | SEE ATTACHED |

| 1 | 2 | 3 | 4 | | 5 |
|---|---|---|---|---|---|
| | | X | | 1. Observance of Work Hours | SECTION C  Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period. |
| | | X | | 2. Attendance | |
| | | X | | 3. Grooming & Dress | |
| | | X | | 4. Compliance with Rules | SEE ATTACHED |
| | | X | | 5. Safety Practices | |
| | | X | | 6. Public Contacts | |
| | | X | | 7. Suspect Contacts | |
| | | X | | 8. Employee Contacts | |
| | | | X | 9. Knowledge of Work | |
| | | X | | 10. Work Judgments | SECTION D  Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see instructions) |
| | | X | | 11. Planning and Organizing | |
| | | X | | 12. Job Skill Level | |
| | | X | | 13. Quality of Work | SEE ATTACHED |
| | | X | | 14. Volume of Acceptable Work | |
| | | X | | 15. Meeting Deadlines | |
| | | X | | 16. Accepts Responsibility | |
| | | X | | 17. Accepts Direction | |
| | | X | | 18. Accepts Change | |
| | | X | | 19. Effectiveness under Stress | SECTION E  Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.) |
| | | X | | 20. Appearance of Work Station | |
| | | X | | 21. Operation & Care of Equip | |
| | | X | | 22. Work Coordination | SEE ATTACHED |
| | | X | | 23. Initiative | |
| | | X | | 24. Report Writing/Spelling. | |
| | | | | 25. | |
| | | | | 26. | |
| | | | | 27. | |
| | | | | 28. | |
| | | | | 29. | |

| FOR EMPLOYEES WHO SUPERVISE OTHERS | |
|---|---|
| 30. Planning & Organizing | |
| 31. Scheduling & Coordinating | |
| 32. Training & Instructing | |
| 33. Effectiveness | |
| 34. Evaluating Subordinates | |
| 35. Judgments & Decisions | |
| 36. Leadership | |
| 37. Operational Economy | |
| 38. Supervisory Control | |
| 39. | |
| 40. | |
| 41. | |

☐ I DO

RATER:  I certify this represents my best judgment.  ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)

(RATER'S SIGNATURE)          (TITLE)          (DATE)
                              Sergeant    02/19/2010    *John Leporte*

REVIEWER:  (IF NONE, SO INDICATE)
(REVIEWER'S SIGNATURE)          (TITLE)          (DATE)
                              Lieutenant    2/20/10    *Rick L Host*

EMPLOYEE:  I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.
☐ I wish to discuss this report with the reviewer.

COMMENT:

CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E

EMPLOYEE'S SIGNATURE          (DATE)  22 Feb 10
*Gregg Wessels*

70-117-2

*CODE KEY: 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply

PL.APP.000258

**PERFORMANCE EVALUATION REPORT ATTACHMENT**

| EMPLOYEE NAME (Last)      (First)  (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| Wessels, Gregg | 4768 | Patrol | Patrol | |
| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
| Senior Police Officer | Permanent | Traffic Unit | | 27 Feb 2010 |

**SECTION B:** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:
9: Gregg has dedicated time to be qualified as a firearms instructor, taser instructor, and is knowledgeable in tactical exercises that he had trained in while part of the STAR team. Although he has dropped most of these extra duties, he remains a valuable resource and an asset to his assigned area.

**SECTION C:** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:

**SECTION D:** Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)
6, 9, 13, 14, 23: As stated by the directions to properly complete employee evaluations, the definition of Standard Performance is "Consistantly...meeting or exceeding standards in all critical factors"(emphasis added). Gregg's performance fits this definition and performs in a manner that is expected by management of every employee. Gregg needs minimal supervision and is a dependable employee and handles himself well with all public contacts. He uses his profound knowledge acquired by past experiences and shares that knowledge and insight with his peers. His reports and actions taken are thorough and complete. He takes direction well and works well with the watch to accomplish our goals.

**SECTION E:** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explain checks in Columns 1 and 2): None at this time.

RATER: I certify this represents my best judgment. ☐ I DO   ☐ I DO NOT recommend this
employee be granted permanent status (for probationary reports only)

| RATER'S SIGNATURE) | (TITLE) | (DATE) |
|---|---|---|
| | Sergeant 02/19/2010 | John Leporte |

EMPLOYEE'S SIGNATURE:                                    (DATE)
2/24/10

PL.APP.000257

**INK OR TYPEWRITER FOR FINAL MARKINGS**

| EMPLOYEE NAME (Last) (First) (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| Wessels, Greg | 4768 | Uniform | Patrol | 2nd Watch |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| Senior Police Officer | Permanent | One Squad One | 12 Feb. 09 |

| | See Key* | | | SECTION A | |
|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | FACTOR CHECKLIST — Immediate Supervisor Must Check Each Factor in the Appropriate Column — SEE CODE KEY* | 5 |

| 1 | 2 | 3 | 4 | FACTOR | 5 |
|---|---|---|---|---|---|
| | | | X | 1. Observance of Work Hours | |
| | | | X | 2. Attendance | |
| | | | X | 3. Grooming & Dress | |
| | | | X | 4. Compliance with Rules | |
| | | | X | 5. Safety Practices | |
| | | X | | 6. Public Contacts | |
| | | X | | 7. Suspect Contacts | |
| | X | | | 8. Employee Contacts | |
| | | X | | 9. Knowledge of Work | |
| | | X | | 10. Work Judgments | |
| | | | X | 11. Planning and Organizing | |
| | | X | | 12. Job Skill Level | |
| | | | X | 13. Quality of Work | |
| | | | X | 14. Volume of Acceptable Work | |
| | | | X | 15. Meeting Deadlines | |
| | | | X | 16. Accepts Responsibility | |
| | | | X | 17. Accepts Direction | |
| | | | X | 18. Accepts Change | |
| | | | X | 19. Effectiveness under Stress | |
| | | | X | 20. Appearance of Work Station | |
| | | | X | 21. Operation & Care of Equip | |
| | | | X | 22. Work Coordination | |
| | | | X | 23. Initiative | |
| | | | X | 24. Report Writing/Spelling | |
| | | | | 25. | |
| | | | | 26. | |
| | | | | 27. | |
| | | | | 28. | |
| | | | | 29. | |

**SECTION B** — Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4

SEE ATTACHED

**SECTION C** — Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period.

SEE ATTACHED

**SECTION D** — Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see Instructions)

SEE ATTACHED

**SECTION E** — Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)

SEE ATTACHED

**FOR EMPLOYEES WHO SUPERVISE OTHERS**

| 30. Planning & Organizing |
| 31. Scheduling & Coordinating |
| 32. Training & Instructing |
| 33. Effectiveness |
| 34. Evaluating Subordinates |
| 35. Judgments & Decisions |
| 36. Leadership |
| 37. Operational Economy |
| 38. Supervisory Control |
| 39. |
| 40. |
| 41. |

☐ I DO

RATER: I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)

| (RATER'S SIGNATURE) | (TITLE) | (DATE) |
|---|---|---|
| | Lieutenant | 12 Feb. 09 | John Scarpino |

REVIEWER: (IF NONE, SO INDICATE)

| (REVIEWER'S SIGNATURE) | (TITLE) | (DATE) |
|---|---|---|
| William R. Jones | Captain —Major | 12 Feb. 09 |

EMPLOYEE: I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.

☐ I wish to discuss this report with the reviewer.

COMMENT:

EMPLOYEE'S SIGNATURE: Gregg Wessels (DATE) 20 Feb 09

**CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E**

70-117-2

*CODE KEY: 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply

PL.APP.000258



# PEÞ ORMANCE EVALUATION RF⌐⌐T ATTACHMENT

| EMPLOYEE NAME (Last)　(First) (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| ⌐⌐ssels, Greg | 4768 | **Uniform** | **Patrol** | **2nd Watch** |
| ⌐⌐S TITLE | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
| **Senior Police Officer** | **Permanent** | **Squad One** | | **12 Feb. 09** |

**SECTION B:** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

**Item 6 - Public Contacts:** Officer Wessels was a member of the Metro Special Tactics and Response Team. Part of Greg's duties required him to work in and around the public during many dignitary visits. During these assignments Greg responded in a professional manner and presented a positive image.

**Item 9 – Knowledge of Work, Item 10 – Work Judgments, Item 12 – Job Skill Level:** Greg had been assigned to the Metro Special Tactics for the past couple of years. During that time Greg was a member of the WMD team, as well as a member of the Tactical Entry Team. Both of these areas require an extremely experienced officer and one that can use sound judgment.

**SECTION C:** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:
**None**

**SECTION D:** Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)
**Item 13 – Quality of Work:** Because of Greg's experience, he has the comprehension and the understanding to know what needs to be done and when it's to be done. Greg normally is able to make appropriate decisions without relying on direct supervision.

**#22 Work Coordination:** As a member of Metro STAR, Greg has learned to coordinate various tasks among the ⌐⌐bers of his squad.

**SECTION E:** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explain checks in Columns 1 and 2):

**Item 8 – Employee Contacts:** Greg recently was disciplined for his inappropriate conduct towards fellow team members and his supervisor. That conduct consisted of walking out on a team training class, missing several On-Call assignments, and being insubordinate to a supervisor.

|  | □ I DO | | |
|---|---|---|---|
| **RATER:** I certify this represents my best judgment. □ I DO NOT recommend this | | | |
| employee be granted permanent status (for probationary reports only) | | | |
| (RATER'S SIGNATURE) | (TITLE) | (DATE) | |
| | Lieutenant | 12 Feb. 09 | John Scarpino |
| EMPLOYEE'S SIGNATURE: | | (DATE) | |
| Gregg Wessels | | | |

PL.APP.000259

# PERFORMANCE EVALUATION REPORT



**USE INK OR TYPEWRITER FOR FINAL MARKINGS**

| EMPLOYEE NAME (Last)     (First) (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| **Wessels, Gregg** | **4768** | **Uniform** | **Patrol** | **1** |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| **Senior Police Officer** | **Permanent** | **Squad 2** | **02-27-12** |

| See Key* | | | | SECTION A | SECTION B | Record job STRENGTHS, superior performance incidents, progress achieved, or |
|---|---|---|---|---|---|---|

| 1 | 2 | 3 | 4 | FACTOR CHECKLIST (Immediate Supervisor Must Check Each Factor in the Appropriate Column) SEE CODE KEY* | 5 |
|---|---|---|---|---|---|
| | | X | | 1. Observance of Work Hours | |
| | | X | | 2. Attendance | |
| | | X | | 3. Grooming & Dress | |
| | | X | | 4. Compliance with Rules | |
| | | X | | 5. Safety Practices | |
| | | X | | 6. Public Contacts | |
| | | X | | 7. Suspect Contacts | |
| | | X | | 8. Employee Contacts | |
| | | | X | 9. Knowledge of Work | |
| | | X | | 10. Work Judgments | |
| | | X | | 11. Planning and Organizing | |
| | | | X | 12. Job Skill Level | |
| | | X | | 13. Quality of Work | |
| | | | X | 14. Volume of Acceptable Work | |
| | | X | | 15. Meeting Deadlines | |
| | | | X | 16. Accepts Responsibility | |
| | | X | | 17. Accepts Direction | |
| | | X | | 18. Accepts Change | |
| | | X | | 19. Effectiveness under Stress | |
| | | X | | 20. Appearance of Work Station | |
| | | X | | 21. Operation & Care of Equip | |
| | | X | | 22. Work Coordination | |
| | | | X | 23. Initiative | |
| | | X | | 24. Report Writing/Spelling | |
| | | | | 25. | |
| | | | | 26. | |
| | | | | 27. | |
| | | | | 28. | |
| | | | | 29. | |

**FOR EMPLOYEES WHO SUPERVISE OTHERS**

| | | | | |
|---|---|---|---|---|
| | | | | 30. Planning & Organizing |
| | | | | 31. Scheduling & Coordinating |
| | | | | 32. Training & Instructing |
| | | | | 33. Effectiveness |
| | | | | 34. Evaluating Subordinates |
| | | | | 35. Judgments & Decisions |
| | | | | 36. Leadership |
| | | | | 37. Operational Economy |
| | | | | 38. Supervisory Control |
| | | | | 39. |
| | | | | 40. |
| | | | | 41. |

CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E

**SECTION B** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4
SEE ATTACHED

**SECTION C** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period.
SEE ATTACHED

**SECTION D** Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see instructions)
SEE ATTACHED

**SECTION E** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)
SEE ATTACHED

☐ I DO

**RATER:** I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)

| (RATER'S SIGNATURE) | (TITLE) | (DATE) |
|---|---|---|
| *Scott Drews* | Sergeant | 27 February 2012   SCOTT DREWS |

**REVIEWER:** (IF NONE, SO INDICATE)

| (REVIEWER'S SIGNATURE) | (TITLE) | (DATE) |
|---|---|---|
| *Salih* | Lieutenant | 27 FEB 12   Scott Rounds |

**EMPLOYEE:** I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.
☐ I wish to discuss this report with the reviewer.

COMMENT:
*Gregg Wessels*

| EMPLOYEE'S SIGNATURE: | (DATE) |
|---|---|
| *Gregg Wessels* | 2/29/12 |

70-117-2

*CODE KEY: 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply

PL.APP.000260

# PERFORMANCE EVALUATION REPORT ATTACHMENT

| EMPLOYEE NAME (Last)          (First) (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| **Wessels, Gregg** | **4768** | **Uniform** | **Patrol** | **2ⁿᵈ Watch** |
| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
| **Senior Police Officer** | **Permanent** | **Squad 2** | | **02-27-12** |

SECTION B: Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

**9. Knowledge of Work:** Officer Wessels is the most senior officer in Squad 2 and has a vast amount of experience because he has spent time in various parts of the department. I feel comfortable in his decisions on handling all types of situations because of this experience.

**12. Job Skill Level:** Officer Wessels has a good working knowledge of laws & ordinances and how they are applied. Officer Wessels' reports are precise and accurate.

**14. Volume of Acceptable Work:** Officer Wessels takes his trips and completes them in a timely manner. If Officer Wessels sees trips that are pending, he will volunteer for it.

**16. Accepts Responsibility:** I have had the opportunity to assist Officer Wessels on trips and he does not hesitate take control of the situation and complete all paperwork without being asked.

**23. Initiative:** It appears to me that Officer Wessels takes pride in completing all tasks in a precise & correct manner. As mentioned earlier, Officer Wessels will not hesitate to volunteer for pending trips and take care of them.

SECTION C: Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:

SECTION D: Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)

**6. Public Contacts:** Officer Wessels treats members of the public in a professional and courteous manner.

**9. Knowledge of Work:** See above in job strengths.

**13. Quality of Work:** Officer Wessels work is comparable to that of his co-workers.

**14. Volume of Acceptable Work:** See above in job strengths.

**23. Initiative:** See above in job strengths.

SECTION E: Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explain checks in Columns 1 and 2):

None

| | | | | |
|---|---|---|---|---|
| | | ☐ I DO | | |
| RATER: I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only) | | | | |
| (RATER'S SIGNATURE) | (TITLE) | (DATE) | | |
| *Scott Dreyer* | Sergeant | 27 February 2012 | SCOTT DREYER | |
| EMPLOYEE'S SIGNATURE | | | (DATE) | |
| *Gregg Wessels* | | | 2/29/12 | |

PL.APP.000261

**USE INK OR TYPEWRITER FOR FINAL MARKINGS**

| EMPLOYEE NAME (Last) (First) (Init) | | | | | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|---|---|---|---|
| **Wessels, Gregg** | | | | | **4768** | **Operations** | **Patrol** | **3rd Watch** |
| CLASS TITLE | | | | | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
| **Sergeant** | | | | | **Permanent** | **Squad Supervisor** | | **8/20/14** |

| See Key* | | | | SECTION A | |
|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | FACTOR CHECKLIST Immediate Supervisor Must Check Each Factor In the Appropriate Column SEE CODE KEY* | 5 |

**SECTION B** — Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4

SEE ATTACHED

| 1 | 2 | 3 | 4 | SECTION A Factor |
|---|---|---|---|---|
| | | X | | 1. Observance of Work Hours |
| | | X | | 2. Attendance |
| | | X | | 3. Grooming & Dress |
| | | X | | 4. Compliance with Rules |
| | | X | | 5. Safety Practices |
| | | X | | 6. Public Contacts |
| | | X | | 7. Suspect Contacts |
| | | X | | 8. Employee Contacts |
| | | | X | 9. Knowledge of Work |
| | | X | | 10. Work Judgments |
| | | X | | 11. Planning and Organizing |
| | | X | | 12. Job Skill Level |
| | | | X | 13. Quality of Work |
| | | X | | 14. Volume of Acceptable Work |
| | | X | | 15. Meeting Deadlines |
| | | | X | 16. Accepts Responsibility |
| | | X | | 17. Accepts Direction |
| | | X | | 18. Accepts Change |
| | | X | | 19. Effectiveness under Stress |
| | | X | | 20. Appearance of Work Station |
| | | X | | 21. Operation & Care of Equip |
| | | X | | 22. Work Coordination |
| | | | X | 23. Initiative |
| | | X | | 24. Report Writing/Spelling |
| | | | | 25. |
| | | | | 26. |
| | | | | 27. |
| | | | | 28. |
| | | | | 29. |

**SECTION C** — Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period.

SEE ATTACHED

**SECTION D** — Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see instructions)

SEE ATTACHED

**SECTION E** — Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)

SEE ATTACHED

**FOR EMPLOYEES WHO SUPERVISE OTHERS**

| 1 | 2 | 3 | 4 | Factor |
|---|---|---|---|---|
| | X | | | 30. Planning & Organizing |
| | X | | | 31. Scheduling & Coordinating |
| | | X | | 32. Training & Instructing |
| | | X | | 33. Effectiveness |
| | X | | | 34. Evaluating Subordinates |
| | X | | | 35. Judgments & Decisions |
| | | X | | 36. Leadership |
| | X | | | 37. Operational Economy |
| | | X | | 38. Supervisory Control |
| | | | | 39. |
| | | | | 40. |
| | | | | 41. |

**CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E**

☐ I DO

**RATER:** I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)

(RATER'S SIGNATURE) (TITLE) (DATE)
lieutenant Joseph M. Leo 8/30/14

**REVIEWER:** (IF NONE, SO INDICATE)
(REVIEWER'S SIGNATURE) (TITLE) (DATE)
Captain Scott Rounds 9/3/14

**EMPLOYEE:** I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.
☐ I wish to discuss this report with the reviewer.

**COMMENT:**

EMPLOYEE'S SIGNATURE (DATE)
Gregg Wessels 9/9/14

70-117-2

*CODE KEY: 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply*

PL.APP.000262

# PERFORMANCE EVALUATION REPORT ATTACHMENT

| EMPLOYEE NAME (Last) (First) (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| **Wessels, Gregg** | **4768** | **Operations** | **Patrol** | **3rd Watch** |
| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
| **Sergeant** | **Permanent** | **Squad Supervisor** | | **8/20/14** |

**SECTION B:** Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

**9. KNOWLEDGE OF WORK:** Sergeant Wessels demonstrates a strong, functional knowledge of city and state traffic and criminal codes and department general orders and SOP's. He is well informed of critical issues affecting the organization and keeps alert to current practices.

**13. QUALITY OF WORK:** Sergeant Wessels shows professional concern for quality work and he demonstrates accuracy, thoroughness and orderliness in performing work assignments.

**16. ACCEPTS RESPONSIBILITY:** Sergeant Wessels Accepts responsibility for mistakes and shortcomings of subordinates. He accepts full responsibility for results of his actions.

During this evaluation period, Sergeant Wessels has received three separate disciplinary actions;

December 2013, received a 4-day suspension for Personal Conduct & Use of Force Violation. Sergeant Wessels struck a handcuffed prisoner who was in the back of the wagon and then failed to properly report the incident. The suspect caused damage and was unruly while in the back of the wagon prior to Sergeant Wessels interaction.

October 2013, received a 2-day suspension for Discharging of Firearms-not Permitted. Sergeant Wessels fired his weapon at the tire of a vehicle attempting to flee after previously being involved in a domestic situation.

October 2013, received a Written Reprimand for Unsatisfactory Service. While working off-duty for Operation Downtown, Sergeant Wessels failed to make an assault report for an intoxicated bar patron.

Sergeant Wessels accepted responsibility for his conduct in each of these situations, he made no excuses or attempted to minimize the severity of these violations. His attitude towards his duties as a police officer and supervisor are admirable. He has not allowed these incidents to detract from his responsibilities or attitude as squad supervisor. I have observed Sergeant Wessels over the last several months, his character allows him to lead from the front.

Sergeant Wessels has overcame these incidents and it is my observation he is a top tier supervisor and police officer. These incidents should not overshadow his overall performance.

**23. INITIATIVE:** Sergeant Wessels will take charge in the absence of detailed instructions and is judicious in carrying out assignments without directions.

**32. TRAINING & INSTRUCTING:** Sergeant Wessels has taken on additional duties with the organization by being a firearms instructor and armorer. He is diligent in carrying out these assignments. I have observed him in the classroom with recruits during firearms, he is methodical and patient in his instruction.

**33. EFFECTIVENESS:** Sergeant Wessels commands respect from his peers and subordinates he is persuasive and a role model to other officers and supervisors.

**36. LEADERSHIP:** Sergeant Wessels demonstrates strong, dynamic leadership, is widely recognized as a strong leader by his peers and commanders. Sergeant Wessels demonstrates excellence in a critical leadership role. He conveys an authoritative image that commands respect and is influential.

PL.APP.000263

**38. SUPERVISORY CONTROL:** Sergeant Wessels effectively manages the marginal performer, he settles disputes firmly and disciplinary problems quickly. He takes appropriate remedial action when necessary.

On July 3, 2014 at 2035 hours dispatch received several calls of a man from 1313 McCormick shooting at people. The suspect barricaded himself inside this address. Sergeant Wessels, arrived on scene and immediately took control, establishing a command post and communications with dispatch, ensuring a perimeter was established, evacuating anyone in harm's way, gathering any information about the residence/occupants. Drawing form his experience in the Metro STAR, he prepared on operations order and established a reactionary/entry team if attempts to gain voluntary surrender failed or his actions became more violent requiring action. Sergeant Wessesls, through his coordinated efforts was able to negotiate the suspects surrender.

**SECTION C:** Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:

Gregg Wessels was promoted to Sergeant on August 20, 2012, he has spent this time on patrol, including a special assignment as the supervisor for the Special Enforcement Team (SET). During this period, he has demonstrated a high level of competency and effectiveness, he leads by example and takes responsibility for his actions. I would recommend Sergeant Wessels for any assignment in Investigations Division or Metro STAR, his vast amount of knowledge, skills and attitude make him a role model to others. I would also encourage Sergeant Wessels to pursue the rank of Lieutenant.

**SECTION D:** Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see instructions)

**6. PUBLIC CONTACT:** Sergeant Wessels is respectful and courteous of the public and represents himself and the department in a professional manner. He is reasonably willing to assist and/or resolve conflicts. On occasions, Sergeant Wessels has allowed his emotions to effect his actions and judgments as outlined in Section B, 16: Accepts Responsibility.

**9. KNOWLEDGE OF WORK:** Refer to Section B.

**13. QUALITY OF WORK:** Refer to Section B.

**14. VOLUME OF ACCEPTABLE WORK:** Sergeant Wessels work is acceptable and he can be counted on and trusted with special assignments that require diligence or of a sensitive nature.

**23. INITIATIVE:** Refer to Section B.

**SECTION E:** Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explain checks in Columns 1 and 2):

None at this time

> ☐ I DO
> **RATER:** I certify this represents my best judgment. ☐ I DO NOT recommend this
> employee be granted permanent status (for probationary reports only)
> (RATER'S SIGNATURE) (TITLE) (DATE)
> Lieutenant Joseph M. Leo 8/30/14
> EMPLOYEE'S SIGNATURE (DATE)
> 9/9/14
>
> Gregg Wessels

PL.APP.000264

# PERFORMANCE EVALUATION REPORT



**USE INK OR TYPEWRITER FOR FINAL MARKINGS**

| EMPLOYEE NAME (Last) (First) (Init) | | | | | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|---|---|---|---|
| Fong, Michael | | | | | 715613 | Patrol | Third Watch | |

| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | DUE DATE: |
|---|---|---|---|
| Police Officer | Permanent | Squad Three | 1-30-2008 |

| See Key* | | | | SECTION A | 5 | SECTION B — Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4 |
|---|---|---|---|---|---|---|

**SECTION A — FACTOR CHECKLIST — Immediate Supervisor Must Check Each Factor in the Appropriate Column — SEE CODE KEY***

| 1 | 2 | 3 | 4 | FACTOR | 5 |
|---|---|---|---|---|---|
| | | x | | 1. Observance of Work Hours | |
| | | x | | 2. Attendance | |
| | | x | | 3. Grooming & Dress | |
| | | x | | 4. Compliance with Rules | |
| | | x | | 5. Safety Practices | |
| | | x | | 6. Public Contacts | |
| | | X | | 7. Suspect Contacts | |
| | | X | | 8. Employee Contacts | |
| | | x | | 9. Knowledge of Work | |
| | | X | | 10. Work Judgments | |
| | | X | | 11. Planning and Organizing | |
| | | x | | 12. Job Skill Level | |
| | | x | | 13. Quality of Work | |
| | | x | | 14. Volume of Acceptable Work | |
| | | X | | 15. Meeting Deadlines | |
| | | x | | 16. Accepts Responsibility | |
| | | x | | 17. Accepts Direction | |
| | | X | | 18. Accepts Change | |
| | | x | | 19. Effectiveness under Stress | |
| | | X | | 20. Appearance of Work Station | |
| | | X | | 21. Operation & Care of Equip | |
| | | X | | 22. Work Coordination | |
| | | x | | 23. Initiative | |
| | | x | | 24. Report Writing/Spelling | |
| | | | | 25. | |
| | | | | 26. | |
| | | | | 27. | |
| | | | | 28. | |
| | | | | 29. | |

**SECTION B** — Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4

SEE ATTACHED

**SECTION C** — Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period.

SEE ATTACHED

**SECTION D** — Describe STANDARD performance (optional for most factors checked in Col 3; Mandatory for some factors - see instructions)

SEE ATTACHED

**SECTION E** — Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction. (Explain checks in Col. 1 and 2.)

SEE ATTACHED

**FOR EMPLOYEES WHO SUPERVISE OTHERS**

| | | | | FACTOR |
|---|---|---|---|---|
| | | | | 30. Planning & Organizing |
| | | | | 31. Scheduling & Coordinating |
| | | | | 32. Training & Instructing |
| | | | | 33. Effectiveness |
| | | | | 34. Evaluating Subordinates |
| | | | | 35. Judgments & Decisions |
| | | | | 36. Leadership |
| | | | | 37. Operational Economy |
| | | | | 38. Supervisory Control |
| | | | | 39. |
| | | | | 40. |
| | | | | 41. |

☐ I DO

**RATER:** I certify this represents my best judgment. ☐ I DO NOT recommend this employee be granted permanent status (for probationary reports only)

(RATER'S SIGNATURE) _____ (TITLE) Sergeant (DATE) 1-31-08

**REVIEWER:** ☐ (If NONE, SO INDICATE)
(REVIEWER'S SIGNATURE) _____ (TITLE) Sergeant CAPTAIN (DATE) 1/30/08

**EMPLOYEE:** I certify that this report has been discussed with me. I understand my signature does not necessarily indicate agreement.
☐ I wish to discuss this report with the reviewer.

**COMMENT:**

EMPLOYEE'S SIGNATURE: _____ (DATE) 1-31-08

CHECKS IN COLS. 1 AND 2 MUST BE EXPLAINED IN SECTION E

'0-117-2

*CODE KEY: 1 = Not satisfactory; 2 = Some Improvement Needed; 3 = Meets Standards; 4 = Exceeds Standards; 5 = Does Not Apply

PL.APP.000265

**GENERAL:**

1. Using a preliminary draft sheet and pencil, complete Section A first, then other appropriate sections. The rater should review the draft report with his own supervisor. Markings and comments should then be typed or inked in on the final form. Either the rater or reviewer (or both), should then review the rating with the employee in a private interview. All signatures shall be in ink. Changes and corrections shall be initialed by the employer.

2. **If space for comments in inadequate, dated and signed attachments may be made (either typewritten or in ink).**

3. **Due Dates** shall be observed, and are particularly important for final probationary reports. Filing dates for these are flexible, and both the first and the final reports may be filed at any time between the receipt and printed due date.

4. **All probationers** (either entrance level or promotional) shall be evaluated not later than the end of the first three months of probationary service, and every three months thereafter for the first year. Probationers may be separated (or demoted, if permanent, in a lesser class) at any time such action is deemed necessary by the department head, through use of either a scheduled or an unscheduled performance evaluation report.

5. All permanent employees and entrance level probationers in their second year shall be evaluated semi-annually as of the printed due date.

6. Unscheduled reports may be filed at any time for either permanent or probationary employees.

7. The "Guide to Performance Evaluation" should be consulted for suggestions, definitions, interpretations, and further instructions.

8. The main purposes of this form are to inform the employee of his performance, to improve performance when possible, and to sustain superior performance.

**SECTION A:**

Check one column for each factor. Column 5 may be checked when a factor is not considered applicable to a particular job. Additional spaces have been provided to write in any additional factors. Each checkmark in Columns 1 and 2 require specific explanation in Section E. In the absence of specific standards for a factor, use your own opinion as to what constitutes standard performance.

4. **EXCEEDS STANDARD:** Total performance is well above standards for the position. This evaluation should be reflected by marks for critical factors in Section A, and superior or excellent performance should be noted in Section B. Only a few employees would normally qualify for this rating.

3. **EFFECTIVE - MEETS STANDARD:** Consistently competent performance meeting or exceeding standards in all critical factors for the position. If margin is narrow and standards barely met, explain in Section E. Most employees would be rated in this category.

2. **SOME IMPROVEMENT NEEDED:** Total performance occasionally or periodically falls short of normal standards. Specific deficiencies should be noted in Section E. This evaluation indicates the supervisor's belief that the employee can and will make the necessary improvements.

1. **NOT SATISFACTORY:** Performance clearly inadequate in one or more critical factors as explained or documented in Section E. Employee has demonstrated inability or unwillingness to improve or to meet standards. Performance not acceptable for position held.

**SECTION B:**
Must be used to describe outstanding qualities or performance when checkmarks are placed in Column 4. Use this section to record other progress or improvements in performance resulting from employee's efforts to reach previously set goals.

**SECTION C:**
Record agreed-upon or prescribed performance goals for the next evaluation period.

**SECTION D:**
Use for describing standard performance. This section must be completed for certain factors, depending on assignment:

**PATROLMAN:**
 Uniform Division: 6,9,13,14,,23
 Crim Invest Div: 9,10,13,23
 Adm. Serv. Div: 6,8,11,2,13,15,19

**CIVILIAN EMPLOYEES:**
 Clerks: 6,12,13,14
 Technical, Trades: 12,13,14
**SUPERVISORS:**
 Sergeants: 32,33,34,38
 Lts. and above: 30,31,33,34
 Civilians: 30,31,,32,33,34

**SECTION E:**
Give specific reasons for checkmarks in Columns 1 and 2. Record here any specific reasons why the employee should not be recommended for permanent status, or, if the employee is already permanent, any specific reasons for required improvement.

**SIGNATURES:**
Both the rater and the employee shall sign the report. The employee's signature indicates that the conference has been held and that he has had an opportunity to read the report. If he refuses to sign for any reason, explain that his signature does not necessarily imply or indicate agreement with the report, and that space is provided for him to state any disagreement. Further refusal to sign shall be recorded on the report, after which it shall be forwarded.

**ROUTING:**
Keep the preliminary draft at the division level until the next rating period and then discard. Route the permanent copy through channels to the Personnel Division.

PL.APP.000266

# PERFORMANCE EVALUATION REPORT ATTACHMENT

| EMPLOYEE NAME (Last)      (First)  (Init) | EMPLOYEE NO. | DIVISION | SECTION | UNIT |
|---|---|---|---|---|
| Fong, Michael | 715613 | Patrol | Third Watch | |
| CLASS TITLE | EMPLOYEE STATUS | ASSIGNMENT | | DUE DATE: |
| Police Officer | Permanent | Squad Three | | 1-30-2008 |

SECTION B: Record job STRENGTHS, superior performance incidents, progress achieved, or checks in Col. 4:

SECTION C: Record specific GOALS or IMPROVEMENT PROGRAMS to be undertaken during next evaluation period:
Fong should continue his requests to attend schools that are offered through other law agencies. I want Fong to improve on maintaining control his emotions and actions when dealing with aggressive suspects. I believe that it will help him become a more mature officer. I feel that Fong is eager to excel in his career and has the potential to become a leader.

SECTION D:    Describe STANDARD performance (optional for most factors checked in Column 3; mandatory for some factors; see nstructions)

6) **Public Contacts**: Fong is a friendly person who is outgoing with the public.

9) **Knowledge of Work**:  Fong has been an officer for approximately 21/2 years and has a good grasp of the aws.

13) **Quality of Work**: Fong's quality of work is up to standard.

14) **Volume of Acceptable Work**: Fong takes care of all of the calls in his beat when available.

16) **Accepts Responsibility**:  Fong is a responsible officer and accepts guidance and constructive criticism.

23) **Initiative**:  Fong takes initiative by performing traffic stops and helping other officers.

ECTION E: Record specific work performance DEFICIENCIES or job behavior requiring improvement or correction (explains checks in :olumns 1 and 2)

☐ I DO

RATER:  I certify this represents my best judgment.  ☐ I DO NOT recommend this
employee be granted permanent status (for probationary reports only)

(RATER'S SIGNATURE)          (TITLE)          (DATE)  1-31-08
Sergeant

EMPLOYEE'S SIGNATURE:          (DATE)  31 JAN 08

PL.APP.000267

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## (CENTRAL DIVISION)

| | | |
|---|---|---|
| **DUSTIN BURNIKEL** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 4:15-cv-00050** |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MICHAEL FONG, individually and in** | ) | |
| **his official capacity as a law enforcement** | ) | |
| **officer with the Des Moines Police** | ) | **COMPLAINT** |
| **Department; GREG WESSELS,** | ) | **AND JURY DEMAND** |
| **individually and in his official capacity** | ) | |
| **as a law enforcement officer with the** | ) | |
| **Des Moines Police Department; and** | ) | |
| **CITY OF DES MOINES, IOWA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMES NOW** the Plaintiff, by and through his undersigned counsel, and for his cause of action against Defendants and in support of his Complaint and Jury Demand, respectfully states as follows:

### INTRODUCTION

1.      Plaintiff, Dustin Burnikel, was beaten, arrested, charged and prosecuted by Defendants Michael Fong and Greg Wessels after Plaintiff made inquiry of the Defendants as to why they were physically abusing a woman.  Without any provocation, the Defendant police officers, Officers Fong and Wessels, stopped their abuse of the woman and directed all of their attention to Plaintiff.  Among the multiple acts committed by one or both Defendant officers,

PL.APP.000268

Officers Fong and Wessels, was the delivery of a blow to the testicles of Plaintiff. Plaintiff suffered multiple injuries at the hands of the Defendant officers.

2.      Having assaulted and battered Plaintiff, the two Defendant officers, Officers Fong and Wessels, arrested him, jailed him and initiated and supported the prosecution of Plaintiff. Plaintiff defended the charges that resulted and was acquitted.

3.      This is a civil action under 42 U.S.C. §1983, in which Plaintiff seeks damages from Defendants City of Des Moines and City of Des Moines Police Officers Fong and Wessels for depriving Plaintiff of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.  Plaintiff also seeks damages pursuant to the Iowa Municipal Tort Claims Act (IMTCA).  Plaintiff also seeks attorney fees pursuant to 42 U.S.C. §1988.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343.

5.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), since the Defendants are located, and all incidents giving rise to this suit occurred, in this judicial district, the Southern District of Iowa.

6.      Plaintiff invokes the supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

## PARTIES

7.      Plaintiff Dustin Burnikel ("Plaintiff" or "Burnikel") is a citizen of the United States of America and of the State of Iowa, who resides in Howard County, Iowa.

8.      Defendant Michael Fong ("Fong") is believed to be a United States citizen and a resident of the State of Iowa.  At all times referred to herein, Defendant Fong was an Iowa-certified peace officer, employed by the City of Des Moines, Iowa.  All acts of Defendant

PL.APP.000269

Michael Fong set forth in the Complaint were done under color of law.  Defendant Michael Fong is sued in his individual capacity.

9.     Defendant Greg Wessels ("Wessels") is believed to be a United States citizen and a resident of the State of Iowa.  At all times referred to herein, Defendant Wessels was an Iowa-certified peace officer, employed by the City of Des Moines, Iowa.  All acts of Defendant Greg Wessels set forth in the Complaint were done under color of law.  Greg Wessels is sued in his individual capacity.

10.     Defendant City of Des Moines, Iowa ("City" or "Des Moines") is an Iowa municipal corporation, organized and existing pursuant to Iowa law and is located at 400 East First Street, Des Moines, Polk County, Iowa.  Defendant City of Des Moines is responsible for maintaining and operating the Des Moines Police Department.

11.     The Defendant officers Fong and Wessels acted individually and together in concert.

12.     At all times referred to herein, the individual Defendants were acting within the scope of their employment or duties as law enforcement officers for the City of Des Moines Police Department.

## FACTS

13.     On February 16, 2013, Plaintiff was in Des Moines, Iowa for the annual Iowa High School State Wrestling Tournament.

14.     After the event, Plaintiff was returning to his hotel from a social outing with his cousin and friend.

15.     As Plaintiff and his cousin and friend walked toward their hotel, they came upon and stood in line at a cabstand in the 200 block of Third Street in Des Moines, Iowa.

3

PL.APP.000270

16.     There, Plaintiff witnessed Defendants Fong and Wessels abusing a woman.

17.     Plaintiff inquired about the situation.

18.     Defendants Fong and Wessels released the woman and immediately attacked the Plaintiff, spraying him with Mace and beating him to the ground.

19.     Defendants Fong and Wessels on either side of Plaintiff, held Plaintiff's arms while kicking and hitting the Plaintiff several times as they forced him to the ground.

20.     Once on the ground and restrained, Defendant Fong and/or Defendant Wessels hit Plaintiff in the face.

21.     Plaintiff was struck in his testicles, his mouth, his head and face and suffered trauma to his hips, thighs, ribs and back.  As a result, he suffered eight chipped teeth and one broken tooth, black eyes, and injuries to his testicles, face, mouth, eyes, hips, thighs, ribs and back.

22.     Plaintiff was arrested by Defendants Fong and Wessels.

23.     Plaintiff was charged with Public Intoxication, Interfering with Official Acts and Resisting Arrest in violation of Iowa law.

24.     Plaintiff was innocent of the charges and defended them at a trial by jury.

25.     Plaintiff was acquitted.

26.     Plaintiff continues to suffer physical limitations from his injuries.

27.     Plaintiff suffers from chronic back pain, which has limited his ability to work at the same level prior to this event.

28.     As a result, Plaintiff suffered damages in the form of lost income from his tree service business.  This loss continues today.

PL.APP.000271

29.     Plaintiff also suffered dental trauma in the form of nine lost or broken teeth from Defendants' punches to his face.

30.     Because of his criminal arrest, Plaintiff's AAU coaching credentials were suspended and he was prohibited from coaching his Pee Wee wrestling team, a post he held for years.

## CAUSE OF ACTION

### COUNT I

#### UNREASONABLE SEIZURE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUION COGNIZABLE PURSUANT TO 42 U.S.C. §1983 AGAINST DEFENDANT FONG

COMES NOW Plaintiff and for Count I of his cause of action, against Defendant Fong, states:

31.     Plaintiff repleads, realleges, and incorporates by reference as if fully set forth herein, each and every allegation of paragraphs 1 through 30.

32.     Defendant Fong acting alone and acting together and in concert with Defendant Wessels violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution when he unreasonably seized Plaintiff by restraining Plaintiff, using unreasonable force against Plaintiff, arresting Plaintiff and confining Plaintiff.

33.     Thereafter, Defendant Fong instigated a criminal prosecution of Plaintiff and supported and contributed to that prosecution by preparing and/or supporting an incident report and then testifying at the criminal trial of Plaintiff.

34.     Plaintiff committed no violation of law and presented no threat to Defendant Fong or to anyone else, that justified the seizure of Plaintiff or any use of force by Defendant Fong much less the excessive and unreasonable level of force deployed by Defendant Fong.

5

PL.APP.000272

35.     As a direct and proximate result of the conduct and actions of Defendant Fong, Plaintiff suffered physical injuries, some of which resolved and some of which continue to affect Plaintiff.

36.     As a direct and proximate result of the conduct and actions of Defendant Fong, Plaintiff suffered emotional distress and mental suffering at having been grabbed, battered, arrested, jailed and prosecuted, some of which continues to affect Plaintiff.

37.     That as a direct and proximate result of the conduct and actions of Defendant Fong, Plaintiff has suffered the loss of his ability to work and earn an income at his pre-event level.

38.      That as a direct and proximate result of the conduct and actions of Defendant Fong, Plaintiff has lost income and incurred medical and therapy expenses and attorney fees.

39.     That as a direct and proximate result of the conduct and actions of Defendant Fong, Plaintiff has been denied his ability to serve as a volunteer youth wrestling coach since his de-certification by the AAU due to his criminal arrest record.

40.     The acts of Defendant Fong were intentional, wanton, malicious, oppressive, reckless, and/or callously indifferent to the rights of Plaintiff, thus entitling Plaintiff to an award of punitive damages against Defendant Fong.

41.     If Plaintiff prevails, he is entitled to recover attorney's fees and costs pursuant to 42 U.S.C. § 1988.

42.     As a direct and proximate result of Defendant Fong's unjustified conduct as referred to herein, Plaintiff is believed to have suffered in the past and will in the future suffer and incur the following damages:

    a.   Deprivation of his constitutional rights;

6

PL.APP.000273

b.  Humiliation, degradation, public ridicule, loss of personal reputation, and

emotional distress;

c.  Consequential damages;

d.  Actual and Compensatory Damages including, but not limited to, past, present and

future pain and suffering, loss of function of mind and/or body, and medical and

dental expenses; and

e.  Other damages as allowed by law.

WHEREFORE, Plaintiff prays for judgment against Defendant Fong, jointly and

severally with Defendant Wessels, for actual damages in an amount that is fair and just, for

punitive damages and for attorney's fees, together with his costs, and for such further relief that

this Honorable Court deems just and proper under the circumstances.

## COUNT II

### UNREASONABLE SEIZURE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUION COGNIZABLE PURSUANT TO 42 U.S.C. §1983 AGAINST DEFENDANT WESSELS

COMES NOW Plaintiff and for Count II of his cause of action, against Defendant

Wessels, states:

43.    Plaintiff repleads, realleges, and incorporates by reference as if fully set forth

herein, each and every allegation of paragraphs 1 through 42.

44.    Defendant Wessels acting alone and acting together and in concert with

Defendant Fong violated Plaintiff's rights under  the Fourth and Fourteenth Amendments to the

United States Constitution when he unreasonably seized Plaintiff by restraining Plaintiff, using

unreasonable force against Plaintiff, arresting Plaintiff and confining Plaintiff.

PL.APP.000274

45.     Thereafter, Defendant Wessels instigated a criminal prosecution of Plaintiff and supported and contributed to that prosecution by preparing and/or supporting an incident report and then testifying at the criminal trial of Plaintiff.

46.     Plaintiff committed no violation of law and presented no threat to Defendant Wessels or to anyone else, that justified the seizure of Plaintiff or any use of force by Defendant Wessels much less the excessive and unreasonable level of force deployed by Defendant Wessels.

47.     As a direct and proximate result of the conduct and actions of Defendant Wessels, Plaintiff suffered physical injuries, some of which resolved and some of which continue to affect Plaintiff.

48.     As a direct and proximate result of the conduct and actions of Defendant Wessels, Plaintiff suffered emotional distress and mental suffering at having been grabbed, battered, arrested, jailed and prosecuted, some of which continues to affect Plaintiff.

49.     That as a direct and proximate result of the conduct and actions of Defendant, Wessels Plaintiff has suffered the loss of his ability to work and earn an income at his pre-event level.

50.      That as a direct and proximate result of the conduct and actions of Defendant Wessels, Plaintiff has lost income and incurred medical and therapy expenses and attorney fees.

51.     That as a direct and proximate result of the conduct and actions of Defendant Wessels, Plaintiff has been denied his ability to serve as a volunteer youth wrestling coach since his de-certification by the AAU due to his criminal arrest record.

PL.APP.000275

52.    The acts of Defendant Wessels were intentional, wanton, malicious, oppressive, reckless, and/or callously indifferent to the rights of Plaintiff, thus entitling Plaintiff to an award of punitive damages against Defendant Wessels.

53.    If Plaintiff prevails, he is entitled to recover attorney's fees and costs pursuant to 42 U.S.C. § 1988.

54.    As a direct and proximate result of Defendant Wessels' unjustified conduct as referred to herein, Plaintiff is believed to have suffered in the past and will in the future suffer and incur the following damages:

a.  Deprivation of his constitutional rights;

b.  Humiliation, degradation, public ridicule, loss of personal reputation, and emotional distress;

c.  Consequential damages;

d.  Actual and Compensatory Damages including, but not limited to, past, present and future pain and suffering, loss of function of mind and/or body, and medical and dental expenses; and

e.  Other damages as allowed by law.

WHEREFORE, Plaintiff prays for judgment against Defendant Wessels, jointly and severally with Defendant Fong, for actual damages in an amount that is fair and just, for punitive damages and for attorney's fees, together with his costs, and for such further relief that this Honorable Court deems just and proper under the circumstances.

PL.APP.000276

## COUNT III

## LIABILITY OF DEFENDANT CITY OF DES MOINES FOR UNREASONABLE SEIZURE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION COGNIZABLE PURSUANT TO 42 U.S.C. §1983

COMES NOW Plaintiff and for Count III of his cause of action, against Defendant City of Des Moines, states:

55.     Plaintiff repleads, realleges, and incorporates by reference as if fully set forth herein, each and every allegation of paragraphs 1 through 54.

56.      Defendant City of Des Moines caused the constitutional violations, injuries and damages suffered by Plaintiff.

57.     Defendant City of Des Moines had a policy or a custom and usage by which its police officers used unreasonable force against people the officers encountered, unreasonably seized by detention and arrest people the officers encountered and then instigated and supported the prosecution of people the officers encountered under circumstances in which there was no probable cause to detain or arrest and/or in an effort to conceal and cover misconduct on the part to the officers, or failed to implement and/or enforce policies and procedures to avoid the creation of a pattern of excessive force and police misconduct of the type referred to herein.

58.     Defendant City of Des Moines failed in its duty to train, supervise, and discipline officers regarding the use of unreasonable force and regarding unreasonable detentions, arrests and prosecutions.

59.     Defendant City of Des Moines has acted, and failed to act, with deliberate indifference to the rights of individuals who encounter the police in its failure to train, supervise and discipline and/or in its policy or custom and usage of unreasonably seizing people.

PL.APP.000277

60.     The data and evidence that supports this Count against the City of Des Moines is within the possession and the exclusive control of the City of Des Moines, including but not limited to the records of complaints and investigations against police officers that allege misconduct, internal memoranda and communications, statistics revealed by the complaint and discipline records, the identity of potential witnesses who have had encounters with the police, including those who have had encounters with Defendants Fong and/or Wessels, the records of individual police officers, including Defendants Fong and Wessels that reveal their patterns for using force, making arrests and preferring charges and other records and things that reveal the policies and customs and usages of the City of Des Moines.

61.     The allegations of this Count III are made by Plaintiff in good faith and upon information and belief.

62.     As a direct and proximate result of the conduct and actions of Defendant City of Des Moines, Plaintiff suffered physical injuries, some of which resolved and some of which continue to affect Plaintiff.

63.     As a direct and proximate result of the conduct and actions of Defendant City of Des Moines, Plaintiff suffered emotional distress and mental suffering at having been grabbed, battered, arrested, jailed and prosecuted, some of which continues to affect Plaintiff.

64.     That as a direct and proximate result of the conduct and actions of Defendant City of Des Moines, Plaintiff has suffered the loss of his ability to work and earn an income at his pre-event level.

65.     That as a direct and proximate result of the conduct and actions of Defendant City of Des Moines, Plaintiff has lost income and incurred medical and therapy expenses and attorney fees.

PL.APP.000278

66.     That as a direct and proximate result of the conduct and actions of Defendant City of Des Moines, Plaintiff has been denied his ability to serve as a volunteer youth wrestling coach since his de-certification by the AAU due to his criminal arrest record.

67.     If Plaintiff prevails, he is entitled to recover attorney's fees and costs pursuant to 42 U.S.C. § 1988.

68.     As a direct and proximate result of Defendant City of Des Moines' unjustified conduct as referred to herein, Plaintiff is believed to have suffered in the past and will in the future suffer and incur the following damages:

    a.  Deprivation of his constitutional rights;

    b.  Humiliation, degradation, public ridicule, loss of personal reputation, and emotional distress;

    c.  Consequential damages;

    d.  Actual and Compensatory Damages including, but not limited to, past, present and future pain and suffering, loss of function of mind and/or body, and medical and dental expenses; and

    e.  Other damages as allowed by law.

WHEREFORE, Plaintiff prays for judgment against Defendant City of Des Moines for actual damages in an amount that is fair and just, for punitive damages and for attorney's fees, together with his costs, and for such further relief that this Honorable Court deems just and proper under the circumstances.

PL.APP.000279

## COUNT IV

### *RESPONDEAT SUPERIOR* LIABILITY OF DEFENDANT
### CITY OF DES MOINES

COMES NOW Plaintiff and for his cause of action in Count IV, states:

69.     Plaintiff repleads, realleges, and incorporates by this reference the allegations in paragraphs 1 through 68 as though fully set forth herein.

70.     Defendant City of Des Moines is directly liable for the constitutional violations that Mr. Burnikel suffered as the City of Des Moines, Iowa hired and retained Defendants Fong and Wessels who, acting within the course and scope of their employment, power and authority, violated the constitutional rights of Mr. Burnikel under the Fourth and Fourteenth Amendment to the United States Constitution.

71.     Plaintiff acknowledges that *respondeat superior* liability is not a basis for liability of Defendant City of Des Moines, under existing law.  Plaintiff submits that there exists a good faith argument for the modification of that rule based on the dissenting opinion of Justice Breyer in *Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 117 S.Ct. 1382 (1997), the dissenting opinion of Justice Stevens in *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), and based upon the literature addressing this issue.

72.     As a direct and proximate result and cause of the conduct of the employees, agents and servants of Defendant City of Des Moines, acting within the course and scope their employment, Plaintiff suffered injuries and damages.

73.     If Plaintiff prevails, he is entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. §1988.

13

PL.APP.000280

74.     As a direct and proximate result of Defendant City of Des Moines' unjustified conduct as referred to herein, Plaintiff is believed to have suffered in the past and will in the future suffer and incur the following damages:

    a.  Deprivation of his constitutional rights;

    b.  Humiliation, degradation, public ridicule, loss of personal reputation, and emotional distress;

    c.  Consequential damages;

    d.  Actual and Compensatory Damages including, but not limited to, past, present and future pain and suffering, loss of function of mind and/or body, and medical and dental expenses; and

    e.  Other damages as allowed by law.

WHEREFORE, Plaintiff prays for judgment against Defendant City of Des Moines, for compensatory damages, and for attorneys' fees and the costs of this litigation, and for other relief as is appropriate under the law.

## COUNT V

## LIABILITY OF DEFENDANT FONG FOR ASSAULT AND BATTERY (IN HIS INDIVIDUAL AND OFFICIAL CAPACITY)

COMES NOW Plaintiff and for his cause of action in Count V, states:

75.      Plaintiff repleads, realleges, and incorporates by this reference the allegations in paragraphs 1 through 74 as though fully set forth herein.

76.     Defendant Fong utilized unnecessary and excessive force while attempting to detain, arrest, and/or restrain the freedom of Plaintiff Burnikel by employing unreasonable physical force and punching and/or kicking and/or hitting Plaintiff Burnikel in his testicles,

PL.APP.000281

mouth, head, face, hips, thighs, ribs and/or back, while Defendants Fong and Wessels had

Plaintiff Burnikel restrained.

77.     Defendant Fong's actions were undertaken without Plaintiff Burnikel's consent.

78.     Defendant Fong's contact was offensive to Plaintiff Burnikel and/or a reasonable

person and caused physical pain and/or injury.

79.     Defendant Fong's use of force against Plaintiff Burnikel was clearly excessive

and unreasonable under the circumstances, constituting assault and battery.

80.     As a direct and proximate result of Defendant Fong's acts and/or omissions,

Plaintiff Burnikel has in the past and will in the future suffer injuries and damages.

81.     As a direct and proximate result of Defendant Fong's illegal and unjustified conduct

as referred to herein, Plaintiff is believed to have suffered in the past and will in the future suffer

and incur the following damages:

     a.  Actual, Compensatory, and Consequential Damages including, but not limited to,

        past, present and future pain and suffering, loss of function of mind and/or body,

        and medical and dental expenses; and

     b.  Other damages as allowed by law.

82.     Defendant Fong's actions were willful, wanton, unlawful, and in gross disregard

of Plaintiff's civil rights, justifying an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment against Defendant Fong, jointly and

severally with Defendant Wessels, for actual damages in an amount that is fair and just, for

punitive damages and for attorney's fees, together with his costs, and for such further relief that

this Honorable Court deems just and proper under the circumstances.

PL.APP.000282

## COUNT VI

## LIABILITY OF DEFENDANT FONG FOR FALSE ARREST (IN HIS INDIVIDUAL AND OFFICIAL CAPACITY)

COMES NOW Plaintiff and for his cause of action in Count VI, states:

83.    Plaintiff repleads, realleges, and incorporates by this reference the allegations in paragraphs 1 through 82 as though fully set forth herein.

84.    Plaintiff Burnikel was detained or restrained against his will by Defendant Fong.

85.    Defendant Fong's detention or restraint of Plaintiff Burnikel caused physical pain and/or injury or damages.

86.    As a direct and proximate result of Defendant Fong's acts and/or omissions, Plaintiff Burnikel has in the past and will in the future suffer injuries and damages.

87.    As a direct and proximate result of Defendant Fong's illegal and unjustified conduct as referred to herein, Plaintiff is believed to have suffered in the past and will in the future suffer and incur the following damages:

   a.  Actual, Compensatory, and Consequential Damages including, but not limited to, past, present and future pain and suffering, loss of function of mind and/or body, and medical and dental expenses; and

   b.  Other damages as allowed by law.

88.    Defendant Fong's actions were willful, wanton, unlawful, and in gross disregard of Plaintiff's civil rights, justifying an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment against Defendant Fong, jointly and severally with Defendant Wessels, for actual damages in an amount that is fair and just, for punitive damages and for attorney's fees, together with his costs, and for such further relief that this Honorable Court deems just and proper under the circumstances.

PL.APP.000283

## COUNT VII

## LIABILITY OF DEFENDANT FONG FOR MALICIOUS PROSECUTION (IN HIS INDIVIDUAL AND OFFICIAL CAPACITY)

COMES NOW Plaintiff and for his cause of action in Count VII, states:

89.   Plaintiff repleads, realleges, and incorporates by this reference the allegations in paragraphs 1 through 88 as though fully set forth herein.

90.   Plaintiff Burnikel was prosecuted in a criminal proceeding in Polk County, Iowa.

91.   Defendant Fong maliciously caused that prosecution without probable cause, which ended favorably for the Plaintiff.

92.   As a direct and proximate result of Defendant Fong's acts and/or omissions, Plaintiff Burnikel has in the past and will in the future suffer injuries and damages.

93.   As a direct and proximate result of Defendant Fong's illegal and unjustified conduct as referred to herein, Plaintiff is believed to have suffered in the past and will in the future suffer and incur the following damages:

  a. Actual, Compensatory, and Consequential Damages including, but not limited to, past, present and future pain and suffering, loss of function of mind and/or body, and medical and dental expenses; and

  b. Other damages as allowed by law.

94.   Defendant Fong's actions were willful, wanton, unlawful, and in gross disregard of Plaintiff's civil rights, justifying an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment against Defendant Fong, jointly and severally with Defendant Wessels, for actual damages in an amount that is fair and just, for punitive damages and for attorney's fees, together with his costs, and for such further relief that this Honorable Court deems just and proper under the circumstances.

PL.APP.000284

## COUNT VIII

## LIABILITY OF DEFENDANT WESSELS FOR ASSAULT AND BATTERY (IN HIS INDIVIDUAL AND OFFICIAL CAPACITY)

COMES NOW Plaintiff and for his cause of action in Count VIII, states:

95.     Plaintiff repleads, realleges, and incorporates by this reference the allegations in paragraphs 1 through 94 as though fully set forth herein.

96.     Defendant Wessels utilized unnecessary and excessive force while attempting to detain, arrest, and/or restrain the freedom of Plaintiff Burnikel by employing unreasonable physical force and punching and/or kicking and/or hitting Plaintiff Burnikel in his testicles, mouth, head, face, hips, thighs, ribs and/or back, while Defendants Fong and Wessels had Plaintiff Burnikel restrained.

97.     Defendant Wessels' actions were undertaken without Plaintiff Burnikel's consent.

98.     Defendant Wessels' contact was offensive to Plaintiff Burnikel and/or a reasonable person and caused physical pain and/or injury.

99.     Defendant Wessels' use of force against Plaintiff Burnikel was clearly excessive and unreasonable under the circumstances, constituting assault and battery.

100.    As a direct and proximate result of Defendant Wessels' acts and/or omissions, Plaintiff Burnikel has in the past and will in the future suffer injuries and damages.

101.  As a direct and proximate result of Defendant Wessels' illegal and unjustified conduct as referred to herein, Plaintiff is believed to have suffered in the past and will in the future suffer and incur the following damages:

      a. Actual, Compensatory, and Consequential Damages including, but not limited to, past, present and future pain and suffering, loss of function of mind and/or body, and medical and dental expenses; and

PL.APP.000285

b.  Other damages as allowed by law.

102.    Defendant Wessels' actions were willful, wanton, unlawful, and in gross disregard of Plaintiff's civil rights, justifying an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment against Defendant Wessels, jointly and severally with Defendant Fong, for actual damages in an amount that is fair and just, for punitive damages and for attorney's fees, together with his costs, and for such further relief that this Honorable Court deems just and proper under the circumstances.

<u>COUNT IX</u>

<u>LIABILITY OF DEFENDANT WESSELS FOR FALSE ARREST (IN HIS INDIVIDUAL AND OFFICIAL CAPACITY)</u>

COMES NOW Plaintiff and for his cause of action in Count IX, states:

103.     Plaintiff repleads, realleges, and incorporates by this reference the allegations in paragraphs 1 through 102 as though fully set forth herein.

104.    Plaintiff Burnikel was detained or restrained against his will by Defendant Wessels.

105.    Defendant Wessels' detention or restraint of Plaintiff Burnikel caused physical pain and/or injury or damages.

106.    As a direct and proximate result of Defendant Wessels' acts and/or omissions, Plaintiff Burnikel has in the past and will in the future suffer injuries and damages.

107.    As a direct and proximate result of Defendant Wessels' illegal and unjustified conduct as referred to herein, Plaintiff is believed to have suffered in the past and will in the future suffer and incur the following damages:

PL.APP.000286

a.  Actual, Compensatory, and Consequential Damages including, but not limited to, past, present and future pain and suffering, loss of function of mind and/or body, and medical and dental expenses; and

b.  Other damages as allowed by law.

108.    Defendant Wessels' actions were willful, wanton, unlawful, and in gross disregard of Plaintiff's civil rights, justifying an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment against Defendant Wessels, jointly and severally with Defendant Fong, for actual damages in an amount that is fair and just, for punitive damages and for attorney's fees, together with his costs, and for such further relief that this Honorable Court deems just and proper under the circumstances.

## COUNT X

## LIABILITY OF DEFENDANT WESSELS FOR MALICIOUS PROSECUTION (IN HIS INDIVIDUAL AND OFFICIAL CAPACITY)

COMES NOW Plaintiff and for his cause of action in Count X, states:

109.     Plaintiff repleads, realleges, and incorporates by this reference the allegations in paragraphs 1 through 108 as though fully set forth herein.

110.    Plaintiff Burnikel was prosecuted in a criminal proceeding in Polk County, Iowa.

111.    Defendant Wessels maliciously caused that prosecution without probable cause, which ended favorably for the Plaintiff.

112.    As a direct and proximate result of Defendant Wessels' acts and/or omissions, Plaintiff Burnikel has in the past and will in the future suffer injuries and damages.

113.  As a direct and proximate result of Defendant Wessels' illegal and unjustified conduct as referred to herein, Plaintiff is believed to have suffered in the past and will in the future suffer and incur the following damages:

20

PL.APP.000287

    a.  Actual, Compensatory, and Consequential Damages including, but not limited to, past, present and future pain and suffering, loss of function of mind and/or body, and medical and dental expenses; and

    b.  Other damages as allowed by law.

114.    Defendant Wessels' actions were willful, wanton, unlawful, and in gross disregard of Plaintiff's civil rights, justifying an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment against Defendant Wessels, jointly and severally with Defendant Fong, for actual damages in an amount that is fair and just, for punitive damages and for attorney's fees, together with his costs, and for such further relief that this Honorable Court deems just and proper under the circumstances.

## COUNT XI

## *RESPONDEAT SUPERIOR* LIABILITY OF DEFENDANT CITY OF DES MOINES, IOWA

COMES NOW Plaintiff and for his cause of action in Count XI, states:

115.    Plaintiff repleads, realleges, and incorporates by this reference the allegations in paragraphs 1 through 114 as though fully set forth herein.

116.    At all times material hereto, an employer-employee relationship existed between the City of Des Moines, Iowa, as the employer, and Defendants Fong and Wessels, as the employees.

117.    At all times material hereto, Defendants Fong and Wessels were acting within the scope of their employment with the City of Des Moines, Iowa.

118.    Under the doctrine of respondeat superior, the City of Des Moines, Iowa is liable for the aforementioned conduct and/or omission of Defendants Fong and Wessels.

PL.APP.000288

119.    As a direct and proximate result of Defendants conduct and/or omissions, Plaintiff Burnikel sustained damages and injuries as previously set forth in this Complaint.

120.   As a direct and proximate result of Defendants' illegal and unjustified conduct as referred to herein, Plaintiff is believed to have suffered in the past and will in the future suffer and incur the following damages:

      a.  Actual, Compensatory, and Consequential Damages including, but not limited to, past, present and future pain and suffering, loss of function of mind and/or body, and medical and dental expenses; and

      b.  Other damages as allowed by law.

121.    Defendants Fong and Wessels' actions were willful, wanton, unlawful, and in gross disregard of Plaintiff's civil rights, justifying an award of punitive damages.

WHEREFORE, Plaintiff prays for judgment against Defendant City of Des Moines, Iowa, jointly and severally, with the other Defendants for actual damages in an amount that is fair and just, for punitive damages and for attorney's fees, together with his costs, and for such further relief that this Honorable Court deems just and proper under the circumstances.

## COUNT XII

## LIABILITY OF DEFENDANT CITY OF DES MOINES, IOWA FOR NEGLIGENT HIRING, RETENTION AND SUPERVISION

COMES NOW Plaintiff and for his cause of action in Count XII, states:

122.     Plaintiff repleads, realleges, and incorporates by this reference the allegations in paragraphs 1 through 121 as though fully set forth herein.

123.     On or about February 16, 2013, Defendant City of Des Moines, Iowa was the employer of Defendants Fong and Wessels.

PL.APP.000289

124.    As the employer, Defendant City of Des Moines had a duty to exercise reasonable care in the hiring, retention and supervision of individuals who, because of their employment, may pose a threat of injury to members of the public; and to develop and/or implement employment policies and procedures regarding hiring, retention and supervision so that police officers would not engage in the type and pattern of conduct referred to above.

125.    Defendant City of Des Moines breached its duty in regards to the negligent and reckless supervision and retention of Defendants Fong and Wessels.

126.    Defendant City of Des Moines knew, or in the exercise of ordinary care should have known, of Defendants Fong's and Wessels' incompetence, unfitness, and/or dangerous characteristics or propensities.

127.    Defendants Fong and Wessels' incompetence, unfitness, and/or dangerous characteristics or propensities were a cause of damage to Plaintiff Burnikel.

128.    Defendant's negligence was a cause of Plaintiff's injuries and damages.

129.    As a direct and proximate result of Defendant City of Des Moines' acts and/or omissions, Plaintiff Burnikel has in the past and will in the future suffer injuries and damages.

130.   As a direct and proximate result of Defendant City of Des Moines' illegal and unjustified conduct as referred to herein, Plaintiff is believed to have suffered in the past and will in the future suffer and incur the following damages:

    a.  Actual, Compensatory, and Consequential Damages including, but not limited to, past, present and future pain and suffering, loss of function of mind and/or body, and medical and dental expenses; and

    b.  Other damages as allowed by law.

PL.APP.000290

WHEREFORE, Plaintiff prays for judgment against Defendant City of Des Moines, Iowa, jointly and severally, for actual damages in an amount that is fair and just, for punitive damages and for attorney's fees, together with his costs, and for such further relief that this Honorable Court deems just and proper under the circumstances.

## JURY DEMAND

The above-named Defendants, and each of them, are hereby notified that the Plaintiff herein does hereby demand trial by jury on all issues presented in this Complaint triable to a jury.

**SWAIM LAW FIRM, P.L.L.C.**

By:     /s/  Justin K. Swaim
        Justin K. Swaim        AT0007788
        701 13th Street, Suite 2
        West Des Moines, IA 50265
        Telephone: 641-777-5120
        Facsimile:  515-777-1127
        E-mail: justin@swaimlawfirm.com
        ATTORNEY FOR PLAINTIFF

Original Electronically Filed.

Copy to:

Dustin Burnikel
PLAINTIFF

PL.APP.000291

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| DUSTIN BURNIKEL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:15-cv-00050 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL FONG, individually and in his | ) | |
| official capacity as a law enforcement | ) | |
| officer with the Des Moines Police | ) | ANSWER AND AFFIRMATIVE |
| Department; GREG WESSELS, | ) | DEFENSES |
| Individually and in his official capacity | ) | |
| As a law enforcement officer with the | ) | |
| Des Moines Police Department; and | ) | |
| CITY OF DES MOINES, IOWA, | ) | |
| | ) | |
| Defendants. | ) | |

COME NOW Defendants, Michael Fong, Greg Wessels and the City of Des Moines, Iowa, by and through their undersigned counsel of record, and for their Answer to Plaintiffs' Petition, respectfully state to this Court as follows:

1.    The allegations of paragraph 1 are denied.

2.    The allegations of paragraph 2 are denied.

3.    Defendants admit paragraph 3 of the Complaint.

4.    The allegations of paragraph 4 are admitted.

5.    The allegations of paragraph 5 are admitted.

6.    The Defendants admits paragraph 6 of the Complaint.

7.    The Defendants can neither admit nor deny paragraph 7 of the Complaint for lack of knowledge or belief.

8.    The Defendants admit paragraph 8 of the Complaint.

PL.APP.000292

9.      The Defendants admit paragraph 9 of the Complaint.  .

10.     Defendants admit paragraph 10 of the Complaint.

11.     The allegations of paragraph 11 are denied.

12.     The Defendants admit paragraph 12 of the Complaint.

13.     The Defendants can neither admit nor deny paragraph 13 of the Complaint for lack of knowledge or belief.

14.     The Defendants can neither admit nor deny paragraph 14 of the Complaint for lack of knowledge or belief.

15.     The Defendants deny paragraph 15 of the Complaint.

16.     The Defendants deny paragraph 16 of the Complaint.

17.     The Defendants deny paragraph 17 of the Complaint.

18.     The Defendants deny paragraph 18 of the Complaint.

19.     The Defendants deny paragraph 19 of the Complaint.

20.     The Defendants deny paragraph 20 of the Complaint.

21.     The Defendants deny paragraph 21 of the Complaint.

22.     The Defendants admit paragraph 22 of the Complaint.

23.     The Defendants admit paragraph 23 of the Complaint.

24.     The Defendants admit paragraph 24 to the extent that Plaintiff was acquitted of criminal charges pursued against him by the City and Polk County Attorney's Offices.

25.     The Defendants admit paragraph 25 of the Complaint.

26.     The Defendants can neither admit nor deny paragraph 26 of the Complaint for lack of knowledge and belief.

PL.APP.000293

27.     The Defendants can neither admit nor deny paragraph 27 of the Complaint for lack of knowledge and belief.

28.     The Defendants can neither admit nor deny paragraph 28 of the Complaint for lack of knowledge and belief.

29.     The Defendants can neither admit nor deny paragraph 29 of the Complaint for lack of knowledge and belief.

30.     The Defendants can neither admit nor deny paragraph 30 of the Complaint for lack of knowledge and belief

## COUNT I OF THE PLAINTIFF'S COMPLAINT

31.     The Defendant Fong can neither admit nor deny paragraph 31 of the Complaint.

32.     The Defendant Fong denies paragraph 32 of the Complaint for lack of knowledge and belief.

33.     The Defendant Fong denies paragraph 33 of the Complaint.

34.     The Defendant Fong denies paragraph 34 of the Complaint.

35.     The Defendant Fong denies paragraph 35 of the Complaint.

36.     The Defendant Fong denies paragraph 36 of the Complaint.

37.     The Defendant Fong denies paragraph 37 of the Complaint.

38.     The Defendant Fong denies paragraph 38 of the Complaint.

39.     The Defendant Fong denies paragraph 39 of the Complaint.

40.     The Defendant Fong denies paragraph 40 of the Complaint.

41.     The Defendant Fong denies paragraph 41 insofar as he does not believe the Plaintiff is entitled to recover damages, costs or fees as his claims will not be established.

42.     The Defendant Fong denies paragraph 42 of the Complaint.

PL.APP.000294

WHEREFORE, Defendant Fong respectfully requests the Court deny the Plaintiff's Claim and enter a judgment for Defendant Fong with costs taxed to Plaintiff.

## COUNT II

43.     The Defendant Wessels can neither admit nor deny paragraph 43 of the Complaint.

44.     The Defendant Wessels denies paragraph 44 of the Complaint.

45.     The Defendant Wessels denies paragraph 45 of the Complaint.

46.     The Defendant Wessels denies paragraph 46 of the Complaint.

47.     The Defendant Wessels denies paragraph 47 of the Complaint.

48.     The Defendant Wessels denies paragraph 48 of the Complaint.

49.     The Defendant Wessels denies paragraph 49 of the Complaint.

50.     The Defendant Wessels denies paragraph 50 of the Complaint.

51.     The Defendant Wessels denies paragraph 51 of the Complaint.

52.     The Defendant Wessels denies paragraph 52 of the Complaint.

53.     The Defendant Wessels denies paragraph 53 insofar as he does not believe the Plaintiff is entitled to recover damages, costs, or fees as his claims will not be established.

54.     The Defendant Wessels denies paragraph 54 of the Complaint.

WHEREFORE, Defendant Wessels respectfully requests the Court deny the Plaintiff's Claim and enter a judgment for Defendant Fong with costs taxed to Plaintiff.

## COUNT III

55.     The Defendant City can neither admit nor deny paragraph 55 of the Complaint.

56.     The Defendant City denies paragraph 56 of the Complaint.

57.     The Defendant City denies paragraph 57 of the Complaint.

4

PL.APP.000295

58.     The Defendant City denies paragraph 58 of the Complaint.

59.     The Defendant City denies paragraph 59 of the Complaint.

60.     The Defendant City admits that it maintains records generally of the type alleged within paragraph 60 of the Complaint but denies the remainder of the paragraph.

61.     The Defendant City can neither admit nor deny paragraph 61 of the Complaint.

62.     The Defendant City denies paragraph 62 of the Complaint.

63.     The Defendant City denies paragraph 63 of the Complaint.

64.     The Defendant City denies paragraph 64 of the Complaint.

65.     The Defendant City denies paragraph 65 of the Complaint.

66.     The Defendant City denies paragraph 66 of the Complaint.

67.     The Defendant City denies paragraph 67 of the Complaint insofar as it does not believe the Plaintiff is entitled to recover damages, costs, or fees as his claims will not be established.

68.     The Defendant City denies paragraph 68 of the Complaint.

WHEREFORE, Defendant City respectfully requests the Court deny the Plaintiff's Claim and enter a judgment for Defendant City with costs taxed to Plaintiff.  Further, and as alleged with greater specificity in the Affirmative Defenses below, Defendant City is immune from punitive damages at law, as held in *City of Newport v. Fact Concerns, Inc.*, 453 U.S. 247; 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

## COUNT IV

69.     The Defendant City can neither admit nor deny paragraph 69 of the Complaint.

70.     The Defendant City denies paragraph 70 of the Complaint.

PL.APP.000296

71.     Defendant City denies paragraph 71 of the Complaint, specifically as it is well-established law that *Respondeat Superior* claims cannot be made against Municipal Corporations such as the City of Des Moines.  See *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

72.     The Defendant City denies paragraph 72 of the Complaint.

73.     The Defendant City denies paragraph 73 of the Complaint insofar as it does not believe the Plaintiff is entitled to recover damages, costs, or fees as his claims will not be established.

74.     The Defendant City denies paragraph 74 of the Complaint.

WHEREFORE, Defendant City respectfully requests the Court deny the Plaintiff's Claim and enter a judgment for Defendant City with costs taxed to Plaintiff.

### COUNT V

75.     The Defendant Fong can neither admit nor deny paragraph 75 of the Complaint.

76.     The Defendant Fong denies paragraph 76 of the Complaint.

77.     Defendant Fong can neither admit nor deny paragraph 77 of the Complaint for lack of knowledge or belief.

78.     Defendant Fong denies paragraph 78 of the Complaint.

79.     Defendant Fong denies paragraph 79 of the Complaint.

80.     Defendant Fong denies paragraph 80 of the Complaint.

81.     Defendant Fong denies paragraph 81 of the Complaint.

82.     Defendant Fong denies paragraph 82 of the Complaint.

WHEREFORE, Defendants respectfully requests the Court deny the Plaintiff's Claim and enter a judgment for Defendants with costs taxed to Plaintiff.

PL.APP.000297

## COUNT VI

83.     Defendant Fong can neither admit nor deny paragraph 83 of the Complaint.

84.     Defendant Fong can neither admit nor deny paragraph 84 of the Complaint.

85.     Defendant Fong can neither admit nor deny paragraph 85 of the Complaint.

86.     Defendant Fong denies paragraph 86 of the Complaint.

87.     Defendant Fong denies paragraph 87 of the Complaint.

88.     Defendant Fong denies paragraph 88 of the Complaint.

WHEREFORE, Defendants respectfully request the Court deny the Plaintiff's Claim and enter a judgment for Defendant Fong with costs taxed to Plaintiff.

## COUNT VII

89.     Defendant Fong can neither admit nor deny paragraph 89 of the Complaint.

90.     Defendant Fong admits paragraph 90 of the Complaint.

91.     Defendant Fong denies paragraph 91 of the Complaint.

92.     Defendant Fong denies paragraph 92 of the Complaint.

93.     Defendant Fong denies paragraph 93 of the Complaint.

94.     Defendant Fong denies paragraph 94 of the Complaint.

WHEREFORE, Defendants respectfully request the Court deny the Plaintiff's Claim and enter a judgment for Defendant Fong with costs taxed to Plaintiff.

## COUNT VIII

95.     Defendant Wessels can neither admit nor deny paragraph 95 of the Complaint.

96.     Defendant Wessels denies paragraph 96 of the Complaint.

97.     Defendant Wessels can neither admit nor deny paragraph 97 of the Complaint for lack of knowledge or belief.

PL.APP.000298

98.     Defendant Wessels denies paragraph 98 of the Complaint.

99.     Defendant Wessels denies paragraph 99 of the Complaint.

100.    Defendant Wessels denies paragraph 100 of the Complaint.

101.    Defendant Wessels denies paragraph 101 of the Complaint.

102.    Defendant Wessels denies paragraph 102 of the Complaint.

WHEREFORE, Defendants respectfully requests the Court deny the Plaintiff's Claim and enter a judgment for Defendants with costs taxed to Plaintiff.

### COUNT IX

103.    Defendant Wessels can neither admit nor deny paragraph 103 of the Complaint.

104.    Defendant Wessels denies paragraph 104 of the Complaint.

105.    Defendant Wessels denies paragraph 105 of the Complaint.

106.    Defendant Wessels denies paragraph 106 of the Complaint.

107.    Defendant Wessels denies paragraph 107 of the Complaint.

108.    Defendant Wessels denies paragraph 108 of the Complaint.

WHEREFORE, Defendants respectfully requests the Court deny the Plaintiff's Claim and enter a judgment for Defendants with costs taxed to Plaintiff.

### COUNT X

109.    Defendant Wessels can neither admit nor deny paragraph 109 of the Complaint.

110.    Defendant Wessels admits paragraph 110 of the Complaint.

111.    Defendant Wessels denies paragraph 111 of the Complaint.

112.    Defendant Wessels denies paragraph 112 of the Complaint.

113.    Defendant Wessels denies paragraph 113 of the Complaint.

114.    Defendant Wessels denies paragraph 114 of the Complaint.

PL.APP.000299

WHEREFORE, Defendants respectfully requests the Court deny the Plaintiff's Claim and enter a judgment for Defendants with costs taxed to Plaintiff.

## COUNT XI

115.   Defendant City can neither admit nor deny paragraph 115 of the Complaint.

116.   Defendant City admits paragraph 116 of the Complaint.

117.   Defendant City admits paragraph 117 of the Complaint.

118.   Defendant City denies paragraph 118 of the Complaint, specifically as it is well-established law that *Respondeat Superior* claims cannot be made against Municipal Corporations such as the City of Des Moines.  See *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

119.   Defendant City denies paragraph 119 of the Complaint.

120.   Defendant City denies paragraph 120 of the Complaint.

121.   Defendant City denies paragraph 121 of the Complaint.

WHEREFORE, Defendants respectfully requests the Court deny the Plaintiff's Claim and enter a judgment for Defendants with costs taxed to Plaintiff. Further, and as alleged with greater specificity in the Affirmative Defenses below, Defendant City is immune from punitive damages at law, as held in *City of Newport v. Fact Concerns, Inc.*, 453 U.S. 247; 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

## COUNT XII

122.   Defendant City can neither admit nor deny paragraph 122 of the Complaint.

123.   Defendant City admits paragraph 123 of the Complaint.

PL.APP.000300

124.    Defendant City can neither admit nor deny paragraph 124 of the Complaint.  The Supreme Court of the United States has made clear that Respondeat Superior Liability cannot be applied to local government entities.  See *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

125.    Defendant City denies paragraph 125 of the Complaint.

126.    Defendant City denies paragraph 126 of the Complaint.

127.    Defendant City denies paragraph 127 of the Complaint.

128.    Defendant City denies paragraph 128 of the Complaint.

129.    Defendant City denies paragraph 129 of the Complaint.

130.    Defendant City denies paragraph 130 of the Complaint.

WHEREFORE, Defendant City respectfully requests the Court deny the Plaintiff's Claim and enter a judgment for Defendant City with costs taxed to Plaintiff.  Further, and as alleged with greater specificity in the Affirmative Defenses below, Defendant City is immune from punitive damages at law, as held in *City of Newport v. Fact Concerns, Inc.*, 453 U.S. 247; 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

## AFFIRMATIVE DEFENSES

COME NOW Defendants Michael Fong, Greg Wessels and City of Des Moines, Iowa, and for their affirmative defenses, set forth the following:

1.    Plaintiffs have failed to state a claim upon which relief may be granted.

2.    Defendants Fong and Wessels have qualified immunity from suit as their actions as police officers were undertaken in good faith.

3.    Defendant City of Des Moines is not liable in respondeat superior.

4.    Defendant City of Des Moines cannot be found liable for punitive damages.

PL.APP.000301

5.     The Defendants are immune pursuant to Iowa Code Chapter 670.

6.     Plaintiffs' fault exceeds the fault of the Defendants and bars any recovery pursuant to Iowa Code Chapter 668.

7.     The Plaintiffs' fault must be compared with the fault of the Defendants', if any, and the Plaintiffs' award must be reduced or eliminated by the percentage of fault pursuant to Iowa Code Chapter 668.

8.     The Plaintiff will not be able to establish the City of Des Moines had a custom, policy or practice that violated the Plaintiff's or any citizen's constitutional rights in regard to the issues asserted in Plaintiff's Complaint.

9.     The Plaintiff will not be able to establish of a pervasive pattern of unconstitutional conduct on the part of the City of Des Moines in the hiring and/or retention of police officers or in regard to any other matter asserted in his Complaint.

10.    Defendant Officers Fong and Wessels had probable cause for their actions toward the Plaintiff on February 16, 2013.

11.    The Defendants reserve the right to supplement their affirmative defenses as discovery continues in this case.

Respectfully submitted,


        /s/ John O. Haraldson
        John O. Haraldson       AT0003231
        City of Des Moines Legal Dept.
        400 Robert D. Ray Drive
        Des Moines, IA  50309-1891
        Telephone: (515) 283-4072
        Facsimile: (515) 237-1748
        E-Mail: joharaldson@dmgov.org
        ATTORNEY FOR DEFENDANTS

Original filed via EDMS.

PL.APP.000302

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 8, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and a true copy of the foregoing was electronically sent via the Clerk of Court.

/s/ *John O. Haraldson*

John O. Haraldson

PL.APP.000303