**EXHIBIT A**

## UNITED STATES DISTRICT COURT
### IN AND FOR THE SOUTHERN DISTRICT OF IOWA
### (CENTRAL DIVISION)

| | |
|---|---|
| DUSTIN BURNIKEL )<br><br>Plaintiff, )<br> )<br> )<br> )<br>v. )<br> )<br>MICHAEL FONG, individually and in )<br>his official capacity as a law enforcement )<br>officer with the Des Moines Police )<br>Department; GREG WESSELS, )<br>individually and in his official capacity )<br>as a law enforcement officer with the )<br>Des Moines Police Department; and )<br>CITY OF DES MOINES, IOWA, )<br> )<br>Defendants. ) | Case No. 4:15-cv-00050 |

Expert Report: John G. Peters, Jr., Ph.D., CTC, CLS
209 South Stephanie Street ✦ Suite B249 ✦ Henderson, Nevada 89012
Telephone: 717.538.5940

Pursuant to Fed. R. Civ. P. 26(1)(2), I, John G. Peters, Jr., Ph.D., hereby submit my report that contains a complete statement of opinions to be expressed and the bases and reasons therefore; the data and other information I considered in forming the opinions; the exhibits or list of references I used as a summary of or support for the opinions; my qualifications, including a list of all publications authored within the preceding ten years; the compensation to be paid for the study and testimony time; and a listing of any other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

*John G. Peters, Jr., Ph.D.*
John G. Peters, Jr., Ph.D.
June 29, 2018

I.     **CASE SPECIFIC DOCUMENTS REVIEWED/CONSIDERED**: See APPENDIX A.

II.    **FOCUS OF ANALYSIS**

Through counsel for Defendants, I was asked to review documents produced in discovery, certain pleadings, and other documents and then analyze training standards, policy standards, use of force, in addition to related issues and then offer opinions about same. The analyses and opinions developed are contained within this report.

I have been retained to provide expert opinions in the above areas of law enforcement and correctional practices. I am not a party to this litigation. A copy of my *Curriculum Vitae* is attached to this report, which identifies my education, professional experience, over 250 publications, and other training and experience. There are areas of my education, training, and experience that are very relevant to issues identified and opinions developed in this matter.

My education includes being a *Certified Litigation Specialist®: Police* by the Americans for Effective Law Enforcement (AELE), in addition to related certifications in corrections and campus law enforcement. I am also an experienced instructional designer and have developed and taught law enforcement programs across the United States. In addition to my extensive experience as an instructional designer and trainer, I also hold a CLEAR California Teaching Credential (Public Safety), and a *post-doctoral* Master of Arts degree in Education (Career and Technical). My doctoral dissertation research focused on sexual harassment, including sexual assault. I have designed and taught programs on the prevention of sexual harassment, sexual assault, and investigating these events.

Vocationally, I serve as president of the Henderson, Nevada-based Institute for the Prevention of In-custody Deaths, Inc., (IPICD), and its senior instructional designer. The IPICD provides a variety of Train-the-Trainer programs to law enforcement agencies across the globe. These training programs include but are not limited to: "Prevention and Management of Suicide," "Excited Delirium and Agitated Chaotic Events™ Instructor: Recognizing, Responding, Preventing, and Investigating Arrest-Related and Sudden, In-Custody Deaths Version 5.1"; "Use-of-Force"; and, "Arrest-Related and In-Custody Death Investigative Specialist™." Agitated Chaotic Events is a term developed by the IPICD to encompass a constellation of delirium-like, agitated behaviors where the underlying cause is unknown to first responders. The topics include, but are not limited to: epilepsy, Hyponatremia, alcohol withdrawal, synthetic drugs, energy drinks, diabetes, autism, and others.

Annually, the IPICD hosts an international conference (2017 was the 12th one) that presents the latest scientific, legal, medical, and psychological research, in addition to street-proven tactics and programs used by law enforcement agencies to identify, prevent, and/or manage sudden in-custody and/or arrest-related deaths. In 2016, presentations included the latest information about Fentanyl and other widely-used drugs and how fast they are spreading and killing individuals. The IPICD has also awarded unrestricted grants for the funding of scientific research (e.g., UCSD School of Medicine; University of Miami, Miller School of Medicine), including the conducting of in-house primary research on in-custody and arrest-related deaths topics.

In 2014, the Singapore Prison Service had engaged my services to conduct training in Singapore and to evaluate several of its training programs. I also teach in the "Jail: Legal Issues" programs held in Las Vegas, Nevada, which are hosted by the AELE. Several correctional facilities have engaged me to review policies, procedures, and training, including, but not limited to jails in Texas, New Mexico, Idaho, Massachusetts, Pennsylvania, and California.

Over the past three decades, I have taught law enforcement programs throughout the United States, including but not limited to Iowa, and its law enforcement academy. Topics have included, but are not limited to: Use of force; officer survival; tactical handcuffing; wheelchair: contact & control; investigating arrest-related and in-custody deaths; investigating TASER®-associated deaths; unarmed defensive tactics; expandable baton; straight baton; side-handle baton; tactical flashlight; handgun retention and disarming; handling of emotionally disturbed persons; restraint devices; identification and prevention of in-custody death; etc. I have trained thousands of law enforcement officers as instructors in these topics.

I am the author of the most widely-adopted and definitive text on tactical handcuffing: **Tactical Handcuffing for Chain- and Hinged-Style Handcuffs**. As senior instructional designer and trainer for the internationally-recognized training firm, Defensive Tactics Institute, Inc., I have trained thousands of law enforcement, military, and security officers as tactical handcuff instructors and/or as basic users. Most recently (March 2018), I taught a user-level basic handcuffing certification course to security professionals who work in Las Vegas night clubs and day clubs. As a former member of the United States Secret Service Defensive Tactics Panel, I have taught tactical handcuffing to federal, state, and local law enforcement officers across North America, the United Kingdom, and Singapore.

In addition to writing about law enforcement policy and procedures, use-of-force, force options, force training, force policies, force warnings, excited delirium, sudden in-custody death, and related topics, I have been a consultant to several correctional facilities, including, but not limited to the Harris County Jail, Houston, Texas (3rd largest jail in the United States). Additionally, I am an Americans for Effective Law Enforcement Certified Litigation Specialist in Corrections Liability. I have also been an invited speaker, on two occasions, at the American Jail Association International Training Conferences, held in Louisville, KY, and have been a contracted trainer for the American Jail Association. I have also consulted with the American Correctional Association. I have also conducted training for the California Sheriff's Association throughout California on several occasions.

As a former Pennsylvania law enforcement patrol officer, deputy sheriff, and Massachusetts law enforcement administrator, I am familiar with the need for written policy, rules, and procedures, and the need to properly train officers about them. I was also President of a Pennsylvania Civil Service Commission, where I oversaw testing requirements for law enforcement officers and was involved with disciplinary actions involving law enforcement officers. Supervisory training is also a key ingredient to organizational effectiveness, as is having contemporary policies and procedures. I have written about these issues, conducted organizational diagnoses about management, training, policies and procedures, etc. in law

enforcement and correctional organizations, and hold graduate degrees (Ph.D. and M.B.A.) in management.

## III.   RIGHT TO AMEND

I reserve the right to amend and/or supplement these opinions if additional information becomes available, or in response to expert disclosures of the defendant or plaintiff, or if questions are asked of me that do not relate to information contained in this disclosure.

## IV.   OPINION STANDARDS

Expressed opinions are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty.

## V.   OPINION METHODOLOGY

The following opinions were developed using one or more qualitative and quantitative research methodologies, in addition to my education, training, experience, and literature review. These research methodologies may have included Historiography, Content Analysis, Phenomenology, Ethnography, Discourse Analysis, and Case Study.

The documents reviewed are classified in the social sciences as *archival records*. Graziano and Raulin (1997) define archival records as "records that already exist" (p. 135). Archival records are one type of unobtrusive measure available to researchers and experts. The review and analysis of archival records is an accepted research methodology in the social sciences and applies to law enforcement research. While not as exacting as *experimental research* where there are control and experimental groups, conducting interviews and examining archival records, plus conducting observations are methodologies that are used in the social sciences.

## VI.   SUMMARY of OPINIONS

1.   **The City of Des Moines, Iowa (CITY) met and/or exceeded national standards, recommendations, and/or guidelines for the development of policies and procedures for their officers.**

2.   **The CITY trained its law enforcement officers consistent with State of Iowa and other generally accepted law enforcement training standards.**

3.   **The CITY used lesson plans for training its law enforcement officers in Use of Force, expandable baton, and pepper spray that meet or exceeded lesson plan standards for career and technical training and testing of law enforcement officers.**

4.   **The CITY's training curricula was aligned with the essential skills of law enforcement officers.**

5.     The CITY trained its sworn police officers in both use-of-force standards, and in use-of-force options, which are consistent with generally accepted national police training, recommendations, and guidelines.

6.     The CITY had an established custom and practice for reviewing all incidents where one or more officers used force, including supervisors who used force.

7.     The force used by DMPD Sergeant Wessels and/or Officer Fong to capture, control, and restrain Mr. Burnikel was consistent with national force standards, recommendations, guidelines, and within DMPD use-of-force policy.

8.     Officer Fong and Sergeant Wessels knew from their training that Mr. Burnikel had violated the law and had resisted them, thereby forming the bases for seizing and charging him.

9.     Mr. Burnikel was decontaminated according to generally accepted pepper spray decontamination methods.

10.    Plaintiff has not produced data to show that the CITY had a custom, practice, or policy of failing to train their law enforcement officers in use of force and/or force options.

11.    The CITY investigated the events surrounding the arrest and force used on Mr. Burnikel by Officer Fong and Sergeant Wessels, which is consistent with law enforcement internal and administrative practices, protocols, and guidelines.

12.    Sergeant Wessels history of using force does not show a pattern, practice, or custom of using it excessively.

## VII.    PRE-INCIDENT OPINIONS

*Pre-Incident Opinions* are those opinions that focus on events that took place prior to the instant matter.

1.     The City of Des Moines, Iowa (CITY) met and/or exceeded national standards, recommendations, and/or guidelines for the development of policies and procedures for their officers.

The CITY had several policies and procedures that were consistent with national recommendations, and standards including, but not limited to:
- Police Rules and Regulations: Chapter 1—Use of Force,
- Police Rules and Regulations: Chapter 14---Off-Duty Police Work.

A content analysis of these policies and standard operating procedures showed they were Not deficient and had met and/or exceeded national policy recommendations.

Contemporary and knowledgeable governmental entities and their Police Chief's know and understand the need for written policy and procedures, especially in high-risk areas such as law enforcement officers using non-deadly force. Writing for the International Association of Chiefs of Police (IACP) **A Police Chief's Desk Reference** (2004), Chief W. Dwayne Orrick noted that policy and procedure manuals and directives "provides staff with the guidance necessary to perform department operations" (p. 139).

The Commission on Accreditation for Law Enforcement Agencies (CALEA) stated that a law enforcement agency (including correctional facilities) "should establish a formal written directive system to provide employees with a clear understanding of the constraints and expectations relating to the performance of their duties" (CALEA, January 1999, p. 12-2). CALEA Standard 12.2, "Written Directives" lists, at a minimum, what a written directive system must include.

Having taught policy development and having reviewed use-of-force policies throughout the United States, I found the CITY's DMPD policies meet and/or exceed policy requirements, recommendations, and/or guidelines. The content analysis also showed the CITY had developed these policies and procedures to provide direction and/or limit discretion of their officers, and to safeguard others who may meet CITY police officers.

2.      **The CITY trained its law enforcement officers consistent with State of Iowa and other generally accepted law enforcement training standards.**

Des Moines Police Department (DMPD) Officer Michael Fong (Officer Fong) had attended and graduated from the Des Moines Police Academy (Fong deposition, 6:3). Sergeant Greg Wessels (Sergeant Wessels) had successfully completed the police academy and had also successfully completed the DMPD three-day Sergeant's School (Wessels deposition, 25:4, 8). Lieutenant Joseph Leo (Lt. Leo) testified that he had been sent by the CITY to various training programs that focused on his core tasks including, but not limited to use-of-force investigations, and supervision (Leo deposition, 16:21-22).

Per Lt. Leo who is in charge of the police academy personnel section (Leo deposition, 4:23-24), and also an instructor at the academy in use of force, expandable baton, and side-handle baton (26:18, 22), police recruits go through a 23-week-long academy (119:4) where they receive a minimum of eight hours of training in use of force (119:6-8). Use-of-force topics are also taught to police recruits in expandable baton, firearms, and similar force training topics. Recruits are evaluated by academy instructors on their knowledge about use of force after being placed into scenario evaluations, and/or by taking written tests (120:7).

In addition to recruit academy training, DMPD officers also received annual training on use of force(Leo deposition, 154:12). Training recruits and conducting in-service training programs for officers is consistent with national training standards, recommendations, and/or guidelines.

Per the **Standards for Law Enforcement Agencies** (November 2001), training is noted as one of the most important responsibilities and duties of a law enforcement agency. Per the Commission on Accreditation for Law Enforcement Agencies (CALEA), "well trained officers are generally better prepared to act decisively and correctly in a broad spectrum of situations" (p. 33-1).

It is well publicized in the criminal justice community and generally accepted that the employer and the employee's administrator must reasonably train **employees in their core tasks** (see City of Canton, Ohio v. Harris, et al, 489 U.S. 378, 109. S.Ct. 1197 [1989]), and in their **essential skills** (Griggs v. Duke Power Co, 401 U.S. 424 (1971)). Contemporary and reasonable law enforcement administrators and other municipal administrators know when they fail to conduct core training and/or essential task training, they can be held to be deliberately indifferent under what one court has defined as "just not giving a damn" (Bordanaro v. McLeod, 871 F2d 1151, 1164 [1st Cir. 1989]. These and similar court holdings are discussed in contemporary training courses, which contemporary and reasonable county and agency administrators attend.

Having taught law enforcement officers throughout the United States during the past three decades, including the Iowa Police Academy in Des Moines, I am familiar with the training requirements of law enforcement officers. Based upon my experience, education, and training, the City of Des Moines and its Police Department not only trained Officer Fong and Sergeant Wessels per state and national standards, recommendations, and guidelines, but also all of its sworn police officers.

3.   **The CITY used lesson plans for training its law enforcement officers in Use of Force, expandable baton, and pepper spray that meet or exceeded lesson plan standards for career and technical training and testing of law enforcement officers.**

Law enforcement training is a part of career and technical education and training (Gordon, 2008). A content analysis of the "Use of Force," "Oleoresin Capsicum: Less-than-Lethal Pepper Spray" lesson plans used by the City of Des Moines in the training of its law enforcement officers identified quantitative and objective instructional objectives, which are within the scope of required testing criteria for career and technical education programs such as use-of-force training (Des Moines Regional Police Training Academy, "Police Use of Force," PowerPoint slide deck; "Written Exam Oleoresin Capsicum").

Based upon my education, training, and experience, a content analysis of the lesson plans used by the CITY met and/or exceeded public safety lesson plan development for the training of law enforcement officers in using force and pepper spray.

4.   **The CITY's training curricula was aligned with the essential skills of law enforcement officers.**

*Alignment* focuses upon the "degree to which the components of an educational system—such as standards, curricula, assessments, and instruction—work together to achieve desired goals" (Case, Jorgensen, & Zucker, 2004, p. 2). *Alignment* is necessary for standards and assessment development. Based on my education, training, and experience, the *essential skills* required of a CITY police officer (i.e., using force and force options) showed there was alignment between the training documents, agency policies, and law enforcement essential job functions.

5.   **The CITY trained its sworn police officers in both use-of-force standards, and in use-of-force options, which are consistent with generally accepted national police training, recommendations, and guidelines.**

The Police Department had issued several policies, several of which contain use-of-force guidance and limits discretion of police officers when they must use force. The policies are mentioned in Opinion #1 and will not be reviewed again.  Lt. Leo testified recruits and in-service police officers are trained about use-of-force options and standards (Leo deposition, 26:18, 22; 28:11-12; 29:25; 199:6-8; 136:18-19; 154:12; Des Moines Regional Police Training Academy, "Police Use of Force," PowerPoint slide deck). As an experienced Use-of-Force Instructor who has trained hundreds of officers about use of force, "force options" differ from "force standards" in that the latter establish legal or administrative boundaries regarding an officer's use of force (see for example, *Graham v. Connor*).

Lt. Leo testified that a DMPD Police Officer's goal in using force is "to control and/or arrest a suspect with no injury to anyone" (Des Moines Regional Police Academy, "Officer's Goal in Use of Force," 7/30/08 jml, p. 1; Leo deposition, 28:11-12). Using force includes defending, controlling, handcuffing, searching, securing, and transporting the suspect (Leo deposition, 28:11-12).

DMPD training staff, including Lt. Leo, taught DMPD police officers various <u>force options</u> they could use depending upon the totality of the circumstances and their response to subject resistance. These options included but were not limited to: Officer presence; Verbal commands; Oleoresin Capsicum (pepper spray); Empty hand; TASER® electronic control weapon (ECW); Striking instrument (e.g., baton); K-9; Bean Bag; Deadly force (Des Moines Regional Police Training Academy, "Police Use of Force," PowerPoint slide #8). The force option(s) chosen by a police officers are based upon many variables, including but not limited to the: totality of the situation; weight and height of the suspect; intoxication level of the suspect; mental illness of the suspect; disability of the suspect; strength of the suspect; reaction to prior force options; and others. Whatever force option is selected, it must be used within the appropriate force standard.

Regarding the seizure of a free person, the appropriate <u>force </u>standard is the Fourth Amendment. This <u>force standard</u> was and is taught to DMPD police officers and has "reasonableness" at its core (Leo deposition, 29:25; Des Moines Regional Police Training Academy, "Police Use of Force," PowerPoint slide deck). Based upon my education, training, and experience, this national force standard is consistent with national use-of-force training, recommendations, and guidelines. A police officer's choice and use of <u>force options</u> must be

"reasonable" based upon the totality of the circumstances (s)he is facing or perceiving at the time the force option(s) was used.

> **6.    The CITY had an established custom and practice for reviewing all incidents where one or more officers used force, including supervisors who used force.**

Lieutenant Tony Knox (Lt. Knox), Lt. Leo, Sergeant Ronald Kouski (Sergeant Kouski), and Sergeant Wessels testified the CITY had an established custom and practice for reviewing all incidents where force was used on a suspect (Knox deposition, 5:19-24; Leo deposition, 7:14; Kouski deposition, 7:16-25; Wessels deposition, 36:12-18). In short, a Sergeant responds to an incident where an Officer used force. If a Sergeant used the force, then a Lieutenant responds to the incident. The supervisor will review the Officer's use-of-force reports, interview the person arrested (if possible), have someone from Identification come to the scene and take pictures, review all statements, and review the totality of the situation (Knox deposition, 5:19-24). The supervisor's role is investigative in nature, but (s)he does not make an assessment of the force used (15:6).

## VIII.   INCIDENT OPINIONS

*Incident Opinions* are those opinions that focus on the actions of the parties during the incident under review.

> **7.    The force used by DMPD Sergeant Wessels and/or Officer Fong to capture, control, and restrain Mr. Burnikel was consistent with national force standards, recommendations, guidelines, and within DMPD use-of-force policy.**

Based upon my experience, training, and education, the force used by DMPD Sergeant Wessels and/or Officer Fong to control and restrain Mr. Burnikel, a *free* person, including striking him in the groin area, was consistent with national force standards, recommendations, guidelines, and DMPD policy.

Mr. Burnikel was a free person; therefore, Sergeant Wessels and Officer Fong knew from their training that any force used to capture, control, and/or restrain him will be analyzed under the Fourth Amendment to the United States Constitution. Mr. Burnikel was an initial threat to Officer Fong when he quickly moved toward Officer Fong who was attempting to make an arrest of a very intoxicated female, Ms. Breanna Hunemiller (Ms. Hunemiller), and continued to be non-complaint with the requests of Officer Fong and Sergeant Wessels when he displayed active resistance toward them. Ms. Hunemiller testified she was at the tournament with her friend Mike, and thought when she heard Mr. Burnikel speak that it was Mike because of the person's close proximity to her and Officer Fong (Hunemiller, criminal trial transcript, 182:25).

Officers are trained to identify three categories of people with whom they interact: "YES," "MAYBE," and "NO" (Remsberg, 1986). It was clear from Ms. Doe's behavior that she was a "NO" person. A "NO" person is "actively uncooperative" (p. 435). In contrast, a "YES" person is cooperative with law enforcement officer's commands and will comply with them (Remsberg, 1986, p. 434).

When peace officers are required to deploy force, there is always the possibility of someone being injured, including one or more peace officers. However, injury alone does not provide support for a claim of excessive force. Mesloh, Henych, and Wolf (2008) found in their study on force used by law enforcement officers that "the injuries of both officers and suspects rose correspondingly with the length of the confrontations" (p. 89). They also found that an officer's use of "decisive force early on in the active suspect-officer confrontations appears to be the solution in ending conflict quickly. . ." (p. 89), otherwise there may exist a force deficit where the officer uses ". . .less force than may be justifiable or necessary to subdue the suspect and end the confrontation" (p. 89).

Law enforcement officers also know that when seizing a free person, their force will be analyzed under the 4th Amendment of the United States Constitution. They also know from their training that there are four critical issues they must answer: [1] the severity of the crime at issue; [2] whether the suspect poses an immediate threat to the safety of officers and others; [3] whether the suspect is actively resisting arrest or attempting to evade arrest by flight; and [4] whether they were forced to make split-second judgments in circumstances that were tense, uncertain, and rapidly evolving (Graham v. Connor, 109 S. Ct. 1865 (1989)). These four issues will be used in the analysis of Officer Fong's and Sergeant Wessels' use of force on Mr. Burnikel, while also incorporating the totality of the circumstances.

**Factor #1: Was Mr. Burnikel an immediate threat to Officer Fong, Sergeant Wessels, and/or others, including himself?**

Yes.

Officer Fong's Verbal Commands: Per his training and DMPD policy, Officer Fong testified that he yelled at Mr. Burnikel to "get back" at least two times (Fong deposition, 32:10; 103:2). He also told Mr. Burnikel that if he did not "get back" that he would be arrested (39:26; 40:1). Sergeant Wessels' testified Mr. Burnikel approached Officer Fong in an aggressive manner (Wessels deposition, 48:6-7), was in an aggressive stance (65:7-9) and was in an agitated state (65:8).

Mr. Burnikel testified that he had his arms in the air (Burnikel trial transcript, 130:22), and that he was over by Officer Fong (138:16). A witness to the incident, Mr. Sovereign, testified Mr. Burnikel's hands were not over his head (Sovereign trial transcript, 151:25). Mr. Burnikel's decision not to follow Officer Fong's verbal commands coupled with his physical actions (arms raised and moving toward Officer Fong) reportedly posed an immediate threat to Officer Fong.

Perceived Threat of Mr. Burnikel by Officer Fong: Officer Fong testified Mr. Burnikel was a "good-sized guy," (Fong deposition, 27:10), and was about the same size as Officer Fong (Fong trial transcript, 92:15). Officer Fong also testified that he assessed Mr. Burnikel was being drunk and belligerent (27:11), and that he was not going to go "toe-to-toe" with him (32:16-17). As previously testified to by Sergeant Wessels who was in the process of arresting another

intoxicated male, Mr. Burnikel was in an aggressive stance (Wessels trial transcript, 65:7-9), approached Officer Fong in an aggressive manner (48:6-7), and was agitated (65:8).

Based upon the totality of the circumstances and officer safety training, it was appropriate for Officer Fong to perceive Mr. Burnikel as a serious threat to himself and to Sergeant Wessels, because Mr. Burnikel continued to not be cooperative even after he was given specific, loud, verbal commands.

**Factor #2: Did Mr. Burnikel actively resist Officer Fong and Sergeant Wessels?**

Yes, on several occasions.

Pepper Spray Force Option:   Mr. Burnikel testified at his criminal trial that he was standing about five or six feet away from Officer Fong when he was suddenly "Maced" in the face by the Officer (Burnikel trial transcript, 200:11; 201:4). Officer Fong testified he sprayed Mr. Burnikel with pepper spray at a distance of approximately three feet after verbally commanding him to "get back" two times (Fong deposition, 41:22; 84:21). Sergeant Wessels estimated the distance between Officer Fong and Mr. Burnikel when the pepper spray was deployed as approximately three to four feet apart (Wessels deposition, 15:2), and two to three feet apart when he testified at Mr. Burnikel's criminal trial (Wessels criminal trial transcript, 74:23).

In surprising contrast, Mr. Burnikel later testified the distance between he and Officer Fong was approximately 15-20 feet away (Burnikel deposition, 33:1; 38:18), and that he never moved toward Officer Fong (42:3-4). He testified being sprayed in the face with "Mace" by Officer Fong at a distance of approximately 15 feet (99:17). Photograph #1 shows a cannister of Sabre pepper spray that was issued by the DMPD to officers.

Photograph #1:  Sabre Pepper Spray



As a pepper spray instructor who has trained thousands of officers as Oleoresin Capsicum Aerosol instructors, coupled with my education, training, and experience, Officer Fong's selection of pepper spray as a defensive force option was consistent with his pepper spray training, and DMPD use-of-force policy (Des Moines Regional Police Training Academy, "Police Use of Force," PowerPoint slide deck; "Written Exam Oleoresin Capsicum"). Further, given the perceived "same-size" analysis by Officer Fong, the use of pepper spray as a force

option was an appropriate selection given the totality of the circumstances. Officer Fong had testified based on Mr. Burnikel's anger and aggression (Fong criminal trial transcript, 93:11), clenched fists (93:12), and size (94:7-8) and his tactical analysis, his best defensive force option was that of pepper spray (94:7-8).

[NOTE: Officer Fong did not use MACE®-brand pepper spray, but rather used Sabre brand (see photo of Sabre pepper spray cannister). MACE is a registered trademark for a chemical agent, that is often used to refer to any type of defensive aerosol spray.]

    Empty hand force option chosen by Officer Fong:   Per DMPD policy and training, another defensive force option available to DMPD officers is "empty hand" (Des Moines Regional Police Training Academy, "Police Use of Force," PowerPoint slide deck). The empty hand defensive force option is when officers use their hands and other "personal weapons" (i.e. feet) to help capture, control, and/or restrain a violator. Personal weapons include, but are not limited to "elbow, edge of fist, forearm, fingers, edge of hand, heel of hand, extended knuckles, fist, front of head, and back of head (FBI, Defensive Tactics Manual, n.d., p. 50; FBI, Defensive Tactics: A Manual for Law Enforcement Officers, 1970, p. 9; Peters, **Realistic Defensive Tactics**, 1992, pp. 1-3).

    Officer Fong testified he and Sergeant Wessels pushed Mr. Burnikel against a cab (Fong deposition, 30:22-25). This is an example of using empty hands to guide a person, in this case, against a firm object. After Mr. Burnikel was redirected against the cab, he reportedly continued to not cooperate with Officer Fong and Sergeant Wessels, which indicated the pepper spray had little or no intended effect on him (Wessels criminal trial transcript, 52:21). Because Mr. Burnikel reportedly continued offering resistance and not follow the verbal commands given to him, Officer Fong and Sergeant Wessels deployed empty hand techniques to various "vulnerable areas" of Mr. Burnikel.

    "Vulnerable areas" of the human body are many, and when pressure is applied to one or more of them, these areas may cause pain. "The most vulnerable areas of the body are located on or near the 'midline,' the imaginary line that bisects the body. Blows delivered to this 'midline' area, either front or back, generally have a much greater effect than blows which are delivered elsewhere" (FBI, Defensive Tactics Manual, n.d., p. 60).

    Knee and Groin Strikes: Officer Fong delivered two knee strikes to Mr. Burnikel's thigh and rib cage areas (Fong deposition, 22:17-18; 31:1-2; Wessels deposition, 18:12-14). Sergeant Wessels testified he struck Mr. Burnikel's groin area, which made Mr. Burnikel bend his knees and go to the ground (Wessels deposition, 4:13; 20:19, 20-23; Fong deposition, 31:4). The groin contact was not aimed at Mr. Burnikel's testicles (4:17-18). The groin area is generally impacted by using a closed hand or edge of hand technique, and this area is considered a "vulnerable area" (FBI, Defensive Tactics Manual, n.d., p. 60; FBI, Defensive Tactics: A Manual for Law Enforcement Officers, 1970, p. 8).

    Closed-hand Punch:  After Mr. Burnikel reportedly was able to get up on all fours and continued to not follow verbal commands from Officer Fong and Sergeant Wessels, Officer Fong punched Mr. Burnikel in the face (nose area) to bring him into custody (Fong deposition, 22:17-

18; 27:8-9; 29:20; 56:12-14; Wessels deposition, 18:12-14). Having already used pepper spray that did not work as intended, Officer Fong believed punching Mr. Burnikel was a better defensive force option than using an expandable baton (Fong deposition, 27:1-3, 14). Officer Fong testified that given the totality of the circumstances, "I thought this was my best course of action" (47:13-18). Mr. Burnikel continued to resist Officer Fong and Sergeant Wessels even after being told to "stop resisting" (48:11; Burnikel deposition, 44:3, 6). Mr. Burnikel testified he "balled up" and had his elbows out as the officers tried to grab his arms to handcuff him (Burnikel deposition, 45:5-6, 12). After one police officer would get one of Mr. Burnikel's arms, Mr. Burnikel would struggle to get his arm back and put it over his face (45:14-18).

In contrast to the testimony of Officer Fong and Sergeant Wessels, Mr. Burnikel said he was struck five or six times in the head (Burnikel deposition, 47:11; 48:14), got kicked in the lower back and testicles (49:22; 50:4, 8, 10), and thinks he was stomped on in the lower back (50:13). If Mr. Burnikel's version of the facts regarding his being stomped in the back and struck multiple times in the head for no apparent reason is correct, this level of force is outside national use-of-force standards, recommendations, guidelines, and DMPD policy.

As a defensive tactics, tactical handcuffing, pepper spray, and baton instructor-trainer who has trained thousands of officers as defensive tactics, tactical handcuffing, pepper spray, and baton instructors, going "physical" with a person who is approximately the same size and perceived as a wrestler by the officer (Fong deposition, 68:14-17), could be a life or death gamble. Aside from the size and reported aggressiveness of Mr. Burnikel, there were other variables to consider such as terrain analysis (e.g., ground, sidewalk), and other people who could aid the suspect (e.g., number of people in close proximity). Mr. Burnikel testified he would not be surprised if people standing nearby were loud and intoxicated (Burnikel deposition, 38:6). Had Officer Fong and Sergeant Wessels gotten into a protracted physical confrontation with Mr. Burnikel, they could have been thrown to a hard surface and injured, and then disarmed, shot, and killed. It must be remembered that when a police officer is present, so is at least one handgun (Hickey, Des Moines Regional Academy: Weapon Retention 406 PowerPoint slide deck, 10/23/2003, slide #3).

In a study conducted by the United States Army and published by J. David Myers, it was found that height, weight, and training often dictate the outcome of a confrontation where handguns are not present. Table 1 shows the study's findings. The exception is handgun fighting as noted on the matrix.

Table 1   Hand-to-Hand Combat Survival Chart



MINI — Under 5 Ft. — Under 100 Lb.
SMALL — 5 Ft. to 5 Ft. 6 In. — 100 to 150 Lb.
MEDIUM — 5 Ft. to 6 Ft. — 150 to 200 Lb.
LARGE — 6 Ft. to 6 Ft. 6 In. — 200 to 250 Lb.
MONSTER — Over 6 Ft. 6 In. — Over 250 Lb.

NOTE: In a head-on confrontation your chances of survival depend to a great extent on the size difference between you and your opponent. This assumes equal training and equipment. The exception is Handgun Fighting.

Source: Myers, 1982.

Per the Hand-to-Hand Combat Survival matrix, when an aggressor is fighting a same-sized person, the probability of the large person winning is 50%. Therefore, the probability of Officer Fong easily winning the encounter against a perceived wrestler was not favorable.

Empty Hand Force Options: The use of "Empty Hands" by Officer Fong and Sergeant Wessels was consistent with DMPD use-of-force training and policy (Des Moines Regional Police Training Academy, "Police Use of Force," PowerPoint slide deck) and with national defensive tactics training.

**Factor #3: What crime(s) had been committed by Mr. Burnikel?**

At first blush, the *severity of the crime at issue* appeared to be a non-criminal offense of challenging a police officer who is in the process of arresting an intoxicated female. Mr. Burnikel testified he said to Officer Fong, "What are you doing to her? Why are you hurting her?" (Burnikel deposition, 38:15-16). He also testified that he did not take the time to consider that a police officer may have been interacting with the female (97:15). However, Mr. Burnikel's behavior quickly changed from his perception of being a "YES" person to becoming a "NO" person, which posed an immediate threat to Officer Fong.

Mr. Burnikel reportedly interfered with Officer Fong's arrest when his actions hindered Officer Fong's action (Leo deposition, 151:133-16). Further, during the seizure of Mr. Burnikel by Officer Fong and Sergeant Wessels, his "resisting" was in violation of Des Moines City Ordinance (151:21). Mr. Burnikel admitted that he continued to resist Officer Fong and Sergeant Wessels even after being told to "stop resisting" (48:11; Burnikel deposition, 44:3, 6). After

being told to "stop resisting" Mr. Burnikel replied "I'm not doing that" indicating to the officers that he was not going to stop resisting (Burnikel deposition, 44:3-4). Mr. Burnikel testified he "balled up" and had his elbows out as the officers tried to grab his arms to handcuff him (45:5-6, 12). After one police officer would get one of Mr. Burnikel's arms, Mr. Burnikel would struggle to get his arm back and put it over his face (45:14-18).

**Element: Were the circumstances surrounding the seizure of Mr. Burnikel on February 16, 2013 tense, uncertain, and rapidly evolving?**

Yes.

The pacing of the event was decided by Mr. Burnikel. Had Mr. Burnikel obeyed Officer Fong's and Sergeant Wessels' verbal commands and not resisted them, the event would have concluded much faster. As previously discussed, Officers Fong and Sergeant Wessels testified that Mr. Burnikel continuously refused to follow their verbal commands to stop resisting. Mr. Burnikel and his behaviors were pacing the event, causing it to become more tense, uncertain, and at the end, rapidly evolving. Mr. Burnikel estimated the entire event lasted approximately 30 seconds (Burnikel deposition, 48:16-17).

8. **Officer Fong and Sergeant Wessels knew from their training that Mr. Burnikel had violated the law and had resisted them, thereby forming the bases for seizing and charging him.**

Based upon Mr. Burnikel's behaviors (verbal and physical), Officer Fong and Sergeant Wessels knew from their training that he had violated the law prior to them seizing and charging him with Interference with a Police Officer, Public Intoxication, and Resisting Arrest. The prosecution of Mr. Burnikel had to be approved and accepted by the County Attorney prior to the charges being officially filed (Wessels deposition, 38:16-17).

9. **Mr. Burnikel was decontaminated according to generally accepted pepper spray decontamination methods.**

Mr. Burnikel testified that he may have been offered water to decontaminate his eyes at the scene (Burnikel deposition, 56:25). He also testified that he was not decontaminated after being sprayed with pepper spray until he was at the jail (56:18-19). DMPD Sergeant Ronald Kouski (Sergeant Kouski) testified bringing water to the scene after he heard a request for water over the radio (Kouski deposition, 10:1-2). He does not remember if it were he or another officer who "dumped water" on Mr. Burnikel's facial area to decontaminate the effects of the pepper spray (10:22-23).

Based upon my experience, education, and training, decontamination of a person after being pepper sprayed is done when it is safe, and when water or other decontamination agent is available. Whether or not Mr. Burnikel was decontaminated on scene or at the jail, both are consistent with national decontamination recommendations.

## IX.   POST-INCIDENT OPINIONS

*Post-Incident Opinions are events that occur following the instant event.*

**10.     Plaintiff has not produced data to show that the CITY had a custom, practice, or policy of failing to train their law enforcement officers in use of force and/or force options.**

I have not reviewed any data from Plaintiffs to show the CITY had a custom, practice, or policy that showing it had failed to train its law enforcement officers about use of force and/or force options.

**11.     The CITY investigated the events surrounding the arrest and force used on Mr. Burnikel by Officer Fong and Sergeant Wessels, which is consistent with law enforcement internal and administrative practices, protocols, and guidelines.**

Mr. Burnikel testified he spoke with a DMPD investigator who came to the scene the morning of his arrest (Burnikel deposition, 55:12-13).  DMPD Lieutenant Larry Davey (Lt. Davey) had responded to the scene and interviewed Mr. Burnikel about what had taken place, and observed Mr. Burnikel had been pepper sprayed, slurred his speech, and swayed a bit (Davey Criminal Trial transcript, 213:21; 215:9, 19; 216:6; 217:11; 220:24-25). When the Identification people arrived on the scene, Lt. Davey testified that Mr. Burnikel would tell them what photographs to take, per policy (237:7-8). Lt. Davey also interviewed Sergeant Wessels and Officer Fong about what took place during the incident (230:17). Based upon my education, training, and experience, the prompt investigation of a use-of-force incident is consistent with national recommendations, guidelines, and DMPD policy.

The International Association of Chiefs of Police (IACP) has issued guidelines for the investigation of employee misconduct and has also authored a model policy regarding such investigations (IACP, "Investigation of Employee Misconduct: Model Policy", July 2001). Regarding the disposition of a citizen complaint, the IACP recommends that: "The primary investigative authority for the investigation (i.e., subject employee's supervisor and commander or OPS) shall review the complaint report and investigate findings once deemed complete. This authority will compile a report of findings and provide a disposition recommendation for each charge as follows:
   a.     *Sustained*: Evidence sufficient to prove allegations.
   b.     *Not sustained*: Insufficient evidence to either prove or disprove allegations.
   c.     *Exonerated*: Incident occurred but was lawful.
   d.     *Unfounded*: Allegation is false or not factual or the employee was not involved (p. 3).
   Reiter (2006) wrote that "agency-initiated complaints come in different forms.  Most complaints are those initiated by a supervisor for some breach of rules and regulations.  Other times it might be knowledge that comes to the agency without an actual complaint from the aggrieved party. . ." (p. 3).  Reiter also noted that the "complaint process must be as foolproof as possible" (Chapter 2, p. 1).  The widely-adopted text by Reiter who is former Assistant Chief of Police for the Los Angeles (CA) Police Department, outlines and discuses in very detailed form how the investigation should be conducted, who should be assigned to conduct it, what

information should be identified and sought, and how the investigation can be used for disciplinary purposes.

Regarding complaint processing, the CALEA standard manual notes "a written directive requires the agency to investigate all complaints against the agency or employees of the agency" (CALEA, Standard 52.2.1, p. 52-2). The CALEA standards manual notes "the integrity of the agency depends on the personal integrity of the agency depends on the personal integrity and discipline of each employee" (p. 52-1).

**12.     Sergeant Wessels history of using force does not show a pattern, practice, or custom of using it excessively.**

A content analysis of Sergeant Wessels discipline records failed to identify a custom, practice, or pattern of using force excessively. Since being hired in 1996, Sergeant Wessels had received discipline a total of nine (9) times, with only three (3) of those incidents involving the use of force on another person (see Sergeant Wessels disciplinary records).

Table 2 shows the year, basis of discipline, and type of discipline Sergeant Wessels received from the DMPD.

Table 2  Sergeant Wessels' Discipline by Year, Reason, and Type

| YEAR | BASIS of DISCIPLINE | DISCIPLINE |
|------|---------------------|------------|
| 2002 | Insubordination at a basketball game | |
| 2005 | Use of Profanity | Written Reprimand |
| | Viewing adult material on DMPD computer | 2-day Suspension |
| 2008 | Punching handcuffed subject | 1-day Suspension |
| | Taking handcuffed subject to the ground | Oral Reprimand |
| 2008-2009 | Insubordination to supervisor | 3-day Suspension |
| 2013 | Discharging a firearm at a suspect's vehicle tire | 2-day Suspension |
| | Failure to file a report in an assault case | Written Reprimand |
| 2014 | Hitting a handcuffed subject | 4-day Suspension |

Source: Bates Stamp, PL.APP.000136-000227

Sergeant Wessels was hired by the City of Des Moines, Iowa in 1996 (Bates Stamp, PL.APP.000230). Disciplinary records reviewed are for an approximately 17-year range of time. A content analysis of Sergeant Wessel's being disciplined for using inappropriate force identified a frequency of three (3) times. When three incidents of inappropriate uses of force are divided by 17 years, it averages 0.177 incidents per year. When Sergeant Wessels 26-year employment range as a police officer is used, it averages to 0.115 per year. Based upon my education, training, and experience these small percentages do not form a basis to create a custom, practice, or pattern of using inappropriate force.

In short, the DMPD has a history of disciplining its officers, with a range of discipline that includes an oral reprimand up to and including termination. Before discipline can be administered, a complaint must be received either internally (i.e. employees) or externally (i.e.

the public). In short, the DMPD has a "surveillance" system to identify and track use-of-force incidents by its police officers. This system follows national recommendations and is within the scope of law enforcement guidelines and recommendations, because the DMPD does maintain disciplinary records of its employees (Bates Stamp, PL.APP.000136-000227).

The United States Department of Justice, the IACP, and the Police Executive Research Foundation (PERF), and other have recommended the development of "an early warning system/risk management program ('EWS') to assist with accountability" (Walker, S., Alpert, G. P., Kenney, D.J., 2001; Amendola, n.d.). Officer Fong and Lt. Knox both testified there are procedures in place to review and identify incidents where DMPD police officers use force (Knox deposition, 5:19-24; Fong deposition, 62:18-19).

## X.      DEMONSTRATIVE EVIDENCE

I reserve the right to use demonstrative evidence at trial, including without limitation the jail surveillance and body-worn camera video recordings, audio recordings, and any combination of them to illustrate the facts and my opinions expressed above.

## XI.     COMPENSATION: See APPENDIX B.

# REFERENCES

Amendola, K. L. (n.d.). Early Warning Systems for Law Enforcement. Washington, DC: Police Executive Research Forum.

Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir., 1989).

Case, B. J., Jorgensen, M.A., & Zucker, S. (2004, December). *Alignment in Educational Assessment*. San Antonio, TX: Pearson, Inc.

City of Canton, Ohio v. Harris, 489 U. S. 378 (1989).

Commission on Accreditation for Law Enforcement Agencies. (2001, November). *Standards for law enforcement agencies (4th ed.)*. Fairfax, VA: Author.

Federal Bureau of Investigation. (n.d.). Defensive Tactics Manual. Washington, D.C.: Author.

Federal Bureau of Investigation. (1970). Defensive Tactics: A Manual for Law Enforcement Officers. Washington, D.C.: Author.

Gordon, H. R. D. (2008). **The history and growth of career and technical education in America** (3rd ed.). Long Grove, IL: Waveland Press, Inc.

Graham v. Connor, 109 S. Ct. 1865 (1989).

Graziano, A. M., & Raulin, M. L. (2000). **Research methods: A process of inquiry** (4th ed.). Boston: Allyn and Bacon.

Graziano, A. M., & Raulin, M. L. (1997). **Research methods: A process of inquiry** (3rd ed.). New York: Longman.

Griggs v. Duke Power Co., 401 U.S. 424 (1971).

International Association of Chiefs of Police. (2002, July). *Investigation of Employee Misconduct: Model Policy*. Alexandria, VA: Author.

Leedy, P. D., & Ormrod, J. E. (2001). **Practical research: Planning and design** (7th ed.). Upper Saddle River, NJ: Merrill Prentice Hall.

Mesloh, C., Henych, M., & Wolf, R. (1008). *Less lethal weapon effectiveness, use of force, and suspect & officer injuries: A five-year analysis*. Washington, D.C.: United States Department of Justice.

Orrick, W. D. (2004, November). Developing a Police Department Policy-Procedure Manual. In *Police chiefs desk reference: A guide for newly appointed police leaders* (pp. 138-155). Alexandria, VA: International Association of Chiefs of Police.

Peters, Jr., J. G. (1992). **Realistic defensive tactics**. Ventura, CA: Reliapon Police Products, Inc.

Reiter, L. (2006). **Law enforcement administrative investigations: A manual guide** (3rd ed.). Indianapolis, IN: Public Agency Training Council.

Remsberg, C. (1986). **The tactical edge: Surviving high-risk patrol**. Northbrook, IL: Calibre Press.

Walker, S., Alpert, G. P., & Kenny, D. J. (2001, July). Early Warning Systems: Responding to the Problem Police Officer. Washington, DC: National Institute of Justice.

# APPENDIX A

## CASE DOCUMENTS REVIEWED and/or CONSIDERED

Burnikel v. Fong, et al.

1. Complaint,
2. Des Moines Police Department Policy: Chapter 14—Off-Duty Police Work,
3. Des Moines Regional Police Academy: Use of Force PowerPoint slide deck,
4. Des Moines Regional Police Academy: Officer's Goal in Use of Force,
5. Des Moines Regional Police Academy:  Handcuffs 806 PowerPoint slide deck,
6. Des Moines Regional Police Academy: Tactical Ground Fighting Safety Rules,
7. Des Moines Regional Police Academy: Defensive Tactics Training: Ground Survival Tactics,
8. Des Moines Regional Police Academy: Officer Safety PowerPoint slide deck,
9. Des Moines Regional Police Academy: Weapon Retention 406 PowerPoint slide deck,
10. Des Moines Regional Police Academy: Oleoresin Capsicum: Less-than-Lethal Pepper Spray,
11. Des Moines Police Department: ASP Baton Basic Course Outline,
12. Photograph: Sabre Pepper Spray cannister,
13. Photograph: Sabre Pepper Spray Ingredients Label,
14. Photographs: Mr. Burnikel, Officer Fong, and Sergeant Wessels at scene,
15. Disciplinary documents:  DMPD Sergeant Wessels,
16. Disciplinary documents:  DMPD Officer Fong,
17. State of Iowa, City of Des Moines, Iowa v, Dustin Burnikel, Transcript of Proceedings: Volume I, May 13, 2013,
18. State of Iowa, City of Des Moines, Iowa v, Dustin Burnikel, Transcript of Proceedings: Volume II, May 14, 2013,
19. Case Investigation Report (CIR): Dustin Burnikel,
20. Supplemental Report: Dustin Burnikel,
21. Polk County Jail Booking Information: Dustin Burnikel,
22. Wanted Person Inquiry: Dustin Burnikel,
23. Preliminary Complaint: Dustin Burnikel,
24. Complaint and Probable Cause Statement: Dustin Burnikel,
25. Polk County Jail Booking Information: Breanna Hunemiller,
26. Wanted Person Inquiry: Breanna Hunemiller,
27. Preliminary Complaint: Breanna Hunemiller,
28. Complaint and Probable Cause Statement: Breanna Hunemiller,
29. Defendants' Motion for Summary Judgment,
30. Defendants' Statement of Material Facts,
31. Plaintiff's Statement of Undisputed Facts,
32. Plaintiff's Motion for Summary Judgment,
33. Plaintiff's Memorandum in Support for His Motion for Summary Judgment,
34. Deposition transcript: Dustin Burnikel,
35. Deposition transcript: Captain Paul Stout,
36. Deposition transcript: Lieutenant Larry Davey,
37. Deposition transcript: Lieutenant Joseph Leo,

38.     Deposition transcript: Lieutenant Tony Knox,
39.     Deposition transcript: Sergeant Garth House,
40.     Deposition transcript: Sergeant Greg Wessels,
41.     Deposition transcript: Officer Michael Fong,
42.     Greg Meyer Expert Report: May 29, 2018,
43.     Videos of Breanna Hunemiller seizure,
44.     YouTube video of Sergeant Wessels and female,
45.     Employee Evaluation Report: Officer Fong, and
46.     Employee Evaluation Report: Sergeant Wessels.

# APPENDIX B

## COMPENSATION

Burnikel v. Fong, et al.

**Compensation**

I have invoiced at my published Flat Fee retainer ($5000.00). Deposition testimony is invoiced at a flat daily rate of $2000.00 per day, if the deposition is taken at my location <u>and pre-paid</u>, or $3000.00 if taken other than at my location, or not pre-paid, plus direct expenses. On-site visits are invoiced at $3000.00 per day, plus direct expenses. Time for trial testimony is invoiced at $2000.00 per day at my location, or $3000.00 per day other than at my location, plus direct expenses.