IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

```
- - - - - - - - - - - - - - X
DUSTIN BURNIKEL,                 :
                                 :
          Plaintiff,             :    Case No. 4:15-cv-00050
                                 :
     vs.                         :
                                 :
MICHAEL FONG, individually       :
and in his official capacity     :
as a law enforcement officer     :
with the Des Moines Police       :
Department; GREG WESSELS,        :
individually and in his          :
official capacity as a law       :
enforcement officer with the     :
Des Moines Police Department;    :
and the CITY OF DES MOINES,      :    TRANSCRIPT OF TRIAL
IOWA,                            :    VOLUME I
                                 :
          Defendants.            :
- - - - - - - - - - - - - - X
```

First Floor, North Courtroom
United States Courthouse
123 East Walnut Street
Des Moines, Iowa  50309
Tuesday, November 13, 2018
8:33 a.m.

BEFORE:  THE HONORABLE REBECCA GOODGAME EBINGER, Judge.

TERRI L. MARTIN, CSR, RPR, CRR
515.689.6444

```
APPEARANCES:

For the Plaintiff:              JAMES R. WYRSCH, ESQ.
                                JAVAD M. KHAZAELI, ESQ.
                                KIARA N. DRAKE, ESQ.
                                911 Washington Avenue, Suite 211
                                St. Louis, Missouri 63101

                                JUSTIN K. SWAIM, ESQ.
                                701 13th Street, Suite 2
                                West Des Moines, Iowa 50265

For the Defendants:             JOHN O. HARALDSON, ESQ.
                                Assistant City Attorney
                                City of Des Moines
                                400 Robert D. Ray Drive
                                Des Moines, Iowa  50309-1891
```

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Plaintiff: | | | | |
| Breanna Hunemiller | 34 | 74 | | |
| Darrick Burnikel | 88 | 107 | 119 | 122 |

4

```
          1              P R O C E E D I N G S
08:34:10  2          (In open court.)
08:34:10  3          THE COURT:  Thank you.  Please be seated.
08:34:12  4          Good morning.
08:34:13  5          We're here in the matter of Dustin Burnikel versus
08:34:15  6  Michael Fong, Gregg Wessels, and the City of Des Moines.  This
08:34:18  7  is Case No. 4:15-cv-50.  This is the time and date set for trial
08:34:23  8  in this matter.  As you know, my name is Rebecca Goodgame
08:34:25  9  Ebinger, and I'm the district judge who's been assigned to
08:34:28 10  preside.
08:34:29 11          If counsel would make their appearances for the day.
08:34:35 12          MR. KHAZAELI:  Your Honor, Javad Khazaeli for the
08:34:38 13  plaintiff.
08:34:39 14          MR. WYRSCH:  James Wyrsch for plaintiff, Your Honor.
08:34:42 15          MR. SWAIM:  Justin Swaim for the plaintiff, Your
08:34:45 16  Honor.
08:34:45 17          MR. HARALDSON:  John Haraldson for the defendants,
08:34:48 18  Your Honor.
08:34:48 19          THE COURT:  Thank you.
08:34:49 20          Mr. Khazaeli, I recall you stating previously that you
08:34:53 21  thought you might have another attorney present.  Do you intend
08:34:55 22  to have that fourth attorney present throughout this trial?
08:35:00 23          MR. KHAZAELI:  Yes, Your Honor.  She's here in
08:35:02 24  attendance, but she will not be participating in the trial.
08:35:04 25          THE COURT:  Thank you.
```

08:35:06  1          I have a number of topics I wanted to discuss at this

08:35:12  2   conference, and then I'll open the floor to issues that you need

08:35:15  3   to bring to the Court's attention.

08:35:17  4          The first is I mentioned at our final pretrial

08:35:20  5   conference two weeks ago that I would like a list of witnesses

08:35:23  6   and subjects of testimony to be able to read to the parties.  I

08:35:27  7   don't know that I saw anything from you in that regard.  Is

08:35:30  8   there anyone, other than the witnesses listed, that you believe

08:35:33  9   will be mentioned during the course of the trial that the Court

08:35:38  10  should inquire as to the jurors' knowledge of those individuals?

08:35:43  11         Mr. Khazaeli?

08:35:44  12         MR. KHAZAELI:  No, Your Honor.

08:35:46  13         THE COURT:  Mr. Haraldson?

08:35:49  14         MR. HARALDSON:  There was a list of potential people

08:35:52  15  that we sent to the defendant [sic], but they're going to be

08:35:54  16  very tangentially related, mentioned in the documents

08:36:00  17  tangentially but not testifying.  So I don't have a concern.

08:36:01  18         THE COURT:  Okay.  My concern is that someone is

08:36:04  19  talking about someone tangentially, John Smith, who happened to

08:36:07  20  be there, and it turns out that juror No. 6 John Smith is her

08:36:11  21  cousin, right.  So if you all are not concerned that there's

08:36:15  22  anybody in the trial that is -- other than the witnesses slated

08:36:19  23  to testify that the Court needs to inquire about, we're just

08:36:22  24  going to make a record about that right now.

08:36:24  25         Mr. Khazaeli, are you comfortable with that?

| | | |
|---|---|---|
| 08:36:27 | 1 | MR. KHAZAELI:  I am, Your Honor. |
| 08:36:28 | 2 | THE COURT:  Mr. Haraldson? |
| 08:36:30 | 3 | MR. HARALDSON:  Yes, Your Honor. |
| 08:36:31 | 4 | THE COURT:  So the Court will read off a list of the |
| 08:36:33 | 5 | witnesses and say that they're potential witnesses and ask if |
| 08:36:37 | 6 | anyone knows them. |
| 08:36:39 | 7 | As to phase two, I would like a proposed statement of |
| 08:36:46 | 8 | the case for phase two.  The Court, and I'll address this |
| 08:36:52 | 9 | further later, is going to allow the issue of punitives damages |
| 08:36:58 | 10 | to be addressed in phase two, and the other issue will be the |
| 08:37:01 | 11 | liability of the City.  I didn't see a proposed statement of the |
| 08:37:04 | 12 | case that covers that.  My intent will be should phase two be |
| 08:37:08 | 13 | necessary, we will have a kind of preliminary set of |
| 08:37:17 | 14 | instructions that explains to them what we're doing, and that |
| 08:37:19 | 15 | will include the statement of the case and some instructions |
| 08:37:24 | 16 | dealing with the materials that are going to be addressed in |
| 08:37:26 | 17 | that.  If you could please file a proposed joint statement of |
| 08:37:31 | 18 | the case for phase two, I would appreciate that. |
| 08:37:35 | 19 | As to the punitive damages issue, I don't think I |
| 08:37:40 | 20 | received anything from the defense in regards to that. |
| 08:37:43 | 21 | Mr. Haraldson? |
| 08:37:45 | 22 | MR. HARALDSON:  That's correct, Your Honor. |
| 08:37:48 | 23 | THE COURT:  Okay.  And at the final pretrial |
| 08:37:49 | 24 | conference, we talked about allowing supplemental briefing in |
| 08:37:51 | 25 | regard to punitive damages.  The defense had changed their |

08:37:56   1   position as to the propriety of having the issue addressed in

08:37:58   2   the phase two.  The Court concurs with the plaintiff's proposal

08:38:04   3   to present evidence of punitive damages during the second phase

08:38:09   4   of the trial.  I've heard nothing in response from the defense

08:38:10   5   that would counter the arguments made by the plaintiff.  The

08:38:16   6   authorities cited by the plaintiff in their briefs in regards to

08:38:21   7   addressing punitive damages during the second phase are on point

08:38:26   8   and persuasive.  *Payne versus Jones* from the Second Circuit and

08:38:31   9   *Williams versus ConAgra Poultry Company* here in the Eighth

08:38:39   10  Circuit support this approach.

08:38:43   11        We will need to discuss what parts of the prior bad

08:38:47   12  acts are appropriate.  The case law suggests that it needs to be

08:38:51   13  similar in kind, and some of the materials that have been put

08:38:58   14  forth in terms of, for example, accessing an appropriate

08:39:06   15  material while on the job would seem to fall outside the scope

08:39:09   16  of the permissible authorities for that purpose; but we can

08:39:14   17  address that more subsequently.

08:39:17   18        But for purposes of understanding where the Court is,

08:39:22   19  the Court does find that the prior acts of Officers Fong and

08:39:26   20  Wessels have some relevance to the punitive damage claim and are

08:39:31   21  also relevant to the plaintiff's claims against the City and

08:39:34   22  that promoting judicial economy and efficiency is served by

08:39:39   23  putting forth those pieces of evidence during the second phase

08:39:44   24  of the trial.

08:39:44   25        In terms of any problems in terms of confusion or

08:39:55   1   issues, those can be addressed in the instructions and in a

08:39:58   2   properly worded verdict form.

08:40:00   3          Any additional record in that regard from the

08:40:03   4   plaintiff?

08:40:06   5          MR. KHAZAELI:  No, Your Honor.

08:40:06   6          THE COURT:  From the defense?

08:40:11   7          MR. HARALDSON:  No.  Your Honor, one concern that I

08:40:13   8   have in my proposed jury instructions is in phase one the jurors

08:40:15   9   determine the issue of whether punitive damages are proper in

08:40:19  10   phase one and then make the "yes" or "no" determination.  If, of

08:40:22  11   course, they say yes, then it moves on obviously to phase two

08:40:25  12   for the actual damages of punitives because I believe that the

08:40:28  13   nature of the acts of the officers and being reckless or willful

08:40:34  14   is the primary question about whether punitives are proper in

08:40:39  15   respect to this case.

08:40:40  16          So that's why in my proposed jury instructions I had a

08:40:44  17   question for the jurors with regard to each claim of whether

08:40:48  18   punitive damages should be provided.  The issue of what those

08:40:51  19   damages should be would be addressed in phase two if the jurors

08:40:54  20   say yes in phase one.

08:40:55  21          THE COURT:  Response from the plaintiff?

08:40:58  22          MR. WYRSCH:  Your Honor, I don't think the case law we

08:41:01  23   cited makes a distinction between those two things, and I think

08:41:05  24   unless we're entitled to get into those other acts in the first

08:41:10  25   phase, we think that -- which we're happy to do; but if we're

08:41:16   1  going to decide the question of punitive damages, then they

08:41:19   2  should be decided altogether in phase two.

08:41:22   3          THE COURT:  So the Court will -- we haven't made our

08:41:23   4  record on the final instructions.  I understand your position,

08:41:26   5  Mr. Haraldson, on that.  The factors determining the extent of

08:41:33   6  the punitive damages are certainly different than whether or not

08:41:35   7  they're eligible for punitive damages; but I'll consider that,

08:41:40   8  and we can make a record on that at the time we're considering

08:41:42   9  final instructions.

08:41:43  10          MR. HARALDSON:  Thank you.

08:41:43  11          THE COURT:  Thank you for bringing that distinction to

08:41:45  12  my attention.

08:41:54  13          The plaintiff brought up *Baldwin versus Estherville*.

08:41:58  14  While that may be new to attorneys from Missouri, it is not new

08:42:02  15  to anyone in Iowa.  This Court has been living with *Baldwin* and,

08:42:07  16  before *Baldwin*, *Godfrey* for years now.  The fact that the week

08:42:12  17  before trial you found this does not change the fact that

08:42:15  18  there's no Iowa Constitutional claim in the complaint, and the

08:42:18  19  Court sees that there's nothing that we need to address at this

08:42:21  20  time.  While I appreciate your review of the Supreme Court case

08:42:26  21  law, I don't see how that has any relevance to the case we have

08:42:29  22  before us.

08:42:30  23          Any additional record in that regard?

08:42:32  24          MR. WYRSCH:  No, Your Honor.

08:42:34  25          THE COURT:  Thank you.

| | | |
|---|---|---|
| 08:42:39 | 1 | We provided preliminary instructions previously, and |
| 08:42:42 | 2 | there were no objections.  Our intent is to provide those to the |
| 08:42:46 | 3 | jury and read those before openings.  Any objections to either |
| 08:42:51 | 4 | the preliminary instructions or the timing of those? |
| 08:42:56 | 5 | MR. KHAZAELI:  No, Your Honor. |
| 08:42:57 | 6 | MR. HARALDSON:  No, Your Honor. |
| 08:42:58 | 7 | THE COURT:  Thank you. |
| 08:43:00 | 8 | And, finally, final instructions -- I think I covered |
| 08:43:04 | 9 | this at the last final pretrial conference -- we will work on |
| 08:43:07 | 10 | those throughout the course of this trial.  They need a lot of |
| 08:43:10 | 11 | work.  A couple of things that I wanted to ask you about first. |
| 08:43:14 | 12 | You proposed a couple of instructions that were to be used |
| 08:43:18 | 13 | during the course of trial.  One of them was a stipulated facts |
| 08:43:22 | 14 | instruction.  What is your intent as to when you're asking the |
| 08:43:27 | 15 | Court to provide that instruction?  And are you also asking for |
| 08:43:31 | 16 | it to be in writing at the close of trial as well? |
| 08:43:36 | 17 | On behalf of the plaintiff? |
| 08:43:38 | 18 | MR. KHAZAELI:  I think we would defer to the Court on |
| 08:43:40 | 19 | that; but I think if we are providing it to the jury, it makes |
| 08:43:44 | 20 | sense to do that as early as possible. |
| 08:43:46 | 21 | THE COURT:  Okay.  Mr. Haraldson? |
| 08:43:52 | 22 | MR. HARALDSON:  I don't have an objection with |
| 08:43:53 | 23 | providing it early. |
| 08:43:54 | 24 | THE COURT:  Okay.  It is not in the preliminary |
| 08:43:57 | 25 | instructions because it wasn't proposed in the preliminary |

| | | |
|---|---|---|
| 08:44:00 | 1 | instructions.  My intent would be, before the start of the |
| 08:44:06 | 2 | plaintiff's case, to simply read that instruction in total, and |
| 08:44:12 | 3 | then I will also include it in the final instructions as a |
| 08:44:15 | 4 | separately numbered instruction. |
| 08:44:17 | 5 | Any objection to that? |
| 08:44:18 | 6 | MR. KHAZAELI:  No, Your Honor. |
| 08:44:20 | 7 | MR. HARALDSON:  No, Your Honor. |
| 08:44:20 | 8 | THE COURT:  If I forget, please remind me. |
| 08:44:24 | 9 | Similarly, the limiting instruction about Mr. Wessels' |
| 08:44:27 | 10 | credibility, is there a particular piece of evidence that you |
| 08:44:35 | 11 | want me to -- do you know when this is going to arise?  And is |
| 08:44:40 | 12 | there a manner in which you have intended to have that provided? |
| 08:44:49 | 13 | MR. WYRSCH:  Your Honor, I think your motions in |
| 08:44:51 | 14 | limine resolve that issue. |
| 08:44:53 | 15 | THE COURT:  Okay.  Well, good. |
| 08:44:55 | 16 | MR. WYRSCH:  That would be we would not need the |
| 08:44:59 | 17 | instruction. |
| 08:45:09 | 18 | THE COURT:  Okay.  Generally speaking about the |
| 08:45:11 | 19 | instructions, my intent will be to work on them internally in |
| 08:45:14 | 20 | chambers.  I will then give you a draft of the Court's proposed |
| 08:45:18 | 21 | instructions which will kind of synthesize the different |
| 08:45:21 | 22 | positions that you all have put forth.  We will then have a |
| 08:45:25 | 23 | conference among ourselves off the record about the |
| 08:45:35 | 24 | instructions.  I'll make any changes that I feel appropriate |
| 08:45:38 | 25 | based on that conference.  I'll then give you another set and |

08:45:41   1   then, if necessary, we'll have another off-the-record

08:45:46   2   discussion.  And then when the Court has a set that I believe is

08:45:49   3   the final version, we'll make a record as to any objections that

08:45:53   4   remain to those or the fact that no objections exist before we

08:45:58   5   provide them to the jury.

08:46:03   6         It's also my practice to read final instructions

08:46:05   7   before closing arguments.  I find it's more helpful to the jury.

08:46:08   8   Instead of you saying the Court is going to instruct you, you

08:46:11   9   can actually refer to the instructions.

08:46:13   10        Any objection to proceeding that way?

08:46:16   11        MR. KHAZAELI:  No, Your Honor.

08:46:17   12        MR. HARALDSON:  No, Your Honor.

08:46:18   13        THE COURT:  Okay.  Those are all of the things that I

08:46:21   14   had.

08:46:22   15        Anything that the plaintiff needs to bring to the

08:46:25   16   Court's attention before we proceed?

08:46:28   17        MR. KHAZAELI:  Yes, Your Honor.  We had a question

08:46:30   18   that we wanted to raise about one of -- at least one of the

08:46:37   19   stricken proposed questions to the jury.

08:46:39   20        THE COURT:  Okay.

08:46:42   21        MR. KHAZAELI:  The first one I wanted to raise,

08:46:53   22   there's a line of questioning on plaintiff's proposed voir dire

08:46:58   23   questions starting at question -- it's questions 24 and 25.

08:47:15   24        THE COURT:  Yes.

08:47:16   25        MR. KHAZAELI:  So the reasons we added those

08:47:18    1  questions, Your Honor, is during our deposition of the

08:47:21    2  defendants' expert witness, repeatedly as we proposed

08:47:24    3  hypotheticals or asked the expert about how the defendant should

08:47:31    4  have been treated based on their history of findings of

08:47:37    5  inappropriate action, the expert consistently came back to,

08:47:41    6  well, you know, police unions make you do something.  Sometimes

08:47:48    7  as a manager, we can't do anything because the police union

08:47:51    8  forces us to keep people.  The police union prevents us from

08:47:55    9  disciplining people.  That's why we put that in there.

08:47:57   10       If the Court doesn't believe that that's something we

08:48:00   11  should be getting into, then we would ask the Court to limit the

08:48:03   12  expert's ability to use the fact that a police union exists as

08:48:09   13  an excuse for the police department not taking action that we

08:48:14   14  think is appropriate.  That's why we placed that in there.

08:48:17   15       So we would defer to the Court as to which one you

08:48:21   16  think is better for judicial economy, whether we limit the

08:48:24   17  expert from being able to get into those types of things, which

08:48:28   18  we believe actually was kind of conjecture.  He didn't know

08:48:31   19  anything about the specific police union here in Des Moines.

08:48:35   20  But if he's allowed to go there, we do think that's very

08:48:38   21  important for us to know about the jury's opinions on that.

08:48:41   22       THE COURT:  Thank you very much.  I appreciate that

08:48:42   23  context.

08:48:43   24       Mr. Haraldson, response?

08:48:44   25       MR. HARALDSON:  Well, those are responses from

08:48:47    1    specific questions from plaintiff in deposition.  It's a

08:48:52    2    difficult situation for cities.  Obviously, this is a negligent

08:48:55    3    retention case.  There are aspects that come into the ability of

08:48:59    4    a supervisory body that's being held for liability for the

08:49:03    5    purpose of they operate under a collective bargaining agreement

08:49:08    6    and have a civil service organization.  I don't think that's

08:49:10    7    necessarily irrelevant for a city to know.  However, it's more

08:49:15    8    of a -- it is -- I do believe that it is fair to say that Dr.

08:49:21    9    Peters, when he was asked that question, was talking in

08:49:23   10    generalities.  He does not know the specifics of the Des Moines

08:49:26   11    Police Union any more than he probably knows other cities other,

08:49:30   12    than the fact that most police officers in major cities have

08:49:34   13    unions.

08:49:35   14          So I think there's some relevance to it.  However, I

08:49:37   15    don't believe it's a major issue in this case as far as the

08:49:40   16    aspect of the City's ability to supervise, the liability.

08:49:44   17          THE COURT:  So, clearly, I didn't know that when I

08:49:48   18    read your proposed voir dire.  I appreciate that context.  So I

08:49:58   19    think that the follow-up question, "Do you have any specific

08:50:09   20    opinions on a union's role in the employee discipline and

08:50:12   21    determination process" is too pointed.  But if you want to ask

08:50:20   22    the two questions in 24 and 25, "Do you have any opinions about

08:50:23   23    police unions, do you have any opinions about unions generally,"

08:50:26   24    that's fine in light of the context you've provided.  I don't

08:50:30   25    think that follow-up about the roles of employee discipline and

08:50:35   1   termination process, because we don't know what you said to me

08:50:39   2   means that this was conjecture that this individual had.  I

08:50:43   3   think that gets too far into the weeds; but those two general

08:50:47   4   questions are acceptable to the Court.

08:50:49   5          MR. KHAZAELI:  Thank you, Your Honor.

08:50:50   6          And then for defendants' questions, there were two

08:50:53   7   that the Court allowed in that we wanted to flag:  Question

08:50:58   8   number 36 being the first one.  "Do any of you think that a

08:51:04   9   police officer must endure and allow disobedience to lawful

08:51:09   10  police orders?"

08:51:09   11         THE COURT:  Okay.

08:51:11   12         MR. KHAZAELI:  I think we've got a problem

08:51:12   13  understanding -- I think that that's confusing.  What is

08:51:16   14  disobedience?  What is a lawful police order?  This is kind of

08:51:19   15  getting into things that a lay jury wouldn't have an idea as to

08:51:24   16  what it meant.  It's not clear.

08:51:26   17         The other one that we wanted to flag for the Court

08:51:30   18  was -- we're not against the general concept, but question

08:51:36   19  number 58.  But this, I think, is more of an instruction for the

08:51:48   20  Court to give.  And once we get into this case the plaintiff

08:51:53   21  will be required to prove its case by a preponderance of the

08:51:55   22  evidence, meaning the greater weight of the evidence, once we

08:51:58   23  get into this next line, "Does anyone feel uncomfortable making

08:52:01   24  a decision where there's as much as 49 percent doubt in their

08:52:05   25  mind?"  I think that gets confusing for the jury, and I think

| | | |
|---|---|---|
| 08:52:08 | 1 | there's a way to kind of -- to streamline that in a way that |
| 08:52:19 | 2 | isn't pushing the jury to 49 percent means something. |
| 08:52:22 | 3 | THE COURT:  Okay.  Thank you. |
| 08:52:23 | 4 | Mr. Haraldson, response? |
| 08:52:29 | 5 | MR. HARALDSON:  As for 36, I agree that probably could |
| 08:52:33 | 6 | be written better.  I think that maybe the proper tone of the |
| 08:52:37 | 7 | question would be, "Do any of you think that a police officer |
| 08:52:44 | 8 | has to allow disobedience to a lawful order?" |
| 08:52:50 | 9 | THE COURT:  Okay.  You said "has to allow" -- |
| 08:52:56 | 10 | MR. HARALDSON:  Or must allow, something along those |
| 08:52:59 | 11 | lines.  You know, actually I think maybe a better word than |
| 08:53:09 | 12 | "must" because that's compulsory, maybe "should," "should |
| 08:53:13 | 13 | allow."  "Do any of you think that a police officer should allow |
| 08:53:16 | 14 | disobedience to lawful orders?" |
| 08:53:54 | 15 | THE COURT:  My suggestion would be, "Do any of you |
| 08:53:56 | 16 | think that a police officer must permit noncompliance with a |
| 08:54:01 | 17 | lawful police order," singular, "or should permit?"  And I think |
| 08:54:11 | 18 | noncompliance as opposed to disobedience is better. |
| 08:54:17 | 19 | MR. HARALDSON:  Okay. |
| 08:54:18 | 20 | THE COURT:  Plaintiff? |
| 08:54:19 | 21 | MR. KHAZAELI:  We agree with that change.  The other |
| 08:54:21 | 22 | issue I think still is the question of the word "lawful." |
| 08:54:25 | 23 | THE COURT:  And that is going to be discussed |
| 08:54:28 | 24 | throughout the course of trial, and I don't think that there's |
| 08:54:31 | 25 | anything in terms of asking that question that informs them what |

| | | |
|---|---|---|
| 08:54:37 | 1 | a lawful order is, so I don't think that that's objectionable. |
| 08:54:41 | 2 | MR. KHAZAELI:  Thank you. |
| 08:54:42 | 3 | THE COURT:  "Do any of you think that a police officer |
| 08:54:44 | 4 | should permit noncompliance with a lawful police order?" |
| 08:54:49 | 5 | Mr. Haraldson? |
| 08:54:50 | 6 | MR. HARALDSON:  That would be acceptable. |
| 08:54:52 | 7 | THE COURT:  Okay.  And then the other one, any |
| 08:54:59 | 8 | response in regards to the 49 percent? |
| 08:55:03 | 9 | MR. HARALDSON:  Well, I do assume the Court will talk |
| 08:55:07 | 10 | about the preponderance of the evidence standard; but with that |
| 08:55:09 | 11 | in mind, I don't have a problem with striking that. |
| 08:55:11 | 12 | THE COURT:  Okay.  And I do talk about the |
| 08:55:13 | 13 | preponderance of the evidence, although I talk about the greater |
| 08:55:16 | 14 | weight of the evidence because that's the language that we use. |
| 08:55:18 | 15 | And to the extent that you have follow-up, you can talk about |
| 08:55:22 | 16 | what that means.  But, again, I interview jurors after every |
| 08:55:28 | 17 | trial, and no juror has ever said, "I wish we spent more time on |
| 08:55:31 | 18 | voir dire."  Every juror always says, "Why did they keep harping |
| 08:55:36 | 19 | on this topic?"  So to the extent that you care about how the |
| 08:55:39 | 20 | jury thinks of you, I would ask you to be streamlined and |
| 08:55:44 | 21 | thoughtful in how you approach voir dire. |
| 08:55:48 | 22 | Any other issues from the plaintiff? |
| 08:55:52 | 23 | MR. WYRSCH:  No, Your Honor. |
| 08:55:53 | 24 | THE COURT:  So one thing, I've noticed that you all |
| 08:55:56 | 25 | are tag-teaming is the best I can say.  I'm going to speak to |

| | | |
|---|---|---|
| 08:56:04 | 1 | Mr. Khazaeli just for efficiency sake, and it's not out of |
| 08:56:12 | 2 | disrespect for the other two members of the trial team.  It is |
| 08:56:15 | 3 | easier for the Court to have one point person that is speaking |
| 08:56:18 | 4 | on behalf.  Similarly, I assume that you'll engage in different |
| 08:56:23 | 5 | examinations and arguments throughout the course of trial. |
| 08:56:26 | 6 | Whoever is doing the examination needs to be the person who is |
| 08:56:29 | 7 | making the objections, needs to be the person who is responding |
| 08:56:33 | 8 | to objections and needs to be the person who is addressing the |
| 08:56:36 | 9 | Court.  You can consult with each other all you need, but I |
| 08:56:40 | 10 | can't have multiple people jumping up during the course of |
| 08:56:44 | 11 | trial. |
| 08:56:47 | 12 | Do you understand that? |
| 08:56:47 | 13 | MR. KHAZAELI:  That's actually how we were planning on |
| 08:56:52 | 14 | doing it, Your Honor. |
| 08:56:53 | 15 | THE COURT:  Thank you. |
| 08:56:53 | 16 | On behalf of the defense, anything you need to bring |
| 08:56:55 | 17 | to the Court's attention? |
| 08:56:56 | 18 | MR. HARALDSON:  I think there's one issue that the |
| 08:56:58 | 19 | parties are close to resolving between each other.  Thursday, |
| 08:57:02 | 20 | Thursday night, or was it -- no; Sunday night, the plaintiff |
| 08:57:07 | 21 | sent me some proposed changes to what's been marked and |
| 08:57:10 | 22 | introduced as Exhibit Q.  We're pretty close together.  Those |
| 08:57:14 | 23 | changes are actually pretty close to the current exhibit, but -- |
| 08:57:20 | 24 | so I assume we'll be able to hash that out today before Exhibit |
| 08:57:23 | 25 | Q is used.  I think that the first time that would come up is |

08:57:28  1  when the plaintiff testifies, which I assume is probably going

08:57:31  2  to be this afternoon at the earliest, so we should be able to

08:57:35  3  address those issues before then and make the changes.

08:57:40  4  　　　　　THE COURT:  Okay.  Thank you, Mr. Haraldson.

08:57:46  5  　　　　　We did make the room behind here available to the

08:57:49  6  plaintiff for purposes of being out of town and being

08:57:53  7  comfortable.

08:57:57  8  　　　　　I assume that you all have resolved whatever issues

08:58:00  9  were in terms of the expert's videography that was brought to

08:58:10  10  the Court's attention.  I heard nothing in response to my order,

08:58:10  11  so I assume that's been resolved.

08:58:13  12  　　　　　MR. KHAZAELI:  We have, Your Honor.  I think

08:58:16  13  Mr. Haraldson has obtained somebody to come and record, and now

08:58:19  14  that we've got the Court's order as to how we're going to deal

08:58:24  15  with punitives, we'll decide how we want to break that up.

08:58:28  16  We'll just do the sections that pertain to phase one in front of

08:58:30  17  the jury.  Then we'll record.

08:58:32  18  　　　　　To that same line, for one of our witnesses,

08:58:37  19  Dr. Shelton -- his testimony was fairly short; he's the

08:58:43  20  dentist -- we were able do testimony with him over the phone and

08:58:50  21  by video.  We have a copy of that video testimony and the

08:58:55  22  transcripts.  I've shared that with Mr. Haraldson.  It's about

08:58:58  23  45 minutes total.  The only issue that I see with that -- and we

08:59:03  24  would defer to the Court on this -- is when you listen to the

08:59:07  25  video, sometimes, because I'm on the side of the video, my voice

| | | |
|---|---|---|
| 08:59:13 | 1 | gets a little bit low.  And we would suggest that while the |
| 08:59:17 | 2 | people are watching the video that they have a copy of the |
| 08:59:20 | 3 | transcript so that they can follow along.  Luckily, for the |
| 08:59:23 | 4 | Court and for us, there were no objections at all during that |
| 08:59:28 | 5 | testimony, so I think we could just play it straight through. |
| 08:59:31 | 6 | That's one issue there. |
| 08:59:34 | 7 | One other issue is that due to some scheduling |
| 08:59:37 | 8 | reasoning -- and actually I meant to tell you, Mr. Haraldson, |
| 08:59:41 | 9 | we're going to flip flop, if the Court is amenable to it, our |
| 08:59:45 | 10 | first two witnesses.  We expect them both to get on and off |
| 08:59:49 | 11 | today, but we would like to start with Breanna Hunemiller and |
| 08:59:56 | 12 | then have Darrick Burnikel afterwards.  And that was my fault, |
| 09:00:19 | 13 | Your Honor, because I was the only one that didn't realize that |
| 09:00:21 | 14 | we were going to 4:30 as opposed to 6:00 every day. |
| 09:00:26 | 15 | THE COURT:  Did you say instead of 6:00? |
| 09:00:28 | 16 | MR. KHAZAELI:  Instead of 6:00.  I don't know -- |
| 09:00:29 | 17 | everybody thought I was crazy when I mentioned it.  No, |
| 09:00:34 | 18 | everybody has been very clear. |
| 09:00:36 | 19 | THE COURT:  So you're saying that you're going to |
| 09:00:38 | 20 | switch the plaintiff and Ms. Hunemiller? |
| 09:00:41 | 21 | MR. KHAZAELI:  No.  The plaintiff is our third. |
| 09:00:43 | 22 | THE COURT:  Oh, I'm sorry. |
| 09:00:43 | 23 | MR. KHAZAELI:  It gets confusing with the Justins and |
| 09:00:51 | 24 | the Dustins.  Darrick Burnikel is plaintiff's cousin, and we're |
| 09:00:53 | 25 | going to switch one and two if the Court is amenable to that. |

| | | |
|---|---|---|
| 09:00:57 | 1 | THE COURT:  Okay.  And they're here and available? |
| 09:00:59 | 2 | MR. KHAZAELI:  They are. |
| 09:01:00 | 3 | THE COURT:  So the first question is, Mr. Haraldson, |
| 09:01:01 | 4 | any objection to the jurors being able to read along with the |
| 09:01:06 | 5 | transcript while the video is playing? |
| 09:01:07 | 6 | MR. HARALDSON:  Not having heard it, I would trust |
| 09:01:07 | 7 | that Mr. Khazaeli is probably right, so I don't have a problem |
| 09:01:11 | 8 | with them reading along as long as they don't keep it. |
| 09:01:12 | 9 | THE COURT:  And that's what the Court would say.  I |
| 09:01:14 | 10 | have no problem handing out -- if you make 12 copies of the |
| 09:01:18 | 11 | transcript -- and that's your responsibility to do -- we can |
| 09:01:21 | 12 | hand it out while the video is playing, and then we'll take it |
| 09:01:23 | 13 | back during the course of the -- as soon as the testimony is |
| 09:01:26 | 14 | over. |
| 09:01:27 | 15 | MR. KHAZAELI:  I think that that plan works, and I |
| 09:01:29 | 16 | think we would probably want to add just a short direction from |
| 09:01:31 | 17 | the Court to tell them not to read ahead as it's going on. |
| 09:01:35 | 18 | THE COURT:  Happy to do that. |
| 09:01:38 | 19 | MR. KHAZAELI:  The only other thing that we want to |
| 09:01:42 | 20 | bring up to the Court, and I think both Mr. Haraldson and I |
| 09:01:46 | 21 | thought about this yesterday, is we've made a small |
| 09:01:49 | 22 | demonstrative that we can put up, not to give to the jury, that |
| 09:01:53 | 23 | is just a to-scale map of the intersection showing where the two |
| 09:02:02 | 24 | most important landmarks are, the vestibule at Jokers and the |
| 09:02:08 | 25 | cab stand.  And I don't know how the Court wants us to deal with |

| | | |
|---|---|---|
| 09:02:12 | 1 | that.  I don't think we ever talked about dealing with |
| 09:02:14 | 2 | demonstratives that aren't going into evidence; but I think what |
| 09:02:18 | 3 | we would do is just put it on the screen, let them see it, let |
| 09:02:22 | 4 | either party, if they want to, talk about directions and stuff. |
| 09:02:26 | 5 | That's the only other thing that I don't think we've raised. |
| 09:02:29 | 6 | THE COURT:  Mr. Haraldson? |
| 09:02:32 | 7 | MR. HARALDSON:  In general -- and I told |
| 09:02:35 | 8 | Mr. Khazaeli -- I don't have a problem with that.  I haven't |
| 09:02:37 | 9 | seen it.  I assume he's going to let me see it, but in general I |
| 09:02:40 | 10 | don't have a problem with the demonstrative. |
| 09:02:42 | 11 | THE COURT:  So why don't you all have the opportunity |
| 09:02:44 | 12 | to talk about that.  If it is an issue, let me know.  The only |
| 09:02:47 | 13 | issue that I have with demonstratives is that you don't leave it |
| 09:02:51 | 14 | up when you're not talking about it.  So as soon as you're done, |
| 09:02:54 | 15 | take it down.  And I need to make sure we have our second screen |
| 09:02:59 | 16 | from the IT people, but I'll do that from my end. |
| 09:03:03 | 17 | Anything further on behalf of the plaintiff? |
| 09:03:05 | 18 | MR. KHAZAELI:  One just quick question.  With the |
| 09:03:11 | 19 | assumption that we would do it in a way that wouldn't disrupt |
| 09:03:14 | 20 | the Court, at times would it be okay with the Court if Ms. Drake |
| 09:03:19 | 21 | would be allowed to go into the room if we need to have her pull |
| 09:03:22 | 22 | something for us while the case is going on, or do you want us |
| 09:03:26 | 23 | to limit that to during breaks? |
| 09:03:30 | 24 | THE COURT:  A couple of things.  You may be seated. |
| 09:03:37 | 25 | I'm going to ask for her to sit in the front row on this side so |

| | | |
|---|---|---|
| 09:03:45 | 1 | that it's clear that -- and I don't know, you could be in the |
| 09:03:56 | 2 | row behind, but she needs to be on this side so she's in your |
| 09:04:01 | 3 | line of sight.  I would like you also to provide me with her |
| 09:04:04 | 4 | name so I can include her in your team so that the jurors know |
| 09:04:09 | 5 | who this person is who's interacting with you.  Generally |
| 09:04:14 | 6 | speaking, it would be my preference that you not have someone |
| 09:04:18 | 7 | scurrying back and forth and opening -- going back into the jury |
| 09:04:23 | 8 | room that we've allowed you to use and you use the times and |
| 09:04:26 | 9 | breaks.  To the extent that there's something that you need |
| 09:04:28 | 10 | immediately, you can ask the Court's permission and we can go |
| 09:04:32 | 11 | from there.  I think it would be distracting to the jury to do |
| 09:04:34 | 12 | that on a regular basis. |
| 09:04:36 | 13 | MR. KHAZAELI:  Thank you, Your Honor. |
| 09:04:37 | 14 | THE COURT:  Mr. Haraldson? |
| 09:04:39 | 15 | MR. HARALDSON:  I think -- I believe Mr. Khazaeli |
| 09:04:41 | 16 | covered most of the issues, and we're ready to go. |
| 09:04:44 | 17 | THE COURT:  Okay.  So I haven't talked to my jury |
| 09:04:47 | 18 | coordinator.  I don't know what the status is on the jurors |
| 09:04:50 | 19 | being here. |
| 09:04:52 | 20 | Do you know? |
| 09:04:54 | 21 | THE LAW CLERK:  Yes.  They're here.  There's 21 here. |
| 09:04:57 | 22 | THE COURT:  We have 21 of the 22 jurors we expected |
| 09:05:05 | 23 | are here.  There's another trial going on in the court -- |
| 09:05:15 | 24 | there's another jury here, and they are separate, in a different |
| 09:05:19 | 25 | courtroom.  So we'll make sure that our jurors stay away.  Just |

| | | |
|---|---|---|
| 09:05:23 | 1 | so you know, we are using for them the jury room across the hall |
| 09:05:28 | 2 | that's associated with my colleague, Judge Rose's courtroom |
| 09:05:32 | 3 | because my jury room, as you've seen, only has one door in and |
| 09:05:36 | 4 | out, and it makes it difficult for bench conferences, which is |
| 09:05:40 | 5 | why we're using that one. |
| 09:05:41 | 6 | All right.  So we'll be in recess.  They're going |
| 09:05:44 | 7 | to -- we'll line up the jurors, and then I'll come out when |
| 09:05:47 | 8 | everybody is ready. |
| 09:05:48 | 9 | Thank you.  We're in recess. |
| 09:05:50 | 10 | (Recess at 9:05 a.m., until 9:24 a.m.) |
| 09:24:24 | 11 | (A jury was impaneled and sworn.) |
| 09:24:24 | 12 | (Preliminary instructions were read and reported but |
| 09:24:24 | 13 | not transcribed.) |
| 09:24:24 | 14 | (Recess at 12:03 p.m. until 1:00 p.m.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

| | |
|---|---|
| 13:01:48 | 1 |
| 13:02:06 | 2 |
| 13:05:22 | 3 |
| 13:05:24 | 4 |
| 13:05:28 | 5 |
| 13:05:30 | 6 |
| 13:05:33 | 7 |
| 13:05:35 | 8 |
| 13:05:42 | 9 |
| 13:05:45 | 10 |
| 13:05:49 | 11 |
| 13:05:54 | 12 |
| 13:05:57 | 13 |
| 13:06:01 | 14 |
| 13:06:02 | 15 |
| 13:06:04 | 16 |
| 13:06:10 | 17 |
| 13:06:12 | 18 |
| 13:06:16 | 19 |
| 13:06:22 | 20 |
| 13:06:26 | 21 |
| 13:06:28 | 22 |
| 13:06:30 | 23 |
| 13:06:31 | 24 |
| 13:06:35 | 25 |

AFTERNOON SESSION  1:05 p.m.

(In open court, out of the presence of the jury.)

THE COURT:  Thank you.  Please be seated.

We're on the record, outside the presence of the jury.

Counsel, is there anything you need to bring to my attention before we bring in the jury?

MR. WYRSCH:  A couple of things, Your Honor.  One, just in the interim, we were working on the -- trying to -- I was asking the clerk how to publish to just the witness and the judge for an exhibit, when an exhibit is presented to the witness but not to the entire court and jury.  My understanding is there's some technical glitch right now, so I believe we're going to be using paper exhibits to the witness unless we can get that resolved.

THE COURT:  Okay.  One moment.

(Law clerk conferring with the Court.)

THE COURT:  Okay.  We'll get that addressed.

MR. WYRSCH:  And, two, I guess, we were wondering, in our exhibit list we had the As, Bs, and Cs.  We've never really resolved any objections in the Bs and Cs.  Are we just planning on, by exhibit, the Court ruling?

THE COURT:  Yes.

MR. WYRSCH:  All right.

THE COURT:  If there's -- I mean, all of the Bs certainly.  The question is if there's a foundation, if there's

13:06:38    1    some specific objection that you have, I will rule on the

13:06:43    2    objection as it is presented to the Court.

13:06:46    3            MR. WYRSCH:  Okay.

13:06:48    4            THE COURT:  Is there something more specific?  I mean,

13:06:51    5    we ruled on the motions in limine.

13:06:54    6            MR. WYRSCH:  No.  This is a different practice issue.

13:06:56    7    Where we generally practice, they take care of all of that

13:06:59    8    during pretrial.  So I just wanted to make sure I knew how the

13:07:03    9    Court wanted to proceed when we start presenting exhibits that

13:07:05   10    are not on the agreed list.

13:07:07   11            THE COURT:  Okay.  Anything else?

13:07:08   12            MR. WYRSCH:  I believe that is it for us.

13:07:12   13            THE COURT:  Mr. Haraldson?

13:07:14   14            MR. HARALDSON:  Just so I understand, you just want us

13:07:16   15    to do the old traditional offer exhibit, objection, admitted?

13:07:21   16            THE COURT:  For anything other than an A.  I mean,

13:07:25   17    everyone is maintaining their objections to B and C exhibits?

13:07:29   18            You're nodding.

13:07:30   19            You're nodding.

13:07:31   20            If you have a specific objection, make it, and I'll

13:07:34   21    rule on it, and that's how the record will be made.  If you

13:07:37   22    don't make an objection, if during the course of the foundation

13:07:42   23    laid or whatever it is, it becomes clear that your objection is

13:07:46   24    unfounded, then certainly don't make the objection.  But if you

13:07:49   25    don't make the objection, the record is not preserved.

| | | |
|---|---|---|
| 13:07:52 | 1 | MR. HARALDSON:  Very good.  That's all I have. |
| 13:07:53 | 2 | THE COURT:  Thank you. |
| 13:07:57 | 3 | Is there any issue with the presentation to -- during |
| 13:08:04 | 4 | your opening statement, you're simply going to use the picture |
| 13:08:08 | 5 | that's an A exhibit anyway? |
| 13:08:11 | 6 | MR. KHAZAELI:  Yes, Your Honor.  The only exhibit that |
| 13:08:13 | 7 | I'm planning to use during the opening is Exhibit 1, page 1, |
| 13:08:16 | 8 | which is an A exhibit. |
| 13:08:17 | 9 | THE COURT:  All right.  Thank you. |
| 13:10:29 | 10 | (Pause.) |
| 13:10:43 | 11 | THE COURT:  Counsel, looking at the exhibits that |
| 13:10:46 | 12 | we -- the B exhibits, most of those seem to be exhibits that |
| 13:10:51 | 13 | were covered by the Court's order in terms of the -- for |
| 13:11:01 | 14 | example, the reprimand of Wessels or any of the prior bad acts |
| 13:11:08 | 15 | would not be admissible in phase one, but phase two.  Most of |
| 13:11:12 | 16 | those appear to be those types of exhibits. |
| 13:11:15 | 17 | Am I incorrect in that? |
| 13:11:18 | 18 | MR. WYRSCH:  You are correct. |
| 13:11:19 | 19 | I was just going through that list.  I think the only |
| 13:11:21 | 20 | one that I would anticipate we might get to today is 60 and 61, |
| 13:11:27 | 21 | the photograph of the trucks.  If we end up getting to |
| 13:11:32 | 22 | plaintiff's testimony, we intend to introduce that in evidence. |
| 13:12:05 | 23 | THE COURT:  Mr. Haraldson? |
| 13:12:09 | 24 | MR. HARALDSON:  The only B exhibit that we may get to |
| 13:12:18 | 25 | are K, which is the booking information for Ms. Hunemiller, and |

| | | |
|---|---|---|
| 13:12:22 | 1 | L, which also is reference to Ms. Hunemiller, although I have to |
| 13:12:29 | 2 | say I probably am not going to introduce L.  It's the warrant, |
| 13:12:33 | 3 | arrest information.  I don't know that that may be particularly |
| 13:12:35 | 4 | relevant unless she brings it up in a particular way. |
| 13:12:41 | 5 | And only if the plaintiff testifies today would M and |
| 13:12:53 | 6 | P come up for the B exhibits and then Q for the C exhibits. |
| 13:12:58 | 7 | THE COURT:  Did you all reach an agreement about Q? |
| 13:13:02 | 8 | MR. KHAZAELI:  We did, Your Honor.  It's just once we |
| 13:13:05 | 9 | get a break, I'm going to do the final redactions so that we can |
| 13:13:08 | 10 | check, but we've come to an agreement. |
| 13:13:10 | 11 | THE COURT:  Okay.  So that would not be an issue |
| 13:13:12 | 12 | assuming that those things are worked out? |
| 13:13:15 | 13 | MR. HARALDSON:  From the defendant's perspective, yes. |
| 13:13:17 | 14 | THE COURT:  Okay.  And from the plaintiff's |
| 13:13:20 | 15 | perspective as well is what it sounds like? |
| 13:13:23 | 16 | MR. WYRSCH:  Yeah, I guess subject to our initial |
| 13:13:26 | 17 | objection to the evidence coming in at all. |
| 13:13:28 | 18 | THE COURT:  Which I overruled in my motions in limine. |
| 13:13:31 | 19 | MR. WYRSCH:  Right, right. |
| 13:13:32 | 20 | THE COURT:  Okay.  So 60 and 61 explain to me, before |
| 13:13:40 | 21 | the jury comes in, why those are not relevant and what I should |
| 13:13:43 | 22 | be concerned about. |
| 13:13:46 | 23 | MR. WYRSCH:  Why they're not relevant? |
| 13:13:46 | 24 | THE COURT:  Right. |
| 13:13:47 | 25 | MR. WYRSCH:  We think they are relevant. |

| | | |
|---|---|---|
| 13:13:49 | 1 | THE COURT:  I mean -- yeah, okay.  Mr. Haraldson. |
| 13:13:51 | 2 | MR. WYRSCH:  I'll be glad to argue for Mr. Haraldson. |
| 13:13:54 | 3 | THE COURT:  No.  Thank you. |
| 13:13:56 | 4 | MR. HARALDSON:  Well, they are two photographs of |
| 13:13:59 | 5 | trucks.  I believe they're trucks that Mr. Burnikel uses in his |
| 13:14:03 | 6 | business.  I don't have -- we haven't had -- those are new |
| 13:14:07 | 7 | documents prior to -- we received them just about the time of |
| 13:14:11 | 8 | the pretrial, so I just think there has to be some testimony as |
| 13:14:15 | 9 | to what the hell they mean.  Sorry; heck. |
| 13:14:18 | 10 | THE COURT:  Thank you for refraining from profanity in |
| 13:14:22 | 11 | the courtroom; but yes. |
| 13:14:26 | 12 | MR. HARALDSON:  So, I mean, it's subject to what he |
| 13:14:28 | 13 | testifies to them about.  The relevance objection was mainly |
| 13:14:30 | 14 | because I hadn't seen them before and hadn't seen them at the |
| 13:14:34 | 15 | time.  They sound innocuous enough, but I think foundation needs |
| 13:14:37 | 16 | to be laid. |
| 13:14:38 | 17 | THE COURT:  Okay.  And you said K -- you don't intend |
| 13:14:50 | 18 | to offer L.  You said K, and what else were the ones that you |
| 13:14:54 | 19 | said before? |
| 13:14:57 | 20 | MR. HARALDSON:  Under B, if Ms. Hunemiller is going to |
| 13:15:03 | 21 | testify, I think that may be one that would come in, although it |
| 13:15:05 | 22 | probably would be something that would be introduced by one of |
| 13:15:08 | 23 | the officers, although that sounds unlikely; but it's something |
| 13:15:11 | 24 | that refers to her.  And under C, only if the plaintiff |
| 13:15:14 | 25 | testified today would Q be an issue as we already addressed. |

13:15:19 THE COURT: Okay. Thank you.

13:15:20 Again, the reason -- I mean, most of these things, in 13:15:23 my view, they all were dealt with by the bifurcation, which is 13:15:28 why we haven't spent any time on them; but to the extent they 13:15:31 weren't, make your objection, and the Court will rule on them as 13:15:35 it arises.

13:15:36 I've been informed that the jury is ready, and we will 13:15:38 have them come in at this time.

13:15:40 (In open court, in the presence of the jury.)

13:17:10 THE COURT: Thank you. You may be seated.

13:17:14 We're back on the record, in the presence of the jury, 13:17:17 in the matter of Dustin Burnikel versus Michael Fong, Gregg 13:17:21 Wessels, and the City of Des Moines, Case No. 4:15-cv-50.

13:17:26 This is now the time for opening statements. Evidence 13:17:29 in a trial often comes into the record piecemeal and out of 13:17:33 chronological or logical sequence. During opening statements 13:17:38 you are provided with thumbnail sketches of the case. Each 13:17:41 attorney will explain to you what he believes the issues in the 13:17:46 case are and what the attorney expects the evidence will be. 13:17:50 These statements, as I said previously, are not evidence and 13:17:53 should not be considered by you as evidence. Please give the 13:17:57 attorneys your undivided attention.

13:17:57 (Opening statements of counsel were reported but not 13:17:57 transcribed.)

14:02:55 THE COURT: At this time I'm going to have my law

| | | |
|---|---|---|
| 14:02:56 | 1 | clerk pass out the binders to you.  As I told you before and as |
| 14:03:02 | 2 | you saw, they will have your oath in them.  They will also have |
| 14:03:05 | 3 | the preliminary instructions, and then they'll have some paper. |
| 14:03:09 | 4 | A couple things to note.  First, where you are seated |
| 14:03:58 | 5 | now will be the seats that you will be in through the remainder |
| 14:04:02 | 6 | of the trial.  Each one of the jury notebooks has an identifying |
| 14:04:06 | 7 | number on the front of it.  That is your juror number, and that |
| 14:04:09 | 8 | is your jury notebook.  I will ask before you come in to court |
| 14:04:12 | 9 | each day, you'll line up and you'll enter, and you'll seat |
| 14:04:15 | 10 | yourself in the order in which you're seated now. |
| 14:04:19 | 11 | Jurors are permitted in this courtroom to take notes |
| 14:04:22 | 12 | during the trial and then to have the notes with you during |
| 14:04:27 | 13 | deliberations.  No one is required to take notes.  In fact, you |
| 14:04:29 | 14 | should not take notes if you feel like note-taking might |
| 14:04:32 | 15 | distract you from the evidence or the testimony of the |
| 14:04:36 | 16 | witnesses.  On the other hand, if you believe that note-taking |
| 14:04:38 | 17 | might better focus your attention on the witnesses and the |
| 14:04:41 | 18 | evidence or might better help you to recall what went on during |
| 14:04:45 | 19 | the trial, you may feel free to take notes.  The notes are |
| 14:04:49 | 20 | intended only to be a help to your memory.  They should not take |
| 14:04:53 | 21 | precedence over your own independent recollection of the |
| 14:04:56 | 22 | testimony and the evidence.  Those jurors who do not take notes |
| 14:05:00 | 23 | should rely on their own memory of the evidence and should not |
| 14:05:03 | 24 | be influenced by the fact that another juror has taken notes.  A |
| 14:05:08 | 25 | juror's notes are only for the note-taker's personal use in |

14:05:12     1   refreshing his or her own recollection.

14:05:16     2              I want to mention two concerns about note-taking

14:05:18     3   before we proceed further with the trial.

14:05:20     4              First, you must consider all of the evidence presented

14:05:23     5   in trial during your deliberations.  One concern is that a juror

14:05:28     6   might take conscientious notes at the beginning of the trial and

14:05:31     7   then, as the trial continues, fail to take as many notes and

14:05:35     8   take fewer and fewer notes.  If that happens the juror can be

14:05:39     9   left with an impression which is not a complete view of all of

14:05:45    10   the evidence.  It's something to be careful about.

14:05:48    11              Secondly, some jurors focus so much on taking notes

14:05:52    12   that they miss what's happening in the court.  Do not become so

14:05:55    13   involved in note-taking that you miss part of the testimony.

14:05:59    14              As I said before, the notes will be taken with you to

14:06:02    15   the jury room for your use in deliberations.  However, again, I

14:06:06    16   caution you that your notes are just that, notes, and they are

14:06:08    17   not evidence.

14:06:11    18              There's loose-leaf paper in the back of your binders.

14:06:14    19   There's also a pen.  If you find yourself needing more paper or

14:06:18    20   more pens, you can let Ms. Berg know, and we'll make sure we get

14:06:24    21   that to you as soon as possible.  If you do not intend to take

14:06:27    22   notes, you can leave your binder on the floor next to your

14:06:30    23   chair.

14:06:30    24              During recesses outside of the courtroom, you can

14:06:32    25   leave your binders on your chairs.  They will not be disturbed.

| | | |
|---|---|---|
| 14:06:35 | 1 | At the end of each day, we will collect those binders, and we'll |
| 14:06:39 | 2 | keep them and secure them for court for the next day.  At no |
| 14:06:42 | 3 | time during or after the trial will anyone look at your notes, |
| 14:06:48 | 4 | including me.  Your notes will be destroyed at the conclusion of |
| 14:06:52 | 5 | the trial. |
| 14:06:53 | 6 | With that, I'm going to read into the record some |
| 14:06:58 | 7 | stipulated facts and then allow the plaintiff to begin |
| 14:07:01 | 8 | presenting their case. |
| 14:07:02 | 9 | The plaintiff and the defendants have stipulated, that |
| 14:07:06 | 10 | is they have agreed, that the following facts are true: |
| 14:07:10 | 11 | One, in the early morning of February 16, 2013, |
| 14:07:15 | 12 | defendants Gregg Wessels and Michael Fong arrested plaintiff |
| 14:07:20 | 13 | Dustin Burnikel. |
| 14:07:22 | 14 | Two, at all times during the February 16, 2013, |
| 14:07:25 | 15 | interactions with plaintiff, defendants Wessels and Fong were |
| 14:07:28 | 16 | acting within the scope of their employment or duties as law |
| 14:07:32 | 17 | enforcement officers for the City of Des Moines Police |
| 14:07:36 | 18 | Department. |
| 14:07:36 | 19 | Three, the City of Des Moines is responsible for |
| 14:07:39 | 20 | maintaining and operating the Des Moines Police Department. |
| 14:07:42 | 21 | Four, during plaintiff's arrest, defendants Wessels |
| 14:07:46 | 22 | and Fong used physical force against plaintiff. |
| 14:07:50 | 23 | Five, defendants Wessels and Fong arrested plaintiff. |
| 14:07:55 | 24 | Six, defendants Wessels and Fong charged plaintiff |
| 14:07:59 | 25 | with public intoxication, interfering with official acts in |

| | | |
|---|---|---|
| 14:08:03 | 1 | violation of Iowa law, and resisting arrest in violation of a |
| 14:08:07 | 2 | Des Moines City ordinance. |
| 14:08:08 | 3 | Seven, the City of Des Moines prosecuted plaintiff in |
| 14:08:11 | 4 | a criminal proceeding in Polk County, Iowa. |
| 14:08:14 | 5 | Eight, a jury acquitted plaintiff of all charges. |
| 14:08:19 | 6 | You must, therefore, treat these facts as having been |
| 14:08:23 | 7 | proved. |
| 14:08:23 | 8 | Thank you. |
| 14:08:24 | 9 | Is the plaintiff prepared to proceed? |
| 14:08:27 | 10 | MR. KHAZAELI:  Yes, Your Honor. |
| 14:08:28 | 11 | THE COURT:  Would you call your first witness. |
| 14:08:32 | 12 | MR. KHAZAELI:  Yes, Your Honor.  We would call Breanna |
| 14:08:35 | 13 | Hunemiller. |
| 14:08:35 | 14 | THE COURT:  Thank you. |
| 14:08:38 | 15 | (Counsel conferring.) |
| 14:08:46 | 16 | THE COURT:  My understanding is that the technical |
| 14:08:48 | 17 | difficulties have been resolved. |
| 14:08:49 | 18 | MR. KHAZAELI:  Great.  I just like to have a backup |
| 14:08:53 | 19 | plan, Your Honor. |
| 14:08:53 | 20 | THE COURT:  I appreciate that. |
| 14:08:55 | 21 | MR. KHAZAELI:  And, Your Honor, you said you're okay |
| 14:08:57 | 22 | with me sitting? |
| 14:09:01 | 23 | THE COURT:  Yes. |
| 14:09:02 | 24 | MR. KHAZAELI:  Thank you. |
| 14:09:03 | 25 | THE COURT:  Please come forward, ma'am, on this side. |

| | | |
|---|---|---|
| 14:09:08 | 1 | If you'll come forward this way. |
| 14:09:09 | 2 | If you'll please pause and raise your right hand and |
| 14:09:13 | 3 | prepare to be sworn. |
| 14:09:16 | 4 | BREANNA HUNEMILLER, PLAINTIFF'S WITNESS, SWORN |
| 14:09:26 | 5 | THE COURT:  Thank you, ma'am.  You may sit down. |
| 14:09:28 | 6 | Ma'am, would you please state and spell your full name |
| 14:09:31 | 7 | for the record. |
| 14:09:32 | 8 | THE WITNESS:  Breanna Hunemiller, B-R-E-A-N-N-A |
| 14:09:36 | 9 | H-U-N-E-M-I-L-L-E-R. |
| 14:09:37 | 10 | THE COURT:  Thank you. |
| 14:09:38 | 11 | And, ma'am, make yourself comfortable in your seat and |
| 14:09:41 | 12 | try to speak into the microphone so everybody can hear you |
| 14:09:44 | 13 | clearly. |
| 14:09:44 | 14 | THE WITNESS:  All right. |
| 14:09:45 | 15 | THE COURT:  Your witness, Counsel. |
| 14:09:47 | 16 | MR. KHAZAELI:  Thank you, Your Honor. |
| 14:09:48 | 17 | DIRECT EXAMINATION |
| 14:09:48 | 18 | BY MR. KHAZAELI: |
| 14:09:48 | 19 | Q.  Ms. Hunemiller, just to be clear, at any point I ask you a |
| 14:09:52 | 20 | question that you don't understand or don't hear, feel free to |
| 14:09:55 | 21 | ask me to rephrase that. |
| 14:09:56 | 22 | A.  Yes, sir. |
| 14:09:56 | 23 | Q.  As the Court asked you, could you please state your name? |
| 14:09:59 | 24 | A.  Breanna Hunemiller. |
| 14:10:00 | 25 | Q.  And, Ms. Hunemiller, where do you currently live? |

14:10:04  1   A.  New Smyrna Beach, Florida.

14:10:07  2   Q.  Where is New Smyrna Beach, Florida, relative to other

14:10:13  3   cities?

14:10:13  4   A.  It's about 30 miles south of Daytona Beach.

14:10:17  5   Q.  What do you do in New Smyrna Beach?

14:10:19  6   A.  I'm a freight broker.

14:10:22  7   Q.  What's a freight broker?  Can you explain that?

14:10:23  8   A.  Basically I find companies, I quote them prices to move

14:10:26  9   their product, and then I contact carriers, negotiate pricing to

14:10:30  10  move that product.

14:10:31  11  Q.  And that's your current job?

14:10:34  12  A.  Yes, sir.

14:10:34  13  Q.  And you're missing work today?

14:10:35  14  A.  Yes.

14:10:35  15  Q.  Where did you live in 2013?

14:10:37  16  A.  Waverly, Iowa.

14:10:39  17  Q.  And can you tell me where Waverly, Iowa, is?

14:10:42  18  A.  It's about two-and-a-half, three hours northeast of here.

14:10:46  19  Q.  And describe Waverly to me.

14:10:48  20  A.  Small town, 10,000 people, farming community.

14:10:53  21  Q.  And is your family at all involved in farming?

14:10:58  22  A.  Yeah.  My stepdad is a farmer.  His entire family is.

14:11:03  23  Q.  And you were living in Waverly at the time; correct?

14:11:07  24  A.  Yes, sir.

14:11:07  25  Q.  Where were you working?

| | | |
|---|---|---|
| 14:11:09 | 1 | A.  At a bar about seven miles by Waverly.  It's Shellrock, |
| 14:11:18 | 2 | Waverly Shellrock. |
| 14:11:19 | 3 | Q.  Can you describe, how big is Shellrock? |
| 14:11:22 | 4 | A.  Like 800 people. |
| 14:11:25 | 5 | Q.  In February of 2013, you were in Des Moines; correct? |
| 14:11:28 | 6 | A.  Yes, sir. |
| 14:11:29 | 7 | Q.  What were you doing in Des Moines, Iowa? |
| 14:11:31 | 8 | A.  We were here for state wrestling to watch the high school |
| 14:11:36 | 9 | boys, Waverly and Denver, wrestle. |
| 14:11:40 | 10 | Q.  Why were you here for a wrestling tournament?  Do you have |
| 14:11:44 | 11 | any relationship with wrestling? |
| 14:11:46 | 12 | A.  I've followed wrestling since I was about 12 years old, been |
| 14:11:50 | 13 | to dozens of AAU and high school tournaments. |
| 14:11:55 | 14 | Q.  Was it a big deal for you to come down to Des Moines for the |
| 14:11:59 | 15 | wrestling tournament? |
| 14:12:00 | 16 | A.  Absolutely. |
| 14:12:00 | 17 | Q.  Who did you come down to Des Moines with? |
| 14:12:02 | 18 | A.  I came with Kyle and Michael, high school friends of mine. |
| 14:12:05 | 19 | Q.  Who are Kyle and Michael? |
| 14:12:07 | 20 | A.  They're friends of mine from high school. |
| 14:12:09 | 21 | Q.  And are Kyle and Michael involved in wrestling at all? |
| 14:12:12 | 22 | A.  They were wrestlers in high school, and then Kyle had family |
| 14:12:16 | 23 | members that were participating.  They were all on the Denver |
| 14:12:21 | 24 | High School wrestling team that went to state. |
| 14:12:22 | 25 | Q.  So Kyle had family members, younger kids who were wrestling? |

14:12:27  1   A.   Yes.

14:12:27  2   Q.   Where did you stay when you were in Des Moines for the

14:12:31  3   tournament?

14:12:31  4   A.   The Bavarian Inn.

14:12:35  5   Q.   And do you know roughly where the Bavarian Inn is in

14:12:38  6   comparison to downtown Des Moines?

14:12:41  7   A.   It was about 15 miles from here.

14:12:43  8   Q.   And how did you get from the Bavarian Inn to Des Moines for

14:12:46  9   the wrestling tournament?

14:12:48  10  A.   We had contacted a cab driver, and he said as long as we --

14:12:51  11  he would give us a discount if we used him throughout the entire

14:12:55  12  period of time.  So if we went out to eat or went to any of the

14:12:58  13  tournaments or anything, we would call him directly on his cell

14:13:01  14  phone.

14:13:01  15  Q.   And did you ever use him throughout the weekend?

14:13:04  16  A.   A lot, yes.

14:13:05  17  Q.   And he gave you a discount?

14:13:07  18  A.   Yes.

14:13:09  19  Q.   So you came down on Thursday; correct?

14:13:11  20  A.   Yes.

14:13:13  21  Q.   Let's move to Friday.  Did you go to the wrestling

14:13:17  22  tournament --

14:13:17  23  A.   Yes.

14:13:18  24  Q.   -- on Friday?

14:13:19  25  A.   Yes, we did.

| | | |
|---|---|---|
| 14:13:20 | 1 | Q.  And just because we're having somebody type this, if you |
| 14:13:23 | 2 | would just make sure that you wait until I'm done because it's |
| 14:13:25 | 3 | really difficult for them to type -- |
| 14:13:27 | 4 | A.  I'm sorry. |
| 14:13:28 | 5 | Q.  That's okay.  I do it all the time.  It's difficult for her |
| 14:13:31 | 6 | to type when we're both speaking. |
| 14:13:35 | 7 | So did you go to the tournament that Friday night? |
| 14:13:36 | 8 | A.  Yes. |
| 14:13:36 | 9 | Q.  And what time did you stay at the tournament until? |
| 14:13:42 | 10 | A.  I want to say around 9:00, 9:30. |
| 14:13:47 | 11 | Q.  So approximately 9:00 or 9:30 you left the tournament? |
| 14:13:50 | 12 | A.  Yes. |
| 14:13:51 | 13 | Q.  Do you remember where you went next? |
| 14:13:53 | 14 | A.  We went to where Kyle's family was staying.  They had a |
| 14:14:00 | 15 | banquet room where they had brought a bunch of food.  There were |
| 14:14:03 | 16 | about 20 of his family members, and we ate with them. |
| 14:14:06 | 17 | Q.  Was the banquet room in a restaurant?  Where was it located? |
| 14:14:10 | 18 | A.  In a hotel. |
| 14:14:11 | 19 | Q.  So you went and met Kyle's family.  Were there any little |
| 14:14:15 | 20 | kids there? |
| 14:14:16 | 21 | A.  Yeah. |
| 14:14:16 | 22 | Q.  What was the mood in that room when you were having dinner |
| 14:14:20 | 23 | there with Kyle's family? |
| 14:14:21 | 24 | A.  Good.  It was excited.  Everybody was happy to be there. |
| 14:14:24 | 25 | It's a big deal to go to state wrestling, especially for Denver. |

| | | |
|---|---|---|
| 14:14:28 | 1 | They're a smaller school. |
| 14:14:29 | 2 | Q.  What was your mood at that point? |
| 14:14:31 | 3 | A.  Excited. |
| 14:14:32 | 4 | Q.  Was it meant to be a fun week for you? |
| 14:14:34 | 5 | A.  It -- state wrestling is meant to be a fun week every year. |
| 14:14:40 | 6 | It's huge.  I mean, Waverly, Denver, it's just -- that's what we |
| 14:14:45 | 7 | do in Iowa. |
| 14:14:46 | 8 | Q.  I've heard. |
| 14:14:48 | 9 | After dinner is done, what do you do? |
| 14:14:50 | 10 | A.  At that point we had went to a bar that was close to that |
| 14:14:55 | 11 | hotel.  We had a drink there.  It wasn't really our atmosphere, |
| 14:14:59 | 12 | so we went to a different bar.  We played darts, and then we |
| 14:15:07 | 13 | left there and went to Jokers. |
| 14:15:09 | 14 | Q.  All right.  So you were at two bars first, and then you left |
| 14:15:12 | 15 | and then you ended up at Jokers; correct? |
| 14:15:14 | 16 | A.  Yes. |
| 14:15:15 | 17 | Q.  Just a little hint, if you're going to pour yourself water, |
| 14:15:21 | 18 | you need to twist the top.  We've had a lot of people have |
| 14:15:26 | 19 | issues. |
| 14:15:34 | 20 | A.  Okay. |
| 14:15:35 | 21 | Q.  So you leave and you go to Jokers; correct? |
| 14:15:38 | 22 | A.  Yes, sir. |
| 14:15:39 | 23 | Q.  Could you describe approximately what time you arrived at |
| 14:15:44 | 24 | Jokers? |
| 14:15:46 | 25 | A.  Midnight; I would say midnight. |

| | | |
|---|---|---|
| 14:15:52 | 1 | Q.  And what type of place is Jokers? |
| 14:15:54 | 2 | A.  It's a club.  It's a dance club, music, lasers. |
| 14:16:00 | 3 | Q.  Strobe lights? |
| 14:16:02 | 4 | A.  Strobe lights. |
| 14:16:03 | 5 | Q.  Were you dancing that night? |
| 14:16:04 | 6 | A.  Yes. |
| 14:16:05 | 7 | Q.  What kind of mood were you in? |
| 14:16:06 | 8 | A.  I was excited.  I was happy.  Again, it's Des Moines, it's |
| 14:16:10 | 9 | state wrestling. |
| 14:16:11 | 10 | Q.  You had some drinks that night; correct? |
| 14:16:13 | 11 | A.  Yes. |
| 14:16:14 | 12 | Q.  About how many? |
| 14:16:15 | 13 | A.  Five; I would say five. |
| 14:16:22 | 14 | Q.  And those drinks made you feel pretty happy? |
| 14:16:26 | 15 | A.  Yeah. |
| 14:16:27 | 16 | Q.  How long did you stay at Jokers? |
| 14:16:30 | 17 | A.  We stayed until last call. |
| 14:16:33 | 18 | Q.  And at last call what did you do? |
| 14:16:37 | 19 | A.  We went down into -- there's like a -- Jokers, there's an |
| 14:16:44 | 20 | entryway on the bottom floor, and then the top floor is the |
| 14:16:47 | 21 | club.  So we down to the entryway, and I called our cab driver |
| 14:16:53 | 22 | we had been using. |
| 14:16:53 | 23 | Q.  How many people were in the entryway? |
| 14:16:58 | 24 | A.  Twenty, thirty. |
| 14:16:58 | 25 | Q.  And is it enclosed with brick?  How is it enclosed? |

14:17:02  1  A.  Glass, windows.

14:17:04  2  Q.  Was it heated?

14:17:05  3  A.  Yes.

14:17:08  4  Q.  So you said that you called your cab driver.  Is that the

14:17:11  5  same cab driver that you told us about earlier?

14:17:13  6  A.  Yes.

14:17:14  7  Q.  And when you got ahold of the cab driver, what was that

14:17:17  8  conversation about?

14:17:17  9  A.  I was telling him where to pick us up obviously.  I told him

14:17:23  10  we were at Jokers, and he said that Jokers must be new because

14:17:27  11  he wasn't aware of where that location was, so he asked me for a

14:17:31  12  cross street.  So I went outside and I looked, and I saw the

14:17:35  13  cross street, and I told him there was actually a cab stand

14:17:38  14  across the street, and he said, "Go there, wait for me there."

14:17:42  15       At that point I was going to go back into the entryway

14:17:44  16  because it was warm, but they were kicking everybody out at that

14:17:48  17  point, so Michael and I headed towards the cab stand.

14:17:52  18       MR. KHAZAELI:  Can we publish the map?

14:18:09  19       Do you want me to use the Elmo?

14:18:12  20       THE COURT:  Is the connection to your computer -- is

14:18:16  21  your computer alive?

14:18:20  22       MR. KHAZAELI:  Let's try again.

14:18:25  23       There we go.

14:18:28  24  BY MR. KHAZAELI:

14:18:29  25  Q.  Do you see -- and then we lost it.

| | | |
|---|---|---|
| 14:18:31 | 1 | THE CLERK: It's pushed in all the way? |
| 14:18:34 | 2 | MR. KHAZAELI: It is. If not, we can go to the Elmo, |
| 14:18:37 | 3 | I've got it on Elmo. |
| 14:18:41 | 4 | THE CLERK: Okay. |
| 14:18:49 | 5 | Okay. |
| 14:18:55 | 6 | MR. KHAZAELI: Can you zoom out a little bit? |
| 14:18:57 | 7 | THE CLERK: Yes. |
| 14:18:58 | 8 | BY MR. KHAZAELI: |
| 14:18:58 | 9 | Q. If you can look behind you -- |
| 14:19:00 | 10 | THE COURT: You actually have a screen right in front |
| 14:19:03 | 11 | of you. |
| 14:19:03 | 12 | BY MR. KHAZAELI: |
| 14:19:03 | 13 | Q. Oh, can you see it on the screen in front of you? |
| 14:19:06 | 14 | A. Yes. |
| 14:19:06 | 15 | Q. When you say you were in Jokers, is that the direction the |
| 14:19:11 | 16 | cab stand was? |
| 14:19:11 | 17 | A. Yes, directly across. |
| 14:19:12 | 18 | Q. Directly north of you? |
| 14:19:14 | 19 | A. Yes. |
| 14:19:15 | 20 | Q. Good. We can unpublish. Thank you. |
| 14:19:17 | 21 | And you were with Michael at this point; correct? |
| 14:19:21 | 22 | A. Yes, sir. |
| 14:19:22 | 23 | Q. What happened to Kyle? |
| 14:19:23 | 24 | A. He had went back to the hotel to hang out with his family. |
| 14:19:28 | 25 | Q. And when you leave the glass, warm area at Jokers, describe |

14:19:35    1   what you do.

14:19:36    2   A.   We went to the corner and went straight across the street to

14:19:40    3   the cab stand.

14:19:41    4   Q.   Now, when you were in the glass area, had you ever met my

14:19:48    5   client, Mr. Burnikel, before?

14:19:49    6   A.   No.   I didn't see him in there.

14:19:51    7   Q.   Had you ever talked to him before?

14:19:53    8   A.   No.

14:19:55    9   Q.   Did you have any relationship with him at all?

14:19:57   10   A.   No, sir.

14:19:57   11   Q.   So you're crossing the street, okay.   When you crossed the

14:20:03   12   street, what do you see?

14:20:07   13   A.   People at the cab stand.

14:20:10   14   Q.   Do you see anybody being arrested?

14:20:13   15   A.   No.

14:20:14   16   Q.   Do you see anybody, any chaos?

14:20:17   17   A.   No.

14:20:18   18   Q.   You kind of laughed there.   Why did you laugh?

14:20:20   19   A.   Because everybody -- I mean, everybody at the cab stand, we

14:20:24   20   were all excited.   Everybody was happy to be there.   There was

14:20:28   21   no commotion of any kind.

14:20:33   22   Q.   Now, eventually you saw the defendants; correct?

14:20:36   23   A.   Yes, sir.

14:20:37   24   Q.   What did you do when you saw the defendants?

14:20:39   25   A.   I had approached Officer Wessels, and I put my hand on his

14:20:45    1    shoulder.

14:20:45    2    Q.   How did you put your hand on his shoulder?  Roughly?  Could

14:20:49    3    you describe that?

14:20:50    4    A.   Gingerly, I guess I would say.

14:20:52    5    Q.   That seems strange to me.  Why would you put your hand on

14:20:56    6    Mr. Wessels' shoulder?

14:20:59    7    A.   I tend to have an attraction towards men in uniform.

14:21:05    8    Q.   And this has been an attraction for a while?

14:21:07    9    A.   Yes.

14:21:08    10   Q.   So when you were putting your hand on his shoulder, was it

14:21:11    11   because you found him attractive?

14:21:12    12   A.   Yes.

14:21:13    13   Q.   This is one of the first cases that I've had something like

14:21:17    14   this occur with the defendants.

14:21:19    15        When you put your hand on his shoulder -- well, jump

14:21:25    16   back for a second.  You said that you had worked as a bartender

14:21:29    17   in Shellrock; correct?

14:21:30    18   A.   Yes, sir.

14:21:31    19   Q.   How many nights a week did you bartend?

14:21:33    20   A.   Pretty much every night.

14:21:35    21   Q.   And in your position as a bartender in Shellrock, did you

14:21:40    22   have occasion to interact with police officers?

14:21:42    23   A.   Every night.

14:21:43    24   Q.   How was your relationship with those officers?

14:21:48    25   A.   Excellent.  We worked with each other.  Obviously, if I had

14:21:52   1   any rowdy patrons, they would assist me.  They came in to check

14:22:01   2   every night.  I was just friendly with all of them.

14:22:03   3   Q.  Did you know them by a first name basis?

14:22:05   4   A.  Yes, sir.

14:22:06   5   Q.  Did they know you?  Did they recognize you?

14:22:08   6   A.  Yes.

14:22:09   7   Q.  Do you believe if I were to ask them, would they say they

14:22:12   8   had a friendly relationship with you?

14:22:14   9   A.  Absolutely.

14:22:15   10  Q.  Generally, in your life, how has your relationship been with

14:22:20   11  law enforcement officers?

14:22:21   12  A.  Good, excellent.  I have the utmost respect.  That's just

14:22:25   13  how I was raised.

14:22:25   14  Q.  When you say how you were raised, can you elaborate on that

14:22:29   15  a little bit?

14:22:29   16  A.  I mean, police officers, they have a hard job.  They're

14:22:34   17  brave.  I was just raised that they're there to protect and

14:22:38   18  serve and to have respect.

14:22:39   19  Q.  And an extra bonus is sometimes they're cute?

14:22:43   20  A.  Sometimes.  A lot of times they're cute.

14:22:45   21  Q.  So when you put your hand on Officer Wessels' shoulder, can

14:22:50   22  you tell me what happened next?

14:22:53   23  A.  At that point I remember just feeling a yank, and then I was

14:23:01   24  whipped around, and then I hit face first on the ground.

14:23:06   25  Q.  We'll take this one step at a time.

14:23:08  1           What were you wearing?

14:23:09  2  A.   I was wearing a bomber jacket that has a big hood on the

14:23:12  3  back of it.

14:23:13  4  Q.   And before you put your hand on the shoulder of Officer

14:23:17  5  Wessels, did you observe what the officers were doing?

14:23:19  6  A.   They were talking to each other in the street, just by the

14:23:24  7  curb.

14:23:24  8  Q.   Were they talking loudly like they were planning to do

14:23:28  9  something?

14:23:29  10  A.   No.

14:23:31  11  Q.   So you didn't think -- did you think there was any problem

14:23:34  12  with you putting your hand on the officer's shoulder?

14:23:39  13  A.   No, I did not.

14:23:40  14  Q.   So let's go back.  You said you were wearing a large bomber

14:23:43  15  jacket.  After you put your hand on the officer's shoulder, can

14:23:46  16  you tell me what happened?

14:23:47  17  A.   I had gotten ripped backwards, what I assume was by the hood

14:23:51  18  of my coat, and then yanked this way (indicating) and slammed on

14:23:55  19  the ground.

14:23:55  20  Q.   Would you mind standing for the jury, taking a step off?

14:24:05  21           And can you show me how your body reacted?  You said

14:24:08  22  you were ripped.  Can you just demonstrate to the jury what

14:24:12  23  happened to your body?

14:24:13  24  A.   It would have been I was yanked back this way (indicating)

14:24:15  25  and then swung and then slammed on my face.

| | | |
|---|---|---|
| 14:24:19 | 1 | Q. You can have a seat. Thank you. |
| 14:24:22 | 2 | You said you were slammed on your face? |
| 14:24:24 | 3 | A. Yes. |
| 14:24:25 | 4 | Q. Is there any chance that you might have just accidentally |
| 14:24:31 | 5 | tripped on your own and fallen down? |
| 14:24:32 | 6 | A. No. |
| 14:24:35 | 7 | Q. Is there any chance that you were just being clumsy? |
| 14:24:42 | 8 | A. No. |
| 14:24:43 | 9 | Q. When you say you were slammed, describe that to me. |
| 14:24:46 | 10 | A. Like I was swung around and I was slammed on my face. |
| 14:24:52 | 11 | Q. What part of your body hit the ground? |
| 14:24:57 | 12 | A. I believe I landed on my knees and my shins because the next |
| 14:25:02 | 13 | day they were bruised really bad, and then I went down on my |
| 14:25:04 | 14 | face, face down pretty quickly. |
| 14:25:06 | 15 | Q. How quickly after you put your hand on Officer Wessels' |
| 14:25:10 | 16 | shoulder was it before you were face down on the ground? |
| 14:25:13 | 17 | A. It was instant, just like that (indicating). |
| 14:25:22 | 18 | Q. And you didn't see them engaging or arresting anybody at |
| 14:25:25 | 19 | that time? |
| 14:25:25 | 20 | A. No. |
| 14:25:26 | 21 | Q. Now, you're face down on the ground. What do you do? |
| 14:25:29 | 22 | A. I immediately start bawling, scared, confused. |
| 14:25:33 | 23 | Q. And how much time, after you got to the cab stand, did this |
| 14:25:39 | 24 | whole thing happen? Were you there for two, three, four |
| 14:25:42 | 25 | minutes? How much time was there after you got to the cab stand |

14:25:46   1   that this occurred?

14:25:48   2   A.   It couldn't have been any more than a couple of minutes.

14:25:54   3   Q.   Was your friend, Michael, being arrested at this point?

14:25:58   4   A.   No.

14:25:58   5   Q.   And did Michael also walk with you from Jokers, from the

14:26:02   6   south, north to the cab stand?

14:26:06   7   A.   Yes.

14:26:06   8   Q.   All right.  So now you've been swung to the ground, and you

14:26:10   9   said instantly you hit the ground.  What happens next?

14:26:14   10  A.   At that point I feel a drop into my knee.

14:26:18   11  Q.   Into your knee --

14:26:20   12  A.   Or, I'm sorry, a knee dropping into my neck.

14:26:24   13  Q.   Tell me how that felt when the knee fell on your neck.

14:26:28   14  A.   Excruciating.  It was horrible.

14:26:31   15  Q.   Is there any way that you're misremembering and a knee

14:26:34   16  wasn't actually in your neck?

14:26:35   17  A.   No.

14:26:36   18  Q.   You said it was excruciating.  Please describe that for me.

14:26:42   19  A.   It was a knee in my neck that was dropped from a standing

14:26:44   20  position to instantly in the back of my neck.  It was horrible.

14:26:48   21  Q.   You said it was horrible.  What's going through your head at

14:26:52   22  this point?

14:26:53   23  A.   Um, I'm scared.  I was confused.

14:27:09   24  Q.   Could you move your neck at all when the knee was on your

14:27:13   25  head?

| 14:27:13 | 1 | A.  No. |

A.  No.

Q.  What's the next thing you remember seeing or hearing?

A.  I heard a man say, "What the fuck are you doing?  You're hurting her."

Q.  And you heard that voice; correct?

A.  Yes.

Q.  What happens to the knee once you hear that voice?

A.  It's up and off me and heading in the direction that it came from.

Q.  Let's take a step back.

     Between the time you're swung to the ground and the knee is on your neck and the time the knee comes off, do you hear any officers give any commands?

A.  No.

Q.  Do you hear any officers tell somebody to back off?

A.  No.

Q.  Did any officer say anything to you before you were thrown to the ground?

A.  No.

Q.  So now you're on the ground and the knee comes off of you?

A.  Yes.

Q.  How long -- well, first, you said that you had excruciating pain to your neck?

A.  Yes.

Q.  Do you still have pain in your neck from that?

14:28:18   1   A.   Absolutely.

14:28:19   2   Q.   Could you describe that briefly?

14:28:23   3   A.   My neck pain?

14:28:24   4   Q.   Yeah.

14:28:25   5   A.   It's constant.  I take medicine for it every day.

14:28:28   6   Q.   And then you said -- from the point that you hear a voice

14:28:36   7   asking why you're being physically restrained, how much time

14:28:46   8   elapses from when you hear that phrase and a knee comes off your

14:28:49   9   neck?

14:28:50   10   A.   It's pretty instant.

14:28:51   11   Q.   And you said that you could tell what was going on with the

14:28:54   12   person on your neck.  What was that person doing?

14:28:57   13   A.   Rushing.  That's the best I can describe it is rushing

14:29:01   14   towards the voice.

14:29:03   15   Q.   No commands, though?

14:29:04   16   A.   No.

14:29:05   17   Q.   What's the next thing you hear or observe?

14:29:12   18   A.   After I'm laying there, I think at that point is when

14:29:22   19   somebody had to have gotten maced because there was a backdraft

14:29:27   20   that hit me in the face.

14:29:27   21   Q.   Now, were you directly hit with Mace?

14:29:30   22   A.   No.

14:29:30   23   Q.   When you say a backdraft, how did that backdraft get to you?

14:29:35   24   A.   I'm assuming that it had gotten sprayed at somebody else and

14:29:40   25   I got just a backdraft of it.

14:29:42    1    Q.  By the wind, or do you think it was whiffed toward you?

14:29:47    2    A.  Wind would be my assumption.

14:29:50    3    Q.  When the pepper spray or Mace gets on you and you weren't

14:29:52    4    directly hit, how did you react?  How did your body react?

14:29:56    5    A.  Instantly my hands to my face, trying to get it out of my

14:30:00    6    eyes.

14:30:00    7    Q.  What happened to your eyes?

14:30:01    8    A.  Burning.  My face was burning.  My eyes were burning.  Every

14:30:05    9    orifice was just running at that point.

14:30:08   10    Q.  And how is your body at this point?

14:30:10   11    A.  I'm in pain.  I'm laying down.

14:30:14   12    Q.  I'm sorry, you were doing what?

14:30:16   13    A.  I'm laying down.  I'm in pain.

14:30:18   14    Q.  At any point did you pop up and try to get between the

14:30:23   15    person who was on your back and the voice?

14:30:25   16    A.  No.  I couldn't get up at that point.

14:30:27   17    Q.  Well, you said you couldn't have.  Why couldn't you?

14:30:29   18    A.  I mean, I couldn't see; but also at that point, there was no

14:30:33   19    way I was going to move from the position that I was in.

14:30:35   20    Q.  Why?

14:30:37   21    A.  I had just gotten slammed to the ground.  I wasn't going to

14:30:42   22    move.

14:30:42   23    Q.  Before you got pepper-sprayed or maced, did you ever pop up

14:30:46   24    and try to get between an officer --

14:30:48   25    A.  No.

14:30:49  1   Q.   -- and try and prevent the officer from doing anything?

14:30:52  2   A.   No, I did not.

14:30:53  3   Q.   When the pepper spray hit you, how did that make you feel?

14:30:58  4   A.   My eyes were burning, in pain, confused, disoriented.

14:31:02  5   Q.   What's going through your head at this point?

14:31:04  6   A.   Panic.  I'm panicking.

14:31:07  7   Q.   More panic than when you were thrown to the ground?

14:31:10  8   A.   Yeah.

14:31:11  9   Q.   Was your panic escalating?

14:31:13  10  A.   Yes.

14:31:14  11  Q.   Now, what are you hearing?  Could you see what was going on

14:31:20  12  with the pepper spray in your face?

14:31:23  13  A.   No.

14:31:25  14  Q.   What do you hear is happening?

14:31:25  15  A.   Just complete chaos.

14:31:30  16  Q.   Do you hear any of the officers say anything?

14:31:33  17  A.   No.

14:31:33  18  Q.   What do you hear?

14:31:36  19  A.   The only thing I hear at that point is, from what I assume

14:31:40  20  is the person who had said get off or you're hurting her, is

14:31:45  21  he's saying, "I'm not resisting, I'm not resisting."

14:31:51  22  Q.   All right.  What happens to you next?

14:31:52  23  A.   At that point they take me to the paddy wagon.

14:31:55  24  Q.   And at any point when you're pepper-sprayed and you've

14:32:00  25  already been slammed to the ground, did you get up and leave?

14:32:01  1   A.   No.

14:32:02  2   Q.   If you had left, would you have come back?

14:32:05  3   A.   Absolutely not.

14:32:06  4   Q.   Were you able to get up and leave?

14:32:08  5   A.   No.  When you get pepper spray in your eyes like that, you

14:32:13  6   can't -- there's no going -- you can't see to walk anywhere.

14:32:19  7   Q.   And they take you to the wagon; correct?

14:32:22  8   A.   Yes.

14:32:26  9   Q.   One question to drop back.  I'm sorry, I missed something.

14:32:30  10        When you saw the defendants, what were they wearing?

14:32:34  11  A.   Black coats, black pants, black shoes, and black stocking

14:32:39  12  caps, I believe.

14:32:40  13  Q.   From behind, did their outfits say police on them anywhere?

14:32:46  14  A.   No.

14:32:47  15  Q.   Standing from behind them, was there anything on their

14:32:53  16  outfits that identified them as police officers?

14:32:56  17  A.   No, sir.

14:33:00  18  Q.   How were you able to tell they were police?

14:33:03  19  A.   I see police every night.  Especially in the winter, I mean,

14:33:07  20  they wear black stocking caps, black jackets.

14:33:11  21  Q.   And then it became more clear to you as you got right up

14:33:16  22  next to them?

14:33:16  23  A.   Yes.

14:33:17  24  Q.   Was there anything -- okay.

14:33:19  25        So you're on the ground.  You said that they're taking

14:33:23   1   you to the wagon?

14:33:24   2   A.  Yes.

14:33:26   3   Q.  When you get to the wagon -- when is the first time that you

14:33:32   4   see Mr. Burnikel?

14:33:35   5   A.  When they put him in the back of the wagon.

14:33:39   6   Q.  Can you describe what he looked like when you saw him?

14:33:41   7   A.  Bloody, a lot of blood, swollen.

14:33:48   8   Q.  How about the way that he was standing there before by

14:33:53   9   himself?

14:33:54   10  A.  Like he was hurting.

14:33:58   11  Q.  When you saw Mr. Burnikel, what did that do to your anxiety

14:34:02   12  levels?

14:34:02   13  A.  It shot up.  I was more panicked at that point because I

14:34:06   14  couldn't believe they did it.

14:34:07   15  Q.  Now, I want you to publish a picture on the Elmo.

14:34:14   16       MR. KHAZAELI:  Your Honor, this is Plaintiff's

14:34:17   17  Exhibit 1.  We would ask -- it has been previously agreed to,

14:34:21   18  and we would ask this be admitted into evidence.

14:34:23   19       THE COURT:  Yes.  All previously admitted exhibits are

14:34:26   20  admitted throughout the course of trial.  You don't need to ask

14:34:29   21  for their admission, but you can for the record ask for their

14:34:33   22  publishing and identify them so the jury knows which exhibits

14:34:38   23  you're addressing.

14:34:40   24       MR. KHAZAELI:  Thank you, Your Honor.

14:34:41   25  BY MR. KHAZAELI:

14:34:43    1    Q.   This is Plaintiff's Exhibit 1.

14:34:43    2              Can you look at the picture?

14:34:45    3    A.   Yes.

14:34:45    4    Q.   Is this what Mr. Burnikel looked like when you first saw

14:34:48    5    him?

14:34:49    6    A.   Yes.

14:34:49    7    Q.   And how did you react to that?

14:34:51    8    A.   I panicked.

14:34:53    9    Q.   I'm kind of getting a reaction from you right now.  Looking

14:34:56   10    at that right now, how are you reacting?

14:34:59   11    A.   I don't want to look at it.

14:35:01   12              MR. KHAZAELI:  Could we unpublish that, please.

14:35:03   13              THE COURT:  You can also remove it from the Elmo which

14:35:06   14    would have the same effect.

14:35:08   15              MR. KHAZAELI:  Actually, Your Honor, that will remind

14:35:12   16    me, I will take you to Plaintiff's Exhibit 2.

14:35:16   17    BY MR. KHAZAELI:

14:35:17   18    Q.   This is a more full body view?

14:35:19   19    A.   Uh-huh.

14:35:19   20    Q.   Is this what he looked like when you saw him?

14:35:22   21    A.   Yes.

14:35:23   22    Q.   Thank you.

14:35:27   23              After you see Mr. Burnikel, what happens to you?

14:35:33   24    A.   We start driving, I believe, and I'm handcuffed on my --

14:35:42   25    behind my back.

14:35:42  1   Q.  So you're in the wagon at this point?

14:35:46  2   A.  Yes.

14:35:46  3   Q.  Before the wagon leaves, does anybody come to interview you

14:35:50  4   and ask you what happened?

14:35:51  5   A.  No.

14:35:51  6   Q.  Does anybody come and ask you why you were touching

14:36:00  7   Mr. Wessels?

14:36:00  8   A.  No.

14:36:01  9           MR. HARALDSON:  Objection.  Relevance.

14:36:05  10          THE COURT:  The objection is overruled.

14:36:11  11          Ms. Hunemiller, the attorney mentioned to you earlier

14:36:15  12  it's important that you wait until he finishes asking his

14:36:17  13  questions before you answer.  I would just remind you of that.

14:36:20  14  He's going to ask you a question, and then make sure he's done

14:36:23  15  before you respond.  That allows the court reporter the

14:36:27  16  opportunity to get everything down clearly.  It also provides

14:36:30  17  opposing counsel the opportunity to pose any objections that

14:36:33  18  they think are appropriate.

14:36:35  19          Thank you for following the Court's instructions.

14:36:37  20          THE WITNESS:  Sorry.

14:36:40  21          THE COURT:  Continue.

14:36:40  22          MR. KHAZAELI:  Thank you, Your Honor.

14:36:40  23  BY MR. KHAZAELI:

14:36:41  24  Q.  Did anybody come and ask you why you had placed your hand on

14:36:44  25  Officer Wessels' shoulder?

14:36:45   1   A.   No.

14:36:46   2   Q.   Did anybody at the scene, before you left, provide you with

14:36:50   3   any medical attention?

14:36:51   4   A.   No.

14:36:52   5   Q.   Once you're in the vehicle, are you in a big room in the

14:36:57   6   back of the wagon with other people?

14:36:59   7   A.   No.  I'm in a -- it's like a cubby, almost like a backseat

14:37:05   8   to the driver and the passenger, separated from a bigger part of

14:37:10   9   the wagon.

14:37:12   10   Q.   And do you know if anybody was in the other portion of the

14:37:15   11   wagon?

14:37:17   12   A.   I know Dusty was.  If there was anybody else, I didn't

14:37:22   13   notice.

14:37:22   14   Q.   How were you positioned inside of the wagon?

14:37:25   15   A.   Laying on my back.

14:37:26   16   Q.   While you're laying on your back, what do you do?

14:37:32   17   A.   I had pulled my hand out of one of the cuffs because I

14:37:36   18   realized my phone was in my front pocket.

14:37:39   19   Q.   So you took your hand out of one of the cuffs and reached

14:37:42   20   for your phone?

14:37:43   21   A.   Yes.

14:37:44   22   Q.   And who did you call when you got your phone out of your

14:37:48   23   pocket?

14:37:49   24           MR. HARALDSON:  Objection.  Relevance.

14:37:51   25           THE COURT:  The objection is sustained.

| | | |
|---|---|---|
| 14:37:59 | 1 | BY MR. KHAZAELI: |
| 14:38:00 | 2 | Q.  When you got to the police station, how were you treated? |
| 14:38:04 | 3 | MR. HARALDSON:  Objection.  Relevance. |
| 14:38:06 | 4 | MR. KHAZAELI:  Your Honor, this goes to her state of |
| 14:38:08 | 5 | mind and how she was feeling at that point. |
| 14:38:10 | 6 | THE COURT:  Thank you. |
| 14:38:11 | 7 | The Court will allow the answer.  The objection is |
| 14:38:14 | 8 | overruled. |
| 14:38:15 | 9 | BY MR. KHAZAELI: |
| 14:38:16 | 10 | Q.  When you got to the police station, how were you treated? |
| 14:38:19 | 11 | A.  Like a joke. |
| 14:38:23 | 12 | Q.  Did anybody then ask you what happened? |
| 14:38:25 | 13 | A.  No. |
| 14:38:26 | 14 | Q.  Did anybody then ask you about -- |
| 14:38:34 | 15 | Well, I'll strike that, Your Honor. |
| 14:38:38 | 16 | What happened that night while you were in the cell? |
| 14:38:42 | 17 | A.  They put me in a holding cell -- |
| 14:38:45 | 18 | MR. HARALDSON:  Objection.  Relevance. |
| 14:38:46 | 19 | THE COURT:  Objection sustained. |
| 14:38:48 | 20 | Counsel, will you approach? |
| 14:38:50 | 21 | (Side-bar conference: |
| 14:39:12 | 22 | THE COURT:  Can you explain to me where we're going |
| 14:39:15 | 23 | with this, Counsel, quietly? |
| 14:39:17 | 24 | MR. KHAZAELI:  I'm going to try and be brief, but the |
| 14:39:20 | 25 | defense has made a portion of their case that Ms. Hunemiller |

14:39:25   1   pled guilty the next morning.  In our discussions with her and

14:39:28   2   how she testified in court was one of the reasons that she pled

14:39:31   3   guilty the next morning is she's still in a state of chaos.  She

14:39:36   4   hasn't had her eyes washed.  The next morning she just wants to

14:39:40   5   get out of there.  So we want to ask her, because counsel made a

14:39:43   6   point in his opening argument she pled guilty, she did this.

14:39:47   7   We're going to admit she pled guilty, even proffer now that

14:39:50   8   she's going to say I pled guilty to public intoxication because

14:39:55   9   I was intoxicated; but she's going to say she pled guilty to

14:39:59  10   interference because she wanted to get out of there.  She was

14:40:04  11   dazed and confused.  She slept on toilet paper all night long.

14:40:08  12   And that goes to her mindset that we think is important.

14:40:12  13         MR. HARALDSON:  It's *Heck versus Humphrey*.  They are

14:40:15  14   trying her case through this means.  She pled guilty.  That's a

14:40:20  15   statement of facts.  That's not an argument.

14:40:22  16         THE COURT:  Counsel, you can't impeach her plea of

14:40:24  17   guilty, which I assume was made in Polk County, in the Polk

14:40:28  18   County Jail, after she was advised of her rights, and there's --

14:40:32  19   this is improper.  It's basically improper impeachment.

14:40:36  20         MR. KHAZAELI:  I think, Your Honor -- well, she

14:40:39  21   wasn't -- she didn't have an attorney, and she will admit that

14:40:42  22   she pled guilty to the intoxication because she was intoxicated.

14:40:50  23         THE COURT:  She pled guilty to interference; correct?

14:40:55  24         MR. KHAZAELI:  Yes, for the purposes of wanting to get

14:40:57  25   out of there.  They told her, if you don't plead guilty, you're

14:41:02  1  going to stay in jail two days, and her feeling was she pled

14:41:06  2  guilty to get out.  And you will hear our client testify that he

14:41:09  3  was given the same option.  And I imagine that Mr. Haraldson is

14:41:15  4  going to come up and say -- actually try to impeach her when she

14:41:19  5  said I didn't interfere and say, well, actually you did.

14:41:22  6       THE COURT:  Well, that would be proper impeachment

14:41:25  7  because she did plead guilty; correct?

14:41:27  8       MR. KHAZAELI:  Right.  But she should be able to

14:41:30  9  explain why if they're asking --

14:41:36  10       MR. HARALDSON:  Again, that's improper impeachment.

14:41:38  11  She pled guilty to the charge.  That's the fact.  This is *Heck*

14:41:41  12  *versus Humphrey*.  They're trying to provide an excuse for her to

14:41:45  13  plead guilty.  Also, who is "they"?  It's not Officers Fong or

14:41:48  14  Wessels.  It's not the City of Des Moines.  So who?  That's --

14:41:53  15       MR. KHAZAELI:  It was somebody with the City of Des

14:41:55  16  Moines.  It's somebody who worked -- she said it was a jailer.

14:41:59  17       THE COURT:  Well, you know that that's the Polk County

14:42:01  18  Jail, which would be a different governmental entity.  I know

14:42:04  19  you're not from here, but these are different entities.

14:42:07  20       MR. KHAZAELI:  Yes.

14:42:07  21       THE COURT:  You can make an offer of proof at the next

14:42:11  22  break, but you can't go into this with her now.

14:42:14  23       You can consult.

14:42:16  24       (Pause.)

14:42:17  25       MR. KHAZAELI:  And that's also the reason we wanted to

14:42:19    1  get into the 911 call was our point to that --

14:42:23    2          THE COURT:  I don't know about the 911 call.  I have

14:42:27    3  no idea who she called.

14:42:29    4          MR. KHAZAELI:  So what she was going to testify when

14:42:31    5  she pulled out her phone is that she called 911, and our point

14:42:35    6  in that is her first reaction at this point is to call the

14:42:39    7  police for protection, and this goes to whether or not she's

14:42:41    8  biased against police officers.

14:42:43    9          THE COURT:  Okay.  Was this in your trial brief?

14:42:48   10          MR. KHAZAELI:  The 911 tapes were submitted.  We said

14:42:55   11  that we were going to use them in the case, and then we realized

14:42:59   12  for judicial -- because we didn't think that playing the sound

14:43:02   13  was good, that we weren't going to play them.  But when we were

14:43:05   14  at pretrial, we did say we were planning on eliciting and

14:43:09   15  talking about the 911 tapes, and the 911 tapes have been

14:43:13   16  presented and talked about repeatedly, and they were actually

14:43:15   17  presented to the Court.  All we said during pretrial was the

14:43:18   18  actual physical playing of them, including there were also some

14:43:21   19  other 911 calls that night, dispatch calls.  And once we

14:43:26   20  listened to them, we realized that playing them in here you

14:43:31   21  couldn't tell what was going on; but we told the Court that this

14:43:32   22  was a portion of our case very early on.

14:43:34   23          MR. HARALDSON:  I moved in limine to exclude them.

14:43:41   24  They don't involve Officers Wessels and Fong.  It's not --

14:43:42   25  what's relevant is what they did, not what she feared and not

| | | |
|---|---|---|
| 14:43:45 | 1 | what she felt.  She's not the plaintiff here.  It's prejudicial |
| 14:43:49 | 2 | and it's irrelevant under 403. |
| 14:43:51 | 3 | THE COURT:  So I'm not going to allow you to get into |
| 14:43:54 | 4 | the 911 call from the back of the wagon.  You can make an offer |
| 14:43:58 | 5 | of proof at the next break as to issues related to why she pled |
| 14:44:04 | 6 | guilty so that you can have that on the record, but you're not |
| 14:44:07 | 7 | going to get into that in front of the jury. |
| 14:44:09 | 8 | Do you understand the Court's instructions? |
| 14:44:11 | 9 | MR. KHAZAELI:  That's fine.  And for the 911 tapes, |
| 14:44:14 | 10 | will we be making an offer of proof at the next time as to how |
| 14:44:19 | 11 | we believe that goes to whether she's biased against police |
| 14:44:22 | 12 | officers? |
| 14:44:24 | 13 | MR. HARALDSON:  She's already testified that she loves |
| 14:44:27 | 14 | police officers. |
| 14:44:28 | 15 | THE COURT:  To the extent that it has any probative |
| 14:44:31 | 16 | value at all, it is far overcome by a potential for prejudice. |
| 14:44:36 | 17 | It's not -- the relevance here is extremely limited.  There's no |
| 14:44:39 | 18 | question as to what her viewpoint is.  Her testimony on that has |
| 14:44:44 | 19 | been linked.  Any probative value of the call to 911 as for |
| 14:44:48 | 20 | purposes of bias is negligible at best. |
| 14:44:52 | 21 | MR. KHAZAELI:  Thank you, Your Honor.) |
| 14:44:53 | 22 | (In open court.) |
| 14:45:20 | 23 | THE COURT:  Mr. Khazaeli, you may continue. |
| 14:45:23 | 24 | MR. KHAZAELI:  Thank you, Your Honor. |
| 14:45:23 | 25 | BY MR. KHAZAELI: |

14:45:25   1   Q.   Ms. Hunemiller, the next morning you were let out of your

14:45:29   2   cell; correct?

14:45:29   3   A.   Yes, sir.

14:45:30   4   Q.   And where were you taken?

14:45:31   5   A.   We were taken to the middle of that building.  I would say

14:45:38   6   it was surrounded by cells, and they sat women on one side and

14:45:42   7   men on the other to wait to see a judge.

14:45:44   8   Q.   And that morning did you see Mr. Burnikel?

14:45:50   9   A.   Yes.

14:45:51   10   Q.   And how did he look the next morning?

14:45:54   11   A.   Worse than he did the night before.

14:45:55   12   Q.   When you say worse, can you describe that?

14:45:58   13   A.   His face was completely swollen, worse than it was.  He

14:46:04   14   slumped.  He looked like he was in a lot of pain.

14:46:06   15   Q.   That picture that I showed you earlier, did he look worse

14:46:10   16   than that picture?

14:46:11   17   A.   Way worse.

14:46:12   18   Q.   Was there a difference in the amount of blood that was on

14:46:15   19   him the next morning?

14:46:17   20   A.   Just that it was dry.

14:46:20   21   Q.   You said he was slumped over.  Can you describe that?

14:46:24   22   A.   Slumped in pain.  I don't know how else to describe it.

14:46:30   23   Q.   And about how many hours after the incident is this?

14:46:34   24   A.   I don't know.

14:46:46   25   Q.   But it was the next morning, though?

14:46:48    1   A.   Yes.

14:46:51    2   Q.   Now, overall, that morning when you were thinking about what

14:46:57    3   happened to you, what was going through your mind?

14:46:59    4   A.   I just wanted to go home.  I wanted it to be over.

14:47:08    5   Q.   And eventually you saw a judge?

14:47:11    6   A.   Yes.

14:47:12    7   Q.   Past that, when was the next time you spoke to Mr. Burnikel?

14:47:20    8   A.   Before I went to court.

14:47:23    9   Q.   When you said court, not that day?  Are you talking about

14:47:26   10   later on?

14:47:26   11   A.   Later on.

14:47:27   12   Q.   And was that for Mr. Burnikel's criminal trial?

14:47:31   13   A.   Yes, sir.

14:47:32   14   Q.   Now, you're from Waverly, and you didn't know Mr. Burnikel

14:47:36   15   ahead of time; correct?

14:47:37   16   A.   No, sir.

14:47:39   17   Q.   Why did you decide to go to court and testify on

14:47:43   18   Mr. Burnikel's behalf in his criminal trial?

14:47:46   19   A.   Because what had happened was wrong.  It shouldn't have

14:47:51   20   happened.

14:47:52   21   Q.   What do you mean by that?

14:47:55   22   A.   The whole situation shouldn't have taken place.  Nobody did

14:48:00   23   anything wrong.

14:48:01   24   Q.   When you say nobody did anything wrong, who are you talking

14:48:04   25   about didn't do anything wrong?

14:48:06    1    A.   Dusty and I didn't do anything wrong.

14:48:13    2    Q.   Now, you now live in Florida; correct?

14:48:17    3    A.   Yeah.

14:48:17    4    Q.   Was it easy for you to come testify?

14:48:20    5    A.   No.

14:48:22    6    Q.   Why was it difficult?

14:48:24    7    A.   I'm a broker.  I have clients that I have to take care of,

14:48:29    8    and I've got new prospects that I have to look for.  I have a

14:48:33    9    business to run.  I have my seven-year-old son.  I just --

14:48:41   10    Q.   Do you get paid by your company for coming --

14:48:41   11    A.   No.

14:48:45   12    Q.   -- here?

14:48:45   13    A.   Sorry.

14:48:50   14    Q.   So why did you come all the way from Florida to testify in

14:48:54   15    court today?

14:48:55   16    A.   Because, again, it was wrong what happened.  It shouldn't

14:48:58   17    have happened, and I don't want it to happen again.

14:49:00   18    Q.   When you say you don't want it to happen again, what are you

14:49:03   19    afraid of?

14:49:04   20    A.   That Officers Fong and Wessels will do it again.

14:49:08   21    Q.   When you're in court in the criminal case and you saw

14:49:12   22    Officers Fong and Wessels, how did that make you feel when you

14:49:15   23    saw them?

14:49:16   24         MR. HARALDSON:  Objection.  Irrelevant.

14:49:20   25         THE COURT:  The objection is overruled.

| | | |
|---|---|---|
| 14:49:22 | 1 | A.  Uncomfortable, scared. |
| 14:49:29 | 2 | BY MR. KHAZAELI: |
| 14:49:30 | 3 | Q.  Five plus years later, sitting in court today and looking at |
| 14:49:33 | 4 | Officers Fong and Wessels, how do you feel? |
| 14:49:36 | 5 | A.  Uncomfortable. |
| 14:49:43 | 6 | Q.  How did this whole thing, this whole incident affect you? |
| 14:49:49 | 7 | MR. HARALDSON:  Objection.  Irrelevant. |
| 14:49:51 | 8 | THE COURT:  The objection is sustained. |
| 14:49:52 | 9 | MR. KHAZAELI:  No further questions, Your Honor. |
| 14:49:56 | 10 | THE COURT:  Members of the jury, we're going to take |
| 14:49:58 | 11 | our afternoon break at this time.  It is 2:50.  I will ask you |
| 14:50:05 | 12 | to be ready to come back into court -- we're going to take a |
| 14:50:11 | 13 | little bit of a longer break -- at 3:15.  If there's any delay |
| 14:50:15 | 14 | longer than that, I'll have my law clerk come and tell you. |
| 14:50:18 | 15 | Otherwise, please be prepared to come back into the courtroom at |
| 14:50:21 | 16 | 3:15. |
| 14:50:22 | 17 | Again, please continue to remember the admonition of |
| 14:50:24 | 18 | the court.  As I stated before, you can leave your notebooks |
| 14:50:27 | 19 | here on your chairs, and we will keep them safe.  These will be |
| 14:50:32 | 20 | your seats when you return. |
| 14:50:33 | 21 | Thank you.  We're in recess. |
| 14:50:35 | 22 | (In open court, out of the presence of the jury.) |
| 14:51:07 | 23 | THE COURT:  Please be seated. |
| 14:51:08 | 24 | We're outside the presence of the jury. |
| 14:51:11 | 25 | Mr. Khazaeli, you had an offer of proof you wanted to |

| | | |
|---|---|---|
| 14:51:11 | 1 | make in regards to the circumstances surrounding her plea? |
| 14:51:19 | 2 | MR. KHAZAELI:  Your Honor, can we -- are you out of |
| 14:51:21 | 3 | tissue? |
| 14:51:22 | 4 | THE WITNESS:  No.  I've got some. |
| 14:51:23 | 5 | THE COURT:  There's actually tissues right there.  Is |
| 14:51:27 | 6 | that box empty? |
| 14:51:28 | 7 | MR. KHAZAELI:  Looks like she's out. |
| 14:51:30 | 8 | THE COURT:  I can certainly give you more.  Can you |
| 14:51:32 | 9 | hand me that, Ms. Hunemiller? |
| 14:51:38 | 10 | There you go, ma'am. |
| 14:51:40 | 11 | THE WITNESS:  Thank you. |
| 14:51:41 | 12 | THE COURT:  Okay.  The objection was made in regards |
| 14:51:45 | 13 | to the phone call and then in regards to the circumstances |
| 14:51:50 | 14 | surrounding the plea.  Looking back at the materials you |
| 14:51:56 | 15 | submitted, I don't -- and the motions in limine that were filed |
| 14:52:01 | 16 | in regards to the plea, and certainly there wasn't a 104(A) |
| 14:52:09 | 17 | motion about the admissibility of it filed in regards to this |
| 14:52:11 | 18 | portion of the testimony; but to the extent that you want to |
| 14:52:14 | 19 | make a record and for the Court's consideration of whether or |
| 14:52:16 | 20 | not this material is relevant and permissible, you can make your |
| 14:52:19 | 21 | record at this time. |
| 14:52:21 | 22 | MR. KHAZAELI:  Thank you, Your Honor. |
| 14:52:22 | 23 | Could I have one second? |
| 14:52:23 | 24 | THE COURT:  Yes. |
| 14:52:24 | 25 | (Pause.) |

14:52:28    1          THE COURT:  If you can point me to anywhere in the

14:52:31    2  docket where I was advised of this issue, I would appreciate it.

14:52:35    3          MR. KHAZAELI:  We will look through, Your Honor.

14:52:40    4  We'll look through.

14:52:41    5          I will flag what, Your Honor, that this piece of

14:52:44    6  evidence was initially -- I'll go back and find it, but it was

14:52:53    7  initially one of the exhibits that we initially presented to the

14:52:55    8  Court and then had withdrawn because of the use of the audio,

14:53:00    9  when we decided we weren't going to use audio equipment.

14:53:04   10          THE COURT:  You just withdrew it, though.  I remember

14:53:07   11  there --

14:53:07   12          MR. KHAZAELI:  I don't believe that we -- I think we

14:53:09   13  identified it at the time that it was the 911 tape, but I do not

14:53:13   14  believe that we had any long conversations about that, Your

14:53:16   15  Honor.

14:53:22   16          THE COURT:  Let's use our time wisely, Counsel.  Go

14:53:25   17  ahead and make your offer of proof.

14:53:26   18  BY MR. KHAZAELI:

14:53:27   19  Q.  Ms. Hunemiller, I'm going to take you back to when you were

14:53:30   20  in the wagon and you said that you were able to loosen your hand

14:53:35   21  from the handcuffs.  What did you do with your hands?

14:53:39   22  A.  I pulled my cell phone out of my pocket and called 911.

14:53:44   23  Q.  Why did you call 911?

14:53:47   24  A.  Because I knew we needed help.

14:53:49   25  Q.  But after what happened to you, why was your first reaction

14:53:54   1   to call the police department?

14:53:55   2   A.   Because I was hoping that there was other police officers

14:53:58   3   that would help.

14:54:00   4   Q.   So is it fair to say that at that time you didn't have a

14:54:05   5   bias against police officers generally?

14:54:07   6   A.   I still don't.

14:54:09   7   Q.   Let's move to what happened the morning that you left the

14:54:15   8   jail.  You were taken into court; correct?

14:54:22   9   A.   Yes, I was.

14:54:24   10   Q.   And before you went into court, were you able to speak to an

14:54:27   11   attorney?

14:54:28   12   A.   No.

14:54:28   13   Q.   Was there anybody there advising you of your rights?

14:54:32   14   A.   No.

14:54:33   15   Q.   Did anybody tell you about what would happen or could happen

14:54:37   16   in court?

14:54:38   17   A.   Um, there was an officer that said that if I chose to plead

14:54:43   18   not guilty, that I would stay over the weekend to see a judge on

14:54:47   19   Monday.

14:54:49   20   Q.   And what did the officer say would happen if you pled

14:54:54   21   guilty?

14:54:54   22   A.   That I could go home.

14:54:56   23   Q.   Now, when you got in front of the judge, you had two charges

14:54:59   24   in front of you.  One was public intoxication.  How did you

14:55:04   25   plead to that?

14:55:04    1   A.   I pled guilty to public intoxication.

14:55:07    2   Q.   Why did you plead guilty to public intoxication?

14:55:09    3   A.   Because I was in public and I did have drinks.

14:55:12    4   Q.   Then you also pled guilty to interfering with public acts;

14:55:20    5   correct?

14:55:20    6   A.   Yes, sir.

14:55:21    7   Q.   Now, earlier in my examination, you told me that you never

14:55:25    8   interfered with anybody; right?

14:55:27    9   A.   That is correct.

14:55:28   10   Q.   Can you explain why you have that difference in your

14:55:31   11   testimony?

14:55:32   12   A.   I wanted to go home.  I didn't want to be there anymore.  I

14:55:36   13   wanted my mom, and I just wanted it to all be over.

14:55:40   14   Q.   And were you scheduled to work that night?

14:55:43   15   A.   Yes.

14:55:43   16   Q.   What would have happened to you if you had missed work that

14:55:46   17   night because you were in jail?

14:55:48   18   A.   I could very well have gotten fired for it.

14:55:51   19   Q.   How would that have affected you?

14:55:53   20   A.   I had a little boy at the time, I had a son.  I had rent to

14:55:57   21   pay.

14:55:58   22   Q.   Now, what did you think would happen if you tried to fight

14:56:02   23   the public intox -- the interfering with public acts charge?

14:56:07   24   A.   I think there would have been no point after what had just

14:56:11   25   happened.  I don't think --

| | | |
|---|---|---|
| 14:56:13 | 1 | Q.  Why do you think there wouldn't have been any point? |
| 14:56:16 | 2 | A.  Because what happened shouldn't have happened, and I don't |
| 14:56:19 | 3 | think that I would have been given a fair chance. |
| 14:56:24 | 4 | MR. KHAZAELI:  No further questions, Your Honor. |
| 14:56:25 | 5 | THE COURT:  Anything in terms of the offer of proof |
| 14:56:29 | 6 | you would like to make a record about, Mr. Haraldson? |
| 14:56:37 | 7 | MR. HARALDSON:  No.  I'll stand on my legal argument. |
| 14:56:48 | 8 | THE COURT:  The Court's prior rulings remain in |
| 14:56:56 | 9 | regards to the relevancy of the 911 call.  That line of |
| 14:57:08 | 10 | questioning doesn't have any relevance.  To the extent it is |
| 14:57:13 | 11 | relevant, it confuses the issue and would be inadmissible under |
| 14:57:19 | 12 | 403. |
| 14:57:22 | 13 | The fact of the plea certainly can come in. |
| 14:57:53 | 14 | Otherwise, the Court's ruling remains the same.  It's improper |
| 14:58:02 | 15 | to impeach the prior plea in this manner.  You certainly can ask |
| 14:58:07 | 16 | questions about it.  I assume there will be some questions on |
| 14:58:11 | 17 | cross-examination about this, and you can ask questions in |
| 14:58:13 | 18 | redirect to the extent that they're relevant to the testimony |
| 14:58:18 | 19 | that the defense elicits on their cross-examination, but |
| 14:58:21 | 20 | otherwise it's not appropriate. |
| 14:58:24 | 21 | Do you have any additional questions you want to ask |
| 14:58:26 | 22 | of this witness before we turn over for cross-examination, in |
| 14:58:31 | 23 | light of the Court's ruling and the record that was made? |
| 14:58:34 | 24 | MR. KHAZAELI:  No, Your Honor. |
| 14:58:35 | 25 | THE COURT:  Then is there anything further on behalf |

14:58:38    1    of the plaintiff at this time in regards to the offer of proof?

14:58:41    2        MR. KHAZAELI:  No, Your Honor.

14:58:43    3        THE COURT:  Anything that you need to bring to the

14:58:46    4    Court's attention before I allow you a brief recess as well?

14:58:49    5        Mr. Khazaeli?

14:58:51    6        MR. KHAZAELI:  Sorry?

14:58:51    7        THE COURT:  Anything else you need to bring to the

14:58:54    8    Court's attention?

14:58:54    9        MR. KHAZAELI:  Not at this time.

14:58:55    10        THE COURT:  Mr. Haraldson?

14:58:56    11        MR. HARALDSON:  No, Your Honor.

14:58:57    12        THE COURT:  Okay.  My records show that the plaintiff

14:58:59    13    withdrew Exhibits 19 and 26, the dispatch calls.  That's the

14:59:03    14    only thing that I see.  I recognize that there was a switch of

14:59:06    15    judges in this, and so I acquainted myself with the materials

14:59:09    16    that have been brought to my attention.  To the extent that they

14:59:13    17    haven't been brought to my attention, there's nothing I can do

14:59:16    18    about that.  So if there are any issues that you think that I'm

14:59:19    19    going to need to know about that have not been briefed, you need

14:59:22    20    to let me know about them so that I can address them as timely

14:59:25    21    as I can.

14:59:26    22        MR. KHAZAELI:  And we'll continue to review, but at

14:59:29    23    this time I haven't seen anything.

14:59:30    24        THE COURT:  Okay.  So it's 3 o'clock now.  I had asked

14:59:34    25    the jury to be ready at 3:15, if you guys are ready to go at

14:59:39    1   3:10.

14:59:41    2          Ms. Hunemiller, while we are on recess, you can't talk

14:59:41    3   to anyone.  You can't consult in terms of the continuation of

14:59:44    4   your testimony, but you can also take a break and use the rest

14:59:48    5   room and whatever you need to.  I'll ask you to be back on the

14:59:50    6   stand at 3:10 as well.

14:59:52    7          Thank you.  We'll be in recess.

15:00:21    8          (Recess at 3:00 p.m., until 3:18 p.m.)

15:18:59    9          THE COURT:  Thank you.  Please be seated.

15:19:01   10          I believe I've been informed that the technical issues

15:19:03   11   have been resolved; is that correct?

15:19:04   12          MR. KHAZAELI:  Yes, Your Honor.  I think that if

15:19:06   13   there's anything outstanding, it won't be until tomorrow.

15:19:09   14          THE COURT:  Okay.  Anything you need to bring to the

15:19:11   15   Court's attention then on behalf of the plaintiff?

15:19:13   16          MR. KHAZAELI:  No, Your Honor.

15:19:14   17          THE COURT:  On behalf of the defendants?

15:19:18   18          MR. HARALDSON:  No, Your Honor.

15:19:19   19          THE COURT:  Okay.  We'll bring in the jury.

15:19:22   20          (In open court, in the presence of the jury.)

15:20:13   21          THE COURT:  Thank you.  Please be seated.

15:20:15   22          We're back on the record, in the presence of the jury,

15:20:18   23   in the case of Dustin Burnikel versus Michael Fong, Gregg

15:20:22   24   Wessels, and City of Des Moines, Case No. 4:15-cv-50.

15:20:27   25          Cross-examination, Mr. Haraldson?

15:20:29     1          MR. HARALDSON:  Thank you, Your Honor.

15:20:30     2                      CROSS-EXAMINATION

15:20:31     3   BY MR. HARALDSON:

15:20:31     4   Q.  Ms. Hunemiller, you described on the night of the 15th,

15:20:35     5   early morning of the 16th, that you were in four different

15:20:37     6   locations that evening after the wrestling tournament; right?

15:20:41     7   A.  Yes, sir.

15:20:42     8   Q.  You were at a banquet room in a hotel.  Do you remember the

15:20:45     9   hotel?

15:20:46    10   A.  I don't remember the name.

15:20:47    11   Q.  Did you have any alcoholic beverages at the banquet room?

15:20:52    12   A.  No, sir.

15:20:52    13   Q.  Then you went to a bar.  And you don't remember the name of

15:20:57    14   the bar; right?

15:20:57    15   A.  No, sir.

15:20:59    16   Q.  And you had -- I believe your testimony is that you had a

15:21:03    17   drink there; is that right?

15:21:04    18   A.  Yes, sir.

15:21:04    19   Q.  Do you remember what you drank?

15:21:08    20   A.  It would have been beer of some sort.

15:21:10    21   Q.  Is that what you usually drink, beer?  You know don't drink

15:21:15    22   mixed drinks?

15:21:16    23   A.  That's correct.

15:21:16    24   Q.  So any alcoholic beverages you had on the night of the

15:21:20    25   15th/16th would have been beer?

15:21:23   1   A.   I believe so.  I'm not really sure.

15:21:25   2   Q.   Okay.  Is it possible you had something else besides beer to

15:21:29   3   drink?  You had beer and something else, I should say?

15:21:32   4   A.   It's a possibility.  I'm not sure.

15:21:34   5   Q.   Okay.  And then you went to another bar.  Do you remember

15:21:39   6   whether you had anything to drink at that bar?

15:21:42   7   A.   Yes.

15:21:42   8   Q.   And how much did you have to drink at that bar?

15:21:45   9   A.   I believe I had a couple there.

15:21:47   10  Q.   A couple beers?

15:21:48   11  A.   Yes, sir.

15:21:50   12  Q.   Do you remember the name of that other bar?

15:21:53   13  A.   No, sir.

15:21:54   14  Q.   Okay.  Then you went to Jokers; right?

15:21:56   15  A.   Yes, sir.

15:21:57   16  Q.   So you would have had three beers by the time you went to

15:22:00   17  Jokers; right?

15:22:02   18  A.   Yes.

15:22:03   19  Q.   And then you were at Jokers for about almost two hours?

15:22:12   20  A.   Yes.

15:22:13   21  Q.   I believe your testimony was that you got there around

15:22:16   22  midnight and you stayed until it closed pretty much; right?

15:22:19   23  A.   Yes, sir.

15:22:20   24  Q.   And you had something -- you had at least a beer at Jokers;

15:22:25   25  right?

15:22:25   1   A.   That's correct.

15:22:26   2   Q.   And how many beers do you think you had at Jokers?

15:22:30   3   A.   One, I believe.

15:22:33   4   Q.   Okay.  Because in your earlier testimony, you thought you

15:22:36   5   had about five -- you said five drinks that night.

15:22:39   6   A.   It was six years ago.  I'm not sure, sir.

15:22:43   7   Q.   Nonetheless, by the time you went to the cab stand, you

15:22:47   8   would agree you were intoxicated?

15:22:49   9   A.   I would say I was buzzed.

15:22:52   10   Q.   You pled guilty to public intoxication; correct?

15:22:56   11   A.   Yes, sir.

15:22:58   12   Q.   And you also pled guilty to interference with the police

15:23:03   13   officers; correct?

15:23:03   14   A.   Unfortunately, yes.

15:23:05   15   Q.   Well, that's not an unfortunately question, ma'am.  It's a

15:23:09   16   yes or no.  Did you or did you not plead guilty to public

15:23:12   17   interference?

15:23:13   18   A.   Yes, I did.

15:23:23   19   Q.   And you were -- at the time that you were at the cab stand,

15:23:27   20   you were with your friend, Mike?

15:23:29   21   A.   Yes, sir.

15:23:30   22   Q.   And you said Mike is a high school friend, so I take it he's

15:23:35   23   about your age?

15:23:35   24   A.   Yes.

15:23:35   25   Q.   And in 2013, you were 25; is that right?

15:23:41   1   A.   I was 26.

15:23:42   2   Q.   26.   And at least in 2013, I know, for example, I had more

15:23:51   3   hair, just illustrious amounts of hair in 2013 which I don't

15:23:57   4   have anymore.   But in 2013, what was Mike's appearance?   How

15:24:02   5   tall was he?   Did he have hair?   What color was his hair, that

15:24:06   6   sort of thing?

15:24:07   7   A.   Mike didn't have any hair.

15:24:09   8   Q.   So he had a shaved head?

15:24:11   9   A.   Yes, sir.

15:24:11   10   Q.   And how tall was he?

15:24:14   11   A.   Mike is my height.

15:24:16   12   Q.   And you are?

15:24:17   13   A.   Five-nine and a half.

15:24:22   14   Q.   And then if I understand it right, you never actually saw

15:24:27   15   what occurred between Mr. Burnikel and the officers?   You never

15:24:32   16   actually saw the arrest event, so to speak; correct?

15:24:36   17   A.   I didn't see anything, but I heard.

15:24:38   18   Q.   And the question was whether you saw it.   You never saw the

15:24:41   19   event; correct?

15:24:42   20   A.   I didn't see anything, but I heard.

15:24:46   21   Q.   Thank you.

15:24:48   22        You said you went down on the pavement face first.

15:24:53   23   Did you have any facial abrasions?

15:24:56   24   A.   I didn't -- I went face down.   I didn't hurt my face.   It

15:25:01   25   was my knees and my shins.

15:25:03  1  Q.  Did anybody grind your face into the cement?

15:25:06  2  A.  No, sir.

15:25:14  3  Q.  And you had no doubt from your observation that Fong and

15:25:19  4  Wessels were police officers?

15:25:21  5  A.  Yeah, I knew they were.

15:25:26  6  Q.  Did they have patches on their shoulders?

15:25:29  7  A.  Not that I saw.

15:25:31  8  Q.  How did you know they were police officers?

15:25:33  9  A.  One, when you're attracted to men in uniform, you tend to

15:25:39  10  spot those kind of things.

15:25:40  11  Q.  Right.  So from your observation, they're police officers,

15:25:43  12  not firemen or sailors?

15:25:52  13  A.  Correct.

15:26:11  14  Q.  Your testimony earlier was that you were, I believe you

15:26:15  15  described it as slammed on your face; is that correct?

15:26:17  16  A.  I believe I meant slammed face down, not on my face.

15:26:29  17  Q.  In fact, what you landed on first were your knees and shins;

15:26:34  18  correct?

15:26:34  19  A.  That's correct.

15:26:44  20  Q.  And what you heard is you said you did hear an interaction

15:26:49  21  between someone and the officers; right?

15:26:51  22  A.  Yes, sir.

15:26:52  23  Q.  And I believe your quote was you heard someone yell -- and

15:26:55  24  they were yelling; correct?

15:26:58  25  A.  I wouldn't say it was a yell.  It was a surprise.

15:27:05  1  Q.  And I believe your testimony was someone yelled, "What the

15:27:09  2  fuck are you doing?"

15:27:10  3  A.  That's correct.

15:27:13  4  Q.  Were you able to judge how far away that voice was coming

15:27:17  5  from?

15:27:17  6  A.  Not very far.  Five feet.  Maybe five, six feet away.

15:27:22  7  Q.  So it was close to you and the officer that you say was on

15:27:27  8  top of you?

15:27:28  9  A.  It was close by, yes.

15:27:47  10  Q.  And during this whole event, you stayed face down; is that

15:27:50  11  right?  You continued to lie down?

15:27:52  12  A.  Yes, sir.

15:27:52  13  Q.  Face down?

15:27:53  14  A.  Face down.

15:27:54  15  Q.  And, as far as you could tell, was the interaction

15:28:01  16  between -- that was going on, the person that was yelling, was

15:28:04  17  that behind you?

15:28:10  18  A.  If I'm laying face down, it was in this direction

15:28:13  19  (indicating).

15:28:13  20  Q.  And am I correct that you were -- at the time you were face

15:28:15  21  down, where were you?  Were you in the parking ramp?  Were you

15:28:20  22  on the sidewalk?  Were you between?  Where were you laying down?

15:28:26  23  A.  To my knowledge, I was on the sidewalk.

15:28:28  24  Q.  Were you close to the parking ramp?

15:28:30  25  A.  Not very close.

15:28:31  1    Q.  And what direction was your head facing:  East, west, north,

15:28:38  2    south?

15:28:41  3    A.  I don't remember.

15:28:43  4    Q.  And so whatever perspective your head was, can you tell me

15:28:49  5    again, from your hearing, where was this sound coming from, from

15:28:55  6    what angle to your head?

15:28:57  7    A.  Behind me.

15:29:03  8    Q.  And your testimony is that somehow you got Mace on you; is

15:29:07  9    that right?

15:29:07  10   A.  Yes.

15:29:09  11   Q.  And was it a windy night?

15:29:12  12   A.  I don't remember.

15:29:15  13   Q.  And you didn't see the pepper spray or Mace, or whatever it

15:29:21  14   was, you didn't see it actually deployed; correct?

15:29:23  15   A.  No, sir.

15:29:24  16   Q.  Did you hear it deployed?

15:29:28  17   A.  No, sir.

15:29:31  18   Q.  So you don't know the nature of the manner in which the Mace

15:29:36  19   was distributed, whether it was a spray or a stream, or anything

15:29:41  20   like that?

15:29:41  21   A.  No, sir.

15:29:46  22   Q.  Where did you -- where did the Mace end up on you, on your

15:29:50  23   body?

15:29:50  24   A.  In my face.  My eyes mostly.

15:29:53  25   Q.  And was that because it got directly into your eyes or

15:29:57   1   because it got on your hands and then you touched your eyes?

15:29:59   2   A.   No.   It was like a mist that hit my face.   My hands

15:30:04   3   immediately went up to wipe it off my eyes.

15:30:16   4   Q.   And you did hear one other thing coming from a voice with

15:30:21   5   the words, "I'm not resisting, I'm not resisting"; correct?

15:30:25   6   A.   Yes, sir.

15:30:27   7   Q.   And was it from the same voice that yelled to the officers,

15:30:32   8   "What are you" -- expletive -- "doing?"

15:30:35   9   A.   Yes.   It was the same voice, but more strained and sounded

15:30:40   10   like he was in pain.

15:30:42   11   Q.   And is it -- and did you hear what the voice that was saying

15:30:49   12   that was responding to?   Was someone talking to him that you

15:30:53   13   recall?

15:30:55   14   A.   No, sir.

15:30:55   15   Q.   Is it possible that someone was talking to him and you just

15:30:58   16   don't remember?

15:30:59   17   A.   I don't remember.

15:31:00   18   Q.   And you agree, do you not, that alcohol can affect a

15:31:14   19   person's perception?

15:31:16   20   A.   I agree that alcohol can affect people's perception, yes.

15:31:20   21   Q.   And you agree it can also affect a memory of an event?

15:31:25   22   A.   I do agree that can happen.

15:31:36   23   Q.   And at some point you state -- your testimony is you stayed

15:31:41   24   on the ground the whole point until -- the whole time until one

15:31:43   25   of the officers escorted you to the van?

15:31:46   1   A.   Yes, sir.  I wasn't going to dare move at that point.

15:32:16   2   Q.   Give me just a second here.

15:32:17   3        You've got a book up there.  It's green.  It's called

15:32:21   4   Misdemeanor Transcript; is that right?

15:32:23   5   A.   Yes, sir.

15:32:34   6   Q.   If you can turn to page 174.  Just keep your thumb there.

15:33:03   7        Do you agree that you testified at Mr. Burnikel's

15:33:05   8   misdemeanor trial in May of 2013?

15:33:12   9   A.   What was the question?  I'm sorry.

15:33:14   10  Q.   Do you remember that you testified in Mr. Burnikel's

15:33:17   11  misdemeanor trial in May of 2013?

15:33:19   12  A.   Yes, sir.

15:33:21   13  Q.   And if you would just keep your page on 174, on page 165, is

15:33:29   14  that a reference to your testimony, the beginning of your

15:33:33   15  testimony in that trial?

15:33:40   16  A.   Yes, sir.

15:33:41   17  Q.   And you would agree that that was about -- that testimony

15:33:46   18  occurred about five-and-a-half years ago?

15:33:48   19  A.   Yeah.

15:33:49   20  Q.   And it would have been about two months after -- or

15:33:53   21  two-and-a-half months after the event with yourself and

15:33:56   22  Mr. Burnikel and the officers on February 16, 2013?

15:34:00   23  A.   Yes, sir.

15:34:02   24  Q.   Actually almost three months; right?

15:34:04   25  A.   Uh-huh.

84

15:34:05  1  Q.  Now if you could turn to 174.

15:34:17  2      Starting on line 15, you're asked:  "Did you see what

15:34:22  3  happened to Dustin Burnikel after the officer left you and maced

15:34:25  4  him?"

15:34:25  5      And your answer was?

15:34:27  6  A.  "No."

15:34:29  7  Q.  And then you were asked:  "Where were you?"

15:34:32  8      And your answer was?

15:34:34  9  A.  "I was in the parking garage, they were taking me into the

15:34:39  10  paddy wagon at that point."

15:34:42  11  Q.  Okay.  So were you taken to the paddy wagon right after the

15:34:47  12  macing?

15:34:48  13  A.  I don't remember.

15:34:49  14  Q.  Now, how many officers do you recall being down there?

15:34:54  15  A.  Down where, sir?

15:34:55  16  Q.  At the parking garage -- I mean at the cab stand?

15:34:59  17  A.  Two.

15:35:00  18  Q.  And you didn't see their physical interaction with

15:35:05  19  Mr. Burnikel?

15:35:05  20  A.  No, sir.

15:35:06  21  Q.  But you didn't just go to the paddy wagon by yourself, did

15:35:11  22  you?

15:35:12  23  A.  No, sir.

15:35:12  24  Q.  Someone, one of the officers, escorted you; correct?

15:35:16  25  A.  That's correct.

15:35:17  1   Q.  Now, that didn't happen -- is it your belief that that

15:35:23  2   happened just after Mr. Burnikel was maced?

15:35:25  3   A.  No, sir.

15:35:26  4   Q.  Okay.  So I'm just trying to again figure out where you

15:35:32  5   were.  Were you actually in the parking garage at the time that

15:35:38  6   the officer would have left you to interact with Mr. Burnikel?

15:35:43  7   A.  No, sir.  I was on the sidewalk.

15:35:46  8   Q.  So I'm just trying to -- can you explain to me when you're

15:35:53  9   asked --

15:35:54  10       MR. KHAZAELI:  Objection, Your Honor.  Improper

15:35:56  11  impeachment.

15:36:01  12       MR. HARALDSON:  It's really not impeachment.  I'm

15:36:04  13  trying to explain -- have her explain what happened that night

15:36:09  14  to see if I can harmonize her current testimony with her

15:36:13  15  testimony in May of 2013.

15:36:15  16       THE COURT:  Under what rule of evidence are you

15:36:17  17  proceeding, Counsel?

15:36:18  18       MR. HARALDSON:  Well, this would be, I believe, sworn

15:36:23  19  testimony, so 802, I believe.

15:36:29  20       THE COURT:  You may proceed.  The objection is

15:36:31  21  overruled.

15:36:31  22       Please pose another objection if you believe it's

15:36:34  23  appropriate.

15:36:39  24  BY MR. HARALDSON:

15:36:40  25  Q.  Ms. Hunemiller, just correct me, I'm just trying to

15:36:44   1   understand here, it reads like you were being -- do you agree it

15:36:48   2   sort of reads like you're being escorted to the wagon while

15:36:53   3   Mr. Burnikel is in the process of interacting with an officer or

15:36:57   4   officers away from you?

15:36:59   5   A.   That's not what happened.   I was on the ground the entire

15:37:03   6   time.

15:37:17   7   Q.   Do you know what happened to your friend, Mike, that night?

15:37:21   8   He was with you when you were at the cab stand, and then he sort

15:37:24   9   of falls out of the story.   Do you have any idea what happened

15:37:27  10   to him?

15:37:28  11   A.   I have no idea.

15:37:29  12   Q.   Well, did you ever see him again?   You must have seen him

15:37:31  13   again, I imagine?

15:37:32  14   A.   I saw him briefly after my mother had picked me up, and I

15:37:37  15   went straight home.

15:37:40  16   Q.   Okay.   But you have no idea whether he hung around there or

15:37:46  17   cleared off at the time you were taken to the van?

15:37:49  18   A.   I think I would have seen him if he had hung around.

15:37:52  19   Q.   So, from your observation or recollection, he was gone?

15:37:56  20   A.   Yes, sir.

15:38:28  21          MR. HARALDSON:   That's all I have.

15:38:29  22          Thank you.

15:38:31  23          THE COURT:   Redirect?

15:38:39  24          MR. KHAZAELI:   Yes, Your Honor.

15:38:41  25

WONDERFILER   REDIRECT

15:38:41  1                    REDIRECT EXAMINATION

15:38:41  2  BY MR. KHAZAELI:

15:38:42  3  Q.  You just testified that -- you were asked a question about

15:38:46  4  how far away the person was when they yelled, "What's happening

15:38:52  5  to you?"

15:38:53  6  A.  Yes, sir.

15:38:54  7  Q.  And you said that you thought that person was five to six

15:38:57  8  feet away; correct?

15:38:59  9  A.  That's a rough guesstimate.  I'm not sure.

15:39:03  10  Q.  But you're making that determination right now as to how far

15:39:06  11  away they are based on sound, not by sight?

15:39:10  12  A.  By sound.

15:39:11  13  Q.  Are you trained in any way to tell how far away somebody is

15:39:15  14  from you based on sound?

15:39:16  15  A.  Not in freight brokerage, no.

15:39:24  16  Q.  In your previous testimony, how far away was the wagon from

15:39:34  17  the area where you were face down on the ground, approximately?

15:39:39  18  A.  It was in the paddy -- or it was in the parking garage, so I

15:39:47  19  don't -- I'm not very good at distance.

15:39:49  20  Q.  Well, was it directly next to it, or was it farther away?

15:39:53  21  A.  It was farther away.

15:39:54  22  Q.  If you were standing by the wagon and somebody was maced at

15:39:58  23  the area where you were laying down, could that Mace have gotten

15:40:02  24  on you?

15:40:02  25  A.  No.

15:40:03  1  Q.  So when you were maced, it's not when you were near the

15:40:06  2  paddy wagon?

15:40:07  3  A.  No.

15:40:07  4  Q.  And when you were by the wagon, that's not when Mr. Burnikel

15:40:11  5  was maced?

15:40:12  6  A.  No.

15:40:15  7          MR. KHAZAELI:  No further questions, Your Honor.

15:40:17  8          THE COURT:  Recross limited to redirect?

15:40:19  9          MR. HARALDSON:  No, Your Honor.

15:40:20  10         THE COURT:  Thank you.

15:40:21  11         Ms. Hunemiller, thank you for your time.  You may step

15:40:24  12  down.

15:40:30  13         Ma'am, would you mind taking your glass with you?

15:40:33  14         THE WITNESS:  Yes; sorry.

15:40:34  15         THE COURT:  Thank you.

15:40:36  16                                     (Witness excused.)

15:40:36  17         THE COURT:  Plaintiff?

15:40:38  18         MR. KHAZAELI:  Your Honor, could I take the

15:40:40  19  transcripts and return them to defendants' counsel?

15:40:42  20         THE COURT:  Yes.  Thank you.

15:40:43  21         Would you call your next witness, please.

15:40:46  22         MR. KHAZAELI:  Yes, Your Honor.  We'll be calling

15:40:51  23  Darrick Burnikel.

15:40:53  24         THE COURT:  Thank you.

15:41:21  25         Thank you, sir.  If you would please come forward,

| | | |
|---|---|---|
| 15:41:24 | 1 | walk through this way.  Thank you, sir.  Please come forward. |
| 15:41:29 | 2 | If you would please pause and raise your right hand and prepare |
| 15:41:32 | 3 | to be sworn. |
| 15:41:34 | 4 | DARRICK BURNIKEL, PLAINTIFF'S WITNESS, SWORN |
| 15:41:42 | 5 | THE COURT:  Thank you, sir.  You may be seated. |
| 15:41:44 | 6 | Sir, would you please state and spell your full name |
| 15:41:47 | 7 | for the record. |
| 15:41:49 | 8 | THE WITNESS:  Darrick Burnikel, D-A-R-R-I-C-K |
| 15:41:55 | 9 | B-U-R-N-I-K-E-L. |
| 15:41:56 | 10 | THE COURT:  Thank you, sir. |
| 15:41:57 | 11 | Your witness, Counsel. |
| 15:41:59 | 12 | MR. SWAIM:  Thank you, Your Honor. |
| 15:42:00 | 13 | DIRECT EXAMINATION |
| 15:42:01 | 14 | BY MR. SWAIM: |
| 15:42:01 | 15 | Q.  Mr. Burnikel, how old are you? |
| 15:42:03 | 16 | A.  I am 42. |
| 15:42:04 | 17 | Q.  And what do you do for a living? |
| 15:42:05 | 18 | A.  Farm and sell crop insurance and seed corn. |
| 15:42:09 | 19 | Q.  Where do you live? |
| 15:42:10 | 20 | A.  Cresco, Iowa. |
| 15:42:13 | 21 | Q.  Have you lived in Cresco, Iowa, most of your life? |
| 15:42:16 | 22 | A.  Yes, I have. |
| 15:42:18 | 23 | Q.  Are you related to the plaintiff, Dustin Burnikel, in this |
| 15:42:21 | 24 | case? |
| 15:42:21 | 25 | A.  Yes. |

DARRICK BURNIKEL - DIRECT

90

| | | |
|---|---|---|
| 15:42:22 | 1 | Q.  How are you related to him? |
| 15:42:23 | 2 | A.  Cousins. |
| 15:42:27 | 3 | Q.  I want to call your attention to the time frame from around |
| 15:42:31 | 4 | February 14th to February 16th of 2013.  Do you recall where you |
| 15:42:36 | 5 | were on those dates? |
| 15:42:38 | 6 | A.  Yes.  I was down to the State Wrestling Tournament in |
| 15:42:42 | 7 | Des Moines. |
| 15:42:42 | 8 | Q.  Okay.  And you said you were down at the State Wrestling |
| 15:42:48 | 9 | Tournament in Des Moines.  Who was with you? |
| 15:42:51 | 10 | A.  My cousin, Don Burnikel; some of his grandsons; and Dusty |
| 15:43:04 | 11 | was down there.  But I rode down with Don Burnikel and Drew |
| 15:43:09 | 12 | Rasmussen. |
| 15:43:10 | 13 | Q.  And Don Burnikel is Dustin's father; is that correct? |
| 15:43:16 | 14 | A.  Yes. |
| 15:43:18 | 15 | Q.  And why were you coming down to the State Wrestling |
| 15:43:21 | 16 | Tournament on that date? |
| 15:43:22 | 17 | A.  My cousin's son was wrestling at the tournament and it's |
| 15:43:28 | 18 | something that I normally love to watch, so -- |
| 15:43:33 | 19 | Q.  And what was that relative's name that was wrestling at the |
| 15:43:37 | 20 | tournament? |
| 15:43:37 | 21 | A.  Tyler Thomas. |
| 15:43:40 | 22 | Q.  And did you come down to the State Wrestling Tournament on |
| 15:43:43 | 23 | Thursday, the 14th? |
| 15:43:44 | 24 | A.  Yes; correct. |
| 15:43:45 | 25 | Q.  Did you watch wrestling that date? |

15:43:48    1    A.   Yes.

15:43:49    2    Q.   All day long?

15:43:51    3    A.   Yeah.   We get here in the afternoon and watched the first

15:43:58    4    rounds.

15:44:01    5    Q.   And where did you stay that night?

15:44:02    6    A.   Embassy Suites.

15:44:05    7    Q.   And did you return to the State Wrestling Tournament the

15:44:08    8    following day, Friday, the 15th?

15:44:10    9    A.   Yes.

15:44:11    10   Q.   And did you watch wrestling all of that day?

15:44:15    11   A.   Yes.

15:44:16    12   Q.   What time in the morning did you start watching wrestling

15:44:19    13   that day?

15:44:19    14   A.   I don't recall what session we started at, but it primarily

15:44:26    15   takes up your whole day, and we continue to watch.   Friday night

15:44:32    16   is the semifinals.   That's always the most exciting round to

15:44:36    17   watch.   So we stayed through that until, probably ended around

15:44:42    18   10:00, 10:30.

15:44:43    19   Q.   10:00, 10:30 at night?

15:44:45    20   A.   Yes.

15:44:47    21   Q.   And what did you do after you left the State Wrestling

15:44:51    22   Tournament at 10:00 or 10:30 that night?

15:44:53    23   A.   Walked back to the Embassy Suites.

15:44:56    24   Q.   Who was with you when you walked back to the Embassy Suites?

15:45:00    25   A.   I don't really recall.   I mean, there's hundreds of people

BARRICK BURNIKEL - DIRECT

92

| | | |
|---|---|---|
| 15:45:06 | 1 | from our town, you know, small -- I don't know, a lot of locals. |
| 15:45:13 | 2 | Just walking with Don and Drew.  I can't recall who I |
| 15:45:19 | 3 | specifically walked -- |
| 15:45:20 | 4 | Q.  A lot of people from your hometown? |
| 15:45:22 | 5 | A.  Yeah.  The whole hometown is a wrestling community there. |
| 15:45:27 | 6 | Q.  And you said you went back to the Embassy Suites; is that |
| 15:45:30 | 7 | correct? |
| 15:45:30 | 8 | A.  Yes. |
| 15:45:30 | 9 | THE COURT:  Mr. Burnikel, something that you need to |
| 15:45:33 | 10 | do is make sure you wait until the attorney finishes asking his |
| 15:45:36 | 11 | question. |
| 15:45:37 | 12 | THE WITNESS:  Oh. |
| 15:45:38 | 13 | THE COURT:  And then answer it so we can all hear you |
| 15:45:41 | 14 | correctly and so the record can be taken down accurately.  Can |
| 15:45:46 | 15 | you do that? |
| 15:45:47 | 16 | THE WITNESS: Yes.  I'm sorry. |
| 15:45:48 | 17 | THE COURT:  That's okay.  Thank you very much. |
| 15:45:50 | 18 | BY MR. SWAIM: |
| 15:45:51 | 19 | Q.  And you mentioned that a lot of people from Cresco were |
| 15:45:55 | 20 | walking back to the Embassy Suites.  Were they all staying there |
| 15:45:59 | 21 | at the Embassy Suites as well? |
| 15:46:01 | 22 | A.  Yes.  There's a major share of them that stay there. |
| 15:46:04 | 23 | Q.  And was Dusty, Dustin Burnikel, staying there as well? |
| 15:46:09 | 24 | A.  Yes, he was. |
| 15:46:10 | 25 | Q.  Along with his dad and son? |

15:46:12   1   A.   Yes.

15:46:14   2   Q.   And about what time did you get back to the Embassy Suites?

15:46:19   3   A.   I'm just guessing roughly around that 10 o'clock to 10:30.

15:46:24   4   Q.   And what did you do then when you got back to the Embassy

15:46:28   5   Suites?

15:46:28   6   A.   A lot of the, you know, friends will gather in the lounge

15:46:34   7   area, or whatever, they have free hors d'oeuvres and had a drink

15:46:41   8   there and discussed the previous night or day's wrestling.

15:46:45   9   Q.   And who was with you in the lounge at the Embassy Suites

15:46:48   10   that night?

15:46:49   11   A.   At that time I was with primarily Justin Sovereign, a local

15:46:57   12   friend.

15:46:57   13   Q.   A friend from Cresco?

15:46:59   14   A.   Yeah.

15:47:00   15   Q.   Was he also down for the State Wrestling Tournament?

15:47:03   16   A.   Yes, he was.

15:47:04   17   Q.   Where was Dustin Burnikel at that time?

15:47:08   18   A.   I believe he was getting pizza for his son, and if he had --

15:47:16   19   whoever was staying in his room, the younger people.

15:47:20   20   Q.   So did Dusty have any drinks with you there at the Embassy

15:47:25   21   Suites?

15:47:25   22   A.   I don't recall if he did or not, to be honest with you.

15:47:29   23   Q.   How many drinks did you have at the Embassy Suites?

15:47:32   24   A.   I may have had two.

15:47:36   25   Q.   And had you been drinking at any time prior that day?

15:47:39    1    A.   No, I had not, was not.

15:47:42    2    Q.   What happened next?

15:47:45    3    A.   Me and Justin, like I said, we were talking to a lot of the

15:47:49    4    other locals.  Dusty come down, met with us, and then we

15:48:03    5    decided -- I think it was Dustin's idea to go to the

15:48:06    6    establishment called the Bait Shop, he was more familiar with

15:48:11    7    it, just to maybe get away from some of the crowd.

15:48:15    8    Q.   What time did you decide to go to the Bait Shop that night?

15:48:19    9    A.   I would say -- I know we weren't at the hotel that long, but

15:48:26   10    I would suppose it was anywhere between 11:30 to 12:00, I would

15:48:34   11    say.

15:48:38   12    Q.   And you said you went -- did you go straight from the

15:48:42   13    Embassy Suites to the Bait Shop?

15:48:43   14    A.   Yes, we did.

15:48:45   15    Q.   How did you get there?

15:48:46   16    A.   We were going to get a cab, but actually the Domino's Pizza

15:48:53   17    delivery man that Dusty had deliver the pizza was there, and we

15:49:00   18    just happened to ask him, and he said he was going right by

15:49:03   19    there, so he dropped us off.

15:49:05   20    Q.   Who all was with you when you went to the Bait Shop?

15:49:08   21    A.   It was me, Dustin, and Justin.

15:49:14   22    Q.   And what happened next when you got to the Bait Shop?

15:49:18   23    A.   Just the three of us walked in.  The establishment was, I

15:49:26   24    would call it kind of slow, I mean not very populated.  The

15:49:30   25    three of us discussed wrestling.  I recall we were discussing

DARRICK BORNHIRED - DIRECT

95

15:49:40   1   Cresco switching coaches, strictly wrestling talk, and going

15:49:45   2   over the day's events.

15:49:47   3   Q.  And was it just the three of you sitting talking or were

15:49:51   4   there others sitting with you?

15:49:53   5   A.  It was primarily just the three of us.  There was other

15:49:56   6   people there obviously, but nobody we were interacting with.

15:50:00   7   Q.  How long were you at the Bait Shop?

15:50:02   8   A.  We were there until they called last call.

15:50:07   9   Q.  And do you recall around what time that would have been?

15:50:10  10   A.  I'm assuming 1:30.

15:50:14  11   Q.  How many drinks did you have at the Bait Shop?

15:50:17  12   A.  I would say we had three at the most.

15:50:20  13   Q.  And do you think all three of you had around the same

15:50:25  14   amount?

15:50:27  15   A.  I can't be -- I presume so, yeah.

15:50:30  16   Q.  That's what you had?

15:50:31  17   A.  Yeah.  And we were, like I said, just socializing.

15:50:38  18   Q.  After they called last call at the Bait Shop, what happened

15:50:42  19   next?

15:50:42  20   A.  I know one of us asked to -- you know, asked the bartender

15:50:48  21   if he would call us a cab, and that's when he directed us that

15:50:52  22   they don't call cabs, you just go down the street to the cab

15:50:56  23   stand and, you know, find a cab there.

15:50:59  24   Q.  And so I think you testified that you had had a couple of

15:51:02  25   drinks at the Embassy Suites and then perhaps three drinks at

15:51:06  1   the Bait Shop; is that correct?

15:51:07  2   A.  As I recall, I would say, you know, one to two at the

15:51:12  3   Embassy and maybe three at the Bait Shop.  Who knows if we

15:51:17  4   finished the last one.

15:51:18  5   Q.  Were you intoxicated when you left the Bait Shop?

15:51:21  6   A.  No.

15:51:22  7   Q.  Was Dusty intoxicated when he left the Bait Shop?

15:51:25  8   A.  No.  None of us were.

15:51:27  9   Q.  So where did you go next?

15:51:30  10  A.  Given the bartender's directions, we went -- you know, we

15:51:35  11  had to walk a few blocks.  It was very cold that night.  So we

15:51:41  12  were proceeding down the street, and there was an entryway into

15:51:45  13  an establishment, I believe it was called Jokers, just kind of a

15:51:49  14  front porch thing.  We ducked in there to warm up for a few

15:51:55  15  minutes.  That establishment was kind of telling everybody they

15:51:58  16  had to get moved --

15:51:59  17  Q.  Was it just the three of you walking from Bait Shop to

15:52:03  18  Jokers?

15:52:04  19  A.  I would say -- I mean, it was us three and a group.  I mean,

15:52:08  20  there was people ahead or behind us.

15:52:10  21  Q.  Were there people in the entryway of Jokers?

15:52:14  22  A.  There was -- excuse me.  There was a few in the entryway.

15:52:17  23  Q.  Anyone else you knew besides Dustin and Justin?

15:52:21  24  A.  No.

15:52:22  25          THE COURT:  Counsel, would you wait until he finishes

15:52:25   1   before you ask your next question.  The same rule applies to

15:52:29   2   you.

15:52:29   3          MR. SWAIM:  I'm sorry.  I understand, Your Honor.

15:52:33   4   Thank you.

15:52:33   5          THE COURT:  Thank you.

15:52:35   6   BY MR. SWAIM:

15:52:36   7   Q.  How long were you in the entryway at Jokers?

15:52:38   8   A.  I would say less than, you know, three to five minutes.

15:52:43   9   Q.  Could you see the cab stand from where you were in the

15:52:46   10  entryway at Jokers?

15:52:47   11  A.  Yes, we could.

15:52:48   12  Q.  And were there people in line at the cab stand at that time?

15:52:51   13  A.  Yes, there was.

15:52:54   14  Q.  Tell us what happened next.

15:52:58   15  A.  We proceeded across the street to the cab stand.  Me and

15:53:06   16  Justin were having a conversation -- we were side by side having

15:53:11   17  a small conversation.  Dusty was just, you know, five to eight

15:53:15   18  feet ahead of us, you know.  You could tell it was a get in line

15:53:23   19  kind of wait.  Cabs were coming and parking, and people were

15:53:26   20  loading.  So we -- me and Justin, you know, kind of got in line.

15:53:32   21  It was two to three people wide and, you know, there was

15:53:35   22  anywhere from, I would say altogether maybe six to twelve

15:53:42   23  people, ten people there, you know.  I guess when it's cold out,

15:53:48   24  a person is kind of hunched up just waiting your turn.

15:53:52   25  Q.  And you said you left the entryway of Jokers along with

15:53:57    1    Justin and Dustin, is that correct, and a group of other people?

15:54:00    2    A.  Yes.

15:54:02    3    Q.  And you were having a conversation with Justin at this time

15:54:06    4    as you were walking to the cab stand; is that right?

15:54:09    5    A.  Yes.  I can recall being right next to Justin walking across

15:54:13    6    the street.

15:54:14    7    Q.  Where was Dusty at the time?

15:54:16    8    A.  He was just ahead of us five to eight feet.

15:54:20    9    Q.  And was he also walking across the street to the cab stand?

15:54:28   10    A.  Yes, he was.

15:54:30   11    Q.  Prior to the time that you're making your way over to the

15:54:35   12    cab stand, did you know a Breanna Hunemiller?

15:54:38   13    A.  No, I didn't.

15:54:42   14    Q.  Ever talk to her before?

15:54:44   15    A.  No.

15:54:45   16    Q.  Do you remember ever seeing her before?

15:54:47   17    A.  No.

15:54:55   18    Q.  So tell us what happens as you make your way and approach

15:54:58   19    the cab stand.

15:54:59   20    A.  As I say, me and Justin, as we're walking with the group of

15:55:04   21    people getting in line, we're kind of having a chitchat, and the

15:55:08   22    next thing I know I could hear Dustin's voice.  I looked a

15:55:17   23    little bit forward and off to my right, and I just see Dustin

15:55:23   24    saying -- you know, I caught his voice first, but I could hear,

15:55:28   25    "What are you doing?" and "You can't do that to her."  And

| | | |
|---|---|---|
| 15:55:33 | 1 | that's what caught my attention first. |
| 15:55:35 | 2 | Q.  Okay.  And as you're approaching the cab stand, you |
| 15:55:41 | 3 | mentioned there were other people already standing there at the |
| 15:55:43 | 4 | cab stand; is that correct? |
| 15:55:44 | 5 | A.  Yes. |
| 15:55:45 | 6 | Q.  Did you notice anything out of the ordinary going on at the |
| 15:55:51 | 7 | cab stand at the time? |
| 15:55:52 | 8 | A.  No, I did not. |
| 15:55:54 | 9 | Q.  All right.  Was there any shouting or profanity or commotion |
| 15:55:59 | 10 | going on at the time when you first approached? |
| 15:56:01 | 11 | A.  No. |
| 15:56:08 | 12 | Q.  Did you hear anyone or see anyone being unruly or mouthing |
| 15:56:14 | 13 | off to any police officers as you approached the cab stand? |
| 15:56:17 | 14 | A.  No.  The only thing I heard was the words I just said Dusty |
| 15:56:23 | 15 | had said. |
| 15:56:29 | 16 | Q.  Before you heard Dusty's voice, did you hear any commands |
| 15:56:33 | 17 | from any police officers? |
| 15:56:35 | 18 | A.  No, I did not. |
| 15:56:42 | 19 | Q.  And when you heard Dusty's voice, did you look over in the |
| 15:56:47 | 20 | direction of Dusty's voice? |
| 15:56:49 | 21 | A.  Yes, immediately. |
| 15:56:50 | 22 | Q.  And what did you see Dusty doing? |
| 15:56:53 | 23 | A.  Like I said, he -- obviously his voice caught my attention, |
| 15:56:58 | 24 | so I turned up to look.  And, like I said, I seen his arms were |
| 15:57:05 | 25 | in, like, disbelief, and he was, like, "What are you doing?" or |

BURNIKEL - DIRECT

100

BURNIKEL - DIRECT

15:57:08    1    "You can't do that to her," and that's what caught my attention.

15:57:12    2    Q. And so you're indicating as you're answering, when he's

15:57:15    3    asking, "What are you doing," like in disbelief, was his arm up

15:57:20    4    to his side like that?

15:57:23    5    A. Yes.

15:57:28    6    Q. Were his hands open or closed?

15:57:32    7    A. His hands were just as I've got them here (indicating).

15:57:42    8         THE COURT: Mr. Burnikel, one of the things also is

15:57:46    9    that, for the record, you had your arms out and you had your

15:57:50    10    hands open. The question was, were his hands in a fist or open,

15:57:53    11    and you gestured to respond. But so that the record is

15:57:56    12    accurate, if you could answer in words when you can, I would

15:57:59    13    appreciate it.

15:58:00    14         THE WITNESS: Okay. Sorry, Your Honor.

15:58:03    15         MR. SWAIM: Thank you, Your Honor.

15:58:04    16    BY MR. SWAIM:

15:58:04    17    Q. Were his arms or hands open and to his side?

15:58:07    18    A. Yes, they were.

15:58:08    19    Q. And how high to the side were they? Were they at his waist

15:58:12    20    level, at his shoulder level? Where were they?

15:58:16    21    A. They were bringing between his waist and his -- a little

15:58:20    22    higher than his waist but lower than his shoulders.

15:58:25    23    Q. Did you see what was going on that caught Dusty's attention,

15:58:30    24    caused him to say, "Hey, what are you doing, you can't do that"?

15:58:36    25    A. No, I did not.

15:58:39   1   Q.  How far away do you think you were from Dustin Burnikel at

15:58:45   2   that time?

15:58:45   3   A.  I was probably eight to twelve feet.

15:58:58   4   Q.  And did you actually see the woman, Ms. Hunemiller, and what

15:59:05   5   was going on with her when Dusty was saying this, "What are you

15:59:11   6   doing?"

15:59:13   7   A.  No, I did not.  The group of people, you know, there was

15:59:16   8   two, three people between me and Dusty.

15:59:22   9   Q.  Did you see to whom Dusty was making that comment to, "What

15:59:29   10  are you doing, you can't do that to her"?

15:59:32   11  A.  Not initially when his voice caught my attention, no.

15:59:36   12  Q.  When you first got to the cab stand, did you see any police

15:59:39   13  officers?

15:59:39   14  A.  No, I did not.

15:59:45   15  Q.  What happened next after you heard Dusty say, "What are you

15:59:48   16  doing, you can't do that" and you saw his arms up to his side

15:59:52   17  like in disbelief?  What happened next?

15:59:55   18  A.  The next thing I seen was a gentleman approaching him, and

16:00:02   19  he had his arm forward, and in seconds Dusty was getting maced.

16:00:13   20  Q.  After Dusty said that, "What are you doing, you can't do

16:00:18   21  that" and you turned and saw him, did he move at all towards the

16:00:22   22  police officers?

16:00:23   23  A.  No.  His feet -- like I said, he was elevated, so I presume

16:00:27   24  he was on a curb or something, and he never moved from that

16:00:30   25  position.

| | | |
|---|---|---|
| 16:00:33 | 1 | Q.  And you said -- how long between the time that Dusty said |
| 16:00:38 | 2 | that and the officer turned and maced him? |
| 16:00:42 | 3 | A.  It seemed like just a few seconds, just like it all flowed |
| 16:00:51 | 4 | into one. |
| 16:00:51 | 5 | Q.  And between that time, did you hear the officers make any |
| 16:00:54 | 6 | commands to Dusty? |
| 16:00:56 | 7 | A.  No, I did not. |
| 16:01:04 | 8 | Q.  What did Dusty do after being maced? |
| 16:01:06 | 9 | A.  After he was maced, you could tell like it totally blinded |
| 16:01:10 | 10 | him, disoriented him.  He kind of fell back and was just like he |
| 16:01:17 | 11 | was stumbling back, curled up into -- like a baby.  I mean, he |
| 16:01:22 | 12 | just -- you could tell it just hit him like a ton of bricks. |
| 16:01:31 | 13 | Q.  And do you know where Dusty got maced?  Was it apparent from |
| 16:01:35 | 14 | his reaction? |
| 16:01:36 | 15 | A.  I presume he was getting it in the eyes because he curled |
| 16:01:40 | 16 | his head down and, you know, wanted to block his eyes or wipe |
| 16:01:48 | 17 | them out. |
| 16:01:49 | 18 | Q.  Did you hear any police officers give Dusty any commands |
| 16:01:55 | 19 | after he was maced? |
| 16:02:00 | 20 | A.  All I remember is, after he was maced, he was stumbling |
| 16:02:03 | 21 | back, and an officer, one of the individuals, came around the |
| 16:02:11 | 22 | side of him and, you know, was trying to -- I don't know.  He |
| 16:02:20 | 23 | come from -- one individual came up behind him, and the next |
| 16:02:24 | 24 | individual comes up and, you know, I'm watching this, and one |
| 16:02:34 | 25 | individual had his arms behind his back, and the other |

16:02:37    1   individual has got an arm on his shoulder and with his other

16:02:40    2   hand multiple punches to the groin.

16:02:46    3        In the meantime, I'm obviously noticing in awe and

16:02:51    4   shock that this is not right, and so I'm trying to get my phone

16:02:55    5   out, you know, to video, do something.  I see Dusty's face.

16:03:05    6   It's full of blood, so, obviously, quite a commotion.  I walked

16:03:10    7   forward and asked, "What is all going on here" and got the reply

16:03:17    8   from one of the gentlemen, "If you don't back up, you're going

16:03:21    9   to get it too.  And I just -- I just honestly couldn't believe

16:03:32   10   what I was seeing.  I mean, there was -- there was no need for

16:03:38   11   it at all and -- sorry.

16:03:46   12   Q.  How many officers were -- after Dusty was maced, did one

16:03:51   13   officer approach him or two?

16:03:55   14   A.  Like I said, it's just like it happened so fast, and there

16:04:01   15   was, you know, that small group of people there, but, obviously,

16:04:04   16   they immediately all disappeared.  But in the time I seen him

16:04:09   17   maced and I seen one individual come to him, it seemed like the

16:04:16   18   second one was right there within seconds, I would say.

16:04:21   19   Q.  And at that point, was Dusty standing up?  Was he down?  Was

16:04:27   20   he --

16:04:28   21   A.  He just -- sorry.  He was just curled, curled forward.  I

16:04:34   22   mean, the guy, you could tell, like I said, the Mace did its

16:04:42   23   job.  It disorientated him, looked like it made him numb, like

16:04:49   24   he couldn't do nothing.

16:04:51   25   Q.  And you said you saw one officer holding his arms back; is

16:04:57    1   that correct?

16:04:57    2   A.   Yes.

16:04:57    3   Q.   And another one was -- had an arm around him and then was

16:05:02    4   punching him; is that correct?

16:05:04    5   A.   Yes.

16:05:05    6   Q.   And did you see where that officer was punching him?

16:05:10    7   A.   Yes.  I seen him punching him in the groin numerous times.

16:05:14    8   Q.   Did it appear to you as though Dusty was resisting or

16:05:19    9   struggling with these officers?

16:05:20   10   A.   No, it did not.

16:05:25   11   Q.   Did you hear the police officers make any commands to Dusty

16:05:29   12   to put his hands behind his back?

16:05:31   13   A.   I did hear them say put your hands behind your back, but

16:05:35   14   they were already behind his back because one of the individuals

16:05:39   15   was already holding them there.

16:05:42   16   Q.   And what was Dusty doing while the officers were striking

16:05:46   17   him?

16:05:47   18   A.   He wasn't doing nothing.

16:05:50   19   Q.   Did he at some point go down to the ground?

16:05:54   20   A.   It looked like he wanted to, but with the one officer

16:05:58   21   holding his arms back, somewhat holding him until his knees

16:06:06   22   were -- almost wanted to fold down to the ground.

16:06:18   23   Q.   And how exactly were they holding him up?  Can you show us?

16:06:22   24   A.   I would call it, it looked like a double chicken wing.  They

16:06:27   25   had his arms like that (indicating), if that makes sense.

| | | |
|---|---|---|
| 16:06:42 | 1 | Q.  So one of the officers was holding him in the chicken wing |
| 16:06:46 | 2 | that you just indicated.  What was the other officer doing? |
| 16:06:48 | 3 | A.  The other officer was doing the striking, had one of his |
| 16:06:51 | 4 | arms kind of up on his shoulder because Dusty is primarily |
| 16:06:57 | 5 | almost kneeled to the ground, so like his one left hand was on |
| 16:07:03 | 6 | Dusty's shoulder and striking him with his right fist. |
| 16:07:11 | 7 | Q.  And what did you think about what you were seeing? |
| 16:07:13 | 8 | A.  I couldn't believe what I was seeing.  Like I said, it was |
| 16:07:18 | 9 | totally wrong.  It was totally unnecessary.  It was -- it was |
| 16:07:25 | 10 | completely unbelievable what I was seeing. |
| 16:07:29 | 11 | Q.  You mentioned that you were so surprised by it that you were |
| 16:07:35 | 12 | trying to find your phone to take video of it; is that correct? |
| 16:07:39 | 13 | A.  Yes, that is correct. |
| 16:07:40 | 14 | Q.  And did you actually catch some of it on video, on your cell |
| 16:07:45 | 15 | phone? |
| 16:07:45 | 16 | A.  Yes, I did catch some on video.  Like I said, I was |
| 16:07:49 | 17 | trembling through trying to get the video on.  It was an old |
| 16:07:54 | 18 | style flip phone, so -- |
| 16:07:56 | 19 | Q.  So did you end up getting the whole incident, part of it? |
| 16:08:00 | 20 | What did you catch? |
| 16:08:01 | 21 | A.  I primarily just got a video of the ending, more or less |
| 16:08:09 | 22 | after he was cuffed and they were taking him in. |
| 16:08:12 | 23 | Q.  Pretty much after the strikes had already been given to |
| 16:08:16 | 24 | Dusty? |
| 16:08:17 | 25 | A.  Yes. |

16:08:19   1   Q.   But you did get your phone out and try to catch it on video,

16:08:22   2   and you at least got the ending; is that correct?

16:08:25   3   A.   Yes.

16:08:34   4   Q.   Did the officers put Dusty in handcuffs?

16:08:37   5   A.   Yes, they did.

16:08:38   6   Q.   What happened next after they put him in handcuffs?

16:08:41   7   A.   He was laying down on the ground in handcuffs, kind of down

16:08:46   8   on his knees with his chest down towards the ground, and they

16:08:51   9   literally, when I seen him, just went to pick him up by the

16:08:57  10   handcuffs.  And you could see his arms flex way back, and I

16:09:04  11   heard him scream, and I thought, geez, they just tore his

16:09:08  12   shoulder muscle off or something.  They let him back down and

16:09:13  13   were pulling him back up again to get him to walk because he

16:09:18  14   wouldn't have been able to -- nobody on his own could probably

16:09:21  15   stand up.

16:09:22  16   Q.   Did you hear Dusty say anything other than "What are you

16:09:26  17   doing?  You can't do that to her" to the officers?

16:09:30  18   A.   After I heard that, the only thing I heard next was when

16:09:35  19   they asked him to put his hands behind his back, and he said,

16:09:39  20   "They already are.  I can't."  And that's when they had him

16:09:43  21   restrained.

16:09:51  22   Q.   And after they did eventually get him handcuffed and picked

16:09:54  23   up off the pavement, what did they do with him?

16:09:58  24   A.   They walked him to this van.

16:10:11  25   Q.   And did you see Dusty and his face before the officers put

16:10:14   1   him in the van?

16:10:15   2   A.   I could tell it looked bloody.

16:10:23   3   Q.   And what did his face look like?

16:10:25   4   A.   It looked -- you could tell he received some punches to the

16:10:29   5   face.  He had blood.  His face had some swelling, his lips, his

16:10:33   6   eyes, you know, just looking towards them was obviously burnt by

16:10:39   7   the Mace.

16:10:40   8   Q.   You mentioned that the officers, after they had Dustin

16:10:47   9   handcuffed, they let him back down.  Did they drop him?  Did

16:10:50   10  they lower him down gently?  How did he go back down to the

16:10:54   11  ground?

16:10:54   12  A.   I recall when they went to pick him up the first time and he

16:10:58   13  screamed because, you know, his arms were being pulled

16:11:05   14  backwards, they -- yeah, they let go of the tension, and he

16:11:11   15  slooped down, and then they got him up again.

16:11:22   16  Q.   And what did you do after the officers placed Dustin in the

16:11:27   17  van?

16:11:27   18  A.   There was -- there was a cab there.  We got in the cab, went

16:11:35   19  back to the Embassy Suites.  I immediately talked to Dustin's

16:11:43   20  father and told him the situation and Dustin's sister.  His

16:11:51   21  father was very upset.  You know, I was trying to explain all of

16:11:59   22  this, and I'm sure it was a lot to take in for him.  And I also

16:12:04   23  proceeded to call the sheriff's department or the police

16:12:07   24  department.  I had no idea where Dusty was headed or going.  I

16:12:14   25  was worried about, you know, his health.  You know, I had no

16:12:19   1   clue what was going to happen to him.

16:12:28   2                MR. SWAIM:  Thank you.

16:12:29   3                Nothing further.

16:12:30   4                THE COURT:  Cross-examination?

16:12:32   5                          CROSS-EXAMINATION

16:12:33   6   BY MR. HARALDSON:

16:12:37   7   Q.  Is it possible, Mr. Burnikel, that you might have missed

16:12:46   8   some of the events between Dustin and the police officers

16:12:49   9   because, like a lot of us, you were trying to make your stupid

16:12:54   10  phone work?

16:12:58   11  A.  I witnessed very vividly the punches to the groin.

16:13:06   12  Q.  Right.  But you were -- at some point you were trying to,

16:13:09   13  you said, you know, there was something compelling you to try

16:13:12   14  and take a video of it.  So you must have spent some time trying

16:13:18   15  to get your -- and you said you missed a lot of video you could

16:13:22   16  have taken just trying to get the phone to work; right?

16:13:25   17  A.  The problem I was having was flipping between video and

16:13:30   18  picture, and I think I double hit the record button when I

16:13:34   19  thought I was recording, and it started and stopped it, you

16:13:39   20  know, immediately.

16:13:39   21  Q.  That's cell phones for you.

16:13:42   22  A.  Right.

16:13:43   23  Q.  But you must -- sometime during this event, you must have

16:13:46   24  had to look at your phone to try and make it work; right?

16:13:49   25  A.  Yes.

16:13:50  1  Q.  And the video that you did get, is it fair to say that you

16:13:59  2  sort of captured the moment that he was finally put in -- that

16:14:05  3  he was sort of secured in handcuffs to the time in which he was

16:14:10  4  walking, being walked to the van?

16:14:12  5  A.  Yes.

16:14:13  6  Q.  So there wasn't some handcuffing moment that you missed in

16:14:20  7  that video up to the point where he's talking towards the van?

16:14:26  8  A.  Could you say that again?

16:14:28  9  Q.  Well, let's put it this way.  Was there any significant

16:14:32  10  aspect of the handcuffing that you didn't record?  In other

16:14:38  11  words, you said that he was dropped for a moment.  Was that

16:14:42  12  recorded by you, the moment of that drop?

16:14:49  13  A.  Yes.  The part where they dropped him, yes, he was

16:14:52  14  handcuffed, and he immediately screamed when they went to lift

16:14:55  15  him.

16:14:56  16  Q.  And you caught that on video?

16:14:57  17  A.  Yes.

16:14:58  18  Q.  He was never dropped onto his face, was he?

16:15:00  19  A.  They said they let him down.  He slooped down because he

16:15:06  20  screamed.

16:15:08  21  Q.  All right.  But he never -- after he was handcuffed and

16:15:08  22  being taken back to the van, even when he slooped down, he

16:15:12  23  didn't hit the concrete with his face, did he?

16:15:15  24  A.  I don't recall that, not when he was handcuffed.

16:15:21  25  Q.  All right.  So if there's testimony that, in the process of

16:15:27   1   being escorted in handcuffs to the van, that he was dropped and

16:15:30   2   he was dropped on his face, that's not your recollection, is it?

16:15:33   3   A.   Not mine, no.

16:15:38   4   Q.   And you were recording that moment that that drop -- that he

16:15:42   5   had that drop on your phone; right?

16:15:48   6   A.   I believe what I recorded was from -- when he was handcuffed

16:15:51   7   and when they lifted him.

16:15:54   8   Q.   Right.

16:15:54   9   A.   And he screamed, and they let him go back down.  I think

16:16:02   10   that was about it.

16:16:03   11   Q.   And you caught that moment on your phone; right?

16:16:06   12   A.   Yes.

16:16:12   13   Q.   Now, I believe that -- do you recall -- I believe your

16:16:15   14   testimony is that Dustin was a little higher -- you saw Dustin

16:16:19   15   because he was a little higher than everybody else; right?

16:16:22   16   A.   Correct.

16:16:23   17   Q.   He said something which caused you to pay attention to him;

16:16:26   18   but when you noticed him, he was higher than everybody else?

16:16:29   19   A.   Yes.  He looked like he was standing on a curb of some sort.

16:16:33   20   Q.   Right.  And, in fact, there is a curb between the sidewalk

16:16:37   21   and the parking ramp; isn't that right?

16:16:40   22   A.   Yeah, I do believe so.

16:16:42   23   Q.   And that, in fact, was what Dustin was standing on?  That's

16:16:48   24   why he was higher; correct?

16:16:49   25   A.   I presume that's what it was, yes.

16:16:51   1   Q.   Because that is about six to eight inches higher than the

16:16:58   2   sidewalk surrounding it; right?

16:17:00   3   A.   Right.

16:17:01   4   Q.   And he wasn't standing on a park bench?

16:17:03   5   A.   No.

16:17:04   6   Q.   So that's likely what he was standing on?

16:17:07   7   A.   That's what I was presuming he was standing on, yes.

16:17:10   8   Q.   Now, you said you couldn't see what was going on.  There's

16:17:16   9   obviously then something going on then below Dustin that he was

16:17:20   10   yelling about.  That's your recollection; correct?

16:17:23   11   A.   Correct.

16:17:24   12   Q.   So whatever was happening, is it your recollection it was

16:17:28   13   probably happening in the proximity of where Dustin was?

16:17:32   14   A.   I presume it was -- you know, the way he was facing, it had

16:17:37   15   to be that direction, yes.

16:17:38   16   Q.   So probably something around that curb that he was standing

16:17:42   17   on?

16:17:42   18   A.   I did not know if it was two feet away or 40 feet away.

16:17:49   19   Q.   But from the nature in which he was standing and yelling and

16:17:52   20   the position that you were at, you assumed at the time that it

16:17:57   21   looked like it was somewhere near him; right?

16:18:01   22   A.   No, I really didn't know, have a clue what was going on.

16:18:04   23   Q.   But, in any case, you're confident he was probably standing

16:18:08   24   on that curb between the sidewalk and the parking ramp?

16:18:12   25   A.   Yes, by his elevated position.

16:18:20   1   Q.   I believe you testified earlier that you were drinking beer;

16:18:23   2   is that right?

16:18:23   3   A.   Yes.

16:18:24   4   Q.   Okay.   There's one thing that I'm curious about.   There was

16:18:27   5   some testimony in the past that you -- someone recalled you were

16:18:33   6   drinking Captain and Coke.   Is that something that you may have

16:18:36   7   been drinking at that time?

16:18:38   8   A.   It's possible.   I don't recall what exactly we were

16:18:42   9   drinking.

16:18:43   10   Q.   Okay.   So you may have been drinking Captain and Coke that

16:18:46   11   night?   You don't have a specific recollection?

16:18:47   12   A.   No, I do not.

16:18:49   13   Q.   And are you experienced enough to tell us what a Captain and

16:18:53   14   Coke is?

16:18:53   15   A.   Yes.

16:18:54   16   Q.   What is it?

16:18:55   17   A.   It's a mixed drink.

16:18:57   18   Q.   It's a rum drink.   Is it rum and Coke essentially?

16:19:01   19   A.   Correct.

16:19:20   20   Q.   And did I hear you right that you did hear the officers ask

16:19:27   21   Dusty or Mr. Burnikel -- I know you're both Mr. Burnikel, so I'm

16:19:31   22   going to say Dustin, okay?

16:19:33   23   A.   Okay.

16:19:33   24   Q.   You did hear the officers say to Dustin to put his hands

16:19:38   25   behind his back; right?

16:19:39   1   A.   Yes.

16:19:40   2   Q.   But what you're saying is that struck you as odd because his

16:19:44   3   hands kind of were behind his back; right?

16:19:47   4   A.   It struck me odd because there was no way he could move his

16:19:51   5   hands.   They were restrained.

16:19:53   6   Q.   Restrained by what?

16:19:55   7   A.   One of the gentlemen's arms.

16:19:57   8   Q.   One of the gentlemen that was telling him to put his hands

16:20:01   9   behind his back?

16:20:01   10   A.   I can't recollect which one was saying it.   They were both

16:20:05   11   right on him.

16:20:05   12   Q.   One of them was definitely telling Dustin, though, to put

16:20:09   13   his hands behind his back?

16:20:10   14   A.   Yes.

16:20:12   15   Q.   And that was before he was on the ground?

16:20:22   16   A.   Which -- what time do you mean he was on the ground?

16:20:26   17   Q.   Well, at some point Dustin went to the ground, right, with

16:20:30   18   the officers?   I mean, you described when he was being

16:20:32   19   handcuffed he was on the ground, so he must have gone to the

16:20:37   20   ground at some point; correct?

16:20:37   21   A.   After they struck him numerous times in the groin and

16:20:40   22   obviously in the face.

16:20:42   23   Q.   He eventually went to the ground, though?

16:20:47   24   A.   He kind of had his legs curled up on his knees and --

16:20:53   25   Q.   But it was before this that at least one of the officers was

16:20:56    1    telling Dusty to put his hands behind his back?

16:20:59    2    A.   It is when the one officer was striking him in the groin or

16:21:05    3    right along that.

16:21:07    4    Q.   But my question is, he was standing at the time one of the

16:21:11    5    officers said, "Put your hands behind your back"?

16:21:15    6    A.   I wouldn't really call it standing.  He was hunched over,

16:21:22    7    knees half bent, with an officer -- with one of the individuals

16:21:32    8    having his arms restrained behind his back.

16:21:36    9    Q.   So he wasn't standing erect, but he was standing on two

16:21:40   10    feet?

16:21:41   11    A.   The way it really looked, I don't know if he would have been

16:21:44   12    able to stand on his feet without one of the individuals holding

16:21:49   13    him there.

16:21:52   14    Q.   But he wasn't on the ground?

16:21:55   15    A.   No.  One of the individuals was holding him.

16:22:01   16    Q.   Wasn't -- at the time that you saw Dusty on top of the

16:22:11   17    concrete rise to the parking ramp, you actually did see him

16:22:21   18    close to an officer, didn't you?

16:22:26   19    A.   What I seen -- his voice caught my attention.  I turned that

16:22:32   20    way.  I could hear him say, "What are you doing, you can't do

16:22:36   21    this to her," and that's when I seen an individual approach him.

16:22:43   22              MR. HARALDSON:  May I approach, Your Honor?

16:22:45   23              THE COURT:  The witness or me?

16:22:46   24              MR. HARALDSON:  The witness.  Sorry.

16:22:48   25              THE COURT:  Yes.

16:22:49    1   BY MR. HARALDSON:

16:23:12    2   Q.  Mr. Burnikel, do you recall testifying at Dustin Burnikel's

16:23:16    3   misdemeanor trial in 2013?

16:23:18    4   A.  Yes.

16:23:20    5   Q.  And if you could turn to page 124.  It says that in the

16:23:44    6   upper right-hand corner.  I'm sorry.

16:23:46    7   A.  Yep.

16:23:48    8   Q.  Are you there?

16:23:49    9   A.  Yes.

16:23:50   10   Q.  All right.  That's the beginning of your testimony at Dustin

16:23:54   11   Burnikel's misdemeanor trial on May 13, 2013; correct?

16:23:59   12   A.  Correct.

16:24:01   13   Q.  And if you can turn further on in your testimony to page

16:24:18   14   138.

16:24:18   15   A.  Okay.

16:24:28   16   Q.  And I'm directing you at page 138, line 5.  You were asked

16:24:39   17   there that -- I'll just use the quote, and you can tell me the

16:24:44   18   answer.  "You testified you weren't near your cousin, Dusty, at

16:24:47   19   the time that you saw him yelling to the officer?"

16:24:49   20           And your answer was?

16:24:52   21   A.  "I was not right next to him, no."

16:24:55   22   Q.  Okay.  And then if you could just go down the page a little

16:24:58   23   bit, to line 14, you were asked, "So it's fair to say that Dusty

16:25:07   24   was over by the officer; 'yes' or 'no'?"

16:25:10   25           And your answer was?

DARRICK BURNELL - CROSS

16:25:11    1    A.   "Yes."

16:25:12    2    Q.   All right.  So does that refresh your recollection where

16:25:17    3    Dusty was relative to an officer when you first observed him

16:25:24    4    yelling something that night?

16:25:29    5    A.   I still never seen Dusty next to an officer.  I never

16:25:37    6    recollected that.  Yeah, I could say it's fair to say he was

16:25:41    7    over there because he was in the same direction probably.

16:25:45    8    Q.   You said earlier he might have been 40 feet.  He wasn't 40

16:25:49    9    feet away from an officer based on what you recall from that

16:25:51   10    night, was he?

16:25:52   11    A.   Right.

16:25:53   12    Q.   At the time that this incident began, I should say?

16:25:55   13    A.   Right.  I don't know if he was 10 feet or 40 feet.

16:25:58   14    Q.   But that's what I'm asking.  When you first observed this

16:26:03   15    moment begin, when Dusty is yelling something, you then see him

16:26:09   16    interact with these officers; correct?

16:26:13   17    A.   I didn't see any interaction.  I heard his words, and I seen

16:26:19   18    an individual come towards him and mace him.  There was no

16:26:23   19    interaction, though.

16:26:23   20    Q.   Well, and that individual was an officer?

16:26:26   21    A.   I did not know that at the time.

16:26:28   22    Q.   Well, you found it out soon enough, didn't you, when you saw

16:26:33   23    two individuals with Dustin, physically interacting with him and

16:26:37   24    they were police officers; correct?

16:26:40   25    A.   They were dressed in black coats, black hats, black gloves.

16:26:45   1   Q.   With patches on their shoulders; right?

16:26:48   2   A.   I don't recall any patches.

16:26:49   3   Q.   Well, in any case, one of those individuals that you saw

16:26:53   4   spraying the Mace was one of the individuals tussling with

16:26:57   5   Dusty; correct?

16:26:58   6   A.   Correct.

16:26:59   7   Q.   Okay.  And when that individual -- you first noticed that

16:27:03   8   individual, that was shortly after you saw Dustin standing on

16:27:07   9   top of the parking ramp curve yelling something?

16:27:12   10   A.   Would you say that again?

16:27:14   11   Q.   When you first saw this individual reach out and mace or

16:27:19   12   pepper spray Mr. Burnikel, that was shortly after you saw him

16:27:23   13   yelling something on top of the parking ramp curb?

16:27:27   14   A.   Correct.

16:27:28   15   Q.   So it's likely that that individual and Dusty were close to

16:27:37   16   each other when Dusty was yelling, isn't it?

16:27:40   17   A.   It could be fair to say that.

16:27:41   18   Q.   Okay.  Now, if I understand, you may have had five beers or

16:27:58   19   five drinks of some kind between the Embassy Suites when you get

16:28:03   20   back at 10:30 to 11:00 and when you're told that the Bait Shop

16:28:10   21   was closing about 1:30, 1:45?

16:28:15   22   A.   Yes.

16:28:15   23   Q.   Is that right?

16:28:16   24   A.   Correct.

16:28:27   25   Q.   But you did not think that you were feeling the effect of

16:28:31   1   those drinks; is that right?

16:28:33   2   A.  Correct.

16:28:54   3   Q.  And your recollection is that Dusty had the same number of

16:28:58   4   drinks at the Bait Shop that you did, and your recollection is

16:29:02   5   three?

16:29:02   6   A.  Yes, at the Bait Shop.

16:29:04   7   Q.  And I'm guessing that Mr. Sovereign probably was the same

16:29:08   8   number?

16:29:08   9   A.  Correct.

16:29:09   10  Q.  You were sort of -- you sort of drank your beer and finished

16:29:13   11  your beer at the same rate and ordered another round until you

16:29:17   12  both had three?

16:29:18   13  A.  Correct.

16:29:23   14  Q.  And your testimony is that there were people between you and

16:29:25   15  Dusty; right?

16:29:26   16  A.  Correct.

16:29:27   17  Q.  And were these people sort of -- were you sort of

16:29:33   18  approaching the curb when you noticed -- you and Justin were --

16:29:37   19  that's a really bad question.  Let me start over.

16:29:40   20          You and Justin were sort of talking to each other,

16:29:43   21  sort of absorbed in your conversation, when you noticed Dusty

16:29:48   22  yelling.  You were sort of not paying attention so much to what

16:29:52   23  was going on around you.  You were paying attention to what the

16:29:55   24  two of you were talking about; right?

16:29:57   25  A.  Right.

16:29:57   1    Q.  And then all of a sudden you saw Dusty on top of the ramp in

16:30:03   2    the parking -- by the parking garage yelling something, and that

16:30:05   3    drew your attention?

16:30:06   4    A.  Correct.

16:30:08   5    Q.  But you didn't really see how Dustin came to be in that

16:30:10   6    spot, did you?

16:30:12   7           MR. SWAIM:  Asked and answered, Your Honor.

16:30:14   8           THE COURT:  The objection is sustained.

16:30:15   9    BY MR. HARALDSON:

16:30:22   10    Q.  When you first noticed this, where were you relative to the

16:30:25   11    street or the sidewalk?  What were you on?

16:30:27   12    A.  We were on the sidewalk.

16:30:30   13    Q.  On the same side as the parking ramp?

16:30:35   14    A.  Yes.

16:30:35   15    Q.  Okay.  Were you walking south to north then?  Is that the

16:30:39   16    direction you were headed?

16:30:42   17    A.  I'm not familiar with Des Moines, but I'm guessing we were

16:30:46   18    walking north.

16:30:47   19    Q.  Were you going in a straight line across the street from

16:30:51   20    Jokers to the parking ramp?

16:30:52   21    A.  Correct.

16:31:26   22    Q.  Now, you said that there were people -- that my clients were

16:31:32   23    dressed in black that night; but you did assume that they were

16:31:35   24    security of some sort, didn't you?

16:31:37   25    A.  I would assume they were some sort of security maybe.

| | | |
|---|---|---|
| 16:32:06 | 1 | THE COURT:  Mr. Haraldson, have you completed your |
| 16:32:09 | 2 | examination? |
| 16:32:09 | 3 | MR. HARALDSON:  I believe I have, Your Honor. |
| 16:32:10 | 4 | THE COURT:  Thank you. |
| 16:32:12 | 5 | Redirect? |
| 16:32:13 | 6 | MR. SWAIM:  Yes, Your Honor.  I'll be real brief. |
| 16:32:15 | 7 | THE COURT:  Thank you. |
| 16:32:16 | 8 | REDIRECT EXAMINATION |
| 16:32:17 | 9 | BY MR. SWAIM: |
| 16:32:20 | 10 | Q.  Mr. Burnikel, when you were at Bait Shop, you weren't |
| 16:32:25 | 11 | keeping track of Dustin's drinks or Justin's drinks, were you? |
| 16:32:31 | 12 | A.  No, I really wasn't. |
| 16:32:32 | 13 | Q.  You know how many drinks you had; correct? |
| 16:32:36 | 14 | A.  Correct. |
| 16:32:36 | 15 | Q.  And you assume that you all had probably around the same; is |
| 16:32:39 | 16 | that correct? |
| 16:32:39 | 17 | A.  Correct. |
| 16:32:42 | 18 | Q.  Mr. Haraldson asked you some questions about your testimony |
| 16:32:51 | 19 | in the criminal trial about how far away Dusty was from the |
| 16:32:55 | 20 | officers. |
| 16:32:55 | 21 | Do you remember that? |
| 16:32:56 | 22 | A.  Yes. |
| 16:32:56 | 23 | Q.  Is it fair to say your testimony is that Dusty was closer to |
| 16:33:00 | 24 | the officers than you were; is that correct? |
| 16:33:01 | 25 | A.  Correct. |

| | | |
|---|---|---|
| 16:33:02 | 1 | Q.  You just don't know how close Dusty was to the officers, do |
| 16:33:06 | 2 | you? |
| 16:33:07 | 3 | A.  I have no idea how close he was. |
| 16:33:11 | 4 | Q.  Okay.  But you saw the officers move towards Dusty after |
| 16:33:14 | 5 | Dusty asked, "What are you doing"; is that correct? |
| 16:33:16 | 6 | A.  Correct. |
| 16:33:17 | 7 | Q.  Dusty didn't move towards the officers; is that correct? |
| 16:33:21 | 8 | A.  No.  His feet never left the curb. |
| 16:33:25 | 9 | Q.  When the officers asked Dusty to put his hands behind his |
| 16:33:30 | 10 | back, where were Dusty's hands? |
| 16:33:32 | 11 | A.  They were being restrained more or less behind his back. |
| 16:33:34 | 12 | His arms were being restrained. |
| 16:33:36 | 13 | Q.  Was it possible for Dusty to move his hands? |
| 16:33:39 | 14 | A.  No.  That's why I thought how can you ask him to do that |
| 16:33:42 | 15 | when there's no way he could. |
| 16:33:47 | 16 | MR. SWAIM:  Your Honor, we would just ask to publish |
| 16:33:49 | 17 | the videos that are A exhibits, and then we'll be done. |
| 16:33:52 | 18 | THE COURT:  Yes. |
| 16:34:00 | 19 | THE CLERK:  Is it plugged in? |
| 16:34:03 | 20 | MR. KHAZAELI:  It is. |
| 16:34:15 | 21 | THE CLERK:  It should come up. |
| 16:34:23 | 22 | MR. SWAIM:  Mr. Burnikel, if you would watch the |
| 16:34:25 | 23 | video. |
| 16:34:27 | 24 | THE COURT:  Again, he has a screen right in front of |
| 16:34:29 | 25 | him. |

16:34:31    1              MR. SWAIM:  Oh, okay.

16:34:32    2              (Plaintiff's Exhibit 17, a video, was played.)

16:34:49    3   BY MR. SWAIM:

16:34:49    4   Q.  Is this the video that you took, Mr. Burnikel?

16:34:55    5   A.  Yes.

16:35:09    6   Q.  And I'm about to show you a second video, Mr. Burnikel.

16:35:13    7              (Plaintiff's Exhibit 18, a video, was played.)

16:35:49    8   BY MR. SWAIM:

16:35:50    9   Q.  And, Mr. Burnikel, are those two videos that you took on

16:35:54   10   your cell phone?

16:35:55   11   A.  Yes.

16:35:57   12              MR. SWAIM:  And for the record, Your Honor, those were

16:35:59   13   Exhibits 17 and 18.

16:36:00   14              THE COURT:  Thank you.

16:36:02   15              MR. SWAIM:  No further questions.

16:36:03   16              THE COURT:  Recross limited to redirect?

16:36:14   17              You don't have to use it.

16:36:16   18              MR. HARALDSON:  Yeah.  If -- Justin, if you could play

16:36:19   19   the first video again, and I'm just going to ask you to pause it

16:36:23   20   at one point.

16:36:32   21              So, Mr. Burnikel, if you could just watch that.

16:36:36   22              THE COURT:  And for the record, this is 17?

16:36:38   23              MR. SWAIM:  Correct, Your Honor.

16:36:40   24              (Plaintiff's Exhibit 17 was played.)

16:36:48   25              MR. HARALDSON:  I'm not going to ask you about this

16:36:52   1   part.

16:36:52   2            If you could stop it right there, Justin.  There you

16:36:57   3   go.

16:36:57   4                    RECROSS-EXAMINATION

16:36:57   5   BY MR. HARALDSON:

16:36:58   6   Q.  All right.  So, Mr. Burnikel, that is -- would you agree

16:37:03   7   that that's sort of the end point where the handcuffs are being

16:37:07   8   placed on Dustin Burnikel?

16:37:11   9   A.  Yes.

16:37:13   10            MR. HARALDSON:  Okay.  If you could play it a little

16:37:15   11   bit further.

16:37:15   12            (Plaintiff's Exhibit 17 was continued to be played.)

16:37:15   13            MR. HARALDSON:  Stop.

16:37:15   14   BY MR. HARALDSON:

16:37:22   15   Q.  We just saw what looked to me like a patch on the shoulder.

16:37:28   16   Did you see that?

16:37:29   17            MR. HARALDSON:  If you could play it a little further,

16:37:30   18   I think it will show up again.

16:37:36   19            (Plaintiff's Exhibit 17 continued to be played.)

16:37:36   20            MR. HARALDSON:  Stop.

16:37:47   21   BY MR. HARALDSON:

16:37:47   22   Q.  All right.  Do you see that patch on the right arm?

16:37:49   23   A.  Yes.

16:37:50   24   Q.  Would you agree that that's a patch?

16:37:51   25   A.  It's a patch.

16:37:52     1   Q.  Would you agree it looks a lot like that patch (indicating)?

16:37:57     2   A.  I can't with this video.  It's a patch, yes.

16:38:02     3   Q.  But based on your recollection, you don't remember whether

16:38:05     4   the officers had patches on their shoulders that night?

16:38:08     5   A.  I said they were dressed in black, and they weren't

16:38:11     6   obviously dressed as they are today.

16:38:14     7   Q.  They weren't dressed as they are today?

16:38:17     8   A.  They didn't have no badge on or equipment belts or --

16:38:33     9   Q.  What -- at what point -- has the situation already -- you

16:38:38    10   say from this video it's your recollection Dustin never -- his

16:38:42    11   face never hits the ground after they pick him up; right?

16:38:45    12   A.  Not on the video here it doesn't.

16:38:47    13   Q.  And they never -- after he was in handcuffs -- and this is

16:38:51    14   the full moment that you recorded, from your recollection, for

16:38:56    15   the time he was put in handcuffs until the end of this video

16:38:59    16   where he's walking on two feet with the assistance of the

16:39:02    17   officers; right?

16:39:02    18   A.  That's my video, yes.

16:39:05    19   Q.  Okay.  There's no -- there's nothing we're seeing in the

16:39:09    20   video here that you recall, outside of the video, where

16:39:13    21   Mr. Burnikel in handcuffs was dropped on his face by the

16:39:15    22   officers; right?

16:39:17    23   A.  He was in handcuffs prior to this part of the video, yes.

16:39:24    24   Q.  Well, I just asked you a few moments ago whether what we're

16:39:28    25   seeing at the very beginning, once it's in focus a little bit,

16:39:32   1   was the end point where he was finally put in handcuffs, and I

16:39:35   2   believe your testimony was correct.  Are you changing that

16:39:38   3   testimony?

16:39:43   4   A.  Ask that -- I don't know what you're really trying to ask

16:39:46   5   here.

16:39:47   6   Q.  All right.  All I'm asking is, did you videotape the point

16:39:50   7   where Dustin is finally put in handcuffs to where he's walked to

16:39:54   8   the van?  That's what this 42-second video captures; right?

16:39:59   9   A.  Yes.  I took this video.  But do you believe he was

16:40:05   10  handcuffed prior to this video?

16:40:07   11  Q.  No.  I'm just asking -- that's actually the opposite of what

16:40:11   12  I'm asking.

16:40:12   13  A.  Okay.

16:40:12   14  Q.  He was -- this was the point -- you videoed the point where

16:40:16   15  he was finally put in handcuffs; right?

16:40:18   16  A.  Yes, he's in handcuffs.

16:40:19   17  Q.  He wasn't in handcuffs before the moment that you captured

16:40:23   18  it on video?

16:40:24   19  A.  That's what I'm trying to ask you, if you think he was

16:40:28   20  handcuffed on video or --

16:40:30   21          THE COURT:  Mr. Burnikel, one of the roles of the

16:40:35   22  witnesses is to provide the facts.  The role of the attorneys is

16:40:38   23  to provide the questions.  So the questions that have been posed

16:40:40   24  to you need to be based upon what your knowledge is and what

16:40:44   25  your understanding is, not what Mr. Haraldson thinks the facts

| | | |
|---|---|---|
| 16:40:48 | 1 | are.  So the question that he posed to you was, was he |
| 16:40:52 | 2 | handcuffed before you started recording. |
| 16:40:55 | 3 | Do you understand that question? |
| 16:40:57 | 4 | THE WITNESS:  Yes. |
| 16:40:57 | 5 | THE COURT:  And do you have an answer to that |
| 16:40:59 | 6 | question? |
| 16:40:59 | 7 | THE WITNESS:  Yes.  Sorry, Your Honor, for that. |
| 16:41:02 | 8 | THE COURT:  And your answer is? |
| 16:41:04 | 9 | THE WITNESS:  Yes. |
| 16:41:07 | 10 | THE COURT:  Okay. |
| 16:41:07 | 11 | BY MR. HARALDSON: |
| 16:41:08 | 12 | Q.  He was handcuffed prior to the beginning of this video? |
| 16:41:10 | 13 | A.  That's the way I see the video as. |
| 16:41:13 | 14 | Q.  Okay.  Was he ever moved around by the officers in the |
| 16:41:18 | 15 | handcuffs before this video? |
| 16:41:26 | 16 | A.  I can't recall that. |
| 16:41:27 | 17 | Q.  And just going back to your previous testimony, you don't |
| 16:41:31 | 18 | recall him ever being dropped on his face -- |
| 16:41:34 | 19 | MR. SWAIM:  Your Honor, this is beyond -- |
| 16:41:36 | 20 | BY MR. HARALDSON: |
| 16:41:36 | 21 | Q.  -- by the officers? |
| 16:41:37 | 22 | MR. SWAIM:  This is beyond the redirect. |
| 16:41:39 | 23 | THE COURT:  Well, you played the video, so -- I mean, |
| 16:41:42 | 24 | you played it during your redirect, which allows for this.  But |
| 16:41:45 | 25 | I do think that we've well covered this ground, Counsel. |

16:41:49   1              MR. HARALDSON:  Okay.

16:41:59   2   BY MR. HARALDSON:

16:41:59   3   Q.  Just to make it short, the answer is no, he had not been

16:42:02   4   dropped?  He was never dropped on his face while in handcuffs,

16:42:05   5   correct, that you saw?

16:42:10   6   A.  Not that I saw.

16:42:12   7              MR. HARALDSON:  Thank you.

16:42:12   8              That's all I have.

16:42:13   9              MR. SWAIM:  Nothing further, Your Honor.

16:42:15   10             THE COURT:  Thank you.

16:42:15   11             Mr. Burnikel, you may step down.

16:42:17   12             THE WITNESS:  Thank you.

16:42:17   13             THE COURT:  Members of the jury, it is 4:42.  I told

16:42:20   14  you at the beginning of the day that typically we end at 4:30.

16:42:23   15  As you saw until -- I don't want to break testimony in the

16:42:28   16  middle if there's only a few minutes left --

16:42:30   17             You may be excused, sir.

16:42:32   18                                    (Witness excused.)

16:42:32   19             THE COURT:  And so this is what you can expect.  We

16:42:34   20  will generally stop between 4:30 and 5 o'clock, but the Court

16:42:38   21  will allow the testimony to come in so that we can use

16:42:42   22  everybody's time efficiently.

16:42:45   23             I want to talk with you a little bit about what's

16:42:45   24  going to happen now.  You're going to go home and your friends,

16:42:48   25  your family members, your co-workers will call you or post

16:42:51   1   something on whatever social media you use, and they might ask

16:42:55   2   you what you've done today.  You might be tempted to say, I'm in

16:42:59   3   a jury trial, I'm a juror, it's really cool, I'm enjoying

16:43:03   4   hearing about this.  You cannot do that.  You cannot do that

16:43:09   5   because that post may elicit responses from other people that

16:43:12   6   would infect the process of a fair and impartial jury trial.

16:43:17   7           You can tell your family members or loved ones that

16:43:20   8   you are -- you've been selected to serve on a jury and that the

16:43:24   9   jury trial is expected to go between five and seven days, not on

16:43:27   10  Thanksgiving Day and the day after Thanksgiving, in case anyone

16:43:31   11  is concerned about that.  But you really can't say anything

16:43:34   12  more.  You can't talk about the allegations.  You can't talk

16:43:36   13  about the parties.  You can't talk about the judge.  You can't

16:43:39   14  talk about the attorneys.  And when I say "talk," I mean post,

16:43:46   15  Tweet.  I don't know what there is out there, but whatever it is

16:43:49   16  that you do, you can't.  And that's to make sure that everyone

16:43:54   17  involved in this trial has a fair trial based upon the evidence

16:43:59   18  presented in court and the instructions of the Court.

16:44:01   19          Now, if someone pushes back on you and says, tell me

16:44:05   20  something about this, you're a juror, you need to blame me and

16:44:09   21  you need to say that the Court told me that I could not do this

16:44:14   22  and that I would get in trouble if I did, and that is true.

16:44:19   23  After the end of trial, you will be able to tell people about

16:44:23   24  your experience, but you cannot at this point.

16:44:26   25          The reason why I have said this repeatedly today is

16:44:29    1    because in our current day and age, people don't do anything

16:44:33    2    without Instagramming it or Facebooking it or posting it on your

16:44:39    3    family blog.  And this is something you cannot do, and the

16:44:45    4    reason why I have repeated it and the reason why I'm repeating

16:44:48    5    it here at the end of the day is so that you understand just how

16:44:52    6    important it is.

16:44:52    7            I will ask you all to be here tomorrow between 8:30

16:44:55    8    and 8:45.  We'll get started as soon as we can.  Again, between

16:45:00    9    8:45 and 9 o'clock in the morning.

16:45:01   10            Please continue to remember the admonition of the

16:45:04   11    Court.  I'll ask you to confirm with Ms. Berg who you are and

16:45:07   12    where you're sitting so that we have an accurate record of where

16:45:10   13    everyone is, and you can leave your notebooks on your chairs.

16:45:14   14            Thank you very much for your service.  We'll see you

16:45:16   15    tomorrow morning.

16:45:17   16            We'll be in recess.

16:45:18   17            (In open court, out of the presence of the jury.)

16:45:49   18            THE COURT:  Please be seated.

16:45:50   19            Anything on behalf of the plaintiff before we stop for

16:45:53   20    the day?

16:45:53   21            MR. KHAZAELI:  The only thing, Your Honor, is we don't

16:45:56   22    have any intention on calling back Mr. Darrick Burnikel or

16:46:03   23    Ms. Hunemiller.  Considering how far away they live, we would

16:46:06   24    like the Court's permission to release them.

16:46:08   25            THE COURT:  Mr. Haraldson, any objection to releasing

| | | |
|---|---|---|
| 16:46:10 | 1 | those witnesses? |
| 16:46:11 | 2 | MR. HARALDSON:  I don't plan on calling them, so no. |
| 16:46:13 | 3 | THE COURT:  Okay.  Thank you.  Then they can be |
| 16:46:14 | 4 | released. |
| 16:46:15 | 5 | MR. KHAZAELI:  Thank you, Your Honor. |
| 16:46:16 | 6 | THE COURT:  Anything further on behalf of the |
| 16:46:18 | 7 | defendants? |
| 16:46:18 | 8 | MR. HARALDSON:  No, Your Honor. |
| 16:46:19 | 9 | THE COURT:  So, some of my colleagues have recently |
| 16:46:23 | 10 | been experimenting with putting attorneys on a clock.  That |
| 16:46:27 | 11 | means that we say to you how much time do you need and then we |
| 16:46:30 | 12 | keep you to that.  It has been my colleagues' experiences that |
| 16:46:34 | 13 | this has resulted in very efficient presentation of evidence.  I |
| 16:46:42 | 14 | am not doing that right now.  I want you all to be aware that |
| 16:46:46 | 15 | that has been the practice in some of my colleagues' cases in |
| 16:46:50 | 16 | the Southern District of Iowa, and that is something that I will |
| 16:46:53 | 17 | consider doing if people are not thoughtful in the manner in |
| 16:46:57 | 18 | which they present their evidence, whether it be direct or |
| 16:47:00 | 19 | cross-examination. |
| 16:47:01 | 20 | You all are good attorneys.  You all know how to try a |
| 16:47:05 | 21 | case.  Please do so in a way that uses everyone's time wisely, |
| 16:47:09 | 22 | particularly in light of the fact that we're sandwiched between |
| 16:47:11 | 23 | two holidays and we need to make sure that we're thoughtful |
| 16:47:15 | 24 | about people's time. |
| 16:47:16 | 25 | Do you anticipate having a full day of witnesses |

| | | |
|---|---|---|
| 16:47:20 | 1 | tomorrow, Counsel? |
| 16:47:22 | 2 | MR. KHAZAELI:  Yes, Your Honor. |
| 16:47:23 | 3 | THE COURT:  And as I've explained to you before, along |
| 16:47:26 | 4 | the same vein of being efficient, you need to be sure that you |
| 16:47:30 | 5 | have witnesses here and ready to go so we don't have any |
| 16:47:32 | 6 | unexpected downtime. |
| 16:47:34 | 7 | MR. KHAZAELI:  Yes, Your Honor.  We're communicating |
| 16:47:39 | 8 | with them. |
| 16:47:40 | 9 | THE COURT:  Thank you. |
| 16:47:41 | 10 | Anything else we need to address?  I'm sorry about the |
| 16:47:44 | 11 | technical issues.  It appears to be an issue with the connection |
| 16:47:47 | 12 | with your computer.  That seems to be resolved. |
| 16:47:50 | 13 | MR. KHAZAELI:  Yes, Your Honor.  Luckily your IT staff |
| 16:47:52 | 14 | had other options or we went old school, to the old school plugs |
| 16:47:58 | 15 | because the new advanced one is loose and broken on the panel; |
| 16:48:02 | 16 | but it seems to be working. |
| 16:48:03 | 17 | THE COURT:  Okay.  Great. |
| 16:48:05 | 18 | Anything else before we break for the day? |
| 16:48:08 | 19 | MR. HARALDSON:  Not from the defendants, Your Honor. |
| 16:48:09 | 20 | MR. KHAZAELI:  No. |
| 16:48:10 | 21 | THE COURT:  Okay.  I'll expect you all to be here at |
| 16:48:12 | 22 | 8:30.  I'll expect you to bring anything to my attention that |
| 16:48:15 | 23 | you need to bring to my attention at that time.  If there's |
| 16:48:17 | 24 | nothing that we need to do, we'll get started with the jury as |
| 16:48:20 | 25 | soon as we can. |

16:48:20    1              Thank you.  We'll be in recess.

16:48:22    2                  (Recess at 4:48 p.m. until 8:30 a.m., Wednesday,

16:48:37    3   November 14, 2018.)

            4

            5

            6

            7

            8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25